# 23-303

## United States Court of Appeals for the Second Circuit

Benzor Shem Vidal,
*Plaintiff-Appellee,*

v.

Advanced Care Staffing, LLC,
Defendant-Appellant.

**On Appeal from the United States District Court
for the Eastern District of New York, No. 1:22-cv-05535-NRM-MMH**

———————————

**BRIEF OF DEFENDANT-APPELLANT
ADVANCED CARE STAFFING LLC AND SPECIAL APPENDIX**

———————————

PROLOY K. DAS
SAMI ASAAD
CRAIG THOMAS DICKINSON
FORDHARRISON LLP
CityPlace II
185 Asylum Street, Suite 820
Hartford, CT 06103
(860)740-1355
pdas@fordharrison.com
sasaad@fordharrison.com
cdickinson@fordharrison.com

*Counsel for Defendant-Appellant*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Plaintiff-Appellant has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

## <u>TABLE OF CONTENTS</u>

CORPORATE DISCLOSURE STATEMENT ......................................................i

TABLE OF AUTHORITIES .................................................................... iii

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF ISSUE.......................................................................1

STATUTORY ADDENDUM ..................................................................1

STATEMENT OF THE CASE.................................................................1

I.      PROCEDURAL HISTORY ...........................................................3

II.     FACTUAL BACKGROUND...........................................................7

        A.      Plaintiff's Employment with Defendant .............................7

        B.      Initiation of Arbitration .....................................................14

SUMMARY OF THE ARGUMENT .......................................................17

ARGUMENT ......................................................................................18

I.      THE DISTRICT COURT ERRED IN REFUSING TO COMPEL
        ARBITRATION ...........................................................................18

        A.      Standard of Review ...........................................................18

        B.      There is No Question That the Parties Agreed to Arbitrate Breach of
                Contract Claims.................................................................18

        C.      The Parties Clearly and Unmistakably Delegated All Questions of
                Arbitrability to the Arbitrator...........................................23

        D.      The District Court Incorrectly Treated Plaintiff's General Contract
                Defenses as an Attack on the Delegation Provision ...........................27

i

E.    There is No Unconscionability in the Delegation Provision of the Revised DRP or Otherwise ...................................................30

    1.    The Delegation Provision Is Not Procedurally Unconscionable.........................................................31

    2.    The Delegation Clause Is Not Substantively Unconscionable.........................................................33

        a.    The fee shifting provisions are not unconscionable .......34

        b.    Wage and Hour laws do not bar enforcement of the arbitration agreement ......................................................35

        c.    The District Court Erred In Concluding that the fee shifting provision could not be severed..........................36

II.    THE PLAINTIFF WAS NOT ENTITLED TO A PRELIMINARY INJUNCTION ...................................................................37

    A.    Standard of Review ...........................................................37

    B.    The plaintiff did not establish irreparable harm.................................39

    C.    Plaintiff did not show a likelihood of success on the merits..............41

    D.    The Balance of Equities Favor the Defendant ...................................46

    E.    The Public Interest Analysis Favors The Defendant .........................47

CONCLUSION .....................................................................................50

CERTIFICATE OF COMPLIANCE.......................................................51

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adia v. Grandeur Mgmt., Inc.*,
   933 F.3d 89 (2d Cir. 2019) ................................................................. 44, 45

*Aguirre v. Best Care Agency, Inc.*,
   961 F. Supp. 2d 427 (E.D.N.Y. 2013) .....................................................45

*Alleyne v. New York State Educ. Dep't*,
   516 F.3d 96 (2d Cir. 2008) .............................................................. 38, 39

*Arciniaga v. General Motors Corp.*,
   460 F.3d 231 (2d Cir. 2006) ..................................................................18

*Arrigo v. Blue Fish Commodities, Inc.*,
   408 F. App'x 480 (2d Cir. 2011) ...................................................... 28, 29

*AT&T Mobility, LLC v. Concepcion*,
   563 U.S. 333 (2011) ..............................................................................2

*AT&T Technologies v. Communications Workers of America*,
   475 U.S. 643 (1986) ...................................................................... 21, 22

*Badinelli v. Tuxedo Club*,
   183 F. Supp. 3d 450 (S.D.N.Y. 2016) ....................................................20

*Baldia v. RN Express Staffing Registry LLC*,
   2022 WL 4777836 (S.D.N.Y. Oct. 3, 2022) ...........................................44

*Borey v. National Union Fire Ins.*,
   934 F.2d 30 (2d Cir. 1991) ................................................................. 38

*Broadcast Arts Productions, Inc. v. Screen Actors Guild, Inc.*,
   673 F. Supp. 701 (S.D.N.Y. 1987) ...................................................... 20

*Coca Cola Co. v. Tropicana Prods. Inc.*,
   690 F.2d 312 (2d Cir. 1982) ................................................................38

*Coinbase, Inc. v. Bielski*,
  No. 22-105, 2023 WL 4138983 (U.S. June 23, 2023) ........................................41

*Collins & Aikman Prods. Co. v. Building Sys.*,
  58 F.3d 16 (2d Cir. 1995) ...................................................................... 21, 22

*Daly v. Citigroup Inc.*,
  939 F.3d 415 (2d Cir. 2019) ................................................................. 20, 48

*DDK Hotels, LLC v. Williams-Sonoma, Inc.*,
  6 F.4th 308 (2d Cir. 2021) .................................................................... 23, 24

*Dean Witter Reynolds, Inc. v. Byrd*,
  470 U.S. 213 (1985) .............................................................................. 20, 49

*Desiderio v. National Ass'n of Sec. Dealers, Inc.*,
  191 F.3d 198 (2d Cir. 1999) ...........................................................................32

*Dixon v. Dollar Tree Stores, Inc.*,
  No. 22-CV-131S, 2023 WL 2388504 (W.D.N.Y. Mar. 7, 2023) ......................26

*Emery Air Freight Corp. v. Local Union 295*,
  786 F.2d 93 (2d Cir. 1986) ...........................................................................40

*Epic Systems Corp. v. Lewis*,
  138 S. Ct. 1612, 200 L. Ed. 2d 889 (2018) .....................................................2, 49

*Equal Employment Opportunity Commission v. Waffle House, Inc.*,
  534 U.S. 279 (2002) ......................................................................................20

*Eyewonder, Inv. v. Abraham*,
  No. 08 CV 3579 (GBD), 2010 WL 3528882 (S.D.N.Y. Sept. 3, 2010) .............35

*Forest City Daly Housing, Inc. v. Town of Northhampstead*,
  175 F.3d 144 (2d Cir. 1999) ...........................................................................38

*General Textile Printing & Processing Corp. v. Expromtorg International Corp.*,
  862 F. Supp. 1070 (S.D.N.Y. 1994) ........................................................ 37, 38

*Gilbert v. Indeed, Inc.*,
    513 F. Supp. 3d 374 (S.D.N.Y. 2021) ........................................................... 48, 50

*Gilmer v. Interstate/Johnson Lane Corp.*,
    500 U.S. 20 (1991) ................................................................................................2

*Gingras v. Think Fin., Inc.*,
    922 F.3d 112 (2d Cir. 2019) .................................................................................29

*Graphic Communications Union, Chicago Paper Handlers' & Electrotypers'*
    *Local No. 2 v. Chicago Tribune Co.*, 779 F.2d 13 (7th Cir. 1985) ............... 40, 41

*Holick v. Cellular Sales of New York, LLC*,
    802 F.3d 391 (2d Cir. 2015) .................................................................................19

*Ipcon Collections LLC v. Costco Wholesale Corp.*,
    698 F.3d 58 (2d Cir. 2012) ...................................................................................28

*Isaacs v. OCE Bus. Servs., Inc.*,
    968 F. Supp. 2d 564 (S.D.N.Y. 2013) ..................................................................32

*Jung v. Skadden, Arps, Slate, Meagher & Flom, LLP*,
    434 F.Supp.2d 211 (S.D.N.Y. 2006) ....................................................................20

*LAIF X SPRL v. Axtel, S.A. de C.V.*,
    390 F.3d 194 (2d Cir.2004) ..................................................................................18

*Latif v. Morgan Stanley & Co. LLC*,
    2019 WL 2610985 (S.D.N.Y. June 26, 2019)......................................................49

*Magtoles v. United Staffing Registry, Inc.*,
    2021 WL 6197063 (E.D.N.Y. Dec. 30, 2021).......................................................46

*Maity v. Tata Consultancy Servs., Ltd.*,
    2021 WL 6135939 (D.N.J. Dec. 29, 2021) ..................................................... 32, 33

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
    514 U.S. 52 (1995) ...............................................................................................20

v

*Mastrovincenzo v. City of New York*,
435 F.3d 78 (2d Cir.2006) ...................................................................39

*Med. Shoppe Ina, Inc. v. Mitsopoulos*,
2006 WL 8438209 (E.D.N.Y. May 5, 2006), *report and recommendation adopted*, 2006 WL 8438198 (E.D.N.Y. May 12, 2006)......................................40

*Mehler v. Terminix Int'l Co.*,
205 F.3d 44 (2d Cir. 2000), *cert. denied*, 533 U.S. 911 (2001) .................... 21, 22

*Moore v. T-Mobile USA, Inc.*,
10 CV 527 (SLT), 2010 U.S. Dist. LEXIS 143874 (E.D.N.Y. Nov. 8, 2010).....24

*Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*,
460 U.S. 1 (1983) ................................................................. 2, 21, 22

*Nayal v. HIP Network Servs. IPA, Inc.*,
620 F.Supp.2d 566 (S.D.N.Y. 2009) ............................................. 31, 33

*NetJets Aviation, Inc. v. LHC Commc'ns, LLC*,
537 F.3d 168 (2d Cir. 2008) ...............................................................34

*Oldroyd v. Elmira Savings Bank, FSB*,
134 F.3d 72 (2d Cir. 1998) ........................................................... 21, 22

*Oneida Nation of New York v. Cuomo*,
645 F.3d 154 (2d Cir. 2011) ...............................................................39

*Paguirigan v. Prompt Nursing Emp. Agency LLC*,
2019 WL 4647648 (E.D.N.Y. Sept. 24, 2019)....................................................45

*Panwar v. Access Therapies, Inc.*,
2015 WL 1396599 (S.D. Ind. Mar. 25, 2015)..................................... 43, 44

*Parisi v. Goldman, Sachs & Co.*,
710 F.3d 483 (2d Cir. 2013) ...............................................................18

*Park v. FDM Grp., Inc.*,
2018 WL 4100524 (S.D.N.Y. Aug. 28, 2018). ...................................................35

*Polymer Technology Corp. v. Mimran*,
   37 F.3d 74 (2d Cir. 1994) ....................................................38

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
   388 U.S. 395 (1967) ...........................................................28

*Rent-A-Center, West, Inc. v. Jackson*,
   561 U.S. 63, 130 S.Ct. 2772 (2010) ........................................ *passim*

*Reuters, Ltd. v. United Press International, Inc.*,
   903 F.2d 904 (2d Cir. 1990) .......................................... 39, 40

*Rodriguez v. DeBuono*,
   162 F.3d 56 (2d Cir. 1998) ..................................................38

*Saizhang Guan v. Uber Techs., Inc.*,
   236 F. Supp. 3d 711 (E.D.N.Y. 2017)................................ 34, 36

*Schiavone Construction Co. v. New York City Transit Authority*,
   593 F. Supp. 1257 (S.D.N.Y. 1984) ......................................38

*Smith v. AHS Oklahoma Heart, LLC*,
   No. 11-CV-691-TCK-FHM, 2012 WL 3156877 (N.D. Okla. Aug. 3, 2012)..... 37

*Southland Corp. v. Keating*,
   465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984) ......................... 48, 50

*Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co.*,
   263 F.3d 26 (2d Cir. 2001) ..................................................28

*Suqin Zhu v. Hakkasan NYC LLC*,
   291 F. Supp. 3d 378 (S.D.N.Y. 2017) .....................................32

*United Bhd. of Carpenters & Joiners of Am. v. Tappan Zee Constructors, LLC*,
   804 F.3d 270 (2d Cir. 2015) ................................................20

*United States v. Dann*,
   652 F.3d 1160 (9th Cir. 2011) ......................................... 42, 43

vii

*United States v. Toviave*,
  761 F.3d 623 (6th Cir. 2014) ...............................................................43

*Valle v. ATM Nat., LLC*,
  2015 WL 413449 (S.D.N.Y. Jan. 30, 2015) ........................................37

*Vittoria Corp. v. New York Hotel & Motel Trades Council, AFL-CIO*,
  30 F. Supp. 2d 431 (S.D.N.Y. 1998) ...................................................20

*White v. We Work Cos., Inc.*,
  2020 WL 3099969 (S.D.N.Y. June 11, 2020) ......................................48

*Woodlawn Cemetery v. Loc. 365, Cemetery Workers & Greens Attendants Union*,
  1990 WL 150472 (S.D.N.Y. Oct. 2, 1990), *affd*,
  930 F.2d 154 (2d Cir. 1991) ................................................................40

*WorldCrisa Corp. v. Armstrong*,
  129 F.3d 71 (2d Cir. 1997) ..................................................................22

**Statutes**

18 U.S.C. § 1589 ...................................................................................42

18 U.S.C. § 1589(c)(1) ..........................................................................43

28 U.S.C. § 1292 .....................................................................................1

28 U.S.C. § 1292(a)(1) ............................................................................1

28 U.S.C. § 1331 .....................................................................................1

28 U.S.C. § 2201 ..................................................................................1, 5

9 U.S.C. § 1 et seq. .................................................................................2

9 U.S.C. § 2 ........................................................................................1, 48

9 U.S.C. § 4 ...........................................................................................20

9 U.S.C. § 16(a)(1)(B) ........................................................................1, 6

9 U.S.C. § 16(a)(1)(C) ................................................................18

9 U.S.C. § 16(a)(2) ............................................................. 1, 6, 18

**Other Authorities**

NY Attorney General Investigation of Albany Med Health System,
  https://ag.ny.gov/sites/default/files/albany med and no. 22-058 - fully_executed
  9.13.22.pdf ..............................................................................46

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction pursuant to the Federal Arbitration Act; 9 U.S.C. § 2; and the Declaratory Judgment Act; 28 U.S.C. § 2201. Jurisdiction was also proper because the case presents a question of federal law, as required by 28 U.S.C. § 1331. This Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1), 9 U.S.C. § 16(a)(1)(B) and 9 U.S.C. § 16(a)(2) because this appeal is from the order of the District Court granting the Plaintiff's motion for a preliminary injunction and denying the Defendant's motion to compel arbitration. Venue is proper pursuant to 28 U.S.C. § 1292 because this appeal is from a decision of the United States District Court for the Eastern District of New York. This appeal was timely filed on March 7, 2023, within 30 days of the District Court's February 24, 2023 order.

## STATEMENT OF ISSUE

Whether the District Court properly enjoined a pending arbitration and denied a motion to compel that arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 16(a)(1)(B) and/or 9 U.S.C. § 16(a)(2).

## STATUTORY PROVISIONS

Relevant statutes are produced in the Special Appendix (SPA-56-57).

## STATEMENT OF THE CASE

This case is about the enforceability of an arbitration agreement. The District Court (*Morrison, J.*) erroneously found that the Plaintiff's broad challenge to the

1

enforceability of an agreement to arbitrate, as well as the employment contract in which it is found, should be decided by the Court, rather than an arbitrator, in direct contravention of the United States Supreme Court's holding in *Rent-a-Center v. Jackson,* 130 S.Ct. 2772 (2010). The Supreme Court has recognized repeatedly that, in enacting the Federal Arbitration Act ("FAA"); 9 U.S.C. § 1 et seq.; Congress intended to establish a liberal policy favoring arbitration when the parties contract for that mode of dispute resolution. *See, e.g.*, *AT&T Mobility, LLC v. Concepcion,* 563 U.S. 333, 337 (2011); see also *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S.* 1, 24 (1983) (referring to the "liberal federal policy favoring arbitration"). Further, the policy favoring arbitration extends and applies to arbitration agreements between employers and employees. *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26-27 (1991); *Epic Systems Corp. v. Lewis,* 138 S. Ct. 1612, 1619, 200 L. Ed. 2d 889 (2018). Even though the District Court acknowledged this, and other well-settled Supreme Court precedent, it still deviated from these principles and refused to compel arbitration, instead enjoining a pending arbitration. Mem. Dec. at 12-13. The relevant facts of this case do not provide any reasonable basis for the District Court to have deviated from Supreme Court precedent in the application of the FAA and, therefore, a vacatur of the preliminary injunction and an order compelling arbitration is required.

## I.     PROCEDURAL HISTORY

The plaintiff here, Benzor Vidal ("Mr. Vidal" or "Plaintiff"), is a registered professional nurse from the Philippines. In order to access the more lucrative labor market for nurses in the United States, Vidal entered into an Employment Agreement with Defendant Advanced Care Staffing, LLC ("ACS") on May 7, 2019 (the "Original Agreement"). Pursuant to the Original Agreement, Vidal agreed to provide nursing services for ACS's clients for a period of three years. In consideration for Mr. Vidal's services, ACS agreed to sponsor him for an employment-based immigrant visa, and provide several other forms of support and compensation. Upon honoring that 3-year term of the agreement, Vidal would have been free to negotiate a new agreement with ACS or enter the labor market to work wherever he chose. The Original Agreement included an agreement to arbitrate all disputes arising out of the agreement.

The process for Mr. Vidal to secure his Green Card took more than two years. On January 4, 2022, well in advance of him commencing actual employment, ACS sent Mr. Vidal an Amended and Restated Employment Agreement ("Amended Agreement") and other materials. The Amended Agreement reiterates that in exchange for a three-year work commitment ACS would provide assistance securing a visa and other consideration. Critical here, the Amended Agreement incorporates a revised Dispute Resolution Provision ("Revised DRP"), which states:

3

> I agree that any dispute, controversy or claim arising between me and Employer (including a dispute, controversy or claim arising out of, in connection with or relating to, this Agreement, or the interpretation, performance or breach, termination or validity hereof) shall be resolved by arbitration pursuant to this dispute resolution provision (the "Provision"). This includes, but is not limited to, claims involving an alleged violation of public policy; all statutory claims for discrimination and/or harassment and/or retaliation under federal, state, or local law; and claims concerning wages or other compensation, whether based on statute or any other grounds. . . .

Although under no compulsion to do so, Vidal returned a fully executed revised Amended Agreement to ACS the same day he received it. He began working for ACS three months later, on March 8, 2022. As a result, the three-year work term set forth in the Agreement would expire on March 7, 2025. After only three months of work, however, Vidal tendered his resignation to ACS by email dated June 15, 2022, effective on June 29, 2022. In response to his resignation, ACS reminded Vidal in correspondence to him that he had signed an agreement to work for a term of three years and asked that he reconsider his resignation. Having refused to reconsider, Vidal's last day of work for ACS was June 29, 2022. Pursuant to the Amended Agreement, ACS then initiated arbitration by filing a Demand for Arbitration with the American Arbitration Association ("AAA) containing a single claim for breach of contract.

On September 16, 2022, Vidal filed the complaint in the EDNY initiating the litigation underlying this appeal, *Vidal v. Advanced Care Staffing, LLC*, 1:22-cv-05535 ("Complaint"). The Complaint sought a "declaratory judgment under the

4

Declaratory Judgment Act, 28 U.S.C. § 2201, that the arbitration provision Advanced Care Staffing seeks to enforce against him (the "Arbitration Provision") is illegal and unenforceable." On October 24, 2022, Arbitrator Kula sent the parties an order finding, among other things, that:

> Pursuant to the Parties' Dispute Resolution Provision and AAA's rules, as the Arbitrator in this matter, I have the authority to rule on my own jurisdiction, including with respect to the validity of the arbitration agreement or the arbitrability of any claim. Many of the arguments made by Respondent are premature and do not support the issuance of a stay. Respondent shall have the opportunity during the course of the arbitration to argue that the contract at issue is unenforceable, in whole or in part, and to assert counter-claims concerning the Claimant's alleged unlawful conduct.

Mr. Vidal made several attempts to convince the AAA to stay the arbitration, none of which were successful. By order dated December 9, 2022, the Arbitrator denied Mr. Vidal's request for a stay explaining that "[n]either Respondent's initial or supplemental submission provided sufficient factual or legal support for the argument that the arbitration agreement is unconscionable...." Moreover, Arbitrator Kula held that: "Based on those submissions and the facts related to the execution of the parties' Arbitration Agreement, the Arbitrator will apply AAA's Employment Arbitration Rules."

On January 23, 2023, Mr. Vidal filed a motion for preliminary injunction in the declaratory judgment action that had been pending in the EDNY. ACS filed its opposition to that motion on February 8, 2023. The Court heard oral argument on

February 21, 2023, and on February 24, 2023, the Court issued an Order granting Vidal's motion for a preliminary injunction and enjoining the pending arbitration. The Order also denied ACS's request to move to compel arbitration as moot.

In enjoining the arbitration, Judge Morrison found that Vidal was "likely to succeed on the merits of his claim that the contract does not clearly and unmistakably delegate issues of arbitrability to the arbitrator" and that even if the contract did contain an unambiguous delegation clause, the Court could "still consider whether the clause itself violates state or federal laws protecting the rights of persons like Vidal"; Mem. Dec. at 21; and that Vidal was likely to prevail on such claims as well. The District Court further held that Vidal would suffer irreparable harm if forced to arbitrate because he would "be forced to expend time and substantial resources seeking to protect his rights in arbitration," that the balance of harms weighed in Vidal's favor for the same reason, and that granting a preliminary injunction furthered the public interest because of the New York Attorney General's purported interest in this case. Mem. Dec. at 49. Each of these determinations was erroneous.

Accordingly, the instant interlocutory appeal seeks review of the Court's order enjoining the pending arbitration and denying ACS' motion to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 16(a)(1)(B) and/or 9 U.S.C. § 16(a)(2).

## II.   FACTUAL BACKGROUND

### A.   <u>Plaintiff's Employment with Defendant</u>

The plaintiff is a Registered Professional Nurse. *(See* Declaration of Maureen Luy ("Luy Decl."), A-227 and A-237). In addition to his nursing credentials, he has a demonstrated proficiency with the English language. (Luy Decl., A-237 and A-239).

In order to access the more lucrative labor market for nurses in the United States, Plaintiff entered into an Employment Agreement with Defendant Advanced Care Staffing, LLC ("ACS") on May 7, 2019 (the "Original Agreement"). (Luy Decl., A-182). Pursuant to the Original Agreement, Mr. Vidal agreed to provide nursing services for ACS's clients at a rate of pay at least as high as that specified by the National Prevailing Wage of the United States Department of Labor. (Luy Decl., A-182). Pursuant to the Original Agreement, ACS also agreed to provide one way air fare, a rent subsidy for 2 months, and a one-month MTA card. (Luy Decl., Ex. A, A-190).

