# 23-303

## United States Court of Appeals for the Second Circuit

Benzor Shem Vidal,
*Plaintiff-Appellee,*

v.

Advanced Care Staffing, LLC,
Defendant-Appellant.

**On Appeal from the United States District Court
for the Eastern District of New York, No. 1:22-cv-05535-NRM-MMH**

————————————

**JOINT APPENDIX VOL. I OF III (A-1—A-274)**

————————————

HUGH BARAN
KAKALEC LAW PLLC
195 Montague Street, 14th Floor
Brooklyn, NY 11201
(212) 705-8730
Hugh@kakaleclaw.com

DAVID SELIGMAN
TOWARDS JUSTICE
P.O. Box 371680
Pmb 44465
Denver, CO 80237
(720) 248-8426
david@towardsjustice.org

*Counsel for Plaintiff-Appellee*

PROLOY K. DAS
SAMI ASAAD
CRAIG THOMAS DICKINSON
FORDHARRISON LLP
CityPlace II
185 Asylum Street, Suite 820
Hartford, CT 06103
(860)740-1355
pdas@fordharrison.com
sasaad@fordharrison.com
cdickinson@fordharrison.com

*Counsel for Defendant-Appellant*

**CASE NO. 23-303**
**INDEX TO DOCUMENT REFERENCES IN APPENDIX**

| Description of Item | Record Entry No. | Appendix Page No. |
|---|---|---|
| **VOLUME I** | | |
| **Docket U.S. District Court for the Eastern District of New York (Brooklyn) Case #: 1:22-cv-05535-NRM-MMH** ................................................................ | NA | A-1 |
| **Complaint for Declaratory Judgment & Injunctive Relief (09/16/2022)** ................................................................ | 1 | A-10 |
| **Letter Motion for premotion Conference (10/20/2022)** ................................................................ | 11 | A-35 |
| **Response to Motion for premotion Conference (10/27/2022)** ................................................................ | 13 | A-38 |
|     **Exhibit 1 – Plaintiff's October 6, 2022 Letter to AAA Seeking a Stay of Arbitral Proceedings** ................................................................ | | A-42 |
|     **Exhibit 2 – American Arbitration Association's Commercial Rules** ................................................................ | | A-48 |
| **Motion for Preliminary Injunction (01/23/2023)** ................................................................ | 23 | A-100 |

i

| Description of Item | Record Entry No. | Appendix Page No. |
|---|---|---|
| **Defendant's Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction (02/08/2023)** ................................................... | **29** | **A-140** |
| **Declaration of Maureen Luy (02/08/2023)** ................................................... | **30** | **A-179** |
| **Exhibit A – Employment Agreement between Benzor Shem R. Vidal and Advanced Care on May 8, 2019** ................................................... | **30-1** | **A-182** |
| **Exhibit B1-B7 – Email with original attachments from Advanced Care to Mr. Vidal on January 4, 2022 regarding the Amended Employment Agreement and cover letter explaining the amendments** ................................................... | **30-2— 30-8** | **A-191** |
| **Exhibit C – Executed Amended and Restated Employment Agreement, signed by Mr. Vidal on January 4, 2022** ................................................... | **30-9** | **A-239** |
| **Exhibit D – Email communications between Mr. Vidal and Joel Rosalio on January 4, 2022** ................................................... | **30-10** | **A-251** |
| **Exhibit E – Email communications between Mr. Vidal and Advanced Care on January 6, 2022 and January 10, 2022** ................................................... | **30-11** | **A-254** |

ii

| Description of Item | Record Entry No. | Appendix Page No. |
|---|---|---|
| **Exhibit F – Mr. Vidal's email dated January 13, 2022** .................................................................. | **30-12** | **A-256** |
| **Exhibit G – Mr. Vidal's email communications with Advanced Care on June 15, 2022** .................................................................. | **30-13** | **A-257** |
| **Exhibit H – Mr. Vidal's resume submitted to Advanced Care** .................................................................. | **30-14** | **A-259** |
| **Exhibit I – Mr. Vidal's transcript from CEBU Doctors' University with related diplomas and certificates** .................................................................. | **30-15** | **A-263** |
| **Exhibit J – 1 Application for Prevailing Wage Determination submitted to the United States Citizenship and Immigration Services on behalf of Mr. Vidal with the Immigrant Petition for Alien Worker, Form 1-140** .................................................................. | **30-16** | **A-270** |
| **Exhibit K – Wage Statement** .................................................................. | **30-17** | **A-274** |

## VOLUME II

| | | |
|---|---|---|
| **Declaration of Sami Asaad (02/08/2023)** .................................................................. | **31** | **A-275** |
| **Exhibit 1 – Letter sent to Plaintiff Benzor Shem Vidal, date June 22, 2022** .................................................................. | **31-1** | **A-278** |

| Description of Item | Record Entry No. | Appendix Page No. |
|---|---|---|
| **Exhibit 2 – Email from Plaintiff's prior counsel on June 29, 2022** .................................................... | 31-2 | A-280 |
| **Exhibit 3 – Demand for Arbitration filed with the American Arbitration Association ("AAA") on July 8, 2022** .................................................... | 31-3 | A-283 |
| **Exhibit 4 – Commercial Demand Form filed with the AAA on July 8, 2022** .................................................... | 31-4 | A-289 |
| **Exhibit 5 – Emails exchanged with the AAA in August 2022** .................................................... | 31-5 | A-291 |
| **Exhibit 6 – August and September 2022 emails regarding Plaintiff's request for an extension to the AAA** .................................................... | 31-6 | A-300 |
| **Exhibit 7 – Plaintiff's counsel's September 19, 2022 email to the AAA requesting a stay and the AAA's response** .................................................... | 31-7 | A-303 |
| **Exhibit 8 – Preliminary Conference Scheduling Order of Arbitrator Sara Kula, dated September 22, 2022** .................................................... | 31-8 | A-307 |
| **Exhibit 9 – Plaintiff's October 6, 2022 Letter to Arbitrator Kula** .................................................... | 31-9 | A-309 |

iv

| Description of Item | Record Entry No. | Appendix Page No. |
|---|---|---|
| **Exhibit 10 – Advanced Care's October 20, 2022 Letter to Arbitrator Kula** .......................... | **31-10** | **A-340** |
| **Exhibit 11 – Arbitrator Kula's October 24, 2022 order and email to the parties** .......................... | **31-11** | **A-344** |
| **Exhibit 12 – Plaintiff's October 28, 2022 Letter to the AAA Arbitration Manager** .......................... | **31-12** | **A-346** |
| **Exhibit 13 – Plaintiff's November 1, 2022 Email requesting an extension** .......................... | **31-13** | **A-348** |
| **Exhibit 14 – Plaintiff's November 10, 2022 Letter to Arbitrator Kula** .......................... | **31-14** | **A-350** |
| **Exhibit 15 – Advanced Care's November 20, 2022 Letter to Arbitrator Kula** .......................... | **31-15** | **A-382** |
| **Letter 16 – AAA's November 23, 2022 Letter to the parties attaching an email from Arbitrator Kula** .......................... | **31-16** | **A-445** |
| **Exhibit 17 – Advanced Care's December 2, 2022 Letter to Arbitrator Kula** .......................... | **31-17** | **A-447** |
| **Exhibit 18 – Plaintiff's Letter to Arbitrator Kula** .......................... | **31-18** | **A-451** |

v

| Description of Item | Record Entry No. | Appendix Page No. |
|---|---|---|
| **Exhibit 19 – Plaintiff's December 6, 2022 email to the AAA** .................................................. | **31-19** | **A-457** |
| **Exhibit 20 – Arbitrator Kula's December 9, 2022 order that was amended on December 15, 2022 to fix an error** .................................................. | **31-20** | **A-460** |
| **Exhibit 21 – Plaintiff's December 9, 2022 Letter to Arbitrator Kula** .................................................. | **31-21** | **A-461** |
| **Exhibit 22 – Emails in the arbitration regarding discovery** .................................................. | **31-22** | **A-463** |
| **Exhibit 23 – Advanced Care's January 4, 2023 Letter to the AAA** .................................................. | **31-23** | **A-465** |
| **Exhibit 24 – Plaintiff's Email regarding the Letter the New York Attorney General's office sent to the AAA** .................................................. | **31-24** | **A-469** |
| **Exhibit 25 – AAA's Letter to the New York Attorney General** .................................................. | **31-25** | **A-475** |
| **Exhibit 26 – AAA's Letter to Plaintiff** .................................................. | **31-26** | **A-477** |
| **Letter with Supplemental Authority (02/23/2023)** .................................................. | **37** | **A-481** |

| Description of Item | Record Entry No. | Appendix Page No. |
|---|---|---|
| **Letter with Supplemental Authority (02/23/2023)** | | |
| .................................................................. | **38** | **A-488** |
| **Notice of Appeal (03/07/2023)** | | |
| .................................................................. | **40** | **A-493** |

## VOLUME III

| | | |
|---|---|---|
| **Declaration of David H. Seligman in Support of Plaintiff's Motion for Preliminary Inunction** | | |
| .................................................................. | **23-2** | **A-495** |
| **Exhibit 1 – Declaration of Benzor Shem Vidal** | | |
| .................................................................. | **23-3** | **A-499** |
| **Exhibit 2 – 2019 Contract between Mr. Vidal and Defendant Advanced Care Staffing** | | |
| .................................................................. | **23-4** | **A-511** |
| **Exhibit 3 – Letter dated January 4, 2022** | | |
| .................................................................. | **23-5** | **A-521** |
| **Exhibit 4 – 2022 Contract between Mr. Vidal and ACS** | | |
| .................................................................. | **23-6** | **A-523** |
| **Exhibit 5 – Letter dated June 22, 2022** | | |
| .................................................................. | **23-7** | **A-536** |
| **Exhibit 6 – ACS's demand for arbitration** | | |
| .................................................................. | **23-8** | **A-539** |
| **Exhibit 7 – Email dated August 1, 2022** | | |
| .................................................................. | **23-9** | **A-546** |

| Description of Item | Record Entry No. | Appendix Page No. |
|---|---|---|
| Exhibit 8 – Email dated August 10, 2022 .................................................................. | 23-10 | A-548 |
| Exhibit 9 – Email dated September 8, 2022 .................................................................. | 23-11 | A-550 |
| Exhibit 10 – Email dated September 2, 2022. .................................................................. | 23-12 | A-559 |
| Exhibit 11 – Email dated September 7, 2022 .................................................................. | 23-13 | A-562 |
| Exhibit 12 – Email dated September 19, 2022 .................................................................. | 23-14 | A-565 |
| Exhibit 13 – Email dated October 6, 2022 .................................................................. | 23-15 | A-568 |
| Exhibit 14 – Letter dated October 20, 2022 .................................................................. | 23-16 | A-571 |
| Exhibit 15 – Letter dated October 28, 2022 .................................................................. | 23-17 | A-576 |
| Exhibit 16 – Letter dated November 10, 2022 .................................................................. | 23-18 | A-579 |
| Exhibit 17 – Letter dated Dec. 2, 2022 .................................................................. | 23-19 | A-600 |
| Exhibit 18 – Email dated Oct. 24, 2022 .................................................................. | 23-20 | A-606 |
| Exhibit 19 – Order dated December 9, 2022 .................................................................. | 23-21 | A-609 |

| Description of Item | Record Entry No. | Appendix Page No. |
|---|---|---|
| **Exhibit 20 – Letter dated January 4, 2023** ............ | **23-22** | **A-611** |
| **Exhibit 21 – Email dated January 4, 2023** ............ | **23-23** | **A-615** |
| **Exhibit 22 – Letter dated January 9, 2023** ............ | **23-24** | **A-618** |
| **Exhibit 23 – Letter dated January 9, 2023** ............ | **23-25** | **A-621** |
| **Exhibit 24 – AAA Commercial Rules** ............ | **23-26** | **A-626** |
| **Exhibit 25 – Letter dated January 4, 2023** ............ | **23-27** | **A-678** |
| **Letter regarding arbitration schedule (01/23/2023)** ............ | **24** | **A-683** |
| **Letter regarding Arbitration Proceedings before AAA by Benzor Shem Vidal (02/06/2023)** ............ | **28** | **A-685** |
| **Letter regarding Arbitration Proceedings before AAA by Advanced Care Staffing, LLC (02/10/2023)** ............ | **32** | **A-690** |
| **Letter regarding Arbitration Proceedings before AAA by Benzor Shem Vidal (02/14/2023)** ............ | **33** | **A-697** |

ix

| Description of Item | Record Entry No. | Appendix Page No. |
|---|---|---|
| **Reply Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction (02/15/2023)** .................................................. | **34** | **A-702** |
| **Declaration of Hugh Baran in Support of Plaintiff's Motion for Preliminary Injunction (02/15/2023)** | **35** | **A-722** |
| **Exhibit 26 – Supplemental Declaration of Benzor Shem Vidal** .................................................. | **35-1** | **A-724** |
| **Exhibit 27 – Letter from Jeffrey S. Rogoff, Regional Solicitor, United States Department of Labor** .................................................. | **35-2** | **A-728** |

Query    Reports    Utilities    Help    Log Out

APPEAL,ACO

# U.S. District Court
## Eastern District of New York (Brooklyn)
## CIVIL DOCKET FOR CASE #: 1:22-cv-05535-NRM-MMH

Vidal v. Advanced Care Staffing, LLC
Assigned to: Judge Nina R. Morrison
Referred to: Magistrate Judge Marcia M. Henry
Cause: 28:2201 Declaratory Judgement

Date Filed: 09/16/2022
Jury Demand: None
Nature of Suit: 790 Labor: Other
Jurisdiction: Federal Question

**Plaintiff**

**Benzor Shem Vidal**                        represented by    **Anna P Prakash**
Nichols Kaster PLLP
4700 IDS Center
80 South 8th Street
Minneapolis, MN 55402
612-256-3291
Fax: 612-338-4878
Email: aprakash@nka.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew C. Helland**
Nichols Kaster LLP
Nichols Kaster, LLP
235 Montgomery Street
Suite 810
San Francisco, CA 94104
415-277-7235
Fax: 415-277-7238
Email: helland@nka.com
*LEAD ATTORNEY*
*PRO HAC VICE*

**David Seligman**
Towards Justice
PO Box 371680
Pmb 44465
Denver, CO 80237-5680
720-248-8426
Fax: 720-248-8426
Email: david@towardsjustice.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Juno Turner**
Towards Justice

Towards Justice
PO Box 371680
Pmb 44465
Denver, CO 80237-5680
720-441-2236
Email: juno@towardsjustice.org
*ATTORNEY TO BE NOTICED*

**Patricia C. Kakalec**
Kakalec Law PLLC
195 Montague Street
Ste 14th Floor
Brooklyn, NY 11201
212-705-8730
Fax: 646-759-1587
Email: patricia@kakaleclaw.com
*ATTORNEY TO BE NOTICED*

**Valerie Collins**
Towards Justice
PO Box 371680
Pmb 44465
Denver, CO 80237-5680
720-441-2236
Email: valerie@towardsjustice.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hugh Baran**
Kakalec Law PLLC
195 Montague Street, 14th Floor
Brooklyn, NY 11201
212-705-8730
Fax: 646-759-1587
Email: hugh@kakaleclaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Advanced Care Staffing, LLC**              represented by **Sami Asaad**
FordHarrison LLP
CityPlace II
185 Asylum Street
Suite 610
Hartford, CT 06103
860-740-1357
Email: sasaad@fordharrison.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Craig Thomas Dickinson**
FordHarrison LLP

**A-2**

CityPlace II
185 Asylum Street
Suite 820
Hartford, CT 06103
860-740-1371
Email: cdickinson@fordharrison.com
*ATTORNEY TO BE NOTICED*

**Marissa Vitolo**
Epstein Becker & Green, P.C.
One Landmark Square
Stamford, CT 06901
203-326-7421
Email: mvitolo@ebglaw.com
*TERMINATED: 06/27/2023*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/16/2022 | 1 | COMPLAINT against Advanced Care Staffing, LLC filing fee $ 402, receipt number ANYEDC-15945861 Was the Disclosure Statement on Civil Cover Sheet completed -NO,, filed by Benzor Shem Vidal. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet, # 2 Proposed Summons Proposed Summons) (Baran, Hugh) (Entered: 09/16/2022) |
| 09/16/2022 | | Case Assigned to Judge Carol Bagley Amon and Magistrate Judge Marcia M. Henry. Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. (Bowens, Priscilla) (Entered: 09/16/2022) |
| 09/16/2022 | 2 | Summons Issued as to Advanced Care Staffing, LLC. (Bowens, Priscilla) (Entered: 09/16/2022) |
| 09/16/2022 | 3 | In accordance with Rule 73 of the Federal Rules of Civil Procedure and Local Rule 73.1, the parties are notified that **if** all parties consent a United States magistrate judge of this court is available to conduct all proceedings in this civil action including a (jury or nonjury) trial and to order the entry of a final judgment. Attached to the Notice is a blank copy of the consent form that should be filled out, signed and filed electronically **only if all** parties wish to consent. The form may also be accessed at the following link: http://www.uscourts.gov/uscourts/FormsAndFees/Forms/AO085.pdf. **You may withhold your consent without adverse substantive consequences. Do NOT return or file the consent unless all parties have signed the consent.** (Bowens, Priscilla) (Entered: 09/16/2022) |
| 09/16/2022 | 4 | This attorney case opening filing has been checked for quality control. See the attachment for corrections that were made, if any. (Bowens, Priscilla) (Entered: 09/16/2022) |
| 09/16/2022 | 5 | NOTICE of Appearance by Patricia C. Kakalec on behalf of Benzor Shem Vidal (aty to be noticed) (Kakalec, Patricia) (Entered: 09/16/2022) |
| 09/17/2022 | 6 | Proposed Summons. by Benzor Shem Vidal (Baran, Hugh) (Entered: 09/17/2022) |
| 09/19/2022 | 7 | Summons Issued as to Advanced Care Staffing, LLC. (Fernandez, Erica) (Entered: 09/19/2022) |
| 10/20/2022 | 8 | SUMMONS Returned Executed by Benzor Shem Vidal. Advanced Care Staffing, LLC served on 10/3/2022, answer due 10/24/2022. (Baran, Hugh) (Entered: 10/20/2022) |

A-3

| 10/20/2022 | 9 | NOTICE of Appearance by Sami Asaad on behalf of Advanced Care Staffing, LLC (aty to be noticed) (Asaad, Sami) (Entered: 10/20/2022) |
|---|---|---|
| 10/20/2022 | 10 | MOTION to Appear Pro Hac Vice *by Anna P. Prakash* Filing fee $ 150, receipt number ANYEDC-16059010. by Benzor Shem Vidal. (Attachments: # 1 Affidavit of Anna P. Prakash in support of Motion for Admission pro hac vice, # 2 Certificate of Good Standing for Anna P. Prakash for the State of Minnesota) (Prakash, Anna) (Entered: 10/20/2022) |
| 10/20/2022 | 11 | Letter MOTION for pre motion conference re 1 Complaint, by Advanced Care Staffing, LLC. (Asaad, Sami) (Entered: 10/20/2022) |
| 10/20/2022 | 12 | MOTION to Appear Pro Hac Vice *by Matthew C. Helland* Filing fee $ 150, receipt number ANYEDC-16059054. by Benzor Shem Vidal. (Attachments: # 1 Affidavit of Matthew C. Helland in support of Motion for Admission pro hac vice, # 2 Certificate of Good Standing for Matthew C. Helland for the State of California, # 3 Certificate of Good Standing for Matthew C. Helland for the State of Minnesota) (Helland, Matthew) (Entered: 10/20/2022) |
| 10/27/2022 | 13 | RESPONSE to Motion re 11 Letter MOTION for pre motion conference re 1 Complaint, filed by Benzor Shem Vidal. (Attachments: # 1 Exhibit Ex. 1, Pl.'s Ltr. to AAA Seeking Stay, # 2 Exhibit Ex. 2, AAA Commercial Rules) (Baran, Hugh) (Entered: 10/27/2022) |
| 10/28/2022 | | Case Reassigned to Judge Nina Morrison. Judge Carol Bagley Amon no longer assigned to the case. Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. (AM) (Entered: 10/28/2022) |
| 11/01/2022 | 14 | NOTICE of Appearance by Juno Turner on behalf of All Plaintiffs (aty to be noticed) (Turner, Juno) (Entered: 11/01/2022) |
| 11/02/2022 | | **ORDER GRANTING 12 Motion for Leave to Appear** *Pro Hac Vice*. Attorney Matthew C. Helland is granted permission to appear *pro hac vice* on behalf of Plaintiff Benzor Shem Vidal. The attorney shall register for ECF at www.pacer.gov. Once registered, the attorney shall file a notice of appearance and ensure that s/he receives electronic notification of activity in this case. So Ordered by Magistrate Judge Marcia M. Henry on 11/02/2022. (RC) (Entered: 11/02/2022) |
| 11/02/2022 | | **ORDER GRANTING 10 Motion for Leave to Appear** *Pro Hac Vice*. Attorney Anna P Prakash is granted permission to appear *pro hac vice* on behalf of Plaintiff Benzor Shem Vidal. The attorney shall register for ECF at www.pacer.gov. Once registered, the attorney shall file a notice of appearance and ensure that s/he receives electronic notification of activity in this case. So Ordered by Magistrate Judge Marcia M. Henry on 11/02/2022. (RC) (Entered: 11/02/2022) |
| 11/04/2022 | 15 | MOTION to Appear Pro Hac Vice *by David Seligman* Filing fee $ 150, receipt number ANYEDC-16110698. by Benzor Shem Vidal. (Attachments: # 1 Affidavit of David Seligman in support of Motion for Admission pro hac vice, # 2 Certificate of Good Standing for David Seligman for the State of New York, # 3 Certificate of Good Standing for David Seligman for the State of Colorado, # 4 Certificate of Good Standing for David Seligman for the Commonwealth of Massachusetts) (Seligman, David) (Entered: 11/04/2022) |
| 11/07/2022 | | **ORDER GRANTING 15 Motion for Leave to Appear** *Pro Hac Vice*. Attorney David Seligman is granted permission to appear *pro hac vice* on behalf of Plaintiff Benzor Shem Vidal. The attorney shall register for ECF at www.pacer.gov. Once registered, the attorney shall file a notice of appearance and ensure that s/he receives electronic notification of activity in this case. So Ordered by Magistrate Judge Marcia M. Henry on 11/07/2022. (RC) (Entered: 11/07/2022) |

| | | |
|---|---|---|
| 11/15/2022 | 16 | NOTICE of Appearance by David Seligman on behalf of Benzor Shem Vidal (notification declined or already on case) (Seligman, David) (Entered: 11/15/2022) |
| 11/16/2022 | 17 | MOTION to Appear Pro Hac Vice *by Valerie Collins* Filing fee $ 150, receipt number ANYEDC-16147079. by Benzor Shem Vidal. (Attachments: # 1 Affidavit, # 2 Certificate of Good Standing for the State of Colorado, # 3 Certificate of Good Standing for the State of Maryland) (Collins, Valerie) (Entered: 11/16/2022) |
| 11/22/2022 | 18 | NOTICE of Appearance by Anna P Prakash on behalf of Benzor Shem Vidal (notification declined or already on case) (Prakash, Anna) (Entered: 11/22/2022) |
| 11/22/2022 | 19 | NOTICE of Appearance by Matthew C. Helland on behalf of Benzor Shem Vidal (notification declined or already on case) (Helland, Matthew) (Entered: 11/22/2022) |
| 11/22/2022 | | **ORDER GRANTING 17** Motion for Leave to Appear *Pro Hac Vice*. Attorney Valerie Collins is granted permission to appear *pro hac vice* on behalf Plaintiff Benzor Shem Vidal. The attorney shall register for ECF at www.pacer.gov. Once registered, the attorney shall file a notice of appearance and ensure that s/he receives electronic notification of activity in this case. So Ordered by Magistrate Judge Marcia M. Henry on 11/22/2022. (Entered: 11/22/2022) |
| 11/28/2022 | 20 | NOTICE of Appearance by Marissa Vitolo on behalf of Advanced Care Staffing, LLC (aty to be noticed) (Vitolo, Marissa) (Entered: 11/28/2022) |
| 11/29/2022 | 21 | NOTICE of Appearance by Valerie Collins on behalf of Benzor Shem Vidal (notification declined or already on case) (Collins, Valerie) (Entered: 11/29/2022) |
| 01/20/2023 | 22 | Letter *Regarding Motion for Preliminary Injunction and Expedited Briefing* by Benzor Shem Vidal (Seligman, David) (Entered: 01/20/2023) |
| 01/23/2023 | | SCHEDULING ORDER: Plaintiff's request 22 for an expedited briefing schedule on its motion for a preliminary injunction is granted. The Court also waives its bundling practice, *see* Individual Rule 5.2.3.1, and directs the parties to adhere to the following briefing schedule: Plaintiff shall file its motion for a preliminary injunction--previously served on Defendant--and any supporting documentation on the docket immediately. Defendant shall file its opposition to the motion for a preliminary injunction motion on or before January 30, 2023. Plaintiff shall file his reply, if any, on or before February 6, 2023. <br><br> A video status conference will be held on February 7, 2023 at 2:00 PM, at which time the parties should be prepared to discuss scheduling for proceeding on the preliminary injunction motion, as well as the status of Defendant's earlier request 11 for leave file a motion to dismiss the complaint. The parties will be provided with Zoom access information by email prior to the conference. Ordered by Judge Nina R. Morrison on 1/23/2023. (LK) (Entered: 01/23/2023) |
| 01/23/2023 | 23 | MOTION for Preliminary Injunction by Benzor Shem Vidal. (Attachments: # 1 Memorandum in Support Pl.'s Mem. of Law in Support of Mot. for Prelim. Injunction, # 2 Declaration Decl. of David Seligman in Support of Pl.'s Mot. for Prelim. Injunction, # 3 Exhibit Ex. 1 to Seligman Decl. - Decl. of Pl. Benzor Vidal, # 4 Exhibit Ex. 2 to Seligman Decl. - 2019 Contract & Addenda, # 5 Exhibit Ex. 3 to Seligman Decl. - 2022.01.04 Letter, # 6 Exhibit Ex. 4 to Seligman Decl. - 2022 Contract, # 7 Exhibit Ex. 5 to Seligman Decl. - 2022.06.22 Letter, # 8 Exhibit Ex. 6 to Seligman Decl. - Demand for Arbitration, # 9 Exhibit Ex. 7 to Seligman Decl. - 2022.08.01 Email from TJ, # 10 Exhibit Ex. 8 to Seligman Decl. - 2022.08.10 Email from Vidal, # 11 Exhibit Ex. 9 to Seligman Decl. - 2022.09.08 Email from Vidal, # 12 Exhibit Ex. 10 to Seligman Decl. - 2022.09.02 Email from Vidal, # 13 Exhibit Ex. 11 to Seligman Decl. - 2022.09.07 Letter from AAA, # 14 Exhibit Ex. 12 to Seligman Decl. - 2022.09.19 Email, # 15 Exhibit Ex. 13 to Seligman |

| | | |
|---|---|---|
| | | Decl. - 2022.10.06 Email, # [16](#) Exhibit Ex. 14 to Seligman Decl. - 2022.10.20 Letter from ACS, # [17](#) Exhibit Ex. 15 to Seligman Decl. - 2022.10.28 Letter from TJ, # [18](#) Exhibit Ex. 16 to Seligman Decl. - 2022.11.10 Letter from TJ, # [19](#) Exhibit Ex. 17 to Seligman Decl. - 2022.12.01 Letter from TJ, # [20](#) Exhibit Ex. 18 to Seligman Decl. - 2022.10.24 Email from Kula, # [21](#) Exhibit Ex. 19 to Seligman Decl. - 2022.12.09 Order, # [22](#) Exhibit Ex. 20 to Seligman Decl. - 2023.01.04 NYAG Letter, # [23](#) Exhibit Ex. 21 to Seligman Decl. - 2023.01.04 Email from TJ, # [24](#) Exhibit Ex. 22 to Seligman Decl. - 2023.01.09 Letter from AAA to AG, # [25](#) Exhibit Ex. 23 to Seligman Decl. - 2023.01.09 Letter from AAA to parties, # [26](#) Exhibit Ex. 24 to Seligman Decl. - AAA Commercial Rules, # [27](#) Exhibit Ex. 25 to Seligman Decl. - 2023.01.04 Letter from ACS) (Seligman, David) (Entered: 01/23/2023) |
| 01/23/2023 | [24](#) | Letter *Regarding Arbitration Schedule* by Benzor Shem Vidal (Seligman, David) (Entered: 01/23/2023) |
| 01/26/2023 | [25](#) | Letter MOTION for Extension of Time to File Response/Reply as to [23](#) MOTION for Preliminary Injunction by Advanced Care Staffing, LLC. (Asaad, Sami) (Entered: 01/26/2023) |
| 01/26/2023 | | ORDER granting in part [25](#) Defendant's Motion for extension of time to file its opposition to Plaintiff's motion for a preliminary injunction. The Court observes that Plaintiff does not consent to Defendant's request in light of Defendant's opposition to a stay of the arbitration proceedings pending resolution of the motion. Defendant's request for a twenty-one day extension is denied. However, the Court will modify the prior briefing and argument schedule as follows to give Defendant additional time to prepare and file its brief. Defendant's opposition shall be due on or before February 8, 2023. Plaintiff's reply shall be due on or before February 15, 2023. Rather than scheduling a status conference, the Court will hear oral argument on the motion for a preliminary injunction on February 22, 2023 at 2:00 PM. The parties are requested to inform the Court by February 16, 2023 if they consent to have oral argument in person or would prefer video. Ordered by Judge Nina R. Morrison on 1/26/2023. (LK) (Entered: 01/26/2023) |
| 02/01/2023 | [26](#) | NOTICE of Appearance by Craig Thomas Dickinson on behalf of Advanced Care Staffing, LLC (aty to be noticed) (Dickinson, Craig) (Entered: 02/01/2023) |
| 02/06/2023 | [27](#) | MOTION to Adjourn Conference *(Request to Reschedule Oral Argument on Plaintiff's Motion for Preliminary Injunction from 2/22/23 to 2/21/23)* by Benzor Shem Vidal. (Baran, Hugh) (Entered: 02/06/2023) |
| 02/06/2023 | [28](#) | Letter *Regarding Arbitration Proceedings before AAA* by Benzor Shem Vidal (Seligman, David) (Entered: 02/06/2023) |
| 02/08/2023 | [29](#) | MEMORANDUM in Opposition re [23](#) MOTION for Preliminary Injunction filed by Advanced Care Staffing, LLC. (Asaad, Sami) (Entered: 02/08/2023) |
| 02/08/2023 | [30](#) | AFFIDAVIT/DECLARATION in Opposition re [23](#) MOTION for Preliminary Injunction filed by Advanced Care Staffing, LLC. (Attachments: # [1](#) Exhibit A - Original Agreement, # [2](#) Exhibit B1 - 2022-01-04 Email re Amended Agreement, # [3](#) Exhibit B2 - 2022-01-04 Letter to Vidal, # [4](#) Exhibit B3 - Waiver of Promissory Note - PCS, # [5](#) Exhibit B4 - ACS Quick Guide for Sponsored Nurses, # [6](#) Exhibit B5 - Introductory Guide to Skilled Nursing Facility, # [7](#) Exhibit B6 - Amended and Restated Employment Agreement with Schedule A, # [8](#) Exhibit B7 - Schedule B to the Amended And Restated Employment Agreement - Dispute Resolution Provision, # [9](#) Exhibit C - Signed Amended and Restated Employment Agreement, # [10](#) Exhibit D - 2022-01-04 Email to BV Re Signed Agreement, # [11](#) Exhibit E - 2022-01-06 Email regarding conference call to discuss Amended Agreement, # [12](#) Exhibit F - 2022-01-13 Email from BV, # [13](#) Exhibit G - Resignation Email and Response_Redacted, # [14](#) Exhibit H - BenzorShem Vidal - Resume_Redacted, # [15](#) |

| | | |
|---|---|---|
| | | Exhibit I - Vidal Transcript and Diplomas_Redacted, # [16] Exhibit J - Application for Prevailing Wage Determination_Redacted, # [17] Exhibit K - Wage Report_Redacted) (Asaad, Sami) (Entered: 02/08/2023) |
| 02/08/2023 | [31] | AFFIDAVIT/DECLARATION in Opposition re [23] MOTION for Preliminary Injunction filed by Advanced Care Staffing, LLC. (Attachments: # [1] Exhibit 1 - 2022-06-22 Letter to Benzor Shem Vidal, # [2] Exhibit 2 - 2022-07-08 Emails with Vidal Counsel, # [3] Exhibit 3 - 2022-07-08 Demand for Arbitration_30113289, # [4] Exhibit 4 - 2022-07-08 Commercial Demand Form_30113288, # [5] Exhibit 5 - August 2022 Emails Re Seligman Representation, # [6] Exhibit 6 - September Extension Emails, # [7] Exhibit 7 - 2022-09-22 Stay Request Response with Attachment, # [8] Exhibit 8 - 2022-09-23 Preliminary Conference Scheduling Order, # [9] Exhibit 9 - 2022-10-06 Respondent's Letter with Exhibit, # [10] Exhibit 10 - 2022-10-20 Claimant's Letter to Arbitrator Kula, # [11] Exhibit 11 - 2022-10-24 Arbitrator-s Order Regarding Request for a Stay, # [12] Exhibit 12 - 2022-10-28 Letter from Benzor Vidal to AAA, # [13] Exhibit 13 - 2022-11-01 Respondent's Email to AAA, # [14] Exhibit 14 - 2022-11-10 Respondent's Letter to Arbitrator, # [15] Exhibit 15 - 2022-11-20 Claimant's Letter to Arbitrator Kula with Exhibits, # [16] Exhibit 16 - 2022-11-23 Email from AAA with Attachments, # [17] Exhibit 17 - 2022-12-02 Claimant's Letter to Arbitrator Kula, # [18] Exhibit 18 - 2022-12-02 Respondent's Letter, # [19] Exhibit 19 - 2022-12-06 Respondent's Email to AAA, # [20] Exhibit 20 - 2022-12-15 Order Re Request for Stay Corrected, # [21] Exhibit 21 - 2022-12-09 Respondent's Letter to AAA, # [22] Exhibit 22 - 2022-12-19 Emails Regarding Discovery, # [23] Exhibit 23 - 2023-01-04 Claimant's Letter to Lesser, # [24] Exhibit 24 - 2023-01-04 Respondent's Email Re AG Letter with Attachment, # [25] Exhibit 25 - 2023-01-09 AAA Letter to NYAG, # [26] Exhibit 26 - 2023-01-09 AAA Letter to Respondent) (Asaad, Sami) (Entered: 02/08/2023) |
| 02/09/2023 | | ORDER granting [27] Motion to Adjourn Conference. The oral argument previously scheduled for February 22, 2023 at 2:00 PM is rescheduled to February 21, 2023 at 11:00 AM in Courtroom 6E North. Ordered by Judge Nina R. Morrison on 2/9/2023. (LK) (Entered: 02/09/2023) |
| 02/10/2023 | [32] | Letter *regarding Arbitration Proceedings before AAA* by Advanced Care Staffing, LLC (Asaad, Sami) (Entered: 02/10/2023) |
| 02/14/2023 | [33] | Letter *regarding arbitration proceedings before AAA and new correspondence from AAA* by Benzor Shem Vidal (Baran, Hugh) (Entered: 02/14/2023) |
| 02/15/2023 | [34] | REPLY in Support re [23] MOTION for Preliminary Injunction filed by Benzor Shem Vidal. (Baran, Hugh) (Entered: 02/15/2023) |
| 02/15/2023 | [35] | AFFIDAVIT/DECLARATION in Support re [23] MOTION for Preliminary Injunction *(Declaration of Hugh Baran)* filed by Benzor Shem Vidal. (Attachments: # [1] Exhibit Ex. 26 - Supp. Decl. of Benzor Vidal, # [2] Exhibit Ex. 27 - Letter from U.S. Department of Labor Regional Solicitor Jeffrey Rogoff) (Baran, Hugh) (Entered: 02/15/2023) |
| 02/17/2023 | [36] | Letter *regarding proposed division of oral argument pursuant to the Court's Individual Practice Rules 4.2 and 5.7* by Benzor Shem Vidal (Baran, Hugh) (Entered: 02/17/2023) |
| 02/21/2023 | | Minute Entry Oral argument on Plaintiff's [23] Motion for Preliminary Injunction was held before Judge Nina Morrison on February 21, 2023. David Seligman and Hugh Baran appeared on behalf of Plaintiff. Craig Thomas Dickinson and Sami Asaad appeared on behalf of Defendant. The Court heard the parties' arguments on Plaintiff's preliminary injunction motion. The court authorized the parties to submit letter briefs containing supplemental authorities relevant to certain matters discussed on the record. To the extent that either party is inclined to do so, those submissions shall be filed on or before February 23, 2023. Ordered by Judge Nina R. Morrison on 2/21/2023. (Court Reporter Charleane Heading.) (LK) (Entered: 02/21/2023) |

| 02/23/2023 | 37 | Letter *with Supplemental Authority* by Benzor Shem Vidal (Seligman, David) (Entered: 02/23/2023) |
|---|---|---|
| 02/23/2023 | 38 | Letter *with Supplemental Authority* by Advanced Care Staffing, LLC (Asaad, Sami) (Entered: 02/23/2023) |
| 02/24/2023 | 39 | ORDER GRANTING PRELIMINARY INJUNCTION: Pursuant to the attached Order, Plaintiff's 23 motion for a preliminary injunction is granted and Defendant's 11 request for a pre-motion conference for a motion to compel arbitration is denied as moot. Ordered by Judge Nina R. Morrison on 2/24/2023. (LK) (Entered: 02/24/2023) |
| 03/07/2023 | 40 | NOTICE OF APPEAL as to 39 Order on Motion for Pre Motion Conference,, Order on Motion for Preliminary Injunction,,, by Advanced Care Staffing, LLC. Appeal Record due by 3/21/2023. (Asaad, Sami) (Entered: 03/07/2023) |
| 03/07/2023 | | APPEAL FILING FEE DUE re 40 Notice of Appeal Payment in the amount of $505.00, can be made in person to the clerks office, or mailed in or paid online with the event *Civil Case Appeal Filing Fee*. (VJ) (Entered: 03/07/2023) |
| 03/07/2023 | | Electronic Index to Record on Appeal sent to US Court of Appeals. 40 Notice of Appeal Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (VJ) (Entered: 03/07/2023) |
| 03/07/2023 | | CIVIL CASE APPEAL FILING FEE: $ 505, receipt number ANYEDC-16475219 (Asaad, Sami) (Entered: 03/07/2023) |
| 03/07/2023 | | Supplemental Electronic Index to Record on Appeal sent to US Court of Appeals. 40 Notice of Appeal Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (VJ) (Entered: 03/07/2023) |
| 03/20/2023 | 41 | Letter *regarding newly filed lawsuit* by Benzor Shem Vidal (Attachments: # 1 Exhibit Ex. 1 - USDOL Complaint, Su v. Advanced Care Staffing, LLC et al.) (Baran, Hugh) (Entered: 03/20/2023) |
| 04/04/2023 | 42 | OPINION AND ORDER: The Court issues the attached opinion pursuant to its earlier Order 39 granting Plaintiff's motion for a preliminary injunction. Ordered by Judge Nina R. Morrison on 4/4/2023. (LK) (Entered: 04/04/2023) |
| 04/27/2023 | 43 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on February 21, 2023, before Judge Morrison. Court Reporter/Transcriber Charleane M. Heading, Telephone number 718-613-2643. Email address: cheading@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 5/18/2023. Redacted Transcript Deadline set for 5/29/2023. Release of Transcript Restriction set for 7/26/2023. (Heading, Charleane) (Entered: 04/27/2023) |
| 06/23/2023 | 44 | MOTION to Withdraw as Attorney *for Advanced Care Staffing, LLC* by Advanced Care Staffing, LLC. (Vitolo, Marissa) (Entered: 06/23/2023) |
| 06/26/2023 | | ORDER re 44 : By **07/06/2023**, attorney Marissa Vitolo and/or the law firm of FordHarrison, LLP shall clarify whether she is asserting a charging or retaining lien. *See* Local Civ. R. 1.4. So Ordered by Magistrate Judge Marcia M. Henry on 06/26/2023. (MY) (Entered: 06/26/2023) |

| 06/26/2023 | 45 | Letter *to Magistrate Judge Marcia M. Henry regarding response to Court's Order, dated June 26, 2023* by Advanced Care Staffing, LLC (Vitolo, Marissa) (Entered: 06/26/2023) |
| 06/27/2023 | | ORDER **granting** 44 , as supplemented by 45 : Attorney Marissa Vitolo is terminated as counsel of record for Defendant. So Ordered by Magistrate Judge Marcia M. Henry on 06/27/2023. (MY) (Entered: 06/27/2023) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/05/2023 11:57:17 | | | |
| **PACER Login:** | bg0034bg | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-05535-NRM-MMH |
| **Billable Pages:** | 8 | **Cost:** | 0.80 |

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

BENZOR SHEM VIDAL,

*Plaintiff,*

v.

ADVANCED CARE STAFFING, LLC,

*Defendant.*

**COMPLAINT FOR
DECLARATORY JUDGMENT
& INJUNCTIVE RELIEF**

Civ. Action No.: 22-cv-5535

Plaintiff Benzor Shem Vidal, by his undersigned attorneys for his Complaint, alleges as follows:

### INTRODUCTION

1.    Plaintiff Benzor Shem Vidal ("Mr. Vidal" or "Plaintiff") is an immigrant nurse who came to the United States from the Philippines on a visa sponsored by his former employer Advanced Care Staffing, LLC ("Advanced Care Staffing" or "Defendant"). After entering the United States in 2022, he confronted grueling and unsafe working conditions that threatened his nursing license—including unmanageable patient loads of more than forty patients at a time. Mr. Vidal believed it was impossible for him to provide adequate care to patients but was also terrified to resign. He knew that his contract with Advanced Care Staffing purported to allow the company to pursue legal action against him, with potentially ruinous financial consequences, if he decided to terminate his employment.

2.    After months working for Advanced Care Staffing, he decided that he could no longer work under these dangerous conditions. He decided to quit his job. Advanced Care Staffing characterized his termination as a "breach of contract," and—after sending him a letter threatening legal action in which it would seek to recover tens of thousands of dollars and all of

its attorney's fees and arbitration costs if he did not return to his employment—Advanced Care Staffing filed a demand for arbitration before the American Arbitration Association, pursuing its purported damages ( including its supposed "lost profits"), its attorney's fees, and the costs of arbitration.

3.     With this case, Mr. Vidal seeks a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, that the arbitration provision Advanced Care Staffing seeks to enforce against him (the "Arbitration Provision") is illegal and unenforceable.

4.     First, the Arbitration Provision is a contract for illegal purposes. The Arbitration Provision and its "loser pays" term—which would require Mr. Vidal to pay all Advanced Care Staffing's attorney's fees and arbitration costs if the arbitrator awarded Advanced Care Staffing even a dollar in purported damages—are a threat of serious harm designed to coerce Mr. Vidal to stay in his job. That threat violates federal and state trafficking laws. Additionally, Advanced Care Staffing seeks to recoup costs, including lost profits, that federal and state minimum wage laws prevent it from forcing Mr. Vidal to bear. Advanced Care Staffing's recovery of attorney's fees and costs accrued would be an illegal kickback under federal and state wage and hour laws. Because it is black letter law that contracts for illegal purposes cannot be enforced, the Arbitration Provision is unenforceable.

5.     The Arbitration Provision is also unenforceable on its face. Its substantively unconscionable and illegal "loser pays" provision threatens to bury Mr. Vidal in tens of thousands of dollars of attorney's fees and arbitration costs and conflicts with the one-way fee shifting mechanism set out in the trafficking and minimum wage laws.

6.     As the United States Supreme Court has recently reaffirmed, the Federal Arbitration Act's policy "is to make 'arbitration agreements as enforceable as other contracts, but

A-11

not more so.'" *Morgan v. Sundance, Inc.*, No. 21-328, __ U.S. __, slip op. at 6 (2022) (citation omitted). "The federal policy is about treating arbitration contracts like all others, not about fostering arbitration." *Id.* (citation omitted).

7.      For all these reasons, this Court should declare the Arbitration Provision unenforceable under federal and state law and enjoin the currently pending arbitration against Mr. Vidal.

## THE PARTIES

8.      Plaintiff Benzor Shem Vidal is a Registered Nurse who was formerly employed by Defendant. He is a citizen of the Republic of the Philippines and a legal permanent resident of the United States. He lives in New York.

9.      Defendant Advanced Care Staffing, LLC is a limited liability company with its principal place of business in New York.

10.     At all times relevant to this action, Defendant has been an enterprise engaged in interstate commerce within the meaning of the FLSA, 29 U.S.C. § 203(r)–(s).

11.     Upon information and belief, Defendant had gross sales made or business done in excess of $500,000 annually for each of the years from 2018 through 2021.

12.     Throughout his employment, Defendant was an "employer" of Plaintiff as defined by the FLSA and NYLL.

13.     Throughout his employment, Plaintiff was a non-exempt "employee" of Defendant as defined by the FLSA and NYLL.

14.     Throughout his employment, Defendant "employed" Plaintiff within the meaning of the FLSA and NYLL.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331. Plaintiff seeks a declaration under the Declaratory Judgment Act, 28 U.S.C. § 2201, that

Defendant's Arbitration Provision is a contract for illegal purposes in violation of the Trafficking

Victims Protection Act ("TVPA"), 18 U.S.C. § 1589, and the Fair Labor Standards Act

("FLSA"), 29 U.S.C. § 201 *et seq*., and that the enforcement of the Arbitration Provision would

violate Plaintiff's rights under the TVPA and the FLSA.

16.     The Court has subject matter jurisdiction over Mr. Vidal's request for a

declaration that Defendant's Arbitration Provision is a contract for illegal purposes and

unconscionable in violation of state law, and that the enforcement of the Arbitration Provision

would violate Plaintiff's rights under state laws, pursuant to 28 U.S.C. § 1367, as they form part

of the same case or controversy.

17.     This Court has personal jurisdiction over Defendant because Defendant initiated

the AAA proceeding in New York, is based in New York, and employed Plaintiff in New York.

18.     Venue is proper in this district pursuant to and 28 U.S.C. § 1391 because this

action seeks a declaration affecting the rights of Plaintiff who was employed in Brooklyn, New

York with respect to an arbitration initiated in New York.

19.     A declaratory judgment is appropriate because the facts alleged show that there is

a substantial controversy between parties having adverse legal interests—Mr. Vidal and

Advanced Care Staffing—of sufficient immediacy and reality to warrant the issuance of a

declaratory judgment.

## BACKGROUND

### I.     DEFENDANT'S BUSINESS

20.     Defendant recruits trained nurses from the Philippines and elsewhere, bringing

them to the United States, and selling their labor to healthcare facilities, including nursing

homes.

21.     Defendant profits by charging healthcare facilities more for healthcare workers'

labor than it pays the workers in wages. Therefore, the longer healthcare workers work, the more

Defendant can profit from their labor. Defendant's clients (the healthcare facilities) benefit from

the arrangement through, among other things, obtaining the labor of expert healthcare workers at

a time when providers across the country face increasingly serious challenges attracting qualified

healthcare workers. Defendant and similar companies that recruit foreign healthcare workers can

provide labor that is less expensive than domestic travel nurse companies, a common source of

healthcare workers.

### II.     PLAINTIFF'S RECRUITMENT

22.     Mr. Vidal is an experienced Registered Nurse. He worked in a hospital setting for

four years in the Philippines and the United Kingdom prior to immigrating to the United States.

23.     Like many healthcare workers in the Philippines, Mr. Vidal had dreamed about

becoming a nurse in the United States. Mr. Vidal thought it would allow him to advance his

career because he could work for top-notch healthcare providers. He also thought it would allow

him to save a little money to send home to his family in the Philippines. Mr. Vidal's father is the

sole caretaker for his nonverbal autistic brother, who cannot care for himself. Mr. Vidal's father

must feed, bathe, and attend to all of his brother's needs, which means that Mr. Vidal's father

cannot work to support himself. Mr. Vidal is thus a crucial source of support for his family back

home.

24.     Lured by the possibility of a more prosperous future, Mr. Vidal contacted

Advanced Care Staffing, which recruited nurses from the Philippines with promises of achieving

the "American Dream." Eventually, Defendant offered to help him obtain an EB-3, legal

permanent resident visa to take up work for Advanced Care Staffing in the United States.

25.     In May 2019, Advanced Care Staffing required Mr. Vidal to sign a nonnegotiable

form contract (the "2019 Contract") for nurses that included several pages of fine print, legalese

in English that he could barely understand. Advanced Care Staffing presented the contract to Mr.

Vidal on a take-it-or-leave-it basis.

26.     Mr. Vidal had to sign the 2019 Contract if he wanted to come to the United States.

Mr. Vidal did not understand the 2019 Contract at the time he signed it, but the contract included

several unfair terms. For example, the 2019 Contract included a promissory note that required

Mr. Vidal to work for Advanced Care Staffing for three years, and, if he left the company before

his three-year term ended, to pay a $20,000 fee, in addition to all costs and expenses (including

legal costs and attorney's fees) to enforce the promissory note. That was far more money than he

had ever had in savings.

27.     The 2019 Contract also said that Mr. Vidal would not be able to sue Advanced

Care Staffing in court but had to bring any claim in arbitration. And even though arbitration can

cost tens of thousands of dollars in fees and costs, not including the fees Mr. Vidal might have to

pay his own lawyer, the contract said that he would have to split those arbitration costs with

Advanced Care Staffing. Mr. Vidal did not have the money to pay those costs.

28.     After he signed the 2019 Contract, Advanced Care Staffing required Mr. Vidal to

spend several months fulfilling administrative requirements for placement, including licensure,

English proficiency exams, birth certificates, transcripts, visa screening certificates, and medical examination.

29.     While waiting for Advanced Care Staffing to help him with his visa, Mr. Vidal could not look for any other jobs working in the United States because had promised Advanced Care Staffing that he would not seek other employment there. Instead, Mr. Vidal located a healthcare staffing company that placed nurses in the United Kingdom and worked at a London hospital for two years.

30.     While in the U.K., Mr. Vidal earned approximately $3,000 a month, but about half of his earnings went directly to housing. If he worked overtime shifts, he was able to send a few hundred dollars a month to his family in the Philippines to help support his father and brother.

31.     Despite paying a $1200 out-of-pocket fee for expedited visa processing—almost half of what he earned in a month—Mr. Vidal waited well over two years before Advanced Care Staffing assigned him to work at a rehabilitation facility in New York.

### III.     ADVANCED CARE STAFFING IMPOSES A NEW CONTRACT

32.     In late 2021, Mr. Vidal discovered that his visa paperwork had come through and that he would be moving in the United States to begin work for Defendant.

33.     In January 2022, when he was still in the United Kingdom but on the verge of flying to the United States to begin work, Advanced Care Staffing told Mr. Vidal that he had to sign a new contract to work for the company. This contract is the "Amended and Restated Employment Agreement" (the "2022 Contract"), and it states that it supersedes all prior contracts.

34.     In correspondence accompanying the 2022 Contract, Advanced Care Staffing told Mr. Vidal the new contract contained two key updates: (1) greater clarity; and (2) the elimination

of the promissory note because Defendant had received feedback that it could be viewed as a "buy out" which would allow him to leave his employment if he just paid the note amount.

35.     As with the 2019 Contract, Defendant presented Mr. Vidal the 2022 Contract on a take-it-or-leave-it basis. At the time Mr. Vidal signed the 2022 Contract, he believed he would not be able to come to the United States if he did not sign, because Advanced Care Staffing presented the contract as a condition of sponsoring his visa application. Mr. Vidal had also already given notice to his UK employer and arranged his travel to the United States.

36.     Mr. Vidal also feared that if he did not sign the 2022 Contract, Defendant would seek the $20,000 in liquidated damages outlined in the original contract, which would not be revoked unless he signed the 2022 Contract. Mr. Vidal had no way of paying such a sum. In addition, Advanced Care Staffing had not reimbursed him for the expenses he had already incurred in anticipation of his travel to the United States, so that money would be lost as well.

37.     While Mr. Vidal did not understand the 2022 Contract at the time he signed it, it includes even more unfair and aggressive provisions than the 2019 Contract with Advanced Care Staffing. First, although it no longer includes a specifically-labeled "breach fee," it nevertheless states that if Mr. Vidal were to leave his employment with Defendant early "without good reason," he would owe Advanced Care Staffing "all damages and other relief to redress the harm," meaning that there remains a significant breach fee, except under the 2022 Contract this fee is of an unknown magnitude.

38.     Advanced Care Staffing told Mr. Vidal that if he left his job, he would be responsible for purported damages that far exceed the hard costs it expended in bringing Plaintiff to the United States.

39.     The 2022 Contract states that Defendant's purported damages in the event of a breach by Mr. Vidal would include "significant loss of profits (reflecting not only loss of anticipated profits under this Agreement but also resulting from the impact on [Advanced Care Staffing's] relationship with its Clients)."

40.     That is not the only financial harm that Defendant suggested it could inflict on Mr. Vidal if he left his job early. In addition to its purported damages, the 2022 Contract suggests in two different places that Mr. Vidal could be on the hook for all Advanced Care Staffing's attorney's fees and costs.

41.     First, Section 14 of the 2022 Contract specifies that Mr. Vidal is responsible for reimbursing Defendant for all "reasonable costs, including all attorney's fees" that it "incurs in enforcing its rights and remedies under the Agreement."

42.     Second, the 2022 Contract's Schedule B, the Dispute Resolution Provision—described in this action as the Arbitration Provision—specifies that the prevailing party in arbitration, including Advanced Care Staffing if it prevailed in any arbitration against Mr. Vidal for leaving his employment before the end of the contract term, would be "reimbursed for its reasonable attorney's fees as well as all costs and fees charged by the AAA and the arbitrator."

## IV.     WORKING CONDITIONS IN THE UNITED STATES

43.     In February 2022, Mr. Vidal entered the United States.

44.     Defendant assigned Plaintiff to work at Downtown Brooklyn Nursing & Rehabilitation Center, and he began working there on March 8, 2022.

45.     Mr. Vidal's life in the United States working for Advanced Care Staffing was nothing like what he had envisioned or been promised.

46.     Prior to Mr. Vidal signing the 2022 Contract, Advanced Care Staffing told Mr. Vidal that, once placed in a facility, he would be assigned manageable patient loads of twenty to thirty patients at a time.

47.     But in the United States, he was required to work under brutal and dangerous conditions, caring for as many as forty patients at a time. This patient load meant that Mr. Vidal rarely took a break and ran constantly from one patient to the next, unable to take the time he believed was necessary to provide them with adequate care.

48.     The facility where Defendant placed Mr. Vidal also failed to adequately staff Certified Nursing Assistants, which meant Mr. Vidal was not only doing the work of two nurses but was also performing duties that would typically be the responsibility of assistants, such as sanitary cleaning, hygiene care, and feeding assistance for residents unable to feed themselves.

49.     As a result of his working conditions, Mr. Vidal suffered repeated bouts of illness, including COVID-19, which he contracted while working at the facility.

50.     On the rare occasion Mr. Vidal was able to take a break, they rarely lasted longer than 10-15 minutes due to the severe staffing shortages and excessive number of patients in his care.

51.     Mr. Vidal's breakneck work pace was not only dangerous and exhausting for him—it also endangered his patients. Despite his best efforts, he often could not physically get to patients fast enough to give them their medications or protect them against falls. Mr. Vidal commonly heard his patients moaning in agony as they waited for him or anyone else to provide them with care. Patients being fed often had to wait hours to eat because Mr. Vidal did not have the capacity to assist them. Patients frantically used their call buttons, ringing them repeatedly, to

alert staff of their medical needs, including issues with feeding tubes, oxygen lines, and bed sores.

52. As a result of the dangerous staffing practices, Mr. Vidal was terrified he would lose the license he had worked so hard to train for and obtain.

53. Although Mr. Vidal's pay of around $36 per hour was more than he had ever made, it was far below market wages for nurses in the region, and he could barely make ends meet in New York City after sending a little money home to support his father and his brother with severe disabilities.

## V. PLAINTIFF'S RESIGNATION, THREATS FROM ADVANCED CARE STAFFING, AND THE RESULTING ARBITRATION DEMAND AGAINST PLAINTIFF

54. After months of exhausting work and persistent fears of losing his license, on June 15, 2022, Mr. Vidal informed Defendant that he felt compelled to resign from his role.

55. On June 22, 2022, Defendant, through its attorneys, commenced a campaign of threatening and aggressive communications demanding that Mr. Vidal return to work for Advanced Care Staffing.

56. Those communications claimed that Defendant had suffered "significant damages." If Mr. Vidal "proceeded with [his] resignation," Defendant's lawyers said, Advanced Care Staffing would "seek to be made whole" through an "arbitration." They explained that Defendant would provide evidence that its purported damages were "at least $20,000" (emphasis in original).

57. Defendant's lawyers suggested that those costs would include the costs Advanced Care Staffing would incur in trying to find a new nurse to replace Mr. Vidal, which they said would be $9,000 for each year remaining in his contract.

58.     But that was not the extent of the financial harm confronting Mr. Vidal. Defendant's letter also claimed that Mr. Vidal would be on the hook for "attorney's fees and costs incurred in the arbitration" unless he returned to work. Mr. Vidal did not know how much those fees and costs could be but, based on what little he knew about the American legal system, he feared they would far exceed the wages he could earn in many months working as a nurse.

59.     At least one court in New York and the New York Attorney General's Office have concluded that luring nurses into the United States and then coercing them to continue working under threat of financial penalties less substantial than those at issue in this case violates federal and state anti-trafficking laws. *See Paguirigan v. Prompt Nursing Emp't Agency*, 286 F. Supp 3d 430, 535 (E.D.N.Y. 2017) ($25,000 contract termination fee unenforceable penalty designed to compel performance); *see also* Assurance of Discontinuance, *In re: Albany Med Health System f/k/a Albany Medical Center* (settlement agreement between New York Attorney General and Albany Med Health System for unlawfully including a $20,000 repayment fee in employment contracts for nurses recruited from foreign nations).[1]

60.     Defendant has already threatened Mr. Vidal with "at least" $20,000 in purported damages and has indicated he could be responsible for tens of thousands more after factoring in attorney's fees and arbitration costs, including arbitrator compensation.

61.     Mr. Vidal did not know what to do in response to Defendant's threats. He was terrified by the crippling financial burdens threatened by Advanced Care Staffing, including its purported damages. These purported damages seemingly included not just the amounts Defendant paid for his travel to the United States, but also tens of thousands in dollars in "lost profits" and the costs of hiring a replacement.

---

[1] https://ag.ny.gov/sites/default/files/albany_med_aod_21-040_fully_executed_6.11.21.pdf

62.     Mr. Vidal was terrified to quit his job, but he felt that his working conditions were too dangerous and presented a genuine risk to his nursing license. If Mr. Vidal lost his license, he would end up even more helpless. Notwithstanding the substantial risks, he declined to return to work for Defendant.

63.     On July 8, 2022—just weeks after Mr. Vidal left his employment—Advanced Care Staffing initiated an arbitration against Mr. Vidal before the American Arbitration Association ("AAA"). The arbitration is titled *Advanced Care Staffing, LLC v. Benzor Vidal*, AAA Case Number: 01-22-0002-9008.

64.     In its demand for arbitration, Advanced Care Staffing seeks expansive relief that includes aggressive and harsh financial penalties from Mr. Vidal, including "all available damages, including, without limitation, [Advanced Care Staffing's] [c]osts and lost profits," "reasonable attorney's fees," and the "cost of arbitration."

## VI.     PLAINTIFF'S INABILITY TO PAY ATTORNEY'S FEES AND THE COSTS OF THE PENDING ARBITRATION PROCEEDING

65.     Plaintiff cannot afford to pay Defendant's attorney's fees and the costs of the pending arbitration.

66.     When he was working for Advanced Care Staffing, Plaintiff earned around $3,600 a month. Nearly all of his salary went to paying rent and basic living expenses. He could barely provide his family in the Philippines with any additional support.

67.     Plaintiff currently takes home approximately $5,000 per month. Half of his earnings go directly to rent. The remainder goes to basic living expenses such as household bills, food, and transportation costs.

68.     Most of what is left, Plaintiff uses to support his family in the Philippines, including his father and brother.

69. Mr. Vidal cannot afford to pay the arbitration costs of the pending arbitration proceeding, let alone Advanced Care Staffing's attorney's fees.

70. In July, the AAA sent a list of potential arbitrators to Advanced Care Staffing and Mr. Vidal, and said that the parties had until August 4, 2022, to strike potential arbitrators.

71. On August 10, 2022, Mr. Vidal, who was unrepresented in the arbitration and seeking counsel, sought an extension of time to respond to the arbitration demand.

72. On August 25, 2022, Mr. Vidal, who was still unrepresented in the arbitration, sought an additional two weeks to respond to the arbitration demand. The AAA denied this request, granting him only a one-week extension.

73. On September 2, 2022, Mr. Vidal informed the AAA that he did not believe he should be in arbitration because he did not believe the arbitration provision was legal, and also requested an additional two weeks to evaluate the potential arbitrators, given that he lacked the assistance of counsel in doing so.

74. But the AAA denied his request for additional time to evaluate the arbitrators, without informing Mr. Vidal that it was doing so. Instead, the AAA barreled ahead and on September 7, 2022, unilaterally (though presumably with Advanced Care Staffing's input) informed the parties that it had appointed an arbitrator, Sara Kula.

75. Arbitrator Kula's rate is $450 per hour, for both time in a hearing and for "study" time reviewing the parties' briefs and evidentiary submissions prior to a hearing.

76. In addition, the costs of arbitration due to the AAA also include a filing fee of $1,900, and a case management fee of $750, all of which Advanced Care Staffing could recover from Mr. Vidal if it were to prevail in the arbitration.

77.     Under the Arbitration Provision, Mr. Vidal would also be required to pay Advanced Care Staffing's attorney's fees and costs. Those fees could easily run into the tens of thousands of dollars or more.

78.     Mr. Vidal lacks the means to pay an attorney to represent him in the arbitration—let alone the potentially enormous attorney's fees and costs incurred by Defendant.

79.     In its letter appointing the arbitrator, the AAA informed Mr. Vidal that he had to provide his availability within several time slots for a "case management conference call." All the time slots AAA suggested were during Mr. Vidal's working hours.

80.     On September 8, 2022, Mr. Vidal wrote the AAA to inform them he was not available at any of the times indicated. He also asked, among other things, how many other arbitrations the AAA was administering for Advanced Care Staffing because it seemed that Defendant understood the process much better than him.

81.     On September 9, the AAA informed Mr. Vidal that it could not tell him "any information regarding any case you are not a party/representative to." The AAA thus refused to disclose whether it had a potential financial conflict of interest in its administration of the arbitration because of Defendant's potential repeat player role in filing arbitrations.

### COUNT I: THE ARBITRATION PROVISION IS INVALID UNDER THE TRAFFICKING VICTIM PROTECTIONS ACT, 18 U.S.C. § 1589
(Declaratory Relief Under 28 U.S.C. § 2201)

82.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth here.

83.     The Arbitration Provision is intended to achieve purposes that are illegal under the TVPA, as it aims to procure the labor of services of Mr. Vidal by threatening Mr. Vidal that he will have to pay Defendant's attorney's fees and the costs of arbitration, including arbitrator compensation, if he leaves his job.

84.     These threats constitute the "threatened abuse of legal process" and/or a threat of "serious harm," in violation of 18 U.S.C. § 1589(a)(2)–(3).

85.     Defendant knowingly used such threats to exert pressure on Plaintiff to continue working for Advanced Care Staffing and to prevent him from seeking employment elsewhere, telling him that he would be on the hook for "attorney's fees and costs incurred in the arbitration" unless he returned to work. This was done with the purpose of obtaining Plaintiff's continued labor for Advanced Care Staffing.

86.     Additionally, the Arbitration Provision's requirement that Plaintiff pay Defendant's attorney's fees and the costs of arbitration if Defendant prevails is inconsistent with the one-way fee shifting provision in the TVPA, which allows the victims of trafficking to recover their attorney's fees in civil actions brought under the TVPA.

87.     Accordingly, Mr. Vidal seeks a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, that the Arbitration Provision is unenforceable.

## COUNT II: THE ARBITRATION PROVISION IS INVALID UNDER NEW YORK'S PROHIBITION ON LABOR TRAFFICKING, N.Y. PENAL LAW § 135.35
### (Declaratory Relief Under 28 U.S.C. § 2201)

88.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth here.

89.     The Arbitration Provision is intended to achieve purposes that are illegal under N.Y. Penal Law § 135.35, as it was intended to force Mr. Vidal into continued labor for Advanced Care Staffing through threats of serious harm and abuse of legal process.

90.     The Arbitration Provision violates N.Y. Penal Law § 135.35's prohibitions against forced labor and attempted forced labor.

91.     Through the Arbitration Provision, Defendant compelled or induced Plaintiff's labor by requiring him to work in order to retire, repay, or service a purported debt, in the form

of Defendant's attorney's fees and arbitration costs, including arbitrator compensation, that could run into the tens of thousands of dollars.

92.    Defendant engaged in an ongoing course of conduct with intent to defraud Plaintiff by recruiting Plaintiff from the Philippines and intentionally deceiving him as to the nature of his work in the United States. Specifically, Defendant represented that Plaintiff could achieve his "American Dream" and would have a manageable patient caseload, when in fact Defendant knew that Plaintiff would be assigned 40 or more patients—a caseload that placed Plaintiff's nursing license and the health of those patients at risk.

93.    Furthermore, Defendant fraudulently induced Plaintiff to come to the United States and work in unbearable conditions by inducing Plaintiff to enter into an unenforceable and unlawful contract, as set forth in detail above.

94.    Defendant knew or should have known that its Arbitration Provision is illegal and unenforceable, but nonetheless used the Arbitration Provision to intimidate Plaintiff and coerce him to continue working for Defendant. Representing that the contract is enforceable is also fraudulent conduct.

95.    Accordingly, Mr. Vidal seeks a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, that the Arbitration Provision is unenforceable.

**COUNT III: THE ARBITRATION PROVISION IS INVALID UNDER THE FAIR LABOR STANDARDS ACT, 29 U.S.C. § 201, *ET SEQ.* BECAUSE IT WOULD REDUCE PLAINTIFF'S WAGES BELOW THE FEDERAL MINIMUM WAGE**
(Declaratory Relief Under 28 U.S.C. § 2201)

96.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth here.

97.    When he worked for Defendant, Plaintiff was an employee pursuant to the FLSA.

98.    Defendant was Plaintiff's employer under the FLSA.

99.    The Arbitration Provision is intended to achieve purposes that are illegal under the FLSA, as it is aims to force Mr. Vidal to pay Advanced Care Staffing's attorney's fees and costs of arbitration, including arbitrator compensation—costs that are principally for its own benefit—and thus reduce Mr. Vidal's wages in his last workweek below the federal minimum wage.

100.    The Arbitration Provision is thus illegal and unenforceable, under the FLSA because it would, if enforced, permit Defendant to pay its workers wages that are below the federal minimum wage.

101.    In his last workweek of work, Plaintiff worked approximately 40 hours and was paid approximately $1,440. His hourly wage for that week was approximately $36 per hour.

102.    In satisfying its federal minimum wage obligations, Defendant may not seek to recover costs or damages that are primarily for its own benefit. In this case, such costs include, among other purported damages, Defendant's purported "lost profits" and the costs of hiring a replacement employee, costs that Defendant has suggested will amount to $9,000 per year over each of the years remaining on Plaintiff's contract, plus Defendant's attorney's fees and the costs of arbitration, including arbitrator compensation.

103.    Defendant's attempt to recoup costs that are for the benefit of Advanced Care Staffing violates the FLSA because Defendant did not pay Mr. Vidal's wages "free and clear."

104.    Because the recovery of damages such as "lost profits," attorney's fees, or costs of arbitration would reduce Mr. Vidal's wages in the last week of his employment below the federal minimum wage, the enforcement of the Arbitration Provision would violate the FLSA.

105.    Additionally, the Arbitration Provision's requirement that Plaintiff pay Defendant's attorney's fees and the costs of arbitration if Defendant prevails in the arbitration, is

inconsistent with the one-way fee shifting provision in the FLSA, which allows prevailing employees, but not employers, to recover their reasonable attorney's fees in actions brought under the FLSA.

106.     Accordingly, Mr. Vidal seeks a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, that the Arbitration Provision is unenforceable.

## COUNT IV: THE ARBITRATION PROVISION IS INVALID UNDER NYLL § 650 *ET SEQ.* BECAUSE IT WOULD REDUCE PLAINTIFF'S WAGES BELOW THE STATE MINIMUM WAGE
(Declaratory Relief Under 28 U.S.C. § 2201)

107.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth here.

108.     When Mr. Vidal worked for Advanced Care Staffing, he was employed within the meaning of NYLL §§ 2 and 651.

109.     At all relevant times, Advanced Care Staffing was an employer within the meaning of the NYLL.

110.     The Arbitration Provision is intended to achieve purposes that are illegal under the NYLL, as it is aims to force Mr. Vidal to pay Advanced Care Staffing's attorney's fees and costs of arbitration, including arbitrator compensation—costs that are principally for its own benefit—and thus reduce Mr. Vidal's wages in his last workweek below the state minimum wage.

111.     The Arbitration Provision is thus illegal and unenforceable, under the NYLL because it would, if enforced, permit Defendant to pay its workers wages that are below the state minimum wage.

112.     In his last workweek of work, Plaintiff worked approximately 40 hours and was paid approximately $1,440. His hourly wage for that week was approximately $36 per hour.

113.     In satisfying its state minimum wage obligations, Defendant may not seek to recover costs or damages that are primarily for its own benefit. In this case, such costs include, among other purported damages, Defendant's purported "lost profits" and the costs of hiring a replacement employee, costs that Defendant has suggested will amount to $9,000 per year over each of the years remaining on Plaintiff's contract, plus Defendant's attorney's fees and the costs of arbitration, including arbitrator compensation.

114.     Accordingly, because the recovery of damages such as "lost profits," attorney's fees, or costs of arbitration would reduce Mr. Vidal's wages in the last week of his employment below the state minimum wage, the enforcement of the Arbitration Provision would violate the NYLL.

115.     Additionally, the Arbitration Provision's requirement that Plaintiff pay Defendant's attorney's fees and the costs of arbitration if Defendant prevails in the arbitration, is inconsistent with the one-way fee shifting provision in the NYLL, which allows prevailing employees, but not employers, to recover their reasonable attorney's fees in actions brought under the NYLL.

116.     Accordingly, Mr. Vidal seeks a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, that the Arbitration Provision is unenforceable.

**COUNT V: THE ARBITRATION PROVISION IS INVALID UNDER NYLL § 198-b
BECAUSE IT WOULD FORCE PLAINTIFF TO PROVIDE AN ILLEGAL KICKBACK**
(Declaratory Relief Under 28 U.S.C. § 2201)

117.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth here.

118.     When Mr. Vidal worked for Advanced Care Staffing, he was employed within the meaning of NYLL §§ 2 and 651.

119.    At all relevant times, Advanced Care Staffing was an employer within the meaning of the NYLL.

120.    The Arbitration Provision is illegal under the NYLL, as it was intended to force Mr. Vidal to provide a kickback against his wages to his employer if he left his employment before the end of the contract term, thus resulting in him being paid below the legally-required wage for his hours worked.

121.    The Arbitration Provision's terms are illegal and unenforceable, under the NYLL because they permit Defendant to force workers to make kickbacks from their wages that are illegal under the NYLL.

122.    In his last workweek of work, Plaintiff worked approximately 40 hours and was paid approximately $1,440. His hourly wage for that week was approximately $36 per hour.

123.    In satisfying its minimum wage obligations, Defendant may not seek to recover costs or damages that are primarily for its own benefit. In this case, such costs include, among other costs and purported damages, Defendant's purported "lost profits" and the costs of hiring a replacement employee, costs that Defendant has suggested will amount to $9,000 per year over each of the years remaining on Plaintiff's contract.

124.    Any attorney's fees or arbitration costs incurred in seeking to collect an illegal kickback under the NYLL are themselves illegal kickbacks under the NYLL. Thus, the provision allowing Defendant to recover its attorney's fees and arbitration costs is invalid under the NYLL.

125.    Additionally, the Arbitration Provision's requirement that Plaintiff pay Defendant's attorney's fees and the costs of arbitration if Defendant prevails in the arbitration, is inconsistent with the one-way fee shifting provision in the NYLL, which allows prevailing

A-30

employees, but not employers, to recover their reasonable attorney's fees in actions brought under the NYLL.

126. Accordingly, Mr. Vidal seeks a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, that the Arbitration Provision is unenforceable.

**COUNT VI: THE ARBITRATION PROVISION IS INVALID UNDER NYLL § 193 BECAUSE IF ENFORCED IT WOULD RESULT IN AN ILLEGAL DEDUCTION FROM PLAINTIFF'S WAGES**
(Declaratory Relief Under 28 U.S.C. § 2201)

127. Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth here.

128. When Mr. Vidal worked for Advanced Care Staffing, he was employed within the meaning of NYLL §§ 2 and 651.

129. At all relevant times, Advanced Care Staffing was an employer within the meaning of the NYLL.

130. The Arbitration Provision is illegal and unenforceable under the NYLL, as it was intended to allow Defendant to make illegal deductions from the pay of Mr. Vidal if he left his employment before the end of the contract term.

131. The arbitration purports to permit Defendant to recover attorney's fees and arbitration costs in conjunction with the recovery of an illegal deduction that is not authorized in writing under the NYLL.

132. In the course of satisfying its obligations under the NYLL, Defendant may only deduct from Plaintiff's wages those deductions that are expressly authorized in writing by Plaintiff, as required by statute, and that are for the benefit of Plaintiff.

133. Defendant seeks to deduct from Plaintiff's wages its lost profits as well as arbitration costs and attorney's fees. Such deductions are unlawful under NYLL § 193.

134.     Any attorney's fees or arbitration costs incurred in seeking to collect an illegal deduction under the NYLL are themselves illegal deductions under the NYLL. Thus, the Arbitration Provision is invalid under the NYLL.

135.     Additionally, the Arbitration Provision requires that Plaintiff pay Defendant's attorney's fees and the costs of arbitration if Defendant prevails in the arbitration. This provision is invalid under the NYLL, which allows prevailing employees, but not employers, to recover their reasonable attorney's fees in actions brought under the NYLL.

136.     Accordingly, Mr. Vidal seeks a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, that the Arbitration Provision is illegal and unenforceable.

**COUNT VII: THE ARBITRATION PROVISION IS UNCONSCIONABLE AND UNENFORCEABLE UNDER NEW YORK COMMON LAW**
(Declaratory Relief Under 28 U.S.C. § 2201)

137.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth here.

138.     The Arbitration Provision is unconscionable as a matter of New York law.

139.     Mr. Vidal was forced to enter into the Arbitration Provision on a take-it-or-leave-it basis and faced substantial economic harm if he did not sign the contract, including potentially $20,000 in penalties, an amount that far exceeded his savings and that would be financially ruinous. Mr. Vidal lacked meaningful choice about whether to enter into the contract.

140.     The Arbitration Provision is also unreasonably favorable to Defendant. Among other things, it requires Mr. Vidal, who is of limited financial means to bear costs that could run into the tens of thousands or hundreds of thousands of dollars if he does not prevail in the arbitration.

141.     The Arbitration Provision unreasonably prevents Mr. Vidal from vindicating his own contractual and statutory rights under federal and New York law in the arbitration forum, as

they would require him to spend tens of thousands or hundreds of thousands of dollars if he does not prevail in arbitration. This risk effectively chills Mr. Vidal from raising his own claims against Defendant, and thus precludes him from vindicating his rights in arbitration.

142.   Accordingly, Mr. Vidal seeks a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, that the Arbitration Provision is unenforceable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

(a)  A declaration that the Arbitration Provision is unenforceable;

(b)  An order enjoining the arbitration brought by Defendant against Plaintiff before the American Arbitration Association.

DATED:          September 16, 2022
                Brooklyn, New York

**KAKALEC LAW PLLC**

Hugh Baran (he/him)
Patricia Kakalec (she/her)
Kakalec Law PLLC
195 Montague Street, 14th Floor
Brooklyn, NY 11201
(212) 705-8730
Hugh@KakalecLaw.com
Patricia@KakalecLaw.com

**TOWARDS JUSTICE**

Juno Turner
David H. Seligman (*pro hac vice* motion forthcoming)
Valerie Collins (*pro hac vice* motion forthcoming)
Towards Justice
P.O. Box 371689, PMB 44465

Denver, CO 80237-5680
(720) 441-2236
juno@towardsjustice.org
david@towardsjustice.org
valerie@towardsjustice.org

**NICHOLS KASTER, PLLP**

Anna P. Prakash, MN Bar No. 0351362 (*pro hac vice* motion forthcoming)
4700 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 215-6870
aprakash@nka.com

**NICHOLS KASTER, LLP**

Matthew C. Helland, CA Bar No. 250451
(*pro hac vice* motion forthcoming)
235 Montgomery St., Suite 810
San Francisco, CA 94104
Telephone: (415) 277-7235
Facsimile: (415) 277-7238
helland@nka.com

*Attorneys for Plaintiff*



Ius Laboris USA Global HR Lawyers

<div style="text-align: right">

CityPlace II, 185 Asylum Street
Suite 820
Hartford, CT 06103
Tel 860-740-1355 | Fax 860-578-2075

Writer's Direct Dial:

SAMI ASAAD
860-740-1357
sasaad@fordharrison.com

</div>

<div style="text-align: center">

October 20, 2022

</div>

The Honorable Carol Bagley Amon
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

  **Re:**  ***Benzor Shem Vidal v. Advanced Care Staffing, LLC***
     **Civil Action No.: 22-CV-5535**

Your Honor:

   This firm represents defendant Advanced Care Staffing, LLC ("ACS"). Pursuant to Rule 3 (A) of Your Honor's Individual Motion Practices and Rules, ACS respectfully requests a pre-motion conference with respect to its proposed *Fed. R. Civ. P*. 12(b)(1) motion to dismiss plaintiff Benzor Shem Vidal's ("Mr. Vidal") Complaint or, in the alternative, to compel arbitration.

**I.**  **The Parties' Arbitration Agreement and Pre-Existing Arbitration Proceeding**

   On May 8, 2019, Mr. Vidal and ACS entered into an employment agreement. On January 4, 2022, the parties executed an Amended and Restated Employment Agreement (the "Agreement") containing a broad arbitration provision. Schedule B to the Agreement, titled *Dispute Resolution Provision*, provides, in relevant part:

> As a condition of my employment with Advanced Care Staffing, LLC ("Employer"), except for Employer's enforcement of restrictive covenants as provided for in Section 6(c) of the Agreement, I agree that any dispute, controversy or claim arising between me and Employer (including a dispute, controversy or claim arising out of, in connection with or relating to, this Agreement, or other interpretation, performance or breach, termination or validity thereof) shall be resolved by arbitration pursuant to this dispute resolution provision (the "Provision"). …. I, therefore, waive my right to sue in court and have a jury trial.

> I agree that arbitration will be administered by the American Arbitration Association ("AAA") and that the AAA's Commercial Arbitration Rules in effect at the time of the dispute will govern, except as modified by this Provision. I understand that the AAA's Commercial Arbitration Rules are available online at www.adr.org.

October 20, 2022

On July 8, 2022, ACS filed a Demand for Arbitration with the American Arbitration Association seeking damages for breach of the Agreement (Doc. 1), and in August, Mr. Vidal formally appeared. On September 7, 2022, the AAA appointed Sara D. Kula, Esq. as Arbitrator. On September 12, 2022, absent any objection by either party, the AAA confirmed the appointment of Arbitrator Kula and scheduled a Management Conference.

On September 16, 2022, Mr. Vidal filed the Complaint before this Court but did not serve ACS until October 3 (via Secretary of State).

On September 22, 2022, Mr. Vidal and ACS appeared for the Arbitrator's Management Conference and agreed to a number of dates, including a deadline of October 6 for Mr. Vidal to submit a letter contesting arbitrability.

On October 6, 2022, Mr. Vidal submitted a letter contesting the AAA proceedings, making the same arguments contained in his Complaint and attaching a copy of the Complaint. Today, October 20, 2022, ACS filed its letter in opposition to Mr. Vidal's request for a stay of the arbitration. Against this background, we are seeking permission to move to dismiss the action pending before this Court.

## II. Grounds for Dismissal or in the Alternative Compelling Arbitration

### a. The Federal Arbitration Act Mandates Enforcement of the Arbitration Agreement.

The Federal Arbitration Act ("FAA") provides that arbitration agreements "shall be valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. There is a strong presumption in favor of enforcing arbitration agreements under the FAA. *See AT&T Mobility LLC v.* Concepcion, 131 S. Ct. 1740, 1742 (2011).

### b. Threshold Questions of Arbitrability Must Be Decided by the Arbitrator.

An arbitration agreement is determinative in dictating whether the arbitrability of a dispute is to be resolved by the court or the arbitrator. *DDK Hotels, LLC v. Williams-Sonoma, Inc*., 6 F.4th 308, 318 (2d Cir. 2021*)*; citing *First Options*, 514 U.S. at 943, 115 S. Ct. 1920. In *DDK Hotels*, the Second Circuit noted that Rule 7(a) of the AAA's Commercial Arbitration Rules (the "AAA Rules") provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement," and found that "incorporation of [the AAA Rules] into an arbitration agreement to be relevant in evaluating whether there is clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the arbitrator." *Id.* At 318 (quoting the AAA Rules, found at https://adr.org/sites/default/files/Commercial%20Rules.pdf). The court stated that "where the arbitration agreement is broad and expresses the intent to arbitrate all aspects of all disputes, this – coupled with incorporation of rules that expressly empower an arbitrator to decide issues of arbitrability – constitutes clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the arbitrator." *Id.* at 318-19.

October 20, 2022

Here, the arbitration agreement is broad and expresses the parties' intent to arbitrate "***any dispute***, controversy or claim arising between [the employee] and Employer (including a dispute, controversy or claim arising out of, in connection with or relating to, this Agreement, or other interpretation, performance or breach, termination or validity thereof)." (Emphasis added). The broad language of agreement, coupled with the incorporation of the AAA's rules (including Rule 7(a)), constitutes clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the arbitrator.

Furthermore, not only did the parties in this case agree to submit questions of arbitrability to the arbitrator, ***they have already done so***. Pursuant to Arbitrator Kula's scheduling order, Mr. Vidal filed a letter on October 6 contesting arbitrability, and ACS filed its opposition today.

### c. If the Court Were to Determine that It Must Decide Arbitrability, The Parties' Agreement Warrants an Order Compelling Arbitration

In deciding whether a motion to compel arbitration should be granted, the Court must determine: (1) whether an agreement to arbitrate exists, (2) whether the agreement to arbitrate encompasses the dispute at issue, and (3) whether the agreement to arbitrate is otherwise valid. *See* 9 U.S.C. § 4; *see also Howsam v. Dean Winter Reynolds, Inc.*, 537 U.S. 79, 84 (2002).

Here, as described above, the Amended and Restated Employment Agreement contains (and Mr. Vidal does not dispute) an agreement to arbitrate ***all*** claims, and ACS's breach of contract claim against Mr. Vidal is squarely within its scope. Mr. Vidal appears to only dispute the validity of the arbitration agreement, asserting in various ways that the terms of the agreement are substantively unconscionable. Mr. Vidal's arguments, however, are without merit, having previously been considered and rejected by courts. *See e.g., Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 33 (1991) ("Mere inequality in bargaining power... is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context ...."); *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008)("Under New York law, a contract that provides for an award of reasonable attorneys' fees to the prevailing party in an action to enforce the contract is enforceable if the contractual language is sufficiently clear."); *Saizhang Guan v. Uber Techs., Inc.*, 236 F. Supp. 3d 711, 732 (E.D.N.Y. 2017)(rejecting an attack on arbitration based on fee-splitting because the challenge was limited to a review of the potential costs for "the arbitration of enforceability")(quoting *Rent–A–Center, West, Inc. v. Jackson*, 561 U.S. 63, 74 (2010)).

For all of the reasons stated above, ACS intends to move to dismiss Mr. Vidal's Complaint or, in the alternative, compel arbitration.

Sincerely,

Sami Asaad

www.fordharrison.com | www.iuslaboris.com

A-37



Hugh Baran (he/him)
Hugh@KakalecLaw.com

October 27, 2022

**Via ECF**
The Hon. Carol Bagley Amon, United States District Judge
United States District Court, Eastern District of New York
225 Cadman Plaza East, Brooklyn, NY 11201

     Re:    *Benzor Shem Vidal v. Advanced Care Staffing, LLC*, 22-cv-5535 (CBA)(MMH)

Dear Judge Amon:

     Kakalec Law PLLC, along with Towards Justice, Nichols Kaster, PLLP, and Nichols Kaster, LLP, represents Plaintiff Benzor Shem Vidal in the above-referenced matter. I write to briefly respond to Defendant Advanced Care Staffing, LLC's request for a pre-motion conference regarding its proposed motion to dismiss and/or compel arbitration. As discussed below, Defendant's proposed motion is without merit. Moreover, because Plaintiff disputes that there was a genuine meeting of the minds with respect to the arbitration provision here, there is a contract formation issue that will require factual development. The Court should thus not permit Defendant's proposed motion to be made at this time, but should instead permit the parties to engage in discovery concerning formation issues prior to the filing of any such motion.

     This case is not a routine dispute about an employer's arbitration provision, but is instead about an employer weaponizing arbitration to coerce a worker's labor. Courts around the country, including in this District, have determined that threats to collect debts from workers similar to the threats underlying Defendant's arbitration demand amount to a violation of the Trafficking Victims Protection Act ("TVPA"). *See, e.g.*, *Paguirigan v. Prompt Nursing Emp't Agency*, 286 F. Supp. 3d 430, 535 (E.D.N.Y. 2017) ($25,000 contract termination fee an unenforceable penalty designed to compel performance); *see also* Assurance of Discontinuance, *In re: Albany Med Health System* (settlement agreement between NY Attorney General & Albany Med Health System for unlawfully including $20,000 repayment fee in employment contracts for nurses from foreign nations) (cited in Compl. ¶ 59). Mr. Vidal seeks an order from this Court that Defendant may not use arbitration and the additional costs it seeks to impose as part of its illegal scheme.

     Defendant is a healthcare staffing company that recruits foreign nurses and sells their labor to healthcare facilities in the United States. Mr. Vidal is one such nurse. Among other things, Defendant promised to sponsor Mr. Vidal's visa, bring him to the U.S., and give him a job at a healthcare facility. But this promise was contingent on Mr. Vidal signing a non-negotiable, lawyer-drafted contract that purported to allow Defendant to recover $20,000 in liquidated damages if Mr. Vidal were to leave his employment with Defendant. A subsequent contract, which Defendant sent to Mr. Vidal after he had signed the first contract and given notice at his prior job, contained an arbitration provision containing an aggressive loser pays provision. Fearing the severe financial penalties described in the first contract, and fearing that he would be jobless in London (as he had given his notice) if he did not sign the agreement, Mr. Vidal signed and came to the U.S., and

**Kakalec Law PLLC**
195 Montague Street, 14th Floor, Brooklyn, NY 11201
(212) 705-8730; (646) 759-1587 (fax)
www.KakalecLaw.com

**A-38**

Defendant assigned him to a facility in Brooklyn. However, as detailed in the Complaint, Mr. Vidal eventually resigned his position, despite his fear of legal action and costly fees.

Mr. Vidal's fear was not unfounded. After threatening legal action against Mr. Vidal if he did not return to his employment, Defendant filed an arbitration demand against Mr. Vidal with the American Arbitration Association ("AAA"), seeking to recover its purported damages (including supposed "lost profits"), attorney's fees, and costs of arbitration. Despite Mr. Vidal informing the AAA that the arbitration provision was not legal and requesting more time to evaluate potential arbitrators, the AAA denied that request and unilaterally informed the parties it had appointed an arbitrator. Mr. Vidal then filed this action.

Defendant now argues that any challenge to the viability of arbitration is itself subject to arbitration because the arbitration provision incorporates the AAA's "Commercial Rules," which Defendant contends constitutes a delegation of issues of arbitrability to the arbitrator.[1] But Defendant is wrong, for three reasons: (1) Plaintiff signed the arbitration provision under economic duress and therefore could not have assented to it or to its purported delegation clause as a matter of New York law—a question that cannot be delegated to the arbitrator; (2) the incorporation of the Commercial Rules in this case does not constitute a "clear and unmistakable" delegation of issues of arbitrability to the arbitrator, in part because those Rules do not seem to apply to any potential arbitration here; and (3) even if the Court were to find Plaintiff meaningfully assented to a clear and unmistakable delegation provision, that provision is itself illegal and unenforceable.

**1. Mr. Vidal Did Not Meaningfully Assent to the Arbitration Provision or Purported Delegation Clause.** The threshold question of whether there was a genuine meeting of the minds with respect to an arbitration provision such that a valid arbitration provision was formed and exists is always for the court to decide. *See, e.g., Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017) ("[B]efore an agreement to arbitrate can be enforced, the district court must first determine whether such agreement exists[.]") (citing *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012)). If no valid agreement to arbitrate was ever formed, then no delegation provision exists, and it would be improper to send any part of the dispute to arbitration. *See Schnabel*, 697 F.3d at 118 ("noting that the question of whether such an [arbitration] agreement "exists and is effective is necessarily for the court and not the arbitrator.") (citations omitted).

Under New York law, a contract is unenforceable on grounds of economic duress when a party "was forced to agree to it by means of a wrongful threat precluding the exercise of his free will." *Austin Instrument, Inc. v. Loral Corp.*, 29 N.Y.2d 124, 130 (1971). Here, Mr. Vidal has alleged that he was under substantial economic duress at the time the contract containing the arbitration provision was presented to him. Because of Defendant's prior contract with him, Mr. Vidal feared that, if he did not sign the contract containing the arbitration provision, aggressive loser pays term, and purported delegation clause, he would be required to pay $20,000 in liquidated damages. He also feared that he would be jobless in London. This formation issue—which goes to both the enforceability of the arbitration provision as a whole and to the delegation clause in particular—must be adjudicated by this Court with the benefit of further factual development.

---

[1] Defendant contends that Mr. Vidal has submitted issues of arbitrability to the arbitrator, but that is not so. Mr. Vidal has repeatedly objected to the AAA proceedings, and has simply requested that the AAA follow its procedures and past practices by administratively staying its proceedings pending the resolution of this litigation. *See* Ex. 1, attached. The arbitrator construed that request as a submission on the arbitrability issue and denied it. However, Plaintiff is renewing that request for an administrative pause of the proceedings to the AAA itself—not the arbitrator—tomorrow.

**2. There is No "Clear and Unmistakable" Delegation of Arbitrability to the Arbitrator.** Questions regarding the validity of an arbitration provision are referrable to arbitration only if the arbitration provision includes a delegation clause that "clearly and unmistakably provide[s]" delegates arbitrability issues to the arbitrator. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986). While in some commercial contexts the Second Circuit has concluded that a mere reference to AAA rules may constitute such a "clear and unmistakable" delegation, the Circuit has also emphasized that "context matters" and that "[i]ncorporation of such rules into an arbitration agreement does not, *per se*, demonstrate clear and unmistakable evidence of the parties' intent to delegate threshold questions of arbitrability to the arbitrator where other aspects of the contract create ambiguity as to the parties' intent." *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 318 (2d Cir. 2021). Here, the context shows ambiguity, not clarity.

First, the AAA's Commercial Rules themselves indicate that the Commercial Rules do not apply to this dispute because it is a dispute arising out of an "employment plan." *See* AAA Commercial Rules, Ex. 2 (attached), at 10, n.*. Because the Commercial Rules should not apply to a AAA arbitration under this agreement—Commercial Rule 7(a) has not clearly and unmistakably been incorporated by reference. *See Castedo v. Permanent Mission of Thailand to the U.N.*, 114 N.Y.S.3d 70, 71 (2019) (incorporation by reference ineffective where contract did not "clearly reflect an intention to incorporate"). Concluding that a reference to the Commercial Rules amounts to an incorporation by reference in an arbitration subject to the Employment Rules—solely because the reference occurs in an arbitration provision—would violate the FAA's equal footing principle. *See Morgan v. Sundance, Inc.*, No. 21-328, __ U.S. __, slip op. at 6 (2022).

Second, the arbitration provision at issue also contains a clause that specifically contemplates judicial review. It says that "in the event that any court of competent jurisdiction shall determine that any portion of this Provision exceeds the scope permitted by applicable law, the court shall have the authority to modify or 'blue pencil' such portion so as to render it enforceable . . . ." This provision creates further ambiguity about the intent of the agreement by suggesting that a *court* can rule on the enforceability of the arbitration provision.

Finally, unlike many cases where such incorporation by reference has been adjudged a clear and unmistakable delegation, Mr. Vidal is not a sophisticated commercial party who can be assumed to have knowledge of the detailed AAA Commercial Rules and the extent to which they might apply in an employment context. The textual ambiguities here—and the fact Mr. Vidal is not a sophisticated commercial party presumed to know the import of a passing reference to the Commercial Rules—negate a finding of a "clear and unmistakable" intent to delegate arbitrability.

**3. The Purported Delegation Clause is Not Enforceable.** Finally, assuming *arguendo* that that Mr. Vidal voluntarily assented to the arbitration provision and its purported delegation clause, and that the delegation clause was "clear and unmistakable," the Court should still deny Defendant's motion because the delegation clause itself would be illegal and unenforceable under the TVPA, the FLSA, state statutes, and common law. Delegating questions of arbitrability to the arbitrator would require Mr. Vidal to submit to an arbitration that would threaten to bury him in extraordinary costs and legal fees. Even litigating the question of arbitrability could cost tens of thousands of dollars. The Court should not require Mr. Vidal to submit to an illegal and unconscionable arbitral process for the purpose of establishing that that same process is illegal and unconscionable. *See, e.g.*, *Lim v. TForce Logistics*, LLC, 8 F.4th 992, 1003 (9th Cir. 2021).

We thank the Court for its attention to this matter.

Respectfully submitted,

Hugh Baran
KAKALEC LAW PLLC

David Seligman
TOWARDS JUSTICE
(*pro hac vice* motion forthcoming)

Anna P. Prakash
NICHOLS KASTER, PLLP
(*pro hac vice* motion pending)

*Counsel for Plaintiff*

cc:     All counsel (via ECF)

# EXHIBIT 1

Plaintiff's October 6, 2022 Letter to the AAA
Seeking a Stay of Arbitral Proceedings



**towardsjustice.org** | 720-441-2236
2840 Fairfax Street, Suite 220, Denver, CO 80207
PO Box 371680, PMB 44465 Denver, CO 80237-5680

October 6, 2022

**By Email**

Michele Gomez
Manager of ADR Services
American Arbitration Association
1301 Atwood Ave, Suite 211N
Johnston, RI 02919

     Re: *Advanced Care Staffing, LLC v. Benzor Vidal* (Case No. 01-22-0002-9008)

Dear Ms. Gomez:

   Towards Justice represents Respondent Benzor Vidal for the limited purpose of requesting a stay of this arbitration pending resolution of Mr. Vidal's action for declaratory and injunctive relief in the United States District Court for Eastern District of New York. *See Vidal v. Advanced Care Staffing, LLC*, 22-cv-5535 (E.D.N.Y.), attached as Ex. A ("Compl."). We write now to formally request a stay of the pending arbitration.

   As explained in detail below, Mr. Vidal seeks this stay because: (1) the arbitration provision that Claimant Advanced Care Staffing seeks to enforce in this case is unenforceable and illegal under federal and state trafficking and wage and hour laws and is unconscionable as a matter of New York common law; (2) AAA's rules and practices support a stay pending judicial resolution of the enforceability of the arbitration provision; (3) conducting this arbitration, even on the question of whether a stay is appropriate, conflicts with the AAA's moratorium on the administration of debt collection arbitrations involving vulnerable consumers; and (4) this case involves conduct by Advanced Care Staffing that implicates laws prohibiting the exploitation of foreign workers, and AAA's administration of this arbitration before a federal court has had the opportunity to address the critical issues posed by Advanced Care Staffing's conduct in seeking to enforce the arbitration provision, risks furthering that exploitation.

   AAA—not the arbitrator—should make this decision as an administrative matter. Even a limited proceeding before the arbitrator to determine whether a stay is appropriate would exacerbate the harm of the arbitration provision by burdening Mr. Vidal with the risks of increased costs pursuant to the arbitration provision's loser pays term.

**I.  BACKGROUND**

   Mr. Vidal is registered nurse from the Philippines. Advanced Care Staffing is a healthcare staffing business that recruits foreign nurses, sponsors their visas, and sells their labor to healthcare facilities in the United States. Compl. ¶¶ 8-31.

   In late 2021, Mr. Vidal signed the contract that includes the arbitration provision and loser pays term that Advanced Care Staffing seeks to enforce in this arbitration. Compl. ¶¶ 32-44. That contract purported to allow Advanced Care Staffing to recover potentially tens of thousands of dollars in "lost profits" if Mr. Vidal left his employment with Advanced Care Staffing before the completion of his contractual term of employment. Mr. Vidal feared that if he did not sign the

contract, he would owe $20,000 in liquidated damages under an earlier contract with the company. Compl. ¶ 36.

Mr. Vidal's life in the United States working for Advanced Care Staffing was nothing like what the company had promised him. Mr. Vidal's work was grueling and unsafe for him and the patients he was responsible for at the facility where he worked. Fearing that his working conditions threatened his nursing license, he resigned, despite his fear that the contract purported to allow Advanced Care Staffing to pursue legal action. Compl. ¶¶ 34-64.

After sending Mr. Vidal a letter threatening legal action in which Claimant would seek to recover tens of thousands of dollars and its attorney's fees and arbitration costs if he did not return to his employment, Advanced Care Staffing filed its arbitration demand on July 8, 2022. In its demand, Advanced Care Staffing sought to recover purported damages (including its supposed "lost profits"), its attorney's fees, and the costs of arbitration. Compl. ¶¶ 62-64.

On September 16, 2022, Mr. Vidal sued Advanced Care Staffing in the U.S. District Court for the Eastern District of New York, seeking a declaratory judgment that the arbitration provision is illegal and unenforceable and accompanying injunctive relief.

## II.    AAA SHOULD STAY THE ARBITRATION PROCEEDINGS

Mr. Vidal requests the AAA formally stay all further arbitral proceedings in this matter until his complaint is adjudicated in federal court. A stay is necessary and appropriate for the following reasons:

(A) The arbitration provision is a contract for illegal purposes in violation of federal and state law, and the AAA's continued administration of this action exacerbates the unfairness and illegality of the arbitration provision.

A stay is necessary because continuing these proceedings would undermine important federal and state legal protections. As detailed in the complaint, the arbitration provision and its "loser pays" provision would require Mr. Vidal to pay all Advanced Care Staffing's attorney's fees and arbitration costs, including the arbitrator's compensation, if the arbitrator awarded Advanced Care Staffing even a dollar in purported damages—a threat of serious harm designed to coerce Mr. Vidal to stay in his job. *See* Compl. ¶¶ 54-81. Even after Mr. Vidal resigned, Advanced Care Staffing explicitly used the arbitration provision to coerce Mr. Vidal to return to work. *Id.* ¶ 58. By maintaining these proceedings—even by accruing arbitrator costs to consider the stay request— AAA would be exacerbating the threat of serious harm looming over Mr. Vidal. *Id.* ¶ 54-81.

Furthermore, in satisfying its minimum wage obligations, Advanced Care Staffing may not seek to recover costs that are primarily for its own benefit. Compl. ¶ 102. In this case, such costs include Advanced Care Staffing's purported "lost profits"—meaning the amount of surplus profits Advanced Care Staffing would have recouped for its own benefit had Mr. Vidal completed his contract term—and the costs of hiring a replacement employee, costs that Advanced Care Staffing has suggested will amount to $9,000 per year over each of the years remaining on Mr. Vidal's contract. *Id.*

Debt collection costs incurred in seeking to collect an illegal kickback—including attorney's fees and arbitration costs—are inherently also an illegal kickback under wage and hour laws. *Id.* ¶ 104. As a result, the arbitration provision is illegal under the Fair Labor Standards Act ("FLSA"),

Compl. ¶¶ 96-106 (citing 29 U.S.C. § 201, *et seq.*), and New York minimum wage and wage payment laws, Compl. ¶¶ 107-36 (citing NYLL § 650, *et seq.*, § 198-b, § 193). Conducting even a limited arbitration proceeding to evaluate the proprietary of a stay would increase the risks of further costs being imposed on Mr. Vidal in violation of the wage and hour laws.

The arbitration provision is also unconscionable. Its substantively unconscionable and illegal "loser pays" provision threatens to bury Mr. Vidal in tens of thousands of dollars of attorney's fees and arbitration costs and conflicts with the one-way fee shifting mechanism set out in the trafficking and minimum wage laws. Furthermore, Advanced Care Staffing required Mr. Vidal to accept the provision on a take-it-or-leave-it basis, and he faced substantial financial harm if he did not sign the contract, including potentially $20,000 in penalties, an amount that far exceeded his savings and that would be financially ruinous. As a result, Mr. Vidal lacked meaningful choice about whether to sign the contract. Conducting the arbitration would thus conflict with New York common law protections against unconscionable contracts. Compl. ¶¶ 137-42.

(B) <u>A stay is consistent with AAA's rules and practices.</u>

The stay is also consistent with AAA's rules and practices. The AAA is empowered to refuse to administer arbitrations for lack of due process protocol compliance. See Searle Civil Justice Institute, Preliminary Report on Consumer Arbitration, *available at* https://tinyurl.com/538kzkxr (detailing cases in which AAA refused to administer the arbitration in consumer cases). And AAA rules authorize postponement at the request of a party or upon the arbitrator's own initiative. AAA Commercial R. 31; Employment R. 24 (same). Additionally, if the AAA does not think a stay is warranted here, AAA's Employment Rules *require* the AAA to grant a stay for 60 days so that Mr. Vidal may seek an order from the federal court mandating such a stay. Employment R. 1.

Consistent with this scheme, AAA grants stays in similar contexts. For example, in matters filed by Strategic Delivery Solutions, LLC against Blanca Alulema and Maria Tacoaman, the AAA paused proceedings, upon request from Ms. Alulema and Ms. Tacoaman, pending federal court resolution of a pending motion to lift the stay on their federal court case. *See* Case Nos. 01-02-0015-6896 & 01-20-0015-6897.

(C) <u>A stay is required by AAA's moratorium on debt collection arbitrations.</u>

The stay is also required pursuant to the AAA's moratorium on consumer debt collection arbitrations. In 2009, the AAA implemented a moratorium on the administration of debt collection arbitration programs and noted that "a series of important fairness and due process concerns must be addressed and resolved before [it] will proceed with the administration of any future debt collection arbitrations."[1] The moratorium came in the wake of an enforcement action brought against the National Arbitration Forum (NAF) by the Minnesota Attorney General related to NAF's alleged corrupt administration of debt collection arbitrations brought against credit card consumers.[2] The moratorium was motivated by concerns that AAA's arbitration procedures would not

---

[1] *Arbitration or 'Arbitrary': The Misuse of Mandatory Arbitration to Collect Consumer Debts,* Hearing Before the House Subcommittee on Domestic Policy, Committee on Oversight and Government Reform, 111th Congress (July 22, 2009) (Testimony of Richard W. Naimark on behalf of the American Arbitration Association).
[2] https://library.nclc.org/sites/default/files/Arb10_Appx_O-1.pdf.

adequately ensure due process, including sufficient notice and arbitrator neutrality, and that arbitrators would not be sufficiently equipped to protect the interests of debtors, including by ensuring that creditors do not seek to recover inappropriate interest or unreasonable attorney's fees.

Here, Advanced Care Staffing seeks to collect a debt purportedly owed because Mr. Vidal, an immigrant worker, terminated his employment due to allegedly poor working conditions. Mr. Vidal's experience within arbitration demonstrates why AAA's reasoned and important moratorium on debt collection proceedings should apply to this case. Mr. Vidal has been confused about and intimidated by these arbitration proceedings since Advanced Care Staffing's initial demand. Furthermore, AAA's concerns about creditors seeking unreasonable attorney's fees apply with special force here, as Mr. Vidal may be required to pay for nearly every aspect of the arbitration, including Advanced Care Staffing's attorney's fees and costs. The same concerns AAA has about the fairness of debt collection arbitrations brought against credit card consumers should apply to debt collection arbitrations brought against vulnerable foreign workers subject to debt designed to coerce them to continue working.

That the arbitration at issue here does not involve a traditional consumer debt collection proceeding does not change the analysis. The use of debt to keep workers trapped in their jobs is an urgent problem that has received the attention of federal consumer protection agencies like the Consumer Financial Protections Bureau.[3] Furthermore, the underlying debt obligation imposed by Advanced Care Staffing may constitute credit under federal or state law. *See, e.g.*, 15 U.S.C. § 1691 *et seq.* The consumer debt collection arbitration moratorium should apply in this case.

   (D) <u>This case raises important issues implicating critical protections for vulnerable workers. AAA should not proceed with the arbitration until the court has ruled on its legality.</u>

Finally, the arbitration proceeding raises profoundly important issues regarding the exploitation of immigrant workers. The underlying facts of this case substantially overlap with trafficking cases involving other foreign nurses in New York. Indeed, at least one court in New York and the New York Attorney General's Office have concluded that luring nurses into the United States and then coercing them to continue working under threat of financial penalties *less* substantial than those at issue in this case violates federal and state anti-trafficking laws. *See Paguirigan v. Prompt Nursing Emp't Agency*, 286 F. Supp 3d 430, 535 (E.D.N.Y. 2017) ($25,000 contract termination fee unenforceable penalty designed to compel performance); *see also* Assurance of Discontinuance, *In re: Albany Med Health System f/k/a Albany Medical Center* (settlement agreement between New York Attorney General and Albany Med Health System for unlawfully including a $20,000 repayment fee in employment contracts for nurses recruited from foreign nations).

The most notable difference between those cases and this one is that in this case, Advanced Care Staffing has weaponized the arbitration forum as a tool of its scheme, designed to impose further costs and fees on workers like Mr. Vidal who terminate their employment agreement before the end of their term of employment. The AAA should not allow itself to be used in this manner. It

---

[3] *CFPB Launches Inquiry into Practices that Leave Workers Indebted to Employers, Consumer Financial Protection Bureau, June 9, 2022.*

should stay this arbitration proceeding until, at the very earliest, the federal court has ruled on the enforceability of the arbitration provision.

We thank the AAA for its attention to this matter.

TOWARDS JUSTICE

/s/ *David H. Seligman*

David H. Seligman
Juno Turner
Valerie Collins
Towards Justice
P.O. Box 371689, PMB 44465
Denver, CO 80237-5680
(720) 441-2236
david@towardsjustice.org
juno@towardsjustice.org
valerie@towardsjustice.org

cc:
Sara Kula
Arbitrator

Sami Asaad
FordHarrison
Counsel for Claimant

# EXHIBIT 2

American Arbitration Association's
Commercial Rules



# Commercial

## Arbitration Rules and Mediation Procedures

**Including Procedures for Large, Complex Commercial Disputes**



AMERICAN ARBITRATION ASSOCIATION®

Available online at **adr.org/commercial**

Rules Amended and Effective September 1, 2022

# Regional Vice Presidents

**States: Delaware, District of Columbia, Maryland, New Jersey, Pennsylvania, Virginia**
P. Jean Baker, Esq.
Vice President
Phone: 202.223.7093
Email: BakerJ@adr.org

**States: Oklahoma, Texas**
Andrew Barton
Vice President
Phone: 210.998.5750
Email: BartonA@adr.org

**States: Alabama, Georgia**
John M. Bishop
Vice President
Phone: 404.320.5150
Email: BishopJ@adr.org

**States: Arkansas, Illinois, Iowa, Michigan, Minnesota, Missouri, North Dakota, South Dakota, Wisconsin**
Svetlana Gitman, Esq.
Vice President
Phone: 773.820.7801
Email: GitmanS@adr.org

**States: Alaska, California, Oregon, Washington**
Aaron Gothelf, Esq.
Vice President
Phone: 415.671.4053
Email: GothelfA@adr.org

**States: City of Houston, Louisiana, Mississippi**
Ingeuneal C. Gray, Esq.
Vice President
Phone: 832.308.7893
Email: GrayI@adr.org

**States: Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont**
Karen Jalkut
Vice President
Phone: 617.695.6062
Email: JalkutK@adr.org

**States: Indiana, Kentucky, North Carolina, Ohio, South Carolina, Tennessee, West Virginia**
Michelle M. Skipper
Vice President
Phone: 704.643.8605
Email: SkipperM@adr.org

**States: Florida**
Rebecca Storrow, Ph.D.
Vice President
Phone: 954.372.4341
Email: StorrowR@adr.org

**States: Arizona, Colorado, Kansas, Hawaii, Idaho, Montana, Nebraska, Nevada, New Mexico, Utah, Wyoming**
Lance K. Tanaka
Vice President
Phone: 303.831.0824
Email: TanakaL@adr.org

**States: New York**
Jeffrey T. Zaino, Esq.
Vice President
Phone: 212.484.3224
Email: ZainoJ@adr.org

# Case Management

John M. Bishop
Vice President
Phone: 404.320.5150
Email: BishopJ@adr.org
**Administers cases in: AL, DC, FL, GA, IN, KY, MD, NC, OH, SC, TN, VA**

Sandra Marshall
Vice President
Phone: 559.490.1906
Email: MarshallS@adr.org
**Administers cases in: AK, AZ, CA, CO, HI, ID, MT, NV, NM, OR, UT, WA, WY**

Rod Toben
Vice President
Phone: 972.774.6923
Email: TobenR@adr.org
**Administers Cases in: AR, IL, IA, KS, LA, MN, MS, MO, NE, ND, OK, SD, TX, WI**

Yvonne Baglini
Assistant Vice President
Phone: 866.293.4053
Email: BagliniY@adr.org
**Administers cases in: CT, DE, MA, ME, MI, NH, NJ, NY, PA, RI, VT, WV**

# Table of Contents

Important Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Standard Arbitration Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Administrative Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Large, Complex Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Commercial Arbitration Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

R-1. Agreement of Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

R-2. AAA, Delegation of Duties, Conduct of Parties, Administrative Review Council . . 11

R-3. National Roster of Arbitrators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

R-4. Filing Requirements and Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

R-5. Answers and Counterclaims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

R-6. Changes of Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

R-7. Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

R-8. Consolidation and Joinder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

R-9. Interpretation and Application of Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

R-10. Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

R-11. Administrative Conference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

R-12. Fixing of Locale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

R-13. Appointment from National Roster . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

R-14. Direct Appointment by Party . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

R-15. Appointment of Chairperson by Party-Appointed Arbitrators, Parties, or
the AAA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

R-16. Nationality of Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

R-17. Number of Arbitrators. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

R-18. Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

R-19. Disqualification of Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

R-20. Communication with Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

R-21. Vacancies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

R-22. Preliminary Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

R-23. Pre-Hearing Exchange and Production of Information . . . . . . . . . . . . . . . . . . . . . . . 22

R-24. Enforcement Powers of Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

R-25. Date, Time, Place, and Method of Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

R-26. Attendance at Hearing .................................................... 24

R-27. Representation ........................................................... 24

R-28. Oaths .................................................................... 24

R-29. Official Record of Proceedings............................................. 24

R-30. Interpreters.............................................................. 25

R-31. Postponements........................................................... 25

R-32. Arbitration in the Absence of a Party or Representative ...................... 25

R-33. Conduct of Proceedings................................................... 25

R-34. Dispositive Motions ...................................................... 26

R-35. Evidence ................................................................ 26

R-36. Evidence by Written Statements and Post-Hearing Filing of Documents or
Other Evidence .................................................................. 26

R-37. Inspection or Investigation ................................................ 27

R-38. Interim Measures ........................................................ 27

R-39. Emergency Measures of Protection ......................................... 27

R-40. Closing of Hearing........................................................ 29

R-41. Reopening of Hearing..................................................... 29

R-42. Waiver of Rules .......................................................... 29

R-43. Extensions of Time........................................................ 29

R-44. Serving of Notice and Communications ..................................... 30

R-45. Confidentiality ........................................................... 30

R-46. Majority Decision ........................................................ 30

R-47. Time of Award............................................................ 31

R-48. Form of Award............................................................ 31

R-49. Scope of Award........................................................... 31

R-50. Award Upon Settlement – Consent Award................................... 32

R-51. Delivery of Award to Parties ............................................... 32

R-52. Modification of Award..................................................... 32

R-53. Release of Documents for Judicial Proceedings.............................. 32

R-54. Applications to Court and Exclusion of Liability .............................. 32

R-55. Administrative Fees ....................................................... 33

R-56. Expenses................................................................. 33

R-57. Neutral Arbitrator's Compensation.......................................... 33

R-58. Deposits ................................................................. 34

R-59. Remedies for Nonpayment ................................................ 34

R-60. Sanctions................................................................. 35

**A-52**

**Preliminary Hearing Procedures** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

P-1. General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

P-2. Checklist . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

**Expedited Procedures** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

E-1. Limitation on Extensions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

E-2. Changes of Claim or Counterclaim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

E-3. Serving of Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

E-4. Appointment and Qualifications of Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

E-5. Discovery, Motions, and Conduct of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

E-6. Proceedings on Documents and Procedures for the Resolution of Disputes
Through Document Submission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

E-7. Date, Time, Place, and Method of Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

E-8. The Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

E-9. Time of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

E-10. Arbitrator's Compensation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**Procedures for Large, Complex Commercial Disputes**. . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

L-1. Administrative Conference. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

L-2. Arbitrators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

L-3. Management of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

**Administrative Fee Schedules (Standard and Flexible Fees)** . . . . . . . . . . . . . . . . . . . . . . 43

**Commercial Mediation Procedures**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

M-1. Agreement of Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

M-2. Initiation of Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

M-3. Representation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

M-4. Appointment of the Mediator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

M-5. Mediator's Impartiality and Duty to Disclose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

M-6. Vacancies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

M-7. Duties and Responsibilities of the Mediator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

M-8. Responsibilities of the Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

M-9. Privacy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

M-10. Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

M-11. No Stenographic Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

M-12. Termination of Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

M-13. Exclusion of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

M-14. Interpretation and Application of Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

M-15. Deposits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

M-16. Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

M-17. Cost of the Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

**A-54**



# Commercial Arbitration Rules and Mediation Procedures

(Including Procedures for Large, Complex Commercial Disputes)

## Important Notice

These rules and any amendment of them shall apply in the form in effect at the time the administrative filing requirements are met for a demand for arbitration or submission agreement received by the AAA®. To ensure that you have the most current information, see our web site at **www.adr.org.**

## Introduction

Each year, many millions of business transactions take place. Occasionally, disagreements develop over these business transactions. Many of these disputes are resolved by arbitration, the voluntary submission of a dispute to an impartial person or persons for final and binding determination. Arbitration has proven to be an effective way to resolve these disputes privately, promptly, and economically.

The American Arbitration Association® (AAA), a not-for-profit, public service organization, offers a broad range of dispute resolution services to business executives, attorneys, individuals, trade associations, unions, management, consumers, families, communities, and all levels of government. Services are available through AAA headquarters in New York and through offices located in major cities throughout the United States. Hearings may be held at locations convenient for the parties and are not limited to cities with AAA offices. In addition, the AAA serves as a center for education and training, issues specialized publications, and conducts research on various forms of alternative dispute resolution.

## Standard Arbitration Clause

The parties can provide for arbitration of future disputes by inserting the following clause into their contracts:

> *Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.*

Arbitration of existing disputes may be accomplished by use of the following:

> *We, the undersigned parties, hereby agree to submit to arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules the following Controversy: (describe briefly). We further agree that the above controversy be submitted to (one) (three) arbitrator(s). We further agree that we will faithfully observe this agreement and the rules, that we will abide by and perform any award rendered by the arbitrator(s), and that a judgment of any court having jurisdiction may be entered on the award.*

The services of the AAA are generally concluded with the transmittal of the award. Although there is voluntary compliance with the majority of awards, judgment on the award can be entered in a court having appropriate jurisdiction if necessary.

## Administrative Fees

The AAA charges a filing fee based on the amount of the claim or counterclaim. This fee information, which is included with these rules, allows the parties to exercise control over their administrative fees. The fees cover AAA administrative services; they do not cover arbitrator compensation or expenses, if any, reporting services, or any post-award charges incurred by the parties in enforcing the award.

## Mediation

Subject to the right of any party to opt out, in cases where a claim or counterclaim exceeds $100,000, the Rules provide that the parties shall mediate their dispute upon the administration of the arbitration or at any time when the arbitration is pending. In mediation, the neutral mediator assists the parties in reaching a

settlement but does not have the authority to make a binding decision or award. Mediation is administered by the AAA in accordance with its Commercial Mediation Procedures. There is no additional filing fee where parties to a pending arbitration attempt to mediate their dispute under the AAA's auspices.

Although these rules include a mediation procedure that will apply to many cases, parties may still want to incorporate mediation into their contractual dispute settlement process. Parties can do so by inserting the following mediation clause into their contract in conjunction with a standard arbitration provision:

> *If a dispute arises out of or relates to this contract, or the breach thereof, and if the dispute cannot be settled through negotiation, the parties agree first to try in good faith to settle the dispute by mediation administered by the American Arbitration Association under its Commercial Mediation Procedures before resorting to arbitration, litigation, or some other dispute resolution procedure.*

If the parties want to use a mediator to resolve an existing dispute, they can enter into the following submission agreement:

> *The parties hereby submit the following dispute to mediation administered by the American Arbitration Association under its Commercial Mediation Procedures. (The clause may also provide for the qualifications of the mediator(s), method of payment, locale of meetings, and any other item of concern to the parties.)*

## Large, Complex Cases

Unless the parties agree otherwise, the Procedures for Large, Complex Commercial Disputes, which appear in this pamphlet, will be applied to all cases administered by the AAA under the Commercial Arbitration Rules in which the disclosed claim or counterclaim of any party is at least $1,000,000 exclusive of claimed interest, arbitration fees and costs. The key features of these Procedures include:

> A highly qualified, trained Roster of Neutrals;

> A mandatory preliminary hearing with the arbitrators, which may be conducted by teleconference or other electronic means;

> Broad arbitrator authority to order and control the exchange of information, including depositions;

> A presumption that hearings will proceed on a consecutive or block basis.

## Commercial Arbitration Rules

### R-1. Agreement of Parties*

**(a)** The parties shall be deemed to have made these Rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules or for arbitration by the AAA of a domestic commercial dispute without specifying particular rules. These Rules and any amendment to them shall apply in the form in effect at the time the administrative requirements are met for a Demand for Arbitration or Submission Agreement received by the AAA. Any disputes regarding which AAA rules shall apply shall be decided by the AAA. The parties, by written agreement, may vary the procedures set forth in these Rules. After appointment of the arbitrator, such modifications may be made only with the consent of the arbitrator.

**(b)** Unless the parties agree or the AAA determines otherwise, the Expedited Procedures shall apply in any case in which no disclosed claim or counterclaim exceeds $100,000, exclusive of interest, attorneys' fees, and arbitration fees and costs. Parties may also agree to use these Procedures in larger cases. Unless the parties agree otherwise, these Procedures will not apply in cases involving more than two parties. The Expedited Procedures shall be applied as described in Procedures E-1 through E-10, in addition to any other portion of these Rules that is not in conflict with the Expedited Procedures.

**(c)** Unless the parties agree otherwise, the Procedures for Large, Complex Commercial Disputes shall apply to all cases in which the disclosed claim or counterclaim of any party is at least $1,000,000, exclusive of claimed interest, attorneys' fees, arbitration fees and costs. Parties may also agree to use the Procedures in cases involving claims or counterclaims under $1,000,000 or in nonmonetary cases. The Procedures for Large, Complex Commercial Disputes shall be applied as described in Procedures L-1 through L-3 in addition to any other portion of these Rules that is not in conflict with the Procedures for Large, Complex Commercial Disputes.

**(d)** Parties may, by agreement, apply the Expedited Procedures; the Procedures for Large, Complex Commercial Disputes; or the Procedures for the Resolution of Disputes Through Document Submission (Procedure E-6) to any dispute.

**(e)** All other cases shall be administered in accordance with Rules R-1 through R-60 of these Rules.

*\* The AAA will apply the Employment Fee Schedule to any dispute between an individual employee or an independent contractor (working or performing as an individual and not incorporated) and a business or organization and the dispute involves work or work-related claims, including any statutory claims and including work-related claims under independent contractor agreements. A dispute arising out of an employment plan will be administered under the AAA's Employment Arbitration Rules and Mediation Procedures. A dispute arising out of a consumer arbitration agreement will be administered under the AAA's Consumer Arbitration Rules.*

*\* Beginning June 1, 2021, the AAA will apply the Consumer Arbitration Fee Schedule to any dispute between an online marketplace or platform and an individual user or subscriber (using or subscribed to the service as an individual and not incorporated) and the dispute does not involve work or work-related claims.*

**A-58**

## R-2. AAA, Delegation of Duties, Conduct of Parties, Administrative Review Council

**(a)** When parties agree to arbitrate under these Rules, or when they provide for arbitration by the AAA and an arbitration is initiated under these Rules, they thereby authorize the AAA to administer the arbitration.

**(b)** The authority and duties of the AAA are prescribed in the agreement of the parties and in these Rules, and may be carried out through such of the AAA's representatives as it may direct. The AAA may, in its discretion, assign the administration of an arbitration to any of its offices. Arbitrations administered under these Rules shall only be administered by the AAA or by an individual or organization authorized by the AAA to do so.

**(c)** The AAA requires that parties and their representatives conduct themselves in accordance with the AAA's *Standards of Conduct for Parties and Representatives* when utilizing the AAA's services. Failure to do so may result in the AAA's declining to further administer a particular case or caseload.

**(d)** For cases proceeding under the Procedures for Large, Complex Commercial Disputes, and for other cases where the AAA, in its sole discretion, deems it appropriate, the AAA may act through its Administrative Review Council to take the following administrative actions:

    **i)** determine challenges to the appointment or continuing service of an arbitrator;

    **ii)** make an initial determination as to the locale of the arbitration, subject to the power of the arbitrator to make a final determination; or

    **iii)** decide whether a party has met the administrative requirements to file an arbitration under these Rules.

## R-3. National Roster of Arbitrators

The AAA shall establish and maintain a National Roster of Arbitrators ("National Roster") and shall appoint arbitrators as provided in these Rules. The term "arbitrator" in these Rules refers to the arbitration panel, constituted for a particular case, whether composed of one or more arbitrators, or to an individual arbitrator, as the context requires.

## R-4. Filing Requirements and Procedures

**(a)** Filing Requirements

    **i)** Arbitration under an arbitration provision in a contract shall be initiated by the initiating party ("claimant") filing with the AAA a Demand for Arbitration, the administrative filing fee, and a copy of the applicable arbitration agreement from the parties' contract which provides for arbitration. The filing fee must be paid before a matter is considered properly filed.

    **ii)** Arbitration pursuant to a court order shall be initiated by the initiating party filing with the AAA a Demand for Arbitration, the administrative filing fee, and a copy of any applicable arbitration agreement from the parties' contract which provides for arbitration.

        **a)** The filing party shall include a copy of the court order.

        **b)** The filing fee must be paid before a matter is considered properly filed. If the court order directs that a specific party is responsible for the filing fee, it is the responsibility of the filing party to either make such payment to the AAA and seek reimbursement as directed in the court order or to make other such arrangements so that the filing fee is submitted to the AAA with the Demand.

        **c)** The party filing the Demand with the AAA is the claimant and the opposing party is the respondent regardless of which party initiated the court action. Parties may request that the arbitrator alter the order of proceedings if necessary pursuant to Rule R-33.

    **iii)** Parties to any existing dispute who have not previously agreed to use these Rules may commence an arbitration under these Rules by filing a written Submission Agreement and the administrative filing fee. To the extent that the parties' Submission Agreement contains any variances from these Rules, such variances should be clearly stated in the Submission Agreement.

    **iv)** Information to be included with any arbitration filing includes:

        **a)** the name of each party;

        **b)** the address of each party and, if known, the telephone number and email address;

        **c)** if applicable, the name, address, telephone number, and email address of any known representative for each party;

        **d)** a statement setting forth the nature of the claim including the relief sought and the amount involved; and

        **e)** the locale requested if the arbitration agreement does not specify one.

**(b)** Filing Procedures

    **i)** The initiating party may file or submit a dispute to the AAA in the following manner:

        **a)** through AAA WebFile®, located at **www.adr.org;**

        **b)** by filing the complete Demand or Submission with any AAA office, regardless of the intended locale of hearing; or

        **c)** by emailing the complete Demand or Submission to **casefiling@adr.org,** with payment to follow as directed by the AAA.

    **ii)** The filing party shall simultaneously provide a copy of the Demand and any supporting documents to the opposing party.

     **iii)** Any papers, notices, or process necessary or proper for the initiation of an arbitration under this Rule may be served on a party:

        **a)** by mail addressed to the party or its authorized representative at their last known address;

        **b)** by electronic service/email, with the prior agreement of the party being served;

        **c)** by personal service; or

        **d)** by any other service methods provided for under the applicable procedures of the courts of the state where the party to be served is located.

     **iv)** The AAA shall provide notice to the parties (or their representatives if so named) of the receipt of a Demand or Submission when the administrative filing requirements have been satisfied. The date on which the filing requirements are satisfied shall establish the date of filing the dispute for administration. However, all disputes in connection with the AAA's determination of the date of filing may be decided by the arbitrator.

     **v)** It is the responsibility of the filing party to ensure that any conditions precedent to the filing of a case are met prior to filing an arbitration, as well as any time requirements associated with the filing. Any dispute regarding whether a condition precedent has been met may be raised with the arbitrator for determination.

     **vi)** The AAA has the authority to make an administrative determination whether the filing requirements set forth in this Rule have been met.

     **vii)** If the filing does not satisfy the filing requirements set forth in Section (a) above, the AAA shall acknowledge to all named parties receipt of the incomplete filing, and the filing may be returned to the initiating party.

**(c)** *Authority of arbitrator.* Any decision made by the AAA regarding filing requirements and procedures shall not interfere with the arbitrator's authority to determine jurisdiction pursuant to Rule R-7.

## R-5. Answers and Counterclaims

**(a)** A respondent may file an answering statement with the AAA within 14 calendar days after notice of the filing of the Demand is sent by the AAA. The respondent shall, at the time of any such filing, send a copy of any answering statement to the claimant and to all other parties to the arbitration. If no answering statement is filed within the stated time, the respondent will be deemed to deny the claim. Failure to file an answering statement shall not operate to delay the arbitration.

**(b)** A respondent may file a counterclaim at any time after notice of the filing of the Demand is sent by the AAA, subject to the limitations set forth in Rule R-6. The respondent shall send a copy of the counterclaim to the claimant and all other parties to the arbitration. If a counterclaim is asserted, it shall include a statement setting forth the nature of the counterclaim including the relief sought and the

amount involved. The filing fee as specified in the applicable AAA Fee Schedule must be paid at the time of filing. The claimant may file an answering statement or reply in response to the counterclaim with the AAA within 14 calendar days after notice of the filing of the counterclaim is sent by the AAA.

(c) If the respondent alleges that a different arbitration provision is controlling, the matter will be administered in accordance with the arbitration provision submitted by the initiating party subject to a final determination by the arbitrator.

(d) If the counterclaim does not meet the requirements for filing a claim and the deficiency is not cured by the date specified by the AAA, it may be returned to the filing party.

## R-6. Changes of Claim

(a) A party may at any time prior to the close of the hearing or by any earlier date established by the arbitrator increase or decrease the amount of its claim or counterclaim. Written notice of the change of claim amount must be provided to the AAA and all parties. If the change of claim amount results in an increase in the administrative fee, the balance of the fee is due before the change of claim or counterclaim amount may be accepted by the arbitrator. After the arbitrator is appointed, however, a party may increase the amount of its claim or counterclaim, or alter its request for non-monetary relief, only with the arbitrator's consent.

(b) Any new or different claim or counterclaim, as opposed to an increase or decrease in the amount of a pending claim or counterclaim, shall be made in writing and filed with the AAA, and a copy shall be provided to the other party, who shall have 14 calendar days from the date of such transmittal within which to file an answer to the proposed change of claim or counterclaim with the AAA. After the arbitrator is appointed, however, no new or different claim or counterclaim may be submitted except with the arbitrator's consent.

(c) A party that filed a claim or counterclaim of an undisclosed or undetermined amount must specify the amount of the claim or counterclaim to the AAA, all parties, and the arbitrator at least seven calendar days prior to the commencement of the hearing or by any other date established by the arbitrator. If the disclosed amount of the claim or counterclaim results in an increased filing fee, that fee must be paid at the time the claim or counterclaim amount is disclosed. For good cause shown and with the consent of the arbitrator, a party may proceed to the hearing with an undisclosed or undetermined claim or counterclaim, provided that the final amount of the claim or counterclaim is set forth in a post-hearing brief or submission and any appropriate filing fee is paid.

## R-7. Jurisdiction

(a) The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim, without any need to refer such matters first to a court.

**(b)** The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

**(c)** A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award.

## R-8. Consolidation and Joinder

**(a)** Consolidation

  **i)** Two or more arbitrations may be consolidated if all parties to all of the arbitrations to be consolidated so agree.

  **ii)** Unless all parties agree to consolidation, the party requesting consolidation of two or more arbitrations must file with the AAA and serve on all other parties a written request for consolidation with the supporting reasons for such request within 90 days of the date the AAA determines that all administrative filing requirements were satisfied for the last-filed case that is part of the consolidation request. Such time limit may be extended by the arbitrator appointed in the first-filed case upon a showing of good cause for the late request. The other parties to the arbitrations shall provide their written responses to the consolidation request within 10 calendar days after the AAA sends notice of receipt of the request.

  **iii)** At its discretion, the AAA either may direct that the consolidation request be decided by the arbitrator appointed in the first-filed case or may appoint a consolidation arbitrator for the sole purpose of deciding the consolidation request.

  **iv)** The arbitrator deciding consolidation may order consolidation of two or more cases for all purposes or for such limited purposes and under such conditions as the arbitrator may direct.

  **v)** Absent agreement of all parties, an arbitrator appointed for the sole purpose of deciding the consolidation request shall have no further power to act, and shall be removed from the case, after the consolidation request is decided.

  **vi)** In deciding whether to consolidate, the arbitrator or consolidation arbitrator shall take into account all relevant circumstances, including:

   **a)** the terms and compatibility of the agreements to arbitrate,

   **b)** applicable law,

   **c)** the timeliness of the request to consolidate and the progress already made in the arbitrations,

   **d)** whether the arbitrations raise common issues of law and/or fact, and

      **e)** whether consolidation of the arbitrations would serve the interests of justice and efficiency.

**(b)** Joinder

    **i)** Additional parties may be joined to an arbitration if all parties to the arbitration and the parties proposed to be joined so agree.

    **ii)** Absent such consent, all requests for joinder must be submitted to the AAA prior to the appointment of an arbitrator pursuant to these Rules or within 90 days of the date the AAA determines that all administrative filing requirements have been satisfied. The arbitrator may extend this deadline on a showing of good cause for the late request.

    **iii)** If the existing parties and the parties proposed to be joined are unable to agree to the joinder of those additional parties to an ongoing arbitration, the arbitrator shall decide whether parties should be joined. If an arbitrator has not yet been appointed in the case, the AAA may appoint an arbitrator for the sole purpose of deciding the joinder request. Absent agreement of all parties, the arbitrator appointed for the sole purpose of deciding the joinder request shall have no further power to act, and shall be removed from the case, after the joinder request is decided.

    **iv)** The party requesting the joinder of one or more parties to a pending arbitration must file with the AAA a written request that provides the names and contact information for such parties; the names and contact information for the parties' representatives, if known; and the supporting reasons for such request, including applicable law. The requesting party must provide a copy of the joinder request to all parties in the arbitration and all parties it seeks to join at the same time it files the request with the AAA. The other parties to the arbitration and the parties sought to be joined shall provide their written responses to the joinder request within 14 days after the AAA sends notice of receipt of the request for joinder.

    **v)** The requesting party shall comply with the provisions of Rule R-4(a) as to all parties sought to be joined.

**(c)** If an arbitrator determines that separate arbitrations shall be consolidated or that the joinder of additional parties is permissible, that arbitrator may also determine:

    **i)** whether any arbitrator previously appointed to an existing case that was consolidated shall remain on the newly constituted case;

    **ii)** whether any arbitrator previously appointed to a case where additional parties have been joined shall remain;

    **iii)** if appropriate, a process for selecting the arbitrator(s) to fill any vacancies; and

    **iv)** unless agreed otherwise by the parties, the allocation among the parties of arbitrator compensation and expenses, subject to reapportionment by the arbitrator appointed to the ongoing or newly constituted case in the final award.

**(d)** The AAA may take reasonable administrative actions to accomplish any consolidation or joinder ordered by the arbitrator or as agreed to by the parties. Pending the determination on a consolidation or joinder request, the AAA shall have the authority to stay the arbitration or arbitrations impacted by the consolidation or joinder request, at its sole discretion.

## R-9. Interpretation and Application of Rules

The arbitrator shall interpret and apply these Rules insofar as they relate to the arbitrator's powers and duties. When there is more than one arbitrator and a difference arises among them concerning the meaning or application of these Rules, it shall be decided by a majority vote. If that is not possible, either an arbitrator or a party may refer the question to the AAA for final decision. All other rules shall be interpreted and applied by the AAA.

## R-10. Mediation

In all cases where a claim or counterclaim exceeds $100,000, upon the AAA's administration of the arbitration or at any time while the arbitration is pending, the parties shall mediate their dispute pursuant to the applicable provisions of the AAA's Commercial Mediation Procedures, or as otherwise agreed by the parties. Absent an agreement of the parties to the contrary, the mediation shall take place concurrently with the arbitration and shall not serve to delay the arbitration proceedings. However, any party to an arbitration may unilaterally opt out of this Rule upon notification to the AAA and the other parties to the arbitration. The parties shall confirm the completion of any mediation or any decision to opt out of this Rule to the AAA. Unless agreed to by all parties and the mediator, the mediator shall not be appointed as an arbitrator to the case.

## R-11. Administrative Conference

At the request of any party or upon the AAA's own initiative, the AAA may conduct an administrative conference, in person, by videoconference or by telephone, with the parties and/or their representatives. The conference may address such issues as arbitrator selection, mediation of the dispute, potential exchange of information, a timetable for hearings, and any other administrative matters.

## R-12. Fixing of Locale

The parties may mutually agree on the locale where the arbitration is to be held. When the parties' arbitration agreement requires a specific locale, absent the parties' agreement to change it, or a determination by the arbitrator that

applicable law requires a different locale, the locale shall be that specified in the arbitration agreement.

Any disputes regarding the locale that are to be decided by the AAA must be submitted to the AAA and all other parties within 14 calendar days after the AAA sends notice of the filing of the Demand or by the date established by the AAA. Disputes regarding locale shall be determined in the following manner:

(a) When the parties' arbitration agreement is silent with respect to locale, and if the parties disagree as to the locale, the AAA shall initially determine the locale of arbitration, subject to the power of the arbitrator after appointment to make a final determination on the locale.

(b) If the reference to a locale in the arbitration agreement is ambiguous, and the parties are unable to agree to a specific locale, the AAA shall determine the locale, subject to the power of the arbitrator to finally determine the locale.

(c) If the parties' arbitration agreement specifies more than one possible locale, the filing party may select any of the specified locales at the time of filing, subject to the power of the arbitrator to finally determine the locale.

The arbitrator, at the arbitrator's sole discretion, shall have the authority to conduct special hearings for document production purposes or otherwise at other locations if reasonably necessary and beneficial to the process.

## R-13. Appointment from National Roster

If the parties have not appointed an arbitrator and have not provided any other method of appointment, the arbitrator shall be appointed in the following manner:

(a) The AAA shall send simultaneously to each party to the dispute an identical list of 10 (unless the AAA decides that a different number is appropriate) names of persons chosen from the National Roster. The parties are encouraged to agree to an arbitrator from the submitted list and to advise the AAA of their agreement.

(b) If the parties are unable to agree upon an arbitrator, each party to the dispute shall have 14 calendar days from the transmittal date in which to strike names objected to, number the remaining names in order of preference, and return the list to the AAA. At its discretion, the AAA may limit the number of strikes permitted. The parties are not required to exchange selection lists. If a party does not return the list within the time specified, all persons named therein shall be deemed acceptable to that party. From among the persons who have been approved on both lists, and in accordance with the designated order of mutual preference, the AAA shall invite the acceptance of an arbitrator to serve. If the parties fail to agree on any of the persons named, or if acceptable arbitrators are unable to act, or if

**A-66**

for any other reason the appointment cannot be made from the submitted lists, the AAA shall have the power to make the appointment from among other members of the National Roster without the submission of additional lists.

**(c)** Unless the parties agree otherwise, when there are two or more claimants or two or more respondents, the AAA may appoint all the arbitrators.

## R-14. Direct Appointment by Party

**(a)** If the agreement of the parties names an arbitrator or specifies a method of appointing an arbitrator, that designation or method shall be followed. If a party selects an arbitrator for appointment, it shall file the name, address, telephone number, and email address of the arbitrator with the AAA. Upon the request of any appointing party, the AAA shall submit a list of members of the National Roster from which the party may, if it so desires, make the appointment.

**(b)** Where the parties have agreed that each party is to name one arbitrator, the arbitrators so named must meet the standards of Rule R-19 with respect to impartiality and independence unless the parties have specifically agreed pursuant to Rule R-19(b) that the party-appointed arbitrators are to be non-neutral and need not meet those standards.

**(c)** If the agreement specifies a period of time within which an arbitrator shall be appointed and any party fails to make the appointment within that period, the AAA shall make the appointment.

**(d)** If no period of time is specified in the agreement, the AAA shall notify the party to make the appointment. If within 14 calendar days after such notice has been sent, an arbitrator has not been appointed by a party, the AAA shall make the appointment.

## R-15. Appointment of Chairperson by Party-Appointed Arbitrators, Parties, or the AAA

**(a)** Where there is a panel of three or more arbitrators, one arbitrator will be designated as the panel chairperson. Such designation will be according to the terms of the parties' arbitration agreement. However, if the parties' arbitration agreement does not specify how the chairperson is to be selected, the chairperson can be designated, at the AAA's discretion, by the party-appointed arbitrators, the parties, the panel, or the AAA.

**(b)** If the arbitration agreement specifies a period of time for appointment of the chairperson and no appointment is made within that period or any agreed extension, the AAA may appoint the chairperson. If no period of time is specified for appointment of the chairperson, and the party-appointed arbitrators or the parties do not make the appointment within 14 calendar days from the date of the appointment of the last party-appointed arbitrator, the AAA may appoint the chairperson.

(c) Absent the agreement of the parties, the chairperson shall be appointed from the National Roster, and the AAA shall furnish to the party-appointed arbitrators, in the manner provided in Rule R-13, a list selected from the National Roster, and the appointment of the chairperson shall be made as provided in that Rule.

## R-16. Nationality of Arbitrator

Where the parties are nationals of different countries, the AAA, at the request of any party or on its own initiative, may appoint as arbitrator a national of a country other than that of any of the parties. The request must be made before the time set for the appointment of the arbitrator as agreed by the parties or set by these Rules.

## R-17. Number of Arbitrators

(a) The parties may agree on the number of arbitrators to hear and determine the case. If the arbitration agreement does not specify the number of arbitrators or is ambiguous, and the parties do not otherwise agree, the dispute shall be heard and determined by one arbitrator, unless the AAA, in its discretion, directs that three arbitrators be appointed. A party may request three arbitrators in the Demand or Answer, which request the AAA will consider in exercising its discretion regarding the number of arbitrators appointed to the dispute.

(b) Use of terms such as "the arbitrator", "an arbitrator", or "the arbitrators" in the arbitration agreement, without further specifying the number of arbitrators, shall not be deemed by the AAA to reflect an agreement as to the number of arbitrators.

(c) Any request for a change in the number of arbitrators as a result of an increase or decrease in the amount of a claim or a new or different claim must be made to the AAA and other parties to the arbitration no later than seven calendar days after receipt of the Rule R-6-required notice of change of claim amount. If the parties are unable to agree with respect to the request for a change in the number of arbitrators, the AAA shall make that determination.

## R-18. Disclosure

(a) Any person appointed or to be appointed as an arbitrator, as well as the parties and their representatives, shall disclose to the AAA any circumstance likely to give rise to justifiable doubt as to the arbitrator's impartiality or independence, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their representatives. Such obligation shall remain in effect throughout the arbitration. Failure on the part of a party or a representative to comply with the requirements of this Rule may result in the waiver of the right to object to an arbitrator in accordance with Rule R-42.

**A-68**

(b) Upon receipt of such information from the arbitrator or another source, the AAA shall communicate the information to the parties and, if it deems it appropriate to do so, to the arbitrator and others.

(c) Disclosure of information pursuant to this Rule R-18 is not an indication that the arbitrator considers the disclosed circumstance likely to affect impartiality or independence.

## R-19. Disqualification of Arbitrator

(a) Any arbitrator shall be impartial and independent and shall perform his or her duties with diligence and in good faith, and shall be subject to disqualification for:

   i)   partiality or lack of independence,

   ii)  inability or refusal to perform his or her duties with diligence and in good faith, and

   iii) any grounds for disqualification provided by applicable law.

(b) The parties may agree in writing, however, that arbitrators directly appointed by a party pursuant to Rule R-14 shall be non-neutral, in which case such arbitrators need not be impartial or independent and shall not be subject to disqualification for partiality or lack of independence.

(c) Upon objection of a party to the continued service of an arbitrator, or on its own initiative, the AAA shall determine whether the arbitrator should be disqualified on the grounds set out above, and shall inform the parties of its decision, which decision shall be conclusive.

## R-20. Communication with Arbitrator

(a) No party and no one acting on behalf of any party shall communicate *ex parte* with an arbitrator or a candidate for arbitrator concerning the arbitration, except that a party, or someone acting on behalf of a party, may communicate *ex parte* with a candidate for direct appointment pursuant to Rule R-14 in order to advise the candidate of the general nature of the controversy and of the anticipated proceedings and to discuss the candidate's qualifications, availability, or independence in relation to the parties or to discuss the suitability of candidates for selection as a third arbitrator where the parties or party-designated arbitrators are to participate in that selection.

(b) Rule R-20(a) does not apply to arbitrators directly appointed by the parties who, pursuant to Rule R-19(b), the parties have agreed in writing are non-neutral. Where the parties have so agreed under Rule R-19(b), the AAA shall as an administrative practice suggest to the parties that they agree further that Rule R-20(a) should nonetheless apply prospectively.

(c) As set forth in Rule R-44, unless otherwise instructed by the AAA, in the Rules, or by the arbitrator, any documents submitted by any party to the AAA or to the arbitrator shall simultaneously be provided to the other party or parties to the arbitration.

## R-21. Vacancies

**(a)** If for any reason an arbitrator is unable or unwilling to perform the duties of the office, the AAA may, on proof satisfactory to it, declare the office vacant. Vacancies shall be filled in accordance with the applicable provisions of these Rules.

**(b)** In the event of a vacancy in a panel of neutral arbitrators after the hearings have commenced, the remaining arbitrator or arbitrators may continue with the hearing and determination of the controversy, unless the parties agree otherwise.

**(c)** In the event of the appointment of a substitute arbitrator, the panel of arbitrators shall determine in its sole discretion whether it is necessary to repeat all or part of any prior hearings.

## R-22. Preliminary Hearing

**(a)** At the discretion of the arbitrator, and depending on the size and complexity of the arbitration, a preliminary hearing should be scheduled as soon as practicable after the arbitrator has been appointed. The parties should be invited to attend the preliminary hearing along with their representatives. The preliminary hearing may be conducted in person, by video conference or by telephone.

**(b)** At the preliminary hearing, the parties and the arbitrator should be prepared to discuss and establish a procedure for the conduct of the arbitration that is appropriate to achieve a fair, efficient, and economical resolution of the dispute. Procedures P-1 and P-2 of these Rules address the issues to be considered at the preliminary hearing.

## R-23. Pre-Hearing Exchange and Production of Information

**(a)** *Authority of arbitrator.* The arbitrator shall manage any necessary exchange of information among the parties with a view to achieving an efficient and economical resolution of the dispute, while at the same time promoting equality of treatment and safeguarding each party's opportunity to fairly present its claims and defenses.

**(b)** *Documents.* The arbitrator may, on application of a party or on the arbitrator's own initiative:

   **i)** require the parties to exchange documents in their possession or custody on which they intend to rely;

   **ii)** require the parties to update their exchanges of the documents on which they intend to rely as such documents become known to them;

   **iii)** require the parties, in response to reasonable document requests, to make available to the other party documents in the responding party's possession or custody, not otherwise readily available to the party seeking the documents, and reasonably believed by the party seeking the documents to exist and to be relevant and material to the outcome of disputed issues; and

**A-70**

iv) require the parties, when documents to be exchanged or produced are maintained in electronic form, to make such documents available in the form most convenient and economical for the party in possession of such documents, unless the arbitrator determines that there is good cause for requiring the documents to be produced in a different form. The parties should attempt to agree in advance upon, and the arbitrator may determine, reasonable search parameters to balance the need for production of electronically stored documents relevant and material to the outcome of disputed issues against the cost of locating and producing them.

## R-24. Enforcement Powers of Arbitrator

The arbitrator shall have the authority to issue any orders necessary to enforce the provisions of Rules R-22 and R-23 and any other rule or procedure and to otherwise achieve a fair, efficient and economical resolution of the case, including, without limitation:

**(a)** conditioning any exchange or production of confidential documents and information, and the admission of confidential evidence at the hearing, on appropriate orders to preserve such confidentiality;

**(b)** imposing reasonable search parameters for electronic and other documents if the parties are unable to agree;

**(c)** allocating costs of producing documentation, including electronically stored documentation;

**(d)** in the case of willful non-compliance with any order issued by the arbitrator, drawing adverse inferences, excluding evidence and other submissions, and/or making special allocations of costs or an interim award of costs arising from such non-compliance; and

**(e)** issuing any other enforcement orders which the arbitrator is empowered to issue under applicable law.

## R-25. Date, Time, Place, and Method of Hearing

The arbitrator shall set the date, time, place, and method (including video, audio or other electronic means when appropriate) for each hearing. The parties shall respond to requests for hearing dates in a timely manner, be cooperative in scheduling the earliest practicable date, and adhere to the established hearing schedule. The AAA shall send a notice of hearing to the parties at least 10 calendar days in advance of the hearing date, unless otherwise agreed by the parties.

## R-26. Attendance at Hearing

The arbitrator and the AAA shall maintain the privacy of the hearings unless the law provides to the contrary. Any person having a direct interest in the arbitration is entitled to attend hearings. The arbitrator shall otherwise have the power to require the exclusion of any witness, other than a party or other essential person, during the testimony of any other witness. It shall be discretionary with the arbitrator to determine the propriety of the attendance of any other person.

## R-27. Representation

Any party may participate without representation (*pro se*), or by counsel or any other representative of the party's choosing, unless such choice is prohibited by applicable law. A party intending to be so represented shall notify the other party and the AAA of the name, telephone number and address, and email address if available, of the representative at least seven calendar days prior to the date set for the hearing at which that person is first to appear. When such a representative initiates an arbitration or responds for a party, notice is deemed to have been given.

## R-28. Oaths

Before proceeding with the first hearing, each arbitrator may take an oath of office and, if required by law, shall do so. The arbitrator may require witnesses to testify under oath administered by any duly qualified person and, if it is required by law or requested by any party, shall do so.

## R-29. Official Record of Proceedings

(a) Any party desiring a transcribed record of a hearing shall make arrangements directly with a transcriber or transcription service and shall notify the arbitrator and the other parties of these arrangements at least seven calendar days in advance of the hearing. The requesting party or parties shall pay the cost of the record.

(b) No other means of recording any proceeding will be permitted absent the agreement of the parties or per the direction of the arbitrator.

(c) If the transcript or any other recording is agreed by the parties or determined by the arbitrator to be the official record of the proceeding, it must be provided to the arbitrator and made available to the other parties at the direction of the arbitrator.

(d) The arbitrator may resolve any disputes with regard to apportionment of the costs of the transcription or other recording.

### R-30. Interpreters

Any party wishing an interpreter shall make all arrangements directly with the interpreter and shall assume the costs of the service.

### R-31. Postponements

The arbitrator may postpone any hearing upon agreement of the parties, upon request of a party for good cause shown, or upon the arbitrator's own initiative.

### R-32. Arbitration in the Absence of a Party or Representative

Unless the law provides to the contrary, the arbitration may proceed in the absence of any party or representative who, after due notice, fails to be present or fails to obtain a postponement. An award shall not be made solely on the default of a party. The arbitrator shall require the party who is present to submit such evidence as the arbitrator may require for the making of an award.

### R-33. Conduct of Proceedings

(a) The claimant shall present evidence to support its claim. The respondent shall then present evidence to support its defense. Witnesses for each party shall also submit to questions from the arbitrator and the adverse party. The arbitrator has the discretion to vary this procedure, provided that the parties are treated with equality and that each party has the right to be heard and is given a fair opportunity to present its case.

(b) The arbitrator, exercising his or her discretion, shall conduct the proceedings with a view to expediting the resolution of the dispute and may direct the order of proof, bifurcate proceedings and direct the parties to focus their presentations on issues the decision of which could dispose of all or part of the case.

(c) The arbitrator may also allow for some or all of the presentation of evidence by alternative means including video, audio or other electronic means other than an in-person presentation. Such alternative means must afford a full opportunity for all parties to present any evidence that the arbitrator deems material and relevant to the resolution of the dispute and, when involving witnesses, provide an opportunity for cross-examination.

(d) The parties may agree to waive oral hearings in any case and may also agree to utilize the *Procedures for Resolution of Disputes Through Document Submission*, found in Procedure E-6.

**A-73**

## R-34. Dispositive Motions

**(a)** The arbitrator may allow the filing of and make rulings upon a dispositive motion only if the arbitrator determines the moving party has shown that the motion is likely to succeed and to dispose of or narrow the issues in the case.

**(b)** Consistent with the goal of achieving an efficient and economical resolution of the dispute, the arbitrator shall consider the time and cost associated with the briefing of a dispositive motion in deciding whether to allow any such motion.

**(c)** Fees, expenses, and compensation associated with a motion or an application to make a motion may be assessed as provided for in Rule R-49(c).

## R-35. Evidence

**(a)** The parties may offer such evidence as is relevant and material to the dispute and shall produce such evidence as the arbitrator may deem necessary to an understanding and determination of the dispute. Conformity to legal rules of evidence shall not be necessary. All evidence shall be taken in the presence of all of the arbitrators and all of the parties, except where any of the parties is absent, in default, or has waived the right to be present.

**(b)** The arbitrator shall determine the admissibility, relevance, and materiality of the evidence offered and may exclude evidence deemed by the arbitrator to be cumulative or irrelevant.

**(c)** The arbitrator shall take into account applicable principles of legal privilege, such as those involving the confidentiality of communications between a lawyer and client.

**(d)** An arbitrator or other person authorized by law to subpoena witnesses or documents may do so upon the request of any party or independently.

## R-36. Evidence by Written Statements and Post-Hearing Filing of Documents or Other Evidence

**(a)** At a date agreed upon by the parties or ordered by the arbitrator, the parties shall give written notice for any witness or expert witness who has provided a written witness statement to appear in person at the arbitration hearing for examination. If such notice is given, and the witness fails to appear, the arbitrator may disregard the written witness statement and/or expert report of the witness or make such other order as the arbitrator may consider to be just and reasonable.

**(b)** If a witness whose testimony is represented by a party to be essential is unable or unwilling to testify at the hearing, either in person or through electronic or other means, either party may request that the arbitrator order the witness to appear in person for examination before the arbitrator at a time and location where the witness is willing and able to appear voluntarily or can legally be compelled to do so. Any such order may be conditioned upon payment by the requesting party of all reasonable costs associated with such examination.

**A-74**

**(c)** If the parties agree or the arbitrator directs that documents or other evidence be submitted to the arbitrator after the hearing, the documents or other evidence shall be filed with the AAA for transmission to the arbitrator. All parties shall be afforded an opportunity to examine and respond to such documents or other evidence.

## R-37. Inspection or Investigation

An arbitrator finding it necessary to make an inspection or investigation in connection with the arbitration shall direct the AAA to so advise the parties. The arbitrator shall set the date and time and the AAA shall notify the parties. Any party who so desires may be present at such an inspection or investigation. In the event that one or all parties are not present at the inspection or investigation, the arbitrator shall make an oral or written report to the parties and afford them an opportunity to comment.

## R-38. Interim Measures

**(a)** The arbitrator may take whatever interim measures he or she deems necessary, including injunctive relief and measures for the protection or conservation of property and disposition of perishable goods.

**(b)** Such interim measures may take the form of an interim award, and the arbitrator may require security for the costs of such measures.

**(c)** A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

## R-39. Emergency Measures of Protection

**(a)** Unless the parties agree otherwise, the provisions of this Rule shall apply to arbitrations conducted under arbitration clauses or agreements entered on or after October 1, 2013. This Rule shall not apply to cases administered pursuant to the Expedited Procedures.

**(b)** A party in need of emergency relief prior to the constitution of the panel shall notify the AAA and all other parties in writing of the nature of the relief sought and the reasons why such relief is required on an emergency basis. The application shall also set forth the reasons why the party is entitled to such relief. Such notice may be given by facsimile or email or other reliable means, but must include a statement certifying that all other parties have been notified or an explanation of the steps taken in good faith to notify other parties.

(c) Within one business day of receipt of notice from the AAA initiating the request referenced in section (b), the AAA shall appoint a single emergency arbitrator designated to rule on emergency applications. The emergency arbitrator shall expeditiously disclose any circumstance likely, on the basis of the facts disclosed on the application, to affect such arbitrator's impartiality or independence. Any challenge to the appointment of the emergency arbitrator must be made within one business day of the communication by the AAA to the parties of the appointment of the emergency arbitrator and the circumstances disclosed.

(d) The emergency arbitrator shall as soon as possible, but in any event within two business days of appointment, establish a schedule for consideration of the application for emergency relief. Such a schedule shall provide a reasonable opportunity to all parties to be heard, but may provide for proceeding by telephone or video conference or on written submissions as alternatives to a formal hearing. The emergency arbitrator shall have the authority vested in the tribunal under Rule R-7, including the authority to rule on her or his own jurisdiction, and shall resolve any disputes over the applicability of this Rule R-39.

(e) If, after consideration, the emergency arbitrator is satisfied that the party seeking the emergency relief has shown that immediate and irreparable loss or damage shall result in the absence of emergency relief, and that such party is entitled to such relief under applicable law, the emergency arbitrator may enter an interim order or award granting the relief and stating the reason therefore.

(f) Any application to modify an interim award of emergency relief must be based on changed circumstances and may be made to the emergency arbitrator until the non-emergency ("merits") arbitrator is appointed; thereafter such a request shall be addressed to the merits arbitrator. The emergency arbitrator shall have no further power to act after the merits arbitrator is appointed unless the emergency arbitrator is named as the merits arbitrator or as a member of the panel.

(g) Any interim award of emergency relief may be conditioned on provision by the party seeking such relief for appropriate security.

(h) A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with this Rule, the agreement to arbitrate or a waiver of the right to arbitrate. If the AAA is directed by a judicial authority to nominate a special master to consider and report on an application for emergency relief, the AAA shall proceed as provided in this Rule, and the references to the emergency arbitrator shall be read to mean the special master, except that the special master shall issue a report rather than an interim award.

(i) The costs associated with applications for emergency relief shall initially be apportioned by the emergency arbitrator or special master, subject to the power of the merits arbitrator to determine finally the apportionment of such costs. The emergency arbitrator may take into consideration whether the request for emergency relief was made in good faith.

### R-40. Closing of Hearing

**(a)** The arbitrator shall specifically inquire of all parties whether they have any further proofs to offer or witnesses to be heard. Upon receiving negative replies or if satisfied that the record is complete, the arbitrator shall declare the hearing closed.

**(b)** If documents or responses are to be filed as provided in Rule R-36, or if briefs are to be filed, the hearing shall be declared closed as of the date the arbitrator is satisfied that the record is complete, and such date shall occur no later than seven calendar days from the date of receipt of the last such submissions or hearing transcript.

**(c)** The time limit within which the arbitrator is required to make the award shall commence, in the absence of other agreements by the parties, upon the closing of the hearing. The AAA may extend the time limit for rendering of the award only in unusual and extreme circumstances.

### R-41. Reopening of Hearing

The hearing may be reopened on the arbitrator's initiative, or by the direction of the arbitrator upon application of a party, at any time before the award is made. If reopening the hearing would prevent the making of the award within the specific time agreed to by the parties in the arbitration agreement, the matter may not be reopened unless the parties agree to an extension of time. When no specific date is fixed by agreement of the parties, the arbitrator shall have 30 calendar days from the closing of the reopened hearing within which to make an award (or 14 calendar days if the case is governed by the Expedited Procedures).

### R-42. Waiver of Rules

Any party who proceeds with the arbitration after knowledge that any provision or requirement of these Rules has not been complied with and who fails to state an objection in writing shall be deemed to have waived the right to object.

### R-43. Extensions of Time

The parties may modify by mutual agreement any period of time established by these Rules or the parties' arbitration agreement. The AAA or the arbitrator may for good cause extend any period of time established by these Rules, except the time for making the award. The AAA shall notify the parties of any extension.

## R-44. Serving of Notice and Communications

**(a)** The service methods set forth in Rule R-4(b)(iii) may also be used for the delivery of any filing, notice or communication throughout the course of the arbitration proceeding.

**(b)** The AAA, the arbitrator, and the parties may also use alternative methods of communication or other platforms as directed by the AAA or as agreed by the parties or directed by the arbitrator to exchange any communication or other notice required by these Rules during the course of the arbitration.

**(c)** Unless otherwise instructed by the AAA or by the arbitrator, any party submitting any document or written communication to another party, the AAA or the arbitrator, shall simultaneously provide that material to all other participants, including the AAA.

**(d)** Failure to provide the other party with copies of communications provided to the AAA or the arbitrator may prevent the AAA or the arbitrator from acting on any requests or objections contained therein.

**(e)** The AAA may direct that any oral or written communications sent by a party or their representative shall be sent in a particular manner. The failure of a party or their representative to comply with any such direction may result in the AAA's refusal to consider the issue raised in the communication

**(f)** The AAA may initiate administrative communications with the parties or their representatives either jointly or individually.

**(g)** Any method of service on or notice to a party must be made in such a manner to provide that party with reasonable opportunity to be heard with regard to the dispute.

## R-45. Confidentiality

**(a)** Unless otherwise required by applicable law, court order, or the parties' agreement, the AAA and the arbitrator shall keep confidential all matters relating to the arbitration or the award.

**(b)** Upon the agreement of the parties or the request of any party, the arbitrator may make orders concerning the confidentiality of the arbitration proceedings or of any other matters in connection with the arbitration and may take measures for protecting trade secrets and confidential information.

## R-46. Majority Decision

**(a)** When the panel consists of more than one arbitrator, unless required by law or by the arbitration agreement or section (b) of this Rule, a majority of the arbitrators must make all decisions.

**(b)** Where there is a panel of three arbitrators, absent an objection of a party or another member of the panel, the chairperson of the panel is authorized to

resolve any disputes related to the exchange of information or procedural matters without the need to consult the full panel.

**(c)** Absent an objection of a party or another member of the panel, the chairperson may sign any order on behalf of the panel.

## R-47. Time of Award

The award shall be made promptly by the arbitrator and, unless otherwise agreed by the parties or specified by law, no later than 30 calendar days from the date of closing the hearing, or, if oral hearings have been waived, from the due date set for receipt of the parties' final statements and proofs.

## R-48. Form of Award

**(a)** Any award shall be in writing and signed by a majority of the arbitrators. Signatures may be executed in electronic or digital form. The award shall be executed in the form and manner required by law.

**(b)** The arbitrator need not render a reasoned award unless the parties request such an award in writing prior to appointment of the arbitrator or unless the arbitrator determines that a reasoned award is appropriate.

## R-49. Scope of Award

**(a)** The arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance of a contract.

**(b)** In addition to a final award, the arbitrator may make other decisions, including interim, interlocutory, or partial rulings, orders, and awards. In any interim, interlocutory, or partial award, the arbitrator may assess and apportion the fees, expenses, and compensation related to such award as the arbitrator determines is appropriate.

**(c)** In the final award or any order disposing of all of the case, the arbitrator shall assess the fees, expenses, and compensation provided in Rules R-55, R-56, and R-57. The arbitrator may also assess such fees, expenses, and compensation in any order or award disposing of part of the case. The arbitrator may apportion such fees, expenses, and compensation among the parties in such amounts as the arbitrator determines is appropriate.

**(d)** The award of the arbitrator may include:

**i)** interest at such rate and from such date as the arbitrator may deem appropriate; and

**ii)** an award of attorneys' fees if all parties have requested such an award or it is authorized by law or the parties' arbitration agreement.

### R-50. Award Upon Settlement – Consent Award

**(a)** If the parties settle their dispute during the course of the arbitration and if the parties so request, the arbitrator may set forth the terms of the settlement in a "consent award." A consent award must include an allocation of arbitration costs, including administrative fees and expenses as well as arbitrator fees and expenses as set forth in Rule R-49(c).

**(b)** The consent award shall not be released to the parties until all administrative fees and all arbitrator compensation have been paid in full.

### R-51. Delivery of Award to Parties

Parties shall accept as notice and delivery of the award the placing of the award or a true copy thereof in the mail addressed to the parties or their representatives at their last known addresses, personal or electronic service of the award, or the filing of the award in any other manner that is permitted by law.

### R-52. Modification of Award

**(a)** Within 20 calendar days after the transmittal of any award, any party, upon notice to the other parties, may request the arbitrator, through the AAA, interpret the award or correct any clerical, typographical, or computational errors in the award. The arbitrator is not empowered to re-determine the merits of any claim already decided. The other parties shall be given 10 calendar days to respond to the request. The arbitrator shall dispose of the request within 20 calendar days after transmittal by the AAA to the arbitrator of the request and any response thereto.

**(b)** If the arbitrator has established a different schedule for such requests, responses, and disposition, the arbitrator's schedule will supersede the deadlines set forth in this Rule.

### R-53. Release of Documents for Judicial Proceedings

The AAA shall, upon the written request of a party to the arbitration, furnish to the party, at its expense, copies or certified copies of any papers in the AAA's possession that are not determined by the AAA to be privileged or confidential.

### R-54. Applications to Court and Exclusion of Liability

**(a)** No judicial proceeding by a party relating to the subject matter of the arbitration shall be deemed a waiver of the party's right to arbitrate.

**(b)** Neither the AAA nor any arbitrator in a proceeding under these Rules is a necessary or proper party in any judicial proceedings relating to the arbitration or any other services provided by the AAA.

**(c)** Parties to an arbitration under these Rules shall be deemed to have consented that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction thereof.

**(d)** Parties to an arbitration under these Rules shall be deemed to have consented that the AAA shall not be liable to any party in any action for damages, or injunctive or other relief, for any act or omission in connection with any arbitration administered in whole or in part by the AAA or conducted under these Rules. Parties shall also be deemed to have consented that the arbitrator shall not be liable to any party in any action for damages, or injunctive or other relief, for an act or omission in connection with any arbitration administered in whole or in part by the AAA.

**(e)** Parties to an arbitration under these Rules may not call the arbitrator, the AAA, or AAA employees as a witness in litigation or any other proceeding relating to the arbitration. The arbitrator, the AAA and AAA employees are not competent to testify as witnesses in any such proceeding.

## R-55. Administrative Fees

As a not-for-profit organization, the AAA shall prescribe administrative fees to compensate it for the cost of providing administrative services. The fee schedule in effect when the Demand is filed will apply throughout the pendency of the case. The administrative fees shall be paid initially by the party or parties making a claim or counterclaim, subject to final apportionment by the arbitrator in the award. The AAA may, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees.

## R-56. Expenses

The expenses of witnesses for either side shall be paid by the party producing such witnesses. All other expenses of the arbitration, including required travel and other expenses of the arbitrator, AAA representatives, and any witness and the cost of any proof produced at the direct request of the arbitrator, shall be borne equally by the parties, unless they agree otherwise or unless the arbitrator in the award assesses such expenses or any part thereof against any specified party or parties.

## R-57. Neutral Arbitrator's Compensation

**(a)** Arbitrators shall be compensated at a rate consistent with the arbitrator's stated rate of compensation at the time their AAA resume is presented to the parties for consideration pursuant to Rule R-13, unless otherwise determined by the AAA. Such compensation will be consistent with the provisions of the arbitrator's executed *Notice of Compensation Arrangements*.

**(b)** If there is disagreement concerning the terms of compensation, an appropriate rate shall be established with the arbitrator by the AAA and confirmed to the parties.

**(c)** Any arrangement for the compensation of a neutral arbitrator shall be made through the AAA and not directly between the parties and the arbitrator.

## R-58. Deposits

**(a)** The AAA will require the parties to deposit in advance of any hearings such sums of money as it deems necessary to cover the expense of the arbitration, including the arbitrator's compensation and expenses, if any, and shall render an accounting to the parties and return any unexpended balance at the conclusion of the case. A party's failure to make the requested deposits by the date established by the AAA may result in the AAA's or the arbitrator's taking any appropriate steps as set forth in Rule R-59.

**(b)** Other than in cases where the arbitrator serves for a flat fee, deposit amounts requested will be based on estimates provided by the arbitrator. The arbitrator will determine the estimated amount of deposits using the information provided by the parties with respect to the complexity of each case.

**(c)** The AAA shall request from the arbitrator an itemization or explanation for the arbitrator's request for deposits.

**(d)** The AAA will allocate the deposits requested among the parties and will establish due dates for the collection of those deposits.

## R-59. Remedies for Nonpayment

If arbitrator compensation or expenses or the AAA's administrative fees have not been paid in full, the AAA may so inform the parties so that one of them may advance the required payment.

**(a)** Upon receipt of information from the AAA that payment for administrative fees or deposits for arbitrator compensation or expense have not been paid in full, to the extent the law allows, a party may request that the arbitrator take specific measures relating to a party's non-payment. Such measures may include, but are not limited to:

    **i)** limiting a party's ability to assert or pursue its claim, and

    **ii)** prohibiting a non-paying party from filing any motion.

**(b)** In no event, however, shall a party be precluded from defending a claim or counterclaim.

**(c)** The arbitrator must provide the party opposing a request for such measures with the opportunity to respond prior to making any ruling regarding the same.

**(d)** In the event that the arbitrator grants any request for relief which limits any party's participation in the arbitration, the arbitrator shall require the party who is making a claim and who has made appropriate payments to submit such evidence as the arbitrator may require for the making of an award.

**(e)** Upon receipt of information from the AAA that full payments have not been received, the arbitrator, on the arbitrator's own initiative or at the request of the AAA or a party, may order the suspension of the arbitration. If no arbitrator has yet been appointed, the AAA may suspend the proceedings.

**(f)** If the arbitration has been suspended by either the AAA or the arbitrator and the parties have failed to make the full payments requested within the time provided after the suspension, the arbitrator, or the AAA if an arbitrator has not been appointed, may terminate the proceedings.

## R-60. Sanctions

**(a)** The arbitrator may, upon a party's request, order appropriate sanctions where a party fails to comply with its obligations under these Rules or with an order of the arbitrator. In the event that the arbitrator enters a sanction that limits any party's participation in the arbitration or results in an adverse determination of an issue or issues, the arbitrator shall explain that order in writing and shall require the submission of evidence and legal argument prior to making of an award. The arbitrator may not enter a default award as a sanction.

**(b)** The arbitrator must provide a party that is subject to a sanction request with the opportunity to respond prior to making any determination regarding the sanctions application.

## Preliminary Hearing Procedures

### P-1. General

**(a)** In all but the simplest cases, holding a preliminary hearing as early in the process as possible will help the parties and the arbitrator organize the proceeding in a manner that will maximize efficiency and economy, and will provide each party a fair opportunity to present its case.

**(b)** Care must be taken to avoid importing procedures from court systems, as such procedures may not be appropriate to the conduct of arbitrations as an alternative form of dispute resolution that is designed to be simpler, less expensive and more expeditious.

### P-2. Checklist

**(a)** The following checklist suggests subjects that the parties and the arbitrator should address at the preliminary hearing, in addition to any others that the parties or the arbitrator believe to be appropriate to the particular case. The items to be addressed in a particular case will depend on the size, subject matter, and complexity of the dispute, and are subject to the discretion of the arbitrator:

**i)** the possibility of other non-adjudicative methods of dispute resolution, including mediation pursuant to Rule R-10;

**ii)** whether all necessary or appropriate parties are included in the arbitration;

**iii)** whether a party will seek a more detailed statement of claims, counterclaims or defenses;

**iv)** whether there are any anticipated amendments to the parties' claims, counterclaims, or defenses;

**v)** which

    **a)** arbitration rules;

    **b)** procedural law; and

    **c)** substantive law govern the arbitration;

**vi)** issues related to cybersecurity, privacy and data protection to provide for an appropriate level of security and compliance in connection with the proceeding;

**vii)** whether there are any threshold or dispositive issues that can efficiently be decided without considering the entire case, including without limitation,

    **a)** any preconditions that must be satisfied before proceeding with the arbitration;

    **b)** whether any claim or counterclaim falls outside the arbitrator's jurisdiction or is otherwise not arbitrable;

**A-84**

    **c)**  consolidation of the claims or counterclaims with another arbitration; or

    **d)**  bifurcation of the proceeding.

**viii)**  whether the parties will exchange documents, including electronically stored documents, on which they intend to rely in the arbitration, and/or make written requests for production of documents within defined parameters;

**ix)**  whether to establish any additional procedures to obtain information that is relevant and material to the outcome of disputed issues;

**x)**  how costs of any searches for requested information or documents that would result in substantial costs should be borne;

**xi)**  whether any measures are required to protect confidential information;

**xii)**  Whether the parties shall disclose:

    **a)**  whether any non-party (such as a third-party funder or an insurer) has undertaken to pay or to contribute to the cost of a party's participation in the arbitration, and if so, to identify the person or entity concerned and to describe the nature of the undertaking; and

    **b)**  whether any non-party (such as a funder, insurer, parent company, or ultimate beneficial owner) has an economic interest in the outcome of the arbitration, and if so, to identify the person or entity concerned and to describe the nature of the interest;

**xiii)**  whether the parties intend to present evidence from expert witnesses, and if so, whether to establish a schedule for the parties to identify their experts and exchange expert reports;

**xiv)**  whether, according to a schedule set by the arbitrator, the parties will:

    **a)**  identify all witnesses, the subject matter of their anticipated testimonies, exchange written witness statements, and determine whether written witness statements will replace direct testimony at the hearing;

    **b)**  exchange and pre-mark documents that each party intends to submit; and

    **c)**  exchange pre-hearing submissions, including exhibits;

**xv)**  the date, time and place of the arbitration hearing;

    **a)**  whether, at the arbitration hearing,

    **b)**  testimony may be presented in person, in writing, by videoconference, via the internet, telephonically, or by other reasonable means;

**xvi)**  there will be a stenographic transcript or other record of the proceeding and, if so, who will make arrangements to provide it;

**xvii)**  whether any procedure needs to be established for the issuance of subpoenas;

**xviii)**  the identification of any ongoing, related litigation or arbitration;

**xix)**  whether post-hearing submissions will be filed;

xx)    the form of the arbitration award; and

xxi)    any other matter the arbitrator considers appropriate or a party wishes to raise.

(b) The arbitrator shall issue a written order memorializing decisions made and agreements reached during or following the preliminary hearing.

# Expedited Procedures

## E-1. Limitation on Extensions

(a) Except in extraordinary circumstances, the AAA or the arbitrator may grant a party no more than one seven-day extension of time to respond to the Demand for Arbitration or counterclaim as provided in Rule R-5.

(b) Any other extension requests may be granted only after consideration of Procedure E-7.

## E-2. Changes of Claim or Counterclaim

A claim or counterclaim may be increased in amount, or a new or different claim or counterclaim added, any time prior to the appointment of the arbitrator. However, after the arbitrator is appointed, no new or different claim or counterclaim may be submitted except with the arbitrator's consent. If an increased claim or counterclaim exceeds $100,000, the case will be administered under the regular Commercial Arbitration Rules unless all parties and the arbitrator agree that the case may continue to be administered under the Expedited Procedures.

## E-3. Serving of Notice

In addition to notice provided by Rule R-44, the parties shall also accept notice by telephone. Telephonic notices by the AAA shall subsequently be confirmed in writing to the parties. Should there be a failure to confirm in writing any such oral notice, the proceeding shall nevertheless be valid if notice has, in fact, been given by telephone.

## E-4. Appointment and Qualifications of Arbitrator

(a) The AAA shall simultaneously submit to each party an identical list of five proposed arbitrators drawn from its National Roster from which one arbitrator shall be appointed.

(b) The parties are encouraged to agree to an arbitrator from this list and to advise the AAA of their agreement. If the parties are unable to agree upon an arbitrator, each party may strike two names from the list and return it to the AAA within seven days from the date of the AAA's mailing to the parties. If for any reason the appointment of an arbitrator cannot be made from the list, the AAA may make the appointment from other members of the panel without the submission of additional lists.

(c) The parties will be given notice by the AAA of the appointment of the arbitrator, who shall be subject to disqualification for the reasons specified in Rule R-19.

**A-87**

The parties shall notify the AAA within seven calendar days of any objection to the arbitrator appointed. Any such objection shall be for cause and shall be confirmed in writing to the AAA with a copy to the other party or parties.

## E-5. Discovery, Motions, and Conduct of Proceedings

(a) At least two business days prior to the hearing, the parties shall exchange copies of all exhibits they intend to submit at the hearing. The arbitrator shall resolve disputes concerning the exchange of exhibits.

(b) No other discovery shall be permitted except as allowed by the arbitrator for good cause shown. If the arbitrator allows additional discovery, the AAA, in consultation with the arbitrator, may remove the case from the Expedited Procedures.

(c) There shall be no motions except as allowed by the arbitrator for good cause shown.

## E-6. Proceedings on Documents and Procedures for the Resolution of Disputes Through Document Submission

Where no party's claim exceeds $25,000, exclusive of interest, attorneys' fees and arbitration costs, and other cases in which the parties agree, the dispute shall be resolved by submission of documents, unless any party requests an oral hearing, or the arbitrator determines that an oral hearing is necessary. Where cases are resolved by submission of documents, the following procedures may be utilized at the agreement of the parties or the discretion of the arbitrator:

(a) Within 14 calendar days of confirmation of the arbitrator's appointment, the arbitrator may convene a preliminary management hearing, via conference call, video conference, or internet, to establish a fair and equitable procedure for the submission of documents, and, if the arbitrator deems appropriate, a schedule for one or more telephonic or electronic conferences.

(b) The arbitrator has the discretion to remove the case from the documents-only process if the arbitrator determines that an in-person hearing is necessary.

(c) If the parties agree to in-person hearings after a previous agreement to proceed under this Procedure, the arbitrator shall conduct such hearings. If a party seeks to have in-person hearings after agreeing to this Procedure, but there is not agreement among the parties to proceed with in-person hearings, the arbitrator shall resolve the issue after the parties have been given the opportunity to provide their respective positions on the issue.

(d) The arbitrator shall establish the date for either written submissions or a final telephonic or electronic conference. Such date shall operate to close the hearing and the time for the rendering of the award shall commence.

(e) Unless the parties have agreed to a form of award other than that set forth in Rule R-48, when the parties have agreed to resolve their dispute by this Procedure, the

arbitrator shall render the award within 14 calendar days from the date the hearing is closed.

**(f)** If the parties agree to a form of award other than that described in Rule R-48, the arbitrator shall have 30 calendar days from the date the hearing is declared closed in which to render the award.

**(g)** The award is subject to all other provisions of the regular Commercial Arbitration Rules which pertain to awards.

## E-7. Date, Time, Place, and Method of Hearing

In cases in which a hearing is to be held, the arbitrator shall set the date, time, place, and method of the hearing, to be scheduled to take place no more than 60 days after the preliminary hearing or as otherwise mutually agreed to between the parties and the arbitrator. The AAA will notify the parties in advance of the hearing date.

## E-8. The Hearing

**(a)** Absent good cause shown, the hearing shall not exceed one day. Each party shall have equal opportunity to submit its proofs and complete its case. The arbitrator shall determine the order of the hearing, and may require further submission of documents within two business days after the hearing.

**(b)** For good cause shown, the arbitrator may schedule one additional day of hearings to be completed within seven business days after the initial day of hearing or as soon as practicable as determined by the arbitrator. In cases where the hearing is scheduled to exceed one day, the AAA, in consultation with the arbitrator, may remove the case from the Expedited Procedures.

**(c)** Generally, there will be no stenographic record. Any party desiring a transcribed record of the hearing may arrange for one pursuant to the provisions of Rule R-29.

## E-9. Time of Award

Unless otherwise agreed by the parties and arbitrator, the award shall be rendered not later than 14 calendar days from the date of the closing of the hearing or, if oral hearings have been waived, from the due date established for the receipt of the parties' final statements and proofs.

## E-10. Arbitrator's Compensation

**(a)** Arbitrators will receive compensation at a rate to be suggested by the AAA regional office.

**(b)** For cases that are removed from the Expedited Procedures after the preliminary hearing is held, the arbitrator shall be compensated pursuant to Rule R-57.

**A-89**

## Procedures for Large, Complex Commercial Disputes

### L-1. Administrative Conference

Prior to the dissemination of a list of potential arbitrators, the AAA may, unless the parties agree otherwise, conduct an administrative conference with the parties and/or their attorneys or other representatives by conference call or video conference. The conference will take place as soon as practicable after the commencement of the arbitration. In the event the parties are unable to agree on a mutually acceptable time for the conference, the AAA may contact the parties individually to discuss the issues contemplated herein. Such administrative conference shall be conducted for the following purposes and for such additional purposes as the parties or the AAA may deem appropriate:

(a) to obtain additional information about the nature and magnitude of the dispute and the anticipated length of hearing and scheduling;

(b) to discuss the views of the parties about the technical and other qualifications of the arbitrators;

(c) to obtain conflicts statements from the parties; and

(d) to consider, with the parties, whether mediation or other non-adjudicative methods of dispute resolution might be appropriate.

### L-2. Arbitrators

(a) Large, complex commercial cases shall be heard and determined by either one or three arbitrators, as may be agreed upon by the parties. With the exception in paragraph (b) below, if the parties do not agree upon the number of arbitrators and a claim or counterclaim involves at least $3,000,000 then three arbitrators shall hear and determine the case; otherwise one arbitrator shall hear and determine the case.

(b) In cases involving the financial hardship of a party or other circumstance, the AAA at its discretion may require that only one arbitrator hear and determine the case, regardless of the amount of the claim and counterclaim.

(c) The AAA shall appoint the arbitrator as agreed by the parties. If they are unable to agree on a method of appointment, the AAA shall appoint arbitrators from the Large, Complex Commercial Case Panel, in the manner provided in the regular Commercial Arbitration Rules. Absent agreement of the parties, the arbitrator shall not have served as the mediator in the mediation phase of the instant proceeding.

**A-90**

### L-3. Management of Proceedings

**(a)** The arbitrator shall take such steps as deemed necessary or desirable to avoid delay and to achieve a fair, speedy and cost-effective resolution of a Large, Complex Commercial Dispute.

**(b)** As promptly as practicable after the selection of the arbitrator(s), a preliminary hearing shall be scheduled in accordance with Procedures P-1 and P-2 of these rules.

**(c)** The parties shall exchange copies of all exhibits they intend to submit at the hearing at least 10 calendar days prior to the hearing unless the arbitrator determines otherwise.

**(d)** The parties and the arbitrator shall address issues pertaining to the pre-hearing exchange and production of information in accordance with Rule R-23 of the AAA Commercial Rules, and the arbitrator's determinations on such issues shall be included within a scheduling order.

**(e)** The arbitrator, or any single member of the panel, shall be authorized to resolve any disputes concerning the pre-hearing exchange and production of documents and information by any reasonable means within their discretion, including, without limitation, the issuance of orders set forth in Rules R-23 and R-24 of the AAA Commercial Rules.

**(f)** In exceptional cases, at the discretion of the arbitrator, upon good cause shown and consistent with the expedited nature of arbitration, the arbitrator may order depositions to obtain the testimony of a person who may possess information determined by the arbitrator to be relevant and material to the outcome of the case. The arbitrator may allocate the cost of taking such a deposition.

**(g)** Generally, hearings will be scheduled on consecutive days or in blocks of consecutive days in order to maximize efficiency and minimize costs.

## Administrative Fee Schedules (Standard and Flexible Fees)

FOR THE CURRENT ADMINISTRATIVE FEE SCHEDULE, PLEASE VISIT *www.adr.org/feeschedule*.

## Commercial Mediation Procedures

### M-1. Agreement of Parties

Whenever, by stipulation or in their contract, the parties have provided for mediation or conciliation of existing or future disputes under the auspices of the American Arbitration Association or under these procedures, the parties and their representatives, unless agreed otherwise in writing, shall be deemed to have made these procedural guidelines, as amended and in effect as of the date of filing of a request for mediation, a part of their agreement and designate the AAA as the administrator of their mediation.

The parties by mutual agreement may vary any part of these procedures including, but not limited to, agreeing to conduct the mediation via telephone or other electronic or technical means.

### M-2. Initiation of Mediation

Any party or parties to a dispute may initiate mediation under the AAA's auspices by making a request for mediation to any of the AAA's regional offices or case management centers via telephone, email, regular mail or fax. Requests for mediation may also be filed online via AAA WebFile at **www.adr.org.**

The party initiating the mediation shall simultaneously notify the other party or parties of the request. The initiating party shall provide the following information to the AAA and the other party or parties as applicable:

(i) A copy of the mediation provision of the parties' contract or the parties' stipulation to mediate.

(ii) The names, regular mail addresses, email addresses, and telephone numbers of all parties to the dispute and representatives, if any, in the mediation.

(iii) A brief statement of the nature of the dispute and the relief requested.

(iv) Any specific qualifications the mediator should possess.

### M-3. Representation

Subject to any applicable law, any party may be represented by persons of the party's choice. The names and addresses of such persons shall be communicated in writing to all parties and to the AAA.

## M-4. Appointment of the Mediator

If the parties have not agreed to the appointment of a mediator and have not provided any other method of appointment, the mediator shall be appointed in the following manner:

(i) Upon receipt of a request for mediation, the AAA will send to each party a list of mediators from the AAA's Panel of Mediators. The parties are encouraged to agree to a mediator from the submitted list and to advise the AAA of their agreement.

(ii) If the parties are unable to agree upon a mediator, each party shall strike unacceptable names from the list, number the remaining names in order of preference, and return the list to the AAA. If a party does not return the list within the time specified, all mediators on the list shall be deemed acceptable. From among the mediators who have been mutually approved by the parties, and in accordance with the designated order of mutual preference, the AAA shall invite a mediator to serve.

(iii) If the parties fail to agree on any of the mediators listed, or if acceptable mediators are unable to serve, or if for any other reason the appointment cannot be made from the submitted list, the AAA shall have the authority to make the appointment from among other members of the Panel of Mediators without the submission of additional lists.

## M-5. Mediator's Impartiality and Duty to Disclose

AAA mediators are required to abide by the *Model Standards of Conduct for Mediators* in effect at the time a mediator is appointed to a case. Where there is a conflict between the *Model Standards* and any provision of these Mediation Procedures, these Mediation Procedures shall govern. The Standards require mediators to (i) decline a mediation if the mediator cannot conduct it in an impartial manner, and (ii) disclose, as soon as practicable, all actual and potential conflicts of interest that are reasonably known to the mediator and could reasonably be seen as raising a question about the mediator's impartiality.

Prior to accepting an appointment, AAA mediators are required to make a reasonable inquiry to determine whether there are any facts that a reasonable individual would consider likely to create a potential or actual conflict of interest for the mediator. AAA mediators are required to disclose any circumstance likely to create a presumption of bias or prevent a resolution of the parties' dispute within the time-frame desired by the parties. Upon receipt of such disclosures, the AAA shall immediately communicate the disclosures to the parties for their comments.

The parties may, upon receiving disclosure of actual or potential conflicts of interest of the mediator, waive such conflicts and proceed with the mediation. In the event that a party disagrees as to whether the mediator shall serve, or in the event that the mediator's conflict of interest might reasonably be viewed as undermining the integrity of the mediation, the mediator shall be replaced.

## M-6. Vacancies

If any mediator shall become unwilling or unable to serve, the AAA will appoint another mediator, unless the parties agree otherwise, in accordance with section M-4.

## M-7. Duties and Responsibilities of the Mediator

(i) The mediator shall conduct the mediation based on the principle of party self-determination. Self-determination is the act of coming to a voluntary, uncoerced decision in which each party makes free and informed choices as to process and outcome.

(ii) The mediator is authorized to conduct separate or *ex parte* meetings and other communications with the parties and/or their representatives, before, during, and after any scheduled mediation conference. Such communications may be conducted via telephone, in writing, via email, online, in person or otherwise.

(iii) The parties are encouraged to exchange all documents pertinent to the relief requested. The mediator may request the exchange of memoranda on issues, including the underlying interests and the history of the parties' negotiations. Information that a party wishes to keep confidential may be sent to the mediator, as necessary, in a separate communication with the mediator.

(iv) The mediator does not have the authority to impose a settlement on the parties but will attempt to help them reach a satisfactory resolution of their dispute. Subject to the discretion of the mediator, the mediator may make oral or written recommendations for settlement to a party privately or, if the parties agree, to all parties jointly.

(v) In the event a complete settlement of all or some issues in dispute is not achieved within the scheduled mediation session(s), the mediator may continue to communicate with the parties, for a period of time, in an ongoing effort to facilitate a complete settlement.

(vi) The mediator is not a legal representative of any party and has no fiduciary duty to any party.

**A-94**

## M-8. Responsibilities of the Parties

The parties shall ensure that appropriate representatives of each party, having authority to consummate a settlement, attend the mediation conference.

Prior to and during the scheduled mediation conference session(s) the parties and their representatives shall, as appropriate to each party's circumstances, exercise their best efforts to prepare for and engage in a meaningful and productive mediation.

## M-9. Privacy

Mediation sessions and related mediation communications are private proceedings. The parties and their representatives may attend mediation sessions. Other persons may attend only with the permission of the parties and with the consent of the mediator.

## M-10. Confidentiality

Subject to applicable law or the parties' agreement, confidential information disclosed to a mediator by the parties or by other participants (witnesses) in the course of the mediation shall not be divulged by the mediator. The mediator shall maintain the confidentiality of all information obtained in the mediation, and all records, reports, or other documents received by a mediator while serving in that capacity shall be confidential.

The mediator shall not be compelled to divulge such records or to testify in regard to the mediation in any adversary proceeding or judicial forum.

The parties shall maintain the confidentiality of the mediation and shall not rely on, or introduce as evidence in any arbitral, judicial, or other proceeding the following, unless agreed to by the parties or required by applicable law:

(i) Views expressed or suggestions made by a party or other participant with respect to a possible settlement of the dispute;

(ii) Admissions made by a party or other participant in the course of the mediation proceedings;

(iii) Proposals made or views expressed by the mediator; or

(iv) The fact that a party had or had not indicated willingness to accept a proposal for settlement made by the mediator.

## M-11. No Stenographic Record

There shall be no stenographic record of the mediation process.

## M-12. Termination of Mediation

The mediation shall be terminated:

- **(i)** By the execution of a settlement agreement by the parties; or
- **(ii)** By a written or verbal declaration of the mediator to the effect that further efforts at mediation would not contribute to a resolution of the parties' dispute; or
- **(iii)** By a written or verbal declaration of all parties to the effect that the mediation proceedings are terminated; or
- **(iv)** When there has been no communication between the mediator and any party or party's representative for 21 days following the conclusion of the mediation conference.

## M-13. Exclusion of Liability

Neither the AAA nor any mediator is a necessary party in judicial proceedings relating to the mediation. Neither the AAA nor any mediator shall be liable to any party for any error, act or omission in connection with any mediation conducted under these procedures.

## M-14. Interpretation and Application of Procedures

The mediator shall interpret and apply these procedures insofar as they relate to the mediator's duties and responsibilities. All other procedures shall be interpreted and applied by the AAA.

## M-15. Deposits

Unless otherwise directed by the mediator, the AAA will require the parties to deposit in advance of the mediation conference such sums of money as it, in consultation with the mediator, deems necessary to cover the costs and expenses of the mediation and shall render an accounting to the parties and return any unexpended balance at the conclusion of the mediation.

### M-16. Expenses

All expenses of the mediation, including required traveling and other expenses or charges of the mediator, shall be borne equally by the parties unless they agree otherwise. The expenses of participants for either side shall be paid by the party requesting the attendance of such participants.

### M-17. Cost of the Mediation

FOR THE CURRENT ADMINISTRATIVE FEE SCHEDULE, PLEASE VISIT ***www.adr.org/feeschedule***.

*© 2022 American Arbitration Association, Inc. All rights reserved. These rules are the copyrighted property of the American Arbitration Association (AAA) and are intended to be used in conjunction with the AAA's administrative services. Any unauthorized use or modification of these rules may violate copyright laws and other applicable laws. Please contact 800.778.7879 or websitemail@adr.org for additional information.*

**A-98**

## Regional Vice Presidents

**States: Delaware, District of Columbia, Maryland, New Jersey, Pennsylvania, Virginia**
P. Jean Baker, Esq.
Vice President
Phone: 202.223.7093
Email: BakerJ@adr.org

**States: Oklahoma, Texas**
Andrew Barton
Vice President
Phone: 210.998.5750
Email: BartonA@adr.org

**States: Alabama, Georgia**
John M. Bishop
Vice President
Phone: 404.320.5150
Email: BishopJ@adr.org

**States: Arkansas, Illinois, Iowa, Michigan, Minnesota, Missouri, North Dakota, South Dakota, Wisconsin**
Svetlana Gitman, Esq.
Vice President
Phone: 773.820.7801
Email: GitmanS@adr.org

**States: Alaska, California, Oregon, Washington**
Aaron Gothelf, Esq.
Vice President
Phone: 415.671.4053
Email: GothelfA@adr.org

**States: City of Houston, Louisiana, Mississippi**
Ingeuneal C. Gray, Esq.
Vice President
Phone: 832.308.7893
Email: GrayI@adr.org

**States: Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont**
Karen Jalkut
Vice President
Phone: 617.695.6062
Email: JalkutK@adr.org

**States: Indiana, Kentucky, North Carolina, Ohio, South Carolina, Tennessee, West Virginia**
Michelle M. Skipper
Vice President
Phone: 704.643.8605
Email: SkipperM@adr.org

**States: Florida**
Rebecca Storrow, Ph.D.
Vice President
Phone: 954.372.4341
Email: StorrowR@adr.org

**States: Arizona, Colorado, Kansas, Hawaii, Idaho, Montana, Nebraska, Nevada, New Mexico, Utah, Wyoming**
Lance K. Tanaka
Vice President
Phone: 303.831.0824
Email: TanakaL@adr.org

**States: New York**
Jeffrey T. Zaino, Esq.
Vice President
Phone: 212.484.3224
Email: ZainoJ@adr.org

---

## Case Management

John M. Bishop
Vice President
Phone: 404.320.5150
Email: BishopJ@adr.org
**Administers cases in: AL, DC, FL, GA, IN, KY, MD, NC, OH, SC, TN, VA**

Sandra Marshall
Vice President
Phone: 559.490.1906
Email: MarshallS@adr.org
**Administers cases in: AK, AZ, CA, CO, HI, ID, MT, NV, NM, OR, UT, WA, WY**

Rod Toben
Vice President
Phone: 972.774.6923
Email: TobenR@adr.org
**Administers Cases in: AR, IL, IA, KS, LA, MN, MS, MO, NE, ND, OK, SD, TX, WI**

Yvonne Baglini
Assistant Vice President
Phone: 866.293.4053
Email: BagliniY@adr.org
**Administers cases in: CT, DE, MA, ME, MI, NH, NJ, NY, PA, RI, VT, WV**



AMERICAN ARBITRATION ASSOCIATION®

<div align="center">
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
</div>

| | |
|---|---|
| BENZOR SHEM VIDAL, | Civ. Action No.: 22-cv-5535 (NM)(MMH) |
| *Plaintiff*, | |
| v. | **NOTICE OF MOTION FOR PRELIMINARY INJUNCTION** |
| ADVANCED CARE STAFFING, LLC, | |
| *Defendant*. | |

PLEASE TAKE NOTICE that upon the January 20, 2023 Declaration of David H. Seligman and the exhibits attached thereto, the accompanying Memorandum of Law, and all other pleadings and filings in this action, Plaintiff Benzor Shem Vidal, by and through his undersigned counsel, hereby moves this Court, before the Honorable Nina Morrison, United States District Judge for the Eastern District of New York, at the United States Courthouse for the Eastern District of New York, 225 Cadman Plaza East, Brooklyn, NY 11201, at a date and time to be determined by the Court, for an order preliminarily enjoining further proceedings in the arbitration brought by Defendant against Plaintiff before the American Arbitration Association, captioned *ACS, LLC v. Benzor Vidal*, AAA Case Number: 01-22-0002-9008, until this Court can determine whether the arbitration provision in this case contains a clear and unmistakable delegation clause, and whether that clause is valid and enforceable.

Dated:  January 20, 2023

<div style="margin-left: 50%;">
/s/
David H. Seligman
**TOWARDS JUSTICE**
David H. Seligman (*pro hac vice*)
Juno Turner
Valerie Collins (*pro hac vice*)
P.O. Box 371689, PMB 44465
</div>

<div align="center">
A-100
</div>

Denver, CO 80237-5680
(720) 441-2236
juno@towardsjustice.org
david@towardsjustice.org
valerie@towardsjustice.org

**KAKALEC LAW PLLC**

Hugh Baran (he/him)
Patricia Kakalec (she/her)
195 Montague Street, 14th Floor
Brooklyn, NY 11201
(212) 705-8730
Hugh@KakalecLaw.com
Patricia@KakalecLaw.com

**NICHOLS KASTER, PLLP**

Anna P. Prakash, MN Bar No. 0351362
(*pro hac vice*)
4700 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 215-6870
aprakash@nka.com

**NICHOLS KASTER, LLP**

Matthew C. Helland, CA Bar No. 250451
(*pro hac vice*)
235 Montgomery St., Suite 810
San Francisco, CA 94104
Telephone: (415) 277-7235
Facsimile: (415) 277-7238
helland@nka.com

*Attorneys for Plaintiff*

2

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

BENZOR SHEM VIDAL,

     Plaintiff,

     v.

ADVANCED CARE STAFFING, LLC,

     Defendant.

Civ. Action No.: 22-cv-5535 (NM)(MMH)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**ORAL ARGUMENT REQUESTED**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................... ii

INTRODUCTION ............................................................................................ 1

FACTUAL AND PROCEDURAL HISTORY ..................................................... 1

I.      ACS's Business Model ......................................................................... 1
II.     Plaintiff Vidal's Recruitment from the Philippines and ACS'S Contracts ................... 3
III.    Mr. Vidal's Intolerable Working Conditions .......................................... 5
IV.     ACS's Weaponized Arbitration ............................................................ 6

        A. ACS's Arbitration Demand ............................................................ 6
        B. Mr. Vidal's Repeated Pleas to AAA to Pause the Arbitration
           Pending Litigation Due to the Extraordinary Costs of Arbitration .............. 7
        C. The New York Attorney General Urges AAA to Stop the Arbitration .............. 10

ARGUMENT ................................................................................................ 10

I.      The Court Should Preliminarily Enjoin the Arbitration until this Court Rules on the
        Enforceability of the Purported Delegation Clause .................................. 10

        A. This Court Has Authority to Enjoin an Arbitration That is Not Authorized by an
           Enforceable Agreement to Arbitrate ................................................ 11
        B. Mr. Vidal Only Seeks a Preliminary Injunction against the Arbitration Pending
           Judicial Resolution on the Delegation Issue ...................................... 12
        C. Mr. Vidal Is Likely to Succeed on the Merits ..................................... 14

                1. There is No Clear and Unmistakable Delegation Clause ................... 14
                2. Mr. Vidal signed the arbitration requirement, including its delegation provision,
                   under economic duress ............................................................ 16
                3. The delegation provision is illegal and unconscionable ................. 17

                        a. The arbitration provision and delegation clause violate trafficking laws ........ 18
                        b. The arbitration requirement and delegation provision violate wage and hour
                           laws ........................................................................ 21
                        c. The delegation clause is unconscionable as a matter of New York law .......... 22
                        d. The loser pays term cannot be severed from the arbitration requirement and
                           delegation clause ............................................................ 25

        D. Even if the Court Cannot Resolve Whether Mr. Vidal Is Likely to Succeed on the
        Merits, Mr. Vidal Raises a Serious Question Regarding the Arbitrator's Authority, Which
        Warrants Injunctive Relief ............................................................... 26

        E. Mr. Vidal Will Suffer Irreparable Harm Absent Immediate Relief ............... 27

        F. The Balance of Harms Tips Decidedly in Mr. Vidal's Favor ...................... 28

        G. A Preliminary Injunction Is in the Public Interest .............................. 29

i

II.     The Court Can Enjoin the Arbitration Pursuant to the All Writs Act............................29

CONCLUSION..............................................................................................................................31

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Anthony Int'l, L.P.*,
341 F.3d 256 (3d Cir. 2003)..............................................................................................22, 25

*Allstate Ins. Co. v. Elzanaty*,
929 F. Supp. 2d 199 (E.D.N.Y. 2013) ............................................................................... 12

*Andersen v. InePros Federal, Inc.*,
240 F.Supp.3d 143 (D.D.C. 2017) ..................................................................................... 18

*Arriaga v. Florida Pacific Farms, L.L.C.*,
305 F.3d 1228 (11th Cir. 2002) .......................................................................................... 22

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
475 U.S. 643 (1986)............................................................................................................. 14

*Austin Instrument, Inc. v. Loral Corp.*,
29 N.Y.2d 124 (1971) .......................................................................................................... 16

*Castedo v. Permanent Mission of Thailand to the U.N.*,
 114 N.Y.S.3d 70 (2019)...................................................................................................... 15

*Chen-Oster v. Goldman, Sachs & Co.*,
785 F. Supp. 2d 394 (S.D.N.Y. 2011).........................................................................12, 14

*Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*,
598 F.3d 30 (2d Cir. 2010)
aff'd, 598 F.3d 30 (2d Cir. 2010)................................................................................11-12, 30

*Citigroup, Inc. v. Abu Dhabi Inv. Auth.*,
776 F.3d 126 (2d Cir. 2015)............................................................................................... 30

*DDK Hotels, LLC v. Williams-Sonoma, Inc.*,
6 F.4th 308 (2d Cir. 2021) .................................................................................................. 14

*Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*,
191 F.3d 198 (2d Cir. 1999)................................................................................................ 23

*Fedor v. United Healthcare, Inc.*,
976 F.3d 1100 (10th Cir. 2020) .......................................................................................... 16

*First Options of Chi., Inc. v. Kaplan*,
514 U.S. 938 (1995)............................................................................................................. 15

*Gingras v. Think Fin., Inc.*,
922 F.3d 112 (2d Cir. 2019)..........................................................................................11, 13

*Gov't Emps. Ins. Co. v. Wellmart RX, Inc.*,
No. 19-cv-04414 (KAM), 2020 WL 249020 (E.D.N.Y. Jan. 16, 2020)................................ 26

iii

**A-105**

*Hayes v. Delbert Services Corp.*,
811 F.3d 666 (4th Cir. 2016) ............................................... 26

*He v. Home on 8th Corp.*,
No. 09 CV 5630, 2014 WL 3974670 (S.D.N.Y. Aug. 13, 2014) ............................................. 21

*In re Am. Exp. Fin. Advisors Secs. Litig.*,
672 F.3d 113 (2d Cir. 2011) ................................................ 12

*In re Am. Honda Motor Co., Inc., Dealerships Rels. Litig.*,
315 F.3d 417 (4th Cir. 2003) ............................................... 30

*Int'l Dairy Foods Ass'n v. Amestoy*,
 92 F.3d 67 (2d Cir. 1996) .................................................. 28

*Kane v. De Blasio*,
19 F.4th 152 (2d Cir. 2021) ................................................ 14

*Lim v. TForce Logistics, LLC*,
8 F.4th 992 (9th Cir. 2021) ............................................ 18, 26

*Loc. 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. N.Y. Shipping Ass'n, Inc.*,
965 F.2d 1224 (2d Cir. 1992) .............................................. 30

*Lowden v. T-Mobile, USA, Inc.*,
No. 05 Civ. 1482, 2006 WL 1009279 (W.D. Wash. Apr. 13, 2006) ...................................... 26

*MacDonald v. CashCall, Inc.*,
883 F.3d 220 (3d Cir. 2018) ............................................... 25

*Magtoles v. United Staffing Registry, Inc.*,
No. 21 Civ. 1850, 2021 WL 6197063 (E.D.N.Y. Dec. 30, 2021) ......................................... 20

*Maryland Casualty Co. v. Realty Advisory Bd. on Labor Relations*,
107 F.3d 979 (2d Cir. 1997) ............................................... 28

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017) ................................................ 16

*Morgan v. Sundance, Inc.*,
142 S. Ct. 1708 (2022) .................................................... 15

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983) ....................................................... 11-12

*Mount Ararat Cemetery v. Cemetery Workers & Greens Attendants Union*,
975 F. Supp. 445 (E.D.N.Y. 1997) .......................................... 27

*New York v. Nuclear Regulatory Comm'n*,
550 F.2d 745 (2d Cir. 1977) ............................................... 14

*Paguirigan v. Prompt Nursing Emp't Agency*,
286 F. Supp 3d 430 (E.D.N.Y. 2017) ..................................... 2-3, 18

iv

**A-106**

*Port Drivers Fed'n 18, Inc. v. All Saints Express*,
757 F. Supp. 2d 443 (D.N.J. 2010) ...................................................................27-28

*Ragone v. Atl. Video at Manhattan Ctr.*,
595 F.3d 115 (2d Cir. 2010)................................................................................... 22

*Rent-A-Center, W., Inc. v. Jackson*,
560 U.S. 63 (2010)................................................................................................. 12

 *Santich v. VCG Holding Corp.*,
2018 WL 3968879 (D. Colo. Aug. 20, 2018) ........................................................ 22

*Schnabel v. Trilegiant Corp.*,
697 F.3d 110 (2d Cir. 2012)..............................................................................11-12

*Smith v. AHS Okla. Heart, L.L.C.*,
No. 11 Civ. 691, 2012 WL 3156877 (N.D. Okla. Aug. 3, 2012)........................... 22

*Starke v. SquareTrade, Inc.*,
913 F.3d 279 (2d Cir. 2019)................................................................................... 11

*State v. Wolowitz*,
96 A.D.2d 47 (N.Y. App. Div. 1983) ..................................................................... 23

*Tellium, Inc. v. Corning Inc.*,
No. 03 Civ. 8487, 2004 WL 307238 (S.D.N.Y. Feb. 13, 2004) ............................. 27

*Trump v. Vance*,
941 F.3d 631 (2d Cir. 2019)................................................................................... 11

*Tompkins v. 23andMe, Inc.*,
840 F.3d 1016 (9th Cir. 2016) ......................................................................................

*United States v. Int'l Bhd. of Teamsters, Chauffeurs,*
*Warehousemen & Helpers of Am., AFL-CIO*,
907 F.2d 277, 281 (2d Cir. 1990).......................................................................29-30

*Valle v. ATM Nat., LLC*,
No. 14-CV-7993 KBF, 2015 WL 413449 (S.D.N.Y. Jan. 30, 2015)...................... 24

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008).................................................................................................... 11

**RULES**

Rule 65(a)...........................................................................................................13-14

**STATUTES AND REGULATIONS**

29 C.F.R. § 53.13(b) .............................................................................................. 21

9 U.S.C. § 10........................................................................................................... 28

18 U.S.C. § 1589(a)(2)............................................................................................ 19

18 U.S.C. § 1589(c)(1) .................................................................................................. 18, 20

18 U.S.C. § 1594(a) ............................................................................................................ 20

29 U.S.C. § 201 .................................................................................................................. 21

29 U.S.C. § 216(b) ............................................................................................................. 22

**OTHER**

N.Y. Lab. Law § 198-b ...................................................................................................... 22

Wright & Miller,
11A Fed. Prac. & Proc. Civ. § 2947 (3d ed.) ............................................................... 13-14, 29

AAA, Employment Fee Schedule,
https://www.adr.org/sites/default/files/Employment_Fee_Schedule.pdf ................................. 21

**INTRODUCTION**

Plaintiff Benzor Vidal seeks preliminary relief to pause an arbitration brought against him by Advanced Care Staffing ("ACS") to punish him for leaving his job. ACS has weaponized the arbitration requirement in its employment contract, which requires Mr. Vidal to pay all ACS's alleged "lost profits," arbitration costs, and attorney's fees if the company succeeds in arbitration.

The New York State Attorney General's office has taken action, urging that the arbitration proceedings be paused because ACS's employment contract implicates forced labor concerns. Mr. Vidal has objected strenuously to the arbitrator's jurisdiction, raising threshold challenges about the circumstances under which he signed the contract, as well as challenges about the enforceability of the contract. These are questions that have not been delegated to the arbitrator and which are for this Court to resolve in the course of this declaratory judgment action. Nonetheless, the American Arbitration Association and the arbitrator have declined to even pause the arbitration, and ACS has refused to agree to a pause in the proceeding through the pendency of this action.

Accordingly, Mr. Vidal seeks a narrow injunction to stay the ongoing arbitration proceedings pending judicial resolution of his threshold challenges. Such relief would protect Plaintiff from the irreparable harm of being subject to the unauthorized acts of the arbitrator, would not harm Defendant, and would broadly serve the public interest by putting a halt to a proceeding that is perpetuating forced labor in the Court's backyard.

**FACTUAL AND PROCEDURAL HISTORY**

**I.      ACS's Business Model**

ACS is a healthcare staffing company based in New York that recruits trained nurses from the Philippines and sends them to work for healthcare facilities, including nursing homes around New York City. ECF No. 1 ("Compl.") ¶¶ 9, 20. ACS profits off the difference

1

between the payments it receives from its clients and the wages it pays its nurses. *Id.* ¶ 21.

The wages ACS pays nurses are substantially less than market wages for similar nurses. Compl. ¶ 53. ACS requires nurses like Mr. Vidal to work with challenging staffing ratios under difficult conditions. *Id.* ¶¶ 47-51; Ex. 1 (Vidal Decl.) ¶¶ 27-32.[1] In theory, nurses like Mr. Vidal would pressure ACS to pay decent wages and treat nurses fairly by seeking work with other employers that would pay more and treat them better. And because ACS's nurses are recruited on Legal Permanent Resident visas, not guest worker visas that bind an employee to their employer, *see id.* ¶ 24, as an immigration law matter, these nurses should be able to leave ACS if they were dissatisfied with their wages or treatment.

So that it can continue to subject them to low wages and deplorable staffing ratios without fear that they will seek out work elsewhere, however, ACS's contracts with immigrant nurses include harsh and abusive financial penalties if nurses leave their jobs before the end of a purported commitment period. *See, e.g.*, Compl. ¶¶ 32-37. Exacerbating the coercive force of these penalties, the contract includes a forced arbitration provision, which ACS uses to threaten nurses with being respondents in arbitrations and facing ACS's legal bills and thousands of dollars in arbitration costs in the event they decide to leave their jobs. *See, e.g.*, Compl. ¶¶ 54-58, 63-64; Ex. 1 (Vidal Decl.) ¶¶34-41.

Similar business models have already been the subject of public enforcement and litigation in New York state. At least one court in the Eastern District, as well as the New York Attorney General's Office, have concluded that luring nurses into the United States and then coercing them to continue working under threat of financial penalties *less* substantial than those at issue in this case violates federal and state anti-trafficking laws. *See Paguirigan v. Prompt Nursing Emp't Agency*, 286 F. Supp 3d 430, 535 (E.D.N.Y. 2017) (granting

---

[1] All exhibits are attached to the Declaration of David H. Seligman in Support of Plaintiff's Motion for Preliminary Injunction.

summary judgment to plaintiff and holding that a $25,000 contract termination fee was an unenforceable penalty designed to compel performance, in violation of the TVPA); *see also* Assurance of Discontinuance, *In re: Albany Med Health System f/k/a Albany Medical Center* (settlement between N.Y. Attorney General and Albany Med Health System for unlawfully including a $20,000 repayment fee in contracts for nurses recruited from foreign nations).[2]

## II.    Plaintiff Vidal's Recruitment from the Philippines and ACS's Contracts

Benzor Vidal grew up in the Philippines. When he was a child, his parents frequently had to borrow money to feed their family. Ex. 1 (Vidal Decl.) ¶ 1. To this day, Mr. Vidal's father cannot work because he needs to provide constant care to Mr. Vidal's autistic and nonverbal brother. Compl. ¶ 23. It has always fallen on Mr. Vidal to support his family, but it was hard for Mr. Vidal to make enough money in the Philippines. *Id.*; Ex. 1 (Vidal Decl.) ¶ 9.

Hoping to find more lucrative opportunities in the United States, Mr. Vidal contacted ACS in 2019. Compl. ¶ 24; Ex. 1 (Vidal Decl.) ¶¶ 11-12. ACS offered to help Mr. Vidal obtain an EB-3 legal permanent resident visa to work in the United States and required Mr. Vidal to sign a nonnegotiable form contract in May 2019 ("2019 Contract"). Compl. ¶ 25; Ex. 1 (Vidal Decl.) ¶¶12-13; Ex. 2 (2019 Contract). The 2019 Contract included pages of fine print legalese with several unfair terms, including a so-called "promissory note" that required Mr. Vidal to work for ACS for three years and, if he left before his term ended, pay a $20,000 fee in addition to all costs and expenses. Compl. ¶ 26; *see also* Ex. 2 (2019 Contract) at 6.

After Mr. Vidal signed the 2019 Contract, it took years to fulfill the administrative requirements for placement, including licensure, English proficiency exams, birth certificates, transcripts, visa screening certificates, and medical examination. Compl. ¶¶ 28-31; Ex. 1 (Vidal Decl.) ¶¶ 14-16. During that time, ACS forbade Mr. Vidal from working any other job

---

[2] *Available at* https://ag.ny.gov/aod/matter-investigation-letitia-james-attorney-general-state-new-york-albany-med-health-system-fka (last visited January 20, 2023).

in the United States. Compl. ¶ 29; Ex. 2 (2019 Contract) at 2. Instead, Mr. Vidal worked at a

London hospital for two years, making barely enough to afford basic living expenses and to

send a little money home to his family. Compl. ¶¶ 29-31; Ex. 1 (Vidal Decl.) ¶ 18.

In 2021, ACS informed Mr. Vidal that his visa had been approved and he should plan

to move to the United States in 2022. Compl. ¶ 32; Ex. 1 (Vidal Decl.) ¶ 20. Mr. Vidal

resigned from his UK job, and ACS then informed him that he had to sign a new contract (the

"2022 Contract") to move to the United States. Compl. ¶ 33; Ex. 1 (Vidal Decl.) ¶ 21. The

2022 Contract superseded the 2019 Contract but was similarly presented on a take-it-or

leave-it basis and contained terms written in legalese Mr. Vidal did not understand. Compl. ¶

35; Ex. 1 (Vidal Decl.) ¶ 21. Although ACS stated that 2022 Contract removed the $20,000

promissory note, it repackaged that penalty by broadening its scope: if Mr. Vidal left his

employment before the contract term ended, the 2022 Contract required him to pay "all

damages and other relief to redress the harm" allegedly resulting from his early departure,

including "lost profits" ACS would have recouped through Mr. Vidal's work for ACS's

clients. Compl. ¶¶ 34, 37-38; Ex. 3 (Jan. 4, 2022 let.); *see also* Ex. 4 (2022 Contract) at 6.

ACS's 2022 Contract also stated that any dispute between Mr. Vidal and the company

had to be resolved in arbitration. Ex. 4 (2022 Contract) at 7 & Sched. B. Forced arbitration

was designed to further coerce Mr. Vidal's labor. It includes a "loser pays" provision, which

entitles the prevailing party in the arbitration to reimbursement of its attorney's fees and costs

and fees charged by the American Arbitration Association ("AAA") and arbitrator. *Id.* at

Sched. B. In short, any arbitration would bury Mr. Vidal in further debt to ACS.

When ACS presented Mr. Vidal with the 2022 Contract, it did not disclaim potential

liability for Mr. Vidal under the 2019 Contract for failing to sign the 2022 Contract. Compl.

¶ 36; *see* Ex. 3 (Jan. 4, 2022 let.). As a result, Mr. Vidal believed that, if he did not sign the

new contract, ACS would attempt to collect the $20,000 promissory note contained in the

4

then-applicable 2019 Contract. Compl. ¶ 36; Ex. 1 (Vidal Decl.) ¶ 25. Mr. Vidal had no way

of paying ACS $20,000. *Id.* With no other viable options, Mr. Vidal signed the 2022 Contract

and came to the United States in early 2022. Compl. ¶¶ 35-36; Ex. 1 (Vidal Decl.) ¶ 26.

## III.    Mr. Vidal's Intolerable Working Conditions

On March 8, 2022, Mr. Vidal began working at ACS's client facility, Downtown

Brooklyn Nursing & Rehabilitation Center, located at 727 Classon Avenue in Crown Heights.

Compl. ¶ 44. But Mr. Vidal's working conditions were nothing like ACS had led him to

believe. Compl. ¶ 45; Ex. 1 (Vidal Decl.) ¶¶ 26-27. Most notably, prior to entering the United

States, ACS told Mr. Vidal he would have a manageable patient load of 20-30 patients.

Compl. ¶ 46; Ex. 1 (Vidal Decl.) ¶ 26. Instead, Mr. Vidal juggled up to forty patients at a

time. Compl ¶ 47; Ex. 1 (Vidal Decl.) ¶ 27. Mr. Vidal often heard his patients moaning in

agony as they waited for him, or anyone else, to care for them. Ex. 1 (Vidal Decl.) ¶¶ 27-29,

32-33; *see also* Compl. ¶ 51. Patients frantically rang their call buttons repeatedly to alert

staff of their medical needs, including with feeding tubes, oxygen lines, and painful bed

sores. Compl ¶ 51; Ex. 1 (Vidal Decl.) ¶ 28. Due to the dangerous staffing practices, Mr.

Vidal feared he would lose the nursing license he had worked so hard for. Compl ¶ 52; Ex. 1

(Vidal Decl.) ¶¶ 32-35. Without it, he feared he would no longer be able to send money to his

family. Ex. 1 (Vidal Decl.) ¶ 33.

After months of exhausting work and persistent fears of losing his license, Mr. Vidal

resigned on June 15, 2022. Compl ¶ 54; Ex. 1 (Vidal Decl.) ¶ 35. Mr. Vidal was terrified to

leave his job. Ex. 1 (Vidal Decl.) ¶ 35. He knew that his contract included harsh penalties for

leaving, and he knew that he did not have the money to pay those penalties, especially if he

wanted to have any money to support his family. *See id.* ¶¶ 37-42. But Mr. Vidal felt that he

had no choice because of how horrible his working conditions were. *Id.* ¶¶ 34-35.

Shortly after he resigned, ACS commenced a campaign of threatening and aggressive

5

communications and demanded that Mr. Vidal return to work. Ex. 1 (Vidal Decl.) ¶¶ 36-37, 40-41; Ex. 5 (June 22, 2022 let.). In a June 2022 letter from its lawyers, ACS claimed it had suffered "significant damages" and threatened it would "seek to be made whole" through arbitration, which would include ACS's "attorney's fees and costs incurred in the arbitration." Ex. 5 (June 22, 2022 let.). ACS also warned Mr. Vidal that he would be responsible for "<u>at least</u> $20,000 [in damages] (not counting attorney's fees and costs that would be incurred in the arbitration)." *Id.* (emphasis original). ACS also told Mr. Vidal that he would be responsible for the cost of recruiting and hiring a replacement nurse, which it estimated would be "over $9,000 <u>per year</u> over the remainder" of his contract. *Id.* (emphasis in original). Finally, ACS stated that Mr. Vidal would also be on the hook for ACS's costs, "including all attorney's fees." *Id.* ACS asked Mr. Vidal to "reconsider" his resignation in response to its threats made under loser pays term in the arbitration requirement. *Id.*

Mr. Vidal did not know how to respond. Compl. ¶ 61. He was terrified by the threatened crippling financial burdens, including ACS's purported damages and fees. *Id.*; Ex. 1 (Vidal Decl.) ¶¶ 41-43. Mr. Vidal feared the ramifications of quitting his job, but felt that his working conditions were too dangerous and presented a genuine risk to his nursing license. Compl. ¶ 62; Ex. 1 (Vidal Decl.) ¶¶ 34-35, 42. If Mr. Vidal lost his license, he would end up even more helpless. Compl. ¶ 62; Ex. 1 (Vidal Decl.) ¶ 64. So, despite the substantial risks, he declined to return to work for ACS. Compl. ¶ 62; Ex. 1 (Vidal Decl.) ¶ 56.

IV.    **ACS's Weaponized Arbitration**

A.    <u>ACS's Arbitration Demand</u>

On July 8, 2022—just weeks after Mr. Vidal left his employment—ACS initiated an arbitration against Mr. Vidal before AAA. Compl. ¶ 63; *see* Ex. 6 (Arb. Demand). In its demand, ACS sought expansive relief, including "all available damages, including, without limitation, [ACS's] [c]osts and lost profits," "reasonable attorney's fees," and the "cost of

6

arbitration." *Id.* ¶ 64; Ex. 6 (Arb. Demand). Mr. Vidal would owe these amounts, apparently, based on the contract's loser pays provision.

 Mr. Vidal knew little about how arbitration worked, though based on ACS's lawyer-drafted threatening letter, he was terrified that arbitration costs and attorney's fees would bury him in more debt, devastating him financially and endangering his family. Ex. 1 (Vidal Decl.) ¶¶ 38-42. Throughout July and August 2022, Mr. Vidal attempted to alert AAA that he needed additional time to respond to the arbitration demand and attempt to find legal counsel who would represent him in arbitration. Compl. ¶¶ 70-72; Ex. 1 (Vidal Decl.) ¶¶ 55-56; Ex. 7 (Aug. 1, 2022 email); Ex. 8 (Aug. 10, 2022 email). Mr. Vidal expressed concern about his inability to pay for the arbitration. *See, e.g.*, Ex. 9 (Sept. 8, 2022 email). Nonetheless, AAA barreled ahead and notified Mr. Vidal that it had selected an arbitrator on September 7, even after Mr. Vidal informed AAA he needed additional time to evaluate the list of arbitrators. Compl. ¶ 74; Ex. 10 (Sept. 2, 2022 email); Ex. 11 (Sept. 7, 2022 let.).

 **B.**   **Mr. Vidal's Repeated Pleas to AAA to Pause the Arbitration Pending Litigation Due to the Extraordinary Costs of Arbitration**

 After AAA assigned an arbitrator, Mr. Vidal again informed AAA that he could not afford arbitration and any of the costs of ACS's attorney's fees. *Id.* ¶ 80; Ex. 1 (Vidal Decl.) 44-45. The arbitrator's hourly rate is $450 per hour. Compl. ¶ 75; Ex. 11 (Sept. 7, 2022 let.). Mr. Vidal was unable to afford even one hour of her time, let alone the entire proceeding. Ex. 1 (Vidal Decl.) ¶¶ 44-45. In addition, the costs of arbitration owed to the AAA include a filing fee of $1,900, and a case management fee of $750, all of which ACS could potentially recover from Mr. Vidal if it were to prevail. Compl. ¶ 76. Given this, even a preliminary hearing on delegation—i.e., whether a court or arbitrator can decide whether the arbitration provision is valid—would likely cost thousands. And, as ACS repeatedly emphasized, Mr. Vidal would also be required to pay its attorney's fees and costs. *Id.* ¶ 77; Ex. 5 (June 22, 2022 let.). Those fees could easily be tens of thousands of dollars or more. Compl. ¶ 77.

On September 16, 2022, Mr. Vidal, through the undersigned counsel, filed the instant lawsuit against ACS, seeking a declaration that the arbitration provision in his contract is invalid because it penalizes him with costs and fees that violate his rights under trafficking laws and minimum wage laws, and because it is unconscionable. *See generally* Compl.

In the fall of 2022, Mr. Vidal, through his counsel in this case, repeatedly informed AAA that he had filed this case, requested that AAA stay the arbitration pending this case's resolution, and made clear that the arbitration requirement was illegal and unenforceable. Ex. 12 (Sept. 19, 2022 email); Ex. 13 (Oct. 6, 2022 email). In response, ACS argued that this Court does not have authority to decide whether ACS's arbitration provision is illegal because, in ACS's view, the provision includes a "delegation clause" delegating questions of the arbitration provision's validity to the arbitrator. Ex. 14 (Oct. 20, 2022 let.).

In truth, the arbitration provision failed to "clearly and unmistakably" delegate such questions to the arbitrator. Mr. Vidal asserted this and further asserted that any purported delegation clause was illegal and unenforceable under state and federal trafficking laws, federal and state wage and hour laws, and is unconscionable, including because Mr. Vidal signed under economic duress. *See* Ex. 15 (Oct. 28, 2022 let.); Ex. 16 (Nov. 10, 2022 let.).

In several letters filed with the arbitrator and the AAA in late 2022, Mr. Vidal explained that the arbitrator lacks authority to maintain the arbitration pending judicial resolution of this action because challenges to the delegation provision—the sole purported contractual basis to decide the validity of the arbitration provision—are necessarily for this Court to decide.[3] Ex. 16 (Nov. 10, 2022 let.); Ex. 17 (Dec. 2, 2022 let.). Mr. Vidal urged that, at the very least, the arbitrator should stay the arbitration pending judicial resolution of the

---

[3] These letters were filed with the aid of pro bono counsel Towards Justice, which appeared in the arbitration for the limited purpose of challenging the authority of the arbitrator. Towards Justice does not represent Mr. Vidal for any other purpose in the arbitration, and Mr. Vidal has no other counsel there.

delegation question. Ex. 17 (Dec. 2, 2022 let.).

Again, however, AAA barreled ahead. In an October 24, 2022 order, the arbitrator concluded—without engaging with the substance of whether there was a delegation clause—that "I have the authority to rule on my own jurisdiction, including with respect to the validity of the arbitration agreement or the arbitrability of any claim." Ex. 18 (Oct. 24, 2022 email). On December 9, the arbitrator denied Mr. Vidal's request to stay the arbitration. Ex. 19 (Dec. 9, 2022 order). The arbitrator held that Mr. Vidal's submissions did not provide "sufficient factual or legal support for the argument that the arbitration agreement is unconscionable under New York law" and that Mr. Vidal's "other arguments can be addressed during the proceedings in this matter." *Id.* That is, the arbitrator decided to defer concerns over the validity of the purported delegation clause to the end of the arbitration process, thus ensuring that the cost of resolving that question will be virtually the same as the cost of the entire arbitration, thus compounding the harm to Mr. Vidal effected by ACS's loser pays provision.

To avoid burdening the judicial resources of this Court with a motion for preliminary relief pending resolution of this declaratory judgment action, Mr. Vidal has repeatedly sought relief from the AAA. He has continued to reinforce to the arbitrator that the arbitration requirement is unenforceable and illegal, that she may not proceed until those arguments are resolved, and that she has no authority to rule on the enforceability of the arbitration requirement because challenges to the delegation clause are necessarily for the Court. *See, e.g.*, Ex. 15 (Oct. 28, 2022 let.); Ex. 16 (Nov. 10, 2022 let.); Ex. 17 (Dec. 2, 2022 let.). The arbitrator ignored substantive engagement with most of these arguments. She has instead set an aggressive schedule, including a deadline for service of discovery requests in December 2022, responses to which are due January 20, and completion of all discovery by mid-March. Ex. 19 (Dec. 9, 2022 order). Meanwhile, the arbitrator's work on this case—mounting at a cost of $450 per hour—and ACS's likely spiraling attorney's fees related to the arbitration,

continue to impose even greater costs on Mr. Vidal.

### C.  <u>The New York Attorney General Urges AAA to Stop the Arbitration</u>

On January 4, 2023, the New York State Office of Attorney General, Labor Bureau (the "OAG") sent AAA a letter expressing "grave concerns" regarding the use of arbitration proceedings to enforce oppressive contract provisions that "compel forced labor" in violation of the Trafficking Victims Protection Act ("TVPA"). Ex. 20 (OAG let.) at 1. Specifically, the OAG reviewed the provisions in the ACS 2022 Contract and determined that the provisions "appear invalid and unlawful under the TVPA." *Id.* at 2.

The OAG expressed specific concerns about AAA administering arbitrations like this one, brought by employers like ACS. AAA should "exercise caution" before administering arbitrations "concer[ning] unlawful contract provisions that violate the TVPA," lest the AAA's arbitration program be "used as a tool by employers to further labor trafficking violations." *Id.* at 3. The OAG also asked the AAA to stay the Vidal arbitration in particular "because it is an undue burden on the worker to defend this matter, especially while the legality of the contract provision at issues is pending" before the Court. *Id.*

Following this letter, Mr. Vidal renewed his request that AAA stay the arbitration pending the resolution of the declaratory judgment action in federal court. Ex. 21 (Jan. 4, 2023 email). Mr. Vidal also informed AAA that if it refused to stay the proceeding, it would necessitate him filing a motion for preliminary injunction in the federal court case. *Id.*

In response to the OAG, AAA explained it had "no authority to vacate or overturn an arbitrator's order." Ex. 22 (Jan. 9, 2023 let.). For that reason, AAA informed the OAG that it would not stay the arbitration absent a court order. *Id.* AAA told Mr. Vidal the same. Ex. 23 (Jan. 9, 2023 let. to D. Seligman).

### ARGUMENT

**I.  The Court Should Preliminarily Enjoin the Arbitration until this Court Rules on the Enforceability of the Purported Delegation Clause.**

10

Mr. Vidal requests that the Court preliminarily enjoin the arbitration so the Court can decide the threshold issue of whether the arbitration provision contains a clear and unmistakable delegation clause, and if it does, whether that clause is valid and enforceable. Absent a valid delegation clause, the arbitrator does not have the authority to arbitrate the underlying dispute because Mr. Vidal has raised threshold questions regarding the enforceability of the arbitration requirement.

Mr. Vidal satisfies the Rule 65 criteria for a preliminary injunction: (1) he is likely to succeed in his challenges to the delegation clause; (2) he faces the irreparable harm of being forced to endure lengthy legal proceedings in arbitration when he has not assented to those proceedings; (3) the balance of equities between ACS's interests and Plaintiff's interests tips in favor of Plaintiff; and (4) an injunction is in the public interest to help restrain ACS from launching other arbitrations that will keep workers laboring for ACS against their will. *See Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34 (2d Cir. 2010) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

Regardless, a preliminary injunction is appropriate because "serious questions" about the arbitrator's lack of authority are sufficient to justify issuing an injunction. *See Trump v. Vance*, 941 F.3d 631, 639 (2d Cir. 2019); *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126 (2d Cir. 2019) ("That specific attack on the delegation provision is sufficient to make the issue of arbitrability one for a federal court.").

### A. This Court Has Authority to Enjoin an Arbitration That is Not Authorized by an Enforceable Agreement to Arbitrate.

Arbitration is a creature of contract. *Starke v. SquareTrade, Inc*., 913 F.3d 279, 288 (2d Cir. 2019). Thus, while the Federal Arbitration Act may embody a "liberal federal policy favoring arbitration agreements," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp*., 460 U.S. 1, 24 (1983), the mere invocation of arbitration does not strip this Court of its authority. An arbitrator has "no authority of any kind with respect to a matter at issue absent an

11

agreement to arbitrate," and "the question of whether such an agreement exists and is effective is necessarily for the court and not the arbitrator." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012).

The Second Circuit has been clear that federal courts may enjoin pending arbitrations that are not authorized pursuant to a binding and enforceable agreement to arbitrate. *See In re Am. Exp. Fin. Advisors Secs. Litig.*, 672 F.3d 113, 139 (2d Cir.2011); *see also Allstate Ins. Co. v. Elzanaty*, 929 F. Supp. 2d 199, 219 (E.D.N.Y. 2013). "[A]t least where the court determines . . . that the parties have not entered into a valid and binding arbitration agreement, the court has the authority to enjoin the arbitration proceedings." *In re Am. Exp.*, 672 F.3d at 140. For these same reasons, the Second Circuit has also concluded that a district court may issue a preliminary injunction to "freeze [an] arbitration without destroying" the responding party's "ability to continue that arbitration in the event that the district court" determines that the dispute is arbitrable. *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34 (2d Cir. 2010).

### B. Mr. Vidal Only Seeks a Preliminary Injunction against the Arbitration Pending Judicial Resolution on the Delegation Issue.

Because an arbitrator does not have authority to decide a dispute absent an enforceable agreement to arbitrate, *Schnabel*, 697 F.3d at 119, questions regarding the enforceability of an arbitration provision are generally for a court to decide. *See Rent-A-Center, W., Inc. v. Jackson*, 560 U.S. 63 (2010). There is a narrow exception, however, where the parties have "clearly and unmistakably" agreed to arbitrate questions regarding the validity of an arbitration provision—in other words, where they have contractually delegated to the arbitrator the authority to decide disputes regarding the enforceability of an arbitration provision. *Id.* Where such a delegation is "clear and unmistakable," questions regarding the enforceability of an arbitration provision are for the arbitrator. *See, e.g.*, *Chen-Oster v. Goldman, Sachs & Co.*, 785 F. Supp. 2d 394 (S.D.N.Y. 2011).

12

**A-120**

ACS has argued that such a delegation clause exists here in two places: first in the incorporation by reference of AAA's "Commercial Rules," and second in language of the arbitration provision purportedly mandating that disputes regarding the "validity" of the arbitration provision are themselves subject to arbitration. Ex. 14 (Oct. 20, 2022 let.). The arbitrator has continually declined to pause the arbitration proceedings—which continue to impose substantial costs on Mr. Vidal—and presumed that she has the authority to decide his challenges to the validity of the arbitration provision. Indeed, she has explained that such challenges shall be addressed through the development of evidence in the arbitration, along with the merits of ACS's action. Ex. 19 (Dec. 9, 2022 order).

But the mere invocation of arbitration does not divest a court of jurisdiction absent an enforceable agreement to arbitrate. And mere invocation of a delegation requirement does not divest this Court of the authority to decide whether the arbitration requirement is enforceable. Again, to delegate questions of validity to an arbitrator, there must be "clear and unmistakable" delegation. Whether there is a "clear and unmistakable" delegation clause, and the enforceability of any such clause, is necessarily for the Court to decide. *See, e.g.*, *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126 (2d Cir. 2019) ("[An] attack on the delegation provision is sufficient to make the issue of arbitrability one for a federal court.").

At this stage, all Mr. Vidal seeks is a preliminary injunction against the arbitration pending judicial resolution of the preliminary question of the enforceability of any delegation clause in ACS's arbitration requirement. So, although this case challenges the validity of ACS's arbitration requirement as a whole, the instant motion is narrower. It simply requests a preliminary injunction against the arbitration pending judicial resolution of the preliminary question of the enforceability of any delegation clause in ACS's arbitration requirement. This is consistent with the purpose of Rule 65(a), which allows for an injunction to issue "to protect plaintiff from irreparable injury and to preserve the court's power to render a

13

**A-121**

meaningful decision after a trial on the merits." Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2947 (3d ed.); *Kane v. De Blasio*, 19 F.4th 152, 163 (2d Cir. 2021) ("The 'purpose' of a preliminary injunction 'is not to award the movant the ultimate relief sought in the suit but is only to preserve the status quo by preventing during the pendency of the suit the occurrence of that irreparable sort of harm which the movant fears will occur.'") (quoting *New York v. Nuclear Regulatory Comm'n*, 550 F.2d 745, 754 (2d Cir. 1977).[4]

### C. **Mr. Vidal Is Likely to Succeed on the Merits.**

Mr. Vidal's contract does not include a clear and unmistakable delegation clause. And even if it did, that clause would not be valid and enforceable because: (1) Mr. Vidal signed it and the arbitration provision in which it is situated under economic duress; and (2) the clause is unenforceable and illegal because it violates labor trafficking laws, state and federal wage and hour laws, and because it is unconscionable.

#### 1) *There is No Clear and Unmistakable Delegation Clause.*

Questions regarding the validity of an arbitration provision ("arbitrability") are referrable to an arbitrator only if there is a clear and unmistakable delegation clause. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986); *see also Chen-Oster*, 785 F. Supp. 2d 394. There is a presumption that the court should decide issues of arbitrability, and that presumption can be overcome only by clear contractual language to the contrary. *See DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 317 (2d Cir. 2021).

Here, there has been no clear and unmistakable delegation of issues of arbitrability to the arbitrator. ACS points to two clauses in the 2022 Contract that it claims amount to such a delegation: A statement that the arbitration "shall proceed in accordance with Rule E-6 of the AAA's Commercial Arbitration rules," Ex. 4 (2022 Contract), Schedule B at 2, and a clause

---

[4] *See also* Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2947 (3d ed.) ("the most compelling reason in favor of entering a Rule 65(a) order is the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act").

purporting to require arbitration of all claims, including those about the "validity" of the arbitration provision. *Id.* Schedule B, at 1.

The contractual reference to the AAA Commercial Rules is insufficient to constitute a "clear and unmistakable" delegation. Although Commercial Rule 7(a) provides that an arbitrator has the power to rule on her own jurisdiction, the Commercial Rules themselves indicate that they do *not* apply to this dispute because it is a dispute arising out of an "employment plan." *See* Ex. 24 (AAA Commercial Rules), at 10, n*. Because the Commercial Rules by definition do not apply to a AAA arbitration under this agreement, which indisputably arises out of Mr. Vidal's employment, the Commercial Rules have not been clearly and unmistakably been incorporated by reference.

While incorporation of AAA's Commercial Rules may in some cases amount to a clear and unmistakable delegation to the arbitrator of the authority to rule on matters of arbitrability, Mr. Vidal is not a sophisticated commercial party who can be assumed to have knowledge of the detailed AAA Commercial Rules and the extent to which those rules might apply in an employment context. *Cf. First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 945 (1995) (unwise to "interpret silence or ambiguity on the 'who should decide arbitrability' point as giving the arbitrators that power" in cases involving employees or consumers).

Furthermore, under New York law, the arbitration requirement does not incorporate AAA's Commercial Rules by reference. *See Castedo v. Permanent Mission of Thailand to the U.N.*, 114 N.Y.S.3d 70, 71 (2019) (incorporation by reference ineffective where contract did not "clearly reflect an intention to incorporate"). And concluding that a reference to the Commercial Rules, which themselves disclaim applicability to this dispute, amounts to an incorporation by reference in an arbitration subject to the Employment Rules—solely because the reference occurs in an arbitration provision—would violate the FAA's equal footing principle. *See Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713-14 (2022).

15

**A-123**

Finally, the language ACS points to stating that disputes regarding the "validity" of the contract should be compelled into arbitration is also far from clear and unmistakable. The arbitration provision at issue also contains a clause that specifically contemplates judicial review of enforceability matters. Specifically, it states that "in the event that any court of competent jurisdiction shall determine that any portion of this Provision exceeds the scope permitted by applicable law, the court shall have the authority to modify or 'blue pencil' such portion so as to render it enforceable . . . ." Ex. 4 (2022 Contract), Sched. B, at 2. This provision creates further ambiguity about the intent of the agreement by suggesting that a *court* can rule on the enforceability of the arbitration provision.

### 2) Mr. Vidal signed the arbitration requirement, including its delegation provision, under economic duress.

The delegation provision is also unenforceable because Mr. Vidal signed it, and the arbitration provision in which it is situated, under economic duress. Whether a party voluntarily entered into an agreement to arbitrate is always for the court to decide. *See, e.g.*, *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017) ("[B]efore an agreement to arbitrate can be enforced, the district court must first determine whether such agreement exists[.]"); *Fedor v. United Healthcare, Inc*., 976 F.3d 1100, 1106–07 (10th Cir. 2020) (questions of formation "cannot be delegated to the arbitrator"). If no valid agreement to arbitrate was ever formed, then no delegation provision exists, and it would be improper to send any part of the dispute to arbitration. *See Schnabel*, 697 F.3d at 118.

Under New York law, a contract is unenforceable on grounds of economic duress when a party "was forced to agree to it by means of a wrongful threat precluding the exercise of his free will." *Austin Instrument, Inc. v. Loral Corp*., 29 N.Y.2d 124, 130 (1971). Here, Mr. Vidal alleges that he was under substantial economic duress at the time the contract containing the arbitration provision was presented to him. Pursuant to the harsh liquidated damages clause in ACS's first contract with him, if Mr. Vidal did not sign the 2022 contract

16

containing the arbitration provision and its purported delegation clause, he would have been contractually required to pay $20,000 in liquidated damages. Ex. 1 (Vidal Decl.) ¶ 25; *see also* Ex. 2 (2019 Contract) at 4, 6. He also feared that he would be left jobless in London. Ex. 1 (Vidal Decl.) ¶ 25. Especially in light of his circumstances at the time, he could not voluntarily enter into the agreement in the face of this extraordinary financial pressure. *Id.* ¶¶ 20-26. This formation challenge—which goes to both the enforceability of the arbitration provision as a whole and to the delegation clause in particular—must be adjudicated by this Court with the benefit of further factual development.

### 3) The delegation provision is illegal and unconscionable.

Even if the delegation clause were clear and unmistakable and even if Mr. Vidal had voluntarily entered into the arbitration requirement and its delegation provision, he would still be likely to succeed on the merits because the delegation clause is illegal and unenforceable for the same reasons that the arbitration requirement in which it is situated is unenforceable: It violates state and federal trafficking laws, state and federal wage and hour laws, and is unconscionable as a matter of law.

Again, delegating questions of arbitrability to the arbitrator would require Mr. Vidal to submit to an arbitration regarding matters that, by virtue of the "loser pays" provision, could bury him in extraordinary costs and legal fees. Although the precise fees and costs associated with ACS's collection activities are not known at this time, they already likely exceed $3,000, including the attorney's fees and arbitration costs, and the only issues raised by the parties to date concern the arbitrability of ACS's claims. *See* Vidal Decl. ¶¶ 43-47. At the arbitrator's rate of $450 per hour, even litigating the question of arbitrability could cost tens of thousands of dollars, particularly given that the arbitrator has apparently decided to defer ruling on arbitrability until resolution of the merits of the case. *See supra* § IV.B. Those costs could be ruinous to Mr. Vidal should the loser pays provision be invoked against him.

17

**A-125**

*See* Vidal Decl. ¶¶ 2, 3, 46; *see also Andersen v. InePros Federal, Inc.*, 240 F.Supp.3d 143 (D.D.C. 2017) ("$7,500 filing fee, standing alone, is more than sufficient to demonstrate cost-prohibitiveness when measured against [plaintiff's] modest financial circumstances").

The Court should not require Mr. Vidal to submit to an illegal arbitral process for the purpose of establishing that that same process is illegal and unconscionable. *See, e.g., Lim v. TForce Logistics*, LLC, 8 F.4th 992, 1003 (9th Cir. 2021).

<div style="text-align:center">

a) <u>The arbitration provision and delegation clause violate trafficking laws.</u>

</div>

ACS's conduct—using threats of financial penalties obtained through a weaponized arbitration—violates federal prohibitions on forced labor. The TVPA prohibits labor obtained through threats of "serious harm," including "psychological, financial, or reputational harm" that is sufficiently serious under the circumstances to compel a reasonable person "to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(1). The TVPA also prohibits extracting labor through the "abuse or threatened abuse of legal process." 18 U.S.C. § 1589(c)(1). Under these circumstances, the extraordinary costs that could be imposed on Mr. Vidal as a consequence of an arbitration even over threshold issues of arbitrability, fall squarely within these prohibitions.

Federal courts in New York have concluded that it is a violation of federal labor trafficking laws to require immigrant nurses like Mr. Vidal to pay steep financial penalties if they leave their employment before the end of a contractual commitment period. *See, e.g.*, *Paguirigan v. Prompt Nursing Emp't Agency,* 286 F. Supp. 3d 430, 535 (E.D.N.Y. 2017) ($25,000 contract termination fee an unenforceable penalty designed to compel performance). The OAG has come to a similar conclusion. *See* Assurance of Discontinuance, *In re: Albany Med Health System* (settlement agreement between NY Attorney General & Albany Med Health System for unlawfully including $20,000 repayment fee in employment contracts for nurses from foreign nations); *see also* Ex. 20 (OAG let.) at 1 & n.2.

<div style="text-align:center">

18

**A-126**

</div>

As made clear by the OAG in its letter to AAA, this case involves similar, but even more troubling, facts. *See* Ex. 20 (OAG let.) at 2 (facts and circumstances here "strikingly similar" to cited cases). In all three cases, an employer threatened an immigrant nurse from the Philippines with tens of thousands of dollars in debt for leaving their job. But in *Pagurigan* and *In re: Albany Med Health System*, the employers defended their conduct based on a "liquidated damages" provision which they argued was enforceable. ACS has no such defense here (and in fact has specifically disclaimed any right to pursue liquidated damages), Ex. 25 (Jan. 4, 2023 let.). Instead, ACS seeks unspecified damages (including $9,000 per year for the remainder of Mr. Vidal's contract), costs, and fees of "at least" $20,000, but likely much more. *See* Ex. 5 (June 22, 2022 let.).

Worse still, unlike *Paguarigan* and *In re: Albany Med Health System*, ACS has weaponized the financial burdens of its arbitration requirement to further coerce Mr. Vidal to continue working for ACS. That is the issue before the Court now. In this case, it is not just the costs of the penalty, but the costs of arbitration fees, the arbitrator's hourly rates, attorney's fees, and other related costs that ACS has used to coerce Mr. Vidal into staying in his job. These costs—even just those costs flowing from an arbitration over matters of arbitrability—amount to a threat of "serious harm" that ACS used to coerce Mr. Vidal to continue working for the company. 18 U.S.C. § 1589(a)(2).

ACS clearly intended for the costs of arbitration and related attorney's fees to coerce Mr. Vidal into staying in his job. In its letter to Mr. Vidal on June 22, 2022, shortly after Mr. Vidal indicated his intent to quit, ACS specifically told Mr. Vidal that, if he did not return to work, the company would sue him in arbitration. It also highlighted that, if he left before his contract term, Mr. Vidal would owe "attorney's fees and costs incurred in the arbitration" and that he would, pursuant to the loser pays provision, need to "reimburse" ACS "for all reasonable costs, including all attorneys' fees" that it "incur[red] in enforcing its rights and

19

**A-127**

remedies" under the contract. Immediately after asserting those threats, ACS invited Mr.

Vidal to "reconsider" his "course of action." Ex. 5 (June 22, 2022 let.). ACS thus explicitly

threatened Mr. Vidal with the potentially devastating costs of its collection activities and the

costs of the arbitration itself to coerce him into returning to work.[5] A contract, in this case the

delegation provision, intended to be used, and in fact used, for such illegal purposes is illegal

and unenforceable under the TVPA.

Furthermore, the unenforceable arbitration provision and its purported delegation

clause amount to a "threatened abuse of legal process" to keep Mr. Vidal trapped in his job.

New York courts have concluded that the threat of suing workers for leaving a job, even

without forcing them to bear the costs of attorney's fees and private dispute resolution,

amounts to the threatened abuse of legal process. *See, e.g., Magtoles v. United Staffing*

*Registry, Inc*., No. 21 Civ. 1850, 2021 WL 6197063, at *8 (E.D.N.Y. Dec. 30, 2021).[6]

By threatening arbitration—even over the threshold matter of arbitrability—against

Mr. Vidal and using the threat of that arbitration and its related costs to coerce Mr. Vidal's

continued work, ACS unlawfully coerced Mr. Vidal's work, using the arbitration scheme in a

manner for which it was surely "not designed." *See* 18 U.S.C. § 1589(c)(1). ACS's arbitration

provision also contravenes the stated purposes and protections of the AAA's Employment

Due Process Protocols and employment fee schedules, which purport to prohibit abusive

contract terms like ACS's loser pays provision.[7]

---

[5] That Mr. Vidal ultimately stopped working for Advanced Care Staffing does not make the coercive arbitration requirement permissible under the TVPA. Mr. Vidal was terrified to quit his job, but felt he had no choice because of the risks to him and his patients created by Advanced Care Staffing's conduct. Vidal Decl. ¶¶ 32-37. Moreover, *attempted* forced labor also violates the TVPA, 18 U.S.C. § 1594(a), and Advanced Care Staffing clearly used the arbitration requirement to *attempt* to coerce Mr. Vidal to continue working.

[6] For similar reasons, ACS's conduct violates New York's anti-trafficking statute, Penal Law § 135.35. *See* ECF No. 1 (Complaint) ¶¶ 88-95.

[7] For example, the Employment/Workplace Fee Schedule provides that "the company shall pay the arbitrator's compensation unless the individual, *post* dispute, voluntarily elects to pay a portion of the arbitrator's compensation" and that "arbitrator compensation, expenses, and administrative fees are not subject to reallocation by the arbitrator(s) except upon the arbitrator's

20

**A-128**

b)  The arbitration requirement and delegation provision violate wage and hour laws.

Under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, an employer like ACS may not require an employee like Mr. Vidal to pay costs or damages that are "primarily for the benefit of the employer" when those costs take the employee's wages below applicable federal minimum wage or required overtime in the relevant workweek. *He v. Home on 8th Corp.*, No. 09 Civ. 5630, 2014 WL 3974670, at *9 (S.D.N.Y. Aug. 13, 2014).

In the underlying arbitration here, ACS seeks such an illegal kickback:  ACS seeks to recover its purported "lost profits" and the costs of hiring a replacement employee. Those costs are not primarily for the employee's benefit. The profit from an employee's work is inherently for the employer's benefit. *See, e.g.*, 29 C.F.R. § 53.13(b) (where an employer does seek to recoup costs paid for the employee's benefit, such costs may not include a "profit" for the employer). In a fair and competitive marketplace, employers recoup that value (and avoid the costs of hiring a replacement) through competitive wages and benefits. Allowing employers like ACS to recover these types of costs would eviscerate the minimum wage laws. Because the costs ACS seeks are an illegal kickback, the costs of attempting to collect that illegal kickback are an illegal kickback too.

Because ACS seeks to recover an illegal kickback through arbitration, the loser pays term requiring Mr. Vidal to bear the costs of the arbitration, even merely over the threshold issue of arbitrability, also effects an illegal kickback. And because those costs must be measured against Mr. Vidal's last week of wages—for which he earned less than $1,500 for 35-40 hours of work—they result in a minimum wage violation. Vidal Decl. ¶ 53; *see Arriaga*, 305 F.3d at 1236.[8] The delegation provision is thus unenforceable because it

---

determination that a claim or counterclaim was filed for purposes of harassment or is patently frivolous." AAA, Employment Fee Sched., https://www.adr.org/sites/default/files/Employment_Fee_Sched..pdf (emphasis added).
[8] It makes no difference to the analysis that Advanced Care Staffing did not directly deduct the alleged damages from Mr. Vidal's wages. There is no difference between deducting a cost from a

21

requires a violation of Mr. Vidal's federal minimum wage rights.

Finally, the loser pays term in the arbitration provision and delegation clause is also inconsistent with the one-way fee shifting provisions in state and federal wage and hour law. *See, e.g.*, 29 U.S.C. § 216(b). In enacting a one-way fee shifting statute, Congress did not intend to permit employers to contract for the recovery of their own fees and costs when they prevail in disputes under the FLSA. *See, e.g.*, *Alexander v. Anthony Int'l, L.P.,* 341 F.3d 256, 268–269 (3d Cir. 2003) (provision requiring losing party in employment discrimination case to pay all arbitrator fees and costs unenforceable); *Santich v. VCG Holding Corp.*, 2018 WL 3968879, at *7 (D. Colo. Aug. 20, 2018); *Smith v. AHS Okla. Heart, L.L.C.*, No. 11 Civ. 691, 2012 WL 3156877, at *4-5 (N.D. Okla. Aug. 3, 2012) (invalidating loser pays provision in arbitration clause covering employee's Title VII and Equal Pay Act claims, but severing provision and enforcing remainder of arbitration clause).[9]

c) The delegation clause is unconscionable as a matter of New York law.

The delegation clause is also unconscionable as a matter of New York law. Under New York law, unconscionability involves both procedural and substantive components. *See, e.g.*, *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010). Procedural unconscionability concerns the circumstances of contract formation and the degree of choice provided to the non-drafting party. Substantive unconscionability concerns the substantive fairness of the terms of a contract.

A contract or clause is unconscionable when there is an "absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably

---

worker's wages and shifting a cost to an employee to bear directly. *Arriaga v. Florida Pacific Farms, L.L.C.*, 305 F.3d 1228, 1236 (11th Cir. 2002) (citations omitted).

[9] For all these same reasons, the arbitration requirement violates state minimum wage and anti-kickback laws. *See* N.Y. Lab. Law § 198-b. New York prohibits an employer from conditioning employment on the employee agreeing to kick back "any part or all of said employee's wages." *Id.* That is precisely what the Advanced Care Staffing's contract and arbitration requirement do here.

22

favorable to the other party." *Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 207 (2d Cir. 1999). And while procedural unconscionability always bears on the unconscionability analysis, substantive unconscionability alone may be enough to establish a contract as unconscionable if the terms of the contract are sufficiently unfair. *Ragone*, 595 F.3d at 122. "In general, it can be said that procedural and substantive unconscionability operate on a 'sliding scale'; the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa." *State v. Wolowitz*, 96 A.D.2d 47, 68 (N.Y. App. Div. 1983). In this case, the arbitration provision and the delegation clause are strongly procedurally and substantively unconscionable.

The arbitration provision, including the purported delegation clause, has a strong degree of procedural unconscionability. ACS forced Mr. Vidal to sign the arbitration requirement as a condition of his employment, without any meaningful opportunity to negotiate, and Mr. Vidal had an imperfect understanding of the contents of the contract he was signing. Vidal Decl. ¶¶ 20-26.

But this case also includes exceptionally coercive contracting circumstances that are unlike those typically arising in the employment context. *Ragone*, 595 F.3d at 122. Most importantly, ACS required Mr. Vidal to sign the arbitration provision when he was in a foreign country, had already quit his job, and had no way of supporting himself or paying rent unless he signed the contract and began his employment with ACS. *Id.* Even more significantly, because Mr. Vidal had already signed a prior agreement with the company that required him to pay $20,000 if he did not work for ACS, he reasonably believed that if he did not sign the new contract, which included the delegation clause, he would have to pay ACS thousands of dollars he did not have. *Id.* This amounted to an extraordinary "inequality of bargaining power" resulting in "lack of meaningful choice." *Wolowitz*, 96 A.D.2d at 66.

The degree of procedural unconscionability evident in this case is so substantial that

23

under the "sliding scale" framework Mr. Vidal should face a lower burden for establishing substantive unconscionability. Nonetheless, there is also a high degree of substantive unconscionability present in the delegation clause. Most importantly, the requirement includes a loser pays term that provides that the prevailing party "shall be entitled" to its attorney's fees and the costs of the arbitration, including the arbitrator's fees, even over an arbitration regarding preliminary matters of arbitrability.

Although there is minimal New York case law on the enforceability of loser pays provisions in employment contracts, some courts around the country find such terms to be *per se* unconscionable. *See, e.g.*, *Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1025 (9th Cir. 2016) (as a matter of California law, "when an employer imposes mandatory arbitration as a condition of employment, the arbitration agreement or arbitration process cannot generally require the employee to bear any type of expense that the employee would not be required to bear if he or she were free to bring the action in court" (internal quotation marks omitted)). However, even under an analysis that looks to the circumstances of the party challenging the contract, this contract is substantively unconscionable under New York law because it prevents Mr. Vidal from vindicating his rights or defending himself in arbitration. *See, e.g.*, *Valle v. ATM Nat., LLC*, No. 14 Civ. 7993, 2015 WL 413449, at *7 (S.D.N.Y. Jan. 30, 2015) (loser pays provision in arbitration agreement covering low-wage workers is substantively unconscionable where the costs of arbitration could amount to tens of thousands of dollars).

The loser pays term effectively prevents Mr. Vidal from even being able to challenge the arbitrator's authority to administer this case. Mr. Vidal came to the United States from the Philippines, where he grew up in poverty. Ex. 1 (Vidal Decl.) ¶¶ 1-4. He is a critical source of support for his family back home, including his brother who has a severe disability, is non-verbal, and requires the constant care and attention of Mr. Vidal's father, who cannot work outside of the house. *See id.* ¶¶ 2, 10, 13, 33, 48-49. Mr. Vidal cannot afford to pay the over

24

**A-132**

$2,000 in filing fees already at issue here, let alone the arbitrator's time, which costs $450 per hour. *Id.* ¶¶ 44-45. He certainly cannot afford to pay tens of thousands of dollars in attorney's fees for the several attorneys that ACS has retained to pursue this purported debt. Paying even some of those costs would prevent him from sending any money home to his father and brother who rely on him to put food on the table and pay rent. *Id.* ¶ 45.

> d) The loser pays term cannot be severed from the arbitration requirement and delegation clause.

ACS cannot avoid the conclusion that the delegation provision is unenforceable by urging the court to sever the loser pays term and enforce the purported delegation provision in its absence. First, the loser pays term is integral to the arbitration requirement here, and the arbitrator cannot re-write the provision without fundamentally altering the nature of the agreement. *See, e.g.*, *MacDonald v. CashCall, Inc*, 883 F.3d 220, 230 (3d Cir. 2018). The purpose of the contract to shift the costs of arbitration and collection onto Mr. Vidal is evident in several provisions of the contract, including in the "loser pays" term in Schedule B of the requirement's "Dispute Resolution Provision," and in Section 14 of the contract, which purports to require Mr. Vidal to bear all the costs and attorney's fees associated with ACS's collection activities. *See, e.g.*, *Alexander v. Anthony Int'l*, L.P., 341 F.3d 256, 271 (3d Cir. 2003) ("The cumulative effect of such illegality prevents us from enforcing the arbitration agreement. Because the sickness has infected the trunk, we must cut down the entire tree.")

Second, ACS's own conduct has revealed that the fee-shifting aspects of the requirement are integral to the agreement. In its communications with Mr. Vidal, it repeatedly emphasized that he would bear the costs of collection and arbitration and all ACS's attorney's fees. Ex. 5 (June 22, 2022 let.). The loser pays term was clearly critical to ACS.

Third, particularly in light of ACS's conduct and threats, severing the loser pays provision would create incentives for contract drafters like ACS to overreach and pack their contracts with unfair and unenforceable terms. *See, e.g.*, *Lim v. TForce Logistics, LLC*, 8

25

F.4th 992, 1006 (9th Cir. 2021); *Hayes v. Delbert Services Corp.*, 811 F.3d 666 (4th Cir. 2016); *Lowden v. T-Mobile, USA, Inc.*, No. 05 Civ. 1482, 2006 WL 1009279, at *9 (W.D. Wash. Apr. 13, 2006). If such terms were routinely severed in cases like this one, then drafting parties like ACS would have every incentive to pack their arbitration requirements with fee-shifting provisions and loser pays terms, then use those terms to threaten workers while attempting to coerce their labor, knowing that—at worst—the arbitrator will sever or blue pencil the aspects of the requirement that she finds most concerning.

> **D. Even if the Court Cannot Resolve Whether Mr. Vidal Is Likely to Succeed on the Merits, Mr. Vidal Raises a Serious Question Regarding the Arbitrator's Authority, Which Warrants Injunctive Relief.**

The Court need not definitively resolve whether or not Mr. Vidal is likely to succeed on the merits of the enforceability of the delegation clause. Because "[p]reliminary injunctions should not be mechanically confined to cases that are simple or easy," a preliminary injunction is appropriate even when a plaintiff's chance of success is uncertain so long as the balance of hardships tilts strongly enough in her favor. *See Citigroup*, 598 F.3d at 35 (affirming district court order preliminarily enjoining arbitration). This flexibility "permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Id.* Disputes over the merits of a plaintiff's claim that "simply raise a question of fact," for example, do not prevent a court from entering an injunction while those serious questions are resolved. *See Gov't Emps. Ins. Co. v. Wellmart RX, Inc.*, No. 19 Civ. 04414, 2020 WL 249020, at *9 (E.D.N.Y. Jan. 16, 2020).

The Second Circuit has specifically invoked the "serious question" standard in upholding a preliminary injunction against a potentially unauthorized arbitration. *Citigroup* 598 F.3d at 35. The *Citigroup* court explained that even where "uncertainty" about the

arbitrability of a dispute "poses a serious question," a district court may preliminarily enjoin the arbitration. *Id.* at 39. After all, doing so does not strip the party seeking arbitration of the right to arbitrate. All it does is "freeze" the arbitration pending judicial resolution of the arbitrability of the dispute. *Id.* at 32. For the same reasons that Plaintiff meets the higher threshold of establishing a likelihood of success on the merits, Plaintiff also presents "serious questions" about the arbitrator's authority to proceed with this arbitration. And, as explained below, the balance of hardships overwhelmingly favors Plaintiff.

### E. Mr. Vidal Will Suffer Irreparable Harm Absent Immediate Relief.

Absent a preliminary injunction, Mr. Vidal faces the irreparable harm of being subjected to an arbitration before an arbitrator without any authority to rule even on threshold questions of arbitrability. Courts in this Circuit recognize that being subjected to an unauthorized arbitration constitutes an irreparable harm sufficient to support preliminary injunctive relief. *See Citigroup Global Mkts. Inc. v. VCG Special Opportunities Master Fund Ltd.*, No. 08 Civ. 5520, 2008 WL 4891229, at *2 (S.D.N.Y. Nov. 12, 2008) ("Compelling arbitration of a matter not properly subject to arbitration constitutes 'per se irreparable harm.') (citation omitted), *aff'd*, 598 F.3d 30, 41 (2d Cir. 2010); *Mount Ararat Cemetery v. Cemetery Workers & Greens Attendants Union*, 975 F. Supp. 445, 447 (E.D.N.Y. 1997).

Absent a preliminary injunction staying the arbitration—at least until the Court decides whether the parties delegated arbitrability to the arbitrator—Mr. Vidal will be forced to expend time and substantial resources seeking to protect his rights in arbitration. *See Tellium, Inc. v. Corning Inc.*, No. 03 Civ. 8487, 2004 WL 307238, at *3 (S.D.N.Y. Feb. 13, 2004); *see also Port Drivers Fed'n 18, Inc. v. All Saints Express*, 757 F. Supp. 2d 443, 460–61 (D.N.J. 2010). And as the Second Circuit has acknowledged, "the time and resources [a party] would expend in arbitration is not compensable by any monetary award of attorneys' fees or damages . . .." *Maryland Casualty Co. v. Realty Advisory Bd. on Labor*

27

*Relations,* 107 F.3d 979, 985 (2d Cir. 1997) (citing *Int'l Dairy Foods Ass'n v. Amestoy,* 92 F.3d 67, 71 (2d Cir. 1996)).

This harm is not speculative—it is already occurring as the arbitrator has commenced, and refused to halt, proceedings, despite Mr. Vidal's attempts to persuade her that she was not delegated the authority to decide questions of arbitrability, and despite the Attorney General's office urging AAA to consider staying the arbitration. The threatened harm is thus more than a mere possibility. *See Winter*, 555 U.S. at 22.

Moreover, this harm cannot be redressed by challenging an arbitration award following the proceeding. To get to that point, Mr. Vidal would have to go through the entire arbitration, expending considerable time and resources in doing so. *See Maryland Casualty Co.*, 107 F.3d at 985. And he could only challenge the outcome of the arbitration through a separate proceeding seeking vacatur of the arbitral order, an exceptionally high standard to meet. *See* 9 U.S.C. § 10.

### F.  The Balance of Harms Tips Decidedly in Mr. Vidal's Favor.

The harm to ACS from granting a preliminary injunction is only a small delay in a potential monetary recovery through arbitration. That harm is minimal, particularly given that ACS is a large company that likely earns millions of dollars every year. And any harm that may result from the delay could be compensated by the arbitrator if the Court determines that the arbitration here may lawfully proceed. By contrast, the harm to Mr. Vidal of having to expend further time and resources on the unauthorized arbitration before the Court has ruled on whether issues of arbitrability were validly delegated to the arbitrator would be, as the Second Circuit has recognized, "not compensable by any monetary award of attorneys' fees or damages." *Maryland Casualty Co.*, 107 F.3d at 985 (cleaned up).

### G.  A Preliminary Injunction Is in the Public Interest.

That a preliminary injunction is squarely in the public interest is evident from the

28

New York Attorney General's interest in this case. *See supra* section IV.C. The Attorney

General expressed "grave concerns" that circumstances like those experienced by Mr. Vidal

"compel forced labor" in violation of the TVPA. Ex. 20 (OAG Let.) at 1. The OAG also

noted that the legal and financial harms threatened against vulnerable immigrant workers like

Mr. Vidal are likely to result in coerced work. *Id.* The public has a strong interest in

preventing forced labor, as reflected in the adoption of the TVPA. *See* Wright & Miller, 11A

Fed. Prac. & Proc. Civ. § 2948.4 (3d ed.) (federal statute prohibiting threatened acts that are

subject of litigation "strong factor in favor of granting a preliminary injunction.").

In addition, the incentives created by allowing ACS's conduct to proceed unchecked

militate in favor of a preliminary injunction to protect the public interest in a fair dispute

resolution process. Allowing ACS to weaponize the arbitration process and aggressively seek

judgment against Mr. Vidal while his allegations go unexamined would undermine that

interest. *See* Ex. 20 (OAG Let.) at 2.

## II.  The Court Can Enjoin the Arbitration Pursuant to the All Writs Act.

The Court also has the authority to preliminarily enjoin this arbitration pursuant to the

All Writs Act. The All Writs Act provides federal courts with the authority to issue all writs

"necessary or appropriate in aid of their respective jurisdictions." 28 U.S.C. § 1651(a). The

Act specifically allows courts to issue orders directed toward non-parties. *United States v.

Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 907 F.2d

277, 281 (2d Cir. 1990). In this case, that would include an order directed toward the AAA

and the arbitrator requiring that the underlying arbitration be stayed, at least preliminarily,

until this Court can rule on the arbitrator's authority to decide issues of arbitrability.

The continued administration of ACS's arbitration against Mr. Vidal constitutes a

direct threat to this Court's jurisdiction. As explained above, whether the arbitrator has the

authority under the purported delegation requirement to decide the enforceability of the

29

arbitration provision is necessarily for the Court to decide in the first instance. The Second Circuit and courts around the country have reasoned that the All Writs Act gives federal courts authority to enjoin arbitrations that threaten their jurisdiction. *See, e.g.*, *In re Am. Exp.*, 672 F.3d at 141 n.20; *In re Am. Honda Motor Co., Inc., Dealerships Rels. Litig.*, 315 F.3d 417, 438-40 (4th Cir. 2003); *Allstate Ins.*, 929 F. Supp. 2d at 220. The administration of an arbitration regarding issues that are not arbitrable and that fall within a court's jurisdiction presents a sufficiently serious threat to that court's jurisdiction to justify application of the All Writs Act. *In re Am. Honda Motor Co.*, 315 F.3d at 438.[10]

The Court need not decide now whether a clear and unmistakable delegation clause exists or whether the arbitration requirement or the putative delegation clause is enforceable. All Plaintiff requests here is a preliminary injunction staying arbitration until the Court can address those issues. The Court should preliminarily enjoin the arbitration if it concludes that there are serious questions whether the administration of the arbitration, before the Court has had a chance to decide the applicability and enforceability of the delegation provision, presents a threat to this Court's jurisdiction. *Citigroup Glob. Markets, Inc.*, 598 F.3d at 33. There should be no question that such questions are present here.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff's requested injunction and enjoin further proceedings in arbitration until this Court can determine whether the arbitration provision contains a clear and unmistakable delegation clause, and whether that clause is valid and enforceable.

---

[10] Although some courts have refused to enjoin arbitrations under the All Writs Act and permitted arbitrators to rule on their own authority to decide the dispute before them, in those cases there was no dispute that the underlying substantive question was covered by an enforceable arbitration agreement. *See, e.g., Citigroup, Inc. v. Abu Dhabi Inv. Auth.*, 776 F.3d 126, 128 (2d Cir. 2015); *Loc. 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. N.Y. Shipping Ass'n, Inc.*, 965 F.2d 1224,1233 (2d Cir. 1992). Here, Plaintiff challenges the purported delegation clause, a challenge that the Court must decide. *See supra* § I.B.

Dated: January 20, 2023

Respectfully submitted,
/s/_____
David H. Seligman

**TOWARDS JUSTICE**

David H. Seligman (*pro hac vice*)
Juno Turner
Valerie Collins (*pro hac vice*)
P.O. Box 371689, PMB 44465
Denver, CO 80237-5680
(720) 441-2236
juno@towardsjustice.org
david@towardsjustice.org
valerie@towardsjustice.org

**KAKALEC LAW PLLC**

Hugh Baran (he/him)
Patricia Kakalec (she/her)
195 Montague Street, 14th Floor
Brooklyn, NY 11201
(212) 705-8730
Hugh@KakalecLaw.com
Patricia@KakalecLaw.com

**NICHOLS KASTER, PLLP**

Anna P. Prakash, MN Bar No. 0351362 (*pro hac vice*)
4700 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 215-6870
aprakash@nka.com

Matthew C. Helland, CA Bar No. 250451 (*pro hac vice*)
235 Montgomery St., Suite 810
San Francisco, CA 94104
Telephone: (415) 277-7235
Facsimile: (415) 277-7238
helland@nka.com

*Attorneys for Plaintiff*

31

**A-139**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Benzor Shem Vidal,

                *Plaintiff*,

      -against-

ACS Staffing, LLC

                *Defendant*.

Civ. Action. No. 1:22-cv-05535-NRM-MMH

### DEFENDANT'S MEMORANDUM IN OPPOSITION
### TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

**FordHarrison, LLP**
CityPlace II
185 Asylum Street, Suite 820
Hartford, CT 06103
Tel #:  860-740-1357
Fax #: 860-740-1397
*Counsel for Claimant Advanced Care Staffing, LLC*

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 3

    A. Plaintiff's Employment with Defendant ............................................................ 3

    B. Initiation of Arbitration .................................................................................... 9

LEGAL ARGUMENT .................................................................................................. 12

    A. Legal Standard ................................................................................................ 12

    B. Plaintiff's Delegation Clause argument is a red herring because Plaintiff does not (and cannot) dispute that ACS's breach of contract claim is arbitrable. ................................. 13

    C.   Second Circuit Authority Mandates that any arbitrability questions in this case be decided by the arbitrator. ................................................................................. 15

    D.   Plaintiff cannot prove irreparable harm. ........................................................ 17

    E.   Plaintiff is unlikely to succeed on the merits. ................................................ 18

            1.   The Amended Agreement and Revised DRP are not unconscionable. .......... 18

               a.   The fee shifting provisions are not unconscionable. ................................. 20

               b.   Wage and Hour laws do not bar ACS's claim here. ................................... 21

               c.   Plaintiff's TVPA argument does not bar arbitration. ............................... 23

    F.   There is no "serious question" warranting a stay. ......................................... 26

    G.   Balance of Equities ........................................................................................ 27

    H.   Public Interest. ............................................................................................... 28

CONCLUSION ............................................................................................................. 31

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adia v. Grandeur Mgmt., Inc.*,
   933 F.3d 89 (2d Cir. 2019) ................................................................... 25

*Aguirre v. Best Care Agency, Inc.*,
   961 F. Supp. 2d 427 (E.D.N.Y. 2013) ................................................... 25

*Allstate Ins. Co. v. Elzanaty*,
   929 F. Supp. 2d 199 (E.D.N.Y. 2013) ................................................... 30

*AT&T Mobility, LLC v. Concepcion*,
   563 U.S. 333 (2011) ............................................................................... 2

*AT&T Technologies v. Communications Workers of America*,
   475 U.S. 643 (1986) ............................................................................. 14

*Badinelli v. Tuxedo Club*,
   183 F. Supp. 3d 450 (S.D.N.Y. 2016) ................................................... 13

*Baldia v. RN Express Staffing Registry LLC*,
   2022 WL 4777836 (S.D.N.Y. Oct. 3, 2022) ......................................... 24

*Borey v. National Union Fire Ins.*,
   934 F.2d 30 (2d Cir. 1991) ................................................................... 12

*Broadcast Arts Productions, Inc. v. Screen Actors Guild, Inc.*,
   673 F. Supp. 701 ................................................................................... 14

*Citigroup Global Markets v. VCG Special Opportunities Master Fund,
   Unlimited*, 598 F.3d 30 (2d Cir. 2010) ........................................... 26, 27

*Coca Cola Co. v. Tropicana Prods. Inc.*,
   690 F.2d 312 (2d Cir. 1982) ................................................................. 12

*Collins & Aikman Prods. Co. v. Building Sys.*,
   58 F.3d 16 (2d Cir. 1995) ............................................................... 14, 15

*Daly v. Citigroup Inc.*,
   939 F.3d 415 (2d Cir. 2019) ........................................................... 13, 29

*DDK Hotels, LLC v. Williams-Sonoma, Inc.*,
   6 F.4th 308 (2d Cir. 2021) ................................................................... 16

*Dean Witter Reynolds, Inc. v. Byrd*,
   470 U.S. 213 (1985) ................................................................ 13

*Desiderio v. National Ass'n of Sec. Dealers, Inc.*,
   191 F.3d 198 (2d Cir.1999) ...................................................... 19

*Emery Air Freight Corp. v. Local Union 295*,
   786 F.2d 93 (2d Cir. 1986) ....................................................... 17

*Epic Systems Corp. v. Lewis*,
   138 S. Ct. 1612, 200 L. Ed. 2d 889 (2018) ................................. 2, 29, 30

*Equal Employment Opportunity Commission v. Waffle House, Inc.*,
   534 U.S. 279 (2002) ................................................................ 13

*Eyewonder, Inv. v. Abraham*, No. 08 CV 3579 (GBD)
   2010 WL 3528882 (S.D.N.Y. Sept. 3, 2010) ............................. 21

*Forest City Daly Housing, Inc. v. Town of*,
   *Northhampstead*, 175 F.3d 144 (2d Cir. 1999) ......................... 12

*General Textile Printing & Processing Corp. v. Expromtorg International Corp.*,
   862 F. Supp. 1070 (S.D.N.Y. 1994) ......................................... 12

*Gilbert v. Indeed, Inc.*,
   513 F. Supp. 3d 374 (S.D.N.Y. 2021) ....................................... 29

*Gilmer v. Interstate/Johnson Lane Corp.*,
   500 U.S. 20 (1991) .................................................................. 2

*Gingras v. Think Fin., Inc.*,
   922 F.3d 112 (2d Cir. 2019) ..................................................... 27

*Graphic Communications Union, Chicago Paper Handlers' & Electrotypers' Local No. 2 v. Chicago Tribune Co.*,
   779 F.2d 13 (7th Cir.1985) ...................................................... 18

*In re American Express Financial Advisors Securities Litigation*,
   672 F.3d 113 (2d Cir. 2011) ..................................................... 30

In *re American Honda Motor Co., Inc., Dealerships Relations Litigation*,
   315 F.3d 417 (4th Cir. 2003) ................................................... 30

*Isaacs v. OCE Bus. Servs., Inc.*,
   968 F. Supp. 2d 564 (S.D.N.Y. 2013) ....................................... 19

*Jung v. Skadden, Arps, Slate, Meagher & Flom, LLP*,
   434 F. Supp. 2d 211 (S.D.N.Y. 2006) ....................................... 13

iii

**A-143**

*Latif v. Morgan Stanley & Co. LLC*,
  2019 WL 2610985 (S.D.N.Y. June 26, 2019) ...................................................... 29

*Magtoles v. United Staffing Registry, Inc.*,
  2021 WL 6197063 (E.D.N.Y. Dec. 30, 2021) .................................................... 26

*Maity v. Tata Consultancy Servs., Ltd.*,
  2021 WL 6135939 (D.N.J. Dec. 29, 2021) ................................................... 19, 20

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
  514 U.S. 52 (1995) ............................................................................................. 13

*Mehler v. Terminix Int'l Co.*,
  205 F.3d 44 (2d Cir. 2000) ........................................................................... 14, 15

*Moore v. T-Mobile USA, Inc.*, 10 CV 527 (SLT),
  2010 U.S. Dist. LEXIS 143874, at *10 (E.D.N.Y. Nov. 8, 2010) ...................... 16

*Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*,
  460 U.S. 1 (1983) ........................................................................................... 2, 14

*Nayal v. HIP Network Servs. IPA, Inc.*,
  620 F. Supp. 2d 566 (S.D.N.Y. 2009) ........................................................... 18, 20

*NetJets Aviation, Inc. v. LHC Commc'ns, LLC*,
  537 F.3d 168 (2d Cir. 2008) ............................................................................... 21

*Oldroyd v. Elmira Savings Bank, FSB*,
  134 F.3d 72 (2d Cir. 1998) ........................................................................... 14, 15

*Paguirigan v. Prompt Nursing Emp.Agency LLC*,
  286 F. Supp. 3d 430 (E.D.N.Y. 2017) ................................................................ 25

*Paguirigan v. Prompt Nursing Emp. Agency LLC*,
  2019 WL 4647648 (E.D.N.Y. Sept. 24, 2019) .................................................... 25

*Panwar v. Access Therapies, Inc.*,
  2015 WL 1396599 (S.D. Ind. Mar. 25, 2015) .................................................... 24

*Park v. FDM Grp., Inc.*,
  2018 WL 4100524 (S.D.N.Y. Aug. 28, 2018) .................................................... 21

*Polymer Technology Corp. v. Mimran*,
  37 F.3d 74 (2d Cir. 1994) ................................................................................... 12

*Rent-A-Center, West, Inc. v. Jackson*,
  561 U.S. 63 (2010) ....................................................................................... 16, 21

*Reuters, Ltd. v. United Press International, Inc.*,
  903 F.2d 904 (2d Cir. 1990) ................................................................... 17

*Rodriguez v. DeBuono*,
  162 F.3d 56 (2d Cir. 1998) ..................................................................... 12

*Saizhang Guan v. Uber Techs., Inc.*,
  236 F. Supp. 3d 711 (E.D.N.Y. 2017) .................................................... 21

*Schiavone Construction Co. v. New York City Transit Authority*,
  593 F. Supp. 1257 (S.D.N.Y. 1984) ....................................................... 12

*Shoppe Int'l, Inc. v. Mitsopoulos*,
  2006 WL 8438209 (E.D.N.Y. May 5, 2006) ........................................... 17

*Smith v. AHS Oklahoma Heart, LLC*,
  2012 WL 3156877 (N.D. Okla. Aug. 3, 2012) ........................................ 22

*Southland Corp. v. Keating*,
  465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984) .................................... 29

*Suqin Zhu v. Hakkasan NYC LLC*,
  291 F. Supp. 3d 378 (S.D.N.Y. 2017) ..................................................... 19

*Trump v. Vance*,
  941 F.3d 631 (2d Cir. 2019) ................................................................... 27

*United Bhd. of Carpenters & Joiners of Am. v. Tappan Zee Constructors, LLC*,
  804 F.3d 270 (2d Cir. 2015) ................................................................... 13

*United States v. Dann*,
  652 F.3d 1160 (9th Cir. 2011) ................................................................ 23

*United States v. Int'l Blvd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*,
  907 F.2d 277 (2d Cir. 1990) ................................................................... 30

*United States v. New York Tel.*,
  434 U.S. 159 (1977) ............................................................................... 30

*United States v. Toviave*,
  761 F.3d 623 (6th Cir. 2014) .................................................................. 23

*Valle v. ATM Nat., LLC*,
  2015 WL 413449 (S.D.N.Y. Jan. 30, 2015) ........................................... 22

*Vittoria Corp. v. New York Hotel & Motel Trades Council, AFL-CIO*,
  30 F. Supp. 2d 431 (S.D.N.Y. 1998) ...................................................... 13

**A-145**

*White v. WeWork Cos., Inc.*,
  2020 WL 3099969 (S.D.N.Y. June 11, 2020) .......................................................... 29

*Woodlawn Cemetery v. Loc. 365, Cemetery Workers & Greens Attendants Union*,
  1990 WL 150472 (S.D.N.Y. Oct. 2, 1990) ....................................................... 17, 18

*WorldCrisa Corp. v. Armstrong*,
  129 F.3d 71 (2d Cir. 1997)........................................................................................ 14

**Statutes**

9 U.S.C. § 4................................................................................................................. 13

18 U.S.C. §1589.......................................................................................................... 23

18 U.S.C. § 1589......................................................................................................... 23

**Rules**

CPLR § 7515............................................................................................................... 29

**Regulations**

20 CFR § 655.731 ....................................................................................................... 26

**INTRODUCTION**

Plaintiff Benzor Vidal ("Plaintiff") walks a well-worn path of employees challenging lawful arbitration agreements with their employers. In that connection, Plaintiff attempts to portray himself as an unfortunate victim. He is not.

While he may have family financial obligations, he is not an unsophisticated, illiterate victim of "coyotes" who bilked him out of his life savings to smuggle him across the border. Nor is he the victim of any manner of "forced labor" or human trafficking. To the contrary, he is an educated nurse who has a command of the English language and a lawful permanent resident of the United States. Unlike actual victims of human trafficking coerced into exploitive work arrangements, he leveraged his skill set against a high demand for his services in this country to negotiate assistance securing the right to work in this country legally. In exchange for lengthy and costly assistance from ACS Staffing ("ACS") navigating the immigration system to secure a Green Card, as well as support securing a nursing license and other credentials to work in New York, Plaintiff agreed to remain employed with ACS for a three-year period. After securing his Green Card and New York nursing license, he was not smuggled here in the back of a truck or in the hold of a cargo ship; he was provided company-paid airfare. Upon his arrival, he was not left to his own devices for food, transportation, and shelter, or, worse yet, imprisoned; he was provided grocery money, a transit card, and a rent subsidy. Finally, during his agreed upon period he was not relegated to working in a back alley sweat shop, a remote lettuce field, or a massage parlor for substandard wages; he was lawfully employed as a licensed registered nurse at an authorized healthcare facility, paid more than prevailing wage, and provided paid vacation, sick time, and other benefits.

A-147

If Plaintiff had satisfied the terms of his agreement and completed the agreed upon 3 year term, he would have been free to negotiate a new agreement with ACS or enter the labor market as an "unrestricted free agent." He did not do so. Instead, after he received the benefit of his bargain – particularly assistance securing the invaluable benefit of lawful permanent residency in this country – he shirked his obligations to ACS under their agreement. Having brazenly breached his agreement, he now quarrels with the consequences of his actions. This should not be permitted.

Unlike the cases he references, he faces no punitive consequences. He only faces the legal damages that ACS can prove at arbitration flow from his breach. He now claims that facing those consequences is unconscionable. He was not coerced into signing the agreement; he received valuable consideration. If Plaintiff did not want to face the potential damages flowing from his breach, he should have abided by the terms of his agreement. He should not now look to the court to excuse him from his contractual obligations while he enjoys the benefit of his bargain.

Plaintiff's assertions about weaponized arbitration fly in the face of controlling, well-settled, and unequivocal authority. The United States Supreme Court has repeatedly recognized that the Federal Arbitration Act ("FAA") establishes a liberal policy favoring arbitration when the parties contract for that mode of dispute resolution. See, e.g., *AT&T Mobility, LLC v. Concepcion*, 563 U.S. 333, 337 (2011); see also *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983) (referring to the "liberal federal policy favoring arbitration"). Further, the policy favoring arbitration extends and applies to arbitration agreements between employers and employees. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26-27 (1991); *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1619, 200 L. Ed. 2d 889 (2018). Nothing Plaintiff presents warrants deviation from well-settled Supreme Court precedent.

As set forth more fully herein and in the accompanying exhibits, the record amply refutes Plaintiff's factual assertions and legal arguments. In view of the record before the court and controlling case law, Plaintiff's motion should be denied and the already pending arbitration permitted to proceed without further delay.

**FACTUAL BACKGROUND**

    **A.** <u>**Plaintiff's Employment with Defendant**</u>

Plaintiff Benzor Vidal ("Plaintiff") is a Registered Professional Nurse. (*See* Declaration of Maureen Luy ("Luy Decl."), Ex. G and Ex. I). In addition to his nursing credentials, he has a demonstrated proficiency with the English language. (Luy Decl., Ex. H and Ex. I)

In order to access the more lucrative labor market for nurses in the United States, Plaintiff entered into an Employment Agreement with Defendant Advanced Care Staffing, LLC ("ACS") on May 7, 2019 (the "Original Agreement"). (Luy Decl., Ex. A). Pursuant to the Original Agreement, Mr. Vidal agreed to provide nursing services for ACS's clients at a rate of pay at least as high as that specified by the National Prevailing Wage of the United States Department of Labor. (Luy Decl., Ex. A, para. 9). Pursuant to the Original Agreement, ACS also agreed to provide one way air fare, a rent subsidy for 2 months, and a one-month MTA card. (Luy Decl., Ex. A, Addendum B).

In consideration for Mr. Vidal's services, ACS agreed, *inter alia*, to sponsor Mr. Vidal for an employment-based Immigrant Visa, which allows non-residents to obtain Permanent Residency ("Green Card") status in the United States. (Luy Decl., Ex. A). In that connection, ACS agreed to pay all costs and legal fees associated with sponsoring Mr. Vidal's visa. (Luy Decl., Ex. A, p. 1 and ¶ 16). Not only did they agree to fund his immigration process, they also agreed to pay his costs associated with getting licensed and credentialed to work in the United States. *Id.* In view

3

**A-149**

of that outlay, the Original Agreement expressly states: "the Employee agrees that the Employer has spent a considerable sum of money in recruiting costs, licensure/certification review and credentialing costs, exam costs, Visa Screen costs, attorney's fees, petition filing costs, flight and/or transportation costs, housing costs, etc. to enable him/her to work with Employer in the United States." (Luy Decl., Ex. A, ¶ 19). In exchange for this lengthy and expensive undertaking by ACS, Mr. Vidal agreed to remain employed by ACS for a period of three years. (Luy Decl., Ex. A, ¶ 18). Upon completion of that 3 year term, Plaintiff would have been free to negotiate a new agreement with ACS or enter the labor market to work where he felt best suited his needs.

The Original Agreement also included an agreement to arbitrate disputes arising out of the Employment Agreement. (Luy Decl., Ex. A, ¶ 20). Notably, the Original Agreement states:

> All disputes arising out of this Agreement or Employee's employment, including but not limited to Employee's recruitment, hiring, termination, and/or failure to complete/fully perform paragraph 18 with the Employer, shall be resolved exclusively by mandatory arbitration of the dispute . . . . Employee and Employer both understand and agree that they are knowingly and voluntarily waiving, to the extent permitted by law, any rights they might have to a trial by jury on any discrimination, contractual, employment, or other claims under federal, state, or local law, . . . . *Id.*

Although Mr. Vidal signed the Original Agreement on May 7, 2019, the process for him to secure his Green Card took time. During that process, ACS assisted him with completing and submitting a visa application, amongst other things. In that submission, the parties make clear:

- Plaintiff will be employed full time as a registered nurse earning the prevailing wage of $68,058 per year. (Luy Decl., Ex. J);
- Plaintiff can read and understand English (Doc. No. 23-3); and, *inter alia*,
- Plaintiff has a Bachelor's degree in Nursing (Luy Decl., Ex. H & Ex. I);

On January 4, 2022, well in advance of him commencing actual employment, ACS sent Mr. Vidal an email providing him guidance for his upcoming US Embassy Visa Application interview. (Luy Decl., Exs. B1-B7). In addition, the email attached a cover letter (Luy Decl., Ex. B2), letter waiving a prior promissory note (Luy Decl., Ex. B3), Introductory Guide to Skilled-

4

A-150

Nursing Facility (Luy Decl., Ex. B4), Nurses Quick Guide (Luy Decl., Ex. B5), and an Amended and Restated Employment Agreement ("Amended Agreement") (Luy Decl., Ex. B6 & B7).

The January 4, 2022 cover letter attached to the email explained that ACS had updated their Employment Agreement in accordance with industry best practices and team member feedback. (Luy Decl., Ex. B2). ACS specifically explained that one of the key updates in the Amended Agreement from the Original Agreement was that the new version provides greater clarity of the parties' expectations, obligations, and rights, including that the nursing assignments would be at skilled nursing facilities and nursing homes. (Luy Decl., Ex. B2).

The January 4, 2022 cover letter also explained other updates to the Amended Agreement that are central to the current controversy. First, it explains that the Amended Agreement removed the liquidated damages provision and promissory note that were part of the Original Agreement. The letter further explained, however: "We have tried to be clear from the beginning that ACS is making a significant investment in our nurses, and we only agree to sponsor nurses who are committed to providing services to ACS for a three-year term." (Luy Decl., Ex. B2). With that set forth explicitly, the cover letter further explains that the Amended Agreement would permit ACS to recover any damages that it could prove, which "might be higher or lower" than the amount specified in the Original Agreement. (Luy Decl., Ex. B2). This is not inscrutable legalese; it is a straightforward summary of some revisions in the Amended Agreement. Further, it is in no way coercive; it simply explains the consequences of disregarding the obligations in the agreement.

In addition to the changes summarized in the cover letter, the Amended Agreement reiterates that ACS will pay in accordance with prevailing wage requirements, provide paid time off and other benefits, a one way air fare, a rent subsidy for two months, a gift card for groceries, and a monthly MTA card. (Luy Decl., Ex. B6, p. 4, Section 4, p. 5, Sections 7 and 8)). The

Amended Agreement also specifies a term of 3 years. (Luy Decl., Ex. B6, p. 6, Section 9). The

Amended Agreement again sets forth the other costs it was advancing on behalf of or reimbursing

Plaintiff for, including but not limited to licensing costs, credentialing costs, review course costs,

nursing exam costs, and visa screening costs. (Luy Decl., Ex. B6, p. 4, Section 4). In that

connection, the Amended Agreement also states: "Employee acknowledges that Employer is

incurring Advanced Costs upon the express condition that Employee will complete the Term in

full. Therefore, Employee shall immediately repay all Advanced Costs in the event that Employee

fails to complete the Term for any reason." *Id.*

Finally, the Amended Agreement incorporates a revised Dispute Resolution Provision

("Revised DRP"). (Luy Decl., Ex. B7, Schedule B). Crucially, it states:

> I agree that any dispute, controversy or claim arising between me and Employer
> (including a dispute, controversy or claim arising out of, in connection with or
> relating to, this Agreement, or the interpretation, performance or breach,
> termination or validity hereof) shall be resolved by arbitration pursuant to this
> dispute resolution provision (the "Provision"). This includes, but is not limited to,
> claims involving an alleged violation of public policy; all statutory claims for
> discrimination and/or harassment and/or retaliation under federal, state, or local
> law; and claims concerning wages or other compensation, whether based on statute
> or any other grounds. . . .

*Id.* The Revised DRP further explicitly states: "This agreement to arbitrate shall be governed by

the Federal Arbitration Act and shall remain in force even after I separate from Employer for any

reason." *Id.* The Revised DRP also states that any arbitration "will be administered by the

American Arbitration Association ("AAA") …." *Id.* The Revised DRP also explains that, "the

employer will initially bear all other filing fees, administrative fees, hearing fees, and arbitrator

compensation." *Id.* The Revised DRP also provides that "should there be arbitration proceedings

in accordance with this Provision, [Mr. Vidal] would be free to pursue all available substantive or

procedural rights or remedies in such arbitration proceedings." *Id.* The Revised DRP expressly

provides that Plaintiff understood that "all disputes or claims relating to [his] employment (or termination of employment) will instead be decided by an arbitrator." *Id.*

As part of the January 4, 2022 transmittal, ACS also sent a letter to Plaintiff regarding the Promissory Note that was part of the Original Agreement. (Luy Decl., Ex. B3). Notwithstanding Plaintiff's efforts to mischaracterize that letter as somehow confusing or coercive, the opposite is self-evident. Contrary to any assertions of stultifying legalese, the letter states in plain terms that: "ACS Staffing hereby unconditionally waives, cancels, and releases the $20,000 promissory note that you made to ACS Staffing, dated May 8, 2019." (Luy Decl., Ex. B3). Plaintiff was thus clearly advised that he was free from the obligation set forth in the promissory note.

Also contrary to any claim of confusion or coercion, neither the January 4, 2022 cover letter nor email set forth a deadline by when Mr. Vidal was required to sign the Amended Agreement. (Luy Decl., Ex. B1 and Ex. B2). Instead, the letter concluded by asking Mr. Vidal to contact ACS if he had any questions prior to signing the agreement. (Luy Decl., Ex. B2).

Despite the express invitation to discuss any questions or concerns, Mr. Vidal did not send an email to or call anyone at ACS with any questions regarding the revised agreement. (Luy Decl., Ex. D). Instead, Mr. Vidal returned a fully executed revised agreement (the "Agreement") to ACS *the same day* he received it. (Luy Decl., Ex. C and Ex. D).

On January 6, 2022, ACS emailed Mr. Vidal an invitation to a call to discuss the Amended Agreement. (Luy Decl., Ex. E). He responded to that invitation, but did not ask any questions about the Amended Agreement or give any indication that he wished to revoke it. (Luy Decl., Ex. E). On January 13, 2022, Plaintiff sent another email to ACS regarding his pending work assignment and did not raise any concerns about the Amended Agreement. (Luy Decl., Ex. F). Rather than conveying any concerns, Plaintiff made clear he was eager to start work.

7

Mr. Vidal began working for ACS three months later, on March 8, 2022. (Luy Decl., Ex. G). As a result, the three-year work term set forth in the Agreement would expire on March 7, 2025. (Luy Decl., Ex. G).

While Plaintiff attempts to portray this assignment as some sort of Dickensian workhouse, it was at an accredited institution and the duties were consistent with any nurse assigned there. Also, contrary to any suggestion of involuntary servitude, when Plaintiff arrived in the United States, he requested to work in a different facility from the one to which he was originally assigned, and ACS granted him his desired work assignment. (Luy Decl., Ex. F). Finally, ACS, actually paid Mr. Vidal more than prevailing wage. (Luy Decl., Ex. G, Ex. C, and Ex. K).

After only three months of work, part of which was spent on vacation, Mr. Vidal tendered his resignation to ACS by email dated June 15, 2022, effective on June 29, 2022. (Luy Decl., Ex. G). Contrary to his allegations in this suit, Mr. Vidal never expressed any complaints or dissatisfaction to ACS regarding his assigned work location or any other term or condition of his employment with ACS prior to submitting his resignation. (Luy Decl., Ex. G). Rather than any legitimate concern over his working conditions, Mr. Vidal resigned in order to pursue other opportunities. Indeed, once he received all the front-loaded benefits from ACS – including but not limited to airfare, rent subsidy, grocery money, and crucial immigration and licensing assistance – he ignored his obligations to ACS and "cashed in" by securing a higher paid position. While that was his prerogative, there were agreed upon consequences for pursuing that course of action. Crucially, he acknowledged them in his resignation email. (Luy Decl., Ex. G).

Thus, in response to his resignation, ACS reminded Mr. Vidal that he had signed an agreement to work for a term of three years and that he had barely even worked for three months. (Luy Decl., Ex. G). Mr. Vidal refused to reconsider his resignation. (Luy Decl., Ex. G). ACS thus

issued a letter on June 22, 2022, confirming that Plaintiff's resignation was a breach of the Amended Agreement. (Declaration of Sami Asaad ("Asaad Decl."), Ex. 1). Mr. Vidal's last day of work for ACS was June 29, 2022. (Luy Decl., Ex. G).

## B. Initiation of Arbitration

Plaintiff initially promised ACS that he would pay the costs it incurred as required by the Amended Agreement. (Luy Decl., Ex. G). Shortly thereafter, however, Plaintiff's original counsel, Reuben Seguritan, Esq., contacted ACS's counsel after which no payment was ever made. (Luy Decl., Ex. G; Asaad Dec., Ex. 2).

As a result, ACS initiated arbitration by filing a Demand for Arbitration with the American Arbitration Association ("AAA). (Asaad Dec., Exs. 2-4). On August 1, 2022, Towards Justice informed the AAA that they were not representing Mr. Vidal in the arbitration but were nevertheless requesting a stay on his behalf. (Asaad Dec. Ex. 5). The Arbitration Manager explained that because they were not entering an appearance in the proceeding, she could not communicate with Towards Justice about the administration of the arbitration. *Id.* The AAA denied the request for a 60-day stay but granted a shorter extension of time for the parties to respond to the upcoming deadlines. *Id.* Plaintiff continued to request extensions to delay the arbitration. (Asaad Dec., Exs. 6 and 7). As such, he engendered delay and additional expense, not ACS.

On September 16, 2022, Plaintiff filed the complaint to initiate this litigation. (*See* Doc. No. 1). On September 22, 2022, Arbitrator Sara Kula held a Preliminary Conference at which Plaintiff again requested the opportunity to argue for a stay, which maneuver would again engender delay and additional expense. (Asaad Dec., Ex. 8). On October 6, 2022, Plaintiff, through Towards Justice, sent a letter to Arbitrator Kula again setting forth the arguments for why they believed Plaintiff was entitled to a stay of the arbitration. (Asaad Dec., Ex. 9). ACS responded by letter

9

A-155

dated October 20, 2022. (Asaad Dec., Ex. 10). On October 24, 2022, Arbitrator Kula sent the

parties an order finding, among other things, that:

> Pursuant to the Parties' Dispute Resolution Provision and AAA's rules, as the
> Arbitrator in this matter, I have the authority to rule on my own jurisdiction,
> including with respect to the validity of the arbitration agreement or the arbitrability
> of any claim. Many of the arguments made by Respondent are premature and do
> not support the issuance of a stay. Respondent shall have the opportunity during the
> course of the arbitration to argue that the contract at issue is unenforceable, in whole
> or in part, and to assert counter-claims concerning the Claimant's alleged unlawful
> conduct.

(Asaad Dec., Ex. 11).

On October 28, 2022, Plaintiff sent a letter to the Arbitration Manager requesting that AAA

determine whether the arbitration should be stayed or, in the alternative, the AAA should decline

to administer it in its entirety pending judicial resolution. (Asaad Dec., Ex. 12). Plaintiff sought a

further extension from the AAA on November 1, 2022. (Asaad Dec., Ex. 13). Again, it was the

Plaintiff increasing the duration and cost of the arbitration, not ACS.

By letter dated November 10, 2022, Plaintiff submitted arguments to Arbitrator Kula

regarding his allegation that the Revised DRP was unconscionable. (Asaad Dec., Ex. 14). By letter

dated November 20, 2022, ACS refuted each of Plaintiff's arguments. (Asaad Dec., Ex. 15). On

November 22, 2022, Arbitrator Kula requested further briefing from the parties on the issue of

whether the AAA's Commercial or Employment Rules should apply to the proceeding. (Asaad

Dec., Ex. 16). On December 2, 2022, ACS sent a letter to Arbitrator Kula stipulating to the

application of the Employment Rules and explaining that regardless of which rules Arbitrator Kula

applied to the proceeding, Mr. Vidal was not entitled to a stay of this arbitration. (Asaad Dec., Ex.

17). Plaintiff submitted a letter arguing for the application of the Employment Rules the same day.

(Asaad Dec., Ex. 18). In view of the parties' agreement, there can be no contention about whether the AAA's Employment Rules apply.[1]

By order dated December 9, 2022, Arbitrator Kula denied Mr. Vidal's request for a stay explaining that "[n]either Respondent's initial or supplemental submission provided sufficient factual or legal support for the argument that the arbitration agreement is unconscionable…." (Asaad Dec., Ex. 20). Moreover, Arbitrator Kula held that: "Based on those submissions and the facts related to the execution of the parties' Arbitration Agreement, the Arbitrator will apply AAA's Employment Arbitration Rules." As a result of AAA's Employment Rules, the costs and fees associated with the arbitration have been and shall be borne by ACS. (See AAA Employment Rules and Employment Fee Schedule at Rule 7.) Any concerns Plaintiff asserts regarding such fees and costs are thus unfounded.

Plaintiff sent an email the same day again arguing that Arbitrator Kula lacked the authority to determine the validity and enforceability of the Revised DRP in the Amended Agreement, but provided no legal support. (Asaad Dec., Ex. 21). Of course, this bald assertion is belied by both the express terms of the Revised DRP, as well as AAA Commercial Rule number 7 and Employment Rule number 6, all of which make clear the Arbitrator is empowered to determine whether she had the authority to arbitrate the dispute.

In response to Arbitrator Kula's order, ACS attempted to move forward with the schedule she established and served discovery on Plaintiff. (Asaad Dec., Ex. 22). Further, on January 4, 2023, ACS sent a letter to Ms. Lesser setting forth why Mr. Vidal's claims and arguments in support of a stay lacked merit. (Asaad Dec., Ex. 23).

---

[1] On December 6, 2022, Plaintiff submitted a request to Ms. Gomez and Ann Lesser, Esq, the AAA's Vice President of Labor, Employment, and Elections, arguing that the AAA has its own authority to stay the arbitration outside of Arbitrator Kula. (Asaad Dec., Ex. 19). This went nowhere.

Months after filing this matter, and having failed to prevail upon the assigned Arbitrator and the AAA to stay an arbitration he obviously wants to avoid at all costs because he has undeniably received the benefit of his bargain without reciprocating, he reboots his court claim by filing the present motion for preliminary injunction. This effort should also be rebuffed.

## LEGAL ARGUMENT

### A. Legal Standard

The Second Circuit has made clear that the grant of a preliminary injunction is an extraordinary and drastic remedy which should not be routinely granted. *General Textile Printing & Processing Corp. v. Expromtorg International Corp.*, 862 F. Supp. 1070, 1074 (S.D.N.Y. 1994) *citing Borey v. National Union Fire Ins.*, 934 F.2d 30, 33 (2d Cir. 1991). It is well settled that a court in this Circuit will grant a temporary restraining order or a preliminary injunction only if there is proof of:

> (a) irreparable harm; and,
> (b) either     (1) likelihood of success on the merits; or,
>                 (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Polymer Technology Corp. v. Mimran*, 37 F.3d 74, 77-78 (2d Cir. 1994) citing *Coca Cola Co. v. Tropicana Prods. Inc.*, 690 F.2d 312, 314-315 (2d Cir. 1982). The standards for granting a TRO are the same as those governing the granting of preliminary injunctive relief. *Schiavone Construction Co. v. New York City Transit Authority*, 593 F. Supp. 1257, 1260 (S.D.N.Y. 1984). Both remedies are extraordinary ones that will be granted only upon a showing that the alleged threat of irreparable harm is not remote or speculative, but actual and imminent. *Forest City Daly Housing, Inc. v. Town of Northhampstead*, 175 F.3d 144, 153 (2d Cir. 1999) citing *Rodriguez v. DeBuono*, 162 F.3d 56, 61 (2d Cir. 1998).

**B. Plaintiff's Delegation Clause argument is a red herring because Plaintiff does not (and cannot) dispute that ACS's breach of contract claim is arbitrable.**

Plaintiff attempts to misdirect by asking whether the Court or the arbitrator should determine whether ACS's Breach of Contract claim is arbitrable. The real issue, however, is whether or not the breach of contract claim is arbitrable, which Plaintiff does not and cannot dispute because the Revised DRP is an express agreement to arbitrate that Plaintiff assented to.

To begin with, the Revised DRP explicitly states: "This agreement to arbitrate shall be governed by the Federal Arbitration Act . . . ." (Luy Decl., Ex. B7) "By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Daly v. Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019), quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original). See also, *Badinelli v. Tuxedo Club*, 183 F. Supp. 3d 450, 453 (S.D.N.Y. 2016), quoting *Jung v. Skadden, Arps, Slate, Meagher & Flom, LLP*, 434 F.Supp.2d 211, 214–15 (S.D.N.Y. 2006).

In that connection, the FAA requires courts to order arbitration "in accordance with the terms of the agreement." 9 U.S.C. § 4. In determining whether Plaintiff's claims are subject to arbitration, the threshold inquiry is an analysis of the contractual language. *Equal Employment Opportunity Commission v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002)("Absent some ambiguity in the agreement ... it is the language of the contract that defines the scope of disputes subject to arbitration.") See also, *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 57 (1995). Indeed, courts are obligated to "rigorously enforce arbitration agreements according to their terms," *United Bhd. of Carpenters & Joiners of Am. v. Tappan Zee Constructors, LLC*, 804 F.3d 270, 274 (2d Cir. 2015). "In doing so, a court is not to rule on the potential merits of the underlying claims." *Vittoria Corp. v. New York Hotel & Motel Trades Council, AFL-CIO*, 30 F. Supp. 2d 431,

13

436 (S.D.N.Y. 1998), citing *Broadcast Arts Productions, Inc. v. Screen Actors Guild, Inc.*, 673 F. Supp. 701, 706

 Moreover, in reviewing the scope of the arbitration agreement, the Court must be guided by the principle that arbitration agreements are favored and are to be broadly construed with doubts being resolved in favor of coverage. *AT&T Technologies v. Communications Workers of America*, 475 U.S. 643, 648-650 (1986); *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25. Indeed, prevailing federal precedent directs courts to "construe arbitration clauses as broadly as possible." *Collins & Aikman Prods. Co. v. Building Sys.*, 58 F.3d 16, 19 (2d Cir. 1995) (internal quotations and citations omitted). "[A]s a matter of federal law, any doubts concerning the scope of the arbitrable issues should be resolved in favor of the arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem. Hosp.*, 460 U.S. at 24-25.

 Further, the "existence of a broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that [it] covers the asserted dispute." *Oldroyd v. Elmira Savings Bank, FSB*, 134 F.3d 72, 76 (2d Cir. 1998); see also, *Mehler v. Terminix Int'l Co.*, 205 F.3d 44, 49 (2d Cir. 2000), *cert. denied*, 533 U.S. 911 (2001) (citing *Collins & Aikman Prods. Co.*, 58 F.3d at 19); *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997). In cases where the arbitration clause is broad, "only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *AT & T Technologies v. Communications Workers of America*, 475 U.S. 643, 650 (1986).

 Here the Revised DRP expressly and unequivocally requires that all disputes arising under the agreement itself and all other disputes between the parties are to be resolved through

14

**A-160**

arbitration. It states: "I agree that any dispute, controversy or claim arising between me and Employer (including a dispute, controversy or claim arising out of, in connection with or relating to, this Agreement, or the interpretation, performance or breach, termination or validity hereof) shall be resolved by arbitration pursuant to this dispute resolution provision (the "Provision")."

The Second Circuit has held that this is "precisely the kind of broad arbitration clause that justifies a presumption of arbitrability." *Oldroyd*, 134 F.3d at 76 (clause in employment agreement requiring arbitration of "any dispute, controversy or claim arising under or in connection with this Agreement" creates presumption of arbitrability of employment-related claims). See also, *Mehler*, 205 F.3d at 49-50 (clause providing for arbitration of "'any controversy or claim . . . arising out of or relating to the agreement is ...' a classically broad one."); *Collins & Aikman Prods. Co.*, 58 F.3d at 20 (clause requiring arbitration of "'any claim or controversy arising out of or relating to the agreement'" is "the paradigm of a broad clause."). Because Plaintiff's claims clearly arise out of his employment with ACS, any argument that it does not apply to the claims advanced by Plaintiff in this case is specious.[2]

### C. Second Circuit Authority Mandates that any arbitrability questions in this case be decided by the arbitrator.

The issue of whether questions of arbitrability in this case are to be decided by the court or arbitrator is controlled by the Second Circuit's decision in *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, in which the court held that "where the arbitration agreement is broad and expresses the intent to arbitrate all aspects of all disputes, this – coupled with incorporation of rules that expressly

---

[2] Assuming *arguendo* that the Revised DRP somehow was not operative through some fault in the reformation of contract through the Amended Agreement (which is not the case), the arbitration agreement incorporated into the Original Agreement would then remain in force. That agreement also requires arbitration of all disputes arising out of this Agreement or Employee's employment, so it, too, would require arbitration of this matter. Plaintiff does not (and cannot) contend that the arbitration provision in the Original Agreement is invalid. Therefore, it is indisputable that ACS's breach of contract claim is arbitrable.

empower an arbitrator to decide issues of arbitrability – constitutes clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the arbitrator." 6 F.4th 308, 318-19 (2d Cir. 2021). The Revised DRP also states that any arbitration "will be administered by the American Arbitration Association ("AAA") …." (Luy Decl., Ex. B7) Coupled with the broad arbitrability language in the Revised DRP, the AAA rules applicable to this dispute also invest the arbitrator with the authority to determine arbitrability. See Rule 7 of the AAA's Commercial Rules and Rule 6 of the AAA's Employment Rules.

Given the terms of the Revised DRP and well-settled law, any argument that the Court must rule on the scope or enforceability of the Revised DRP before referral to arbitration must be rejected. Indeed, a court should not determine whether an arbitration agreement is enforceable or whether a particular claim is covered by the arbitration agreement where the parties have clearly and unmistakably delegated that task to an arbitrator. *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68 (2010) ("We have recognized that parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy."); *Moore v. T-Mobile USA, Inc.,* 10 CV 527 (SLT), 2010 U.S. Dist. LEXIS 143874, at *10 (E.D.N.Y. Nov. 8, 2010) ("the question of whether the parties have agreed to arbitrate a specific controversy or even agreed to arbitration at all may be delegated to the arbitrator to decide").

Thus, it is for an arbitrator to decide whether the current claims regarding Plaintiff's employment fall within the scope of the agreement, not this court. That outcome is consistent with well-settled law on the issue and further compels the conclusion that the arbitration should not be stayed, but instead directed to proceed apace. It is all the more compelling in this instance because the assigned Arbitrator has already considered the Plaintiff's arguments and determined:

> Pursuant to the Parties' Dispute Resolution Provision and AAA's rules, as the Arbitrator in this matter, I have the authority to rule on my own jurisdiction, including with respect to the validity of the arbitration agreement or the arbitrability of any claim. Many of the arguments made by Respondent are premature and do not support the issuance of a stay. Respondent shall have the opportunity during the course of the arbitration to argue that the contract at issue is unenforceable, in whole or in part, and to assert counter-claims concerning the Claimant's alleged unlawful conduct.

(Asaad Decl., Ex. 11). On the record before the court, the arguments over the delegation clause are nothing more than a delay tactic. The motion for an injunction should be denied and the parties directed to proceed with the pending arbitration forthwith.

### D. **Plaintiff cannot prove irreparable harm.**

A showing of irreparable harm is the single most important prerequisite for the issuance of injunctive relief. *See Reuters, Ltd. v. United Press International, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990). Plaintiff cannot prevail on this issue.

This Circuit has concluded that forcing a party to participate in an even potentially unwarranted arbitration "by itself imposes no [irreparable] injury to the resisting party, except perhaps in 'extraordinarily rare' circumstances;" "[t]he monetary cost of arbitration certainly does not impose such legally recognized irreparable harm." *Emery Air Freight Corp. v. Local Union 295*, 786 F.2d 93, 100 (2d Cir. 1986). Where there is a valid agreement to arbitrate, no irreparable harm results from compelling the resisting party to arbitrate. *Med. Shoppe Int'l, Inc. v. Mitsopoulos*, 2006 WL 8438209, at *3 (E.D.N.Y. May 5, 2006), *report and recommendation adopted*, 2006 WL 8438198 (E.D.N.Y. May 12, 2006), citing *Emery Air Freight Corp.*, *supra*. If the mere opportunity costs or out-of-pocket expenses associated with an order to arbitrate constitutes irreparable harm, "every order to arbitrate would be deemed to create irreparable harm, and it would be easy to get such orders stayed." *Woodlawn Cemetery v. Loc. 365, Cemetery Workers & Greens Attendants Union*, 1990 WL 150472, at *3 (S.D.N.Y. Oct. 2, 1990), *aff'd*, 930 F.2d 154 (2d Cir. 1991), quoting

17

*Graphic Communications Union, Chicago Paper Handlers' & Electrotypers' Local No. 2 v. Chicago Tribune Co*., 779 F.2d 13, 15 (7th Cir. 1985). "Such a harm does not warrant the extraordinary relief of a stay since it 'is no different from the harm of being turned down on a motion to dismiss or for summary judgment, thereby being forced to try a case that one does not believe should be tried....'" *Id.*

In light of the fact that it is well settled that simply being compelled to arbitrate a claim that falls within the scope of an agreement to arbitrate does not constitute irreparable harm, Plaintiff's motion should fail on this basis alone.

### E.  **Plaintiff is unlikely to succeed on the merits**

Plaintiff advances several arguments for the proposition he is likely to succeed on the merits. None of them are persuasive.

█ *The Amended Agreement and Revised DRP are not unconscionable.*

Under New York law, "a contract is unconscionable when it is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms." *Nayal v. HIP Network Servs. IPA, Inc*., 620 F.Supp.2d 566, 571 (S.D.N.Y. 2009) (internal citations and quotations omitted). To prove unconscionability, "there must be a showing that such a contract is both procedurally and substantially unconscionable. The procedural element of unconscionability concerns the contract formation process and the alleged lack of meaningful choice; the substantive element looks to the content of the contract, per se." *Id*. (internal citations omitted) (emphasis added). Here, there is neither procedural nor substantive unconscionability.

Plaintiff contends that the arbitration agreement is procedurally unconscionable because it is an employment contract of adhesion, but this argument has already been considered by courts and universally rejected. "A contract or clause is unconscionable when there is an absence of

meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Desiderio v. National Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 207 (2d Cir. 1999); see also, *Isaacs v. OCE Bus. Servs., Inc.*, 968 F. Supp. 2d 564, 570 (S.D.N.Y. 2013) ("[I]t is well accepted under New York law that it is not unconscionable to be bound by an arbitration agreement in the course of securing employment. Moreover, the fact that there is inequality in bargaining power between an employer and a potential employee is not a sufficient reason to hold that arbitration agreements are not enforceable in the employment context. Therefore, the fact that [the employer] unilaterally drafted the Policy and required the plaintiff to sign the Policy as a condition of his employment does not in itself render the Policy unconscionable.") (Internal citations omitted).[3] That Plaintiff subjectively believed he would have lost his opportunity to work for Claimant if he did not sign the arbitration agreement does not support a finding of procedural unconscionability. See *Maity v. Tata Consultancy Servs., Ltd.,* 2021 WL 6135939, at *7 (D.N.J. Dec. 29, 2021).

In addition, contrary to Plaintiff's assertions, he was not coerced into signing the agreement with high-pressure tactics. ACS sent Plaintiff the Amended Agreement on January 4, 2022 "for [his] perusal" with a message letting him know that a conference call would be scheduled in the following week to go over it. Additionally, the cover letter attached with the agreement expressly invited Plaintiff to ask questions by phone or email before signing and to sign only if he had no questions. *Id.* The cover letter to the Amended Agreement also highlighted the key differences

---

[3] Even in instances where non-English speakers were told to sign an agreement without providing a translation, New York courts have refused to find the agreements procedurally unconscionable. See *Suqin Zhu v. Hakkasan NYC LLC*, 291 F. Supp. 3d 378, 391 (S.D.N.Y. 2017) ("Plaintiffs do not allege that they ever tried to negotiate the terms of the Agreement or that Defendants prevented them from doing so; that Plaintiffs requested and were denied a translated version of the Agreement or the opportunity to review it; or that Defendants used high-pressure or coercive tactics."). Here, Plaintiff is a fluent English speaker, which cuts against any finding of unconscionability.

between the original contract and the amended agreement, including the elimination of liquidated damages, making clear that in the event of breach, the contract "allows for recovery of whatever damages are proven". *Id.* Plaintiff chose not to ask any questions or wait for the conference call. Instead, Plaintiff signed the agreement on the same day that he received it and emailed it back to ACS. Plaintiff's contention that he had no bargaining power is palpably false. While he elected not to engage in those discussions, he was demonstrably able to negotiate the terms of his employment because on January 13, 2022, Plaintiff requested that his facility assignment be changed to Downtown Brooklyn, New York and ACS granted Plaintiff's requested assignment. (Luy Decl., Ex. F)

Although the absence of procedural unconscionability is sufficient to reject Plaintiff's claim that the arbitration agreement is unconscionable, *see Nayal,* 620 F.Supp.2d at 571 (S.D.N.Y. 2009), Plaintiff also has failed to demonstrate that the arbitration agreement is substantively unconscionable. Plaintiff's assertion that the terms of the agreement are substantively unconscionable is without merit, having previously been considered and rejected by courts.

a. The fee shifting provisions are not unconscionable.

Plaintiff's claim that the arbitration agreement's prevailing-party ("loser pays") provision violates federal or state wage and hour or trafficking laws are meritless. To begin with, Plaintiff's arguments are premised upon incurring arbitration costs and fees, which is false. Not only has ACS paid the filing fee, but the Arbitrator has determined (and ACS had already stipulated) that the AAA's Employment Rules apply. Those rules require the employer to pay the arbitrator's compensation unless the employee or individual, post dispute, voluntarily elects to pay a portion

of the arbitrator's compensation.[4] As a result, Plaintiff has not and will not incur fees for the AAA's administration and the arbitrator's consideration of the case.

Plaintiff's arguments premised on the attorney fee shift in the Revised DRP are similarly unpersuasive. In fact, controlling authority holds otherwise. *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008)("Under New York law, a contract that provides for an award of reasonable attorneys' fees to the prevailing party in an action to enforce the contract is enforceable if the contractual language is sufficiently clear."); *Saizhang Guan v. Uber Techs., Inc.*, 236 F. Supp. 3d 711, 732 (E.D.N.Y. 2017)(rejecting an attack on arbitration based on fee-splitting because the challenge was limited to a review of the potential costs for "the arbitration of enforceability")(quoting *Rent–A–Center, West, Inc. v. Jackson*, 561 U.S. 63, 74 (2010)); *Eyewonder, Inv. v. Abraham*, No. 08 CV 3579 (GBD), 2010 WL 3528882, at *4 (S.D.N.Y. Sept. 3, 2010) ("The arbitrator was within his power under the Employment Agreement to shift all costs and did not exceed his authority by permitting Plaintiff to recover monies it spent on attorneys' fees in the arbitration, and arbitration costs and fees.")

### b. Wage and Hour laws do not bar ACS's claim here.

Plaintiff's arguments about wage and hour law are without merit. Indeed, New York courts have found that even termination fees imposed by employment agreements did not constitute illegal kickbacks under the Fair Labor Standards Act ("FLSA"). *See Park v. FDM Grp., Inc.*, 2018 WL 4100524, at *4 (S.D.N.Y. Aug. 28, 2018).

None of the cases cited by Plaintiff support his claim that the cost-shifting provision of the arbitration agreement violates the Fair Labor Standards Act or New York wage and hour law. Indeed, the cases cited by Plaintiff are inapposite to the facts in this case. Unlike the employers in

---

[4] See, https://www.adr.org/sites/default/files/Employment_Group_Filing_FeeSchedule.pdf

cases cited by Plaintiff, ACS is not trying to deduct costs that are primarily for its benefit from Plaintiff's wages. Instead, ACS is seeking lawful damages, as determined by the Arbitrator, for Plaintiff's breach of contract. Moreover, Plaintiff's argument that the damages alleged in ACS's breach of contract claim arose from issues that primarily benefitted ACS is specious. The damages at issue arise out of ACS's expenditures pertaining to, among other things, Plaintiff a Green Card and license to work as a Registered Professional Nurse in New York. While ACS would benefit from Plaintiff being able to work during the circumscribed term of the agreement, Plaintiff would benefit from his New York license and the access to the U.S. job market provided by his Green Card for the rest of his life.

Similarly, Plaintiff has not cited a single case that states that a prevailing party fee-shifting provision is unenforceable in a breach of contract case involving the employee's breach. The cases Plaintiff cites are, again, inapposite, involving cases initiated by employees to enforce statutory rights. For instance, Plaintiff cites to *Smith v. AHS Oklahoma Heart, LLC*, 2012 WL 3156877, at *4 (N.D. Okla. Aug. 3, 2012), which found "the arbitration clause requires Plaintiff to pay Defendant's attorneys' fees if she does not prevail, which is inconsistent with Plaintiff's statutory rights under Title VII and the EPA." Again, this is not the case here because Title VII and the EPA aren't at issue; ACS is seeking to enforce a breach of an employment agreement.[5]

---

[5] Although ACS contends that there is no reason to sever the fee-shifting provision, its presence does not render the agreement unconscionable because it can be severed from the arbitration agreement if necessary. Courts have found that fee-shifting provisions are not essential to the bargain and that severance is proper when warranted. See *Smith v. AHS Oklahoma Heart, LLC*, No. 11-CV-691-TCK-FHM, 2012 WL 3156877, at *4 (N.D. Okla. Aug. 3, 2012) (noting "severance was proper, even in absence of severability clause, because "the primary purpose of the arbitration bargain ... was not to regulate costs or attorney's fees" but instead "was designed to provide a mechanism to resolve employment-related disputes."). Just as in *Smith*, the purpose of the arbitration agreement is to set a mechanism to resolve employment disputes. Unlike *Smith*, the Revised DRP contains an express severability clause. Therefore, even if the fee-shifting were deemed unenforceable, it would not render the agreement unconscionable because it can readily be severed from the rest of the arbitration agreement if the arbitrator deems that appropriate. See *Valle v. ATM Nat., LLC*, 2015 WL 413449, at *7 (S.D.N.Y. Jan. 30, 2015) (finding the appropriate remedy is to sever the

c. Plaintiff's TVPA argument does not bar arbitration.

Plaintiff attempts to vilify ACS by accusing it of engaging in modern-day slavery. His arguments are baseless.

"Forced Labor" is prohibited by 18 U.S.C. § 1589. Through this statute:

> Congress intended to address serious trafficking, or cases where traffickers…restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence. According to the statute, the threat, considered from the vantage point of a reasonable person in the place of the victim, must be "sufficiently serious" to compel that person to remain.

*United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011) (emphasis added). There are no allegations of any threat of violence, so that is no concern here. Instead, Plaintiff argues he was coerced through threatened use of the legal process. He fails on that front.

"Abuse or threatened abuse of law or legal process" is defined as: "[T]he use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." 18 U.S.C. §1589(c)(1) (emphasis added). Thus, § 1589(c)(1) prohibits use of the legal system for a reason it is not otherwise meant to be used. *Dann*, 652 F.3d at 1170; see *United States v. Toviave*, 761 F.3d 623, 625 (6th Cir. 2014). Thus, Plaintiff's persistent assertion that ACS is trying to weaponize arbitration is unavailing. Using a tool for its intended purpose does not weaponize it. Using a hammer to drive a nail or a wrench to turn a bolt does not turn them into weapons. Similarly, using a federally authorized and encouraged dispute resolution tool to resolve a contract dispute, which is what ACS's effort to arbitrate its breach of contract claims against Plaintiff involves, does not transform that arbitration into an "abuse of process" weapon. See *Dann* and *Toviave*, *supra*.

---

improper "loser pays" provision of the arbitration agreement and not to invalidate the entire arbitration provision).

**A-169**

*Panwar v. Access Therapies, Inc.,* provides a counterpoint to this case. 2015 WL 1396599, at *5 (S.D. Ind. Mar. 25, 2015). In *Panwar*, the plaintiffs signed employment agreements and promissory notes requiring them to repay their employer for expenses and lost revenue if they resigned before the term of the agreement was completed. *See id.* at * 2. The court dismissed the "forced labor" claims, explaining:

> [The] [p]laintiffs conflate the "use" of legal process with the "abuse" of legal process…. [A]buse of legal process requires a finding that the legal process has been utilized to achieve an end other than one which the process was designed to accomplish. The motive behind such action is irrelevant.
>
> ***
>
> …[F]iling lawsuits against employees who breached their employment contracts is exactly the end that the legal process at issue was designed to accomplish. It is not an abuse of legal process to enforce valid contractual rights against individuals who no longer wish to be bound by the terms of an agreement they voluntarily signed. By [the] [p]laintiffs' logic, any pursuit of damages for breach of contract would constitute an abuse of process, which would be an absurd outcome. Thus, the Court concludes that…the enforcement of contract rights [did not] constitute[] an "abuse of law or legal process" for purposes of TVPA liability.

*Id*. at * 5 (citations omitted).

*Baldia v. RN Express Staffing Registry LLC*, also provides a meaningful contrast to the current case. 2022 WL 4777836 (S.D.N.Y. Oct. 3, 2022). Similar to this case, the defendant in *Baldia* recruited Filipino nurses to work in New York. 2022 WL 4777836 *1. Applying a vastly different standard than the irreparable harm/success on the merits standard here, the *Baldia* court denied the employer's motion to dismiss on two grounds that are absent in this case. First, the employment agreement at issue in *Baldia* contained both liquidated damages and promissory note, which the court found potentially coercive. *Id.* at *7-9. ACS removed similar provisions when it asked Plaintiff to sign the Amended Agreement before starting work in New York. *Baldia* also recognized that the threat of deportation may qualify as abuse of legal process. *Id.* at *10, citing

24

*Adia v. Grandeur Mgmt., Inc.*, 933 F.3d 89, 93 (2d Cir. 2019); *Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 444 (E.D.N.Y. 2013).There is no evidence of any such threat in this matter.

Plaintiff's comparison of this case to *Paguirigan v. Prompt Nursing Emp. Agency LLC*, 2019 WL 4647648 (E.D.N.Y. Sept. 24, 2019), is grossly inapposite.[6] As a preliminary matter, *Paguirigan* does not even prohibit recovery of liquidated damages from an employee, stating, "of course, there is no prohibition against defendants placing a valid liquidated damages provision in their contracts." *Id.* at *17 (emphasis added). In *Paguirigan,* the court found that the employer violated the Trafficking Victims Protection Act because of multiple actions that together were tantamount to holding a proverbial gun to workers' heads. Those actions included (a) continuing to impose a $25,000 contract termination fee after a judge had already ruled against it, (b) forcing workers to sign a $25,000 confession of judgment in favor of their employers, (c) filing lawsuits against workers claiming damages of $250,000, and (d) criminally prosecuting workers who quit. *See* 286 F. Supp. 3d 430, 435 (E.D.N.Y. 2017). While none of those things is true in this case, Plaintiff contends that ACS's arbitration demand constitutes a more egregious example of human trafficking because ACS is seeking an opportunity to prove liability and damages in the arbitration hearing. He overstates his case.

The other trafficking cases cited by Plaintiff involve disproportionate liquidated damages and other transgressions that are also easily distinguishable from this case. For example: *NY Attorney General Investigation of Albany Med Health System*, https://ag.ny.gov/sites/default/files/albany_med_aod_no._22-058_-_fully_executed_9.13.22.pdf

---

[6] The NYAG's reference to *Paguirigan* in its letter to the AAA reveals that the NYAG is accepting Plaintiff's counsel's representation of the facts at face value without determining whether or not Plaintiff was subject to a liquidated damages provision or some other contract termination fee, whether he was sued for a large sum certain of money, or whether he was the subject of criminal prosecution like Paguirigan. Mr., Vidal was not, so the NYAG's concerns are not applicable to this case.

("The employment contract provided to these nurse recruits faced mandatory repayment provisions that obligated payments between $10,000 to $20,000 and threatened reporting to immigration authorities upon non-compliance." No comparable facts are present here.) *Magtoles v. United Staffing Registry, Inc*., is similarly distinguishable. 2021 WL 6197063, at *1 (E.D.N.Y. Dec. 30, 2021). Unlike the case before the court, that matter involved a liquidated damages provision that required employees to pay up to $90,000 and threats the employer would report a change in employment status to immigration authorities and face possible deportation. *Id*. Again, are no comparable facts are present here.[7]

### F.  There is no "serious question" warranting a stay.

Plaintiff contends that if the court is not able to resolve the question of Likelihood of Success on the Merits in his favor, an injunction should still issue because of "serious questions" about the arbitrator's authority warrant an injunction. He is mistaken.

In this regard, the Plaintiff's reliance on *Citigroup Global Markets v. VCG Special Opportunities Master Fund Unlimited*, 598 F.3d 30 (2d Cir. 2010), is misplaced. While that case sets forth an oft-quoted recitation of the appropriate test for determining whether a preliminary injunction is warranted, including support for the "serious question" basis for granting injunctive relief, its usefulness is limited because that case is so factually inapposite. Instead of an agreement directly between an employee and an employer, that matter dealt with a complex credit default swap transaction between a hedge fund, a brokerage service, and a third party that resulted in a

---

[7] Interestingly, the presence of a liquidated damages clause should not be considered *per se* an unenforceable penalty.  In fact, the opposite is true. Although 20 CFR § 655.731(c)(10)(i) (A) prohibits imposition of a "penalty" on H-1B non-immigrant workers, subsection (B) specifically approves of liquidated damages in that context, and subsection (C) explains that whether a set sum is an appropriate liquidated damages amount vs penalty is to be determined by state law. H-1B non-immigrant workers have no lawful permanent status in the United States, so they are more vulnerable to such provisions. By contrast, Vidal has a green card (Lawful Permanent Resident status) and is free to work where he wishes.

claim for $10,000,000. 598 F.3d at 32. In addition to a suit between the parties to the credit default swap agreement, the hedge fund also initiated arbitration against the brokerage service provider before FINRA. *Id*. In response, the brokerage service provider sought an injunction to stay the FINRA arbitration pending the outcome of the suit between the parties to the credit default swap. *Id*. In affirming the utility of the "serious question" basis for granting an injunction, the court observed: "The value of this circuit's approach to assessing the merits of a claim at the preliminary injunction stage lies in its flexibility in the face of varying factual scenarios and the greater uncertainties at the outset of particularly complex litigation." *Id*. at 35.

Clearly this matter is far from that presented to the court in *Citigroup Global Markets*. Instead of two competing suits between three parties before different forums, this matter involves the straightforward breach of an employment agreement between two parties in a single forum. Plaintiff's reliance on *Trump v. Vance* also misses the mark because it is also completely inapposite. 941 F.3d 631 (2d Cir. 2019), *aff'd and remanded*, 207 L. Ed. 2d 907, 140 S. Ct. 2412 (2020)(matter of first impression regarding presidential immunity and enforcement of grand jury subpoena). The same holds true for *Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019)(addressing an issue of first impression regarding tribal sovereign immunity and an arbitration agreement designed to avoid federal and state consumer protection laws through application of tribal law). The fact that Plaintiff clearly does not want to arbitrate this matter does not convert the breach of contract claim into a "serious question" warranting an injunction, even if the arbitrator will consider Plaintiff's other claims in the process.

### G. **Balance of Equities**

Plaintiff argues that the balance of the equities weigh in his favor. He is wrong.

Plaintiff has received the benefit of his bargain. He was assisted and underwritten through the visa sponsorship and licensing process. Once that was process was completed, he was flown

to the United States, provided grocery money, a transit card, a rent subsidy, and a job paying above prevailing wage, as well as other meaningful employment benefits. Rather than comply with his part of the bargain to remain employed by ACS for three years, he reneged on his agreement after only three months and used the Green Card and New York license ACS helped him secure to find another, better paying job. He clearly made a cost-benefit analysis that he could earn more money elsewhere and that difference would cover any consequences of his breach because he agreed to pay what was due in his resignation. Apparently he now regrets the cost benefit analysis he performed. That he does not want to suffer the consequences of that naked breach, however, does not tip the balance of equities in his favor. Rather, ACS should be able to advance its claims through the agreed-upon arbitration process in a timely fashion.

### H. **Public Interest.**

Plaintiff argues that the public interest weighs in favor of granting this requested injunction. Again, he misses the mark.

There is no public interest in preventing ACS from arbitrating its breach of contract claim against Plaintiff. To the contrary, the only interest is Plaintiff's personal interest in avoiding the pecuniary consequences of his breach.

The fact that his attorneys appear to have prevailed on the NYAG to send letters to the AAA does not alter this conclusion. As set forth previously, the NYAG was self-evidently prompted to send those letters based on the distorted portrayal of the underlying facts. In the absence of any action by the NYAG based on a complete understanding of the underlying facts, no determination of a public interest in barring arbitration plaintiff's breach should be found. Instead, his personal interest in avoiding the consequences of his breach should give way to the well-settled public interest in enforcing arbitration agreements.

Contrary to Plaintiff's arguments, well-settled case law mandates that the public interest would be better served by denying the requested injunctive relief and directing the parties to proceed through arbitration. To begin with, the Second Circuit has held that employment-related civil rights claims are arbitrable. *Daly*, 939 F.3d at 422; *Gilbert v. Indeed, Inc.*, 513 F. Supp. 3d 374, 396–97 (S.D.N.Y. 2021). Indeed, *Southland Corp. v. Keating*, 465 U.S. 1, 16, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984), foreclosed any such argument. "The Federal Arbitration Act rests on the authority of Congress to enact substantive rules under the Commerce Clause" and "[i]n enacting § 2 of the federal Act, Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration." *Id.* at 10-1. Thus, Congress intended to foreclose attempts to undercut the enforceability of arbitration agreements." *Id.* at 16. See also, *White v. WeWork Cos., Inc.*, 2020 WL 3099969, at *5 (S.D.N.Y. June 11, 2020) (holding that CPLR § 7515 was preempted by FAA); *Latif v. Morgan Stanley & Co. LLC*, 2019 WL 2610985 (S.D.N.Y. June 26, 2019) (same).

The Supreme Court addressed other challenges to the FAA based on purported statutory conflicts in *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1619, 200 L. Ed. 2d 889 (2018). There the Court squarely addressed the question: "Should employees and employers be allowed to agree that any disputes between them will be resolved through one-on-one arbitration?" *Id*. In the face of a variety of asserted statutory conflicts to arbitration, the Court observed: "Not only did Congress require courts to respect and enforce agreements to arbitrate; it also specifically directed them to respect and enforce the parties' chosen arbitration procedures." 138 S. Ct. at 1621 It also noted, "[i]n many cases over many years, this Court has heard and rejected efforts to conjure conflicts between the Arbitration Act and other federal statutes. In fact, this Court has rejected

29

every such effort to date . . . ." 138 S. Ct. at 1627. Against that background, the Court concluded:
"The policy may be debatable but the law is clear: Congress has instructed that arbitration
agreements like those before us must be enforced as written." 138 S. Ct. at 1632.

In view of the foregoing, Plaintiff's argument that ACS's breach of contract claim should
not be arbitrated because of potential conflicts with the Trafficking Victim Protection Act or
federal and state wage and hour issues should be rejected. In the absence of an express
Congressional exception to the arbitrability of Plaintiff's purported TVPA or wage and hour
claims, their presence is no impediment to arbitration of Defendant's breach of contract claim. To
the contrary, the breadth of the arbitration agreement, especially the express language that "should
there be arbitration proceedings in accordance with this Provision, [Mr. Vidal] would be free to
pursue all available substantive or procedural rights or remedies in such arbitration proceedings,"
weighs against an injunction and in favor of unimpeded arbitration of both ACS's claims and
Plaintiff's purported defenses and counterclaims.[8]

---

[8] As an apparent "Hail Mary" pass, Plaintiff argues that an injunction is warranted under the All Writs Act. This effort
is out of bounds. The Supreme Court has stated that the All Writs Act empowers courts to issue extraordinary writs
"as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued." *United
States v. Int'l Blvd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 907 F.2d 277 (2d Cir.
1990) quoting *United States v. New York Tel*., 434 U.S. 159, 172 (1977). Unlike *Int'l Blvd. of Teamsters,* however,
the District Court does not need to take action pursuant to the All Writs Act here because there are clear alternative
procedures available for Plaintiff to obtain the relief that he seeks. Specifically, the arbitration to which he agreed to
submit any such claims. His attempt to avoid the application of a mandatory arbitration provision in an employment
agreement is not an "exceptional circumstance" under the All Writs Act. The other cases cited by the Plaintiff also
fail to support resort to the All Writs Act here. I*n re American Honda Motor Co., Inc., Dealerships Relations
Litigation*, 315 F.3d 417 (4th Cir. 2003)(affirming denial of potential double recovery when the settlement agreement
remained in the court's exclusive jurisdiction); *In re American Express Financial Advisors Securities Litigation*, 672
F.3d 113 (2d Cir. 2011)( the arbitration enjoined because claims barred by the settlement agreement); *Allstate Ins. Co.
v. Elzanaty*, 929 F. Supp. 2d 199 (E.D.N.Y. 2013)("It is no doubt unwise for a Court to simply step in and stay a
contractually deserved arbitration merely because the Court sees a potentially more efficient use of time and resources
by litigants, arbitrators, and judges. This is undeniably a slippery slope.").

**CONCLUSION**

For the reasons set forth herein and supported by the accompanying evidence, the Plaintiff's motion for a stay of the arbitration should be denied in its entirety and the parties directed to complete the pending arbitration in a timely fashion.

Dated: February 8, 2023           **FordHarrison, LLP**

*Counsel for Claimant Advanced Care Staffing, LLC*

By:        _____

Sami Asaad
Craig Dickinson
Marissa Vitolo
CityPlace II
185 Asylum Street, Suite 820
Hartford, CT 06103
Tel #: 860-740-1357
Fax #: 860-740-1397
Email: sasaad@fordharrison.com
       cdickinson@fordharrioson.com
       mvitolo@forharrison.com

## CERTIFICATE OF SERVICE

This is to certify that on the 8th day of February a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's CM/ECF electronic filing system.

/s/ Sami Asaad
.                                                                                          Sami Asaad

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Benzor Shem Vidal,

                *Plaintiff*,

     -against-

Advanced Care Staffing, LLC

                *Defendant*.

Civ. Action. No. 1:22-cv-05535-NRM-MMH

DECLARATION OF MAUREEN LUY

I, Maureen Luy, hereby depose and state under oath as follow.

1.      I am over the age of eighteen and believe in the obligation of an oath.

2.      I am employed by Advanced Care Staffing, LLC ("Advanced Care") in the role of Director of Recruitment. I have been employed with Advanced Care for twelve years.

3.      Attached as Exhibit A is a true and accurate copy of the Employment Agreement between Benzor Shem R. Vidal and Advanced Care on May 8, 2019 (the "Original Agreement").

4.      Attached as Exhibits B1- B7 are true and accurate copies of the email with original attachments that Advanced Care sent to Mr. Vidal on January 4, 2022 regarding, among other things, the Amended Employment Agreement and cover letter explaining the amendments. The individual exhibits are as follows:

      a.   Exhibit B1 is a true and accurate copy of the January 4, 2022 email to Mr. Vidal;

      b.   Exhibit B2 is a true and accurate copy of the January 4, 2022 letter attached to the email that explains some of the amendments in the Amended and Restated Employment Agreement;

  c. Exhibit B3 is a true and accurate copy of the January 4, 2022 letter to Mr. Vidal, attached to the email, stating that Advanced Care "unconditionally waives, cancels, and releases" the promissory note the Mr. Vidal made to Advanced Care pursuant to the Prior Agreement;

  d. Exhibit B4 is a true and accurate copy of Advanced Care's Quick Guide for Sponsored Nurses, which was attached to the email;

  e. Exhibit B5 is a true and accurate copy of the Introductory Guide to Skilled Nursing Facilities, which was attached to the email;

  f. Exhibit B6 is a true and accurate copy of the Amended and Restated Employment Agreement with Schedule A, which was attached to the Email; and

  g. Exhibit B7 is a true and accurate copy of Schedule B to the Amended and Restated Employment Agreement, titled "Dispute Resolution Provision," which was attached to the email.

5. Attached as Exhibit C is a true and accurate copy of the fully executed Amended and Restated Employment Agreement, signed by Mr. Vidal on January 4, 2022.

6. Attached as Exhibit D is are true and accurate copies of the email communications between Mr. Vidal and Joel Rosalio on January 4, 2022.

7. Attached as Exhibit E are true and accurate copies of email communications between Mr. Vidal and Advanced Care on January 6, 2022 and January 10, 2022.

8. Attached as Exhibit F is a true and accurate copy of Mr. Vidal's email dated January 13, 2022.

Case 23-303, Document 49, 07/05/2023, 3537568, Page192 of 285

9.      Attached as Exhibit G are true and accurate copies of Mr. Vidal's email communications with Advanced Care on June 15, 2022.

10.      Attached as Exhibit H is a true and accurate copy of Mr. Vidal's resume that he submitted to Advanced Care.

11.      Attached as Exhibit I are true and accurate copies of Mr. Vidal's transcript from CEBU Doctors' University with related diplomas and certificates.

12.      Attached as Exhibit J is a true and accurate copy of the Application for Prevailing Wage Determination that Advanced Care submitted to the United States Citizenship and Immigration Services on behalf of Mr. Vidal with the Immigrant Petition for Alien Worker, Form I-140.

13.      Attached as Exhibit K is a true and accurate copy of the Wage Statement showing the history of compensation that Mr. Vidal earned while employed by Advanced Care prior to his resignation.

14.      The foregoing documents and email communications were created and maintained in the regular course of Advanced Care's business, and the preparation and retention of such materials is a regular practice of the company.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 8, 2023.


_____
Maureen Luy



08 MAY 2019

This Employment Agreement (the "Agreement") is hereby made this date _____, by and between Advanced Care Staffing, LLC, 1000 Gates Avenue, Suite 5B, Brooklyn, NY 11221, United States of America (the "Employer"), and _Benzor Chem R. Vidal_____, a Registered Professional Nurse and current resident of _27 Rizal Avenue Extension Mambaling Cebu City, Cebu, Phil._, (the "Employee").

### WITNESSETH:

WHEREAS, Employer is a healthcare staffing agency in the business of recruiting and deploying healthcare professionals to contracted medical facilities;

WHEREAS, Employer has determined that there is an insufficient number and shortage of Registered Professional Nurses to meet the present and future needs of its contracted medical facility providing skilled nursing and rehabilitation to elderly and infirmed residents; and,

WHEREAS, Employer has determined that as a result of said shortage, it must recruit Registered Professional Nurses outside of the United States in order to be properly staffed; and,

WHEREAS, Employee is a Registered Professional Nurse having received a bachelor's degree in nursing from an accredited university; and,

WHEREAS, Employee has promised that he or she will exhaust all means necessary—and in a timely manner—to obtain and maintain a Visa Screen certificate from the Commission on Graduates of Foreign Nursing Schools Certification Program, and obtain and maintain an unrestricted license to practice Nursing in the State of New York, Connecticut, New Jersey or Florida;

WHEREAS, the Employee hereby confirms and affirms that he or she is not bound by any other employment agreement with any other Employer.

WHEREAS, if the Employee has a pending or approved Form I-140 petition filed by another employer/petitioner, the Employee affirms and confirms that he or she no longer wishes to pursue employment with such employer/petitioner.

WHEREAS, Employee desires to relocate to the State of New York, Connecticut, New Jersey or Florida in the United States of America and desires to become employed and receive remuneration and benefits from Employer;

WHEREAS, Employee shall accept Employer's assigned contracted medical facility; and

WHEREAS, Employee shall accept any shift assigned made by the assigned contracted medical facility in accordance with the contract between the medical facility and the Employer.

WHEREAS, Employer will shoulder the following fees and costs: attorney fee, USCIS and NVC filing fees, RN State licensing fees, Visa Screen fee, credentialing fee, and medical examination fee, excluding any and all fees for dependents.

WHEREAS, Employee understands that the approval or disapproval of the petition rests solely upon the discretion of the USCIS and that, Employer makes no representations and warranties that said petition will be approved by USCIS, or that the USCIS will act one way or the other on the petition. WHEREAS, Employee holds the Employer free and harmless from liability whatsoever in the event the petition is disapproved by the USCIS or for any reason the Employee is prevented from lawfully staying or working in the USA.

WHEREAS, Employee is able to read, write, and understand English proficiently and with ease, and has read and understood this entire Agreement; and,

Page 1 of **6**

**A-182**



WHEREAS, Employee has been given a reasonable and sufficient opportunity to consider this Agreement and to consult with his or her own attorney prior to executing this Agreement; now:

EMPLOYER AND EMPLOYEE DO HEREBY AGREE AS FOLLOWS:

I.      **Job Duties and Requirements**

1.  The Employer agrees to employ the Employee in accordance with the terms of this agreement as a Registered Professional Nurse and the Employee agrees to accept such employment.

2.  Employee shall exhaust all means necessary to obtain and maintain a Visa Screen Certificate from the Commission on Graduates of Foreign Nursing Schools (CGFNS) and as soon as practicable obtain and maintain an unrestricted license to practice Nursing in the State of New York, Connecticut, New Jersey or Florida.

3.  The Employee's job duties are generally described as follows: Provide general nursing care to patients in a rehabilitation and health care center. Administer prescribed medications and treatments in accordance with approved nursing techniques. Prepare equipment and aid physician during treatments and examinations of patients. Observe patient, record significant conditions and reactions, and notify supervisor or physician of patient's condition and reaction to drugs, treatments, and significant incidents. Take temperature, pulse, blood pressure, and other vital signs to detect deviations from normal and assess condition of patient. Employee may also be required to make beds, bathe, and feed patients and shall perform such other duties associated with the job of a Registered Professional Nurse as may be assigned to him/her by the Employer.

4.  Employee agrees to devote his/her professional efforts in the full time practice of Nursing exclusively to the interest of the Employer. Employee shall devote his/her utmost knowledge and best skill to the care of such patients entrusted to him/her. Employee shall conduct himself/ herself in strict conformance to the principles of medical ethics and standards of the healthcare profession and its governing bodies.

5.  Other than for Employer herein, Employee agrees not to engage in the practice of Nursing, or in any other occupation, for any other company, facility, hospital, entity or private individual during the time of his or her employment. This exclusivity provision is binding upon the Employee immediately signing this agreement.

6.  Employee agrees to comply with all policies, standards, and procedures of Employer and assigned contracted medical facility, which shall, from time to time, be reasonably promulgated.

7.  Employer may mandate additional shifts where the nature of the work requires continuous operation and the stoppage of work may result to deficiency in quality of nursing care. Employer will assign the unit that the nurse will perform his/her duties in.

8.  Employer has the right at its sole discretion to transfer this agreement to any of its affiliates.

II.     **Wages, Hours, Work Days, and Benefits**

9.  As of the Commencement Date, Employee will be paid a base salary in accordance with the prevailing wage for the geographic area in which the employee is assigned to work, as determined by the National Prevailing Wage and Helpdesk Center (NPWC) of the United States Department of Labor.

10. All compensation paid to Employee by Employer shall be subject to customary withholding and employment taxes as required by law.

11. On or before the beginning of each work week, or as soon as thereafter practical, the Employer, at its discretion, will schedule the Employee to work on one of the following three (3) "daily shifts":

        7:00 a.m. to 3:00 p.m.

- 2 -

**A-183**



3:00 p.m. to 11:00 p.m.
11:00 p.m. to 7:00 a.m.

The Employee will be paid the base pay in accordance to item #9 in one of the following three (3) "daily shift". The Employee will be given unpaid meal period during each work shift.

The Employee shall work on full-time over a fifty-two (52) week year. The Employee shall be required to work on an alternate weekend, both Saturday and Sunday. The Employee must render at least five (5) shifts and will be given two (2) rest days in a week by the Employer.

12. Employees will be subject to performance reviews by Employer on a yearly basis. After each performance review, the Employer, at its discretion, and subject to Employees performance in his/her job duties, may increase the hourly wage described in paragraph 9 up to three percent (3%) yearly to cover additional cost of living expenses.

13. Vacation Benefits - All full time employees accrue five (5) days of vacation. Vacation will be granted as approved by your supervisor and can be used by the Employee starting from one year work anniversary date.

14. Holiday Benefits– Employee is entitled to time and a half when they report for work on the designated holidays recognized by the Employer and contracted medical facility where they are assigned. Because we provide care 24 hours per day, 7 days per week, you may be scheduled to work on a holiday based on overtime rate defined by the Department of Labor's State of employment.

15. Sick Pay Benefit —An Employee accrues sick leave at the rate of one (1) hour for every 30 hours worked, up to a maximum of 40 hours of sick leave per calendar year. Because Sick Pay is designed to be used as income protection in the event of an extended illness or accident, it cannot be cashed out at the end of the year or at the time of termination. Medical documentation will be required from a licensed health care provider when used for more than three (3) consecutive days.

III.    **Employer Responsibilities, Termination of Agreement, and other Miscellaneous Items**

16. Employer is willing to take all necessary steps to sponsor the Employee as a Registered Nurse in order to obtain an immigrant visa for the Employee to enter the United States to be employed as contemplated herein.

17. Employer shall furnish to Employee all of the necessary equipment, facilities, and supplies for Employee to practice Nursing, together with appropriate assistance from trained technicians, doctors, or office staff. The cost of providing these support services shall be borne solely by Employer. However, it is understood by Employee and Employer that, all instruments and equipment furnished to or for Employee by Employer shall at all times remain the property of Employer. Employer shall exercise direction over and give support to Employee in regard to standards, policies, record keeping, and treatment procedures. During the term of this agreement, Employer shall, at Employer's expense, obtain and maintain professional malpractice insurance to cover liabilities of both Employer and Employee resulting from the practice of Nursing by Employee on behalf of Employer.

18. The employee agrees to be employed by the Employer under the terms of this contract for three (3) years. This is commencing on start of work at the assigned contracted medical facility. The three (3) year employment period shall be deemed to have been completed upon rendering an equivalent of 5460 man hours of actual service. If Employee is not able to fulfill the required 5460 man hours in three (3) years, this contract is still in full effect until the Employee satisfies this condition. If Employee wishes to stay after the contract period, this will be on at-will basis.

19. If Employee voluntarily terminates his/her employment with the Employer prior to the expiration of the term of this Employment Agreement, if Employee is terminated for cause, or if Employee otherwise breaches any of the

- 3 -



provisions of this Employment Agreement and stops working for the Employer, the Employee agrees that the Employer has spent a considerable sum of money in recruiting costs, licensure/certification review and credentialing costs, exam costs, Visa Screen costs, attorney's fees, petition filing costs, flight and/or transportation costs, housing costs, etc. to enable him/her to work with Employer in the United States, and that some of those costs are readily calculable and some of those costs are difficult to calculate.

As a result, the Employee acknowledges and agrees that the sum of $20,000.00 USD represents a reasonable and legitimate attempt by the Employer to calculate the costs incurred on the Employee's behalf and the amount of damages to which the Employer would be entitled to receive in a legal action brought against the Employee for breach of contract. The Employee acknowledges and agrees that the sum of $20,000.00 USD is not a penalty and is not a buy-out clause. If you breach your contract you will be subject to litigation. This can include but will not be limited to any damages, lost profits, direct and indirect costs that the Employer will suffer as a result of your breach of contract. Refusal of work assignments and false declaration or any form of misrepresentation related to, but not limited to, submission of documents and information to the Employer will constitute a breach of contract.

The Employer may enforce the liquidated damages provisions contained above of this Employment Agreement through any or all of the following:
- Enforcing the terms and conditions of the attached promissory note;
- To the extent of allowable under New York State, Federal Immigration and Labor Department laws and regulations, the Employer at its discretion may deduct any amounts from the Employee's last Pay check(s).

The Employee agrees that in the event The Employer is obligated to enforce the liquidated damages provisions contained above of this Employment Agreement by legal action of any type, the Employer shall also be entitled to reimbursement for all reasonable costs and attorney's fees incurred by it.

20. All disputes arising out of this Agreement or Employee's employment, including but not limited to Employee's recruitment, hiring, termination, and/or failure to complete/fully perform paragraph 18 with the Employer, shall be resolved exclusively by mandatory arbitration of the dispute, except that Employer may seek injunctive relief and other equitable remedies in a court of competent jurisdiction. Arbitration is an alternative dispute resolution process that involves submission of disputes to one or more impartial persons for a final and binding determination. Employee and Employer both understand and agree that they are knowingly and voluntarily waiving, to the extent permitted by law, any rights they might have to a trial by jury on any discrimination, contractual, employment, or other claims under federal, state, or local law, except that Employer does not waive its right to trial by jury on any claims for injunctive relief. As to any dispute or controversy which is subject to arbitration, neither Employer nor Employee may bring any action, proceeding, suit at law or in equity based on such dispute or controversy, other than a suit to confirm, enforce, vacate, modify or correct the award of the arbitrator as provided by law or for injunctive relief. The parties mutually select, designate and appoint (to be determined by both parties) as arbitrator of any and all such disputes, and if he is unavailable due to death, disability, conflict of interest, or other good cause, then parties mutually select, designate, and appoint (to be determined by both parties). The arbitrator shall have no authority to alter or modify any of the terms and conditions of this agreement, and may not enter any award which alters, amends or modifies the terms or conditions of this agreement in any form or manner. The arbitrator is authorized to determine liability and to award compensatory damages, if any, together with the highest rate allowable by law, but is not authorized to award punitive damages or injunctive relief'. Each party shall be responsible for paying half of all arbitration fees and expenses so that such costs are shared equally; provided however that the arbitrator is authorized to determine whether and to what extent each party has prevailed and to award a prevailing party its, his, or her own attorney's fees, disbursements, expert witness fees, costs, and expenses incurred in connection with the dispute. The arbitrator shall provide the parties with a written determination of the outcome of the arbitration and an accompanying opinion setting forth the bases for such determination. The Employer and Employee agree in advance, on a voluntary basis, that such arbitration shall be final and binding, and both Employer and Employee will be bound by its outcome. The award of the arbitrator may be docketed, entered, and enforced as a judgment in the applicable State of New York, Connecticut, New Jersey or Florida Supreme Court or any other Court of competent jurisdiction.



21. Notwithstanding paragraph 19, the Employer at any time may discharge Employee for cause, or as a result of the death or disability of the Employee, Discharge under this paragraph would automatically terminate the contract herein.

22. This agreement shall be interpreted, construed and enforced pursuant to and in accordance with the laws of the State of New York, Connecticut, New Jersey or Florida.

23. Whenever the context hereto requires, the gender of all words shall include the masculine, feminine, and neuter and the number of all words shall include the singular and plural.

24. This agreement and amendments thereto shall be in writing and executed in multiple copies. Each multiple copy shall be deemed an original, but all multiple copies shall constitute one and the same instrument.

25. Any Notice, Demand or Communication required, permitted or desired to be given hereunder shall be deemed effectively given when personally delivered or mailed by prepaid certified mail, return receipt requested, addressed as follows:

To Employee:
Name: Benzor Shem R. Vidal

To Employer:
ADVANCED CARE STAFFING

Address: 27 Rizal Avenue Extension Mambaling Cebu City, Cebu, Philippines

1000 Gates Avenue, Suite 5B
Brooklyn, NY 11221

Either party may designate a new future address in New York / Connecticut / New Jersey / Florida, or to the attention of such other person(s) or officer(s) as either party may designate by written notice to the other party. Further, Employee shall at all times keep Employer notified of his/her home address and home telephone number.

26. The waiver by either party of a breach or violation of any provision of this agreement shall not operate as, or be construed to be, waiver of any subsequent breach of the same or other provision hereof.

27. The provisions of this agreement shall be self-operative and shall not require further agreement by the parties; provided however, each party shall, at the request of the other, execute such additional instruments and take such additional acts as may be necessary to effectuate this agreement.

28. This agreement supersedes all previous employment contacts and constitutes the entire agreement between the parties.

**IN WITNESS WHEREOF,** the parties have executed the Agreement in multiple originals as of the date above written.

For Employee:

Signature Over Printed Name: Benzor Shem Vidal
Title: Registered Nurse
Date: 05-08-19

For Employer:

Sam Klein
COO

SUBSCRIBED AND SWORN TO THIS _____ DAY OF 08 MAY 2019
CEBU CITY, PHILIPPINES

ATTY. ENRIQUE F. LACERNA
Not. Commission No. 131-15
Notary Public For Cities and Province
Until December 31, 2020
Roll No. 51374
9 D Jakosalem St., Cebu City
IBP – AR34758017 - 12/03/2018/ C.C.
PTR- 166 1234 / 12-27-2018/C.C./FOR 2019
MCLE IV-0001957 – 5/23/2011
MCLE V-0004972 – 12/2/2014

ACS – International Recruitment – rev. February 2019

DOC. NO. 98
PAGE NO. 0
BOOK NO. 119
SERIES OF 2019

- 5 -

**A-186**


AdvancedCare
Staffing

**TERM OF PROMISSORY NOTE**

Date: _**08 MAY 2019**_

For value received, the Borrower, _Benzor Shem Vidal_, currently residing in (Address) _27 Rizal Avenue Extension Mambaling Cebu City, Cebu, Philippines_, promises to pay to the order of Advanced Care Staffing, LLC ("Creditor") the principal sum of **Twenty Thousand US Dollars** ($20,000.00).

All principal outstanding hereunder, at the option of the Creditor, shall become immediately due and payable without notice or demand upon the occurrence of any of the following events of default:

Upon termination of the Borrower's employment with the Creditor within **three (3) years** of joining the employ of the Creditor or before the Borrower has worked **5460 billable hours** for the Creditor, whichever occurs later, either voluntary by the Borrower's own action, or by a Just Cause termination by the Creditor and/or a Breach of the Employment Agreement by the Borrower.

The Borrower hereby waives presentment, demand, notice protest and all other demands and notices (including the extent allowable under the State of New York, Connecticut, New Jersey or Florida, Service of Process) in connection with the delivery acceptance, performance, default, or enforcement hereof and consents that this Promissory Note may be extended from time to time and that no such extension or other indulgence shall discharge or otherwise affect the liability of the Borrower. No delay or omission on the part of the Creditor in exercising any right hereunder shall operate as a waive of any such right or of any other right hereunder and a waiver of any such right on any one occasion shall not be construed as a bar to or waiver of any such right on any future occasion.

The Borrower intends and agrees to pay on demand all costs and expenses (including legal costs and attorney's fees) incurred or paid by the Creditor in enforcing the Promissory Note.

Any notice, consent, request, demand, or other communications required or permitted to be given under this agreement by either party shall be in writing.

This Promissory Note shall inure to the benefit of and shall bind the heirs, executors, administrators, successors, and assigns of the parties.

This Promissory Note shall be governed by and construed under the laws of the State of New York, Connecticut, New Jersey or Florida, USA.

This Promissory Note shall take effect as a sealed instrument as of the date set forth above.

By: _____

Name: _Benzor Shem Vidal_

**Borrower**

SUBSCRIBED AND SWORN TO
THIS _____ DAY OF _08 MAY_ 2019
CEBU CITY, PHILIPPINES

ATTY. ENRIQUE F. LACERNA
Not. Commission No. **131-15**
Notary Public For Cities and Province
Until December 31, 2020
Roll No. 51374
9 D Jakosalem St., Cebu City
IBP - AR34758017- 12/03/2018/ C.C.
PTR- 166 1234 / 12-27-2018/C.C./FOR 2019
MCLE IV-0001957 – 5/23/2011
MCLE V-0004972 – 12/2/2014

DOC. NO. 35
PAGE NO. 3
BOOK NO. 119
SERIES OF 2019

International Recruitment – rev. February 2019

- 6 -

**A-187**



1000 Gates Avenue, Suite 5B
Brooklyn, NY 11221
(T) 718 305 6700
(F) 718 305 6824
www.advancedcarestaffing.com

## ADDENDUM A

## Timeline for ACS-Sponsored Registered Nurses

This Sponsorship Agreement (the "Agreement") dated this **08 MAY 2019**, by and between **ADVANCED CARE STAFFING, LLC** with business address at *1000 Gates Avenue, Suite 5B, Brooklyn, NY 11221*, ("Employer") and ___Benzor Shem R. Vidal___, a Registered Professional Nurse and a current resident of ___27 Rizal Avenue Extension Mambaling Cebu City, Cebu, Philippines___ ("Employee").

WHEREAS, the Parties wish to modify the original stated contract, as set forth herein.

NOW THEREFORE, in consideration of the mutual promises herein, the parties, intending to be legally bound, hereby agree that the following constitutes conditions of the stated contract. The contract will be modified as follows.

WITNESSETH:

WHEREAS, Employer has recruited and sponsored Employee for EB3 Immigrant Visa petition and, therefore, Employee promises to exhaust all means necessary and accomplish the following tasks in a timely manner as required in the petition process:

| Task Assignment | Time Frame | Notes |
|---|---|---|
| NCLEX Licensing | 6 - 8 months | Employee shall take the exam within 3 months upon receiving authorization to test |
| If Applicable: NCLEX re-examination | 4 - 5 months | The Employee is given 13 months from the start of the first NCLEX processing to pass the NCLEX-RN |
| I-140 Filing | 2 - 4 weeks | All documents are compiled concurrent with NCLEX processing and must be completed 2-4 weeks after passing the NCLEX |
| IELTS Certification (English Language Proficiency Test) | 2 - 4 months | Ideally, IELTS processing is concurrent with NCLEX processing or upon passing the NCLEX-RN. |
| Visa Screen certification | Due prior to consular interview | Visa Screen shall be processed on or before I-140 petition is filed. |
| Medical Examination | Due prior to consular interview | This shall be done together with the Employee's dependent(s), if applicable, and costs for the dependent's medical examination shall be shouldered by the Employee. |
| NVC Processing | Due upon approval of I-140 and prior to consular interview | All documents shall be compiled upon approval of the I-140. Employee must complete and submit documents promptly as needed and make himself/herself available to the Employer and US Agencies requesting compliance to the processing. |

(1) The timeline shall commence at the moment the Employee signs this Agreement. The Employee shall complete Task Assignments within the Time Frame allotted. Failure to complete all tasks is considered a breach of this contract.

(2) Should the Employee fail to pass the NCLEX-RN and IELTS (English Language Proficiency Test) the first round, he/she shall take a re-examination from the last date of examination, which days include processing time, within 150 days. Employee shall shoulder all related costs incurred for the re-examination. In cases when

**A-188**



1000 Gates Avenue, Suite 5B
Brooklyn, NY 11221
(T) 718 305 6700
(F) 718 305 6824
www.advancedcarestaffing.com

the Employee fails the NCLEX-RN and/or IELTS, the Employer has the right to terminate the sponsorship at any given time or event and in whatever stages. In such cases, the Employee has the obligation to settle the agreed liquidated damages to the Employer with the substantial expenses spent by the Employer in the petition process as stated in Item 3 below. The liquidation shall be made within 30 days from the determination of the result of either exam. This liquidation shall be made through international bank transfer (information regarding the transfer shall be provided to the Employee upon request).

(3) Failure of the Employee to make the proper liquidation shall give rise to the Employer to exercise its right to file a case in court to recover damages for breach of contract. There is failure on the part of the Employee to make payment if on the 31st day from the date of the final determination of the result of the examination, the Employer does not receive the liquidated amount in full; Depending on the outcome of the case, the Employee shall be obligated to indemnify the Employer of the full amount of any and all the damages incurred and/or suffered by the Employer as a result of the breach, as determined by the court including litigation cost.

(4) All petition and NVC Immigrant Visa Application requirements shall be completed, obtained and maintained prior to consular interview. Failure to do so will be considered a breach of this contract and will be subject to the financial obligation of Twenty Thousand US Dollars ($20,000) as stated in the initial Employment Agreement signed by the Employer and Employee exclusive of the amount of any and all damages incurred and suffered by the Employer as a result of the breach plus the litigation cost.

This modification shall be made valid and formed part of the original stated contract.

The Parties reaffirm no other terms and conditions of the above-mentioned original contract not hereby otherwise modified or amended shall be negated or changed as a result of this here stated addendum.

This addendum shall become effective as of _____08 MAY 2019_____.

Attest:

**Sam Klein**
**COO**
**Advanced Care Staffing**

Benzor Shem Vidal
_Signature over Printed Name_
Registered Nurse

SUBSCRIBED AND SWORN TO
THIS _____ DAY OF 08 MAY 2019
CEBU CITY, PHILIPPINES

ATTY. ENRIQUE F. LACERNA
Not. Commission No. 131-15
Notary Public For Cities and Province
Until December 31, 2020
Roll No. 51374
9 D Jakosalem St., Cebu City
IBP - AR34758017 - 12/03/2018/ C.C.
PTR- 166 1234 / 12-27-2018/C.C./FOR 2019
MCLE IV-0001957 – 5/23/2011
MCLE V-0004972 – 12/2/2014

DOC. NO. 36
PAGE NO. 8
BOOK NO. 14
SERIES OF 2019

ACS – International Recruitment – rev. February 2019

**A-189**



1000 Gates Avenue, Suite 5B
Brooklyn, NY 11221
(T) 718 305 6700
(F) 718 305 6824
www.advancedcarestaffing.com

**AdvancedCare**
STAFFING

## ADDENDUM B

## Provisions for ACS-Sponsored Registered Nurses Based Outside USA

This Addendum (the "Addendum") dated this **0 8 MAY 2019**, by and between **ADVANCED CARE STAFFING** with business address at *1000 Gates Avenue, Suite 5B, Brooklyn, NY 11221*, ("Employer") and _Benzor Shem R. Vidal_, a Registered Professional Nurse and a current resident of _27 Rizal Avenue Extension Mambaling Cebu City, Cebu, Philippines_ ("Employee").

WHEREAS, the Parties wish to modify the original stated contract, as set forth herein.

NOW THEREFORE, in consideration of the mutual promises herein, the parties, intending to be legally bound, hereby agree that the following constitutes conditions of the stated contract. The contract will be modified as follows.

**WITNESSETH:**

WHEREAS, Employer shall shoulder the following provisions for the Employee for the first month of deployment in the United States:

(1) One (1) one-way airplane ticket for the Employee to the U.S. State where the Employee shall be deployed to. Airfare for the Employee's dependents is not included.
(2) $1000 per month housing subsidy for two (2) months.
(3) One (1) MTA card valid for one (1) month.
(4) Voluntary Health Insurance on pretax basis.

This modification shall be made valid as if they are included in the original stated contract.

The Parties reaffirm no other terms and conditions of the above-mentioned original contract not hereby otherwise modified or amended shall be negated or changed as a result of this here stated addendum.

This addendum shall become effective as of **0 8 MAY 2019**.

Attest:

SUBSCRIBED AND SWORN TO
THIS _____ DAY OF _10 8_ MAY 2019
CEBU CITY, PHILIPPINES

**Sam Klein**
**Chief Operations Officer**
**Advanced Care Staffing**

_Benzor Shem Vidal_
*Signature over Printed Name*
Registered Nurse

ATTY. ENRIQUE F. LACERNA
Not. Commission No. 131-15
Notary Public For Cities and Province
Until December 31, 2020
Roll No. 51374
9 D Jakosalem St., Cebu City
IBP - AR34752017 - 12/03/2018/ C.C.
PTR- 16S 1234 / 12-27-2018/C.C./FOR 2019
MCLE IV-0001957 – 5/23/2011
MCLE V-0004972 – 12/2/2014

DOC. NO. 37
PAGE NO. 8
BOOK NO. II
SERIES OF

**A-190**

| From: | Joel Rosalio <IMCEAEX-_O=EXCHANGELABS_OU=EXCHANGE+20ADMINISTRATIVE+20GROUP+20+28FYDIBOHF23SPDLT+29_CN=RECIPIENTS_CN= 21C50AFDB1B24282BFECD9A67FEAE7EE-JOEL@namprd18.prod.outlook.com> |
|---|---|
| Sent: | Tuesday, January 4, 2022 12:48 PM |
| To: | shem15418@gmail.com |
| Cc: | Jan Romwel Labro; Kriszaleen Baca |
| Subject: | VIDAL, BENZOR SHEM: USEM Interview Initial Instructions |
| Attachments: | Cover Letter for Amended Contract -ACS.pdf; Waiver of Promissory Note - PCS.pdf; Sponsored Nurses Quick Guide.pptx; Intro to SNF - LTC - CH04_HEOC 104.ppsx; Advanced Care Staffing - Amended and Restated 3-Year Employment Agreement.pdf |

Dear Benzor Shem Vidal:

Please refer to the following link for your initial guidance for your upcoming US Embassy Immigrant Visa Application interview on **January 19, 2022 at 9:30AM.**

https://travel.state.gov/content/travel/en/us-visas/immigrate/the-immigrant-visa-process/step-10-prepare-for-the-interview.html

https://ais.usvisa-info.com/en-gb/iv/information/iv_overview.

Through this link you can see and make reference to the following matter:
1. Pre-interview checklist of the documents; some documents may not be required of you depending on which category you are included.
   Please make sure that you will have the following:
   RN credentials:   NY license and CGFNS visa screen certificate (original and photocopies)
   School Credential:   diploma and transcript of records
   Civil documents:   PSA issued birth cert, marriage cert (if applicable), valid passport, NBI clearance and/or police clearance from your present place of residence
2. Registration of your delivery address;
3. Interview Guidelines;
4. Medical Examination Instructions. Please coordinate with the US Embassy for the accredited clinic/hospital. Please take note that it may take about 5 days before you get the result and the medical examination result is valid only for 6 months. The objective is that you should have a valid medical examination result at the time of the interview.

Further, kindly find the following attachment for your perusal:

1. Cover Letter
2. Amended Employment Agreement
3. Introductory Guide to Skilled-Nursing Facility
4. Nurses Quick Guide

**Please review this guidelines carefully and prepare your documents. PLEASE make yourself available sometime next week and we will discuss all these concerns. Briefing and a short lecture will be conducted by one of our Operations Manager and myself. Please be prepared for a video call using Microsoft Teams. This meeting may take an hour to 1.5 hour the most. We will send you a separate invite on a specific date. We are also hoping that you can provide us with your contact details for Viber or Skype (if you have one).**

1

**A-191**

**Will call you prior to this date to monitor how things are going. Also for your reference, we will send the original copy of the Job Offer and Support Letter to the address that you have provided.**

Let us know too should you have any questions or clarification.

Thank you,


**Joel Rosalio**
**International Healthcare Manager**
**Advanced Care Staffing, LLC**
P  :  718.305.6700 Ext. 210
F  :  718.305.6824
E  :  joel@advancedcarestaffing.com
A  :  1000 Gates Avenue, Suite 5B, Brooklyn, NY 11221

CONFIDENTIALITY AND PRIVACY NOTICE: This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify Advanced Care Staffing. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited. Thank you.



January 4, 2022

**AdvancedCare**
STAFFING

1000 Gates Avenue Suite 5B
Brooklyn, NY 11221
(T) 718 305 6700
(F) 718 305 6824

*We take staffing close to heart.*

Benzor Shem Vidal
33 Ross Way, London
United Kingdom E14 7GG

**Re: Your Employment Agreement with Advanced Care Staffing**

Dear Benzor Shem Vidal:

I am pleased to present you with our latest version of our Employment Agreement (enclosed)! This latest version was developed after consulting industry best practices and feedback from our team members.

The following are two key differences between your old agreement and this new version:

- **Greater Clarity.** This new version presents the parties' expectations, obligations, and rights in clearer terms to promote greater transparency and fairness. For example, the new agreement makes clear that nursing assignments in the US will be in skilled nursing facilities / nursing homes and lists the various types of costs that ACS will advance or reimburse.

- **No "Liquidated Damages" or Promissory Note.** The older version specified a sum of money to be paid in the event of a breach and included a promissory note. We received feedback that this was viewed as a "buy out", which was never our intention. We have tried to be clear from the beginning that ACS is making a significant investment in our nurses, and we only agree to sponsor nurses who are committed to providing services to ACS for a three-year term in the United States. This new version eliminates a specified sum of damages and allows for recovery of whatever damages are proven (which might be higher or lower than the amount specified in the older version). Attached to this letter is a separate letter waiving/cancelling any promissory note that you might have signed.

If you have any questions before signing, please contact me as soon as possible at ACS phone 718.305.6700 or through this email address liz@advancedcarestaffing.com. If you have no questions, please return a signed copy of the new Employment Agreement to me via email.

Sincerely,

Sam Klein
CEO



*Advanced Care Staffing, LLC.
has earned The Joint Commission's
Gold Seal of Approval*



January 4, 2022


Benzor Shem Vidal
33 Ross Way, London
United Kingdom E14 7GG


**Re: Release of Promissory Note**


Dear Benzor Shem Vidal,

Advanced Care Staffing hereby unconditionally waives, cancels, and releases the $20,000 promissory note that you made to Advanced Care Staffing, dated May 8, 2019.

Sincerely,


Sam Klein
CEO

Quick Guide for Sponsored Nurses



## About Advanced Care Staffing



Check out our website http://advancedcarestaffing.com/ and learn more by checking out this short clip

Case 1:22-cv-05535-NRM-MMH Document 46-7 Filed 07/03/24 Page 33 of 26 PageID #: 437

You are being sponsored as a Registered Nurse in USA and you will be assigned to work in a Skilled Nursing Facility (SNF) also known as Long Term Care (LTC)Facility.

Before signing the contract, it is important that you understand your role and the demands of this position.



## What to expect in an SNF/LTC setting:

1. SNFs operate 24/7 as residents need nursing care round the clock, therefore it is expected that you will be working on different shifts including holidays and weekends.

2. You will conduct nursing care to all residents on the floor and as such, you will work on high patient volume (example nurse-patient ratio 42:1) and conduct medication and treatment administration, family and physician notification as needed, Electronic Medical Record (EMR) documentation all within your shift. Keep in mind, this is a long-term care setting.

3. You may be asked to participate in an interdisciplinary care plan team including assisting physicians and conducting facility programs.

4. It is normal that when the facility is short staffed, you may be required to work overtime and or longer hours as allowed by the Labor department.

## What to expect in an SNF/LTC setting:

5. It is critical that you actively and consistently practice all nursing skills required for the position. Please refer to this nursing skills checklist.

6. Good attendance and punctuality is a must. In US, we do not have many holidays compared to the Philippines. We observe around 7 holidays in a given year. People up here consistently work and work hard therefore, you are expected to show up for work at all times.

7. It is expected that you help with other floors if needed or discretionary by the Supervisor.

A-199



Understanding Skilled Nursing Homes

Please watch an overview of skilled nursing and long-term care facility below.

Case 1:22-cv-05325-NRM-MMH Document 49-10 Filed 07/08/23 Page 1 of 285 PageID #: 441



# INTRODUCTION TO THE Health Professions

SIXTH EDITION

Peggy S. Stanfield • Nanna Cross • Y.H. Hui



# Chapter 4

## Aging, Health, and Long-Term Care

© 2011 Jones & Bartlett Learning, LLC
www.jblearning.com

**JONES & BARTLETT LEARNING**
*Chart Your Own Course*

# Objectives

After studying this chapter the student should be able to:

- List at least three benefits for the elderly provided by Medicaid that are not provided by Medicare.

- Differentiate between skilled nursing and intermediate care facilities.

- Describe the services provided by assisted living facilities.

- Describe the services provided by each of the following: (a) home health, (b) hospice, and (c) shelter care homes and workshops.

- Discuss the role of health literacy in delivering quality health care.

- Explain how shifts in demographics will impact the skills and training needs of healthcare workers.

- Discuss future trends in long-term health care including community-based care.

## JONES & BARTLETT LEARNING
*Chart Your Own Course*

© 2011 Jones & Bartlett Learning, LLC
www.jblearning.com

# The Impact of Future Changes on Healthcare Needs

- As the population of people over 65 yo increases, increases, **more services will be required for the treatment and management of chronic and acute health conditions and disabilities.**

- Those on Medicare with multiple chronic conditions, especially the **frail elderly** with functional or cognitive impairments, in addition to chronic medical illness, will need care coordination

JONES & BARTLETT LEARNING
*Chart Your Own Course*

© 2011 Jones & Bartlett Learning, LLC
www.jblearning.com

# U.S. Census Bureau Projections

- By 2050 due to increase in life expectancy:

  – people 65 and older will represent **20%** of the total U.S. population

  – Those that are 85 and older (the "old-old") are the fastest growing segment of the population

    - **61% are women** (mostly widows)

    - The "old-old" are expected to account for 19 million

© 2011 Jones & Bartlett Learning, LLC
www.jblearning.com

**JONES & BARTLETT LEARNING**
*Chart Your Own Course*

# The Future

"Chronic diseases, arising from **both emotional and physical causes**, will be the most important of the future disabilities"



JONES & BARTLETT LEARNING
*Chart Your Own Course*

© 2011 Jones & Bartlett Learning, LLC
www.jblearning.com

# Common Health Problems in an Aging Population

The most prevalent chronic conditions in **2007** among the elderly were, in order of prevalence:

- **Hypertension (high blood pressure)**
- Arthritis
- Heart disease
- Cancer
- Diabetes

- *Update 2014* (CMS) *that hypertension, high cholesterol, heart disease, arthritis and diabetes are the most prevalent*
  - *Depression was one of the top 7*

JONES & BARTLETT LEARNING
*Chart Your Own Course*

© 2011 Jones & Bartlett Learning, LLC
www.jblearning.com

A-207

# Common Health Problems in an Aging Population

Limitations associated with aging increase dramatically after age 85 years:

- Hearing impairment (60%)
- Visual impairment (28%)
- **The most debilitating conditions:**
  - Dementia (*accounts for almost half of nursing home residents*)
  - Stroke
  - Hip fractures

JONES & BARTLETT LEARNING
*Chart Your Own Course*

© 2011 Jones & Bartlett Learning, LLC
www.jblearning.com

Case 1:22-cv-05535-NRM-MMH Document 49-7 Document 49-7 Filed 05/03/23 Page 9 of 26 PageID #: 449

# Medicare for the Elderly

**Medicare is divided into four parts:**

- **Part A -** hospital insurance; all elderly beneficiaries are automatically enrolled.

- **Part B -** supplemental medical insurance, voluntary; the majority of the elderly purchase

  – does not provide dental, vision, podiatry or routine physical exams.

- **Part C –** "Medicare advantage"; private supplemental hospital and medical insurance

- **Part D -** medication insurance

JONES & BARTLETT LEARNING
*Chart Your Own Course*

© 2011 Jones & Bartlett Learning, LLC
www.jblearning.com

Case 1:22-cv-05535-NRM-MMH Document 30-6 Filed 02/06/23 Page 210 of 225 PageID #: 450

# **Medicaid** for the Elderly

- Medicaid covers a broad range of services *not* covered by Medicare, **acting as a supplemental insurance for the elderly and disabled.**

- It also pays their Medicare premiums; includes cost-sharing (out of pockets costs) and covers prescription drugs.

- A large number of the elderly do not take advantage of Medicaid because of the inability to navigate the system.

JONES & BARTLETT LEARNING
*Chart Your Own Course*

© 2011 Jones & Bartlett Learning, LLC
www.jblearning.com

A-210

# Long-term Care Insurance

- **Long-term health care (LTC)** - the help needed by people of any age who are unable to care for themselves because of physical and/or mental impairment; *almost as many impaired young adults and children need LTC as the elderly (4 vs. 6 billion)*

- LTC is for extended periods, ranging from months to years to a lifetime.

- **LTC is provided in nursing homes (70%)**, institutions, rehab hospitals, the community, or it can be home based.

JONES & BARTLETT LEARNING
*Chart Your Own Course*

© 2011 Jones & Bartlett Learning, LLC
www.jblearning.com

A-211

# Nursing Homes

There are two types of recognized homes:

- **Skilled Nursing Facility (SNF)**

- **Intermediate Care Facility (ICF)**

The federal government, through **CMS**, is responsible for nursing home standards

- Individual states – responsible for monitoring facilities to ensure standards are being met.

JONES & BARTLETT LEARNING
*Chart Your Own Course*

© 2011 Jones & Bartlett Learning, LLC
www.jblearning.com

# Nursing Homes

A **skilled nursing facility (SNF)** is a nursing home that provides the level of care closest to hospital care:

- Twenty-four-hour nursing services, medical supervision, rehabilitation, physical therapy, pharmacy and dietetic services, and occupational and recreational therapy are provided in accordance with federal guidelines.

- Skilled homes are for convalescents (someone recovering from an illness or operation) and patients with long-term illnesses.

JONES & BARTLETT LEARNING
*Chart Your Own Course*

© 2011 Jones & Bartlett Learning, LLC
www.jblearning.com

# Nursing Homes

An **intermediate care facility (ICF)** provides less extensive care and services:

– For people that need daily personal care because they are not able to care for themselves or live alone, *but they do not need 24-hour care.*

– the emphasis is on personal care and social services.

– Some also employ rehabilitation and occupational therapists.

– These homes must meet federal guidelines to receive government funding.

JONES & BARTLETT LEARNING
*Chart Your Own Course*

© 2011 Jones & Bartlett Learning, LLC
www.jblearning.com

# Assisted Living Care Facilities

- Facilities dedicated to providing **assistance with activities of daily living** – dressing, bathing, eating, using the bathroom

- May be part of a retirement community, nursing home, senior housing or a stand-alone facility

- Residents or the families typically pay the cost, but Medicaid finances care for about 12%

A-215

JONES & BARTLETT LEARNING
*Chart Your Own Course*

© 2011 Jones & Bartlett Learning, LLC
www.jblearning.com

# Nursing Home Regulation

An act named **OBRA 87** created minimum standards of care for nursing homes **in response to concerns about poor quality of care and inadequate regulation;** including staffing requirements and rights (p. 47) for residents

– standards emphasized quality of life issues and the prevention of abuse, mistreatment, and neglect, including the use of physical and chemical restraints.

© 2011 Jones & Bartlett Learning, LLC
www.jblearning.com

JONES & BARTLETT LEARNING
*Chart Your Own Course*

A-216

Case 1:22-cv-05355-NRM-MMH Document 10-6 Filed 12/02/23 Page 237 of 285 PageID #: 457

# Community Services

## The **Program of All-Inclusive Care for the Elderly (PACE)**

- provides comprehensive preventive, primary, acute, and long-term care services for older individuals with chronic care needs

- **Eligibility: 55 years or older and certified by their state to need nursing home care but don't need to live in a facility**

- PACE receives Medicare and Medicaid capitation payments

JONES & BARTLETT LEARNING
*Chart Your Own Course*

© 2011 Jones & Bartlett Learning, LLC
www.jblearning.com

A-217

Case 1:22-cv-05535-NRM-MMH Document 30-12 Filed 02/06/23 Page 229 of 285 PageID #: 458

# Community Health Agencies

- **Home Health Agencies (HHAs)** provide part-time nursing and medical care in patients' homes

  – other services: physical, speech, and occupational therapy; social services; some medical supplies and equipment, i.e. wheelchairs, walkers, etc.

- **Meals on Wheels (an** HHA variation) - agency that supplies one hot meal a day (usually lunch) to people who are confined indoors due to a mental or physical disability

© 2011 Jones & Bartlett Learning, LLC
www.jblearning.com

JONES & BARTLETT LEARNING
*Chart Your Own Course*

# Hospice

- Hospices care for individuals that are dying.

- Hospice care helps manage pain and other symptoms associated with dying **when conventional treatment is no longer of value**

- Hospices are operated on the principle that **the dying have special needs and wants that hospital personnel are too busy to handle.**

- This care **improves the quality of the** remaining time in ones' life.

© 2011 Jones & Bartlett Learning, LLC
www.jblearning.com

**JONES & BARTLETT LEARNING**
*Chart Your Own Course*

**A-219**

# Supportive Housing

- The U.S. Department of Housing and Urban Development provides supportive housing/shelters for the homeless with disabilities, primarily those with severe mental illness, or chronic problems with alcohol or drug abuse (don't need nursing home care)

- Federal regulations on operations, i.e. diet, sanitation

- Both **shelter care** homes and sheltered workshops are available to long-term care recipients

  – workshops are where those with physical or mental challenges can learn a skill

© 2011 Jones & Bartlett Learning, LLC
www.jblearning.com

JONES & BARTLETT LEARNING
*Chart Your Own Course*

A-220

# Demographic Trends and Projections

- By the mid-twenty-first century, the number of elderly individuals will triple.

- Racial and ethnic minority groups will continue to increase → we must take a varied approach to meet their health needs (cultural competence) as these differ from white individuals

- The need for LTC (home and nursing home care) and the associated costs will increase tenfold.

JONES & BARTLETT LEARNING
*Chart Your Own Course*

© 2011 Jones & Bartlett Learning, LLC
www.jblearning.com

# Potential Healthcare Needs

Interesting to note that more than 90% of elderly people continue to live in the community, and more than two-thirds of them perceive their health to be good to excellent.

The authors of the book believe that in the future, the majority of older individuals are likely to be healthy and able to function independently (*what do you think?*)

JONES & BARTLETT LEARNING
*Chart Your Own Course*

© 2011 Jones & Bartlett Learning, LLC
www.jblearning.com

# Health Service Needs for the Elderly

- Necessary services include prevention, as well as primary, acute, post-acute, rehabilitative, long-term, and hospice care.

- Because the "old-old" population is increasing most rapidly → services need to focus on maintaining the functional capacities and on providing long-term care to the frail elderly.

- There will also be an expansion in people aged 65 and older → need more preventive, primary, and acute care services.

© 2011 Jones & Bartlett Learning, LLC
www.jblearning.com

**JONES & BARTLETT LEARNING**
*Chart Your Own Course*

# Personnel Needs

- **We will soon need more personnel specifically prepared to serve older people**

- Greatly expanded training programs are required to prepare personnel to provide services in homes, hospices, nursing homes, and other community settings.

- To provide responsive care to older persons, **greater emphasis on the special needs and conditions of older persons (geriatrics) should be included in the education of all health and human service personnel.**

JONES & BARTLETT LEARNING

*Chart Your Own Course*

© 2011 Jones & Bartlett Learning, LLC

www.jblearning.com

**A-224**

# Future Education for the Health Professions

- **We are currently NOT prepared for the projected increase in elder Americans!**

- Curricula must include the requirements and care of the elderly population.

- We also need to assume an active role in developing acceptable health policies.

- Health professionals must be able to assess needs accurately and teach at all levels.

JONES & BARTLETT LEARNING
*Chart Your Own Course*

© 2011 Jones & Bartlett Learning, LLC
www.jblearning.com

# Shifts in Training Health Personnel

- **Need to develop a broader understanding and competence in geriatrics.**

- Physicians direct the work of other health personnel, and therefore will need to develop additional competencies and leadership roles for the practice of geriatric medicine.

- Nurses, Dentists, dental hygienists, and dental assistants will be serving substantially larger numbers of elderly and their education should now reflect this.

- Social work personnel must be prepared to meet the diverse social services needs of the elderly. They will require a specialized knowledge of the aging process and the interpersonal dynamics of the aging and their families.

© 2011 Jones & Bartlett Learning, LLC
www.jblearning.com

JONES & BARTLETT LEARNING
*Chart Your Own Course*

A-226



**AMENDED AND RESTATED EMPLOYMENT AGREEMENT**

This Amended and Restated Employment Agreement ("Agreement"), dated as of November ___ 2021, is by and between ADVANCED CARE STAFFING, LLC, located at 1000 Gates Avenue, Suite 5B, Brooklyn, New York 11221, ("Employer") and _____ _____, a natural person residing at _____, _____, _____ _____ (the "Employee").

**BACKGROUND**

A. Employer is a healthcare staffing agency that recruits and employs nurses whom Employer deploys to contracted long-term care facilities such as nursing homes and skilled nursing facilities (each, a "Client") in the United States.

B. Based upon the education, training and personal information provided to Employer by Employee, Employer desires to hire Employee to work as a Registered Nurse at one or more of its Clients in the United States.

C. Employee is not currently under contract with any person or company that is sponsoring Employee to work in the United States other than Employer.

D. Employee desires to be employed by Employer as a Registered Nurse in the United States and to work in a long-term care setting in accordance with the terms and conditions of this Agreement.

E. Employee and Employer entered into an Employment Agreement on _____ _____, 20___ ("Prior Agreement").

F. Employer and Employee wish to fully replace the Prior Agreement with this Agreement.

**TERMS**

Employer and Employee hereby agree as follows:

Section 1.    Employee's Representations and Obligation to Cooperate and to Provide Documents and Information.

(a)    Employee represents that Employee is not currently under contract with any other person or company that is sponsoring Employee to work in the United States. Employee also represents that Employee has not been petitioned by any other agency or facility for employment in the United States. Employee agrees that during the Term, Employee shall not contract with any other person or company to file a petition/application with USCIS for Employee's benefit.

(b)    Employee represents and warrants that Employee has not previously been convicted of a criminal offense other than minor traffic violations and that there are no impediments to Employee entering into this Agreement. Employee also represents that Employee is in good physical and mental health (in accordance with the standards and requirements as regulated by US immigration authorities and the Board of Nursing of the state(s)) and neither the execution of this agreement nor the consummation or performance of any of the parties' obligations hereunder will conflict with or result in the breach of any previous

A-227



agreement entered into by the Employee. Employee further represents and warrants that Employee knows of no impediment to Employee receiving an immigrant visa.

(c)     Upon the execution of this Agreement, and during the term of this Agreement, Employee shall deliver to Employer all documents that Employer, in its sole discretion, deems necessary (i) to validate personal, educational, professional and any other information pertaining to Employee; and (ii) to obtain immigration approvals necessary for Employee to depart Employee's foreign country and work in the United States.  Further, during the Term (as defined below), Employee agrees to provide all documents and information and to appear for any and all interviews as deemed necessary by Employer, in its sole discretion.

(d)     Employee promises to promptly schedule and appear for any and all interviews, medical exams or the like that may be necessary to secure approval to depart Employee's foreign country and to enter into and work in the United States.

(e)     Employee agrees to submit to post-offer and pre-employment medical examinations (including a negative PPD and/or chest X-Ray), vaccinations, drug screening, fingerprinting, and other requirements prior to providing any service, in accordance with United States federal, state, and local requirements.

Section 2.     Authorization and Licensing Requirements.

(a)     Employee acknowledges and agrees that employment with Employer is contingent on Employee becoming authorized to work in the United States and maintaining authorization to work as a Registered Nurse in the United States jurisdiction(s) selected by Employer, in its sole discretion.

(b)     Employee shall use Employee's best efforts to promptly register for and take all examinations required to obtain the necessary authorizations and licenses.  Required examinations include, but are not limited to the National Council Licensure Examination ("NCLEX"), which Employee shall take within three months of the date of this Agreement. If Employee fails to pass any required examination, Employee shall take additional steps and shall commit additional time and energy to studying and passing the examination at the next available examination session. Employer's obligations under this Agreement are contingent upon Employee passing the NCLEX within six months of the date of this Agreement.

(c)     Employee shall use Employee's best efforts to promptly obtain a Visa Screen certificate from the Commission on Graduates of Foreign Nursing Schools or a USCIS-approved equivalent independent credentialing organization.

(d)     Employee shall use Employee's best efforts to apply for licensure as a Registered Nurse in the United States jurisdiction(s) selected by Employer, in its sole discretion.

Section 3.     Petition for Employment Based Immigrant Visa.

(a)     Upon receipt of proof that Employee (i) is duly licensed and qualified as a Registered Nurse in the U.S. State selected by Employer, (ii) has passed the IELTS, and (iii) has obtained a Visa Screen, Employer will prepare and submit a petition for an Employment-Based Immigrant Visa ("EB Visa") on behalf of Employee to the United States Citizenship and Immigration Service ("USCIS").  Employer will pay all fees associated with the filing of such petitions, including attorneys' fees. Employee agrees that Employer may



arrange for the handling of the EB Visa petition by an immigration attorney of its choice and that all decisions regarding the handling and filing of the EB Visa petition, including preference category, shall be in Employer's sole discretion.

(b)     In the event that the EB Visa petition is not approved by the government for any reason, Employer shall have the right (but not the obligation), in its sole discretion, to refile, appeal the denial, and/or seek further government review of the petition. If Employer chooses to refile, appeal, or seek further review, Employee will continue to cooperate with Employer's efforts, but the appeal or request for further review shall be at Employer's sole expense.

(c)     Employee understands and acknowledges that Employer cannot guarantee any government approval regarding Employee, including but not limited to, the type of work authorization issued by USCIS (if any). Employee further understands that Employer cannot guarantee a specific date by which Employee will be sent to the United States or a specific date by which all requirements for employment will have been satisfied. Employee understands that any application or petition submitted by or on behalf of Employee with the United States or the foreign governments is subject to the sole approval of such government(s), and that any such approval is outside of Employer's control.

**Section 4.**     <u>Advanced Costs.</u>

(a)     Employer agrees to advance (or reimburse) the following costs on behalf of Employee ("Advanced Costs"):

1.  The costs of the review courses specified by Employer.
2.  The costs of initial professional licensing fees (costs of renewals may be advanced by Employer in its sole discretion);
3.  The costs of credentialing specified by Employer;
4.  The costs of visa screens, as applicable;
5.  Costs of the NCLEX exam for one attempt; Employer may, in its sole discretion, pay for additional attempts, the costs of which would be included as the Advanced Costs; and
6.  IELTS Certification for one attempt (English Language Proficiency Test).

Employer reserves the right, in its sole discretion, to pay for or reimburse additional exams, repeat exams and related expenses as needed by Employee, all of which shall be regarded as Advanced Costs.

(b)     Upon Employee's receipt of USCIS approval to travel to and commence employment in the United States, and satisfaction of all other pre-employment obligations under this Agreement, Employer shall advance (or reimburse) the following additional costs, all of which shall also be regarded as Advanced Costs:

1.  One one-way airplane ticket (economy airfare) to the U.S. state where Employee will be deployed;
2.  Housing allowance of a minimum of $1,000 per month for two months;
3.  $400 gift cards for groceries; and
4.  One monthly pass for local public transportation (if any) in the city where Employee is deployed.



(c)     Employee acknowledges that Employer is incurring Advanced Costs upon the express condition that Employee will complete the Term in full.  Therefore, Employee shall immediately repay all Advanced Costs in the event that Employee fails to complete the Term for any reason.

**Section 5.**     <u>Work Schedule and Responsibilities Upon Commencement of Work</u>

(a)     Upon lawful arrival in the United States, Employee agrees to work as a Registered Nurse (including all duties that are customary in providing nursing services) on a full-time basis. Typically, Employer's clients follow one of three daily shifts, 7:00 a.m. to 3:00 p.m., 3:00 p.m. to 11:00 p.m., and 11:00 p.m. to 7:00 a.m. (with an unpaid meal break during each shift); however, the hours of work and the shift schedule shall be determined by the Employer.

(b)     Employee shall be available to work a full-time work schedule and any overtime required by Employer, subject to applicable law.  Employee shall not commit to any business activity outside of Employee's employment with Employer without Employer's prior written approval.

(c)     Employee's assigned work location shall be determined by Employer in its sole discretion. The assignment to any Client may be changed at any time.  After completing a minimum of six months at Employee's assigned location, Employee may request a different assignment, but Employee understands and agrees that Employer will ultimately determine, in its sole discretion, Employee's assignment.

(d)     Upon becoming eligible to commence employment in the United States, Employee agrees to abide by all of the rules set forth in **Schedule A**.

**Section 6.**     <u>Confidentiality and Nonsolicitation.</u>

(a)     Employee acknowledges that during the course of employment with Employer, Employee will be privy to confidential information of Employer, including but not limited to Client lists and information, placement information, business plan information, marketing information, industry analysis, and business development information ("Proprietary Information").  Employee also acknowledges that Employer has spent substantial amounts of money, time and effort in developing and maintaining relationships with its Clients and employees.  Employee agrees that the following restrictions on Employee's employment and work activities are necessary to protect Employer's legitimate business interests in the education and training provided to Employee, its relationships with Clients and employees, and its Proprietary Information:

(i)     Employee agrees never to disclose any of Employer's Proprietary Information to anyone outside of Employer except as required in the course of Employees duties for Employer.  Employee further agrees not to use, or cause or allow another person or entity to use, Proprietary Information in any way other than in Employer's business (as authorized by Employer).

(ii)     Throughout the duration of the Term (regardless of whether Employee's employment terminates sooner for any reason), Employee shall not work, directly or through another employer, for any Client with whom Employer placed Employee to work at any time.

**A-230**



AdvancedCare
STAFFING

      (iii)     Throughout the duration of the Term (regardless of whether Employee's employment terminates sooner for any reason) and for a period of two years thereafter, Employee will not directly or indirectly, solicit, induce, or encourage any of Employer's employees to separate from Employer.

      (iv)     Throughout the duration of the Term (regardless of whether Employee's employment terminates sooner for any reason) and for a period of two years thereafter, Employee will not directly or indirectly, solicit, induce, or encourage any Clients to stop doing business with Employer.

      (b)     Employee acknowledges that the above restrictions on Employee's activities do not prevent Employee from pursuing a career in nursing or from using skills learned while employed by Employer in any business or activity outside the scope of this Section 6. Employee further acknowledges and agrees that the restrictions in this Section 6 are narrow, reasonable, legitimate and fair, and are warranted to protect only the legitimate business interests of Employer in protecting its Client and employee relationships, ensuring that Employee loyally discharges Employee's duties, and preventing the unauthorized disclosure of its Proprietary Information.

      (c)     Employee acknowledges and agrees that if he or she breaches any of the above covenants, the damage to Employer would be irreparable and that money damages would not adequately compensate Employer for its damages. Accordingly, notwithstanding anything in this Agreement to the contrary, Employee agrees that in the event of a breach of the covenants in this Section 6, Employer will be entitled to an immediate order from a court of competent jurisdiction commanding Employee to cease violating the covenant(s) and enjoining Employee from further violation. Employer shall not be required to post a bond. Employer shall be entitled to recover all reasonable attorneys' fees and costs incurred in seeking such an injunction. This injunctive remedy shall not be exclusive of any other remedy to which Employer might be entitled.

      (d)     The parties agree that if any of the covenants in this Section 6 is found to be unenforceable as drafted, the court interpreting such covenant is expressly authorized to make such modifications as are necessary to make it enforceable according to applicable law and to enforce it as modified.

      Section 7.     <u>Compensation.</u>

      (a)     Employee will be paid in accordance with applicable federal and state law (including applicable minimum wage and overtime requirements).

      (b)     Employee's wage rate for the services specified in the USCIS petition pursuant to which Employee provides services under this Agreement shall be the prevailing wage rate specified in that petition.

      (c)     Employee shall be required to complete and submit time records in accordance with the requirements of Employer and the Client. Payment of compensation, including frequency of payments and withholding of taxes and other legally authorized withholdings, will be subject to applicable law and Employer's policies.

      Section 8.     <u>Paid Time Off and Other Benefits.</u>

      Employee shall participate in all benefits applicable to all of Employer's similarly situated employees, including group health insurance, holidays, and paid time off (which includes both sick time and vacation time). Employee understands that benefits provided to all similarly-situated employees may be changed



from time to time in Employer's sole discretion.  Employee shall also be covered by workers' compensation insurance and all applicable, legally-mandated leave entitlements, such as any applicable family and medical leave, subject to applicable eligibility requirements.

**Section 9.**     Term.

(a)     The term of this Agreement (the "**Term**") shall continue until Employee has completed three years of work as a Registered Nurse for Employer in the United States. The three-year employment period shall be deemed to have been completed upon Employee's completion of 5460 hours worked for Employer in the United States.

(b)     Time off spent by Employee while using authorized accrued paid time off ("PTO") shall be counted towards completion of the Term (e.g., Employee taking one week of PTO will have one week counted toward completion of the Term).

(c)     If Employee fails to report to work for any amount of time during the Term, other than while using authorized, accrued PTO, then, at Employer's option, the Term may be extended by the amount of time missed.

**Section 10.**     Termination.

(a)     Each party reserves the right to terminate this Agreement prior to the end of the Term, subject to the following conditions:

(1)     Employee acknowledges that if Employee fails to fulfill Employee's obligations under this Agreement, Employer will suffer significant harm arising from the significant investment related to the recruitment, training, credentialing, and placement in the United States (including fees paid to third-parties) and the reasonable expectation that Employee will maintain full-time employment with Employer for the maximum amount of time under this Agreement.  Such harm includes, but is not limited to, the expenses and costs mentioned in Sections 3 and 4 (subject to applicable law). In addition, Employee recognizes that Employer will suffer significant loss of profits (reflecting not only loss of anticipated profits under this Agreement but also resulting from the impact on Employer's relationship with its Clients) in the event Employee fails to fulfill Employee's obligations under this Agreement. Therefore, the parties agree that if Employee terminates this Agreement without Good Reason (as defined below), or if Employer terminates this Agreement for Cause (as defined below), Employer shall be entitled to all damages and other relief to redress the harm caused by the failure of Employee to fulfill Employee's obligations under this Agreement.

(2)     For purposes of this Agreement, "Good Reason" for termination by Employee is defined as a failure by Employer to correct a material breach of Sections 3 or 7 of this Agreement within 35 days following Employer's receipt of written notice by Employee of such material breach.  Written notice must physically be received at Employer's office at 1000 Gates Avenue, 5th Floor, Suite 5B, Brooklyn, New York 11221.

(3)     For purposes of this Agreement, "Cause" includes, without limitation, Employee's loss of Employee's authorization to work as a Registered Nurse in the jurisdiction(s) assigned by Employer, Employee's failure or refusal to perform any of Employee's material obligations under this Agreement, Employee's refusal to adhere to the policies or procedures of the Client(s) to which Employee is assigned, Employee's engaging in conduct detrimental to the reputation of Employer or its Client(s), Employee's

Page 6

**A-232**



commission of an unlawful act, Employee's unauthorized removal of property of Employer or a Client, Employee's falsification of documents, reports or records, absenteeism or chronic lateness, Employee's failure or refusal to provide patient care consistent with accepted guidelines or to perform the duties of employment. Employer may immediately terminate this Agreement for Cause at any time.

(b)     This Agreement will terminate in the event of Employee's Disability (as defined below) or death. For purposes of this Agreement, "Disability" means incapacitation due to illness, accident or other physical or mental disability which renders Employee substantially unable to work for a period of one hundred twenty (120) days, and no reasonable accommodation being available which would permit Employee to perform the essential functions of Employee's position. In the event Employee and Employer disagree as to the existence of a Disability, the dispute shall be resolved by an independent medical doctor selected by Employer.

(c)     In the event of termination of this Agreement, any outstanding payment obligations shall remain in effect until satisfied in full, and the following provisions shall remain in effect in accordance with their respective terms: Section 4; Section 13 (including Schedule B), Section 14, and this Section 10.

Section 11.     Headings.

The headings of the Sections of this Agreement (including Schedules) are for convenience only and shall not control or affect the meaning or construction or limit the scope or intent of any of the provisions of this Agreement.

Section 12.     Entire Agreement; Modification; Waiver.

This Agreement contains the entire agreement between the parties concerning the subject matter hereof and supersedes the Prior Agreement. All obligations under this Agreement which were performed by the parties prior to the date of this Agreement (for example, actions performed under the Prior Agreement) shall be deemed to have been performed under this Agreement. This Agreement may not be modified or amended except in a writing signed by both parties. If any term in this Agreement is held by a tribunal having jurisdiction to be overbroad and/or unenforceable, the parties acknowledge and agree that the defective terms shall be modified to the extent necessary to comply with applicable law. If it is determined that any of the provisions of this Agreement are invalid or unenforceable, the remaining provisions shall survive and be given full force and effect. Failure to enforce a provision of this Agreement shall not be construed as a waiver of future enforcement of that provision or any other provision in the Agreement.

Section 13.     Governing Law; Dispute Resolution.

This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York. The parties agree to the dispute resolution provision contained in **Schedule B**.

Section 14.     Reimbursement of Employer's Costs of Enforcement.

Employee shall reimburse Employer for all reasonable costs, including all attorneys' fees that Employer incurs in enforcing its rights and remedies under this Agreement.

**By signing this Agreement, Employee confirms that Employee (i) has read and understood all the terms of this Agreement, and (ii) had an opportunity to consult with an attorney of his or her choosing before signing it. By signing this Agreement, Employee also confirms that Employee is committed to**



working for Employer for at least three years as a Registered Nurse caring for elderly patients in a long-term care setting.

       **Advanced Care Staffing, LLC**

BY: _____

       _____
       Employee Name (Print)

_____
Signature

       _____
       Signature

_____
Date

       _____
       Date



**SCHEDULE A**

**TO THE AMENDED AND RESTATED EMPLOYMENT AGREEMENT**

**RESPONSIBILITIES OF EMPLOYEE UPON COMMENCEMENT OF EMPLOYMENT**

1. Employee shall devote his/her entire professional time, skill and attention to the performance of the nursing services and other activities on behalf of Employer, including but not limited to obtaining any certifications required for Employer.  Employee shall make every effort to, and shall conduct him/herself at all times so as to advance the best interests of Employer and the assigned Client(s).

2. Employee shall not, without the written consent of Employer, practice or render any service of a professional nature, except as assigned by Employer.

3. Employee will report to work at the date, time and location assigned by Employer.

4. Employee shall notify both Employer and the Client immediately upon discovering that Employee will not be able to work at a time or date that Employer has scheduled Employee to work.

5. Employee shall notify Employer, by telephone, if a Client requests Employee to work more than 40 hours in any work week.  This notification requirement does not relieve Employee of Employee's duty to report to work as scheduled.

6. If any Client instructs or directs Employee to take action that Employee believes to be improper, or if any Client instructs or directs Employee to refrain from taking action that Employee thinks is necessary, or if Employee has been subject to any conduct by any Client that he/she believes to be improper or unlawful, Employee will immediately notify Employer.

7. Employee shall abide by Employer's policies and procedures applicable to similarly situated employees, which may be changed from time to time in Employer's sole discretion.

8. Employee shall at all times during the Term keep Employee's license to work as a Registered Nurse in good standing, and shall remain immigration compliant.  This includes, but is not limited to, compliance with health exams, Visa screen, and any continued education as required by state licensing boards. Employee shall immediately notify Employer in writing of any investigation or inquiry involving Employee by any state or federal regulatory agency, governmental authority, or licensing authority.

9. Employee shall at all times comply with the ethics and professional standards pertaining to Registered Nurses as well as all applicable federal, state and local law.

10. Employee shall in a timely fashion prepare, maintain, and submit necessary or appropriate reports, claims, correspondence and records relating to his/her duties performed under this Agreement as may be required by Employer, all of which shall be the sole property of Employer.



11. Employee will immediately notify Employer in writing of (i) any incident or claim of wrongdoing or neglect involving Employee's provision of services under this Agreement and (ii) any investigation or inquiry involving Employee by any state or federal regulatory agency, governmental authority, or licensing authority.

12. Employee shall be held responsible for any legal action taken against Employer due to Employee's misrepresentation of him/herself or his/her qualifications.

13. Employee understands and agrees that he/she is obligated to work the schedules and shifts assigned to him/her and that Employee may be required to work varying shifts and varying hours at Employer's sole discretion.

14. Employee shall be responsible for providing Employee's own method of reliable and timely transportation to and from any Client, including when necessary travelling between different Clients in a single day.

15. Employee must provide a reliable method for Employer to get into contact with Employee during and after work, including a mobile telephone and e-mail address.

16. Employee shall promptly provide all documents as requested by Employer during Employee's employment.

17. Employee shall comply with any additional lawful rules and requirements established by Employer.


Signatures:    _____
               Employee


               _____
               Employer



**SCHEDULE B**
**TO THE AMENDED AND RESTATED EMPLOYMENT AGREEMENT**
**DISPUTE RESOLUTION PROVISION**

As a condition of my employment with Advanced Care Staffing, LLC ("Employer"), except for Employer's enforcement of restrictive covenants as provided for in Section 6(c) of the Agreement, I agree that any dispute, controversy or claim arising between me and Employer (including a dispute, controversy or claim arising out of, in connection with or relating to, this Agreement, or the interpretation, performance or breach, termination or validity hereof) shall be resolved by arbitration pursuant to this dispute resolution provision (the "Provision"). This includes, but is not limited to, claims involving an alleged violation of public policy; all statutory claims for discrimination and/or harassment and/or retaliation under federal, state, or local law; and claims concerning wages or other compensation, whether based on statute or any other grounds. I, therefore, waive my right to sue in court and have a jury trial.

This agreement to arbitrate shall be governed by the Federal Arbitration Act and shall remain in force even after I separate from Employer for any reason.

For purposes of this Agreement, a claim against any of Employer's owners, employees, subsidiaries, affiliates, or the owners or employees of any such entities, will be considered a claim against Employer.

I agree that arbitration will be administered by the American Arbitration Association ("AAA") and that the AAA's Commercial Arbitration Rules in effect at the time of the dispute will govern, except as modified by this Provision. I understand that the AAA's Commercial Arbitration Rules are available online at www.adr.org.

The costs for initiating arbitration will be governed by the AAA's policy on costs for employment-related disputes. For informational purposes, as of January 2021, that policy provides that the initial filing fee for an employee will be no more than $300.00 (which may be waived under certain circumstances), and that the employer will initially bear all other filing fees, administrative fees, hearing fees, and arbitrator compensation. In the event that the AAA's initial filing fee is higher than the filing fee for a court action in the trial court in the jurisdiction where I reside, I will only be required to contribute the cost of what I would have paid to file an action in court. I agree that at the conclusion of arbitration, the prevailing party shall be entitled (in addition to all other relief available under the Agreement or applicable law) to be reimbursed for its reasonable attorney's fees as well as all costs and fees charged by the AAA and the arbitrator.

Arbitration proceedings will be conducted by a single arbitrator. The arbitration shall be conducted in New York, New York unless the parties otherwise agree. The arbitration proceedings shall be conducted in the English language. All submissions shall be made in English or with an English translation. The arbitrator shall be bound by the terms of the Agreement and by applicable law. The award of the arbitrator shall be final and binding upon Employer and me, and either Employer or I may apply to a court of competent jurisdiction for confirmation and enforcement of such award.

**A-237**



I agree that any dispute or claim between Employer and me will be resolved on an individual basis only.  No arbitration shall include any disputes or claims on behalf of any other employees, such as class actions or collective actions.  The arbitrator shall not have the authority to hear or issue any award concerning the claims of a class action or collective action or to consolidate the claims of more than one employee or the claims of a class of employees into a single arbitration proceeding, to the maximum extent permitted by law.  If Employer or I have any disagreement about whether an arbitration can include any dispute or claim on behalf of any other employees, that disagreement will be decided by a court, not by an arbitrator.

I agree that in the event of a default by either party in an arbitration proceeding, if the non-defaulting party has satisfied the AAA's rule(s) on serving of notice, the arbitration shall proceed in accordance with Rule E-6 of the AAA's Commercial Arbitration Rules, Expedited Procedures (titled, "Proceedings on Documents and Procedures for the Resolution of Disputes Through Document Submission").

Employer agrees that should there be arbitration proceedings in accordance with this Provision, I would be free to pursue all available substantive or procedural rights or remedies in such arbitration proceedings.  For example, this Provision does not alter any applicable statute of limitations and does not prevent the arbitrator from awarding all types of damages available under the applicable statute(s) or common law.

I agree that in the event that any court of competent jurisdiction shall determine that any portion of this Provision exceeds the scope permitted by applicable law, the court shall have the authority to modify or "blue pencil" such portion so as to render it enforceable while maintaining the parties' original intent to the maximum extent possible.  If a court determines that a legal dispute shall not be resolved by arbitration for any reason, the dispute or claim shall be decided by a judge, without a jury.

I understand that in a lawsuit in court, I would have certain rights to a trial by a jury or a judge.  I voluntarily and knowingly agree to give up those rights, and I understand that all disputes or claims relating to my employment (or termination of employment) will instead be decided by an arbitrator.  I understand that I have a right to consult with a person of my choosing, including an attorney, before signing this Provision.

Signatures:    _____
                     Employee

               _____
                     Employer

**A-238**

Case 23-303, Document 49, 07/05/2023, 3537568, Page250 of 285



AdvancedCare

### AMENDED AND RESTATED EMPLOYMENT AGREEMENT

This Amended and Restated Employment Agreement ("Agreement"), dated as of November ___ 2021, is by and between ADVANCED CARE STAFFING, LLC, located at 1000 Gates Avenue, Suite 5B, Brooklyn, New York 11221, ("Employer") and _Benzor Shem Vidal_____, a natural person residing at _Flat 102 Iona Tower, 33 Ross Way, London E14 7GG_(the "Employee").

### BACKGROUND

A. Employer is a healthcare staffing agency that recruits and employs nurses whom Employer deploys to contracted long-term care facilities such as nursing homes and skilled nursing facilities (each, a "Client") in the United States.

B. Based upon the education, training and personal information provided to Employer by Employee, Employer desires to hire Employee to work as a Registered Nurse at one or more of its Clients in the United States.

C. Employee is not currently under contract with any person or company that is sponsoring Employee to work in the United States other than Employer.

D. Employee desires to be employed by Employer as a Registered Nurse in the United States and to work in a long-term care setting in accordance with the terms and conditions of this Agreement.

E. Employee and Employer entered into an Employment Agreement on _May___ 8_, 20 19 ("Prior Agreement").

F. Employer and Employee wish to fully replace the Prior Agreement with this Agreement.

### TERMS

Employer and Employee hereby agree as follows:

**Section 1.**   Employee's Representations and Obligation to Cooperate and to Provide Documents and Information.

(a)   Employee represents that Employee is not currently under contract with any other person or company that is sponsoring Employee to work in the United States. Employee also represents that Employee has not been petitioned by any other agency or facility for employment in the United States. Employee agrees that during the Term, Employee shall not contract with any other person or company to file a petition/application with USCIS for Employee's benefit.

(b)   Employee represents and warrants that Employee has not previously been convicted of a criminal offense other than minor traffic violations and that there are no impediments to Employee entering into this Agreement. Employee also represents that Employee is in good physical and mental health (in accordance with the standards and requirements as regulated by US immigration authorities and the Board of Nursing of the state(s)) and neither the execution of this agreement nor the consummation or performance of any of the parties' obligations hereunder will conflict with or result in the breach of any previous

Case 23-303, Document 49, 07/05/2023, 3537568, Page251 of 285



AdvancedCare

agreement entered into by the Employee. Employee further represents and warrants that Employee knows of no impediment to Employee receiving an immigrant visa.

(c)     Upon the execution of this Agreement, and during the term of this Agreement, Employee shall deliver to Employer all documents that Employer, in its sole discretion, deems necessary (i) to validate personal, educational, professional and any other information pertaining to Employee; and (ii) to obtain immigration approvals necessary for Employee to depart Employee's foreign country and work in the United States.  Further, during the Term (as defined below), Employee agrees to provide all documents and information and to appear for any and all interviews as deemed necessary by Employer, in its sole discretion.

(d)     Employee promises to promptly schedule and appear for any and all interviews, medical exams or the like that may be necessary to secure approval to depart Employee's foreign country and to enter into and work in the United States.

(e)     Employee agrees to submit to post-offer and pre-employment medical examinations (including a negative PPD and/or chest X-Ray), vaccinations, drug screening, fingerprinting, and other requirements prior to providing any service, in accordance with United States federal, state, and local requirements.

**Section 2.**     Authorization and Licensing Requirements.

(a)     Employee acknowledges and agrees that employment with Employer is contingent on Employee becoming authorized to work in the United States and maintaining authorization to work as a Registered Nurse in the United States jurisdiction(s) selected by Employer, in its sole discretion.

(b)     Employee shall use Employee's best efforts to promptly register for and take all examinations required to obtain the necessary authorizations and licenses.  Required examinations include, but are not limited to the National Council Licensure Examination ("NCLEX"), which Employee shall take within three months of the date of this Agreement. If Employee fails to pass any required examination, Employee shall take additional steps and shall commit additional time and energy to studying and passing the examination at the next available examination session. Employer's obligations under this Agreement are contingent upon Employee passing the NCLEX within six months of the date of this Agreement.

(c)     Employee shall use Employee's best efforts to promptly obtain a Visa Screen certificate from the Commission on Graduates of Foreign Nursing Schools or a USCIS-approved equivalent independent credentialing organization.

(d)     Employee shall use Employee's best efforts to apply for licensure as a Registered Nurse in the United States jurisdiction(s) selected by Employer, in its sole discretion.

**Section 3.**     Petition for Employment Based Immigrant Visa.

(a)     Upon receipt of proof that Employee (i) is duly licensed and qualified as a Registered Nurse in the U.S. State selected by Employer, (ii) has passed the IELTS, and (iii) has obtained a Visa Screen, Employer will prepare and submit a petition for an Employment-Based Immigrant Visa ("EB Visa") on behalf of Employee to the United States Citizenship and Immigration Service ("USCIS").  Employer will pay all fees associated with the filing of such petitions, including attorneys' fees. Employee agrees that Employer may

Page 2

**A-240**

Case 23-303, Document 49, 07/05/2023, 3537568, Page252 of 285



AdvancedCare

arrange for the handling of the EB Visa petition by an immigration attorney of its choice and that all decisions regarding the handling and filing of the EB Visa petition, including preference category, shall be in Employer's sole discretion.

(b)     In the event that the EB Visa petition is not approved by the government for any reason, Employer shall have the right (but not the obligation), in its sole discretion, to refile, appeal the denial, and/or seek further government review of the petition. If Employer chooses to refile, appeal, or seek further review, Employee will continue to cooperate with Employer's efforts, but the appeal or request for further review shall be at Employer's sole expense.

(c)     Employee understands and acknowledges that Employer cannot guarantee any government approval regarding Employee, including but not limited to, the type of work authorization issued by USCIS (if any). Employee further understands that Employer cannot guarantee a specific date by which Employee will be sent to the United States or a specific date by which all requirements for employment will have been satisfied. Employee understands that any application or petition submitted by or on behalf of Employee with the United States or the foreign governments is subject to the sole approval of such government(s), and that any such approval is outside of Employer's control.

Section 4.     Advanced Costs.

(a)     Employer agrees to advance (or reimburse) the following costs on behalf of Employee ("Advanced Costs"):

1. The costs of the review courses specified by Employer.
2. The costs of initial professional licensing fees (costs of renewals may be advanced by Employer in its sole discretion);
3. The costs of credentialing specified by Employer;
4. The costs of visa screens, as applicable;
5. Costs of the NCLEX exam for one attempt; Employer may, in its sole discretion, pay for additional attempts, the costs of which would be included as the Advanced Costs; and
6. IELTS Certification for one attempt (English Language Proficiency Test).

Employer reserves the right, in its sole discretion, to pay for or reimburse additional exams, repeat exams and related expenses as needed by Employee, all of which shall be regarded as Advanced Costs.

(b)     Upon Employee's receipt of USCIS approval to travel to and commence employment in the United States, and satisfaction of all other pre-employment obligations under this Agreement, Employer shall advance (or reimburse) the following additional costs, all of which shall also be regarded as Advanced Costs:

1. One one-way airplane ticket (economy airfare) to the U.S. state where Employee will be deployed;
2. Housing allowance of a minimum of $1,000 per month for two months;
3. $400 gift cards for groceries; and
4. One monthly pass for local public transportation (if any) in the city where Employee is deployed.

Case 23-303, Document 49, 07/05/2023, 3537568, Page253 of 285



AdvancedCare

(c)     Employee acknowledges that Employer is incurring Advanced Costs upon the express condition that Employee will complete the Term in full. Therefore, Employee shall immediately repay all Advanced Costs in the event that Employee fails to complete the Term for any reason.

**Section 5.**     Work Schedule and Responsibilities Upon Commencement of Work

(a)     Upon lawful arrival in the United States, Employee agrees to work as a Registered Nurse (including all duties that are customary in providing nursing services) on a full-time basis. Typically, Employer's clients follow one of three daily shifts, 7:00 a.m. to 3:00 p.m., 3:00 p.m. to 11:00 p.m., and 11:00 p.m. to 7:00 a.m. (with an unpaid meal break during each shift); however, the hours of work and the shift schedule shall be determined by the Employer.

(b)     Employee shall be available to work a full-time work schedule and any overtime required by Employer, subject to applicable law. Employee shall not commit to any business activity outside of Employee's employment with Employer without Employer's prior written approval.

(c)     Employee's assigned work location shall be determined by Employer in its sole discretion. The assignment to any Client may be changed at any time. After completing a minimum of six months at Employee's assigned location, Employee may request a different assignment, but Employee understands and agrees that Employer will ultimately determine, in its sole discretion, Employee's assignment.

(d)     Upon becoming eligible to commence employment in the United States, Employee agrees to abide by all of the rules set forth in **Schedule A**.

**Section 6.**     Confidentiality and Nonsolicitation.

(a)     Employee acknowledges that during the course of employment with Employer, Employee will be privy to confidential information of Employer, including but not limited to Client lists and information, placement information, business plan information, marketing information, industry analysis, and business development information ("Proprietary Information"). Employee also acknowledges that Employer has spent substantial amounts of money, time and effort in developing and maintaining relationships with its Clients and employees. Employee agrees that the following restrictions on Employee's employment and work activities are necessary to protect Employer's legitimate business interests in the education and training provided to Employee, its relationships with Clients and employees, and its Proprietary Information:

(i)     Employee agrees never to disclose any of Employer's Proprietary Information to anyone outside of Employer except as required in the course of Employees duties for Employer. Employee further agrees not to use, or cause or allow another person or entity to use, Proprietary Information in any way other than in Employer's business (as authorized by Employer).

(ii)     Throughout the duration of the Term (regardless of whether Employee's employment terminates sooner for any reason), Employee shall not work, directly or through another employer, for any Client with whom Employer placed Employee to work at any time.

Case 23-303, Document 49, 07/05/2023, 3537568, Page254 of 285



AdvancedCare

(iii)     Throughout the duration of the Term (regardless of whether Employee's employment terminates sooner for any reason) and for a period of two years thereafter, Employee will not directly or indirectly, solicit, induce, or encourage any of Employer's employees to separate from Employer.

(iv)     Throughout the duration of the Term (regardless of whether Employee's employment terminates sooner for any reason) and for a period of two years thereafter, Employee will not directly or indirectly, solicit, induce, or encourage any Clients to stop doing business with Employer.

(b)     Employee acknowledges that the above restrictions on Employee's activities do not prevent Employee from pursuing a career in nursing or from using skills learned while employed by Employer in any business or activity outside the scope of this Section 6. Employee further acknowledges and agrees that the restrictions in this Section 6 are narrow, reasonable, legitimate and fair, and are warranted to protect only the legitimate business interests of Employer in protecting its Client and employee relationships, ensuring that Employee loyally discharges Employee's duties, and preventing the unauthorized disclosure of its Proprietary Information.

(c)     Employee acknowledges and agrees that if he or she breaches any of the above covenants, the damage to Employer would be irreparable and that money damages would not adequately compensate Employer for its damages. Accordingly, notwithstanding anything in this Agreement to the contrary, Employee agrees that in the event of a breach of the covenants in this Section 6, Employer will be entitled to an immediate order from a court of competent jurisdiction commanding Employee to cease violating the covenant(s) and enjoining Employee from further violation. Employer shall not be required to post a bond. Employer shall be entitled to recover all reasonable attorneys' fees and costs incurred in seeking such an injunction. This injunctive remedy shall not be exclusive of any other remedy to which Employer might be entitled.

(d)     The parties agree that if any of the covenants in this Section 6 is found to be unenforceable as drafted, the court interpreting such covenant is expressly authorized to make such modifications as are necessary to make it enforceable according to applicable law and to enforce it as modified.

Section 7.     Compensation.

(a)     Employee will be paid in accordance with applicable federal and state law (including applicable minimum wage and overtime requirements).

(b)     Employee's wage rate for the services specified in the USCIS petition pursuant to which Employee provides services under this Agreement shall be the prevailing wage rate specified in that petition.

(c)     Employee shall be required to complete and submit time records in accordance with the requirements of Employer and the Client. Payment of compensation, including frequency of payments and withholding of taxes and other legally authorized withholdings, will be subject to applicable law and Employer's policies.

Section 8.     Paid Time Off and Other Benefits.

Employee shall participate in all benefits applicable to all of Employer's similarly situated employees, including group health insurance, holidays, and paid time off (which includes both sick time and vacation time). Employee understands that benefits provided to all similarly-situated employees may be changed

Page 5

**A-243**

Case 23-303, Document 49, 07/05/2023, 3537568, Page255 of 285



AdvancedCare

from time to time in Employer's sole discretion. Employee shall also be covered by workers' compensation insurance and all applicable, legally-mandated leave entitlements, such as any applicable family and medical leave, subject to applicable eligibility requirements.

**Section 9.** Term.

(a)     The term of this Agreement (the "**Term**") shall continue until Employee has completed three years of work as a Registered Nurse for Employer in the United States. The three-year employment period shall be deemed to have been completed upon Employee's completion of 5460 hours worked for Employer in the United States.

(b)     Time off spent by Employee while using authorized accrued paid time off ("PTO") shall be counted towards completion of the Term (e.g., Employee taking one week of PTO will have one week counted toward completion of the Term).

(c)     If Employee fails to report to work for any amount of time during the Term, other than while using authorized, accrued PTO, then, at Employer's option, the Term may be extended by the amount of time missed.

**Section 10.** Termination.

(a)     Each party reserves the right to terminate this Agreement prior to the end of the Term, subject to the following conditions:

(1)     Employee acknowledges that if Employee fails to fulfill Employee's obligations under this Agreement, Employer will suffer significant harm arising from the significant investment related to the recruitment, training, credentialing, and placement in the United States (including fees paid to third-parties) and the reasonable expectation that Employee will maintain full-time employment with Employer for the maximum amount of time under this Agreement. Such harm includes, but is not limited to, the expenses and costs mentioned in Sections 3 and 4 (subject to applicable law). In addition, Employee recognizes that Employer will suffer significant loss of profits (reflecting not only loss of anticipated profits under this Agreement but also resulting from the impact on Employer's relationship with its Clients) in the event Employee fails to fulfill Employee's obligations under this Agreement. Therefore, the parties agree that if Employee terminates this Agreement without Good Reason (as defined below), or if Employer terminates this Agreement for Cause (as defined below), Employer shall be entitled to all damages and other relief to redress the harm caused by the failure of Employee to fulfill Employee's obligations under this Agreement.

(2)     For purposes of this Agreement, "Good Reason" for termination by Employee is defined as a failure by Employer to correct a material breach of Sections 3 or 7 of this Agreement within 35 days following Employer's receipt of written notice by Employee of such material breach. Written notice must physically be received at Employer's office at 1000 Gates Avenue, 5th Floor, Suite 5B, Brooklyn, New York 11221.

(3)     For purposes of this Agreement, "Cause" includes, without limitation, Employee's loss of Employee's authorization to work as a Registered Nurse in the jurisdiction(s) assigned by Employer, Employee's failure or refusal to perform any of Employee's material obligations under this Agreement, Employee's refusal to adhere to the policies or procedures of the Client(s) to which Employee is assigned, Employee's engaging in conduct detrimental to the reputation of Employer or its Client(s), Employee's

Page 6

**A-244**

Case 23-303, Document 49, 07/05/2023, 3537568, Page256 of 285



AdvancedCare

commission of an unlawful act, Employee's unauthorized removal of property of Employer or a Client, Employee's falsification of documents, reports or records, absenteeism or chronic lateness, Employee's failure or refusal to provide patient care consistent with accepted guidelines or to perform the duties of employment. Employer may immediately terminate this Agreement for Cause at any time.

(b)     This Agreement will terminate in the event of Employee's Disability (as defined below) or death. For purposes of this Agreement, "Disability" means incapacitation due to illness, accident or other physical or mental disability which renders Employee substantially unable to work for a period of one hundred twenty (120) days, and no reasonable accommodation being available which would permit Employee to perform the essential functions of Employee's position. In the event Employee and Employer disagree as to the existence of a Disability, the dispute shall be resolved by an independent medical doctor selected by Employer.

(c)     In the event of termination of this Agreement, any outstanding payment obligations shall remain in effect until satisfied in full, and the following provisions shall remain in effect in accordance with their respective terms: Section 4; Section 13 (including Schedule B), Section 14, and this Section 10.

**Section 11.     Headings.**

The headings of the Sections of this Agreement (including Schedules) are for convenience only and shall not control or affect the meaning or construction or limit the scope or intent of any of the provisions of this Agreement.

**Section 12.     Entire Agreement; Modification; Waiver.**

This Agreement contains the entire agreement between the parties concerning the subject matter hereof and supersedes the Prior Agreement. All obligations under this Agreement which were performed by the parties prior to the date of this Agreement (for example, actions performed under the Prior Agreement) shall be deemed to have been performed under this Agreement. This Agreement may not be modified or amended except in a writing signed by both parties. If any term in this Agreement is held by a tribunal having jurisdiction to be overbroad and/or unenforceable, the parties acknowledge and agree that the defective terms shall be modified to the extent necessary to comply with applicable law. If it is determined that any of the provisions of this Agreement are invalid or unenforceable, the remaining provisions shall survive and be given full force and effect. Failure to enforce a provision of this Agreement shall not be construed as a waiver of future enforcement of that provision or any other provision in the Agreement.

**Section 13.     Governing Law; Dispute Resolution.**

This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York. The parties agree to the dispute resolution provision contained in **Schedule B**.

**Section 14.     Reimbursement of Employer's Costs of Enforcement.**

Employee shall reimburse Employer for all reasonable costs, including all attorneys' fees that Employer incurs in enforcing its rights and remedies under this Agreement.

By signing this Agreement, Employee confirms that Employee (i) has read and understood all the terms of this Agreement, and (ii) had an opportunity to consult with an attorney of his or her choosing before signing it. By signing this Agreement, Employee also confirms that Employee is committed to

Case 23-303, Document 49, 07/05/2023, 3537568, Page257 of 285



AdvancedCare

working for Employer for at least three years as a Registered Nurse caring for elderly patients in a long-term care setting.

Advanced Care Staffing, LLC

BY: _____SAM KLEIN_____

_____

Signature

_____01/05/2022_____

Date

Benzor Shem Vidal

Employee Name (Print)

_____

Signature

_____04-04-2022_____

Date

Page 8

**A-246**

Case 23-303, Document 49, 07/05/2023, 3537568, Page258 of 285



AdvancedCare

**SCHEDULE A**

**TO THE AMENDED AND RESTATED EMPLOYMENT AGREEMENT**

**RESPONSIBILITIES OF EMPLOYEE UPON COMMENCEMENT OF EMPLOYMENT**

1. Employee shall devote his/her entire professional time, skill and attention to the performance of the nursing services and other activities on behalf of Employer, including but not limited to obtaining any certifications required for Employer. Employee shall make every effort to, and shall conduct him/herself at all times so as to advance the best interests of Employer and the assigned Client(s).

2. Employee shall not, without the written consent of Employer, practice or render any service of a professional nature, except as assigned by Employer.

3. Employee will report to work at the date, time and location assigned by Employer.

4. Employee shall notify both Employer and the Client immediately upon discovering that Employee will not be able to work at a time or date that Employer has scheduled Employee to work.

5. Employee shall notify Employer, by telephone, if a Client requests Employee to work more than 40 hours in any work week. This notification requirement does not relieve Employee of Employee's duty to report to work as scheduled.

6. If any Client instructs or directs Employee to take action that Employee believes to be improper, or if any Client instructs or directs Employee to refrain from taking action that Employee thinks is necessary, or if Employee has been subject to any conduct by any Client that he/she believes to be improper or unlawful, Employee will immediately notify Employer.

7. Employee shall abide by Employer's policies and procedures applicable to similarly situated employees, which may be changed from time to time in Employer's sole discretion.

8. Employee shall at all times during the Term keep Employee's license to work as a Registered Nurse in good standing, and shall remain immigration compliant. This includes, but is not limited to, compliance with health exams, Visa screen, and any continued education as required by state licensing boards. Employee shall immediately notify Employer in writing of any investigation or inquiry involving Employee by any state or federal regulatory agency, governmental authority, or licensing authority.

9. Employee shall at all times comply with the ethics and professional standards pertaining to Registered Nurses as well as all applicable federal, state and local law.

10. Employee shall in a timely fashion prepare, maintain, and submit necessary or appropriate reports, claims, correspondence and records relating to his/her duties performed under this Agreement as may be required by Employer, all of which shall be the sole property of Employer.

Case 23-303, Document 49, 07/05/2023, 3537568, Page259 of 285



11. Employee will immediately notify Employer in writing of (i) any incident or claim of wrongdoing or neglect involving Employee's provision of services under this Agreement and (ii) any investigation or inquiry involving Employee by any state or federal regulatory agency, governmental authority, or licensing authority.

12. Employee shall be held responsible for any legal action taken against Employer due to Employee's misrepresentation of him/herself or his/her qualifications.

13. Employee understands and agrees that he/she is obligated to work the schedules and shifts assigned to him/her and that Employee may be required to work varying shifts and varying hours at Employer's sole discretion.

14. Employee shall be responsible for providing Employee's own method of reliable and timely transportation to and from any Client, including when necessary travelling between different Clients in a single day.

15. Employee must provide a reliable method for Employer to get into contact with Employee during and after work, including a mobile telephone and e-mail address.

16. Employee shall promptly provide all documents as requested by Employer during Employee's employment.

17. Employee shall comply with any additional lawful rules and requirements established by Employer.

Signatures:

_____  Benzor Shem Vidal

Employee

_____

SAM KLEIN

Employer

**A-248**

Case 23-303, Document 49, 07/05/2023, 3537568, Page260 of 285



**SCHEDULE B**
**TO THE AMENDED AND RESTATED EMPLOYMENT AGREEMENT**
**DISPUTE RESOLUTION PROVISION**

As a condition of my employment with Advanced Care Staffing, LLC ("Employer"), except for Employer's enforcement of restrictive covenants as provided for in Section 6(c) of the Agreement, I agree that any dispute, controversy or claim arising between me and Employer (including a dispute, controversy or claim arising out of, in connection with or relating to, this Agreement, or the interpretation, performance or breach, termination or validity hereof) shall be resolved by arbitration pursuant to this dispute resolution provision (the "Provision"). This includes, but is not limited to, claims involving an alleged violation of public policy; all statutory claims for discrimination and/or harassment and/or retaliation under federal, state, or local law; and claims concerning wages or other compensation, whether based on statute or any other grounds. I, therefore, waive my right to sue in court and have a jury trial.

This agreement to arbitrate shall be governed by the Federal Arbitration Act and shall remain in force even after I separate from Employer for any reason.

For purposes of this Agreement, a claim against any of Employer's owners, employees, subsidiaries, affiliates, or the owners or employees of any such entities, will be considered a claim against Employer.

I agree that arbitration will be administered by the American Arbitration Association ("AAA") and that the AAA's Commercial Arbitration Rules in effect at the time of the dispute will govern, except as modified by this Provision. I understand that the AAA's Commercial Arbitration Rules are available online at www.adr.org.

The costs for initiating arbitration will be governed by the AAA's policy on costs for employment-related disputes. For informational purposes, as of January 2021, that policy provides that the initial filing fee for an employee will be no more than $300.00 (which may be waived under certain circumstances), and that the employer will initially bear all other filing fees, administrative fees, hearing fees, and arbitrator compensation. In the event that the AAA's initial filing fee is higher than the filing fee for a court action in the trial court in the jurisdiction where I reside, I will only be required to contribute the cost of what I would have paid to file an action in court. I agree that at the conclusion of arbitration, the prevailing party shall be entitled (in addition to all other relief available under the Agreement or applicable law) to be reimbursed for its reasonable attorney's fees as well as all costs and fees charged by the AAA and the arbitrator.

Arbitration proceedings will be conducted by a single arbitrator. The arbitration shall be conducted in New York, New York unless the parties otherwise agree. The arbitration proceedings shall be conducted in the English language. All submissions shall be made in English or with an English translation. The arbitrator shall be bound by the terms of the Agreement and by applicable law. The award of the arbitrator shall be final and binding upon Employer and me, and either Employer or I may apply to a court of competent jurisdiction for confirmation and enforcement of such award.

Case 23-303, Document 49, 07/05/2023, 3537568, Page261 of 285



AdvancedCare

I agree that any dispute or claim between Employer and me will be resolved on an individual basis only. No arbitration shall include any disputes or claims on behalf of any other employees, such as class actions or collective actions. The arbitrator shall not have the authority to hear or issue any award concerning the claims of a class action or collective action or to consolidate the claims of more than one employee or the claims of a class of employees into a single arbitration proceeding, to the maximum extent permitted by law. If Employer or I have any disagreement about whether an arbitration can include any dispute or claim on behalf of any other employees, that disagreement will be decided by a court, not by an arbitrator.

I agree that in the event of a default by either party in an arbitration proceeding, if the non-defaulting party has satisfied the AAA's rule(s) on serving of notice, the arbitration shall proceed in accordance with Rule E-6 of the AAA's Commercial Arbitration Rules, Expedited Procedures (titled, "Proceedings on Documents and Procedures for the Resolution of Disputes Through Document Submission").

Employer agrees that should there be arbitration proceedings in accordance with this Provision, I would be free to pursue all available substantive or procedural rights or remedies in such arbitration proceedings. For example, this Provision does not alter any applicable statute of limitations and does not prevent the arbitrator from awarding all types of damages available under the applicable statute(s) or common law.

I agree that in the event that any court of competent jurisdiction shall determine that any portion of this Provision exceeds the scope permitted by applicable law, the court shall have the authority to modify or "blue pencil" such portion so as to render it enforceable while maintaining the parties' original intent to the maximum extent possible. If a court determines that a legal dispute shall not be resolved by arbitration for any reason, the dispute or claim shall be decided by a judge, without a jury.

I understand that in a lawsuit in court, I would have certain rights to a trial by a jury or a judge. I voluntarily and knowingly agree to give up those rights, and I understand that all disputes or claims relating to my employment (or termination of employment) will instead be decided by an arbitrator. I understand that I have a right to consult with a person of my choosing, including an attorney, before signing this Provision.

Signatures: Benzer Shem Vidal
Employee

SAM KLEIN
Employer

| **From:** | Joel Rosalio <IMCEAEX-_O=EXCHANGELABS_OU=EXCHANGE+20ADMINISTRATIVE+ 20GROUP+20+28FYDIBOHF23SPDLT+29_CN=RECIPIENTS_CN= 21C50AFDB1B24282BFECD9A67FEAE7EE-JOEL@namprd18.prod.outlook.com> |
|---|---|
| **Sent:** | Tuesday, January 4, 2022 4:51 PM |
| **To:** | Benzor Shem Vidal |
| **Cc:** | Jan Romwel Labro; Kriszaleen Baca |
| **Subject:** | RE: VIDAL, BENZOR SHEM: USEM Interview Initial Instructions |

Hi Benzor,

I already have it signed and notarized, will send it tomorrow. You should have it sometime early next week.

Will send you a separate invite for our meeting.

Thank you,


**Joel Rosalio**
**International Healthcare Manager**
**Advanced Care Staffing, LLC**
P  :  718.305.6700 Ext. 210
F  :  718.305.6824
E  :  joel@advancedcarestaffing.com
A  :  1000 Gates Avenue, Suite 5B, Brooklyn, NY 11221

CONFIDENTIALITY AND PRIVACY NOTICE: This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify Advanced Care Staffing. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited. Thank you.


**From:** Benzor Shem Vidal <shem15418@gmail.com>
**Sent:** Tuesday, January 4, 2022 4:33 PM
**To:** Joel Rosalio <joel@advancedcarestaffing.com>
**Cc:** Jan Romwel Labro <jan@advancedcarestaffing.com>; Kriszaleen Baca <Kriszaleen@advancedcarestaffing.com>
**Subject:** VIDAL, BENZOR SHEM: USEM Interview Initial Instructions

Hi Sir Joel,

Please see signed contract.

I am available for the video call on Jan 10, 2022 or if we can do it earlier I'm available on Jan 6, 2022.

My viber is +44 7309676345

Also, will the Job Offer and Support Letter be sent to my address this week?

Many Thanks

Benzor

On Tuesday, January 4, 2022, Joel Rosalio <joel@advancedcarestaffing.com> wrote:

Dear Benzor Shem Vidal:

Please refer to the following link for your initial guidance for your upcoming US Embassy Immigrant Visa Application interview on **January 19, 2022 at 9:30AM.**

https://travel.state.gov/content/travel/en/us-visas/immigrate/the-immigrant-visa-process/step-10-prepare-for-the-interview.html

https://ais.usvisa-info.com/en-gb/iv/information/iv_overview.

Through this link you can see and make reference to the following matter:

1. Pre-interview checklist of the documents; some documents may not be required of you depending on which category you are included.

   Please make sure that you will have the following:

   RN credentials:           NY license and CGFNS visa screen certificate (original and photocopies)

   School Credential:      diploma and transcript of records

   Civil documents:       PSA issued birth cert, marriage cert (if applicable), valid passport, NBI clearance and/or police clearance from your present place of residence

2. Registration of your delivery address;
3. Interview Guidelines;
4. Medical Examination Instructions. Please coordinate with the US Embassy for the accredited clinic/hospital. Please take note that it may take about 5 days before you get the result and the medical examination result is valid only for 6 months. The objective is that you should have a valid medical examination result at the time of the interview.

Further, kindly find the following attachment for your perusal:

1. Cover Letter

**A-252**

2. Amended Employment Agreement
3. Introductory Guide to Skilled-Nursing Facility
4. Nurses Quick Guide

**Please review this guidelines carefully and prepare your documents. PLEASE make yourself available sometime next week and we will discuss all these concerns. Briefing and a short lecture will be conducted by one of our Operations Manager and myself. Please be prepared for a video call using Microsoft Teams. This meeting may take an hour to 1.5 hour the most. We will send you a separate invite on a specific date. We are also hoping that you can provide us with your contact details for Viber or Skype** (if you have one).

**Will call you prior to this date to monitor how things are going. Also for your reference, we will send the original copy of the Job Offer and Support Letter to the address that you have provided.**

Let us know too should you have any questions or clarification.

Thank you,

**Joel Rosalio**

**International Healthcare Manager**
**Advanced Care Staffing, LLC**

P : 718.305.6700 Ext. 210

F : 718.305.6824

E : joel@advancedcarestaffing.com

A : 1000 Gates Avenue, Suite 5B, Brooklyn, NY 11221

CONFIDENTIALITY AND PRIVACY NOTICE: This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify Advanced Care Staffing. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited. Thank you.

**A-253**

| | |
|---|---|
| **From:** | Benzor Shem Vidal <shem15418@gmail.com> |
| **Sent:** | Monday, January 10, 2022 2:36 AM |
| **To:** | USA Petition Priority Care Staffing |
| **Cc:** | Joel Rosalio |
| **Subject:** | Re: VIDAL, BENZOR SHEM: ACS Nurse Sponsorship Agreement and Briefing |

Hi Sir Joel,

I would like to double check the scheduled video call later today. What time is it in US time? Is it 3 - 5 PM US time or UK time?

My viber is +447309676345 for the video call or microsoft teams

Thank you

Regards,

Benzor

On Thursday, January 6, 2022, USA Petition Priority Care Staffing <usapetition@prioritycarestaffing.com> wrote:

This is video conference call.  Please make sure you have access to a camera and headset to connect. We will also have a screen sharing presentation therefore advisable that you are in front of a computer or a wide screen to see the content of our discussion. We STRONGLY advise to read the email sent by Joel entitled "USEM Interview Initial Instruuction" including attachment before attending our conference call.

Items to discuss:

1. Amendment in the agreement.
2. About your assignment with us
3. Introduction to Skilled Nursing Facility
4. Interview briefing

Thank you and we look forward to your attendance.

# Microsoft Teams meeting

**A-254**

**Join on your computer or mobile app**
[Click here to join the meeting](#)

[Learn More](#) | [Meeting options](#)

**A-255**

**From:**           Benzor Shem Vidal <shem15418@gmail.com>
**Sent:**           Thursday, January 13, 2022 7:18 AM
**To:**             Joel Rosalio
**Subject:**        Interview Update & Facility Change

Hi Sir Joel,

I've already done my visa interview and it went well. The consular officer said they'll be processing it already. Hopefully I'll receive my visa sometime next week.

Can I kindly request for a change of facility to Downtown Brooklyn as what we have discussed in the phone?

I'll also start looking for a place so I can come next month by February third or fourth week since I need to leave 6 months before my passport expiry.

Looking forward to your favourable response.

Thank you

Kind Regards,

Benzor

## Marissa Vitolo

| | |
|---|---|
| **From:** | Sami Asaad |
| **Sent:** | Thursday, July 7, 2022 1:57 PM |
| **To:** | Marissa Vitolo |
| **Subject:** | FW: Resignation Letter |
| **Attachments:** | VIDAL -Signed Amended and Restated Employment Agreement.pdf |

**From:** Sam Klein <sam@advancedcarestaffing.com>
**Sent:** Thursday, June 16, 2022 12:27 PM
**To:** Sami Asaad <SAsaad@fordharrison.com>
**Cc:** Maureen Luy <mluy@advancedcarestaffing.com>
**Subject:** FW: Resignation Letter



**From:** Maureen Luy <mluy@advancedcarestaffing.com>
**Sent:** Thursday, June 16, 2022 10:55 AM
**To:** Sam Klein <sam@advancedcarestaffing.com>
**Subject:** FW: Resignation Letter

Read below.

**From:** Maureen Luy
**Sent:** Wednesday, June 15, 2022 4:01 PM
**To:** Benzor Shem Vidal <shem15418@gmail.com>; Human Resources <hr@advancedcarestaffing.com>; Tina Tan <Tina@advancedcarestaffing.com>
**Subject:** RE: Resignation Letter

Hi Benzor,

You signed a **3 Year contract** with Advanced Care Staffing that you need to fulfill. You just started with your job and have worked for barely 3 mos. since you requested a week vacation after a week of orientation. We were also clear before you came and even before you signed the contract that the job we are offering you is for a Long Term Care or Skilled Nursing Facility. At this point, we have delivered our part as your sponsoring employer, even more than what we have promised.

Please come to our Brooklyn office to discuss further with Mr. Klein.

We will be waiting for your response.

Sincerely,

1

**A-257**

Maureen Luy

---

**From:** Benzor Shem Vidal <shem15418@gmail.com>
**Sent:** Wednesday, June 15, 2022 3:45 PM
**To:** Human Resources <hr@advancedcarestaffing.com>; Maureen Luy <mluy@advancedcarestaffing.com>; Tina Tan <Tina@advancedcarestaffing.com>
**Subject:** Resignation Letter

Dear Advanced Care Staffing,

Please accept this letter as my formal notice of resignation for my position as a Registered Nurse. I will be rendering my two week notice starting today June 15 and my last work day is June 29.

It has been a great honour of working with you but there has been several factors that led me to this moment. It has been very tough, physically and mentally stressful to work in the nursing home that I always feel burnt out with no motivation.

Working in a nursing home has been the unsafest practice I have ever experienced in my nursing career. We are expected to do so much work by ourselves with so much limited staffing resources.

In order to keep my sanity intact, I need to value my physical and mental health.

Please allow me around 6 months to gather the necessary funds to pay for the resignation fee.

I am truly grateful for the guidance you have provided me. I have learned a lot and will always cherish this opportunity of working with you.

Thank you for the kind understanding.

Kind Regards,

Benzor Shem Vidal

**A-258**

# BENZOR SHEM R. VIDAL

# 27 Rizal Avenue Extension, Mambaling, Cebu City, Philippines
Mobile No.:  09289140514
Home No.:  (032) 4189117
Email Address: shem15418@gmail.com



## PERSONAL INFORMATION

| | | |
|---|---|---|
| Age | : | 24 years old |
| Gender | : | Male |
| Birthdate | : | ████████ |
| Birthplace | : | Cebu City |
| Civil Status | : | Single |
| Nationality | : | Filipino |
| Height | : | 167 cm |
| Weight | : | 62 kgs |
| Religion | : | Latter-day Saint |
| Mother | : | Adelia R. Vidal |
| Father | : | Benicio L. Vidal |

## EDUCATION

**College**          **Bachelor of Science in Nursing**
Cebu Doctors' University, Mandaue City, Philippines
Date Graduated:   March 2016

**Secondary**        **Cebu Eastern College**
Cebu City, Philippines
Date Graduated:   March 2012

**Elementary**       **Cebu Eastern College**
Cebu City, Philippines
Date Graduated:   March 2008

## QUALIFICATIONS

- State of licensure:  Illinois
  - License Number: 041466723
  - Valid Until: 05/31/2020

- PH Board of Nursing
  - Rating – 83.40%
  - License Number: 0883458
  - Valid Until:  03/15/2019

**A-259**

## AWARDS

- Certificate of Recognition as Top 1 – Nursing Theory (Average: 2.1368)
- Certificate of Recognition as Top 1 – Pre-board Examination
- Certificate of Recognition as Top 2 – Cumulative Ranking in Nursing Theory, RLE and General Education Subjects (Weighted Average: 1.8288)
- Certificate of Recognition as Top 2 – Overall Ranking in Nursing Theory, RLE, Competency Appraisal and Pre-board Examination
- Certificate of Recognition as Top 7 – Related Learning Experience – Average 1.8350
- Certificate of Recognition as member of Nursing Table Tennis Team – 2012 to 2016 years
- Certificate of Recognition as member of Nursing Volleyball Men's Team – 2013 to 2016
- Certificate of Recognition as member of Nurses' Notes – 2013 to 2016
- Math Olympiad – CEC, Cebu City – 2005 (Elementary)
- Best in Math, CEC, Cebu City (High School)
- Best in Social Studies, CEC, Cebu City (High School)
- 7th Honorable Mention – CEC, Cebu City (High School)

## WORK EXPERIENCE

**STAFF NURSE**                             September 2016 to November 2017

Employer                           : University of Cebu Medical Center
Bed capacity/Short description     : 300 - 350 bed capacity, certified by ISO
Unit/Area                          : Private Rooms (Medical-Surgical,
                                       Pediatrics and Obstetric Cases)

Job Description:
  o Obtains and records initial assessment and establishes priorities according to patient age, symptoms and psychosocial needs.
  o Serves as a coordinator of all services provided by the medical team
  o Develops and implements a measurable individualized plan of care for the patient within the time frame established by the Nursing Standards of Care.
  o Participates in patient significant others health education and discharge planning.
  o Follows the ten (10) medication rights and reduces the potential for medication errors.
  o Recognizes, assesses, and reassesses pain. Utilizes appropriate pain management techniques. Educates the patient and family regarding pain management.
  o Cooperates with other personnel to achieve departmental objectives; maintains good employee relations and interdepartmental objectives.

**Private Duty Nurse**                           November 2017 to May 2018

Employer                        : Mr. ████████
Short description               : Patient is diagnosed with Alzheimer's
                                  disease and right-sided paraplegia
                                  secondary to stroke

Job Description:
   o   Assists with patient's activities of daily living
   o   Provides medications and follows the 10 medication rights for proper medi-
       cation administration
   o   Involves significant others in health teachings and health planning
   o   Develops holistic plan geared towards patient's optimum level of functioning


**UM USRN Consultant**                           May 2018 to Dec 2018

Employer                        : EXL Service Philippines
Role                            : Utilization Management Associate

Job Description
   o   Reads clinical information and analyzes patient's needs
   o   Sorts out pertinent clinical documents if the patient does need a particular
       surgery
   o   Coordinates with the provider to make a thorough assessment
   o   Establishes the patient's needs and prioritizes goals
   o   Documents detailed description to support why the patient needs a particu-
       lar procedure


**USRN Reviewer**                                Jan 2019 to Present

Employer                        : Shearwater Health Inc.
Role                            : Utilization Management

Job Description
   o   Thoroughly scan and read medical documents and determine patient's
       needs for SNF admission
   o   Determine patient's capabilities in functioning at his current level of function
       in the skilled nursing facility
   o   Coordinates with medical directors to anticipate if patient meets the criteria
       to be admitted in the skilled nursing facility
   o   Documents detailed summary of patient's condition and capabilities to per-
       form at patient's level of function and necessity for SNF admission

A-261

**SKILLS**

- Good interpersonal skills
- Therapeutic application of skills in assessing situations and applying appropriate nursing interventions
- Willing to work in a challenging, dynamic and flexible environment
- Computer literate, Optimistic and fast learner

**REFERENCES**

- ***Mr. Rommel P. Merioles*** *– Dean, College of Nursing, Cebu Doctors University, Cebu City | (032) 238 - 8333*
- ***Dr. Fe M. Elizalde -*** *3rd Floor, Ma. Cristina Building, Fuente Osmeña, Cebu City | (032) – 256 - 2572*
- ***Agnes Marie F. Austero, Fideleo Tañola, Johanna Kristeen P. de la Torre*** *– Clinical Instructors, Cebu Doctors University, Cebu City | (032) 238 - 8333*

FORM IX
No. : 162157



# CEBU DOCTORS' UNIVERSITY
## OFFICE OF THE REGISTRAR

1 Dr. P. V. Larrazabal Jr. Avenue, North Reclamation
6014 Mandaue City, Cebu, Philippines
Telephone No.: +63 (32) 238-8333 Local 8184   Telefax No. +63 (32) 238-8764
Email: registrar@cebudoctorsuniversity.edu   Web: www.cebudoctorsuniversity.edu

## OFFICIAL TRANSCRIPT OF RECORDS

PERSONAL INFORMATION :

| | | |
|---|---|---|
| NAME OF STUDENT | : | VIDAL, BENZOR SHEM RESERVA |
| SCHOOL ID NUMBER | : | 21218629 |
| DATE OF BIRTH | : | |
| SEX | : | MALE |
| CIVIL STATUS | : | SINGLE |
| NATIONALITY | : | FILIPINO |
| RELIGION | : | LATTER-DAY SAINTS |
| CEBU CITY ADDRESS | : | 27 RIZAL AVE. EXT., MAMBALING, CEBU CITY |
| PARENT/GUARDIAN | : | BENICIO L. VIDAL |
| HOME ADDRESS | : | 24 RIZAL AVE. EXT., MAMBALING, CEBU CITY |
| TELEPHONE NO. | : | 418-9117 |
| EMAIL ADDRESS | : | |
| ENTRANCE DATA | : | Form 137-A |
| NAME OF SCHOOL | : | CEBU EASTERN COLLEGE |
| IF ALIEN, ACR NO. | : | |
| PASSPORT NO. | : | |
| EXPIRATION DATE | : | |

### RECORDS OF PRELIMINARY EDUCATION

| | | | |
|---|---|---|---|
| PRIMARY | : | CEBU EASTERN COLLEGE | YEAR : 2005-2006 |
| INTERMEDIATE | : | CEBU EASTERN COLLEGE | YEAR : 2007-2008 |
| SECONDARY | : | CEBU EASTERN COLLEGE | YEAR : 2011-2012 |
| COLLEGE | : | | YEAR : |

### GRADING SYSTEM

| GRADE/RATING | LETTER GRADE | EQUIVALENT | INDICATION/REMARK |
|---|---|---|---|
| 1.0 | A+ | 95 - 100% | EXCELLENT |
| 1.1 - 1.2 | A | 93 - 94% | |
| 1.3 - 1.4 | A- | 91 - 92% | VERY GOOD |
| 1.5 | B+ | 90% | |
| 1.6 - 1.8 | B | 87 - 89% | |
| 1.9 - 2.0 | B- | 85 - 86% | |
| 2.1 - 2.2 | C+ | 83 - 84% | GOOD |
| 2.3 - 2.4 | C | 81 - 82% | |
| 2.5 | C- | 80% | |
| 2.6 - 2.8 | D+ | 77 - 79% | FAIR |
| 2.9 | D | 76% | |
| 3.0 | D- | 75% | PASSED |
| PASSED | P | PASSED | PASSED |
| 5.0 | F | BELOW  75% | FAILED |
| NC | | | NO CREDIT |
| W | | | WITHDRAWN |
| DR | | | DROPPED |

### SEMESTER HOURS CREDIT

One unit of academic credit represents one hour of lecture, seminar, or recitation per week or a total of 18 hours per semester.  For courses with a laboratory component,  one unit of academic credit represents two to three laboratory hours per week.

REMARKS :  ISSUED FOR BOARD EXAMINATION PURPOSES ONLY.

NOT VALID
WITHOUT SEAL

ATTY. ROEL S. HORTELANO
University Registrar

Prepared by :  GEMMALYN S. BADAYOS

Checked by :

Date :  APR 1 1 2016

ROMMEL P. MERIOLES, MAN
Dean, College of Nursing

**A-263**

Case 1:22-cv-02535-NRM-MMH Document 49-7 Filed 02/08/23 Page 2 of 7 PageID #: 504



# CEBU DOCTORS' UNIVERSITY

**OFFICE OF THE REGISTRAR**

FORM IX
No. : 162158

1 Dr. P. V. Larrazabal Jr. Avenue, North Reclamation
6014 Mandaue City, Cebu, Philippines
Telephone No.: +63 (32) 238-8333 Local 8184   Telefax No. +63 (32) 238-8764
Email: registrar@cebudoctorsuniversity.edu   Web: www.cebudoctorsuniversity.edu

College of Nursing
PAASCU Accredited

## OFFICIAL TRANSCRIPT OF RECORDS

NAME OF STUDENT : VIDAL, BENZOR SHEM RESERVA

| COURSE NO. | DESCRIPTIVE TITLE | RATING | RE-EX | CREDITS |
|---|---|---|---|---|
| | **CEBU DOCTORS' UNIVERSITY** | | | |
| | **FIRST SEMESTER, 2012-2013** | | | |
| | **BACHELOR OF SCIENCE IN NURSING** | | | |
| CHEM 11N | GENERAL CHEMISTRY (ORGANIC AND INORGANIC) | 1.4 | | 5 |
| ENGL 11N | COMMUNICATION SKILLS I | 1.9 | | 3 |
| FIL 11N | KOMUNIKASYON SA AKADEMIKONG FILIPINO | 2.0 | | 3 |
| MATH 11 | COLLEGE ALGEBRA | 1.0 | | 3 |
| N 10A | THEORETICAL FOUNDATION IN NURSING | 2.3 | | 3 |
| N 11A | CHRISTIAN LIVING I | 2.0 | | 1 |
| NSTP-CWTS 1 | NATIONAL SERVICE TRAINING PROGRAM-CIVIC WELFARE TRAINING SERVICE | 1.6 | | 3 |
| PE 11 | PHYSICAL FITNESS AND SELF-TESTING ACTIVITIES | 1.0 | | 2 |
| PHILO 12 | PHILOSOPHY OF MAN | 1.2 | | 3 |
| PSYCH 11 | GENERAL PSYCHOLOGY | 2.5 | | 3 |
| | **SECOND SEMESTER, 2012-2013** | | | |
| CHEM 15 | BIOCHEMISTRY | 1.3 | | 5 |
| ENGL 12N | COMMUNICATION SKILLS II | 1.2 | | 3 |
| FIL 12N | PAGBASA AT PAGSULAT TUNGO SA PANANALIKSIK | 1.4 | | 3 |
| HA 11N | ANATOMY AND PHYSIOLOGY | 2.0 | | 5 |
| N 12N | HEALTH ASSESSMENT | 2.2 | | 3 |
| NCM 100 | FUNDAMENTALS OF NURSING PRACTICE | 2.1 | | 5 |
| NSTP-CWTS 2 | NATIONAL SERVICE TRAINING PROGRAM-CIVIC WELFARE TRAINING SERVICE | 1.1 | | 3 |
| PE 12 | RHYTHMIC ACTIVITIES AND DANCING | 1.5 | | 2 |
| | **SUMMER, 2013** | | | |
| PHILO 11 | LOGIC AND CRITICAL THINKING | 2.1 | | 3 |
| PHYS 11 | PHYSICS | 1.1 | | 3 |
| SPCH 11 | ORAL AND AURAL COMMUNICATION | 1.2 | | 3 |
| | **FIRST SEMESTER, 2013-2014** | | | |
| HEDUC | HEALTH EDUCATION | 2.0 | | 3 |
| N 15 | PHARMACOLOGY | 2.4 | | 4 |
| N 13 | COMMUNITY HEALTH NURSING | 2.0 | | 5 |
| N 14 | MICROBIOLOGY AND PARASITOLOGY | 1.3 | | 4 |
| NCM 101 | CARE OF MOTHER, CHILD AND FAMILY | 2.1 | | 8 |
| PE 13 | GAMES AND SPORTS | 1.1 | | 2 |
| SO-AN | SOCIOLOGY AND ANTHROPOLOGY | 1.6 | | 3 |

REMARKS : **more entries on page 2.**

GRADING SYSTEM : 1.0 (95-100%) Excellent, 1.1 (94%), 1.2 (93%), 1.3 (92%), 1.4 (91%), 1.5 (90%) Very Good, 1.6 (89%), 1.7 (88%), 1.8 (87%), 1.9 (86%), 2.0 (85%), 2.1 (84%), 2.2 (83%), 2.3 (82%), 2.4 (81%), 2.5 (80%), 2.6 (79%), 2.7 (78%), 2.8 (77%), 2.9 (76%), 3.0 (75%) Fair/Passed, 5.0 (Below 75%) Failed, DR-Dropped, INC-Incomplete, W-Withdrawn, NC-No Credit, NG-No Grade

NOT VALID
WITHOUT SEAL

ATTY. ROEL S. HORTELANO
University Registrar

Prepared by : GEMMALYN S. BADAYOS

Checked by :

Date : APR 1 1 2016

ROMMEL P. MERIOLES, MAN
Dean, College of Nursing

A-264



# CEBU DOCTORS' UNIVERSITY
## OFFICE OF THE REGISTRAR

1 Dr. P. V. Larrazabal Jr. Avenue, North Reclamation
6014 Mandaue City, Cebu, Philippines
Telephone Nos.: +63 (32) 238-8333 Local 8184  Telefax No. +63 (32) 238-8764
Email: registrar@cebudoctorsuniversity.edu  Web: www.cebudoctorsuniversity.edu

FORM IX
No. : 162159

College of Nursing
PAASCU Accredited

## OFFICIAL TRANSCRIPT OF RECORDS

NAME OF STUDENT : VIDAL, BENZOR SHEM RESERVA

| COURSE NO. | DESCRIPTIVE TITLE | RATING | RE-EX | CREDITS |
|---|---|---|---|---|
| **SECOND SEMESTER, 2013-2014** | | | | |
| ECON 11 | HEALTH ECONOMICS WITH TAXATION AND LAND REFORM | 1.9 | | 3 |
| HISTO 10 | PHILIPPINE HISTORY, GOVERNMENT AND CONSTITUTION | 1.1 | | 3 |
| N 16 | NUTRITION AND DIET THERAPY | 2.1 | | 4 |
| N 11B | CHRISTIAN LIVING II | 1.6 | | 1 |
| NCM 102 | CARE OF MOTHER, CHILD, FAMILY AND POPULATION GROUP AT RISK OR WITH PROBLEMS | 1.9 | | 11 |
| PE 14 | RECREATIONAL ACTIVITIES | 1.0 | | 2 |
| PHILO 13 | HEALTH ETHICS (BIOETHICS) | 2.0 | | 3 |
| **SUMMER, 2014** | | | | |
| NCM 103 | CARE OF CLIENTS WITH PROBLEMS IN INFLAMMATORY AND IMMUNOLOGIC RESPONSE, AND IN PERCEPTION COORDINATION | 2.0 | | 9 |
| **FIRST SEMESTER, 2014-2015** | | | | |
| HIST 12 | LIFE AND WORKS OF RIZAL | 1.3 | | 3 |
| MATH 14 | BIOSTATISTICS | 1.3 | | 3 |
| NCM 104 | CARE OF PATIENTS WITH PROBLEMS IN OXYGENATION, FLUID AND ELECTROLYTE BALANCE, NUTRITION AND METABOLISM, AND ENDOCRINE FUNCTIONS | 2.1 | | 14 |
| NCM 105 | CARE OF PATIENTS WITH MALADAPTIVE PATTERNS OF BEHAVIOR | 2.2 | | 6 |
| **SECOND SEMESTER, 2014-2015** | | | | |
| ELECTIVE 1 | WHOLISTIC CARE ACROSS THE LIFE SPAN | 2.6 | | 2 |
| N 18A | NURSING RESEARCH 1 | 2.5 | | 3 |
| N 20 | INFORMATICS | 2.0 | | 3 |
| NCM 106 | CARE OF CLIENTS WITH PROBLEMS IN REPRODUCTION AND SEXUALITY, COMMUNICABLE DISEASES, CELLULAR ABERRATIONS, ACUTE BIOLOGIC CRISIS, EMERGENCY AND DISASTER NURSING AND THE DYING | 1.8 | | 11 |
| SPCH 12 | PUBLIC SPEAKING | 1.5 | | 3 |
| **FIRST SEMESTER, 2015-2016** | | | | |
| CA 1 | COMPETENCY APPRAISAL 1 | 2.1 | | 3 |

REMARKS : **more entries on page 3.**

GRADING SYSTEM  1.0 (95-100%) Excellent, 1.1 (94%), 1.2 (93%), 1.3 (92%), 1.4 (91%), 1.5 (90%) Very Good, 1.6 (89%), 1.7 (88%), 1.8 (87%), 1.9 (86%), 2.0 (85%), 2.1 (84%), 2.2 (83%), 2.3 (82%), 2.4 (81%), 2.5 (80%), 2.6 (79%), 2.7 (78%), 2.8 (77%), 2.9 (76%), 3.0 (75%) Fair/Passed, 5.0 (Below 75%) Failed, DR-Dropped, INC-Incomplete, W-Withdrawn, NC-No Credit, NG-No Grade

NOT VALID
WITHOUT SEAL

Prepared by : GEMMALYN S. BADAYOS

Checked by :
Date :  APR 1 1 2016

ATTY. ROEL S. HORTELANO
University Registrar

ROMMEL P. MERIOLES, MAN
Dean, College of Nursing



# CEBU DOCTORS' UNIVERSITY

FORM IX
No. : 162160

**OFFICE OF THE REGISTRAR**

1 Dr. P. V. Larrazabal Jr. Avenue, North Reclamation
6014 Mandaue City, Cebu, Philippines
Telephone No.: +63 (32) 238-8333 Local 8184   Telefax No. +63 (32) 238-8764
Email: registrar@cebudoctorsuniversity.edu   Web: www.cebudoctorsuniversity.edu

College of Nursing
PAASCU Accredited

## OFFICIAL TRANSCRIPT OF RECORDS

NAME OF STUDENT : VIDAL, BENZOR SHEM RESERVA

| COURSE NO. | DESCRIPTIVE TITLE | RATING | RE-EX | CREDITS |
|---|---|---|---|---|
| ELECTIVE 2 | CARE OF THE ACUTE AND CHRONICALLY ILL AND OLDER PERSONS OF VARIED CULTURE | 2.2 | | 2 |
| FL | FOREIGN LANGUAGE | 1.7 | | 3 |
| HUMAN 12 | HUMANITIES (WORLD CIVILIZATION AND LITERATURE) | 1.6 | | 3 |
| N 18B | NURSING RESEARCH 2 | 1.7 | | 2 |
| N 21 | LOGOTHERAPY | 1.5 | | 1 |
| N 22 | SIGN LANGUAGE | 1.2 | | 1 |
| NCM 107 | NURSING LEADERSHIP AND MANAGEMENT | 2.5 | | 7 |
| | **SECOND SEMESTER, 2015-2016** | | | |
| CA 2 | COMPETENCY APPRAISAL 2 | 2.2 | | 3 |
| INP | INTENSIVE NURSING PRACTICUM | 1.9 | | 8 |

**************************** TRANSCRIPT  CLOSED ****************************

**GRADUATED WITH THE DEGREE OF BACHELOR OF
SCIENCE IN NURSING (BSN) AS OF MARCH 31, 2016.**

**GRANTED AUTONOMOUS STATUS
EXEMPT FROM SPECIAL ORDER**

e-DST/CDU-OR#0970506-03/22/2016

REMARKS : **ISSUED FOR BOARD EXAMINATION PURPOSES ONLY.**

GRADING SYSTEM
1.0 (95-100%) Excellent, 1.1 (94%), 1.2 (93%), 1.3 (92%), 1.4 (91%), 1.5 (90%) Very Good, 1.6 (89%),  1.7 (88%), 1.8 (87%), 1.9 (86%), 2.0 (85%), 2.1 (84%), 2.2 (83%), 2.3 (82%), 2.4 (81%), 2.5 (80%), 2.6 (79%), 2.7 (78%), 2.8 (77%), 2.9 (76%), 3.0 (75%) Fair/Passed, 5.0 (Below 75%) Failed, DR-Dropped, INC-Incomplete, W-Withdrawn, NC-No Credit, NG-No Grade

NOT VALID
WITHOUT SEAL

ATTY. ROEL S. HORTELANO
University Registrar

Prepared by :  GEMMALYN S. BADAYOS

Checked by :

Date :  APR 1 1 2016

ROMMEL P. MERIOLES, MAN
Dean, College of Nursing

**A-266**

Case 1:22-cv-05535-NRM-MMH Document 40-7 05/31/23 Filed 07/05/23 Page 78 of 85 PageID #: 507

# Cebu Doctors' University

KOLEHIYO NG PAGNA-NARSING

COLLEGE OF NURSING

LUNGSOD NG MANDAUE, CEBU, PILIPINAS
Mandaue City, Cebu, Philippines

Ang Hupong Patnugutan sa paggamit ng kapangyarihang kaloob
THE BOARD OF DIRECTORS, BY AUTHORITY

ng Tagapangulo at Tagapamahala at sa tagubilin ng Dekano
OF THE PRESIDENT AND CHAIRMAN AND ON RECOMMENDATION OF THE DEAN

at mga Guro ng Kolehiyo ay naggawad kay
AND THE FACULTY OF THE COLLEGE, HAS CONFERRED UPON

## Benzor Shem Reserva Vidal

ng titulong
THE DEGREE OF

### Batsilyer ng Aghám sa Pagna-narsing
BACHELOR OF SCIENCE IN NURSING

kalakip ang lahat ng karapatan, karangalan at mga pribilehiyo gayon din
WITH ALL THE RIGHTS, HONORS AND PRIVILEGES AS WELL AS

ang mga tungkulin at pananagutang doon nanukol.
THE OBLIGATIONS AND RESPONSIBILITIES THEREUNTO APPERTAINING.

Iginawad sa Lungsod ng Mandaue, Cebu, Pilipinas ngayong ika-31 ng Marso
GIVEN AT THE CITY OF MANDAUE, CEBU, PHILIPPINES THIS 31st DAY OF March

taon ng ating Panginoon, dalawang libo't labing-anim.
IN THE YEAR OF OUR LORD, TWO THOUSAND SIXTEEN.

POTENCIANO V. LARRAZABAL, JR., MD
Pangulo
President

ROMMEL P. MERRIOLES, MAN
Dekano
Dean

Granted AUTONOMOUS STATUS
Exempted from the issuance of a Special Order

A-267



**State of Illinois**

**Department of Financial and Professional Regulation**
Division of Professional Regulation

LICENSE NO.
041.466723

The person, firm, or corporation whose name appears on this certificate has complied with the provisions of the Illinois Statutes and/or rules and regulations and is hereby authorized to engage in the activity as indicated above:

EXPIRES:
05/31/2020

REGISTERED PROFESSIONAL NURSE

BENZOR SHEM R VIDAL
27 RIZAL AVENUE EXTENSION MAMBALING
CEBU CITY 6000
PHILIPPINES, PHILIPPINES

DEBORAH HAGAN
ACTING SECRETARY

The official status of this license can be verified at www.idfpr.com

13187130

Cut on Dotted Line ✂

For future reference, IDFPR is now providing each person/business a unique identification number, 'Access ID', which may be used in lieu of a social security number, date of birth or FEIN number when contacting the IDFPR. Your Access ID is: 4148447



LICENSE NO.
041.466723

Department of Financial and Professional Regulation
Division of Professional Regulation

REGISTERED PROFESSIONAL NURSE

BENZOR SHEM R VIDAL

EXPIRES:
05/31/2020

DEBORAH HAGAN
ACTING SECRETARY

The official status of this license can be verified at www.idfpr.com

Cut on Dotted Line ✂

**A-268**

Case 1:22-cv-05535-NRM-MMH Document 70-5 Filed 07/05/23 Page 7 of 73 PageID #: 509

# The International Commission On Healthcare Professions
## a division of CGFNS International, Inc.

3600 Market Street
Suite 400
Philadelphia, PA 19104
(215) 349-6721

certifies that

### BENZOR SHEM RESERVA VIDAL

Born on ███████ in Philippines

has met all of the requirements of section 212(a)(5)(C) of the Immigration and Nationality Act, as specified in Title 8, Code of Federal Regulations section 212.15(f) for the Profession of:

Registered Nurse

Issued: September 27, 2018

Certificate No: 0006462564
Expires: September 27, 2023



*Sr. Rosemary Donley*
Sister Rosemary Donley, PHD, APRN, FAAN
Chair
Board of Trustees
CGFNS International, Inc.

*Franklin A. Shaffer*
Franklin A. Shaffer, EdD, RN, FAAN
President and Chief Executive Officer
CGFNS International, Inc.

06/27/18

A-269

OMB Approval: 1205-0508
Expiration Date: 05/31/2019

### Application for Prevailing Wage Determination
### Form ETA-9141
### U.S. Department of Labor



**Please read and review the instructions carefully before completing this form and print legibly. A copy of the instructions can be found at http://www.foreignlaborcert.doleta.gov/.**

### A. Employment-Based Visa Information

| 1. Indicate the type of visa classification supported by this application (Write classification symbol): * | PERM |
|---|---|

### B. Requestor Point-of-Contact Information

| 1. Contact's last (family) name * VILLAMOR | 2. First (given) name * CARMEN | 3. Middle name(s) * T. |
|---|---|---|

| 4. Contact's job title * Attorney |
|---|

| 5. Address 1 * 3701 WILSHIRE BOULEVARD |
|---|

| 6. Address 2 SUITE 1105 |
|---|

| 7. City * LOS ANGELES | 8. State * CA | 9. Postal code * 90010 |
|---|---|---|

| 10. Country * UNITED STATES OF AMERICA | 11. Province (if applicable) N/A |
|---|---|

| 12. Telephone number * 323-939-8200 | 13. Extension N/A | 14. Fax Number 323-939-8400 |
|---|---|---|

| 15. E-Mail Address carmen@carmenvillamor.com |
|---|

### C. Employer Information

| 1. Legal business name * Advanced Care Staffing, LLC |
|---|

| 2. Trade name/Doing Business As (DBA), if applicable § N/A |
|---|

| 3. Address 1 * 1000 Gates Ave. Suite 5B |
|---|

| 4. Address 2 N/A |
|---|

| 5. City * Brooklyn | 6. State * NY | 7. Postal code * 11221 |
|---|---|---|

| 8. Country * UNITED STATES OF AMERICA | 9. Province (if applicable) N/A |
|---|---|

| 10. Telephone number * 718-305-6700 | 11. Extension N/A |
|---|---|

| 12. Federal Employer Identification Number (FEIN from IRS) * ▉▉▉▉▉ | 13. NAICS code (must be at least 4-digits) * ▉▉▉▉ |
|---|---|

### D. Wage Processing Information

| 1. Is the employer covered by ACWIA? * | ☐ Yes ☑ No | |
|---|---|---|
| 2. Is the position covered by a Collective Bargaining Agreement (CBA)? * | ☐ Yes ☑ No | |
| 3. Is the employer requesting consideration of Davis-Bacon (DBA) or McNamara Service Contract (SCA) Acts? * | ☐ Yes ☑ No | ☐ DBA ☐ SCA |

OMB Approval: 1205-0466
Expiration Date: 05/31/2019

Application for Prevailing Wage Determination
Form ETA-9141
**U.S. Department of Labor**



**D. Wage Processing Information (cont.)**

| 4. Is the employer requesting consideration of a survey in determining the prevailing wage? * | ☐ Yes ☑ No |
|---|---|
| 4a. Survey Name: § | |
| 4b. Survey date of publication: § | |

**E. Job Offer Information**

**a. Job Description:**

| 1. Job Title *<br><br>Registered Nurse | |
|---|---|
| 2. *Suggested* SOC (ONET/OES) code *<br>29-1141 | 2a. *Suggested* SOC (ONET/OES) occupation title *<br>Registered Nurses |

3. Job Title of Supervisor for this Position (if applicable) §
Administrator

| 4. Does this position supervise the work of other employees? *<br>☐ Yes ☑ No | 4a. If "Yes", number of employees worker §<br>will supervise: N/A |
|---|---|
| 4b. If "Yes", please indicate the level of the employees to be supervised: | ☐ Subordinate ☐ Peer |

5. Job duties – Please provide a description of the duties to be performed with as much specificity as possible, including details regarding the areas/fields and/or products/industries involved. A description of the job duties to be performed **MUST** begin in this space. *

Under the supervision of an administrator or supervisor, provide general nursing care to patients; administer prescribed medications and treatments in accordance with approved nursing techniques; prepare equipment and assist physicians during treatment and examinations; monitor all aspects of patient care, including diet and physical activity; perform other related duties as ordered.

| 6. Will travel be required in order to perform the job duties? *<br><br>☐ Yes ☑ No | 6a. If "Yes", please provide details of the travel required, such as the area(s), frequency and nature of the travel. §<br>N/A |
|---|---|

OMB Approval: 1205-0466
Expiration Date: 05/31/2019

Application for Prevailing Wage Determination
Form ETA-9141
**U.S. Department of Labor**



---

**E. Job Offer Information (cont.)**

**b. Minimum Job Requirements:**

1. Education: minimum U.S. diploma/degree required *

☐ None  ☐ High School/GED  ☑ Associate's  ☐ Bachelor's  ☐ Master's  ☐ Doctorate (PhD)  ☐ Other degree (JD, MD, etc.)

| 1a. If "Other degree" in question 1, specify the diploma/degree required § | 1b. Indicate the major(s) and/or field(s) of study required § (May list more than one related major and more than one field) |
|---|---|
| N/A | Nursing |

| 2. Does the employer require a second U.S. diploma/degree? * | ☐ Yes  ☑ No |
|---|---|

2a. If "Yes" in question 2, indicate the second U.S. diploma/degree and the major(s) and/or field(s) of study required §

N/A

| 3. Is training for the job opportunity required? * | ☐ Yes  ☑ No |
|---|---|

| 3a. If "Yes" in question 3, specify the number of <u>months</u> of training required § | 3b. Indicate the field(s)/name(s) of training required § (May list more than one related field and more than one type) |
|---|---|
| N/A | N/A |

| 4. Is employment experience required? * | ☐ Yes  ☑ No |
|---|---|

| 4a. If "Yes" in question 4, specify the number of <u>months</u> of experience required § | 4b. Indicate the occupation required § |
|---|---|
| N/A | N/A |

5. Special Requirements - List specific skills, licenses/certificates/certifications, and requirements of the job opportunity. *

RN license in New York, or NCLEX, or CGFNS Visa Screen Certificate

**c. Place of Employment Information:**

| 1. Worksite address 1 * | 3400 Cannon Place |
|---|---|

| 2. Address 2 | N/A |
|---|---|

| 3. City * | Bronx | 4. County * | BRONX |
|---|---|---|---|

| 5. State/District/Territory * | NY | 6. Postal code * | 10463 |
|---|---|---|---|

| 7. Will work be performed in multiple worksites within an area of intended employment or a location(s) other than the address listed above? * | ☐ Yes  ☑ No |
|---|---|

7a. If "Yes", identify the geographic place(s) of employment indicating each metropolitan statistical area (MSA) or the independent city(ies)/township(s)/county(ies) (borough(s)/parish(es)) and the corresponding state(s) where work will be performed. If necessary, submit a second completed ETA Form 9141 with a listing of the additional anticipated worksites. Please note that wages cannot be provided for unspecified/unanticipated locations. §

N/A

---

Case Number: P-100-18163-861697  Case Status: DETERMINATION ISSUED  Validity Period: 09/20/2018 to 06/30/2019

**A-272**

OMB Approval: 1205-0466
Expiration Date: 05/31/2019

Application for Prevailing Wage Determination
Form ETA-9141
**U.S. Department of Labor**



---

**F. Prevailing Wage Determination**

| FOR OFFICIAL GOVERNMENT USE ONLY | |
|---|---|

| 1. PW tracking number   P-100-18163-861697 | 2. Date PW request received   06/12/2018 |
|---|---|

| 3. SOC (ONET/OES) code   29-1141 | 3a. SOC (ONET/OES) occupation title   Registered Nurses |
|---|---|

| 4. Prevailing wage   $   68058.00 | 4a. OES Wage level   ☑ I   ☐ II   ☐ III   ☐ IV   ☐ N/A |
|---|---|

5. Per: (Choose only one)   ☐ Hour   ☐ Week   ☐ Bi-Weekly   ☐ Month   ☑ Year   ☐ Piece Rate

5a. If Piece Rate is indicated in question 5, specify the wage offer requirements :*
N/A

6. Prevailing wage source (Choose only one)
☑ OES (All Industries)   ☐ OES (ACWIA – Higher Education)   ☐ CBA   ☐ DBA   ☐ SCA   ☐ Other/Alternate Survey

6a. If "Other/Alternate Survey" in question 6, specify
N/A

7. Additional Notes Regarding Wage Determination

N/A

| 8. Determination date   09/20/2018 | 9. Expiration date   06/30/2019 |
|---|---|

---

**G. OMB Paperwork Reduction Act** *(1205-0508)*
Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. Respondent's reply to these reporting requirements is mandatory to obtain the benefits of temporary employment certification (Immigration and Nationality Act, Section 101). Public reporting burden for this collection of information is estimated to average 55 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate to the Office of Foreign Labor Certification * U.S. Department of Labor * Box 12 - 200 * 200 Constitution Ave., NW, * Washington, DC * 20210. **Do NOT send the completed application to this address.**

---

# Wage Statement

**Employer:**

**Advanced Care Staffing, LLC**                    **FEIN:** ██████████

1000 Gates Ave, Suite 5B                           Phone: (718) 305-6700
Brooklyn, NY 11221                                 Fax:

**Employee:**

**Vidal, Benzor Shem**                             SSN: ██████████

1353 Saint Marks Ave.                              Pay/Hour:      $38.00
Brooklyn, NY 11233
Phone: (917) 660-3153                              Fed Exemption:  0

| Check Date | Accounting Period | Check No. | Hours Worked | Gross Wages | Total Taxes | Non-Tax Adjs. | Net Pay |
|---|---|---|---|---|---|---|---|
| 04/21/22 | 04/17/22 | 304616 | 40.75 | $1,480.50 | $435.05 | $400.00 | $645.45 |
| 04/21/22 | 04/17/22 | 304712 | 29.00 | $1,044.00 | $259.73 | $392.14 | $392.13 |
| 04/21/22 | 04/17/22 | 304972 | 31.50 | $1,134.00 | $295.03 | $400.00 | $438.97 |
| 04/21/22 | 04/17/22 | 305000 | 39.25 | $1,413.00 | $407.27 | $400.00 | $605.73 |
| 04/21/22 | 04/17/22 | 305001 | 28.75 | $1,035.00 | $257.02 | $388.99 | $388.99 |
| 04/21/22 | 04/17/22 | 305002 | 16.50 | $594.00 | $124.01 | $235.00 | $234.99 |
| 04/21/22 | 04/17/22 | 305003 | 0.00 | $0.00 | $0.00 | ($5,165.04) | $5,165.04 |
| 04/28/22 | 04/24/22 | 305413 | 37.00 | $1,332.00 | $375.25 | $183.87 | $772.88 |
| 05/05/22 | 05/01/22 | 305862 | 36.00 | $1,296.00 | $360.75 | $0.00 | $935.25 |
| 05/12/22 | 05/08/22 | 305960 | 0.00 | $1,008.00 | $249.48 | $0.00 | $758.52 |
| 05/12/22 | 05/08/22 | 306302 | 7.00 | $252.00 | $28.46 | $0.00 | $223.54 |
| 05/19/22 | 05/15/22 | 306739 | 36.53 | $1,315.08 | $368.44 | $0.00 | $946.64 |
| 05/26/22 | 05/22/22 | 307172 | 28.44 | $1,023.84 | $254.25 | $0.00 | $769.59 |
| 06/02/22 | 05/29/22 | 307495 | 36.54 | $1,315.44 | $368.58 | $0.00 | $946.86 |
| 06/09/22 | 06/05/22 | 307947 | 36.73 | $1,322.28 | $371.33 | $0.00 | $950.95 |
| 06/16/22 | 06/12/22 | 308535 | 35.87 | $1,363.06 | $387.76 | $0.00 | $975.30 |
| 06/23/22 | 06/19/22 | 308974 | 28.85 | $1,096.30 | $280.50 | $218.50 | $597.30 |
| 06/30/22 | 06/26/22 | 309089 | 0.00 | $684.00 | $104.14 | $0.00 | $579.86 |
| 06/30/22 | 06/26/22 | 309447 | 21.72 | $825.36 | $193.80 | $0.00 | $631.56 |
| 07/07/22 | 07/03/22 | 309888 | 22.08 | $839.04 | $198.53 | $0.00 | $640.51 |
| | | **Totals:** | **512.51** | **$20,372.90** | **$5,319.38** | **($2,546.54)** | **$17,600.06** |

Employer's Signature                      Title                        Date

Page 1 of 1 Printed By: Solomon.Blaustein                                    Wage Statement
For the Period From 02/01/22 - 02/07/23                           Printed : 2/7/2023 1:41:04 PM

A-274