In consideration for Mr. Vidal's services, ACS agreed, *inter alia,* to sponsor Mr. Vidal for an employment-based Immigrant Visa, which allows non-residents to obtain Permanent Residency ("Green Card") status in the United States. (Luy Decl., A-182). In that connection, ACS agreed to pay all costs and legal fees associated with sponsoring Mr. Vidal's visa. (Luy Decl., A-182). Not only did ACS agree to fund Mr. Vidal's immigration process, it also agreed to pay the costs of the licensing and other credentials required in order for Mr. Vidal to legally work as a nurse in the United States. *Id.* In recognition of that investment, the Original Agreement

7

expressly states: "the Employee agrees that the Employer has spent a considerable sum of money in recruiting costs, licensure/certification review and credentialing costs, exam costs, Visa Screen costs, attorney's fees, petition filing costs, flight and/or transportation costs, housing costs, etc. to enable him/her to work with Employer in the United States." (Luy Decl., A-182). In exchange for this lengthy and expensive undertaking by ACS, Mr. Vidal agreed to remain employed by ACS for a period of three years. (Luy Decl., A-182). Upon completion of that 3 year term, Plaintiff would have been free to negotiate a new agreement with ACS or enter the labor market to work where he felt best suited his needs.

The Original Agreement also included a broad agreement to arbitrate all disputes arising out of the Employment Agreement. (Luy Decl., A-182). Although Mr. Vidal signed the Original Agreement on May 7, 2019, the process for him to secure his Green Card took over two years. During that process, ACS assisted him with completing and submitting a visa application, amongst other things. In that submission, the parties make clear:

- Plaintiff will be employed full time as a registered nurse earning the prevailing wage of $68,058 per year. (Luy Decl., A-251);
- Plaintiff can read and understand English (Doc. No. 23-3); and, *inter alia,*
- Plaintiff has a Bachelor's degree in Nursing (Luy Decl., A-237 & A-239);

On January 4, 2022, well in advance of him commencing actual employment, ACS sent Mr. Vidal an email providing him guidance for his upcoming US Embassy Visa Application interview. (Luy Decl., A-191). In addition, the email attached a cover letter (Luy Decl., A-193), a letter waiving a prior promissory note (Luy Decl.,

A-194), an Introductory Guide to Skilled-Nursing Facility (Luy Decl., A-195), a Nurses Quick Guide (Luy Decl., A-196), and an Amended and Restated Employment Agreement ("Amended Agreement") (Luy Decl., Ex. A-227).

The January 4, 2022 cover letter attached to the email explained that ACS had updated their Employment Agreement in accordance with industry best practices and team member feedback. (Luy Decl., A-193). ACS specifically explained that one of the key updates in the Amended Agreement from the Original Agreement was that the new version provides greater clarity of the parties' expectations, obligations, and rights, including that the nursing assignments would be at skilled nursing facilities and nursing homes. (Luy Decl., A-193).

The January 4, 2022 cover letter also explained other updates to the Amended Agreement that are central to the current controversy. First, it explains that the Amended Agreement removed the liquidated damages provision and promissory note that were part of the Original Agreement. The letter further explained, however: "We have tried to be clear from the beginning that ACS is making a significant investment in our nurses, and we only agree to sponsor nurses who are committed to providing services to ACS for a three-year term." (Luy Decl., A-193). With that set forth explicitly, the cover letter further explains that the Amended Agreement would permit ACS to recover any damages that it could prove, which "might be higher or lower" than the amount specified in the Original Agreement. (Luy Decl., A-193).

In addition to the changes summarized in the cover letter, the Amended Agreement reiterates that ACS will pay in accordance with prevailing wage

9

requirements, provide paid time off and other benefits, a one way air fare, a rent subsidy for two months, a gift card for groceries, and a monthly MTA card. (Luy Decl., A-235)). The Amended Agreement also specifies a term of 3 years. (Luy Decl., A-235 9). The Amended Agreement again sets forth the other costs it was advancing on behalf of or reimbursing Plaintiff for, including but not limited to licensing costs, credentialing costs, review course costs, nursing exam costs, and visa screening costs. (Luy Decl., A-235). In that connection, the Amended Agreement also states: "Employee acknowledges that Employer is incurring Advanced Costs upon the express condition that Employee will complete the Term in full. Therefore, Employee shall immediately repay all Advanced Costs in the event that Employee fails to complete the Term for any reason." *Id.*

Finally, the Amended Agreement incorporates a revised Dispute Resolution Provision ("Revised DRP"). (Luy Decl., A-237). Crucially, it states:

> I agree that any dispute, controversy or claim arising between me and Employer (including a dispute, controversy or claim arising out of, in connection with or relating to, this Agreement, or the interpretation, performance or breach, termination or validity hereof) shall be resolved by arbitration pursuant to this dispute resolution provision (the "Provision"). This includes, but is not limited to, claims involving an alleged violation of public policy; all statutory claims for discrimination and/or harassment and/or retaliation under federal, state, or local law; and claims concerning wages or other compensation, whether based on statute or any other grounds. . . .

*Id.* The Revised DRP further explicitly states: "This agreement to arbitrate shall be governed by the Federal Arbitration Act and shall remain in force even after I separate from Employer for any reason." *Id.* The Revised DRP also states that any arbitration "will be administered by the American Arbitration Association ("AAA")

10

...." *Id.* The Revised DRP also explains that, "the employer will initially bear all other filing fees, administrative fees, hearing fees, and arbitrator compensation." *Id.* The Revised DRP also provides that "should there be arbitration proceedings in accordance with this Provision, [Mr. Vidal] would be free to pursue all available substantive or procedural rights or remedies in such arbitration proceedings." *Id.* The Revised DRP expressly provides that Plaintiff understood that "all disputes or claims relating to [his] employment (or termination of employment) will instead be decided by an arbitrator." *Id.*

As part of the January 4, 2022 transmittal, ACS also sent a letter to Plaintiff regarding the Promissory Note that was part of the Original Agreement. (Luy Decl., A-194). Notwithstanding Plaintiff's efforts to mischaracterize that letter before the District Court as somehow confusing or coercive, the opposite is self-evident. Contrary to any assertions of stultifying legalese, the letter states in plain terms that: "ACS Staffing hereby unconditionally waives, cancels, and releases the $20,000 promissory note that you made to ACS Staffing, dated May 8, 2019." (Luy Decl., Ex. A-194). Plaintiff was thus clearly advised that he was free from the obligation set forth in the promissory note.

Also contrary to any claim of confusion or coercion, neither the January 4, 2022 cover letter nor email set forth a deadline by when Mr. Vidal was required to sign the Amended Agreement. (Luy Decl., A-191 and A-193). Instead, the letter

11

concluded by asking Mr. Vidal to contact ACS if he had any questions prior to signing the agreement. (Luy Decl., A-191).

Despite the express invitation to discuss any questions or concerns, Mr. Vidal did not send an email to or call anyone at ACS with any questions regarding the Amended Agreement. (Luy Decl., A-193). Instead, Mr. Vidal returned a fully executed Amended Agreement to ACS ***the same day*** he received it. A-258.

On January 6, 2022, ACS emailed Mr. Vidal an invitation to a call to discuss the Amended Agreement. (Luy Decl., A-251). He responded to that invitation, but did not ask any questions about the Amended Agreement or give any indication that he wished to revoke it. Id. On January 13, 2022, Plaintiff sent another email to ACS regarding his pending work assignment and did not raise any concerns about the Amended Agreement. A-254. Rather than conveying any concerns, Plaintiff made clear he was eager to start work. Mr. Vidal began working for ACS three months later, on March 8, 2022. A-256. As a result, the three-year work term set forth in the Agreement would expire on March 7, 2025. *Id.*

While Plaintiff attempts to portray this assignment as some sort of Dickensian workhouse, it was at an accredited institution and the duties assigned to him were consistent with those any nurse at that facility or similar facilities would be assigned. Also, contrary to any suggestion of involuntary servitude, when Plaintiff arrived in the United States, he requested to work in a different facility from the one to which

12

he was originally assigned, and ACS granted him his desired work assignment. (Luy Decl., A-256). Finally, ACS, actually paid Mr. Vidal more than the prevailing federal wage. (Luy Decl., A-270).

After only three months of his work assignment, part of which was spent on vacation, Mr. Vidal tendered his resignation to ACS by email dated June 15, 2022, effective on June 29, 2022. (Luy Decl., A-258). Contrary to his allegations in this suit, Mr. Vidal never expressed any complaints or dissatisfaction to ACS regarding his assigned work location or any other term or condition of his employment with ACS prior to submitting his resignation. *Id*. Rather than any legitimate concern over his working conditions, Mr. Vidal resigned in order to pursue other opportunities. Indeed, once he received all the front-loaded benefits from ACS — including but not limited to airfare, rent subsidy, grocery money, and crucial immigration and licensing assistance — he ignored his obligations to ACS and "cashed in" by securing a higher paid position. While that was his prerogative, there were agreed upon consequences for pursuing that course of action. Crucially, he acknowledged them in his resignation email. *Id*.

In response to his resignation, ACS reminded Mr. Vidal that he had signed an agreement to work for a term of three years and that he had barely even worked for three months. Id. Mr. Vidal refused to reconsider his resignation. *Id*. ACS thus issued a letter on June 22, 2022, confirming that Plaintiff's resignation was a breach of the

Amended Agreement. (Declaration of Sami Asaad ("Asaad Decl."), A-278). Mr. Vidal's last day of work for ACS was June 29, 2022. (Luy Decl., A-257).

### B.  <u>Initiation of Arbitration</u>

Plaintiff initially promised ACS that he would pay the costs it incurred as required by the Amended Agreement. (Luy Decl., A-258). No payment was ever made (Asaad Dec., A-280), and consequently, ACS initiated arbitration by filing a Demand for Arbitration with the American Arbitration Association ("AAA) containing a single claim of breach of contract. (Asaad Dec., A-289). On August 1, 2022, Towards Justice informed the AAA that they were not representing Mr. Vidal in the arbitration but were nevertheless requesting a stay on his behalf. (Asaad Dec. A-295). The Arbitration Manager explained that because they were not entering an appearance in the proceeding, she could not communicate with Towards Justice about the administration of the arbitration. *Id.* The AAA denied the request for a 60-day stay but granted a shorter extension of time for the parties to respond to the upcoming deadlines. *Id.* Plaintiff continued to request extensions to delay the arbitration. (Asaad Dec., A-300). As such, he engendered delay and additional expense, not ACS.

On September 16, 2022, Plaintiff filed the complaint to initiate this litigation. *(See* Doc. No. 1). On September 22, 2022, Arbitrator Sara Kula held a Preliminary Conference at which Plaintiff again requested the opportunity to argue for a stay,

which maneuver would again engender delay and additional expense. (Asaad Dec., A-307). On October 6, 2022, Plaintiff, through Towards Justice, sent a letter to Arbitrator Kula again setting forth the arguments for why they believed Plaintiff was entitled to a stay of the arbitration. (Asaad Dec., A-309). ACS responded by letter dated October 20, 2022. (Asaad Dec., A-340). On October 24, 2022, Arbitrator Kula sent the parties an order finding, among other things, that Plaintiff had failed to set forth justification for a stay, but would be given the opportunity at the arbitration to challenge jurisdiction and to raise any counterclaims. On October 28, 2022, Plaintiff sent a letter to the Arbitration Manager requesting that AAA determine whether the arbitration should be stayed or, in the alternative, the AAA should decline to administer it in its entirety pending judicial resolution. (Asaad Dec., A-346). Plaintiff sought a further extension from the AAA on November 1, 2022. (Asaad Dec., A-348). Again, it was the Plaintiff increasing the duration and cost of the arbitration, not ACS. By letter dated November 10, 2022, Plaintiff submitted arguments to Arbitrator Kula regarding his allegation that the Revised DRP was unconscionable. (Asaad Dec., A-350). By letter dated November 20, 2022, ACS refuted each of Plaintiff's arguments. (Asaad Dec., A-382). On November 22, 2022, Arbitrator Kula requested further briefing from the parties on the issue of whether the AAA's Commercial or Employment Rules should apply to the proceeding. (Asaad Dec., A-445). On December 2, 2022, ACS sent a letter to Arbitrator Kula

15

stipulating to the application of the Employment Rules and explaining that regardless of which rules Arbitrator Kula applied to the proceeding, Mr. Vidal was not entitled to a stay of this arbitration. (Asaad Dec., A-447). Plaintiff submitted a letter arguing for the application of the Employment Rules the same day. (Asaad Dec., A-451). In view of the parties' agreement, there can be no contention about whether the AAA's Employment Rules apply.

By order dated December 9, 2022, Arbitrator Kula denied Mr. Vidal's request for a stay explaining that "[n]either Respondent's initial or supplemental submission provided sufficient factual or legal support for the argument that the arbitration agreement is unconscionable...." (Asaad Dec., A-460). Moreover, Arbitrator Kula held that: "Based on those submissions and the facts related to the execution of the parties' Arbitration Agreement, the Arbitrator will apply AAA's Employment Arbitration Rules." As a result of AAA's Employment Rules, the costs and fees associated with the arbitration have been and shall be borne by ACS. (See AAA Employment Rules and Employment Fee Schedule at Rule 7.) Any concerns Plaintiff asserts regarding such fees and costs are thus unfounded.

In response to Arbitrator Kula's order, ACS attempted to move forward with the schedule she established and served discovery on Plaintiff. (Asaad Dec., A-463).

Months after filing this matter, and having failed to prevail upon the assigned Arbitrator and the AAA to stay the arbitration, Plaintiff filed a motion for

16

preliminary injunction with the District Court. ACS responded by filing a motion to compel the arbitration. The District Court granted the motion for a preliminary injunction and denied as moot the motion to compel arbitration. The instant appeal followed.

## SUMMARY OF THE ARGUMENT

This appeal is about the enforceability of an arbitration agreement. The District Court here erroneously refused to enforce an arbitration agreement and enjoined a pending arbitration proceeding based on several challenges that Vidal raised in court to the arbitration agreement and employment contract as a whole. In answering the question of whether the dispute between the parties was arbitrable, the District Court should have limited its inquiry to whether the dispute fell within the scope of the parties' arbitration agreement. Had it done so, it would not have taken the extraordinary step of granting a preliminary injunction enjoining the parties' arbitration proceedings nor would it have denied ACS' motion to compel arbitration. The injunction should be vacated and the parties should be compelled to honor their contractual agreement and proceed to resolve their differences through the arbitration process.

**ARGUMENT**

## I.    THE DISTRICT COURT ERRED IN REFUSING TO COMPEL ARBITRATION

### A.    Standard of Review

"The FAA permits interlocutory review of both a denial of a motion to compel arbitration, 9 U.S.C. § 16(a)(1)(C), and a stay of arbitration, *Id*. § 16(a)(2). We review de novo the district court's determination." *Arciniaga v. General Motors Corp.*, 460 F.3d 231, 234 (2d Cir. 2006)  (citing *LAIF X SPRL v. Axtel, S.A. de C.V.*, 390 F.3d 194, 198 (2d Cir.2004)); *see Parisi v. Goldman, Sachs & Co.*, 710 F.3d 483, 486 (2d Cir. 2013) ("We review *de novo* a district court's refusal to compel arbitration.").[1]

### B.    There is No Question That the Parties Agreed to Arbitrate Breach of Contract Claims.

The District Court began its inquiry with whether or not the issue of arbitrability was delegated to the arbitrator under the Revised DRP. Mem.Dec. at 20-21. But whether or not the parties' breach of contract dispute belongs in arbitration does not hinge on the answer to that question. The ultimate question is whether or not the parties agreed to arbitrate breach of contract claims. The indisputable answer to that question is yes.

---

[1] The District Court analyzed the enforceability of the arbitration agreement within the "likelihood of success" element of its preliminary injunction analysis. It then concluded that the same analysis justified its refusal to compel arbitration. Thus, as discussed in the next section, the legal error in refusing to compel arbitration also constitutes legal error in granting the preliminary injunction.

"In deciding whether a dispute is arbitrable, we must answer two questions: (1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue." *Holick v. Cellular Sales of New York, LLC*, 802 F.3d 391, 394 (2d Cir. 2015) (quotation marks omitted).

From the beginning of their relationship, as memorialized in the Original Agreement signed in 2019, the parties agreed to arbitrate "[a]ll disputes arising out of this Agreement or Employee's employment, including but not limited to Employee's recruitment, hiring, termination, and/or failure to complete/fully perform" (Luy Decl., A-182). Plaintiff does not (and cannot) contend that the arbitration provision in the Original Agreement is invalid. The Revised DRP contained in the parties' Amended Agreement reiterated the parties' agreement to resolve via arbitration "any dispute, controversy or claim arising between [plaintiff] and [defendant] (including a dispute, controversy or claim arising out of, in connection with or relating to, this Agreement, or the interpretation, performance or breach, termination or validity hereof). (Luy Decl., A-237). Accordingly, from the outset of the parties' relationship, the parties agreed to resolve claims for breach of contract by arbitration, and pursuant to the FAA, the District Court should have compelled arbitration and denied plaintiff's motion for preliminary injunction.

"By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to

19

proceed to arbitration on issues as to which an arbitration agreement has been signed." *Daly v. Citigroup Inc.,* 939 F.3d 415, 421 (2d Cir. 2019), quoting *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 218 (1985) (emphasis in original). See also, *Badinelli v. Tuxedo Club,* 183 F. Supp. 3d 450, 453 (S.D.N.Y. 2016), quoting *Jung v. Skadden, Arps, Slate, Meagher & Flom, LLP,* 434 F.Supp.2d 211, 214-15 (S.D.N.Y. 2006).

In that connection, the FAA requires courts to order arbitration "in accordance with the terms of the agreement." 9 U.S.C. § 4. In determining whether Plaintiff's claims are subject to arbitration, the threshold inquiry is an analysis of the contractual language. *Equal Employment Opportunity Commission v. Waffle House, Inc.,* 534 U.S. 279, 289 (2002)("Absent some ambiguity in the agreement ... it is the language of the contract that defines the scope of disputes subject to arbitration.") See also, *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 57 (1995). Indeed, courts are obligated to "rigorously enforce arbitration agreements according to their terms," *United Bhd. of Carpenters & Joiners of Am. v. Tappan Zee Constructors, LLC,* 804 F.3d 270, 274 (2d Cir. 2015). "In doing so, a court is not to rule on the potential merits of the underlying claims." *Vittoria Corp. v. New York Hotel & Motel Trades Council, AFL-CIO,* 30 F. Supp. 2d 431, 436 (S.D.N.Y. 1998), citing *Broadcast Arts Productions, Inc. v. Screen Actors Guild, Inc.,* 673 F. Supp. 701, 706 (S.D.N.Y. 1987).

Moreover, in reviewing the scope of the arbitration agreement, the Court must be guided by the principle that arbitration agreements are favored and are to be broadly construed with doubts being resolved in favor of coverage. *AT&T Technologies v. Communications Workers of America,* 475 U.S. 643, 648-650 (1986); *Moses H. Cone Mem'l Hosp.,* 460 U.S. at 24-25. Indeed, prevailing federal precedent directs courts to "construe arbitration clauses as broadly as possible." *Collins & Aikman Prods. Co. v. Building Sys.,* 58 F.3d 16, 19 (2d Cir. 1995) (internal quotations and citations omitted). "[A]s a matter of federal law, any doubts concerning the scope of the arbitrable issues should be resolved in favor of the arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem. Hosp.,* 460 U.S. at 24-25.

Further, the "existence of a broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that [it] covers the asserted dispute." *Oldroyd v. Elmira Savings Bank, FSB,* 134 F.3d 72, 76 (2d Cir. 1998); see also, *Mehler v. Terminix Int'l Co.,* 205 F.3d 44, 49 (2d Cir. 2000), *cert. denied,* 533 U.S. 911 (2001) (citing *Collins & Aikman Prods. Co.,* 58 F.3d at 19); *WorldCrisa Corp. v. Armstrong,* 129 F.3d 71, 74 (2d Cir. 1997). In cases where the arbitration clause is broad, "only the most forceful evidence of a purpose to exclude

21

the claim from arbitration can prevail." *AT &T Technologies v. Communications Workers of America,* 475 U.S. 643, 650 (1986).

Here the Revised DRP expressly and unequivocally requires that all disputes arising under the agreement itself and all other disputes between the parties are to be resolved through arbitration. It states: "I agree that any dispute, controversy or claim arising between me and Employer (including a dispute, controversy or claim arising out of, in connection with or relating to, this Agreement, or the interpretation, performance or breach, termination or validity hereof) shall be resolved by arbitration pursuant to this dispute resolution provision (the "Provision")."

This Court has held that this is "precisely the kind of broad arbitration clause that justifies a presumption of arbitrability." *Oldroyd,* 134 F.3d at 76 (clause in employment agreement requiring arbitration of "any dispute, controversy or claim arising under or in connection with this Agreement" creates presumption of arbitrability of employment-related claims). See also, *Mehler,* 205 F.3d at 49-50 (clause providing for arbitration of 'any controversy or claim . . . arising out of or relating to the agreement is ...' a classically broad one."); *Collins & Aikman Prods. Co.,* 58 F.3d at 20 (clause requiring arbitration of "any claim or controversy arising out of or relating to the agreement" is "the paradigm of a broad clause."). Because the claims clearly arise out of his employment with ACS, the District Court was

wrong to conclude that it does not apply to the claims advanced by Plaintiff in this case.[2]

### C. The Parties Clearly and Unmistakably Delegated All Questions of Arbitrability to the Arbitrator.

Because the answer to the question of whether the parties' agreed to arbitrate breach of contract disputes does not depend on whether the Revised DRP delegated arbitrability questions to the Arbitrator, the District Court should not have enjoined the arbitration. In any event, this Court's case law makes clear that questions of arbitrability were indeed delegated to the arbitrator based on the broad arbitration agreement at issue in this case. The issue of whether questions of arbitrability in this case are to be decided by the court or arbitrator is controlled by this Court's decision in *DDK Hotels, LLC v. Williams-Sonoma, Inc.,* in which the Court held that "where the arbitration agreement is broad and expresses the intent to arbitrate all aspects of all disputes, this — coupled with incorporation of rules that expressly empower an arbitrator to decide issues of arbitrability — constitutes clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the

---

[2] Assuming *arguendo* that the Revised DRP somehow was not operative through some fault in the reformation of contract through the Amended Agreement (which is not the case), the arbitration agreement incorporated into the Original Agreement would then remain in force. That agreement also requires arbitration of all disputes arising out of this Agreement or Employee's employment, so it, too, would require arbitration of this matter. Therefore, it is indisputable that ACS's breach of contract claim is arbitrable.

arbitrator." 6 F.4th 308, 318-19 (2d Cir. 2021). As in *DDK Hotels*, the Revised DRP states that any arbitration "will be administered by the American Arbitration Association ("AAA") ...." (Luy Decl., Ex.B7). Coupled with the broad arbitrability language in the Revised DRP, which expressly applies to disputes regarding the " validity" of the Revised DRP itself, the AAA rules applicable to this dispute also vests the arbitrator with the authority to determine arbitrability. See Rule 7 of the AAA's Commercial Rules and Rule 6 of the AAA's Employment Rules. Given the terms of the Revised DRP and well-settled law, any argument that the Court must rule on the scope or enforceability of the Revised DRP before referral to arbitration must be rejected. Indeed, a court should not determine whether an arbitration agreement is enforceable or whether a particular claim is covered by the arbitration agreement where the parties have clearly and unmistakably delegated that task to an arbitrator. *Rent-A-Center, West, Inc. v. Jackson,* 561 U.S. 63, 68 (2010) ("We have recognized that parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy."); *Moore v. T-Mobile USA, Inc.,* 10 CV 527 (SLT), 2010 U.S. Dist. LEXIS 143874, at *10 (E.D.N.Y. Nov. 8, 2010) ("the question of whether the parties have agreed to arbitrate a specific controversy or even agreed to arbitration at all may be delegated to the arbitrator to decide").

Thus, it is for an arbitrator to decide whether the current claims regarding plaintiff's employment fall within the scope of the agreement, not the District Court. That outcome is consistent with well-settled law on the issue and further compels the conclusion that the arbitration should not have been stayed, but instead directed to proceed apace. It is all the more compelling in this instance because the assigned Arbitrator has already considered Vidal's arguments and determined:

> Pursuant to the Parties' Dispute Resolution Provision and AAA's rules, as the Arbitrator in this matter, I have the authority to rule on my own jurisdiction, including with respect to the validity of the arbitration agreement or the arbitrability of any claim. Many of the arguments made by Respondent are premature and do not support the issuance of a stay. Respondent shall have the opportunity during the course of the arbitration to argue that the contract at issue is unenforceable, in whole or in part, and to assert counter-claims concerning the Claimant's alleged unlawful conduct.

(Asaad Decl., A-344).

Despite the clear delegation clause in the arbitration agreement, the Court also considered the bargaining powers of the party in determining that the delegation clause was ambiguous. Mem.Dec. at 20 & n.8. It then rejects the AAA rules noting the jurisdiction of the arbitrator by stating that, because of the size of the AAA rules, the plaintiff could not have anticipated the significance of the arbitrator's jurisdiction. But this is no reason for the Court to have ignored the clear and unambiguous language of the delegation clause. Moreover, there is no authority for refusing to recognize the enforceability of a delegation clause on this basis.

25

The District Court also based its ambiguity conclusion on its interpretation of the "blue pencil" provision in the Revised DRP as vitiating the delegation provision. Mem. Dec. at 17 (quoting 2022 agreement language stating "in the event that any court of competent jurisdiction shall determine that any portion of this Provision exceeds the scope permitted by applicable law, the court shall have the authority to modify or 'blue pencil' such portion so as to render it enforceable while maintaining the parties' original intent to the maximum possible intent") (emphasis omitted.). But there was no legal basis for doing so. Pursuant to *Rent-A-Center*, a court's review is limited to the delegation provision, not the arbitration agreement as a whole.

Here, the "blue pencil" provision is not connected to the delegation provision. Rather, the language cited by the Court was put in place in 2022 in the event that Congress passed a law that precluded compelling arbitration for the breach of contract claims being made in this case. Indeed, this was a direct response to the 2021 Congressional act that did, in fact, exclude sexual assault claims from arbitration. *See Dixon v. Dollar Tree Stores, Inc.,* No. 22-CV-131S, 2023 WL 2388504, at *4 (W.D.N.Y. Mar. 7, 2023). In any event, it was a violation of *Rent-a-Center* for the District Court to search the agreement as a whole for a purported ambiguity rather than focusing its review on the plain language of the delegation clause itself.

In sum, the 2022 agreement provided that "any dispute, controversy or claim arising between [Vidal] and Employer (including a dispute, controversy or claim arising out of, in connection with or relating to, this Agreement, or the interpretation, performance or breach, termination or *validity* hereof) shall be resolved by arbitration pursuant to this dispute resolution provision (the "Provision")…" (Emphasis added.) The Court should not have ignored this plain language and sought an ambiguity in the agreement, especially where there was none. On the record in this case, there is no question that, as a matter of law, the questions of arbitrability were delegated to the arbitrator. It was legal error for the District Court to conclude otherwise.

### D. The District Court Incorrectly Treated Plaintiff's General Contract Defenses as an Attack on the Delegation Provision.

In *Rent-A-Center*, the United States Supreme Court stated that "Unless [a party] challenged the delegation provision specifically, we must treat it as valid ... and must enforce it ..., leaving any challenge to the validity of the Agreement as a whole for the arbitrator." 561 U.S. at 70, 72. The Court also stated that "alleged unconscionability applicable to the entire contract (outrageously low wages, for example) would not affect the agreement to arbitrate alone." *Id.* at 71. The Court further noted that even where a party claims that "alleged fraud that induced the whole contract equally induced the agreement to arbitrate which was part of that

27

contract[,] we nonetheless require the basis of challenge to be directed **specifically to the agreement to arbitrate** before the court will intervene." *Id.*

Following *Rent-A-Center*, this Court, in *Arrigo v. Blue Fish Commodities, Inc*. 408 F. App'x 480 (2d Cir. 2011) rejected a plaintiff's challenge to his employment agreement on grounds of unconscionability because Blue Fish forced him to choose between signing it or losing his job. Because the parties agreed that "[t]he Arbitrator, and not any federal, state, or local[ ] court or agency, shall have exclusive authority to resolve any dispute relating to the ... enforceability or formation of this Agreement...." this Court determined that the issue of unconscionability was for the arbitrator to decide. *Arrigo*, 408 F. App'x at 482–83, citing, *Rent–A–Center, W., Inc. v. Jackson,* 130 S.Ct. 2772, 2779, 177 L.Ed.2d 403 (2010). *See also*, *Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co.*, 263 F.3d 26, 31–32 (2d Cir. 2001)("[U]nder *Prima Paint* [C*orp. v. Flood & Conklin Mfg. Co*., 388 U.S. 395 (1967)], a party is not entitled to a trial on the arbitrability of a voidable contract unless the party alleges that the arbitration clause itself is voidable and provides some evidence in support of its allegation.); *Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 62 (2d Cir. 2012) (affirming dismissal of the complaint in favor of pending arbitration, noting that the FAA "does not permit the federal court to consider claims of fraud in the inducement of the contract generally" and finding that "[t]he required *objective* meeting of the minds is demonstrated here by the fully executed contracts")

28

(emphasis in original); *compare Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126 (2d Cir. 2019) ("Plaintiffs mount a convincing challenge to the arbitration clause itself. Their complaint alleges that '[t]he delegation provision of the Purported Arbitration Agreement is also fraudulent.' That specific attack on the delegation provision is sufficient to make the issue of arbitrability one for a federal court.")

Here, there is no dispute that the parties agreed to arbitrate claims arising out of Vidal's employment, including breach of contract claims, because in both of the agreements that Plaintiff signed, the Original Agreement (signed in 2019) and the Amended Agreement, he agreed to arbitrate all disputes. Moreover, as set forth above, the delegation clause in the Amended Agreement expressly delegated questions regarding the "validity" of the contract to the arbitrator. There is also no dispute that plaintiff is challenging the enforceability of the Amended Agreement on grounds of unconscionability, coercion, and other bases as a whole, not just his obligation to arbitrate claims. Under these circumstances, controlling precedent dictates that the injunction must be vacated and the parties directed to proceed with the pending arbitration forthwith. Nonetheless, even if the District Court could have reached the question of whether the delegation clause was valid (which it should not have), as a matter of law it should have upheld that validity of that clause.

**E.** **There is No Unconscionability in the Delegation Provision of the Revised DRP or Otherwise.**

As a preliminary matter, pursuant to *Rent-A-Center*, unconscionability arguments may be considered by a court only if they are specific to the delegation clause itself (i.e., the clause delegating threshold issues to the arbitrator) not to the arbitration agreement as a whole or to the larger Amended Agreement. *See Rent-A-Center*, 561 U.S. at 73 ("As required to make out a claim of unconscionability under Nevada law, he contended that the Agreement was both procedurally and substantively unconscionable. It was procedurally unconscionable, he argued, because it 'was imposed as a condition of employment and was non-negotiable.' But we need not consider that claim because none of Jackson's substantive unconscionability challenges was specific to the delegation provision.")

Here, however, Vidal challenges the arbitration provision (and the employment agreement in which it is found) as unconscionable; his attack is patently *not* directed to the delegation clause itself. Comp.¶ 15 (seeking declaratory judgment that the "Arbitration Provision is a contract for illegal purposes and unconscionable in violation of state law…") Indeed, nowhere in the Complaint does the phrase "delegation clause" even appear. Regardless, even were Vidal's challenge directed to the delegation clause (it was not), the Court erred in holding that Vidal was likely to prevail on the merits with respect to such challenge, or that

30

there were substantial questions going to the merits sufficient to warrant granting the extraordinary relief sought.

Under New York law, "a contract is unconscionable when it is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms." *Nayal v. HIP Network Servs. IPA, Inc.,* 620 F.Supp.2d 566, 571 (S.D.N.Y. 2009) (internal citations and quotations omitted). To prove unconscionability, "there must be a showing that such a contract is both procedurally and substantively unconscionable. The procedural element of unconscionability concerns the contract formation process and the alleged lack of meaningful choice; the substantive element looks to the content of the contract, per se." *Id.* (internal citations omitted) (emphasis added). Here, there is neither procedural nor substantive unconscionability in the delegation provision of the Revised DRP, (to which judicial review is limited) or otherwise.

## 1. The Delegation Provision Is Not Procedurally Unconscionable

The District Court was first influenced by Vidal's contention that the arbitration agreement is procedurally unconscionable because it is an employment contract of adhesion. Mem. Dec. at 20, 33-36. But this argument has already been considered by courts and universally rejected. "A contract or clause is unconscionable when there is an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the

other party." *Desiderio v. National Ass'n of Sec. Dealers, Inc.,* 191 F.3d 198, 207 (2d Cir. 1999); see also, *Isaacs v. OCE Bus. Servs., Inc.,* 968 F. Supp. 2d 564, 570 (S.D.N.Y. 2013) ("[I]t is well accepted under New York law that it is not unconscionable to be bound by an arbitration agreement in the course of securing employment. Moreover, the fact that there is inequality in bargaining power between an employer and a potential employee is not a sufficient reason to hold that arbitration agreements are not enforceable in the employment context. Therefore, the fact that [the employer] unilaterally drafted the Policy and required the plaintiff to sign the Policy as a condition of his employment does not in itself render the Policy unconscionable.") (Internal citations omitted).[3] That Vidal subjectively believed he would have lost his opportunity to work for ACS if he did not sign the arbitration agreement does not support a finding of procedural unconscionability. See *Maity v. Tata Consultancy Servs., Ltd.,* 2021 WL 6135939, at *7 (D.N.J. Dec. 29, 2021).

---

[3] Even in instances where non-English speakers were told to sign an agreement without providing a translation, New York courts have refused to find the agreements procedurally unconscionable. See *Suqin Zhu v. Hakkasan NYC LLC,* 291 F. Supp. 3d 378, 391 (S.D.N.Y. 2017) ("Plaintiffs do not allege that they ever tried to negotiate the terms of the Agreement or that Defendants prevented them from doing so; that Plaintiffs requested and were denied a translated version of the Agreement or the opportunity to review it; or that Defendants used high-pressure or coercive tactics."). Here, Plaintiff is a fluent English speaker, which cuts against any finding of unconscionability.

In addition, contrary to Vidal's assertions, he was not coerced into signing the agreement with high-pressure tactics. ACS sent Plaintiff the Amended Agreement on January 4, 2022 "for [his] perusal" with a message letting him know that a conference call would be scheduled in the following week to go over it. Additionally, the cover letter attached with the agreement expressly invited Plaintiff to ask questions by phone or email before signing and to sign only if he had no questions. *Id.* The cover letter to the Amended Agreement also highlighted the key differences between the original contract and the amended agreement, including the elimination of liquidated damages, making clear that in the event of breach, the contract "allows for recovery of whatever damages are proven". *Id.* Plaintiff signed the agreement on the same day that he received it and emailed it back to ACS. Plaintiff's contention that he had no bargaining power is palpably false. While he elected not to engage in those discussions, he was demonstrably able to negotiate the terms of his employment because on January 13, 2022, Plaintiff requested that his facility assignment be changed to Downtown Brooklyn, New York and ACS granted Plaintiff's requested assignment. (Luy Decl., Ex. F).

### 2. The Delegation Clause Is Not Substantively Unconscionable.

Although the absence of procedural unconscionability is sufficient to reject Vidal's claim that the arbitration agreement is unconscionable, *see Nayal,* 620 F.Supp.2d at 571 (S.D.N.Y. 2009), he also has failed to demonstrate that the

33

delegation clause of the arbitration agreement is substantively unconscionable.

### a. *The fee shifting provisions are not unconscionable.*

The District Court took issue with the aspect of the arbitration agreement that provided for the prevailing-party ("loser pays") to recover its costs, although it reserved judgment on whether it was unconscionable. Mem.Dec. at 43. To begin with, however, not only has ACS paid the filing fee, but the Arbitrator has determined (and ACS had already stipulated) that the AAA's Employment Rules apply. Those rules require the employer to pay the arbitrator's compensation unless the employee or individual, post dispute, voluntarily elects to pay a portion of the arbitrator's compensation. As a result, Plaintiff has not and will not incur fees for the AAA's administration and the arbitrator's consideration of the case.

The Court's conclusion that the attorney fee shifting provision in the Revised DRP rendered the contract substantively unconscionable was also improper. Mem. Dec. at 37-40. In fact, controlling authority holds otherwise. *NetJets Aviation, Inc. v. LHC Commc'ns, LLC,* 537 F.3d 168, 175 (2d Cir. 2008) ("Under New York law, a contract that provides for an award of reasonable attorneys' fees to the prevailing party in an action to enforce the contract is enforceable if the contractual language is sufficiently clear."); *Saizhang Guan v. Uber Techs., Inc.,* 236 F. Supp. 3d 711, 732 (E.D.N.Y. 2017)(rejecting an attack on arbitration based on fee-splitting because the challenge was limited to a review of the potential costs for "the arbitration of

enforceability")(quoting *Rent—A—Center, West, Inc. v. Jackson,* 561 U.S. 63, 74 (2010)); *Eyewonder, Inv. v. Abraham,* No. 08 CV 3579 (GBD), 2010 WL 3528882, at *4 (S.D.N.Y. Sept. 3, 2010) ("The arbitrator was within his power under the Employment Agreement to shift all costs and did not exceed his authority by permitting Plaintiff to recover monies it spent on attorneys' fees in the arbitration, and arbitration costs and fees.")

### b. *Wage and Hour laws do not bar enforcement of the arbitration agreement.*

Vidal also argued below that the arbitration agreement violated state and federal wage and hour laws. The District Court reserved judgment on this argument. Mem. Dec. at 14 n.7. As a practical matter, it is without merit. New York courts have found that even termination fees imposed by employment agreements did not constitute illegal kickbacks under the Fair Labor Standards Act ("FLSA"). *See Park v. FDM Grp., Inc.,* 2018 WL 4100524, at *4 (S.D.N.Y. Aug. 28, 2018).

Although the District Court reserved judgment on the issue, none of the cases cited by the Plaintiff below actually supports his claim that the cost-shifting provision of the arbitration agreement violates the Fair Labor Standards Act or New York wage and hour law. Indeed, the cases cited by Plaintiff are inapposite to the facts in this case. Unlike the employers in cases cited by Plaintiff, ACS is not trying to deduct costs that are primarily for its benefit from Plaintiff's wages. Instead, ACS is seeking lawful damages, as determined by the Arbitrator, for Plaintiff's breach of

contract. Moreover, Plaintiff's argument that the damages alleged in ACS's breach of contract claim arose from issues that primarily benefitted ACS is specious. The damages at issue arise out of ACS's expenditures pertaining to, among other things, procuring Plaintiff's Green Card and license to work as a Registered Professional Nurse in New York. While ACS would reap a short-term benefit from Plaintiff being able to work during the circumscribed term of the agreement, Plaintiff would benefit from his New York license and the access to the U.S. job market provided by his Green Card for the rest of his life.

Similarly, there is no Second Circuit case law to support for the plaintiff's argument, and the Court's agreement, that a prevailing party fee-shifting provision is unenforceable in a breach of contract case involving the employee's breach. Indeed, the District Court here relied on another court's rejection of an employees' challenge to the validity of a delegation clause with a "loser pays" provision. Mem. Dec. at 41 (citing *Saizhang Guan v. Uber Techs., Inc.*, 236 F. Supp. 3d 711, 732 (E.D.N.Y. 2017). But the court in *Saizhang Guan* concluded that an attack on an arbitration agreement based on a fee-shifting would violate *Rent-a-Center*. Indeed, for this reason, the Court's ruling here is a violation of the Supreme Court's holding.

### c. The District Court Erred In Concluding that the fee shifting provision could not be severed

The District Court also concluded that the "loser pays" provision could not be severed. Although ACS contends that there is no reason to sever the fee-shifting

provision, its presence does not render the agreement unconscionable because it can be severed from the arbitration agreement if necessary. Courts have found that fee-shifting provisions are not essential to the bargain and that severance is proper when warranted. See *Smith v. AHS Oklahoma Heart, LLC,* No. 11-CV-691-TCK-FHM, 2012 WL 3156877, at *4 (N.D. Okla. Aug. 3, 2012) (noting "severance was proper, even in absence of severability clause, because "the primary purpose of the arbitration bargain ... was not to regulate costs or attorney's fees" but instead "was designed to provide a mechanism to resolve employment-related disputes."). Just as in *Smith,* the purpose of the arbitration agreement is to set a mechanism to resolve employment disputes. Unlike *Smith,* the Revised DRP contains an express severability clause. Therefore, even if the fee-shifting were deemed unenforceable, it would not render the agreement unconscionable because it can readily be severed from the rest of the arbitration agreement if the arbitrator deems that appropriate. See *Valle v. ATM Nat., LLC,* 2015 WL 413449, at *7 (S.D.N.Y. Jan. 30, 2015) (finding the appropriate remedy is to sever the improper "loser pays" provision of the arbitration agreement and not to invalidate the entire arbitration provision).

## II. THE PLAINTIFF WAS NOT ENTITLED TO A PRELIMINARY INJUNCTION

### A. Standard of Review

The case law in this circuit makes clear that a preliminary injunction is an extraordinary and drastic remedy which should not be routinely granted. *General*

*Textile Printing & Processing Corp. v. Expromtorg International Corp.,* 862 F. Supp. 1070, 1074 (S.D.N.Y. 1994) *citing Borey v. National Union Fire Ins.,* 934 F.2d 30, 33 (2d Cir. 1991). It is well settled that a court in this Circuit will grant a temporary restraining order or a preliminary injunction only if the plaintiff has met his burden of proving:

> irreparable harm; and, either (1) likelihood of success on the merits; or,(2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Polymer Technology Corp. v. Mimran,* 37 F.3d 74, 77-78 (2d Cir. 1994) citing *Coca Cola Co. v. Tropicana Prods. Inc.,* 690 F.2d 312, 314-315 (2d Cir. 1982). The standards for granting a TRO are the same as those governing the granting of preliminary injunctive relief. *Schiavone Construction Co. v. New York City Transit Authority,* 593 F. Supp. 1257, 1260 (S.D.N.Y. 1984). Both remedies are extraordinary ones that will be granted only upon a showing that the alleged threat of irreparable harm is not remote or speculative, but actual and imminent. *Forest City Daly Housing, Inc. v. Town of Northhampstead,* 175 F.3d 144, 153 (2d Cir. 1999) citing *Rodriguez v. DeBuono,* 162 F.3d 56, 61 (2d Cir. 1998).

It is true that, generally, that this Court reviews the District Court's decision on a motion for preliminary injunction for an abuse of discretion. *Alleyne v. New York State Educ. Dep't*, 516 F.3d 96, 100 (2d Cir. 2008). "A district court abuses its discretion 'when (1) its decision rests on an error of law (such as application of the

38

wrong legal principle) or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions.'" *Id.* (quoting *Mastrovincenzo v. City of New York*, 435 F.3d 78, 88–89 (2d Cir.2006)). "Under abuse of discretion review, the factual findings and legal conclusions underlying the district court's decision are 'evaluated under the clearly erroneous and de novo standards, respectively.'" *Oneida Nation of New York v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011).

However, in the arbitration context, the District Court's decision should be reviewed *de novo*. This is because the "legal conclusions underlying the district court's decision are reviewed *de novo*." *Oneida Nation of New York v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011). As discussed in the previous section, in order to grant the preliminary injunction, the Court needed to reject the arbitration agreement. The correct legal standard of review for that determination under the FAA is *de novo*. Thus, review of the District Court's refusal to compel arbitration and granting of a preliminary injunction or, put differently, the question of whether the arbitration should have been stayed or compelled, is subject to *de novo* review.

### B. The plaintiff did not establish irreparable harm

The District Court acknowledged that "irreparable harm is the 'most important" injunction factor. Mem.Dec. at 45; see also *Reuters, Ltd. v. United Press*

*International, Inc.,* 903 F.2d 904, 907 (2d Cir. 1990). Indeed, if the plaintiff cannot prove irreparable harm, he cannot prevail in his claim for a preliminary injunction. Here, the District Court concluded that subjecting Vidal to arbitration would constitute irreparable harm *per se*. But the Court's conclusion does not square with the case law.

This Circuit has concluded that forcing a party to participate in an even potentially unwarranted arbitration "by itself imposes no [irreparable] injury to the resisting party, except perhaps in `extraordinarily rare' circumstances;" "[t]he monetary cost of arbitration certainly does not impose such legally recognized irreparable harm." *Emery Air Freight Corp. v. Local Union 295,* 786 F.2d 93, 100 (2d Cir. 1986). Where there is a valid agreement to arbitrate, no irreparable harm results from compelling the resisting party to arbitrate. *Med. Shoppe Ina, Inc. v. Mitsopoulos,* 2006 WL 8438209, at *3 (E.D.N.Y. May 5, 2006), *report and recommendation adopted,* 2006 WL 8438198 (E.D.N.Y. May 12, 2006), citing *Emery Air Freight Corp., supra.* If the mere opportunity costs or out-of-pocket expenses associated with an order to arbitrate constitutes irreparable harm, "every order to arbitrate would be deemed to create irreparable harm, and it would be easy to get such orders stayed." *Woodlawn Cemetery v. Loc. 365, Cemetery Workers & Greens Attendants Union,* 1990 WL 150472, at *3 (S.D.N.Y. Oct. 2, 1990), *affd,* 930 F.2d 154 (2d Cir. 1991), quoting *Graphic Communications Union, Chicago*

*Paper Handlers' & Electrotypers' Local No. 2 v. Chicago Tribune Co.,* 779 F.2d 13, 15 (7th Cir. 1985). "Such a harm does not warrant the extraordinary relief of a stay since it `is no different from the harm of being turned down on a motion to dismiss or for summary judgment, thereby being forced to try a case that one does not believe should be tried...." *Id.*

The U. S. Supreme Court's recent decision in *Coinbase, Inc. v. Bielski,* No. 22-105, 2023 WL 4138983 (U.S. June 23, 2023), further demonstrates that irreparable harm is lacking here. There, the High Court concluded that District Court proceedings must be stayed pending appellate review of the denial of a motion to dismiss. In that decision, the Court explained that "litigation-related burdens" do not constitute irreparable harm. 2023 WL 4138983, at *6. Here, the only harm the plaintiff can claim is the burden of having to first pursue his claim in arbitration. As the U. S. Supreme Court has made clear, this is not irreparable harm.

Because it is well settled that simply being compelled to arbitrate a claim that falls within the scope of an agreement to arbitrate does not constitute irreparable harm, the District Court was wrong to conclude that the mere participation in an arbitration was sufficient to satisfy the first prong of the test for injunctive relief.

**C.    Plaintiff did not show a likelihood of success on the merits.**

As demonstrated in Section I, *supra*, because the plaintiff indisputably agreed to arbitrate the breach of contract claim pending in arbitration, the District Court

41

erred in finding a likelihood of success on the merits. Although the District Court was persuaded by the plaintiff's invocation of the TVPA, neither the plaintiff nor the District Court provided any reason (there being none) why the plaintiff could not invoke the TVPA either as a defense or counterclaim in the arbitration proceedings.

The District Court also determined that the "threat of uncapped arbitration costs and attorney's fees" rendered the plaintiff's claim that the arbitration agreement was unenforceable based on the TVPA. Mem. Dec. at 32. But, again, this was an improper inquiry. There is nothing to prevent Plaintiff from raising this defense in arbitration. The District Court's conclusion to the contrary was error.

Moreover, the District Court's discussion of the TVPA is really a red herring as it in no way applies to the facts of this case.

"Forced Labor" is prohibited by 18 U.S.C. § 1589. Through this statute:

> Congress intended to address <u>serious</u> trafficking, or cases where traffickers...restrain their victims without physical violence or injury, or threaten <u>dire consequences</u> by means other than overt violence. According to the statute, the threat, considered from the vantage point of a reasonable person in the place of the victim, must be "sufficiently serious" to compel that person to remain.

*United States v. Dann,* 652 F.3d 1160, 1170 (9th Cir. 2011) (emphasis added). There are no allegations of any threat of violence, so that is no concern here. Instead, Plaintiff argues he was coerced through ACS' threatened use of the legal process. He fails on that front.

"Abuse or threatened abuse of law or legal process" is defined as: "[T]he use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose <u>for which the law was not designed,</u> in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." 18 U.S.C. §1589(c)(1) (emphasis added). Thus, § 1589(c)(1) prohibits use of the legal system for a reason it is not otherwise meant to be used. *Dann,* 652 F.3d at 1170; see *United States v. Toviave,* 761 F.3d 623, 625 (6th Cir. 2014). Thus, Plaintiff's persistent assertion that ACS is trying to "weaponize" arbitration is unavailing. Using a tool for its intended purpose does not "weaponize" it. Using a hammer to drive a nail or a wrench to turn a bolt does not turn them into weapons. Similarly, using a federally authorized and encouraged dispute resolution tool to resolve a contract dispute, which is what ACS's effort to arbitrate its breach of contract claims against Plaintiff involves, does not transform that arbitration into an "abuse of process" weapon. See *Dann* and *Toviave, supra. Panwar v. Access Therapies, Inc.,* provides a counterpoint to this case. 2015 WL 1396599, at *5 (S.D. Ind. Mar. 25, 2015). In *Panwar,* the plaintiffs signed employment agreements and promissory notes requiring them to repay their employer for expenses and lost revenue if they resigned before the term of the agreement was completed. *See id.* at * 2. The court dismissed the "forced labor" claims, explaining:

> [The] [p]laintiffs conflate the "use" of legal process with the "abuse" of legal process.... [A]buse of legal process requires a finding that the legal process has been utilized to achieve an end other than one which the process was designed to accomplish. The motive behind such action is irrelevant.
>
> ***
>
> ...[F]iling lawsuits against employees who breached their employment contracts is exactly the end that the legal process at issue was designed to accomplish. It is not an abuse of legal process to enforce valid contractual rights against individuals who no longer wish to be bound by the terms of an agreement they voluntarily signed. By [the] [p]laintiffs' logic, any pursuit of damages for breach of contract would constitute an abuse of process, which would be an absurd outcome. Thus, the Court concludes that...the enforcement of contract rights [did not] constitute[] an "abuse of law or legal process" for purposes of TVPA liability.

*Id. at* *5 (citations omitted).

*Baldia v. RN Express Staffing Registry LLC,* also provides a meaningful contrast to the current case. 2022 WL 4777836 (S.D.N.Y. Oct. 3, 2022). Similar to this case, the defendant in *Baldia* recruited Filipino nurses to work in New York. 2022 WL 4777836 *1. Applying a vastly different standard than the irreparable harm/success on the merits standard here, the *Baldia* court denied the employer's motion to dismiss on two grounds that are absent in this case. First, the employment agreement at issue in *Baldia* contained both liquidated damages and promissory note, which the court found potentially coercive. *Id.* at *7-9. ACS removed similar provisions when it asked Plaintiff to sign the Amended Agreement before starting work in New York. *Baldia* also recognized that the threat of deportation may qualify as abuse of legal process. *Id. at *10,* citing *Adia v. Grandeur Mgmt., Inc.,* 933 F.3d

89, 93 (2d Cir. 2019); *Aguirre v. Best Care Agency, Inc.,* 961 F. Supp. 2d 427, 444 (E.D.N.Y. 2013). There is no evidence of any such threat in this matter.

Plaintiff's comparison of this case to *Paguirigan v. Prompt Nursing Emp. Agency LLC,* 2019 WL 4647648 (E.D.N.Y. Sept. 24, 2019), is grossly inapposite. As a preliminary matter, *Paguirigan* <u>does not even prohibit recovery of liquidated damages</u> from an employee, stating, "of course, there is no prohibition against defendants placing a valid liquidated damages provision in their contracts." *Id.* at *17 (emphasis added). In *Paguirigan,* the court found that the employer violated the Trafficking Victims Protection Act because of multiple actions that together were tantamount to holding a proverbial gun to workers' heads. Those actions included (a) continuing to impose a $25,000 contract termination fee <u>after a judge had already ruled against it,</u> (b) forcing workers to sign a $25,000 confession of judgment in favor of their employers, (c) filing lawsuits against workers claiming damages of $250,000, and (d) criminally prosecuting workers who quit. *See* 286 F. Supp. 3d 430, 435 (E.D.N.Y. 2017). While none of those things is true in this case, Plaintiff contends that ACS's arbitration demand constitutes a more egregious example of human trafficking because ACS is seeking an opportunity to prove liability and damages in the arbitration hearing. He overstates his case.

The other trafficking cases cited by the plaintiff below involved disproportionate liquidated damages and other transgressions that are also easily

distinguishable from this case. For example: NY *Attorney General Investigation of Albany Med Health System,* https://ag.ny.gov/sites/default/files/albany med and no. 22-058 - fully_executed 9.13.22.pdf ("The employment contract provided to these nurse recruits faced mandatory repayment provisions that obligated payments between $10,000 to $20,000 and threatened reporting to immigration authorities upon non-compliance." No comparable facts are present here.) *Magtoles v. United Staffing Registry, Inc.,* is similarly distinguishable. 2021 WL 6197063, at \*1 (E.D.N.Y. Dec. 30, 2021). Unlike the case before the court, that matter involved a liquidated damages provision that required employees to pay up to $90,000 and threats the employer would report a change in employment status to immigration authorities and face possible deportation. *Id.* Again, no comparable facts present here. In any event, these are all things that can be resolved at arbitration.

### D.     The Balance of Equities Favor the Defendant

The District Court determined that the balancing of equities favored Plaintiff, simply by rejecting ACS' claim that it was entitled to a swift resolution. Mem. Dec. at 48-49. But again, that was the wrong inquiry. Here, Plaintiff has received the benefit of his bargain. He was assisted and underwritten through the visa sponsorship and licensing process. Once that process was completed, he was flown to the United States, provided grocery money, a transit card, a rent subsidy, and a job paying above prevailing wage, as well as other meaningful employment benefits. Rather than

46

comply with his part of the bargain to remain employed by ACS for three years, he reneged on his agreement after only three months and used the Green Card and New York license ACS helped him secure to find another, better paying job. He clearly made a cost-benefit analysis that he could earn more money elsewhere and that difference would cover any consequences of his breach because he agreed to pay what was due in his resignation. Apparently, he now regrets the cost benefit analysis he performed. That he does not want to suffer the consequences of that naked breach, however, does not tip the balance of equities in his favor. Rather, ACS should be able to advance its claims through the agreed-upon arbitration process in a timely fashion.

### E. The Public Interest Analysis Favors The Defendant

The District Court concluded that the public interest prong weighed in Plaintiff's rejecting ACS' argument that protecting and enforcing arbitration agreements was in the public interest. Mem.Dec. at 49-50. There is no public interest in preventing ACS from arbitrating its breach of contract claim against Plaintiff, and indeed to do so under these circumstances would run afoul of the FAA. To the contrary, the only interest arguably served would be Plaintiff's personal interest in avoiding the pecuniary consequences of his breach, not the public interest.

The fact that Plaintiff's attorneys appear to have prevailed on the NYAG to send letters to the AAA does not alter this conclusion. As set forth previously, the

NYAG was self-evidently prompted to send those letters based on a distorted portrayal of the underlying facts. In the absence of any action by the NYAG based on a complete understanding of the underlying facts, no determination of a public interest in barring arbitration of Plaintiff's breach should be found. Instead, Plaintiff's personal interest in avoiding the consequences of his breach should give way to the weighty public interest in enforcing arbitration agreements.

Indeed, well-settled case law mandates that the public interest would be better served by denying the requested injunctive relief and directing the parties to proceed through arbitration. To begin with, the Second Circuit has held that employment-related civil rights claims are arbitrable. *Daly,* 939 F.3d at 422; *Gilbert v. Indeed, Inc.,* 513 F. Supp. 3d 374, 396-97 (S.D.N.Y. 2021). Indeed, *Southland Corp. v. Keating,* 465 U.S. 1, 16, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984), foreclosed any argument to the contrary. "The Federal Arbitration Act rests on the authority of Congress to enact substantive rules under the Commerce Clause" and "[i]n enacting § 2 of the federal Act, Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration." *Id*. at 10-1. Thus, Congress intended to foreclose attempts to undercut the enforceability of arbitration agreements." *Id.* at 16. See also, *White v. We Work Cos., Inc.,* 2020 WL 3099969, at *5 (S.D.N.Y. June 11, 2020) (holding that CPLR § 7515 was preempted

by FAA); *Latif v. Morgan Stanley & Co. LLC,* 2019 WL 2610985 (S.D.N.Y. June 26, 2019) (same).

The U. S. Supreme Court addressed other challenges to the FAA based on purported statutory conflicts in *Epic Systems Corp. v. Lewis,* 138 S. Ct. 1612, 1619, 200 L. Ed. 2d 889 (2018). There, the Court squarely addressed the question: "Should employees and employers be allowed to agree that any disputes between them will be resolved through one-on-one arbitration?" *Id.* In the face of a variety of asserted statutory conflicts to arbitration, the Court observed: "Not only did Congress require courts to respect and enforce agreements to arbitrate; it also specifically directed them to respect and enforce the parties' chosen arbitration procedures." 138 S. Ct. at 1621 It also noted, "[i]n many cases over many years, this Court has heard and rejected efforts to conjure conflicts between the Arbitration Act and other federal statutes. In fact, this Court has rejected every such effort to date . . . ." 138 S. Ct. at 1627. Against that background, the Court concluded: "The policy may be debatable but the law is clear: Congress has instructed that arbitration agreements like those before us must be enforced as written." 138 S. Ct. at 1632.

ACS has a statutory right to enforce its arbitration agreement. In the absence of an express Congressional exception to the arbitrability of the plaintiff's purported TVPA or wage and hour claims, their presence is no impediment to arbitration of Defendant's breach of contract claim. To the contrary, the breadth of the arbitration

agreement, especially the express language that "should there be arbitration proceedings in accordance with this Provision, [Mr. Vidal] would be free to pursue all available substantive or procedural rights or remedies in such arbitration proceedings," weighs against an injunction and in favor of unimpeded arbitration of both ACS's claims and Plaintiff's purported defenses and counterclaims.

## CONCLUSION

The preliminary injunction should be vacated and the motion to compel arbitration should be granted.

Respectfully submitted,

/s/ Proloy K. Das
PROLOY K. DAS
SAMI ASAAD
CRAIG THOMAS DICKINSON
FORDHARRISON LLP
CityPlace II
185 Asylum Street, Suite 820
Hartford, CT 06103
(860)740-1355
pdas@fordharrison.com
sasaad@fordharrison.com
cdickinson@fordharrison.com

*Counsel for Defendant-Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,360 words, excluding the parts of the brief exempted by Fed. R. App. P. 32 (a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in size 14 Times New Roman font.

<u>/s/ Proloy K. Das</u>
PROLOY K. DAS

**SPECIAL APPENDIX**

CASE NO. 23-303

## INDEX TO DOCUMENT REFERENCES IN SPECIAL APPENDIX

| Description of Item | Record Entry No. | Appendix Page No. |
|---|---|---|
| **Order Granting Plaintiff's Motion for Preliminary Injunction** (02/24/2023) ............................................................ | **R.39** | **SPA-1** |
| **Opinion & Order** (04/04/2023) ............................................................ | **R.42** | **SPA-5** |
| **9 U.S.C. § 16** ............................................................ | | **SPA-57** |

i

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Benzor Shem Vidal,

                Plaintiff,

       v.

Advanced Care Staffing, LLC,

             Defendants.

No. 1:22-cv-05535-NRM-MMH

ORDER GRANTING PLAINTIFF'S
MOTION FOR PRELIMINARY
INJUNCTION

NINA R. MORRISON, United States District Judge:

      Plaintiff Benzor Shem Vidal seeks a preliminary injunction temporarily pausing a

pending arbitration brought against him by defendant Advanced Care Staffing, LLC.

Specifically, plaintiff seeks this injunction of the pending arbitration while this Court

adjudicates the merits of his legal challenges to the enforceability of what Defendant

contends is a binding arbitration agreement contained in a contract signed by the parties

in January 2022.  Plaintiff's motion for a preliminary injunction is hereby GRANTED,

with an opinion to follow setting forth the reasons for the Court's decision at greater

length.[1]

---

      [1] At oral argument on February 21, 2023, the parties indicated that they each had
an important interest in a prompt ruling on the motion for a preliminary injunction, in
light of the ongoing arbitration and other factors.  Given the complexity of the issues
presented in the motion, Plaintiff indicated he had no objection to the Court proceeding
by ruling on the motion by brief written order with a longer opinion to follow.  In a notice
of supplemental authority, ECF No. 38, Defendant clarified that it would have no
objection to proceeding in this manner as long as any order granting a preliminary
injunction expressly acknowledged that doing so constitutes a denial of Defendant's

It is well settled in the Second Circuit that "a party seeking a preliminary injunction [must] show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (internal quotation marks and citation omitted). Here, the Court finds that Plaintiff is either likely to succeed on the merits of one or more of his claims, or has, at the very least, raised sufficiently serious questions going to the merits of those claims as to warrant preliminary injunctive relief.

The claims as to which the Court finds that plaintiff has met this burden are (1) that the purported delegation clause in the parties' written contract is not "clear and unmistakable," *see Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019); and (2) that even if it were clear and unmistakable, the delegation clause is invalid and unenforceable because it is (a) unconscionable under New York law, and (b) violates the Trafficking Victims Protection Act, 18 U.S.C. § 1589 *et seq. See Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126 (2d Cir. 2019) (noting that "[a] specific attack on the delegation provision is sufficient to make the issue of arbitrability one for a federal court," and proceeding to find that the challenged provisions were invalid and

---

previously filed request for a pre-motion conference on a proposed motion to compel arbitration. *See* ECF No. 11. Because the legal authorities and relief contemplated in Defendant's proposed motion to compel arbitration are within the scope of the issues presented in Plaintiff's motion for a preliminary injunction, Defendant's request for a pre-motion conference regarding a motion to compel arbitration is denied as moot.

unenforceable under state and federal law).  The Court further observes that there are at least serious questions as to whether the "loser pays" provision in the parties' agreement—which would require the party who does not prevail in arbitration to pay an undetermined amount of attorneys' fees incurred by the prevailing party—can be severed from the agreement, at least at the preliminary injunction stage.

Plaintiff has satisfied the remaining preliminary injunction factors.  *See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Citigroup Global Mkts., Inc.,* 598 F.3d at 34.  In light of the Court's finding as to Plaintiff's likelihood of success and/or sufficiently serious questions raised as to the merits of the foregoing legal claims, Plaintiff has adequately demonstrated irreparable harm, since forcing an individual to arbitrate a matter that is not properly subject to arbitration constitutes *per se* irreparable harm.  *See Citigroup Global Mkts. Inc. v. VCG Special Opportunities Master Fund Ltd.*, No. 08-cv-5520 (BSJ), 2008 WL 4891229, at *2 (S.D.N.Y. Nov. 12, 2008).

The Court further finds that the balance of hardships tips decidedly in Plaintiff's favor.  *See Citigroup Global Mkts.*, 598 F.3d at 35.  Defendant's only individualized assertion of harm caused by the issuance of a preliminary injunction is the predicted negative impact of a preliminary injunction on an expedited resolution of the question of arbitrability and the parties' underlying breach of contract dispute.  But both parties' shared interest in an efficient, prompt and final resolution of this matter can just as easily be achieved in this Court.[2]

---

[2] In that regard, as indicated by the Court at oral argument, the parties are welcome to submit a proposed expedited briefing schedule on cross-motions for

- 3 -

Further, the injunction is in the public interest, *see Winter*, 555 U.S. at 20, in light of the important interest in vindicating the rights of workers like Plaintiff to freely challenge contract provisions that may be unconscionable under New York law or may result in forced labor as defined by Congress in the Trafficking Victims Protection Act. *See* 18 U.S.C. § 1589.

Accordingly, it is hereby ORDERED that Plaintiff's motion for a preliminary injunction is granted. A written opinion will follow.

   */s/ Nina R. Morrison*
NINA R. MORRISON
United States District Judge

Dated:  February 24, 2023
        Brooklyn, New York

---

summary judgment without a pre-motion conference letter (as is typically required by this Court's Individual Rules), either at this time or after engaging in discovery.

- 4 -

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Benzor Shem Vidal, | No. 1:22-cv-05535-NRM-MMH |
| Plaintiff, | OPINION & ORDER |
| v. | |
| Advanced Care Staffing, LLC, | |
| Defendant. | |

NINA R. MORRISON, United States District Judge:

This proceeding concerns a healthcare worker's legal challenge to an arbitration

provision in an employment contract he entered into with Advanced Care Staffing ("ACS"), a

third-party staffing agency that recruits workers from other countries and places them in

hospitals and care facilities in the United States.  Plaintiff Benzor Shem Vidal ("Vidal") came to

the United States in 2022 on an immigrant visa sponsored by ACS.  The parties' employment

contract included an agreement to arbitrate their contractual disputes.  After Vidal resigned from

his employment with ACS—citing what he contends were "grueling and unsafe working

conditions that threatened his nursing license," Compl. ¶1—ACS initiated arbitration

proceedings against Vidal for his alleged breach of contract.  In September 2022, Vidal filed a

suit in this Court seeking a declaration that the arbitration agreement was unlawful, and an order

enjoining the arbitration from proceeding.

Vidal now seeks a preliminary injunction to pause the ongoing arbitration on the ground

that the arbitrator does not have the authority under the contract to consider threshold issues of

"arbitrability"—such as whether the arbitration agreement is unenforceable under state or federal

law.  Vidal argues that the contract does not contain language unambiguously delegating these

1

issues to the arbitrator. He further argues that even if the contract did contain a sufficiently clear delegation clause, the clause is invalid under various state and federal laws. This is because, Vidal argues, even exercising his right to contest the enforceability of the arbitration agreement could cost him thousands of dollars in ACS's attorneys' fees and arbitration costs under the contract's "loser pays" provision—an amount Vidal has no ability to pay. For the reasons stated herein, Plaintiff's motion for a preliminary injunction is GRANTED.

## I.   Background

### A. The parties

Plaintiff Benzor Shem Vidal, originally from the Philippines, came to the United States in 2022 to work as a nurse.[1] He grew up with limited financial means and sought to come to the United States to make enough money to support his family: his brother, who has a serious disability, and his father, who provides his brother with full-time care. Vidal Decl. ¶¶ 1–3, ECF No. 23-3. Vidal went to nursing school in the Philippines and in 2019 began the process to move to the United States to work as a nurse. *Id.* ¶¶ 7–8, 11–12.

Advanced Care Staffing ("ACS") is a healthcare staffing company in the business of recruiting nurses from other countries and staffing them at various healthcare facilities, including nursing homes, in the United States. Compl. ¶ 20. The arrangement between ACS and nurses it sponsors is as follows: ACS covers the nurses' relocation expenses, professional licensing costs, and, importantly, sponsors them for employment-based immigrant visas that allow the nurses to obtain lawful permanent resident status (or a "green card") in the United States—and bears the

---

[1] The parties each submitted factual records accompanying their briefs on the motion for a preliminary injunction. A preliminary injunction hearing was held on February 21, 2023, at which neither party offered testimony, but both presented argument. The following facts are taken from their evidentiary submissions and, unless otherwise noted, are undisputed at this stage in the litigation.

2

**SPA-6**

costs associated with his immigration applications. *See* Luy Decl. Ex. A ("2019 Contract") at 3–4, 9, ECF No. 30-1.[2]  In exchange, ACS requires nurses to agree to work exclusively with ACS for three years.  2019 Contract at 3.

### B. The 2019 Contract

Hoping to access higher wages and better working conditions in the United States, Vidal contacted ACS in 2019 and signed a contract ("the 2019 Contract") on May 7, 2019.  Vidal Decl. ¶¶ 11–12.  Vidal did not have an opportunity to negotiate this form contract.  *Id.* ¶¶ 12–13.  The 2019 Contract provided for certain penalties if Vidal were to leave his employment before his three-year term expired.  The contract included a liquidated damages clause stating that "the sum of $20,000.00 USD represents a reasonable and legitimate attempt by the Employer to calculate the costs incurred on the Employee's behalf and the amount of damages to which the Employer would be entitled to receive in a legal action brought against the Employee for breach of contract."  2019 Contract at 4.  Attached to the contract was a promissory note in the amount of $20,000 evincing Vidal's promise to fulfill his employment term of three years or else be liable for the amount of the note.  2019 Contract at 6.  The liquidated damages clause further stated: If you breach your contract you will be subject to litigation," explaining that

> The Employer may enforce the liquidated damages provisions contained above of this Employment Agreement through any or all of the following: Enforcing the terms and conditions of the attached promissory note; To the extent of allowable [sic] under New York State, Federal Inmigration and Labor Department laws and regulations, the Employer at its discretion may deduct any amounts from the Employee's last Pay check(s).

2019 Contract at 4.  This same paragraph also provided that ACS could "enforce the liquidated damages provisions contained above of this Employment Agreement by legal action of any type."  *Id.*  The 2019 Contract also contained an arbitration provision.  *See id*.

---

[2] Page numbers for the 2019 Contract, ECF No. 30-1, refer to the ECF Page numbering.

Once Vidal signed the 2019 Contract, ACS began the process of securing him his immigrant visa and fulfilling the other administrative requirements for placement. Def.'s Mem. in Opp'n to Prelim. Inj. ("Def.'s Opp'n") at 4, ECF No. 29. This process took several years. Vidal Decl. ¶¶ 14–16. During this time, Vidal was bound by the exclusivity provision of the 2019 Contract. As a result, he was unable to seek or accept any other employment in the United States. Pl.'s Mem. in Supp. of Mot. Prelim. Inj. ("Pl.'s Mem.") at 3–4, ECF No. 23-1; 2019 Contract at 2. Still seeking better pay and working conditions, Vidal left the Philippines for the United Kingdom, working at a hospital in London while he waited for his visa to be approved. Vidal Decl. ¶¶ 17–18. While working in London, Vidal could barely afford basic living expenses, and any additional money he made he sent home to support his family. *Id.* ¶¶ 18–19. In late 2021, Vidal learned that his visa paperwork had finally been approved, *see id.* ¶ 20, meaning that all that remained in his application process before he would be cleared to work for ACS in the United States was his interview with the U.S. Embassy. *See* Compl. ¶ 32; Luy Decl. Ex. B1, ECF 30-2. Once he received this news, Vidal quit his job in London, anticipating he would be moving to the United States imminently. Vidal Decl. ¶ 20; *see* Compl. ¶ 35.

### C. The 2022 Contract

On January 4, 2022—two years and eight months after he signed his exclusive contract with ACS—Vidal received a communication from ACS with several significant pieces of information. ACS informed Vidal that he had been scheduled for an interview with the U.S. Embassy in connection with his visa application and sent Vidal an email with materials to assist him in preparing that interview. Luy Decl. Ex. B1. Attached to this email were a cover letter; a letter from ACS releasing the promissory note Vidal had signed in 2019; and an amended employment contract for him to review and sign ("the 2022 Contract"). *Id.*

4

The cover letter stated that this new contract "was developed after consulting industry best practices and feedback from our team members." Luy Decl. Ex. B2, ECF No. 30-3. The letter explained that the differences between the 2019 Contract and the 2022 Contract included "greater clarity," and highlighted, among the changes, the following:

> **No "Liquidated Damages" or Promissory Note.** The older version specified a sum of money to be paid in the event of a breach and included a promissory note. We received feedback that this was viewed as a "buy out", which was never our intention. . . . This new version eliminates a specified sum of damages and allows for recovery of whatever damages are proven (which might be higher or lower than the amount specified in the older version). Attached to this letter is a separate letter waiving/cancelling any promissory note that you might have signed.

*Id.* The cover letter further stated: "If you have any questions before signing, please contact me as soon as possible," via provided contact information, or "[i]f you have no questions, please returned a signed copy of the new Employment Agreement . . . via email." *Id.*

Also attached to the email was a short letter stating in its entirety: "[ACS] hereby unconditionally waives, cancels, and releases the $20,000 promissory note that you made to [ACS], dated May 8, 2019." Luy Decl. Ex. B3, ECF No. 30-4. This letter provided Vidal with no explanation as to whether that cancelation had any impact on either party's rights or obligations under the 2019 Contract that he had signed in conjunction with the note. *See id.*

Like the 2019 Contract, the 2022 Contract provided that ACS would pay Vidal in accordance with prevailing wage requirements and would cover Vidal's relocation expenses, specifying one-way airfare, a rent subsidy for two months, $400 in gift cards for groceries, and one monthly MTA card, as well as licensing and immigration expenses. Seligman Decl. Ex. 4 ("2022 Contract") at 4, ECF No. 23-6.[3]

---

[3] Page numbers for the 2022 Contract, ECF No. 23-6, refer to the ECF page numbering.

5

**SPA-9**

However, the 2022 Contract deviated in several significant ways from the 2019 Contract. First, the 2022 Contract eliminated the liquidated damages clause and substituted a provision outlining the damages ACS would suffer if Vidal left his employment before the end of the term. The provision first noted that ACS would be harmed to the extent that it fronted "expenses and costs" related to immigration and relocation expenses. 2022 Contract at 7. The clause further stated: "In addition, Employee recognizes that Employer will suffer significant loss of profits . . . in the event Employee fails to fulfill Employee's obligations under this Agreement," and provided that, in the event Vidal resigned before the contract term expired, "Employer shall be entitled to all damages and other relief to redress the harm caused by the failure of Employee to fulfill Employee's obligations under this Agreement." 2022 Contract at 7. The contract also contained a statement that it superseded the previous agreement, as well as a severability clause. 2022 Contract at 8.

The 2022 Contract contained an expanded arbitration agreement, set forth in a separate Schedule B, which provided:

> I agree that any dispute, controversy or claim arising between me and Employer (including a dispute, controversy or claim arising out of, in connection with or relating to, this Agreement, or the interpretation, performance or breach, termination or validity hereof) shall be resolved by arbitration pursuant to this dispute resolution provision (the "Provision"). This includes, but is not limited to, claims involving an alleged violation of public policy; all statutory claims for discrimination and/or harassment and/or retaliation under federal, state, or local law; and claims concerning wages or other compensation, whether based on statute or any other grounds.
>
> ***
>
> I agree that arbitration will be administered by the American Arbitration Association ("AAA") and that the AAA's Commercial Arbitration Rules in effect at the time of the dispute will govern, except as modified by this Provision. I understand that the AAA's Commercial Arbitration Rules are available online at www.adr.org.

6

\*\*\*

I agree that at the conclusion of arbitration, the prevailing party shall be entitled (in addition to all other relief available under the Agreement or applicable law) to be reimbursed for its reasonable attorney's fees as well as all costs and fees charged by the AAA and the arbitrator.

\*\*\*

I agree that in the event that any court of competent jurisdiction shall determine that any portion of this Provision exceeds the scope permitted by applicable law, the court shall have the authority to modify or "blue pencil" such portion so as to render it enforceable while maintaining the parties' original intent to the maximum extent possible.

2022 Contract at 12–13. In this proceeding, Vidal refers to the clause providing that the prevailing party in the arbitration is entitled to recover all fees and costs from the non-prevailing party as the "loser pays" provision. Pl.'s Mem. at 4.

Vidal considered himself bound by the terms of the 2019 Contract when he was presented with the 2022 Contract; he believed that if he did not sign the 2022 Contract, he would be in breach of the 2019 Contract he had already signed. Vidal Decl. ¶ 25. Vidal was never informed whether he could have opted to refuse to sign the 2022 Contract and choose, instead, to continue to work for ACS under the terms of the 2019 Contract.

At oral argument before me on February 21, 2023, I asked counsel for ACS whether, at the time he was presented with the 2022 Contract, Vidal could have declined to sign the 2022 Contract without forfeiting his long-awaited opportunity to pursue employment through ACS in the United States. That is, could Vidal have held ACS to its contractual agreement to sponsor his visa application and secure him employment in the United States under the terms of the 2019 Contract, and would ACS have been bound by that contract's original terms had he chosen to do so? Counsel for ACS answered both questions in the affirmative. Thus, in January 2022, Vidal could have chosen to avail himself of all of the benefits of the 2019 Contract, but with one significant change. In the event of an alleged breach on Vidal's part, ACS would no longer be

7

able to seek to collect on the $20,000 promissory note against him, since ACS had unilaterally cancelled the note in January 2022. On the present record, however, it is undisputed that no one from ACS informed Vidal of this option at the time he was presented with the 2022 Contract for his signature.

Vidal did speak with an ACS staff member when he received the proposed new contract, who told him that he "should sign the revised contract and send it back to [ACS] quickly." Supp. Vidal Decl. ¶ 7, ECF No. 35-1. Accordingly, Vidal signed the 2022 Contract the same day he received it—January 4, 2022. 2022 Contract at 9.

### D. Vidal's work in the United States

Vidal came to the United States and began working at ACS's client facility, Downtown Brooklyn Nursing & Rehabilitation Center, on March 8, 2022. Vidal Del. ¶ 26; Compl. ¶ 44. Almost immediately, Vidal contends, he began to work under conditions that he believed were unsafe. Vidal Decl. ¶ 27. Although ACS had previously told him he would be responsible for twenty to thirty patients, Vidal bore a caseload of forty to fifty patients at a time. *Id.* ¶ 26. Vidal experienced patients buzzing his call button repeatedly because they needed urgent help, but he was unable to reach them in time. *Id.* ¶ 28. He regularly heard patients screaming out in pain. *Id.* Vidal was provided with insufficient breaks and suffered repeated illnesses during this time. *Id.* ¶¶ 29–30. Given the number of patients for whom Vidal was responsible—and the conditions under which he was working—Vidal grew increasingly "terrified" that he could not provide his patients with adequate care and was "putting [his] personal health, the health of [his] patients, and [his] professional license at risk." *Id.* ¶¶ 33–34.

8

SPA-12

Ultimately, three months after he began working for ACS, Vidal wrote to ACS to resign on June 15, 2022. Vidal Decl. ¶ 35; Luy Decl. Ex. G at 2, ECF No. 30-13.[4]

Subsequently, ACS wrote to Vidal on June 22, 2022, in response to his resignation. Asaad Decl. Ex. 1, ECF No. 31-1. In this letter, ACS wrote:

> Although [ACS]'s damages would ultimately be determined by an arbitrator pursuant to the Agreement, [ACS] will present evidence demonstrating that *its damages are at least $20,000 (not counting attorney's fees and costs that would be incurred in the arbitration).* As mentioned already, [ACS] would seek the thousands of dollars of lost investment made in helping you get to this point. Also, although [ACS] is seeking to reduce its losses by seeking a replacement, given the current market conditions, recruiting and hiring a replacement nurse(s) *is expected to cost over $9,000 dollars per year* over the remainder of your three-year term.

*Id.* at 1–2 (emphasis added). Although he feared the financial consequences of leaving his position with ACS, Vidal ultimately followed through with his resignation out of concerns that he would lose his license—his sole tool to obtain sufficient income to support himself and his family—if he remained. Vidal Decl. ¶¶ 54, 56.

### E. Arbitration proceedings and the instant litigation

On July 8, 2022, ACS initiated arbitration proceedings against Vidal with the American Arbitration Association ("AAA"). ACS alleged that Vidal had breached his contract and demanded "all available damages" including ACS's "costs and lost profits," "reasonable attorney's fees," and the "cost of arbitration." Seligman Decl. Ex. 6 at 6, ECF No. 23-8.

Proceeding without counsel in the arbitration proceedings, Vidal requested extensions to respond to the demand throughout the summer. *See* Asaad Decl. Ex. 5, ECF No. 31-5; Ex. 6,

---

[4] Vidal maintains that prior to his resignation, he raised his concerns about his working conditions with ACS directly. ACS denies that he did so, *see* Def.'s Opp'n at 8, but has offered no declaration or other direct evidence to refute Vidal's affidavit on this point; ACS instead relies on the absence of any reference to earlier communications with ACS in Vidal's resignation email. Def.'s Opp'n at 8 (citing Luy Decl. Ex. G). In light of this factual dispute, I do not rely on this allegation by Vidal in considering the grounds for the requested injunction, which is in any event immaterial to the claims presented in this motion for a preliminary injunction.

ECF No. 31-6.[5] AAA informed Vidal an arbitrator was selected on September 7, 2022.

Seligman Decl. Ex. 11, ECF No. 23-13. This arbitrator's rate was $450 per hour, *id.*, and AAA

charged a filing fee of $1,900 and a case management fee of $750. Compl. ¶ 76.

Vidal filed the instant action in the Eastern District of New York on September 16, 2022.

He asserted that the arbitration was invalid under the Trafficking Victims Protection Act

("TVPA"), 18 U.S.C. § 1589; New York's prohibition on labor trafficking, N.Y. Pen. Law §

135.35; and federal and state minimum wage laws. He further alleged that the contractual

provisions mandating arbitration were unconscionable under New York law. Vidal sought

declaratory and injunctive relief enjoining the arbitration.

After filing the complaint in this Court, Vidal continued to request that the arbitration be

paused while a court considered his challenge to its terms. Seligman Decl. Ex. 12, ECF No. 23-

14; Ex. 13, ECF No. 23-15. ACS opposed these requests. *See* Seligman Decl. Ex. 14, ECF No.

23-16.

Vidal also submitted arguments to the arbitrator that the purported delegation clause was

invalid. Seligman Decl. Ex. 15, ECF No. 23-17; Ex. 16, ECF No. 23-18. On October 24, 2022,

the arbitrator issued an order stating, "Pursuant to the Parties' Dispute Resolution Provision and

AAA's rules, as the Arbitrator in this matter, I have the authority to rule on my own jurisdiction,

including with respect to the validity of the arbitration agreement or the arbitrability of any

claim." Asaad Decl. Ex 11, ECF No. 31-11. The Arbitrator also noted that many of Vidal's

arguments "are premature and do not support the issuance of a stay," and that he would "have the

---

[5] Attorneys from Towards Justice, Kakalec Law PLLC, and Nichols Kaster PLLP represent Vidal in the instant lawsuit in this Court challenging the enforceability of the arbitration provisions in his 2022 contract; they represent Vidal before the arbitrator for the limited purpose of seeking a stay of the arbitration. *See* Seligman Decl. Ex. 13, ECF No. 23-15.

opportunity during the course of arbitration to argue that the contract at issue is unenforceable."
*Id.* Vidal continued to seek stays from the arbitrator, but instead she set a schedule for discovery
on the merits, originally set to be completed in mid-March. Seligman Decl. Ex. 19, ECF No. 23-
21. The arbitrator later agreed on January 23, 2023, to extend discovery deadlines by 30 days,
but stated that she would only stay the matter "upon party agreement or by court order." Pl.'s
Letter dated Jan. 23, 2023, ECF No. 24. ACS would not consent to a stay. *See id.*; Def.'s Mot.
for Extension, ECF No. 25.

 This case was originally assigned to the Hon. Carol Bagley Amon. ACS filed a letter
seeking a pre-motion conference on anticipated motions to dismiss Vidal's complaint and compel
arbitration on October 20, 2022. Def.'s Mot. for Pre-Mot. Conf., ECF No. 11. Vidal opposed
this request on October 27, 2022. Pl.'s Resp. to Def.'s Mot. for Pre-Mot. Conf., ECF No. 13.
This case was transferred to me as a routine matter of court administration while ACS's request
was pending.

 On January 23, 2023, Plaintiff filed a motion for a preliminary injunction seeking to
enjoin the ongoing arbitration. Following expedited briefing and oral argument, I entered a short
written order granting the preliminary injunction on February 24, 2023. Mem. & Order, ECF
No. 39. This written opinion follows to more fully explain the reasons why Vidal is entitled to
preliminary injunctive relief.

## II. Discussion

 "[A] party seeking a preliminary injunction [must] show '(a) irreparable harm and (b)
either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the
merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly
toward the party requesting the preliminary relief." *Citigroup Glob. Mkts., Inc. v. VCG Special*

11

*Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (citation omitted).[6]  Where a district court applies the "serious questions" standard to grant an injunction, the requirement that the balance of hardships tip decidedly in favor of the moving party is an "additional[]" requirement that ensures that the movant's "overall burden is no lighter than the one it bears under the 'likelihood of success' standard."  *Citigroup Glob. Mkts.*, 598 F.3d at 35.  Additionally, courts also consider whether "the public interest would not be disserved by the issuance of a preliminary injunction."  *Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010).

District courts have jurisdiction to enjoin or stay pending arbitrations.  *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 139–41 (2d Cir 2011); *CRT Cap. Grp. v. SLS Cap., S.A.*, 63 F. Supp. 3d 367, 375 (S.D.N.Y. 2014) ("The [Second Circuit] Court of Appeals has made it clear that federal courts do have the power to enjoin domestic arbitrations . . . ."); *Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*, 764 F.3d 210, 213 (2d Cir. 2014) ("Federal courts generally have remedial power to stay arbitration." (citation omitted)).

### A.  Likelihood of success on the merits

The Federal Arbitration Act ("FAA") provides that written agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the

---

[6] Contrary to ACS's assertions, Def.'s Opp'n at 26–27, the serious question standard is not limited to cases with the potential for particularly widespread impact or particularly complex litigation, but is applied regularly to cases that vary in terms of scope and complexity.  This standard exists in recognition that "preliminary injunctions should not be mechanically confined to cases that are simple or easy."  *Citigroup Glob. Mkts.*, 598 F.3d at 35.  Here, further discovery may reveal additional facts and circumstances surrounding Vidal's signing of the 2022 Contract or his financial circumstances relevant to the unconscionability and TVPA analyses.  Further litigation may be warranted on a more complete record for other issues of first impression in this case, such as the validity of delegation language that is contradicted by other language in the arbitration agreement or the invalidity of a delegation clause paired with a loser pays provision under the TVPA.  Although it is not necessary to rely on the serious questions standard in light of my determination that Plaintiff is likely to succeed on the merits of the claims detailed in this opinion, the serious questions standard is also appropriate here.

revocation of any contract." 9 U.S.C. § 2. The FAA "is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24 (1983). However, this policy seeks to make "arbitration agreements as enforceable as other contracts, but not more so." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404, n. 12 (1967). "Accordingly, a court must hold a party to its arbitration contract just as the court would to any other kind. But a court may not devise novel rules to favor arbitration over litigation." *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022) (citing *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218–221 (1985)).

Generally speaking, when addressing whether a dispute is properly subject to arbitration, courts first consider "whether the parties have entered into a valid agreement to arbitrate," and then "whether the dispute at issue is subject to the arbitration agreement" *In re Am. Exp. Fin. Advisors Sec. Litig.,* 672 F.3d at 128. This second inquiry is often referred to as "arbitrability" and encompasses "threshold questions such as whether the arbitration clause applies to a particular dispute, or whether it is enforceable." *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 251 (2d Cir. 2019).

However, "before addressing the second inquiry, [a court] must also determine *who*, the court or the arbitrator, [should] decide[]" such threshold questions of arbitrability. *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d at 128 (emphasis added); *Alemayehu*, 934 F.3d at 250. "In general, what is determinative for deciding whether the arbitrability of a dispute is to be resolved by the court or by the arbitrator is the arbitration agreement. Just as the parties may elect through their contract to have arbitrators (rather than a court) resolve categories of disputes between them, they may similarly contract to have arbitrators (rather than a court) decide whether a

particular dispute is to be arbitrated under the terms of the contract." *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 189–90 (2d Cir. 2019).

Issues of arbitrability are at the core of the parties' dispute here. Vidal claims this dispute is not properly subject to arbitration because the arbitration agreement is unenforceable: he argues it is unconscionable under New York state contract law, and it violates federal statutes that protect the rights of workers like him to be free from forced labor.[7] He argues that a court, rather than the arbitrator, should resolve these legal challenges because the parties did not properly and validly delegate issues of arbitrability to the arbitrator. For its part, ACS contends that the arbitration agreement is enforceable and, in any event, contains a valid delegation clause that properly delegates any legal challenges regarding enforceability to the arbitrator.

Therefore, the threshold question here is whether the purported delegation clause in the 2022 Contract allows this Court to consider Vidal's challenge to the contract's enforceability at all, or whether all disputes about the enforceability of the agreement's terms must go to the arbitrator in the first instance. This question directly informs the relief Vidal seeks at the preliminary injunction stage. If the delegation clause is valid, then the preliminary injunction should be denied and the arbitration should proceed, because Vidal's arguments on enforceability must go to the arbitrator. But if the delegation clause either (a) does not clearly and unmistakably reserve those questions for the arbitrator, or (b) is otherwise invalid, then a district

---

[7] Vidal also argues (1) that the delegation clause and arbitration agreement violate federal and state labor laws and (2) that the entire 2022 Contract is invalid because he signed the agreement under economic duress. *See* Compl. (Counts III–VI ); Pl.'s Mem. at 21–22. However, the Court need not address these other claims and reserves decision on these claims for the merits stage. *See Upsolve, Inc. v. James*, 604 F. Supp. 3d 97, 109 (S.D.N.Y. 2022) ("To warrant a preliminary injunction, Plaintiffs need not show that there is a likelihood of success on the merits of all their claims for relief. Rather, Plaintiffs must show a likelihood of success on the merits of at least one of their claims." (citation omitted)).

court may (if plaintiff meets his burden under the preliminary injunction standard) proceed to grant Vidal's request for a preliminary injunction. The injunction Vidal requests would have the effect of pausing the arbitration while a court decides these issues of arbitrability—specifically whether the arbitration agreement violates state or federal law.

Vidal argues that the purported delegation language is not a sufficiently "clear and unmistakable" delegation clause to permit these questions to be resolved by the arbitrator under Supreme Court and Second Circuit precedent. He further argues that, even if it were, the delegation clause is nonetheless invalid because (a) it violates the TVPA and (b) is unconscionable under New York state law. For the following reasons, I find that Vidal is likely to succeed on the merits—or, at the very least, raises serious questions as to the merits—of each these claims.

### 1. The contract's delegation language

The parties dispute whether the arbitration agreement properly delegates questions of arbitrability to the arbitrator. It is well-settled that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)); *see also DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 317 (2d Cir. 2021). Importantly, this test reflects a marked departure from the "presumption of arbitrability" that applies to courts' analysis of "whether a given dispute falls within the scope of the arbitration agreement." *DDK*, 6 F.4th at 317. Instead, when parties raise the question of "who should decide arbitrability, there is a presumption that the question should be resolved by the court." *Id.*; *see First Options of Chi.*, 514 U.S. at 944–45.

15

**SPA-19**

Accordingly, while courts generally resolve ambiguities in arbitration agreements in favor of arbitration, they resolve ambiguities as to the *delegation of arbitrability* in favor of court adjudication. *See First Options of Chi.*, 514 U.S. at 944–45 ("[C]ourts might hesitate to interpret silence or ambiguity on the 'who should decide arbitrability point' as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide."); *DDK*, 6 F.4th at 317 ("This 'clear and unmistakable evidence' requirement reflects a departure from the manner in which we treat silence or ambiguity when interpreting whether a particular merits-related dispute falls within the scope of an arbitration agreement."); *Katz v. Feinberg*, 290 F.3d 95, 97 (2d Cir. 2002) (finding that the presence of certain clauses "creates an ambiguity which, under *First Options*, requires us to assign questions of arbitrability to the district court, not the arbitrator").

The "clear and unmistakable" requirement exists in recognition that, generally, "persons involved in a dispute are ordinarily entitled to have access to a court for the resolution of [their] dispute, [and i]t is a fundamental tenet of law that only by agreeing to arbitrate does a person surrender [this] right." *Bucsek*, 919 F.3d at 190. Accordingly, the clear and unmistakable requirement

> is designed to guard against 'the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate.' Were the courts to cede to arbitrators resolution of the arbitrability of the dispute (absent the clear and unmistakable agreement of the parties to that effect), this would incur an unacceptable risk that parties might be compelled to surrender their right to court adjudication, without their having consented.

*Id.* (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)).

I find that the arbitration agreement here contains significant ambiguity such that its purported delegation language cannot be considered clear and unmistakable. In arguing otherwise, ACS points to (1) language in the arbitration agreement that "any dispute, controversy

16

or claim arising between me and Employer (including a dispute, controversy or claim arising out of, in connection with or relating to, this Agreement, or the interpretation, performance or breach, termination *or validity* hereof) shall be resolved by arbitration," and (2) the agreement's incorporation of the AAA Commercial Rules. 2022 Contract at 12.

But these two provisions must be read in context. And taken as a whole, the agreement contains significant ambiguity regarding whether the parties intended that result. On the very next page, the agreement provides that "in the event that *any court of competent jurisdiction* shall determine that any portion of this Provision exceeds the scope permitted by applicable law, the court shall have the authority to modify or 'blue pencil' such portion *so as to render it enforceable* while maintaining the parties' original intent to the maximum extent possible." 2022 Contract at 13 (emphasis added). Rather than "clearly and unmistakably" delegating the question of arbitrability to the arbitrator, *DDK*, 6 F.4th at 317, Schedule B not only repeatedly contemplates that "a court" might someday rule upon, *inter alia,* "any portion" of the contract's "scope" and "enforce[ability]," but does so without referencing any role for the arbitrator in this determination.

At oral argument, counsel for ACS contended that this provision was a "savings clause" that would allow courts to modify the agreement in the event that Congress declared that a particular type of case or legal claim could not be arbitrated. ACS pointed, by way of example, to a law passed by Congress in 2021 that precludes defendants from compelling plaintiffs to arbitrate sexual harassment or sexual assault claims even if their contracts so provide. *See* Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021, Pub. L. No. 117–90, 136 Stat. 26 (codified at 9 U.S.C. §§ 401, 402) (establishing that, where a plaintiff "alleg[es] conduct constituting a sexual harassment dispute or sexual assault dispute" he or she

17

**SPA-21**

may elect to render a "predispute arbitration agreement" invalid or unenforceable). Perhaps that is what ACS intended the clause to mean—but that is not what the clause says. Instead, the clause expressly contemplates that "a court of competent jurisdiction" may review this particular contract between ACS and Vidal and determine whether its provisions are "enforceable," without any limitation or caveats as to what that enforceability review may encompass. 2022 Contract at 13.

ACS has failed to point to any other case where a court has found an arbitration agreement to contain a clear and unmistakable delegation clause notwithstanding specific contractual language—as is present here—contemplating judicial resolution of enforceability issues. At least one federal district court has held that a provision anticipating a court *or an arbitrator* may declare any provision to be void or unenforceable does not render an otherwise clear and unmistakable clause ambiguous. *See Ward v. Ernst & Young U.S. LLP*, 468 F. Supp. 3d 596, 607 (S.D.N.Y. 2020). However, a clause that contemplates either a court or an arbitrator's intervention is distinct from the provision here, which refers *only* to "a court of competent jurisdiction." 2022 Contract at 13. A provision referring to "a court or an arbitrator" is not inconsistent with the purported delegation clause because it still contemplates an arbitrator's ability to rule on enforceability. But a provision referring only to "a court" injects significant ambiguity into the question of whether the contract actually authorizes an arbitrator *alone* to address arbitrability. From the perspective of someone signing the contract, the latter provision might certainly indicate that a court—and, perhaps, *only* a court—could determine whether the agreement was enforceable. And here, the provision twice contemplates judicial intervention: not only does it expressly state that a court may rule on the question of enforceability, but also

18

**SPA-22**

that a court may actively preside over modification (*i.e.*, "blue-penciling") of this specific

contract to ensure that its provisions are legal and enforceable.  2022 Contract at 13.

Indeed, courts have recognized that provisions similar to the "savings clause" at issue

here are enough to negate even an otherwise clear and unambiguous delegation clause. *See, e.g.*,

*Vargas v. Delivery Outsourcing, LLC*, No. 15-CV-03408-JST, 2016 WL 946112, at *6 (N.D. Cal.

Mar. 14, 2016) (declining to enforce "an unambiguous delegation clause contradicted by another

provision of the contract" that "indicates that the *court* might also find provisions in the contract

unenforceable," as "not clear and unmistakable" (citations omitted)); *Levi Strauss & Co. v. Aqua*

*Dynamics Sys., Inc.*, No. 15-CV-04718-WHO, 2016 WL 1365946, at *7 (N.D. Cal. Apr. 6, 2016)

(noting that "[v]iewed holistically" the arbitration agreement was ambiguous even if one

provision "[v]iewed in a vacuum" might constitute clear and unmistakable delegation where

another provision allowed the "Agreement [to] be declared invalid or unenforceable by a court of

competent jurisdiction"); *cf. Peni v. Daily Harvest, Inc.*, No. 22CV5443 (DLC), 2022 WL

16849451, at *7 (S.D.N.Y. Nov. 10, 2022) ("Nowhere does this provision empower a *court* to

rule on the validity or enforceability of the agreement.").

ACS further argues that the test articulated by the Second Circuit in *DDK Hotels, LLC v.*

*Williams-Sonoma, Inc.*, 6 F.4th 308 (2d Cir. 2021), applies here, and that under that framework

the arbitration agreement clearly and unmistakably delegates questions of arbitrability to the

arbitrator.  In *DDK*, the Second Circuit held that an "arbitration agreement [that] is broad and

expresses the intent to arbitrate all aspects of all disputes . . . coupled with incorporation of rules

that expressly empower an arbitrator to decide issues of arbitrability[,] constitutes clear and

unmistakable evidence of the parties' intent to delegate the question of arbitrability to the

19

**SPA-23**

arbitrator." 6 F.4th at 318–19. The *DDK* Court concluded that the incorporation of the AAA Commercial Rules satisfies this second requirement. *Id.*

As an initial matter, the dispute in *DDK* was over a contract between two sophisticated commercial parties that were involved in a long-running business venture that ultimately dissolved. *See DDK*, 6 F.4th at 312–14. While one district court in this Circuit has applied this case to an unsophisticated individual party, "the Second Circuit has not addressed whether the import of rule incorporation differs based on the parties' sophistication." *Daily Harvest*, 2022 WL 16849451, at *7 (applying *DDK* to a form contract in a consumer rights case). Sophisticated commercial actors may be aware, following *DDK*, that the incorporation of the AAA Commercial Rules signals the existence of a delegation clause. But it is highly unlikely that a foreign nurse unfamiliar with United States law, let alone caselaw surrounding the interpretation of arbitration agreements, would see a reference to the AAA Commercial Rules in the contract and reach that same conclusion, *i.e.,* understand that such incorporation would in any way reflect an actual "intent to delegate the question of arbitrability to the arbitrator." *DDK,* 6 F.4th at 318. Indeed, even if Vidal had followed the link in the 2022 Contract and reviewed the AAA Commercial rules, he still may not be aware of or understand that those rules might impact who would someday decide any challenges to arbitrability.[8]

---

[8] It bears noting that the AAA rules are not particularly clear themselves, especially for a party encountering them for the first time. The AAA Commercial rules span roughly forty pages and contain more than 60 rules setting forth filing requirements, the structure of duties under the AAA, procedures for communicating with arbitrators, disqualifying arbitrators, and oaths required at hearings, to name just a few. Tucked within these broad-spanning rules is Rule 7, entitled "Jurisdiction," which states that an "arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim, without any need to refer such matters first to a court." Seligman Decl. Ex. 24 at 15, ECF No. 23-26. It is highly improbable that an unsophisticated party would even register this provision in a set of rules

20

Even assuming *DDK* required a court to consider the delegation language here to constitute a clear and unmistakable delegation clause, regardless of the parties' status, important factual distinctions remain. *DDK* says nothing about whether an arbitration agreement with a broad arbitration provision and that incorporates the AAA Commercial Rules would still clearly and unmistakably delegate arbitrability to the arbitrator *even if* it also had language explicitly providing for judicial intervention on issues of enforceability. Certainly, *DDK* does not disturb the longstanding rule that, if contracts are to delegate issues of arbitrability to an arbitrator, they must do so "clearly and unmistakably"—in fact, *DDK* restates and relies on that very principle. *DDK*, 6 F.4th at 317 (quoting *First Options of Chi.*, 514 U.S. at 944 (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986))).

Accordingly, I find that Vidal is likely to succeed on the merits of his claim that the contract does not clearly and unmistakably delegate issues of arbitrability to the arbitrator, or, at the very least, has raised serious questions as to the merits of that claim.

### 2. The validity of the delegation clause

Even if the contract here does, as ACS alleges, contain an unambiguous delegation clause, a federal court may still consider whether the clause itself violates state or federal laws protecting the rights of persons like Vidal. *See Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63 (2010); *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 128 (2d Cir. 2019).

---

intended for an entirely separate purpose, let alone comprehend its implications. *See Allstate Ins. Co. v. Toll Bros., Inc.*, 171 F. Supp. 3d 417, 429 (E.D. Pa. 2016) ("Incorporating forty pages of arbitration rules into an arbitration clause is tantamount to inserting boilerplate inside of boilerplate, and to conclude that a single provision contained in those rules amounts to clear and unmistakable evidence of an unsophisticated party's intent would be to take 'a good joke too far.'" (internal quotation marks and citation omitted)).

In *Rent-A-Center*, the Supreme Court addressed an employee's challenge to an arbitration agreement that contained a delegation clause. 561 U.S. at 66. There, the employee opposed a motion to compel arbitration, arguing that the arbitration agreement was unconscionable and that the delegation clause was therefore invalid. *Id.* at 73. The Supreme Court emphasized that, in the presence of an otherwise clear and unmistakable delegation clause, a challenge to the contract as a whole must go to the arbitrator—but made clear that *specific* challenges to the *validity* of that delegation clause could be heard by a court. *Id.* at 72 ("Unless Jackson challenged the delegation provision specifically, we must treat it as valid . . . Jackson challenged only the validity of a contract as a whole."); *see also Ward v. Ernst & Young U.S. LLP*, 468 F. Supp. 3d 596, 603 (S.D.N.Y. 2020). Since the employee in *Rent-A-Center* had only challenged the arbitration agreement as a whole, the Supreme Court declined to address the validity of the delegation clause.

Parties can challenge a delegation clause as invalid because a delegation clause is an agreement to arbitrate a gateway issue. *Rent-A-Center*, 561 U.S. at 70. It is therefore "simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce," and as such must be independently evaluated under 9 U.S.C. § 2. *Rent-A-Center*, 561 U.S. at 70. Accordingly, the delegation clause "is valid under § 2 'save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Id.* (quoting 9 U.S.C. § 2).

Since *Rent-A-Center*, courts of appeals have addressed claims where parties to an arbitration agreement have brought challenges to an otherwise "clear and unmistakable" delegation clause, provided those challenges include a specific attack on the validity of the delegation clause. *See Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126 (2d Cir. 2019) (affirming that a "specific attack on the delegation provision is sufficient to make the issue of arbitrability

22

one for a federal court"); *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 1000 (9th Cir. 2021) ("But '[b]ecause a court must enforce an agreement that, as here, clearly and unmistakably delegates arbitrability questions to the arbitrator,' the court's initial inquiry focuses on whether the agreement to delegate arbitrability—the delegation clause—*is itself* unconscionable." (emphasis added) (quoting *Brennan v. Opus Bank*, 796 F.3d 1125, 1132 (9th Cir. 2015))).

Here, Vidal repeatedly mounts specific challenges to the validity of the delegation clause under state and federal law, citing the potentially ruinous financial toll of appearing before an arbitrator even to determine questions of arbitrability. Pl.'s Mem. at 17 ("*[D]elegating questions of arbitrability* to the arbitrator would require Mr. Vidal to submit to an arbitration regarding matters that, by virtue of the 'loser pays' provision, could bury him in extraordinary costs and legal fees."); *id.* at 19 ("These costs—even just those costs flowing from an arbitration over *matters of arbitrability*—amount to a threat of 'serious harm' [under the TVPA].); *id.* at 24 ("Most importantly [for a substantive unconscionability analysis] the requirement includes a loser pays term that provides that the prevailing party 'shall be entitled' to its attorney's fees and the costs of the arbitration, including the arbitrator's fees, even over an arbitration regarding *preliminary matters of arbitrability*."); Pl.'s Reply in Supp. of Mot. for Prelim. Inj. at 7, ECF No. 34 ("If Mr. Vidal were required to adjudicate the arbitration provision's *validity and enforceability* in arbitration, he would potentially face tens of thousands of dollars in arbitration costs and Defendant's attorneys' fees."); *id.* at 9–10 ("[S]erious harm exists because of the threat that an arbitration, *even regarding the threshold question of arbitrability*, could force him to bear tens of thousands of dollars in Defendant's attorney's fees and in arbitration costs.").[9]

---

[9] Accordingly, this is unlike cases where courts have held, following *Rent-A-Center*, that a party's general challenge to the validity of a contract does not qualify as a challenge to the

23

The fact that Vidal emphasizes the impact of other clauses on the delegation clause in his specific challenge to the validity of the delegation clause does not change the analysis. As the Ninth Circuit explained in *Lim*, such arguments are permissible because the existence of other clauses can be what makes the delegation clause unlawful. *See Lim*, 8 F.4th at 1002–03 (concluding that the delegation clause itself was unconscionable because "[v]iewed collectively . . . the cost-splitting, fee-shifting, and . . . venue provisions rendered the delegation clause substantively unconscionable," because the "delegation clause was so 'prohibitively costly' that it deprived Lim of any proceeding to vindicate his rights"). In other words, Vidal need not confine his challenge to the terms of the delegation clause *alone* for him to satisfy *Rent-A-Center*'s specific challenge requirement.

Accordingly, *Rent-A-Center* and its subsequent application permit me to proceed to evaluate Vidal's specific attacks on the validity of the delegation clause. In so doing, I conclude that he is likely to succeed on the merits of at least two of his claims that the delegation clause is legally invalid, or, at the very least, has raised sufficiently serious questions as to the merits of these claims to warrant a pause in the arbitration. Likelihood of success on either of these two independent arguments would satisfy Vidal's burden as to this prong of his motion for a preliminary injunction.

---

validity of an otherwise clear and unmistakable delegation clause. *See, e.g.*, *Ward*, 468 F. Supp. 3d at 604 ("Because the plaintiff's challenge in this Court is clearly directed at the Agreement as a whole, and not at the delegation provision specifically, the plaintiff's . . . challenge to the Agreement . . . must be submitted to the arbitrators under *Rent-A-Center* and the plain language of the delegation provision."); *Greene v. Kabbalah Ctr. Int'l Inc.*, No. 19-CV-4304-ILG-SJB, 2022 WL 4006903, at *1 (E.D.N.Y. Sept. 1, 2022) ("Plaintiffs only make a series of general attacks on the . . . Agreements as a whole. Though they purport to challenge the delegation provision, they do not do so in fact."); *see also Arrigo v. Blue Fish Commodities, Inc.*, 408 F. App'x 480, 482–83 (2d Cir. 2011) (holding that a claim of procedural unconscionability "challenging the validity of the agreement as a whole" was for the arbitrator to decide).

### a. Trafficking Victims Protection Act ("TVPA")

As an antecedent agreement to arbitrate, a delegation clause is enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *Rent-A-Center*, 561 U.S. at 69. Under New York law, courts will not enforce contracts that are "illegal, against public policy, or deficient in some other respect." *64th Assocs., L.L.C. v. Manhattan Eye, Ear & Throat Hosp.*, 813 N.E.2d 887, 889 (N.Y. 2004).

Vidal argues that the delegation clause, in conjunction with the "lost profits" and "loser pays" provisions of the contract, violates the Trafficking Victims Protection Act ("TVPA"). In the TVPA, Congress made it unlawful to "knowingly provide[] or obtain[] the labor or services of a person . . . by means of serious harm or threats of serious harm to that person or another person," or "by means of the abuse or threatened abuse of law or legal process." 18 U.S.C. § 1589(a). "The term 'serious harm' means any harm, whether physical or nonphysical, including" as relevant here, "financial . . . harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform *or continue performing labor or services* in order to avoid incurring that harm." *Id.* § 1589(c)(2) (emphasis supplied).[10]

Prior to the TVPA's enactment, a plaintiff who claimed to have been subjected to "involuntary servitude" was required to show that he or she was being forced to work "by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process." *United States v. Kozminski*, 487 U.S. 931, 952 (1988); *see Paguirigan v.*

---

[10] Vidal also challenges ACS's actions as a "threatened abuse of legal process" under the TVPA, *see* 18 U.S.C. § 1589(c)(1), and a violation of New York's prohibition on labor trafficking. *See* N.Y. Pen. Law § 135.5. I decline to reach these argument at the preliminary injunction stage. *See Upsolve, Inc.*, 604 F. Supp. 3d at 109.

*Prompt Nursing Emp. Agency LLC* ("*Paguirigan I*"), 286 F. Supp. 3d 430, 437 (E.D.N.Y. 2017) (collecting cases). Following the Supreme Court's decision in *Kozminski*, Congress passed the TVPA, which "expanded the scope of cases that could be prosecuted to include those involving non-violent coercion," *Paguirigan I*, 286 F. Supp. 3d at 437, including "physiological, financial, or reputational" harm. 18 U.S.C. § 1589(a); *see also* H.R. Conf. Rep. No. 106–939, at 101 (Oct. 5, 2000) ("[P]rosecutors will not have to demonstrate physical harm or threats of force against victims [under § 1589(a).]").[11]

The TVPA's purpose is thus to "combat severe forms of worker exploitation that do not amount to actual involuntary servitude." *Paguirigan v. Prompt Nursing Emp. Agency LLC* ("*Paguirigan II*"), No. 17-CV-1302 (NG) (JO), 2019 WL 4647648, at *17 (E.D.N.Y. Sept. 24, 2019) (internal quotation marks and citation omitted), *aff'd in part, appeal dismissed in part,* 827 F. App'x 116 (2d Cir. 2020). As its plain terms indicate, one objective of the TVPA is to ensure that workers will not be coerced into remaining in their jobs because they reasonably fear a threat of serious harm—including "financial" harm—if they leave.

Accordingly, "the relevant question under § 1589(a)(2) is whether defendants' conduct constituted a threat of harm serious enough to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." *Paguirigan II*, 2019 WL 4647648, at *16 (internal quotation marks and citation omitted); *see Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 433 (E.D.N.Y. 2013) ("Serious harm includes threats of any consequences, whether physical or non-physical, that are sufficient under all of the surrounding circumstances

---

[11] The TVPA also contains a provision granting a plaintiff a private right of action to allege substantive violations of the TVPA. *See* 18 U.S.C. § 1595; *Paguirigan I*, 286 F. Supp. 3d at 436 n.4.

to compel or coerce a reasonable person in the same situation to provide or continue providing labor or services." (internal quotation marks and citation omitted)). This "standard is a hybrid one. The factfinder is permitted to consider the 'particular vulnerabilities of a person in the victim's position,' but is required to find that 'her acquiescence be objectively reasonable under the circumstances.'" *Paguirigan II*, 2019 WL 4647648, at \*16 (quoting *United States v. Rivera*, 799 F.3d 180, 186 (2d Cir. 2015)); *see also Baldia v. RN Express Staffing Registry LLC*, 19 Civ. 11268 (PGG), 2022 WL 477836, at \*6 (S.D.N.Y. Oct. 3, 2022).

Courts around the country, including many in this Circuit, have held that contracts such as this—in which immigrant workers are threatened with severe financial penalties if they leave their employment before the end of their contract term—can violate the TVPA. *See Paguirigan II*, 2019 WL 4647648, at \*18 (holding that liquidated damages provision of $25,000 violated the TVPA), *Magtoles v. United Staffing Registry*, 21-CV-1850 (KAM) (PL), 2021 WL 6197063, at \*4 (E.D.N.Y. Dec. 30, 2021) (denying motion to dismiss claim that liquidated damages provisions between $90,000 and $30,000 violated the TVPA),[12] *Javier v. Beck*, No. 13CV2926, 2014 WL 3058456, at \*6 (S.D.N.Y. July 3, 2014) (same for a $15,000 confession of judgment), *Baldia*, 2022 WL 4777836, at \*7 (same, for a $33,320 liquidated damages provision); *see also Dale Carmen v. Health Carousel, LLC*, No. 1:20-CV-313, 2021 WL 2476882, at \*7 (S.D. Ohio June 17, 2021) (same, for a $20,000 liquidated damages provision ); *cf. United States v. Dann*, 652 F.3d 1160, 1171 (9th Cir. 2011) (holding that an employer's threat that a foreign domestic

---

[12] On March 30, 2023, Judge Matsumoto granted summary judgment for the plaintiffs in *Magtoles* on, *inter alia*, their claim that the liquidated damages provision in their contracts violated the TVPA. *See Magtoles v. United Staffing Registry*, 21-cv-1850 (KAM) (PK), 2023 WL 2710178, at \*23–27 (E.D.N.Y. March 30, 2023).

worker would owe $8,000 if she left her employment constituted a threat of "serious harm" under the TVPA).

These decisions have not set a numerical floor for what financial penalty can give rise to serious harm; the focus is instead on the effect that these financial penalties may have on a worker deciding whether or not to leave his or her job. *See Baldia*, 2022 WL 4777836, at *7 ("When assessing serious harm under the TVPA, it is not the amount of liquidated damages, *per se*, that controls the analysis. Rather, what matters is whether the specified liquidated damages in a given case rise to the level of serious harm considering all of the surrounding circumstances . . . ." (quoting *Magtoles*, 2021 WL 6197063, at *4)).

ACS asserts the foregoing cases are distinguishable because they addressed liquidated damages clauses—which ACS no longer includes in their contracts, and which it specifically omitted from its superseding contract with Vidal in 2022. It is true that, under the 2022 Contract, Vidal was subject to an uncapped damages provision, rather than a liquidated damages provision, stating that ACS may recover both expenses and lost profits. 2022 Contract at 7. The 2022 Contract also contained (1) an attorneys' fee-shifting provision, and (2) a requirement that he pay arbitration costs and arbitrator's fees—all of which would come due if he were to leave his ACS employment and ACS were to prevail in arbitration. 2022 Contract at 6–7, 12. However, the fact that these provisions were uncapped does not make the potential penalties any less coercive than the liquidated damages provisions at issue in the foregoing cases. The relevant analysis is whether a reasonable person in Vidal's position would have found all of ACS's threatened financial penalties serious enough to compel him or her into remaining on the job, even in the face of unsafe or intolerable working conditions. *Paguirigan II*, 2019 WL 4647648, at *16; *Rivera*, 799 F.3d at 186.

28

Any reasonable person in Vidal's position and of similar financial circumstances would reasonably believe that these enormous potential damages, fees, and costs—even if not labeled with a specific dollar amount in the contract—would be seriously harmful. The contract specified that, if Vidal stopped working for ACS before his employment term concluded, he could be liable for ACS's lost profits for the duration of the contract term; expenses ACS expended in his relocation, licensing, and visa acquisition; arbitration costs and fees; and attorneys' fees expended in arbitration. *See* 2022 Contract at 7, 12. It is not difficult to see why any nurse in Vidal's position would reasonably believe that this provision could easily lead to an enormous judgment against him. Although ultimately an arbitrator would decide the precise amount of damages (as distinct from the ordering enforcement of a pre-set liquidated damages clause), the impact on Vidal at the moment he faced the decision of whether to leave his position with ACS was the same: he faced the threat of incurring a judgment well in excess of anything he could afford to pay. And, in any event, one need not speculate about what Vidal anticipated the liability would be based on the contract alone. ACS expressly told him in a demand letter that it would immediately initiate an arbitration where he would face "*at least* $20,000 in damages, in addition to attorney's fees." Asaad Decl. Ex. 1 (emphasis in original). Thus, from ACS's own letter, Vidal faced a clear threat of incurring (1) "at least" $20,000 in damages, *as well as* (2) what any person with even basic familiarity with the American legal system would have realized might quickly add up to thousands (if not tens of thousands) of dollars in ACS's attorneys' fees.

ACS makes much of the "additional factors" at play in *Paguirigan* beyond the $25,000 liquidated damages clause in the contract. But the court's conclusion of whether the liquidated damages clause violated the TVPA turned on factors similar to those present here: the nurse there was "threatened with the prospect of paying a $25,000 contract termination fee" and was

29

"actually *sued* for recovery both of the $25,000 fee and $250,000 in tort damages." *Paguirigan I*, 286 F. Supp. 3d at 438 (emphasis in original). The court reasoned that "[a]llegations of such a severe financial burden" as a $25,000 liquidated damages clause combined with a threat to enforce it were "more than enough to rise to the level of harm necessary to state a TVPA claim." *Id.*; *see also Paguirigan II*, 2019 WL 4647648, at *18 ("This [$25,000 liquidated damages] provision constitutes a threat of sufficiently serious harm to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." (internal quotation marks and citation omitted)). In so concluding, the court there cited to other cases where threats of enforcement of a $15,000 confession of judgment or to collect a payment of $10,000, standing alone, constituted serious harm under the TVPA. *Id.* (citing *Javier*, 2014 WL 3058456, at *6, and *Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 790 F. Supp. 2d 1134, 1144 (C.D. Cal. 2011)). Here, as in *Paguirigan*, ACS made good on its threats to collect a significant amount of money from Vidal: it promptly initiated an arbitration against him for that very purpose. Furthermore, in *Paguirigan*, the court did not rely on the employer's attempts to have workers criminally prosecuted in its legal analysis of whether the liquidated damages clause constituted a threat of serious financial harm. *Paguirigan I*, 286 F. Supp. 3d at 437–39; *Paguirigan II*, 2019 WL 4647648, at *16–19.

Since *Paguirigan* was decided, courts in this circuit have repeatedly held that liquidated damages clauses can constitute a threat of serious harm on their own terms. In *Baldia*, a worker who was told she would be liable for a liquidated damages provision of over $33,000 sufficiently alleged a threat of serious harm under the TVPA. 2022 WL 4777836, at *9. And in *Magtoles*, the court emphasized that the specified liquidated damages amount can rise to a level of serious

30

**SPA-34**

harm considering the surrounding circumstances, including the employee's pay rate and the enforceability of the contractual term.  2021 WL 6197063, at *4.

Whether the amount is fixed or projected, employers' threats to collect tens of thousands of dollars in contractual damages from hourly workers certainly can violate the TVPA's prohibitions on forced labor.  Under either circumstance, the question is whether the employer's conduct would "compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring" serious financial harm.  18 U.S.C. § 1589(c)(2); *Paguirigan II*, 2019 WL 4647648, at *16.  And in either circumstance, the effect on a worker of limited means who cannot afford the anticipated cost of leaving his job is the same.

Attacking the delegation clause specifically, Vidal argues that even an assessment of costs and fees he may incur contesting issues of arbitrability would have a sufficiently coercive effect on him to constitute a threat of serious harm.  The question thus is whether a reasonable person in Vidal's position considering whether to leave his employment would have considered himself compelled to continue performing that labor in order to avoid the cost of challenging the arbitration agreement.  In other words, would such an employee—even one who believed he had valid arguments that the dispute was not arbitrable or that the agreement was unenforceable— have reasonably concluded that the risk of incurring potentially thousands of dollars in fees and costs just to litigate these threshold questions was too great, such that he felt compelled to remain in that job for the remainder of the contract term?

Here, even if Vidal did not know the precise rate that an attorney or arbitrator charged, any reasonable person in his position (or who did a cursory online search for attorney fee rates) would rightly assume that these rates would likely be hundreds of dollars per hour, and that even

31

25 hours of attorneys' fees and 10 hours of arbitrator's fees could amount to several thousand dollars. *See* Vidal Decl ¶¶ 38-40 ("I don't know how much money arbitration costs exactly, and I don't know how much lawyers cost . . . [b]ut based on what I've heard, arbitration and attorney's charges for [ACS] could cost many thousands of dollars. I knew that much right away."). And at the time he was considering leaving his position, Vidal was making about $3,500 per month after taxes, and had at least $2,850 per month in expenses, while working to send as much money home to his father and disabled brother as possible. Vidal Decl. ¶¶ 48–52. Even the arbitration initiation fees totaling over $2,000 were beyond Vidal's means. *See id.* ¶ 44; Compl. ¶ 76.

Given his financial circumstances and the contract's term, Vidal is likely to succeed on the merits of his claim that the threat of uncapped arbitration costs and attorneys' fees associated with adjudicating even threshold issues of arbitrability constitute threats of "serious harm" in violation of the TVPA. At the very least, given the highly analogous caselaw invalidating liquidated damages clauses in high-dollar amounts similar to what Vidal would have faced if he did not prevail in arbitration, he has raised serious questions as to the merits of this argument.

### b. Unconscionability

Vidal also argues that the arbitration agreement—and specifically, the delegation clause contained in that agreement—is unconscionable. Under New York law, as in other states, the "doctrine of unconscionability seeks to prevent sophisticated parties with grossly unequal bargaining power from taking advantage of less sophisticated parties." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 208 (2d Cir. 2018) (quoting *United States v. Martinez*, 151 F.3d 68, 74

(2d Cir. 1998)).[13]  A contract is unconscionable when it is "so grossly unreasonable or

unconscionable in the light of the mores and business practices of the time and place as to be

unenforcible [sic] according to its literal terms." *Gillman v. Chase Manhattan Bank, N.A.*, 73

N.Y.2d 1, 10 (N.Y. 1988); *see Ragone v. Atlantic Video at Manhattan Ctr.*, 595 F.3d 115, 121

(2d Cir. 2010).

A showing of unconscionability requires a demonstration that "a contract is both

procedurally and substantially unconscionable." *Ragone*, 595 F.3d at 121 (quoting *Nayal v. HIP

Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 571 (S.D.N.Y. 2009)).  "In other words, [a]

contract or clause is unconscionable when there is an absence of meaningful choice on the part of

one of the parties together with contract terms which are unreasonably favorable to the other

party." *Spinelli*, 903 F.3d at 208 (internal quotation marks and citation omitted).  Generally,

"procedural and substantive unconscionability operate on a 'sliding scale'; the more questionable

the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and

vice versa."  *Master Lease Corp. v. Manhattan Limousine, Ltd.*, 580 N.Y.S.2d 952, 954 (N.Y.

App. Div. 1992) (quoting *State v. Wolowitz*, 468 N.Y.S.2d 131, 145 (N.Y. App. Div. 1983)).

### i.    Procedural unconscionability

Vidal is likely to succeed on the merits of his argument that the circumstances

surrounding his signing of the 2022 Contract were procedurally unconscionable; at the very least,

he has raised serious questions on the merits of that claim.  "The procedural element of

unconscionability concerns the contract formation process and the alleged lack of meaningful

choice."  *Wolowitz*, 468 N.Y.S.2d at 145.  "While inequality in bargaining power between

---

[13] The parties do not dispute that New York law applies here.  *See* 2022 Contract at 7;
Pl.'s Mem. at 22; Def.'s Opp'n at 18.

employers and employees is not alone sufficient to hold arbitration agreements unenforceable, such inequality, when coupled with high pressure tactics that coerce an employee's acceptance of onerous terms, may be sufficient to show that an employee lacked a meaningful choice." *Brennan v. Bally Total Fitness*, 198 F. Supp. 2d 377, 382 (S.D.N.Y. 2002) (citations omitted); *see Brower v. Gateway 2000*, 676 N.Y.S.2d 569, 573 (N.Y. App. Div. 1998) (describing disparity in bargaining power as informed by the "experience and education of the party claiming unconscionability"). As part of this inquiry, "a court should focus on evidence of high pressure or deceptive tactics," in addition to the disparity of bargaining power between the parties. *Brennan*, 198 F. Supp. 2d at 382; *Gillman*, 73 N.Y.2d at 11 ("The focus is on such matters as [*inter alia*] whether deceptive or high-pressured tactics were employed.").

The power disparity between the parties here goes beyond the typical employer-employee relationship. At the moment he signed the 2022 Contract, Vidal was in a particularly vulnerable position. He was living in London, away from home and without a job, having spent over two-and-a-half years waiting for his U.S. visa application to be processed. He had already signed and remained bound by the 2019 Contract, which forbade him from working with any employer in the United States other than ACS. 2019 Contract ¶ 5. And he had quit his job in London in reliance on the 2019 Contract—assuming, once he was notified in December 2021 that his visa interview was scheduled, that he would need to move to the United States and begin his employment right away. Vidal Decl. ¶ 20. Indeed, when he quit his job in London, Vidal had no reason to think that he would be asked to sign a second contract, when he was suddenly presented with the 2022 Contract and told by an ACS representative to "sign quickly." Supp. Vidal Decl. ¶ 7.

34

**SPA-38**

In addition to the clear power disparity between the parties here, Vidal identifies many coercive circumstances surrounding his signing of 2022 Contract. Vidal believed when he was presented with the 2022 Contract that he was still bound by the terms of the 2019 Contract—that is, if he walked away from his early contractual agreement to be placed in U.S.-based employment with ACS at that point or refused to sign the 2022 Contract, he would owe $20,000 in liquidated damages. Vidal Decl. ¶ 25; 2019 Contract ¶ 19. Vidal's fear was neither unreasonable nor unfounded. ACS makes much of the fact that its accompanying letter released the promissory note Vidal had previously signed. *See* Def.'s Opp'n at 7, 24. Yet, the 2019 Contract also included other methods outside the promissory note by which ACS could seek to recover the liquidated damages, including by "legal action." 2019 Contract ¶ 19. And no portion of the 2022 Contract nor anything in ACS's written communications advised Vidal that ACS could not and would not seek to collect $20,000 by other means, either immediately if he failed to sign the 2022 Contract or later if he was alleged to violate its terms.

Moreover, ACS employed what I conclude are both "high pressure" and "deceptive" tactics in January 2022 when presenting Vidal with his contract. *See Brennan*, 198 F. Supp. 2d at 382. ACS's letter explaining the changes reflected in the 2022 Contract was misleading at best. ACS told Vidal that the contract was revised because of "feedback" the company had received that the liquidated damages clause—followed by what can charitably be described as a cryptic explanation that ACS was concerned this clause "was viewed as a buy-out, which was not our intent." Luy Decl. Ex. B2. Yet as ACS was no doubt well aware, as of January 2022, a number of courts in this circuit and elsewhere had held that liquidated damages clauses in contracts between staffing agencies and immigrant healthcare workers specifically were unenforceable, because they threatened workers with serious harm in violation of the TVPA. *See, e.g.*,

35

*Paguirigan I*, 286 F. Supp. 3d at 437; *Paguirigan II*, 2019 WL 4647648 (holding in September 2019 that Plaintiffs' TVPA claims survived Defendant's summary judgment motion); *Magtoles*, 2021 WL 6197063, at \*5; *Dale Carmen v. Health Carousel, LLC*, No. 1:20-CV-313, 2021 WL 2476882, at \*7 (S.D. Ohio June 17, 2021) (denying motion to dismiss TVPA claim where a $20,000 liquidated damages clause was at issue); *see also In re Attorney General Investigation*, https://ag.ny.gov/sites/default/files/albany_med_aod_no._22-058_-_fully_executed_9.13.22.pdf (settlement agreement executed in September 2022 in case where immigrant nurses had been subject to liquidated damages clause in amounts between $10,000 and $20,000 that was challenged as a violation of TVPA, and in which employer agreed to pay financial restitution to impacted nurses); *cf. Javier*, 2014 WL 3058456 (denying a motion to dismiss complaint in 2014 that threats to enforce a $15,000 confession of judgment against an immigrant physical therapist violated the TVPA).

To be sure, ACS was not under any obligation to provide Vidal a legal opinion as to the all-but-certain unenforceability of the liquidated damages clause in the 2019 Contract he had already signed. But ACS's affirmative statement that it revised this clause due to "feedback" was highly misleading, and, in conjunction with the other circumstances, adds to the likelihood that Vidal will succeed on the procedural prong of the unconscionability analysis.

In addition, ACS now concedes that in January 2022, its decision to present Vidal with a revised contract did not automatically render the 2019 Contract invalid. It acknowledges that Vidal could have chosen to hold ACS to its end of the bargain the parties made in 2019 and come to work in the United States under the terms of the 2019 Contract. Had he done so, of course, those terms would have tilted significantly in Vidal's favor, since if he left his position before the end of the contract term, ACS would no longer have had the ability to collect on the $20,000

36

promissory note that Vidal signed in 2019 (as ACS had already cancelled that note). But no one at ACS informed Vidal that he had the option to work in the United States under the 2019 contract when they presented him with a revised contract to "quickly" sign.

Finally, ACS makes much of the fact that Vidal was invited to ask questions about the new contract, but that he instead signed the contract that same day. Def.'s Opp'n at 19–20. However, Vidal notes (in a statement that, at this time, is undisputed by ACS) that he did call an ACS representative when he received the 2022 Contract and was told to "sign the revised contract and send it back to [ACS] quickly." Supp. Vidal Decl. ¶ 7. Indeed, in the record provided by ACS, the company advised Vidal should "let us know too should you have any questions or clarification," in its original email attaching the 2022 Contract, Luy Decl. Ex. B1, and followed up with him to invite him to ask further questions *after* he had signed the contract. Luy Decl. Ex. E, ECF No. 30-11. ACS may dispute these circumstances or plead additional facts at a later stage in this litigation. But on the present record, these circumstances taken together demonstrate that Vidal lacked meaningful choice when presented with the 2022 Contract. *Wolowitz*, 468 N.Y.S.2d at 145.

Vidal is likely to succeed on the merits of his claim that the circumstances surrounding the execution of the 2022 Contract were procedurally unconscionable, satisfying the first prong of the unconscionability analysis. At the very least, he has raised serious questions as to the merits of that claim that warrant a pause in arbitration while the merits are fully litigated.

### ii. Substantive Unconscionability

The substantive unconscionability analysis looks to the terms of the contract itself to analyze "the substance of the bargain to determine whether the terms were unreasonably favorable to the party against whom unconscionability is urged." *Gillman*, 73 N.Y.2d at 12.

"Unconscionability is determined by reference to the relative benefit of the bargain to the parties *at the time of its making.*" *Doctor's Assocs., Inc. v. Jabush*, 89 F.3d 109, 113 (2d Cir. 1996) (emphasis in original) (quoting *United States v. Bedford Assocs.*, 657 F.2d 1300, 1312–13 (2d Cir. 1981)).

Here, the agreement shifts costs of arbitration, the arbitrator's fees, and attorneys' fees to Vidal if ACS prevails at arbitration, 2022 Contract at 12, in what courts have referred to as a "loser pays" provision. Vidal argues that this provision is unconscionable, and that, specifically, the delegation clause is unconscionable when paired with the "loser pays" provision. This is because, Vidal argues, the portion of these fees and costs that he would face just to contest arbitrability would be in the thousands of dollars—a prohibitively high amount for someone in his financial circumstances that could prevent him from being able to vindicate his rights to make legal arguments regarding the enforceability of the arbitration agreement.[14]

Courts applying New York law have held that similar "loser pays" provisions in arbitration agreements are substantively unconscionable where a party makes a "showing of individualized prohibitive expense that considers factors including the financial means of plaintiff and the cost differential between arbitration and litigation in court." *Valle v. ATM Nat.,*

---

[14] ACS argues that this Court should not consider whether the provision requiring Vidal to pay the costs of arbitration (including case initiating costs and the arbitrator's fees) is unconscionable since, once the arbitration began, ACS stipulated that it would agree to bear these costs notwithstanding the contract's language to the contrary, and the arbitrator ratified that agreement. *See* Def.'s Opp'n at 11; Asaad Decl. Ex. 20. ACS argues that, since the parties have already agreed that this provision will not apply, I should not consider it in my analysis of unconscionability because ACS has already declined to enforce the provision. Def.'s Opp'n at 20; *see Ragone*, 595 F.3d at 124 (noting that "unconscionability is an equitable defense to the *enforcement* of harsh or unreasonable contract terms"). But here, Vidal is asking the Court to determine the validity of the *delegation clause* in conjunction with other contractual provisions, and at this stage of the litigation, is not seeking a final ruling as to the unconscionability of the "loser pays" provision as it applies to the arbitrator's fees. As such, ACS's arguments are premature.

*LLC*, 14-CV-7993 KBF, 2015 WL 413449, at *6–7 (S.D.N.Y. Jan. 30, 2015); *Brady v. Williams Capital Grp., L.P.*, 878 N.Y.S.2d 693, 698–700 (N.Y. App. Div. 2009), *aff'd as modified* 14 N.Y. 3d 459 (N.Y. 2010) (holding that a fee-splitting provision of an employment arbitration agreement was substantively unconscionable given the cost of $21,150 to a plaintiff who previously was earning between $100,000 and $405,000 in the previous five years but was then unemployed); *cf. Schreiber v. K-Sea Transp. Corp.*, 9 N.Y.3d 331, 341 (N.Y. 2007) ("Schreiber should not be compelled to bear costs which would effectively preclude him from pursuing his claim.").

Here, not only is the "loser pays" provision likely unconscionable on its own terms, but the delegation clause itself is likely unconscionable when paired with the "loser pays" provision. Courts in this district, in conducting similar analyses, have looked to whether the "fee splitting arrangement . . . for the arbitration of *enforceability*" is "substantively unconscionable," "rather than for arbitration of more complex and fact-related aspects of the claim." *Saizhang Guan v. Uber Techs.*, 236 F. Supp. 3d 711, 732 (E.D.N.Y. 2017) (emphasis added) (quoting *Rent-A-Center*, 561 U.S. at 74); *cf. Lim*, 8 F.4th at 1002 (concluding that under California law the cost splitting, fee shifting and venue provisions rendered the delegation clause substantively unconscionable in light of the employee's financial circumstances). It is true that it may be "more difficult to establish" the unconscionability of fees relating only to arbitrability, rather than to the entire arbitration. *Id.* However here, the issues of enforceability are complex, multi-faceted, and, as this litigation has already indicated, likely to result in many hours of work for both parties' attorneys and the decisionmaker.

Vidal has made a sufficient showing for this preliminary stage in the litigation that to even challenge the threshold issues of arbitrability before the arbitrator could cause him financial

39

ruin. As Vidal's counsel explained at oral argument, if an attorney with fifteen years of experience has a prevailing rate of $475/hour, twenty-five hours of work on this case would amount to over $11,000 in fees. *See No Limit Auto Enters., Inc. v. No Limit Auto Body, Inc.*, No. 21-cv-04577 (AMD) (JMW), 2022 WL 18399477, at *15 (E.D.N.Y. 2022) (awarding an hourly rate of $475 for a motion that "involved more than say a straightforward default motion for breach of contract" to a partner with fifteen years of experience). Vidal has demonstrated that he cannot afford even the arbitration initiation fees of over $2,000 in this case. Vidal Decl. ¶ 44. In his current position after leaving ACS, he earns around $4,500 per month after taxes, incurs at least $2,850 worth of basic living expenses, and sends $1,000 per month to his family in the Philippines who rely on him for support. Vidal Decl. ¶¶ 47–52. Accordingly, even during the best month, Vidal would have only $650 left over, which does not account for any unexpected expenses, such as his own medical needs or unexpected emergency expenses his family may incur. Thus, even the $1,900 filing fee and $750 case management fee to initiate arbitration would be well beyond Vidal's means, let alone $10,000 or more in attorneys' fees just to resolve a dispute over arbitrability—and more still in arbitrator's fees. Seligman Decl. Ex. 11 (noting that the arbitrator's rate is "$450 per hour"). And in this case, the arbitrator's choice to reserve decision on enforceability until after discovery on the merits, *see* Asaad Decl. Ex. 11, further increases the cost Vidal may have to bear even were he to contest issues of arbitrability, since attorneys' fees on the merits of ACS's breach of contract claim issues continue to mount.

For all these reasons, the Court concludes that Vidal is likely to succeed on the argument that the terms of this contract are substantively unfair. Under the delegation clause, to even contest the arbitrator's jurisdiction, whether the dispute is properly for arbitration, or even whether the arbitration agreement is unconscionable or illegal, Vidal is vulnerable to owing

40

**SPA-44**

potentially thousands of dollars of legal fees simply to resolve these threshold legal questions. This would "effectively preclude" Vidal from pursuing his claim. *Schreiber v. K–Sea Transp. Corp.*, 9 N.Y.3d at 341; *Ragone*, 595 F.3d at 124. For even if Vidal believed that he had a valid argument that the arbitration agreement or contract as a whole was unenforceable, to contest the arbitrator's jurisdiction would risk potentially thousands of dollars in attorneys' fees and arbitration costs if he failed to convince the arbitrator of the merits of his legal position. *See Brady v. Williams Cap. Grp., L.P.*, 14 N.Y.3d 459, 466–67 (N.Y. 2010) (underscoring that under New York law, courts look to whether the cost of arbitration would "preclude a litigant from effectively vindicating his or her statutory rights in the arbitral forum" (citing, *inter alia*, *Green Tree Financial Corp.–Ala. v. Randolph*, 531 U.S. 79 (2000))). Faced with nearly identical arguments, the Ninth Circuit has held that, where a delegation clause and a "loser pays" provision are taken together, the presence of a "loser pays" provision "creates a chilling effect on [an employee] enforcing his rights because it exposes him to the possibility of paying attorney's fees to [the employer] if he lost at arbitration, including fees associated with the threshold issue of arbitrability." *Lim*, 8 F.4th at 1003.

Thus, although it may be "difficult" in many cases to show that a delegation clause coupled with fee-shifting arrangement is unconscionable as to issues of enforceability, *see Rent-A-Center*, 561 U.S. at 74, Vidal has made such a showing here. Conversely, district courts that have rejected employees' challenges to the validity of delegation clauses in arbitration agreements with "loser pays" provisions have done so because plaintiffs have "not made a particularized showing of their inability to pay for arbitration"—which Vidal has demonstrated here. *See Saizhang Guan*, 236 F. Supp. 3d at 732–33. In *Saizhang Guan* the court also highlighted a contractual provision not present here, which specified that an employee would

41

"not be required to bear any type of fee or expense that [he] would not be required to bear if [he] had filed the action in a court of law." *Saizhang Guan*, 236 F. Supp. 3d at 732–33. By contrast, this is precisely the type of penalty the 2022 Contract would impose on Vidal. Although the arbitration provision states that "in the event that the AAA's *initial filing fee* is higher than the filing fee for a court action . . . [the employee] will only be required to contribute the cost of what [he] would have paid to file an action in Court," it imposes no such limit on other costs and fees. 2022 Contract at 12 ("[A]t the conclusion of arbitration, the prevailing party shall be entitled (in addition to all other relief available under the Agreement or applicable law) to be reimbursed for its reasonable attorney's fees as well as *all costs and fees charged by the AAA and the Arbitrator*."). Accordingly, the delegation clause itself, viewed collectively in conjunction with the "loser pays" provision, is so prohibitively costly as to deprive Vidal of his right to contest its validity. Vidal is likely to succeed on the merits of—or has, at the very least, raised serious questions on the merits of—his argument that the delegation clause is unconscionable.

### c. Severability of the "loser pays" provision

In evaluating the merits of the parties' claims, I have considered whether Vidal's objections to the arbitration agreement—and the delegation clause specifically—could be addressed if the "loser pays" provision were severed from the rest of the contract. *See* 2022 Contract at 8. The Second Circuit has previously held that severance is the appropriate remedy where a particular provision in an arbitration agreement is deemed unconscionable and the agreement contains a severability provision, as the agreement here does. *Ragone v. Atlantic Video at Manhattan Ctr.*, 595 F.3d 115, 124–25 (2d Cir. 2010).[15] As explained below, however, a

---

[15] *Ragone* emphasized that this conclusion was based on the "federal policy favoring the arbitration as an alternative means of dispute resolution," under which courts "are charged with

**SPA-46**

severability analysis would be premature at this stage, where the only relief sought by Vidal is a preliminary injunction pausing the arbitration.

The parties dispute whether severance would be required if I were to find that the "loser pays" provision is unenforceable. Vidal raises several arguments as to why the "loser pays" provision is so integral to the arbitration agreement that it cannot be severed. ACS argues that the fee shifting provision is not essential to the bargain—the purpose of which is to set arbitration as the mechanism for the resolution of employment disputes—and if the "loser pays" provision cannot be enforced, the appropriate remedy is severance.

However, at this preliminary stage in the litigation, I have not made a final determination as to whether the "loser pays" provision is unconscionable or a violation of the TVPA. I have only determined that Vidal is likely to succeed on the merits (or at least raised serious questions as to the merits) of his claim that the *delegation clause*, viewed in conjunction with the "loser pays" provision, is invalid under state and federal law. It is certainly appropriate and necessary for a court to consider severability when it makes a final determination that a particular provision is unlawful or cannot be enforced. But as I have not made any such determination (nor could I, at the preliminary injunction stage), then neither the delegation clause nor any other provision in

---

'encouraging and supporting arbitration.'" 595 F.3d at 121, 124 (citations omitted). However, there are at least serious questions as to the viability of this direction following the Supreme Court's decision in *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022), where the Supreme Court emphasized that the FAA's "policy favoring arbitration does not authorize federal courts to invent special, arbitration-preferring procedural rules," and that instead of adopting a rule that "favor[s] arbitration," courts should "place [arbitration] agreements upon the same footing as other contracts." 142 S. Ct. at 1713 (citations omitted). General contract law is far more flexible in the face of an unconscionable provision than what the Second Circuit instructed in *Ragone*. *See Oneida Indian Nation of New York v. County of Oneida*, 617 F.3d 114, 138 (2d Cir. 2010) ("[A] court generally is allowed substantial flexibility in its choice of remedy when it determines that a contract or term thereof is unconscionable, [but] the traditional remedy for a claim of unconscionability is to deny enforcement of the relevant contract." (citing Restatement (Second) of Contracts § 208)).

this contract has yet been deemed unenforceable—and thus, there is no offending clause to "sever" from the rest of the contract. The question at this stage is simply whether Vidal has made a sufficient showing that the delegation clause, read in conjunction with the "loser pays" provisions of the contract, is *likely* unlawful, such that the arbitration should be paused while his challenges to the contract are fully litigated. Notably, neither party has pointed to any other case—and I have found none—in which a district court has ordered a similar provision severed in the context of a motion for a preliminary injunction that turns on the validity of a delegation clause.

Moreover, the effect of the ruling that ACS seeks would be unproductive and confusing. If I were to hold that the delegation clause is valid only if the (likely-invalid) "loser-pays" provision were severed, such a holding would be essentially advisory. The result would be to deny the preliminary injunction and allow the arbitration to proceed. That would leave the arbitrator free to make her own *de novo* assessment of the merits of Vidal's arguments and determine for herself the enforceability of the agreement (including the "loser pays" provision)— all while ACS continues to accumulate substantial legal fees potentially recoverable against Vidal. Such an advisory ruling should be avoided. *See County of Suffolk v. Sebelius*, 605 F.3d 135, 138 (2d Cir. 2010) ("Obliged, as we are, to avoid issuing advisory opinions, our authority is limited to 'live' cases in which there remains a possibility that the court can grant some form of effectual relief.'"); *Long Island Lighting Co. v. County of Suffolk*, 604 F. Supp. 759, 761–62 (E.D.N.Y. 1985) ("It is fundamental that a United States District Court may not render advisory opinions." (citing *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975); *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)).

Therefore, in light of my determination that Vidal is likely to succeed on the merits of (or at least has raised serious questions as to the merits of) his arguments that the delegation clause is invalid, I decline to address the parties' severance arguments at this stage. ACS remains free to argue at a later stage in the litigation that Vidal's challenges to the fee-shifting provisions of the arbitration agreement could be cured by severance, and Vidal remains free to argue the contrary. At this juncture, the appropriate remedy is simply to pause the arbitration proceeding while discovery and merits litigation continues in this Court.

### B. Irreparable harm

As to the remaining injunction factors, irreparable harm is the "most important." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). Vidal has demonstrated that he will suffer irreparable harm if the arbitration is allowed to proceed before his legal challenges to the 2022 Contract can be adjudicated on the merits in this Court.

First, as explained *supra,* Vidal has shown a likelihood of success on the merits of his claim that threshold issues of arbitrability should be decided by the courts and not the arbitrator. Courts in this circuit have held that "[c]ompelling arbitration of a matter not properly subject to arbitration constitutes '*per se* irreparable harm.'" *Citigroup Glob. Mkts. Inc. v. VCG Special Opportunities Master Fund*, No. 08-cv-5520 (BSJ), 2008 WL 4891229, at *2 (S.D.N.Y. Nov. 12, 2008) (quoting *Tellium, Inc. v. Corning Inc.*, No. 03 Civ. 8487, 2004 WL 307238, at *3 (S.D.N.Y. Feb. 13, 2004)); *Mount Ararat Cemetery v. Cemetery Workers and Greens Attendants Union, Loc. 365*, 975 F. Supp. 445, 446–47 (E.D.N.Y. 1997) ("[Plaintiff] may be presumed to suffer irreparable harm if forced to arbitrate a dispute it did not intend to be subject to arbitration . . . .").

45

**SPA-49**

Here, prior to the injunction, discovery was progressing in arbitration, and the arbitrator had (1) determined that she had jurisdiction over issues of arbitrability and (2) decided she would not even consider Vidal's arguments that the arbitration agreement was unenforceable or unconscionable until she reached the merits of ACS's breach of contract claim. Asaad Decl. Ex. 11. The unauthorized arbitration of arbitrability issues is particularly harmful, given that the "right of access to courts is of such importance that courts will retain authority over the question of arbitrability in the particular dispute unless the parties clearly and unmistakably provide[d] that the question should go to arbitrators." *Bucsek*, 919 F.3d at 190 (internal quotation marks and citation omitted) ("It is a fundamental tenet of law that only by agreeing to arbitrate does a person surrender the right of access to a court for the resolution of a legal dispute that is subject to arbitration."). In the absence of an injunction, Vidal would be unable to vindicate his rights to access the courts and present his claims that the arbitration agreement is unenforceable to a judge. Accordingly, because Vidal is likely to succeed on the merits that the arbitration of his enforceability arguments is unauthorized and that, instead, a court should determine these threshold issues of enforceability, Vidal has made a showing of *per se* irreparable harm.

Second, Vidal has demonstrated a likelihood of specific irreparable harm in the form of time, energy, and expense in defending himself before the arbitrator. While as a general matter, the risk of ultimately being responsible for money damages and attorneys' fees may not amount to irreparable harm, for Vidal, the financial costs of participating in arbitration could constitute irreparable harm. Vidal has limited financial means and is living nearly paycheck to paycheck to provide his family in the Philippines with subsistence income. For him, taking shifts off work to attend arbitration proceedings or responding to discovery requests may have outsized consequences. Vidal may risk losing out on money that is essential for his family's well-being—

46

and his own. ACS argues that any potential loss of wages is not irreparable because it can be remedied—arguing that money, by definition, can be paid back. But ACS fails to acknowledge that, for workers with as slim a financial margin as Vidal has in a given month, missing out on income because of missed shifts could have an irreparable impact. For example, even a small amount of lost income in one month could mean the difference between Vidal's ability to pay for an unexpected medical expense, or not—and suffering more serious symptoms, pain, or a prolonged illness as a result. While ACS may argue that loss of income can never constitute irreparable harm, it is simply not the case that for a worker in Vidal's financial position, the harm from lost income can always be remedied in full through retroactive compensation.

Thus, because of the *per se* irreparable harm of participating in an unauthorized arbitration, coupled with Vidal's specific expenditures of time and resources in defending himself against this arbitration, Vidal has demonstrated irreparable harm.

### C. Balance of the hardships

The balance of the hardships also tips decidedly in Vidal's favor. *See Citigroup Glob. Mkts.*, 598 F.3d at 35; *see Yang v. Kosinski*, 960 F.3d 119, 135 (2d Cir. 2020) (instructing courts to "balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief" (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008))). In addition to the irreparable harm outlined above, Vidal also has demonstrated that participating in the arbitration is harmful to him given the serious risk of financial ruin if ACS were to prevail, the time and energy spent representing himself in the arbitration pro se, the opportunity costs inherent in that representation, and the mental toll that the ongoing proceedings and the threat of a ruinous damages award have had on him. Vidal Decl. ¶¶ 43–45, 54–56; Pl.'s Mem. at 27–28.

47

By contrast, ACS has pointed to no specific harm that it will suffer if the arbitration is temporarily paused while the Court adjudicates the merits of Vidal's claims. ACS makes much of the financial hardships it claims it has suffered due to Vidal's purported breach of his employment contract. Def.'s Opp'n at 27–28. But the relevant analysis at this stage is the harm that the party opposing an injunction "might suffer as a result of a preliminary injunction issuing against it," *Reuters, Ltd. v. United Press Int'l., Inc.*, 903 F.2d 904, 909 (2d Cir. 1990), not of an adverse final judgment on the merits or harm caused by the events giving rise to the lawsuit. Accordingly, even if ACS can point to lost profits or other short-term losses resulting from Vidal's resignation, they are immaterial to the analysis of the balance of the hardships when considering the impact of Vidal's requested relief.

ACS argues that it has an interest in a swift and efficient resolution of the issues—an interest indeed shared by both parties. But this interest can just as easily be vindicated in this Court. At oral argument, ACS expressed that a preliminary injunction would cause a hardship because it would lead to a "snowball effect" in other cases, allegedly preventing ACS from being able to seek damages from other employees who quit before the end of their employment terms, citing two other arbitrations that the AAA indicated would be paused if this Court granted a preliminary injunction. *See* Pl.'s Feb. 14, 2023 Letter, ECF No. 33. However, I fail to see how addressing the legality of the delegation clause, whether for Vidal or other workers, harms ACS. Preventing the enforcement of an illegal arbitration provision does not constitute harm. And, of course, ACS is still free to pursue breach of contract claims on the merits in Vidal's case, and to make its intention to do so known to Vidal and others. This preliminary injunction means only that ACS must wait to resolve those claims until after litigation on the validity of the delegation

48

clause and the enforceability of various provisions of the contract has concluded.  The balance of hardships at this stage of the litigation thus tips decidedly in Vidal's favor.

### D.  Public interest

Finally, a party seeking an injunction must demonstrate that an injunction is "in the public interest."  *Winter*, 555 U.S. at 20.  Vidal has done so here.  It is in the public interest for a potentially unauthorized arbitration to be paused while a court evaluates whether the arbitration is unconscionable or runs contrary to Congressional prohibitions on forced labor.  That is especially so where ACS is seeking to enforce analogous agreements against at least two other employees who also terminated their contracts and who now face the prospect of a costly loser-pays arbitration initiated by ACS.  *See* Pl.'s Feb. 14, 2023 Letter.  It is in the public interest to identify and remedy any unlawful provisions in these contracts.  And it is in the public interest to ensure that arbitration threats are not improperly leveraged to prevent nurses and other essential workers from leaving unsafe or unlawful employment conditions if the circumstances so warrant.

ACS argues that the injunction Vidal seeks is not in the public interest because it runs counter to the national policy in favor of arbitration.  The Supreme Court has referred to the FAA as announcing a federal policy in favor of arbitration.  *See Southland Corp. v. Keating*, 465 U.S. 1, 16 (1984).  It has also repeatedly emphasized, however, that this policy does not place arbitration agreements at a higher level than other contracts, but merely on equal footing with any other contract.  *Morgan*, 142 S. Ct. at 1713 ("[T]he FAA's policy favoring arbitration . . . is merely an acknowledgment of the FAA's commitment to . . . place such agreements upon the same footing as other contracts" (quoting *Moses H. Cone*, 460 U.S. at 24; *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 302 (2010)) (internal quotation marks omitted)).  Accordingly, where, as here, a court's application of New York or federal law leads to the conclusion that a

49

preliminary injunction is warranted, granting an injunction is wholly consistent with the FAA's mandate.

## III.    Additional considerations

Two final points bear mentioning.  First, ACS took the curious step of requesting that any order granting a preliminary injunction also state that ACS's request for a pre-motion conference in anticipation of a motion to compel arbitration or dismiss the complaint is denied.  *See* Def.'s Letter with Supp. Authority, ECF No. 38.  ACS's pre-motion conference request is denied as moot.  The pre-motion conference letter indicated the anticipated motion would raise the very same arguments ACS raised at greater length here: that the agreement contains a valid delegation clause, and as such that threshold issues of arbitrability must be decided by the arbitrator rather than a court; and that Vidal was in fact challenging the arbitration agreement as a whole as unconscionable, rather than the delegation clause specifically.  Def.'s Mot. for Pre-Mot. Conf., ECF No. 11 at 2–3.  Because I considered and rejected each of the foregoing contentions in concluding that Vidal is likely to succeed on the merits of his legal challenge to the delegation clause, and the arbitration is paused pending further litigation, ACS's anticipated motion to compel is clearly moot.  *See In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d at 141 ("[T]o enjoin a party from arbitrating where an agreement to arbitrate is absent is the concomitant of the power to compel arbitration where it is present." (citation omitted)).  ACS may be suggesting that it was somehow prejudiced by the delay in addressing these legal issues until the parties fully briefed and argued them at the preliminary injunction stage.  But if anything, ACS benefitted from this delay, since it allowed arbitration to continue for several more months—and ACS to attempt to accumulate fees it hopes to shift to Vidal in the process.

Second, I feel compelled to note my dismay at ACS's suggestion—with which it opened its brief opposing Vidal's motion for a preliminary injunction, and which it invoked again at oral argument—that Vidal should not be considered a trafficked worker covered by the protections of the TVPA since he was not "working in a back alley sweat shop, a remote lettuce field, or a massage parlor for substandard wages." Def.'s Opp'n at 1. The TVPA was enacted with the understanding that worker exploitation can take myriad forms. *See* 18 U.S.C. § 1589(a) (establishing that threats of, *inter alia*, psychological, financial, and reputational harm can give rise to forced labor). Courts have time and again found that employers can be held liable for violations of the TVPA in legal actions brought by immigrant nurses like Vidal. *See, e.g.*, *Paguirigan II*, 2019 WL 4647648, at *18; *Magtoles*, 2021 WL 6197063, at *6; *Baldia*, 2022 WL 4777836, at *8–9; *Dale Carmen*, 2021 WL 2476882, at *9. And with good reason. Nurses and other healthcare workers toil long hours under demanding conditions to care for our nation's ill and infirm. They are no less entitled to protection against forced labor than those who sew our clothes or harvest our food. For ACS to suggest otherwise—despite its familiarity with the TVPA and the courts' prior application of that law to healthcare workers—is both troubling and highly disingenuous.

## IV.    Conclusion

For the foregoing reasons, Vidal's motion for a preliminary injunction is granted. The arbitration shall be paused while the parties litigate the merits of Vidal's claims in this Court.

SO ORDERED.

/s/ Nina R. Morrison
NINA R. MORRISON
United States District Judge

Dated: Brooklyn, New York
April 4, 2023

period at end in pars. (1) and (2) and ''; or'' for the period at end in par. (3).

Subsec. (a)(5). Pub. L. 107–169, §1(5), substituted ''If an award'' for ''Where an award'', inserted a comma after ''expired'', and redesignated par. (5) as subsec. (b).

Subsec. (b). Pub. L. 107–169, §1(4), (5), redesignated subsec. (a)(5) as (b). Former subsec. (b) redesignated (c).

Subsec. (c). Pub. L. 107–169, §1(4), redesignated subsec. (b) as (c).

1992—Subsec. (b). Pub. L. 102–354 substituted ''section 580'' for ''section 590'' and ''section 572'' for ''section 582''.

1990—Pub. L. 101–552 designated existing provisions as subsec. (a), in introductory provisions substituted ''In any'' for ''In either'', redesignated former subsecs. (a) to (e) as pars. (1) to (5), respectively, and added subsec. (b) which read as follows: ''The United States district court for the district wherein an award was made that was issued pursuant to section 580 of title 5 may make an order vacating the award upon the application of a person, other than a party to the arbitration, who is adversely affected or aggrieved by the award, if the use of arbitration or the award is clearly inconsistent with the factors set forth in section 572 of title 5.''

## § 11. Same; modification or correction; grounds; order

In either of the following cases the United States court in and for the district wherein the award was made may make an order modifying or correcting the award upon the application of any party to the arbitration—

(a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.

(b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.

(c) Where the award is imperfect in matter of form not affecting the merits of the controversy.

The order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties.

(July 30, 1947, ch. 392, 61 Stat. 673.)

DERIVATION

Act Feb. 12, 1925, ch. 213, §11, 43 Stat. 885.

## § 12. Notice of motions to vacate or modify; service; stay of proceedings

Notice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered. If the adverse party is a resident of the district within which the award was made, such service shall be made upon the adverse party or his attorney as prescribed by law for service of notice of motion in an action in the same court. If the adverse party shall be a nonresident then the notice of the application shall be served by the marshal of any district within which the adverse party may be found in like manner as other process of the court. For the purposes of the motion any judge who might make an order to stay the proceedings in an action brought in the same court may make an order, to be served with the notice of motion, staying the proceedings of the adverse party to enforce the award.

(July 30, 1947, ch. 392, 61 Stat. 673.)

DERIVATION

Act Feb. 12, 1925, ch. 213, §12, 43 Stat. 885.

## § 13. Papers filed with order on motions; judgment; docketing; force and effect; enforcement

The party moving for an order confirming, modifying, or correcting an award shall, at the time such order is filed with the clerk for the entry of judgment thereon, also file the following papers with the clerk:

(a) The agreement; the selection or appointment, if any, of an additional arbitrator or umpire; and each written extension of the time, if any, within which to make the award.

(b) The award.

(c) Each notice, affidavit, or other paper used upon an application to confirm, modify, or correct the award, and a copy of each order of the court upon such an application.

The judgment shall be docketed as if it was rendered in an action.

The judgment so entered shall have the same force and effect, in all respects, as, and be subject to all the provisions of law relating to, a judgment in an action; and it may be enforced as if it had been rendered in an action in the court in which it is entered.

(July 30, 1947, ch. 392, 61 Stat. 673.)

DERIVATION

Act Feb. 12, 1925, ch. 213, §13, 43 Stat. 886.

## § 14. Contracts not affected

This title shall not apply to contracts made prior to January 1, 1926.

(July 30, 1947, ch. 392, 61 Stat. 674.)

DERIVATION

Act Feb. 12, 1925, ch. 213, §15, 43 Stat. 886.

PRIOR PROVISIONS

Act Feb. 12, 1925, ch. 213, §14, 43 Stat. 886, former provisions of section 14 of this title relating to ''short title'' is not now covered.

## § 15. Inapplicability of the Act of State doctrine

Enforcement of arbitral agreements, confirmation of arbitral awards, and execution upon judgments based on orders confirming such awards shall not be refused on the basis of the Act of State doctrine.

(Added Pub. L. 100–669, §1, Nov. 16, 1988, 102 Stat. 3969.)

CODIFICATION

Another section 15 of this title was renumbered section 16 of this title.

## § 16. Appeals

(a) An appeal may be taken from—

(1) an order—

(A) refusing a stay of any action under section 3 of this title,

(B) denying a petition under section 4 of this title to order arbitration to proceed,

(C) denying an application under section 206 of this title to compel arbitration,

(D) confirming or denying confirmation of an award or partial award, or

(E) modifying, correcting, or vacating an award;

(2) an interlocutory order granting, continuing, or modifying an injunction against an arbitration that is subject to this title; or

(3) a final decision with respect to an arbitration that is subject to this title.

(b) Except as otherwise provided in section 1292(b) of title 28, an appeal may not be taken from an interlocutory order—

(1) granting a stay of any action under section 3 of this title;

(2) directing arbitration to proceed under section 4 of this title;

(3) compelling arbitration under section 206 of this title; or

(4) refusing to enjoin an arbitration that is subject to this title.

(Added Pub. L. 100–702, title X, §1019(a), Nov. 19, 1988, 102 Stat. 4670, §15; renumbered §16, Pub. L. 101–650, title III, §325(a)(1), Dec. 1, 1990, 104 Stat. 5120.)

AMENDMENTS

1990—Pub. L. 101–650 renumbered the second section 15 of this title as this section.

## CHAPTER 2—CONVENTION ON THE RECOGNITION AND ENFORCEMENT OF FOREIGN ARBITRAL AWARDS

Sec.
201. Enforcement of Convention.
202. Agreement or award falling under the Convention.
203. Jurisdiction; amount in controversy.
204. Venue.
205. Removal of cases from State courts.
206. Order to compel arbitration; appointment of arbitrators.
207. Award of arbitrators; confirmation; jurisdiction; proceeding.
208. Chapter 1; residual application.

AMENDMENTS

1970—Pub. L. 91–368, §1, July 31, 1970, 84 Stat. 692, added heading for chapter 2 and analysis of sections for such chapter.

### § 201. Enforcement of Convention

The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, shall be enforced in United States courts in accordance with this chapter.

(Added Pub. L. 91–368, §1, July 31, 1970, 84 Stat. 692.)

EFFECTIVE DATE

Section 4 of Pub. L. 91–368 provided that: "This Act [enacting this chapter] shall be effective upon the entry into force of the Convention on Recognition and Enforcement of Foreign Arbitral Awards with respect to the United States." The Convention was entered into force for the United States on Dec. 29, 1970.

### § 202. Agreement or award falling under the Convention

An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention. An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states. For the purpose of this section a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States.

(Added Pub. L. 91–368, §1, July 31, 1970, 84 Stat. 692.)

### § 203. Jurisdiction; amount in controversy

An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States (including the courts enumerated in section 460 of title 28) shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy.

(Added Pub. L. 91–368, §1, July 31, 1970, 84 Stat. 692.)

### § 204. Venue

An action or proceeding over which the district courts have jurisdiction pursuant to section 203 of this title may be brought in any such court in which save for the arbitration agreement an action or proceeding with respect to the controversy between the parties could be brought, or in such court for the district and division which embraces the place designated in the agreement as the place of arbitration if such place is within the United States.

(Added Pub. L. 91–368, §1, July 31, 1970, 84 Stat. 692.)

### § 205. Removal of cases from State courts

Where the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention, the defendant or the defendants may, at any time before the trial thereof, remove such action or proceeding to the district court of the United States for the district and division embracing the place where the action or proceeding is pending. The procedure for removal of causes otherwise provided by law shall apply, except that the ground for removal provided in this section need not appear on the face of the complaint but may be shown in the petition for removal. For the purposes of Chapter 1 of this title any action or proceeding removed under this section shall be deemed to have been brought in the district court to which it is removed.

(Added Pub. L. 91–368, §1, July 31, 1970, 84 Stat. 692.)

### § 206. Order to compel arbitration; appointment of arbitrators

A court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein