# No. 23-303

**United States Court of Appeals for the Second Circuit**

---

BENZOR SHEM VIDAL,
*Plaintiff-Appellee*

*v.*

ADVANCED CARE STAFFING, LLC,
*Defendant-Appellant*

---

On Appeal from the United States District Court
for the Eastern District of New York, No. 1:22-cv-05535 (NRM)(MMH)

---

**BRIEF OF PLAINTIFF-APPELLEE**

Hugh Baran
Kakalec Law PLLC
195 Montague Street, 14th Fl.
Brooklyn, NY 11201
212-705-8730
hugh@kakaleclaw.com

David H. Seligman
Juno Turner
Valerie Collins
Towards Justice
P.O. Box 371689, PMB 44465
Denver, CO 80237-5680
(720) 441-2236
david@towardsjustice.org
juno@towardsjustice.org
valerie@towardsjustice.org

*Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.............................................................. iii

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES ................................................................1

STATEMENT OF THE CASE.............................................................2

FACTUAL AND PROCEDURAL BACKGROUND .............................................4

   I.   ACS's Business Model; Recruitment and Contracts with Plaintiff ................4

   II.  Mr. Vidal's Intolerable Working Conditions ....................................8

   III. ACS's Weaponized Arbitration ................................................9

   IV. This Lawsuit and the Continued Arbitration Proceeding..............................10

   V.  Plaintiff Moves for a Preliminary Injunction. ...............................11

SUMMARY OF ARGUMENT............................................................15

ARGUMENT ...........................................................................16

   I.   The District Court's Preliminary Injunction Order Is Reviewed, Like Any Other Preliminary Injunction Order, for Abuse of Discretion. ............................16

   II.  The District Court Did Not Abuse Its Discretion in Holding that Mr. Vidal Was Likely to Succeed on the Merits of Showing that the Arbitration Provision Did Not Contain a Clear and Unmistakable Delegation Clause..........................19

   III. The District Court Correctly Held that Even if the Arbitration Provision Did Contain a Delegation Clause, Mr. Vidal Was Likely to Succeed on the Merits or at Least Had Established a Serious Question that Such Provision is Unconscionable and Unenforceable. ................................................29

     A.  The District Court Correctly Found Mr. Vidal Was Likely to Succeed in Showing that the Purported Delegation Clause Violates the TVPA.................29

     B.  The District Court Correctly Concluded Mr. Vidal Was Likely to Succeed in Showing the Purported Delegation Clause is Unconscionable Under New York Law..........................................................................36

     C.  The Delegation Clause Also Violates Federal and State Wage-and-Hour Requirements ...............................................................41

   IV. The Court Should Decline Any Invitation to Sever the Loser Pays Clause...43

V.   The District Court Correctly Determined that Mr. Vidal Would Face Irreparable Harm If the Arbitration Was Not Paused. ..........................................46

VI. The District Court's Findings as to the Remaining Preliminary Injunction Factors Should be Affirmed in Light of Its Conclusion that Mr. Vidal Had at Least Demonstrated "Sufficiently Serious Questions" as to the Merits and Irreparable Harm. ...................................................................................................51

   A.   The District Court Correctly Found that the Balance of Harms Tipped Decidedly in Mr. Vidal's Favor. ..........................................................................52

   B.   The District Court Correctly Held that a Preliminary Injunction Is in the Public Interest. ..................................................................................................54

CONCLUSION ........................................................................................................55

CERTIFICATE OF COMPLIANCE .......................................................................56

CERTIFICATE OF SERVICE ................................................................................57

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Anthony Int'l, L.P.*,
  341 F.3d 256 (3d Cir. 2003) ...................................................................42

*Am. Fam. Life Assurance Co. of New York v. Baker*,
  848 F. App'x 11 (2d Cir. 2021) ...............................................................44

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
  475 U.S. 643 (1986) ......................................................................... 22, 25

*Baldia v. RN Express Staffing*,
  633 F. Supp. 3d 693 (S.D.N.Y. 2022) .............................................. 34, 35

*BDO Seidman v. Hirshberg*,
  93 N.Y.2d 382 (1999)...............................................................................46

*Brady v. Williams Cap. Grp., L.P.*,
  878 N.Y.S.2d 693 (2009) ........................................................................40

*Burrell v. Staff*,
  60 F.4th 25 (3d Cir. 2023) .......................................................................33

*Carmen v. Health Carousel, LLC*,
  No. 1:20-Civ.-313, 2023 WL 5104066 (S.D. Ohio Aug. 9, 2023) .......................32

*Castedo v. Permanent Mission of Thailand to the U.N.*,
  114 N.Y.S.3d 70 (2019) ...........................................................................27

*Charter Nat'l Life Ins. Co. v. FPL Grp. Cap., Inc.*,
  No. 95-CV-9067, 1997 WL 151033 (S.D.N.Y. Apr. 1, 1997)............................. 11

*Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*,
  598 F.3d 30 (2d Cir. 2010) .............................................................. 52, 53

*Coinbase, Inc. v. Bielski*,
  599 U.S. 736 (2023) ........................................................................ 18, 50

iii

*DDK Hotels, LLC v. Williams-Sonoma, Inc*.,
 6 F.4th 308 (2d Cir. 2021) .............................................................. passim

*Dietz v. Bouldin*,
 579 U.S. 40 (2016) ....................................................................... 11, 17

*Don King Prods., Inc. v. Douglas*,
 742 F. Supp. 778 (S.D.N.Y. 1990) .......................................................41

*Durruthy v. Charter Commc'ns, LLC*,
 No. 20-cv-1374-W-MSB, 2020 WL 6871048 (S.D. Cal. Nov. 23, 2020) ...........23

*Emery Air Freight v. Local Union 295*,
 786 F.2d 93 (2d Cir. 1986) .................................................................51

*First Options of Chi., Inc. v. Kaplan*,
 514 U.S. 938 (1995)........................................................................ 25

*Gonzalez v. CoreCivic, Inc.*,
 986 F.3d 536 (5th Cir. 2021) ..............................................................33

*Hayes v. Delbert Services Corp.*,
 811 F.3d 666 (4th Cir. 2016) ..............................................................46

*Hicks v. T.L. Cannon Corp.*,
 66 F. Supp. 3d 312 (W.D.N.Y. 2014) ...................................................17

*Inetianbor v. CashCall, Inc.*,
 768 F.3d 1346 (11th Cir. 2014) ...........................................................44

*Int'l Bhd. of Elec. Workers, Loc. Union No. 3 v. Charter Commc'ns, Inc.*,
 277 F. Supp. 3d 356 (E.D.N.Y. 2017) ............................................... 47

*Isaacs v. OCE Bus. Servs., Inc.*,
 968 F. Supp. 2d 564 (S.D.N.Y. 2013) ............................................... 38

*Kane v. De Blasio*,
 19 F.4th 152 (2d Cir. 2021) ...............................................................53

iv

*Kapitalforeningen Laegernes Invest v. United Techs. Corp.*,
   779 F. App'x. 69 (2d Cir. 2019) ...........................................................................14

*Katz v. Feinberg*,
   290 F.3d 95 (2d Cir. 2002) ...................................................................................25

*Lackawanna Recycling Ctr., Inc. v. Burrell*,
   143 S. Ct. 2662 (2023) .........................................................................................33

*Levi Strauss & Co. v. Aqua Dynamics Sys., Inc.*,
   No. 15-cv-04718-WHO, 2016 WL 1365946 (N.D. Cal. Apr. 6, 2016) ..............  23

*Lim v. TForce Logistics, LLC*,
   8 F.4th 992 (9th Cir. 2021) ..................................................................................46

*Lowden v. T-Mobile, USA, Inc.*,
   No. 05 Civ 1482, 2006 WL 1009279 (W.D. Wash. Apr. 13, 2006). ...................46

*MacDonald v. CashCall, Inc*,
   883 F.3d 220 (3d Cir. 2018) .................................................................................44

*Magtoles v. United Staffing Registry, Inc.*,
   No. 21-cv-1850, 2021 WL 6197063 (E.D.N.Y. Dec. 30, 2021) ..........................34

*Maity v. Tata Consultancy Servs.*,
   No. 19-cv-19861 (KSH)(CLW), 2021 WL 6135939 (D.N.J. Dec. 29, 2021)......38

*Master Lease Corp. v. Manhattan Limo., Ltd.*,
   580 N.Y.S.2d 952 (N.Y. App. Div. 1992)............................................................37

*Med. Shoppe Int'l, Inc. v. Mitsopoulos*,
   No. CV 2004- 5207 (ERK)(MDG), 2006 WL 8438209 (E.D.N.Y. May 5, 2006)
   ....................................................................................................................51

*Merrill Lynch Inv. Managers v. Optibase, Ltd.*,
   337 F.3d 125, 129 (2d Cir. 2003) .................................................... 47, 51

*Metro. Life Ins. Co. v. Bucsek*,
   919 F.3d 184 (2d Cir. 2019) .................................................................................48

v

*Morgan v. Sundance, Inc.*,
  596 U.S. 411 (2022) ...................................................................... 18, 45

*Moses H. Cone Mem. Hosp.*,
  460 U.S. 1 (1983) ................................................................................25

*Mount Ararat Cemetery v. Cemetery Workers & Greens Attendants Union, Loc. 365*, 975 F. Supp. 445 (E.D.N.Y. 1997) ...............................................47

*North Atl. Instruments v. Haber*,
  188 F.3d 38 (2d Cir. 1999) .................................................................52

*Oneida Nation of N.Y. v. Cuomo*,
  645 F.3d 154 (2d Cir. 2011) ...............................................................47

*Paguirigan v. Prompt Nursing Emp't Agency*,
  286 F. Supp. 3d 430 (E.D.N.Y. 2017) ........................................... 32, 54

*Panwar v. Access Therapies, Inc.*,
  No. 1:12-cv-00619-TWP-TAB, 2015 WL 1396599 (S.D. Ind. Mar. 25, 2015) ...35

*Peleg v. Neiman Marcus Grp., Inc.*,
  140 Cal. Rptr. 3d 38 (Cal. Ct. App. 2012) ..........................................23

*Peni v. Daily Harvest, Inc.*,
  No. 22-cv-5443-DLC, 2022 WL 16849451 (S.D.N.Y. Nov. 10, 2022)...............23

*Port Drivers Fed'n 18, Inc. v. All Saints Express*,
  757 F. Supp. 2d 443 (D.N.J. 2010) .....................................................49

*Ragone v. Atl. Video at Manhattan Ctr.*,
  595 F.3d 115 (2d Cir. 2010) ......................................................... 36, 45

*Register.com, Inc. v. Verio, Inc.*,
  356 F.3d 393 (2d Cir. 2004)......................................................... 49, 52

*Rent-a-Center, W., Inc. v. Jackson*,
  561 U.S. 63 (2010)...................................................................... 22, 25

*Rodolitz v. Neptune Paper Prods.*,

22 N.Y.2d 383 (N.Y. 1968) ................................................................28

*Slatt v. Slatt*,
  64 N.Y.2d 966 (N.Y. 1985) ...........................................................44

*Spear, Leeds & Kellogg v. Central Life Assurance Co.*,
  879 F. Supp. 403 (S.D.N.Y.1995) ..................................................47

*Spinelli v. Nat'l Football League*,
  903 F.3d 185 (2d Cir. 2018) ..........................................................36

*Tellium, Inc. v. Corning Inc.*,
  No. 03 Civ. 8487(NRB), 2004 WL 307238 (S.D.N.Y. Feb. 13, 2004)..........47, 49

*Tompkins v. 23andMe, Inc.*,
  840 F.3d 1016 (9th Cir. 2016) .......................................................39

*U.S. v. Dann*,
  652 F.3d 1160 (9th Cir. 2011) .......................................................33

*Valle v. ATM Nat., LLC*,
  No. 14-cv-7993, 2015 WL 413449 (S.D.N.Y. Jan. 30, 2015) .................. 40, 45

*Vargas v. Delivery Outsourcing, LLC*,
  No. 15-cv-03408-JST, 2016 WL 946112 (N.D. Cal. Mar. 14, 2016) ................. 23

*Walters v. Starbucks Corp.*,
  623 F. Supp. 3d 333 (S.D.N.Y. 2022) .............................................19

*Wisdom Import Sales Co. v. Labatt Brewing Co.*,
  339 F.3d 101 (2d Cir. 2003) .........................................................16

*Woodlawn Cemetery v. Local 365*,
  930 F.2d 154 (2d Cir. 1991)..........................................................16

*Woodlawn Cemetery v. Local 365*,
  No. 90 CIV. 6071(JMC), 1990 WL 150472 (S.D.N.Y. Oct. 2, 1990)...................51

*Wuest v. Comcast Corp.*,
  No. 17-cv-04063-JSW, 2017 WL 6520754 (N.D. Cal. Oct. 5, 2017) .................23

vii

**Statutes**

18 U.S.C. § 1589 .............................................................. 1, 31, 34

29 U.S.C. § 216(b) ....................................................................42

9 U.S.C. § 16(a)(1)(B) ................................................................1

9 U.S.C. § 16(a)(2)....................................................................1

**Other Authorities**

Assurance of Discontinuance, *In re: Albany Med Health Sys. available at*:
   https://ag.ny.gov/sites/default/files/albany_med_aod_no._22-058_-
   _fully_executed_9.13.22.pdf ........................................................ 32, 54

Restatement (Second) of Contracts § 184(1)............................................44

Restatement (Second) of Contracts § 184(2)............................................46

*Su v. Advanced Care Staffing, LLC*, No. 23-cv-2119-NRM-MMH, Am.Compl.,
   ECF No. 19, ¶ 168 (E.D.N.Y. Jul. 7, 2023) ............................................42

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367 over the claims of Plaintiff-Appellee Benzor Vidal ("Mr. Vidal"). This Court has jurisdiction over this appeal under 9 U.S.C. § 16(a)(2), which allowed Defendant-Appellant Advanced Care Staffing, LLC ("ACS") to appeal the District Court's preliminary injunction pausing the arbitration brought by ACS against Mr. Vidal. Contrary to Defendant's contentions, *see* Br. of Def. (hereafter "Br.") at 1, the Court does not have jurisdiction under 9 U.S.C. § 16(a)(1)(B) because the District Court did not deny a motion to compel arbitration under the Federal Arbitration Act ("FAA")—a motion ACS never filed.

## STATEMENT OF ISSUES

(1) Whether the District Court abused its discretion in concluding that Mr. Vidal was likely to succeed on the merits or had at least raised serious questions that the arbitrator does not have authority to address Mr. Vidal's challenges to the arbitration provision contained in his contract with ACS (the "Arbitration Provision") because the Provision does not clearly and unambiguously delegate issues concerning enforceability to the arbitrator and, even if it does, the purported delegation clause violates the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589, and is unconscionable under New York law. Special Appendix ("SPA") 25, 44-46.

1

(2) Whether the District Court abused its discretion in weighing any of the other preliminary injunction factors in deciding to pause the arbitration, including in its determinations that: (a) Mr. Vidal would suffer *per se* irreparable harm and specific irreparable harm if he was forced to undergo an unauthorized arbitration ; (b) the hardships tipped decidedly in his favor, as ACS identified no harm that would result from a preliminary injunction; and (c) pausing a potentially unauthorized arbitration was in the public interest. SPA-49-54.

## STATEMENT OF THE CASE

Mr. Vidal is an immigrant nurse from the Philippines who came to work for ACS on a green card. When Mr. Vidal left his job due to terrible working conditions, ACS brought an arbitration against him seeking to recover tens of thousands of dollars in purported damages, including so-called "lost profits," attorneys' fees, and arbitration costs because he left his job before the end of his purported contractual commitment period.

The arbitration against Mr. Vidal threatens devastating financial harm. After it was filed, Mr. Vidal sued in the Eastern District of New York for a declaration that the Arbitration Provision ACS weaponized against him was unenforceable. Then, when Mr. Vidal was unable to convince the arbitrator to pause the arbitration, he sought a preliminary injunction to pause the fast-paced arbitration without him having to defend himself from a potentially illegal arbitration while the District

2

Court considers his claims. The District Court has yet to adjudicate the Provision's validity.

The narrow legal issue in *this* appeal is whether the District Court abused its discretion by temporarily pausing the arbitration—a very different question than this Court usually confronts in appeals of orders compelling or denying arbitration. The District Court's preliminary injunction order was based on its conclusion Mr. Vidal was likely to succeed on the merits or had at least raised serious questions that the District Court, and not the arbitrator, had the exclusive authority to consider Mr. Vidal's challenges to the Arbitration Provision because it did not clearly and unmistakably delegate challenges to the Arbitration Provision to the arbitrator, and even if it did, the purported delegation provision was illegal and unenforceable. The District Court also concluded that Mr. Vidal would suffer irreparable harm absent an injunction, that the equities tipped strongly in Mr. Vidal's favor, and that an injunction temporarily pausing the arbitration—which allows the District Court to consider Mr. Vidal's challenges to the enforceability of the Arbitration Provision and any future motion to compel arbitration on a fully developed factual record—was in the public interest.

# FACTUAL AND PROCEDURAL BACKGROUND[1]

## I.    ACS's Business Model; Recruitment and Contracts with Plaintiff

ACS is a healthcare staffing company based in New York that recruits international nurses and employs them at healthcare facilities in the United States. SPA-6 (A-14, ¶ 20).

Plaintiff Benzor Vidal grew up in the Philippines, where he also trained to become a registered nurse. SPA-6. He grew up with limited financial means and sought a new opportunity in the United States to make enough money to support his family, including his seriously disabled brother and his elderly father, who provides his brother with full-time care. *Id.*

Mr. Vidal contacted ACS in May 2019 about potential employment. SPA-7. ACS offered to employ Mr. Vidal and sponsor him for an EB-3 visa to work in the U.S., but ACS required Mr. Vidal to sign a form contract ("2019 Contract," Joint Appendix ("A") 182-90), which required him to work for ACS for three years and imposed penalties if he were to leave his job before the term ended. SPA-7. Mr. Vidal did not have the opportunity to negotiate the contract. *Id.*

---

[1] Factual findings made by the District Court in support of its decision granting a preliminary injunction, which are subject to review under a "clearly erroneous" standard, are described below with citations to the District Court's long form order, SPA-5-55. Those facts were undisputed unless otherwise indicated in the District Court's decision.

The 2019 Contract included a liquidated damages clause requiring Mr. Vidal to pay $20,000 if he left his job before his term ended and stated that ACS could enforce the clause by various means, including a "legal action of any type." *Id.* Attached to the contract was also a $20,000 "promissory note." *Id.* The 2019 Contract also contained an arbitration provision. *Id.*

After Mr. Vidal signed the 2019 Contract, it took over two years to secure a visa and fulfill the administrative requirements for placement, during which time Mr. Vidal was forbidden by contract from working any other job in the U.S. SPA-8. In hopes of earning some better pay in the interim, Mr. Vidal moved to London, England to work at a hospital. *Id.* But he could barely afford basic living expenses, and sent any extra money to his family. *Id.*

In late 2021, ACS informed Mr. Vidal that his visa had been approved, he should plan to move to the U.S. in early 2022, and that he would be cleared to work for ACS after an interview with the U.S. Embassy. *Id.* Mr. Vidal then resigned from his UK job, anticipating his move to the U.S. *Id.*

On January 4, 2022, ACS emailed Mr. Vidal, informing him that the Embassy scheduled his interview and that he had to sign a new form contract (the "2022 Contract," A-239-50). SPA-8. In a cover letter, ACS stated that the 2022 Contract "was developed after consulting industry best practices and feedback from our team members." SPA-9. ACS explained that the contract no longer included a "sum of

5

money to be paid in the event of a breach" or "a promissory note" because, "We received feedback that this was viewed as a 'buy out', which was never our intention[.]" *Id.* ACS also stated that under the 2022 Contract, it could recover "whatever damages are proven (which might be higher or lower than the amount specified in the older version)." *Id.*

Also attached was a document that stated that ACS "hereby unconditionally waives, cancels, and releases the $20,000 promissory note that you made to [ACS], dated May 8, 2019." *Id.* This letter provided "no explanation as to whether that cancellation had any impact on either party's rights or obligations under the 2019 Contract" that Vidal had signed at the same time as the note. *Id.*

The 2022 Contract departed from the 2019 Contract in several significant ways, none of which Mr. Vidal had an opportunity to negotiate. First, in place of the liquidated damages provision, the 2022 Contract stated that if Vidal left his employment before the contract term, he would be required to pay "all damages and other relief to redress the harm" allegedly resulting from his early departure, including "lost profits" ACS would have recouped through Mr. Vidal's work for ACS's clients. *Id.* at 6.

The 2022 Contract also contained an expanded arbitration provision with several new terms (the "Arbitration Provision"). These included:

> (1) A requirement that "that the [American Arbitration Association]'s Commercial Arbitration Rules in effect at

the time of the dispute will govern, except as modified by this Provision";

(2) A loser-pays provision stating "that at the conclusion of arbitration the prevailing party shall be entitled (in addition to all other relief available under the Agreement or applicable law) to be reimbursed for its reasonable attorney's fees as well as all costs and fees charged by the AAA and the arbitrator"; and

(3) A judicial review provision stating "that in the event that any court of competent jurisdiction shall determine that any portion of this Provision exceeds the scope permitted by applicable law, the court shall have the authority to modify or 'blue pencil' such portion so as to render it enforceable while maintaining the parties' original intent to the maximum extent possible."

A-249-50.

Nowhere in its correspondence did ACS explain that Mr. Vidal had the option to walk away from the 2022 Contract entirely and still benefit from the promissory note release. As a result, Mr. Vidal believed that if he did not sign the new contract, he would be in breach of the 2019 Contract, and ACS would attempt to collect the $20,000 promissory note contained in the then-applicable 2019 Contract. SPA-11.

When Mr. Vidal spoke to an ACS staffer, the staffer told him to "sign the revised contract and send it back to [ACS] quickly." SPA-12. Believing that he could not work for ACS without signing, and that he would face penalties under the 2019 Contract if he did not sign, Mr. Vidal signed the 2022 Contract. SPA-11-12.

## II.    Mr. Vidal's Intolerable Working Conditions

On March 8, 2022, Mr. Vidal began working at ACS's client Downtown Brooklyn Nursing & Rehabilitation Center. SPA-12. Although ACS had told Mr. Vidal he would have a manageable 20-30 patient caseload, the reality was very different. *Id.* Instead, Mr. Vidal had a daily caseload of forty to fifty patients. *Id.* Mr. Vidal's patients frequently buzzed their call buttons because they needed urgent help, and he "regularly heard patients screaming out in pain." *Id.* He "was provided with insufficient breaks and suffered repeated illnesses during this time." *Id.*

Mr. Vidal feared that under these conditions, he could not provide adequate patient care and was putting his own health at risk because his working environment was so stressful. *Id.* He also feared losing his professional license. *Id.* Without it, he could not support himself or his family. SPA-13.

Although Mr. Vidal alerted ACS and his supervisors at the facility about his poor working conditions, he received little more than weak assurances that he should handle the stress.[2] A-726 ¶ 9. In fact, ACS pressured Mr. Vidal to work longer hours. *Id.* Because he left like he had no other choice, Mr. Vidal resigned on June 15, 2022, stating that his last day would be June 29, 2022. *Id.*

---

[2] The Court did not rely on this disputed fact in granting the injunction because it is "immaterial to the claims presented in [Plaintiff's] motion for a preliminary injunction." SPA-13 n.4.

### III.    ACS's Weaponized Arbitration

Shortly thereafter, ACS wrote Mr. Vidal urging him to reverse his resignation, asserting that it had suffered significant damages and threatening that it would seek to recover "all available damages," including alleged "costs and lost profits," and ACS's "attorney's fees" and the "cost of arbitration." SPA-13. ACS warned Mr. Vidal that it would "present evidence demonstrating that *its damages are at least $20,000 (not counting attorney's fees and costs that would be incurred in the arbitration)*." *Id.* (emphasis added by the District Court). ACS also told Mr. Vidal he was responsible for the cost of recruiting and hiring his replacement, which it estimated at "over $9,000 per year over the remainder" of his contract. *Id.*

Although Mr. Vidal was terrified by the threatened financial harm, he felt his working conditions were so bad that he had no other choice. So he followed through on his resignation. *Id.*

On July 8, 2022, ACS initiated an arbitration against Mr. Vidal before the AAA under AAA's Commercial Rules. *Id.* ACS sought expansive relief for Vidal's alleged breach of contract, including "all available damages" including ACS's "costs and lost profits," "reasonable attorney's fees," and the "cost of arbitration." *Id.*

Representing himself in arbitration, Mr. Vidal sought several extensions to find counsel—but the AAA pressed forward, ultimately selecting an arbitrator on September 7, 2022, without input from Mr. Vidal. SPA-13-14. The arbitrator charged

$450 per hour, and the AAA also charged the parties a $1,900 filing fee and a $750 case management fee. *Id.* Under the Arbitration Provision, Mr. Vidal could end up responsible for paying these thousands of dollars, which are the costs accrued before the arbitrator has heard any evidence. SPA-13.

## IV.    This Lawsuit and the Continued Arbitration Proceeding

On September 16, 2022, Mr. Vidal filed this lawsuit against ACS, seeking a declaration that the Arbitration Provision is invalid because it penalizes him with costs and fees that violate his rights under trafficking laws, minimum wage laws, and because it is unconscionable. SPA-14; A-10-34.

For several weeks, Mr. Vidal attempted to persuade AAA to pause the arbitration while the District Court evaluated his challenge to the enforceability of the Arbitration Provision. Mr. Vidal pointed out that the Provision did not contain a clear and unmistakable delegation clause and thus did not give the arbitrator the authority to rule on Mr. Vidal's challenges to the enforceability of the Arbitration Provision. But the AAA and the arbitrator barreled ahead. In an October 24, 2022 order, the arbitrator concluded—without engaging with the substance of whether there was a delegation clause—that "I have the authority to rule on my own jurisdiction, including with respect to the validity of the arbitration agreement or the arbitrability of any claim." SPA-14. Mr. Vidal continued to seek stays from the

10

arbitrator, but she instead set a merits discovery schedule, deferring concerns over the purported delegation clause's validity to the end of the arbitration. SPA-14-15.

While Mr. Vidal sought a stay of arbitration from the AAA and the arbitrator, on October 20, 2022, Defendant filed a pre-motion letter requesting a pre-motion conference to obtain permission to move to compel arbitration of Mr. Vidal's claims.[3] SPA-15. In its letter, ACS relied on a purported delegation clause that, it argued, required that disputes about enforceability of the Arbitration Provision be heard by the arbitrator. A-35-37. On October 27, 2022, Mr. Vidal responded that that the Arbitration Provision did not contain a clear and unmistakable delegation clause and that, even if it did, that clause violated federal and state trafficking and wage laws, and was unconscionable.[4] A-38-41.

## V. Plaintiff Moves for a Preliminary Injunction.

On January 23, 2023, while ACS's request for a pre-motion conference was pending, Mr. Vidal moved for a preliminary injunction, seeking a pause in the arbitration proceeding. A-100-139. Mr. Vidal sought to ensure that he did not accrue

---

[3] District courts in this Circuit commonly require such pre-motion letters, which are a function of their "inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases." *Dietz v. Bouldin*, 579 U.S. 40, 47 (2016); *see also Charter Nat'l Life Ins. Co. v. FPL Grp. Cap., Inc.*, No. 95-CV-9067, 1997 WL 151033, at *1 (S.D.N.Y. Apr. 1, 1997) ("[C]ourts retain the discretion to dictate the timing of a motion.").

[4] On October 28, 2022, the case was reassigned to the Hon. Nina R. Morrison, SPA-15, and the remainder of the proceedings have been before her.

arbitration costs when the District Court had not had the opportunity to consider his threshold enforceability challenges. *Id.* ACS opposed the motion. A-140-178.

Following oral argument and supplemental briefing, on February 24, 2023, the Court issued a short Order granting the motion for a preliminary injunction, "with an opinion to follow setting forth the reasons for the Court's decision at greater length." SPA-1-4. The Order stated that Mr. Vidal met his burden of showing either likelihood of success on the merits or sufficiently serious questions going to the merits with respect to his claims: "(1) that the purported delegation clause in the parties' written contract is not 'clear and unmistakable,' and (2) that even if it were clear and unmistakable, the delegation clause is invalid and unenforceable because it is (a) unconscionable under New York law, and (b) violates the Trafficking Victims Protection Act[.]" SPA-2 (citations omitted). And the Court found that Plaintiff had also demonstrated irreparable harm; that the balance of the hardships were "decidedly" in his favor; and that an injunction was in the public interest. SPA-3-4.

The Order also addressed Defendant's October 2022 pre-motion letter. The District Court stated that "Because the legal authorities and relief contemplated in Defendant's proposed motion to compel arbitration are within the scope of the issues presented in Plaintiff's motion for a preliminary injunction, Defendant's request for a pre-motion conference regarding a motion to compel arbitration is denied as moot." SPA-2 n.1. In other words, the District Court concluded that the pre-motion

12

request was moot as a function of its inherent power to dictate the timing of such a motion and promote efficiency in its docket. That decision is committed to the District Court's sound discretion. Nothing in the District Court's order suggested that ACS would be prevented from filing a motion to compel arbitration after factual development, including discovery into Plaintiff's challenges to the enforceability of the Arbitration Provision and its purported delegation clause.

ACS did not file a new pre-motion letter seeking leave to file a motion to compel, or continue to litigate the issues, including engaging in discovery about Mr. Vidal's challenges to the Arbitration Provision and delegation clause. Instead, ACS filed this appeal on March 7, 2023.

On April 4, 2023, the District Court issued a detailed Opinion and Order explaining why it granted the preliminary injunction. SPA-5-55. The Court explicitly withheld judgment on the ultimate issues of whether ACS's Arbitration Provision, and in particular its "loser pays" provision, was unenforceable, or whether in fact the "loser pays" and other provisions could be severed and the remainder of the Arbitration Provision enforced. As the Court explained:

> [A]t this preliminary stage in the litigation, I have not made a final determination as to whether the 'loser pays' provision is unconscionable or a violation of the TVPA. I have only determined that Vidal is likely to succeed on the merits (or at least raised serious questions as to the merits) of his claim that the *delegation clause*, viewed in conjunction with the 'loser pays' provision, is invalid under state and federal law.

13

SPA-47-48.

In other words, all the District Court did was pause the arbitration based on preliminary findings that: (1) there was no clear and unmistakable delegation clause; (2) if there was a delegation clause, it was invalid under state and federal law; and (3) the equities tipped strongly in favor of a stay. This was the only relief sought, and granted, because the arbitrator was moving ahead with an unauthorized arbitration on threshold arbitrability issues that would have cost Vidal many thousands of dollars.

The District Court also explained why ACS's pre-motion conference request was moot:

> The pre-motion conference letter indicated the anticipated motion would raise the very same arguments ACS raised at greater length here: that the agreement contains a valid delegation clause, and as such that threshold issues of arbitrability must be decided by the arbitrator rather than a court; and that Vidal was in fact challenging the arbitration agreement as a whole as unconscionable, rather than the delegation clause specifically. Because I considered and rejected each of the foregoing contentions in concluding that Vidal is likely to succeed on the merits of his legal challenge to the delegation clause, and the arbitration is paused pending further litigation, ACS's anticipated motion to compel is clearly moot.

SPA-54 (citations omitted).[5]

---

[5] The District Court did not—as it could do under this Court's precedent—construe the letter as a motion and deny it on the merits. *See Kapitalforeningen Laegernes Invest v. United Techs. Corp.*, 779 F. App'x. 69, 70 (2d Cir. 2019) (noting this Court has approved the practice of construing pre-motion letters as motions).

14

## SUMMARY OF ARGUMENT

The District Court did not abuse its discretion in deciding to pause the arbitration filed against Mr. Vidal so that the Court could determine in the first instance whether the Arbitration Provision is enforceable. The District Court correctly concluded that Plaintiff had demonstrated a likelihood of success on the merits—or at least had demonstrated serious questions about the merits—of his argument that the question of the enforceability of the Arbitration Provision was for the District Court to decide. The District Court found the Arbitration Provision did not clearly and unmistakably delegate questions of enforceability to the arbitrator, in part because its judicial review provision, which provided that *only a court* could sever unenforceable provisions, rendered other language that ACS claimed was a delegation clause ambiguous. The District Court also held that even if the Arbitration Provision *did* contain a delegation clause, Mr. Vidal had demonstrated a likelihood of success on the merits or at least serious questions that the purported delegation clause was unconscionable and that it violated the TVPA.

Having made those findings, the District Court did not abuse its discretion in finding irreparable harm would occur absent an injunction, that the balance of the equities weighed decidedly in Mr. Vidal's favor, and that pausing the arbitration while the Court adjudicated Vidal's challenges to the Arbitration Provision was in the public interest.

## ARGUMENT

## I.    The District Court's Preliminary Injunction Order Is Reviewed, Like Any Other Preliminary Injunction Order, for Abuse of Discretion.

This is not an appeal from a denied motion to compel arbitration. It is an appeal from a preliminary injunction pausing an arbitration filed against Mr. Vidal until the District Court could adjudicate his challenge to the Arbitration Provision.

Orders granting preliminary injunctive relief are subject to abuse of discretion review and can only be overturned when a district court "bases its ruling on an incorrect legal standard or on a clearly erroneous assessment of the facts." *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 108 (2d Cir. 2003) (cleaned up). The standard is the same for orders preliminarily enjoining arbitrations. *Woodlawn Cemetery v. Local 365*, 930 F.2d 154, 156 (2d Cir. 1991). Because ACS can point to neither an error of law or clearly erroneous factual findings, the District Court's preliminary injunction pausing the arbitration so the District Court could rule on the existence of a delegation clause and its enforceability on a full factual record, and the enforceability of the Arbitration Provision, should be affirmed.

ACS's argument (Br. 39) that the District Court's ordering injunctive relief amounts to a denial of a motion to compel arbitration, or somehow necessarily required the District Court "to reject the arbitration agreement," disregards the procedural posture here. No part of the District Court's decision can fairly be read as a decision refusing to compel arbitration. Indeed, that flies in the face of the

16

District Court's detailed explanation of the reasons for its decision to pause the arbitration. This was the only relief that Mr. Vidal sought, because absent court intervention it appeared certain that the arbitrator would move ahead with an arbitration on threshold enforceability issues that, as the District Court found, would have caused Vidal irreparable harm.

Although ACS filed a pre-motion letter requesting a court conference to discuss its anticipated motion to compel arbitration, the District Court denied ACS's letter as moot. *See supra* Factual/Procedural Bkg. §§ IV-V. The District Court acted within its discretion to manage its docket and to defer ruling on the ultimate question of the enforceability of the Arbitration Provision and its delegation clause until after further factual development, including factual development into the enforceability of the delegation clause.[6] S*ee Hicks v. T.L. Cannon Corp.*, 66 F. Supp. 3d 312, 314 (W.D.N.Y. 2014) (district court's inherent power to control its docket as part of its function of resolving disputes between parties includes "the discretion to dictate the timing of a motion.") (citations omitted); *see also Dietz*, 579 U.S. at 47.[7]

---

[6] As Plaintiff explained to the District Court when briefing the preliminary injunction motion, the motion to compel arbitration can be litigated after further factual development into questions that motion to compel arbitration may implicate. *See, e.g.*, A-706-07, A-486-87.

[7] This does not mean ACS will never be able to move to compel arbitration, as ACS can seek leave to file its motion after this Court's resolution of this appeal.

Finally, ACS's suggestion (Br. 39) that a heightened standard of review should apply because this case concerns the validity of an arbitration agreement is inconsistent with the FAA's equal-footing principle. As the Supreme Court recently reaffirmed, the FAA's policy "is to make arbitration agreements as enforceable as other contracts, but not more so." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022) (cleaned up). Applying an arbitration-specific rule providing for *de novo* review of preliminary injunctions in arbitration cases is inconsistent with the general principle that arbitration provisions should be treated the same as other contracts. [8]

Nonetheless, for all the reasons explained here, even if the Court treats the District Court's orders as denying a motion to compel arbitration, it should still affirm them. As a matter of law, there is no basis for compelling Mr. Vidal's challenges to the Arbitration Provision into arbitration because the Arbitration Provision does not clearly and unmistakably delegated questions of arbitrability to the arbitrator, and even if it did, that purported delegation clause is unenforceable.

---

[8] The Supreme Court's recent decision in *Coinbase, Inc. v. Bielski*, 599 U.S. 736 (2023) is not to the contrary. All *Coinbase* said is that the FAA requires a mandatory stay of court proceedings pending an appeal of a denial of a motion to compel arbitration. *Coinbase*, 599 U.S. at 744-47. *Coinbase* does not apply here because there has been no such denial. *See supra* Factual/Procedural Bkg. § V.

18

**II.    The District Court Did Not Abuse Its Discretion in Holding that
Mr. Vidal Was Likely to Succeed on the Merits of Showing that the
Arbitration Provision Did Not Contain a Clear and Unmistakable
Delegation Clause.**

The District Court's preliminary injunction order was rooted in part in its

determination that Mr. Vidal was likely to succeed on the merits that questions of

enforceability were for the Court to decide in the first instance, not the arbitrator, or

at the very least that he had raised serious questions about the merits of that issue.

SPA-18 ("[T]he threshold question here is whether the purported delegation clause

in the 2022 Contract allows this Court to consider Vidal's challenge to the contract's

enforceability at all, or whether all disputes about the enforceability of the

agreement's terms must go to the arbitrator in the first instance"); SPA-20-25

(finding that "the arbitration agreement here contains significant ambiguity such that

its purported delegation language cannot be considered clear and unmistakable").

Because Mr. Vidal had, at minimum, raised serious questions about whether he had

agreed to arbitrate those questions or whether any such delegation clause was

enforceable, the Court was authorized to weigh the relevant equitable considerations

in deciding to issue a preliminary injunction.

The Arbitration Provision at issue in this case, unlike those examined by other

courts in this Circuit, has no standalone language that is clearly identifiable as a

delegation clause. *See, e.g.*, *Walters v. Starbucks Corp.*, 623 F. Supp. 3d 333, 339

(S.D.N.Y. 2022) ("The Arbitration Agreement provides that 'the Arbitrator—and not

19

a court or agency—shall have the exclusive authority to resolve any dispute regarding the formation, interpretation, applicability, enforceability, or implementation of' the Arbitration Agreement. This language unambiguously delegates the question of arbitrability to the arbitrator, and is virtually identical to that of other delegation provisions that the Supreme Court has enforced.") (citation omitted); *see also* A-482 (collecting clearly-drafted delegation clauses).

Instead, ACS contends (Br. 27) that language in the Arbitration Provision stating that "any dispute, controversy or claim arising between me and Employer (including a dispute, controversy, or claim arising out of, in connection with or relating to, this Agreement, or the interpretation, performance or breach, termination or validity hereof) shall be resolved by arbitration" constituted a clear and unmistakable delegation clause. SPA-20-21. In the alternative, Defendant argues (Br. 24) that the agreement incorporated the AAA Commercial Rules by reference, and that this, in turn, incorporated a provision of the Commercial Rules which states that an "arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim, without any need to refer such matters first to a court."[9] *See* SPA-21, SPA-24 n.8.

---

[9] The fact that ACS had to rely on two separate clauses to manufacture a delegation indicates that there was no clearly identifiable delegation clause here. *See* PLA-41-47 (colloquy concerning absence of clearly identifiable delegation clause).

The District Court correctly concluded that "these two provisions must be read in context" and that "taken as a whole, the agreement contains significant ambiguity regarding whether the parties intended" to delegate enforceability issues. SPA-21. This is because the agreement also contains a judicial review provision, which states: "in the event that *any court of competent jurisdiction* shall determine that any portion of this Provision exceeds the scope permitted by applicable law, the court shall have the authority to modify or 'blue pencil' such portion *so as to render it enforceable* while maintaining the parties' original intent to the maximum extent possible." *Id.* (quoting Arbitration Provision, emphasis added by District Court). This language appears to clarify that a "court of competent jurisdiction" will assess challenges to the Arbitration Provision and, at the very least, creates ambiguity about whether the court or the arbitrator should decide issues respecting the enforceability of an arbitration requirement.[10] But the presumption that the court should decide issues of arbitrability can be overcome only by clear contractual language to the contrary—

---

[10] Notably, as discussed extensively at oral argument, the first paragraph of the Arbitration Provision draws a distinction between "Agreement" (meaning the 2022 Contract as a whole) and "Provision" (meaning the Arbitration Provision alone, *see* A-249 ¶ 1), and then uses these as terms of art throughout the Arbitration Provision. *Compare* A-239 ¶ 1 (defining "Agreement" as "This Amended and Restated Employment Agreement"), *with* A-249 ¶ 1 (defining the "Provision" as "this dispute resolution provision"). This suggests a fair reading of the Arbitration Provision is that it is only intended to send issues as to the *Agreement*'s validity to the arbitrator, and not issues as to the *Provision*'s validity. The judicial review clause, moreover, only refers to a court's review of the *Provision*. *See* PLA-42-48; A-482-83.

21

language that is absent from the contract at issue here. *See DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 317 (2d Cir. 2021); *see also AT&T Techs., Inc. v. Commc'ns Workers of Am.,* 475 U.S. 643, 649 (1986).

ACS argues that the District Court erred by examining the purported delegation clause in context of the whole Arbitration Provision. It claims that based on the Supreme Court's decision in *Rent-a-Center* "a court's review is limited to the delegation provision, not the arbitration agreement as a whole." Br. 26.

This is not the law. *Rent-a-Center* simply holds that a party must specifically challenge the delegation provision as unconscionable or unenforceable as opposed to challenging the agreement as a whole. *See Rent-a-Center, W., Inc. v. Jackson*, 561 U.S. 63, 72–74 (2010). This is exactly what Mr. Vidal did.[11] *See, e.g.*, SPA-19, 27. *Rent-a-Center* did not even address whether the arbitration provision before the Supreme Court contained a clear and unmistakable delegation provision, as that issue was not in dispute in that case. *See Rent-a-Center*, 561 U.S. at 74. And certainly nothing in the Supreme Court's opinion suggests a purported delegation provision is

---

[11] ACS also repeatedly claims that Mr. Vidal never properly attacked the purported delegation clause under *Rent-a-Center* for violating the TVPA and being unconscionable under New York law. *See* Br. 1-2, 27-29, 30-31. This claim ignores the voluminous briefing about this issue before the District Court, including in Vidal's brief in support of a preliminary injunction. *See, e.g.*, A-125-33; A-711-14; *see also* SPA-27 ("Vidal repeatedly mounts specific challenges to the validity of the delegation clause[.]").

"clear and unmistakable" where it is directly contradicted by language immediately outside of the claimed delegation provision.

It makes no sense to allow drafting parties to delegate issues of enforceability to an arbitrator based on purportedly clear delegation language that is directly conflicted elsewhere in an arbitration agreement. In fact, multiple courts have concluded that language outside of purported delegation provisions rendered those provisions ambiguous. *Durruthy v. Charter Commc'ns, LLC*, No. 20-cv-1374-W-MSB, 2020 WL 6871048, at *1, 3 (S.D. Cal. Nov. 23, 2020) (finding, in light of severability provision providing for severance if "court of competent jurisdiction" deems part of agreement invalid or unenforceable, that "Agreement lacks the 'clear and unmistakable evidence' required to override the presumption of judicial review of gateway arbitrability.") (citation omitted); *Vargas v. Delivery Outsourcing, LLC*, No. 15-cv-03408-JST, 2016 WL 946112, at *7 (N.D. Cal. Mar. 14, 2016); *Levi Strauss & Co. v. Aqua Dynamics Sys., Inc.*, No. 15-cv-04718-WHO, 2016 WL 1365946, at *7-8 (N.D. Cal. Apr. 6, 2016); *Wuest v. Comcast Corp.*, No. 17-cv-04063 JSW, 2017 WL 6520754, at *3 n.1 (N.D. Cal. Oct. 5, 2017); *Peleg v. Neiman Marcus Grp., Inc.*, 140 Cal. Rptr. 3d 38 (Cal. Ct. App. 2012); *cf. Peni v. Daily Harvest, Inc.*, No. 22-cv-5443-DLC, 2022 WL 16849451, at *7 (S.D.N.Y. Nov. 10, 2022) (severability provision that does not reference a *court* severing unenforceable provision does not render delegation clause ambiguous).

ACS also insists that the District Court misread the judicial review provision, arguing that this so-called "blue pencil" provision "was put in place in 2022 in the event that Congress passed a law that precluded compelling arbitration for the breach of contract claims being made in this case," and "was a direct response to the 2021 Congressional act that did, in fact, exclude sexual assault claims from arbitration." Br. 26. But there is no evidence in the record apart from the unsupported assertions of Defendant's counsel at oral argument that the judicial review clause was so narrowly intended. *See* Pl.-Appellee's Supplemental Appendix ("PLA") 71-78 (transcript of oral argument). More to the point, even if it were so intended, "that is not what the clause says." SPA-22. The District Court rightly concluded that "the clause expressly contemplates that 'a court of competent jurisdiction' may review this particular contract between ACS and Vidal and determine whether its provisions are 'enforceable,' without any limitation or caveats as to what that enforceability review may encompass." *Id.*; *see also DDK Hotels*, 6 F.4th at 323 (conflicting language in arbitration provision created sufficient ambiguity that a court, not an arbitrator should decide arbitrability).

ACS further argues (Br. 21-22) that the District Court was bound to resolve ambiguities in the Arbitration Provision in favor of coverage, but that is wrong. The cases ACS cites state that when determining whether a *claim* or *dispute* is within the

scope of an otherwise valid arbitration provision, doubts are to be resolved in favor of coverage. *See, e.g.*, *Moses H. Cone Mem. Hosp.*, 460 U.S. 1, 24-25 (1983).

But there is a key difference between delegation clauses and other arbitration provisions that cuts against ACS's arguments here: the so-called "presumption of arbitrability" that applies to the question of whether a claim comes within the scope of an otherwise-valid arbitration agreement does not apply to delegation provisions (even valid ones). That is because, as a general matter, the question of whether a dispute should be arbitrated is for courts to decide. The Supreme Court has explained that to overcome this presumption, a delegation provision must be "clear and unmistakable." *AT&T Techs.*, 475 U.S. at 649; *see also Rent-a-Center*, 560 U.S. at 69 n.1; *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944-45 (1995) (where there is silence or ambiguity with respect to whether a dispute is arbitrable, presumption is that court decides); *DDK*, 6 F. 4th at 317 (threshold questions of arbitrability should be resolved by the court absent clear language to contrary); *Katz v. Feinberg*, 290 F.3d 95, 97 (2d Cir. 2002).

With respect to the purported delegation clause contained in the AAA Commercial Rules, which ACS claims the contract incorporates by reference, the District Court concluded that any such incorporation did not constitute a "clear and unmistakable" delegation of issues of arbitrability to the arbitrator. SPA-23-25. This conclusion is consistent with this Court's decision in *DDK Hotels*. SPA-23-24. In

*DDK Hotels*, this Court held that "where the arbitration agreement is broad and expresses the intent to arbitrate all aspects of all disputes, this—coupled with incorporation of rules that expressly empower an arbitrator to decide issues of arbitrability—constitutes clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the arbitrator." 6 F.4th at 308, 318-19.

Here, as the District Court recognized, there are two important distinctions from *DDK Hotels*. First, although the agreement at issue in *DDK Hotels* contained a broad arbitration provision that incorporated the AAA rules, it "says nothing about whether an arbitration agreement with a broad arbitration provision and that incorporates the AAA Commercial Rules would still clearly and unmistakably delegate arbitrability to the arbitrator *even if* it also had language explicitly providing for judicial intervention on issues of enforceability," as ACS's agreement does. SPA-25. Indeed, *DDK Hotels* expressly recognizes that "[i]ncorporation of such rules into an arbitration agreement does not, *per se*, demonstrate clear and unmistakable evidence of the parties' intent to delegate threshold questions of arbitrability to the arbitrator where other aspects of the contract create ambiguity as to the parties' intent." 6 F.4th at 318.

Second, in contrast to the agreement in *DDK Hotels*, the agreement in this case was not entered into by two sophisticated commercial parties, each of whom could be expected to understand the alleged incorporation by reference of the AAA's

26

Commercial rules. SPA-20. In fact, "it is highly unlikely that a foreign nurse unfamiliar with United States law, let alone caselaw surrounding the interpretation of arbitration agreements, would see a reference to the AAA Commercial Rules and reach that same conclusion, *i.e.*, understand that such incorporation would in any way reflect an actual 'intent to delegate the question of arbitrability to the arbitrator.'" SPA-24 (quoting *DDK Hotels*, 6 F.4th at 318).

Furthermore, as the Supreme Court recently emphasized, arbitration agreements are as enforceable as other contracts, but not more so. *See Morgan*, 596 U.S. at 418. Here, it does not appear that, as a matter of New York law, the AAA's Commercial Rules are in fact incorporated by reference since those rules expressly disclaim their applicability to employment disputes, and instead say any such disputes are to be resolved under the Employment Rules—which are *not mentioned* in the Arbitration Provision. *See* A-58, AAA Commercial Rules R.1, n.* ("A dispute arising out of an employment plan will be administered under the AAA's Employment Arbitration Rules and Mediation Procedures."); *Castedo v. Perm. Mission of Thailand*, 114 N.Y.S.3d 70, 71 (2019) (incorporation by reference ineffective where contract did not "clearly reflect an intention to incorporate"). It would therefore be especially nonsensical to conclude that the agreement incorporates the Commercial Rules and thus "clearly and unmistakably" delegates questions of arbitrability on that basis—or to permit ACS to simply substitute in the

27

Employment Rules, which are *not* referenced in the Arbitration Provision. *See* PLA-49. Doing so would rewrite the text of the Arbitration Provision in a way that is counter to its plain meaning, which subjects Mr. Vidal to the Commercial Rules and requires him to bear the costs of arbitration as a way of coercing his continued labor. Such judicial rewriting of contracts is prohibited under New York law. *See Rodolitz v. Neptune Paper Prods.*, 22 N.Y.2d 383, 386 (N.Y. 1968).

As this Court recognized in *DDK Hotels*, "when evaluating the import of incorporation of the AAA rules…into an arbitration agreement, context matters" and "does not, *per se*, demonstrate clear and unmistakable evidence of the parties' intent to delegate threshold questions of arbitrability to the arbitrator where other aspects of the contract create ambiguity as to the parties' intent." 6 F.4th at 318. Accordingly, *even if* the Court concludes that the Commercial Rules were incorporated by reference here despite the fact that *by their terms they do not apply* to this dispute, the Court should still affirm the District Court's finding that the presence of the judicial review clause renders the purported incorporation of a delegation provision ambiguous.

For all these reasons, the District Court correctly held Mr. Vidal was "likely to succeed on the merits of his claim that the contract does not clearly and unmistakably delegate issues of arbitrability to the arbitrator, or, at the very least,

has raised serious questions as to the merits of that claim." SPA-25. These legal determinations should accordingly be affirmed.

**III. The District Court Correctly Held that Even if the Arbitration Provision Did Contain a Delegation Clause, Mr. Vidal Was Likely to Succeed on the Merits or at Least Had Established a Serious Question that Such Provision is Unconscionable and Unenforceable.**

**A. The District Court Correctly Found Mr. Vidal Was Likely to Succeed in Showing that the Purported Delegation Clause Violates the TVPA.**

Even if this Court concluded that the Arbitration Provision does contain a clear and unmistakable delegation clause, it should still affirm the preliminary injunction order because the District Court correctly concluded that Mr. Vidal was likely to succeed in showing that ACS's purported delegation clause violated federal prohibitions against forced labor.[12] SPA-36 ("Given his financial circumstances and the contract's term, Vidal is likely to succeed on the merits of his claim that the threat of uncapped arbitration costs and attorneys' fees associated with adjudicating even threshold issues of arbitrability constitute threats of 'serious harm' in violation of the TVPA."). Alternatively, the District Court found that he had at the very least raised sufficiently serious questions as to the merits of this argument "given the highly

---

[12] Again, contrary to ACS's claims, Mr. Vidal specifically challenged the enforceability purported delegation clause. *See supra* n.11 & SPA-27 ("Vidal repeatedly mounts specific challenges to the validity of the delegation clause[.]").

analogous caselaw invalidating liquidated damages clauses in high-dollar amounts similar to what Vidal would have faced if he did not prevail in arbitration." *Id.*

The facts as found by the District Court reinforce that ACS used its Arbitration Provision and any purported delegation clause not as a mechanism for pursuing a breach of contract action, but as a weaponized threat to coerce Mr. Vidal into staying in his job. ACS explicitly threatened Mr. Vidal with the legal fees it would accrue in arbitration in a bid to keep him in his job. *See generally supra* Factual/Procedural Bkg. § III. In its letter to Mr. Vidal on June 22, 2022, shortly after Mr. Vidal indicated his intent to quit, ACS specifically told Mr. Vidal that, if he did not return to work, the company would sue him in arbitration. A-278-79. It also highlighted that, if he left before his contract term, Mr. Vidal would owe "attorney's fees and costs incurred in the arbitration" and that he would, pursuant to the loser pays provision, need to "reimburse" ACS "for all reasonable costs, including all attorneys' fees" that it "incur[red] in enforcing its rights and remedies" under the contract. *Id.* Immediately after asserting those threats, ACS invited Mr. Vidal to "reconsider" his "course of action." *Id.* ACS thus explicitly threatened Mr. Vidal with the potentially devastating costs of its collection activities and the costs of the arbitration itself to coerce him into returning to work—a threat of serious harm and abuse of legal process that violates the TVPA. A contract, in this case the delegation provision, intended to be

30

used, and in fact used, for such illegal purposes is illegal and unenforceable under the TVPA.

First, the purported delegation provision amounts to a threat of "serious harm." The TVPA prohibits labor obtained through threats of "serious harm," including "psychological, financial, or reputational harm" that is sufficiently serious under the circumstances to compel a reasonable person "to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2).[13] The District Court made a factual finding that "any reasonable person in Vidal's position and of similar financial circumstances would reasonably believe that" the "enormous potential damages, fees, and costs" related to the arbitration, even an arbitration over threshold questions of arbitrability would amount to serious harm. SPA-33.

The District Court's conclusion is in line with the numerous federal courts in New York and elsewhere that have held it is a violation of federal labor trafficking laws to require immigrant nurses like Mr. Vidal to pay steep financial penalties if they leave their employment before the end of a contractual commitment period. *See, e.g.*, *Carmen v. Health Carousel, LLC*, No. 1:20 Civ. 313, 2023 WL 5104066,

---

[13] Vidal also argued that ACS's conduct violated the TVPA's prohibition on extracting labor through the "abuse or threatened abuse of legal process.," 18 U.S.C. § 1589(c)(1) and a violation of New York's labor trafficking statute, but the District Court declined to reach those arguments at the preliminary injunction stage. SPA-29 n.10.

at *8 (S.D. Ohio Aug. 9, 2023) (liquidated damages provision and harsh working conditions sufficient to state a claim for serious harm under TVPA); *Paguirigan v. Prompt Nursing Emp't Agency,* 286 F. Supp. 3d 430, 535 (E.D.N.Y. 2017) ($25,000 contract termination fee an unenforceable penalty designed to compel performance); SPA-31 (collecting cases).[14] As relevant to this appeal, the financial penalties at issue are the extraordinary costs of thousands of dollars that the District Court found Mr. Vidal would likely have to incur to challenge threshold issues of arbitrability before the arbitrator.

Here, in assessing "serious harm," the District Court properly weighed the fees and costs that would be triggered by an initial arbitration on threshold questions of arbitrability. The District Court correctly held that the appropriate focus is "on the effect that the[] financial penalties [contained in the contracts] may have on a worker deciding whether or not to leave his or her job." SPA-31. Although ACS did remove the liquidated damages clause from its contract, it replaced it with an "uncapped damages provision" allowing ACS to recover expenses and lost profits, which is not

---

[14] The New York State Office of the Attorney General has come to a similar conclusion. *See* Assurance of Discontinuance, *In re: Albany Med Health Sys.* (settlement agreement between NY Attorney General & Albany Med Health System for unlawfully including $20,000 repayment fee in employment contracts for nurses from foreign nations), https://ag.ny.gov/sites/default/files/albany_med_aod_no._22-058_-_fully_executed_9.13.22.pdf; *see also* A-612-14.

"any less coercive than the liquidated damages provisions at issue" in the other cases. *Id.*

ACS's brief ignores this analysis entirely, asserting instead that the TVPA "in no way applies to the facts of this case." Br. 42. ACS suggests that because there are "no allegations of any threat of violence," the TVPA does not apply. *Id.* But, as courts around the country have recognized, the TVPA addresses a broad range of conduct that does not involve physical violence. *See, e.g.*, *Burrell v. Staff*, 60 F.4th 25, 37 (3d Cir. 2023), *cert. denied sub nom. Lackawanna Recycling Ctr., Inc. v. Burrell*, 143 S. Ct. 2662 (2023) ("the TVPA clearly encompasses a broad range of conduct which is not limited… to appalling criminal conduct and shocking depravity) (internal quotation marks omitted); *Gonzalez v. CoreCivic, Inc.*, 986 F.3d 536, 539 (5th Cir. 2021). Indeed, even the cases ACS relies on recognize that Congress intended to address circumstances "where traffickers restrain their victims *without physical violence or injury*…or threaten dire consequences *by means other than overt violence*." Br. 42 (quoting *U.S. v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011) (emphasis added).

ACS's reliance (Br. 44-45) on *Baldia v. RN Express Staffing* is misplaced. 633 F. Supp. 3d 693 (S.D.N.Y. 2022). In that case, a court denied an employer's motion to dismiss TVPA claims because the employment agreement at issue contained a liquidated damages clause and promissory note, and the employer threatened

litigation to enforce those provisions *Id.* at 705–11. But nowhere does that decision stand for the proposition that to bring a successful TVPA claim, a plaintiff must show that there was a liquidated damages provision, promissory note, and threats of violence or deportation. If anything, *Baldia* supports Mr. Vidal's arguments below that the threat of crushing indebtedness to an employer *can* support a TVPA claim.

Second, the Arbitration Provision and its purported delegation clause amount to a "threatened abuse of legal process" to keep Mr. Vidal trapped in his job. *See* 18 U.S.C. § 1589(a)(3). New York courts have concluded that the threat of suing workers for leaving a job, even without forcing them to bear the costs of attorney's fees and private dispute resolution—as ACS does here—amounts to the threatened abuse of legal process. *See, e.g.*, *Magtoles v. United Staffing Registry, Inc.*, No. 21 Civ. 1850, 2021 WL 6197063, at *8 (E.D.N.Y. Dec. 30, 2021). By threatening arbitration—even over the threshold matter of arbitrability—against Mr. Vidal and using the threat of that arbitration and its related costs to coerce Mr. Vidal's continued work, ACS unlawfully coerced Mr. Vidal's labor, using the arbitration scheme in a manner for which it was surely "not designed." 18 U.S.C. § 1589(c)(1).

ACS has used and designed the Arbitration Provision and purported delegation clause in "a manner or for a[] purpose for which the law was not designed" in an attempt to coerce Mr. Vidal. 18 U.S.C. § 1589(c)(1). This is evident not just in the unenforceability of the provision and in ACS's threats but also in the

direct conflict between ACS's contractual language and AAA's own rules. The AAA's Employment Due Process Protocols and employment fee schedules purport to prohibit abusive contract terms like ACS's loser pays provision. For example, the Employment/Workplace Fee Schedule provides that "the company shall pay the arbitrator's compensation unless the individual, *post* dispute, voluntarily elects to pay a portion of the arbitrator's compensation" and that "arbitrator compensation, expenses, and administrative fees are not subject to reallocation by the arbitrator(s) except upon the arbitrator's determination that a claim or counterclaim was filed for purposes of harassment or is patently frivolous." A-128-129 n.7 (quoting AAA, Employment Fee Sched.) (emphasis added).

Although ACS relies (Br. 43-44) on a 2015 case from the district of Indiana to buttress its argument that pursuing a "breach of contract" action cannot be an abuse of legal process, that case is an outlier and contrary to the conclusions of many other courts, including several within this Circuit and one on which ACS explicitly relies. *Compare Panwar v. Access Therapies, Inc.*, No. 1:12-cv-00619-TWP-TAB, 2015 WL 1396599, at *4-5 (S.D. Ind. Mar. 25, 2015) (granting summary judgment to employer where contractual provisions were permissible under state law and finding threats to enforce contractual penalties not abuse of legal process), *with Baldia*, 633 F.Supp.3d at 709 (distinguishing *Panwar* and finding that threats to enforce allegedly unenforceable contractual penalties made with intent to pressure

plaintiffs to stay in their jobs stated a claim for abuse of law or legal process under the TVPA). Simply put, although filing a breach of contract claim may not be an abuse of legal process on its own, threatening to file a baseless lawsuit, threatening to collect uncollectable arbitration fees and costs, and using all those threats in an attempt to coerce work clearly does. *Panwar* does not support a different conclusion.

**B. The District Court Correctly Concluded Mr. Vidal Was Likely to Succeed in Showing the Purported Delegation Clause is Unconscionable Under New York Law.**

The District Court also properly concluded that Mr. Vidal was likely to succeed in showing that the delegation clause is unconscionable under New York law or, alternatively, that he had raised sufficiently serious questions as to the merits of this argument. SPA-37-46.

Under New York law, to demonstrate a contract is unconscionable, it must be shown that it "'is both procedurally and substantially unconscionable[,]'" *i.e.* that there was an "'absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'" SPA-37 (quoting *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010) and *Spinelli v. Nat'l Football League*, 903 F.3d 185, 208 (2d Cir. 2018)). Generally, "'procedural and substantive unconscionability operate on a sliding scale; the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa." *Id.* (quoting *Master Lease Corp. v. Manhattan*

36

*Limo., Ltd.*, 580 N.Y.S.2d 952, 954 (N.Y. App. Div. 1992) (cleaned up). In this case, the District Court found that Mr. Vidal was likely to succeed on the merits, or at least had raised serious question as to the merits, of his arguments that the purported delegation clause and the Arbitration Provision were procedurally and substantively unconscionable.

With respect to procedural unconscionability, the District Court concluded that Mr. Vidal was likely to succeed on his argument that the purported delegation clause and the Arbitration Provision is procedurally unconscionable, for two reasons. First, the District Court found that Mr. Vidal believed that he was still bound by the terms of the 2019 Contract, and subject to its liquidated damages provision if he walked away. SPA-39. And although ACS makes much of its release of the promissory note, the District Court recognized that the 2019 Contract included other means by which ACS could seek damages, including through legal action, and ACS never suggested such action was off the table. SPA-39. And at the time he signed the 2022 contract, Mr. Vidal was in a "particularly vulnerable position" because:

> [h]e was living in London, away from home and without a job, having spent over two-and-a-half years waiting for his U.S. visa application to be processed. He had already signed and remained bound by the 2019 Contract, which forbade hm from working with any employer in the United States other than ACS….And he had quit his job in London in reliance on the 2019 Contract—assuming, once he was notified in December 2021 that his visa interview was scheduled, that he would need to move to the United States and begin his employment right away….Indeed,

37

> when he quit his job in London, Vidal had no reason to
> think that he would be asked to sign a second contract,
> when he was suddenly presented with the 2022 Contract
> and told by an ACS representative to "sign quickly."

SPA-38. As such, the District Court found there was both a "power disparity between the parties here [that] goes beyond the typical employer-employee relationship" and "many coercive circumstances surrounding [Vidal's] signing of the 2022 Contract."[15] SPA-38, 39.

Second, the District Court also found that ACS also used "'high pressure' and 'deceptive' tactics when it presented Vidal with the new contract." SPA-39. ACS included a letter explaining that the change to its liquidated damages clause was based on feedback that the clause was viewed as a buy-out—a statement the District Court deemed misleading in light of the many court decisions finding such clauses

---

[15] While ACS suggests the primary basis for the District Court's conclusion as to procedural unconscionability was the unequal bargaining power between the parties, that ignores many additional facts the District Court considered. And the few cases cited by ACS (Br. 31-32) are factually inapposite. *Isaacs v. OCE Bus. Servs., Inc.*, declined to find procedural unconscionability based solely on inequality of bargaining power between employer and employee. 968 F. Supp. 2d 564, 570 (S.D.N.Y. 2013) And in *Maity v. Tata Consultancy Servs.*, cited by ACS, the plaintiff failed to demonstrate a "special degree of economic compulsion motivating him to sign the agreement," as required by New Jersey law. No. 19-cv-19861, 2021 WL 6135939, at *7 (D.N.J. Dec. 29, 2021) (cleaned up). But here, Mr. Vidal adduced evidence showing exactly the kind of economic compulsion missing in *Maity*: he feared ACS would pursue liquidated damages under the 2019 Contract if he did not sign the 2022 Contract. SPA-39.

unenforceable because they threatened workers with serious harm, in violation of the TVPA. SPA-39-40.

With respect to substantive unconscionability, the District Court concluded that Mr. Vidal was likely to succeed on his argument that the purported delegation clause is substantively unconscionable when paired with the Arbitration Provision's "loser pays" provision, which provides that the prevailing party "shall be entitled" to its attorney's fees and the costs of the arbitration, including the arbitrator's fees, even over an arbitration regarding preliminary matters of arbitrability. SPA-40-42.

The District Court recognized that this "loser pays" provision is "likely unconscionable on its own terms," and that "the delegation clause itself is likely unconscionable when paired with the 'loser pays' provision." SPA-43. This conclusion was based on Vidal's showing that "to even challenge the threshold issues of arbitrability before the arbitrator could cause him financial ruin." SPA-43-44.[16] And the arbitrator's choice to defer a decision on enforceability until after discovery on the merits all but ensured that Vidal would have to bear astronomical costs. *Id.* at 40. Because these costs, even to resolve threshold questions of arbitrability, were

---

[16] Some courts find loser pays provisions in employment contracts to be *per se* unconscionable. *See, e.g.*, *Tompkins v. 23andMe, Inc*., 840 F.3d 1016, 1025 (9th Cir. 2016) (as a matter of California law, "when an employer imposes mandatory arbitration as a condition of employment, the arbitration agreement or arbitration process cannot generally require the employee to bear any type of expense that the employee would not be required to bear if he or she were free to bring the action in court.") (internal quotation marks omitted).

likely sufficient to "effectively preclude" Mr. Vidal from pursuing his claims, the District Court concluded that he had established substantive unconscionability. *Id.* at 41; *see also Brady v. Williams Cap. Grp., L.P.*, 878 N.Y.S.2d 693, 701 (2009), *aff'd as modified*, 14 N.Y.3d 459 (2010) (effective preclusion of rights established where party demonstrates that she cannot afford costs associated with arbitration); *Valle v. ATM Nat., LLC*, No. 14 Civ. 7993, 2015 WL 413449, at *7 (S.D.N.Y. Jan. 30, 2015) (loser pays provision in arbitration agreement covering low-wage workers is substantively unconscionable where the costs of arbitration could amount to tens of thousands of dollars).

ACS relies heavily (Br. 34) on its payment of the AAA filing fee and the arbitrator's determination that the AAA Employment Rules, which require the employer to pay the Arbitrator's fee, apply to the arbitration against Mr. Vidal. But ACS obfuscates the fact that it has *not* agreed to waive its right to ultimately recover arbitration costs or arbitrator compensation and that it has *not* agreed to waive its right to recover its own attorneys' fees in the arbitration from Mr. Vidal, including for a proceeding over threshold enforceability issues, which the arbitrator had already indicated she was unwilling to rule on separately.

Furthermore, the "doctrine of unconscionability implicates the circumstances and terms of a contract at the time of formation—not the parties' subsequent performance under it." *Don King Prods., Inc. v. Douglas*, 742 F. Supp. 778, 780

40

(S.D.N.Y. 1990). The Court should not condone ACS's unfair and one-sided contract by allowing ACS to rewrite that contract through subsequent conduct, even if such conduct had removed the extraordinary financial threats on Mr. Vidal—which, in this case, it has not.

### C. The Delegation Clause Also Violates Federal and State Wage-and-Hour Requirements

Although the District Court did not reach the question of whether the delegation clause and loser pays provision likely violate state and federal wage and hour law—or whether there is a serious question about that issue—this provides an equally strong alternative ground for affirmance of the District Court's injunction. There exists a growing body of caselaw supporting the argument that it violates the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* and state-law analogues for employers to seek to recoup costs like those ACS seeks to recoup here from employees departing their jobs. The federal law wage and hour issues raised by ACS's conduct are currently being litigated in another action brought by the United States Department of Labor ("USDOL"), *Su v. Advanced Care Staffing, LLC*, No. 23 Civ. 2119 (E.D.N.Y. 2023), which is currently pending before the District Court.

ACS's conduct is an unlawful kickback and violates the FLSA's "free and clear" requirement because wage requirements of FLSA are not met where employee "kicks back" any part of wage for employer's benefit. *See* 29 C.F.R. § 531.35; *Carmen*, 2023 WL 5104066, at *14 (same). And seeking to recoup costs and

41

attorney's fees to collect an illegal kickback would be an illegal kickback under federal law and state analogues. This is the basis for USDOL's action against ACS, which alleges among other things that ACS's demands to pay costs and attorney's fees "are an illegal request that employees kick back wages to ACS[.]" *Su v. Advanced Care Staffing, LLC*, No. 23-cv-2119-NRM-MMH, Am.Compl., ECF No. 19, ¶ 168 (E.D.N.Y. Jul. 7, 2023). If the Court disagrees with the District Court on the merits of whether there is a "clear and unambiguous" delegation provision and even if there is whether it violates the TVPA or is unconscionable, the Court should either affirm because the delegation provision violates the FLSA or remand for the District Court to consider that argument alongside the USDOL action challenging precisely the same conduct.

The loser pays term in the arbitration provision and delegation clause is also inconsistent with the one-way fee shifting provisions in state and federal wage and hour law. *See, e.g.*, 29 U.S.C. § 216(b). In enacting a one-way fee shifting statute, Congress did not intend to permit employers to contract for the recovery of their own fees and costs when they prevail in disputes under the FLSA. *See, e.g.*, *Alexander v. Anthony Int'l, L.P.,* 341 F.3d 256, 268-69 (3d Cir. 2003) (provision requiring losing party in employment discrimination case to pay all arbitrator fees and costs unenforceable).

**IV.     The Court Should Decline Any Invitation to Sever the Loser Pays Clause.**

This Court need not reach the question of whether the loser pays clause can be severed from the remainder of the contract. Given the preliminary stage of the litigation, the District Court reasoned that:

> It is certainly appropriate and necessary for a court to consider severability when it makes a final determination that a particular provision is unlawful or cannot be enforced. But as I have not made any such determination (nor could I, at the preliminary injunction stage), then neither the delegation clause nor any other provision in this contract has yet been deemed unenforceable-and thus, there is no offending clause to 'sever' from the rest of the contract.

SPA-47-48. This Court can therefore affirm the injunction if it agrees that the delegation clause is not clear and unmistakable or, if the Court disagrees with that conclusion, it can still affirm the injunction on the ground that the loser pays term is likely unenforceable or that there is at least a serious question about its unenforceability such that the District Court did not abuse its discretion.

However, even if the Court were to address this issue in the first instance, it should decline to sever the arbitration requirement, for substantially the same reasons articulated in Plaintiff's briefs below. *See* A-133-34; A-717-18. The touchstone of severance analysis is whether the provision in question is integral or ancillary to the agreement, such that the provision cannot be rewritten without fundamentally altering the nature of the agreement. *See, e.g.*, *MacDonald v.*

*CashCall, Inc*, 883 F.3d 220, 230 (3d Cir. 2018). Here, the loser pays term is "an essential part of the agreed exchange." Restatement (Second) of Contracts § 184(1). Rather than being a "single isolated term" in an otherwise valid agreement, it "go[es] to the core" of the 2022 Contract and ACS's goals in drafting the contract and presenting it to Mr. Vidal. *Am. Fam. Life Assurance Co. of New York v. Baker*, 848 F. App'x 11, 13 (2d Cir. 2021). In two different places in the 2022 Contract, ACS reinforces that Mr. Vidal will be responsible for the fees and costs associated with pursuing a breach of contract action against him. A-244, A-249. Additionally, ACS explicitly threatened Mr. Vidal with the loser pays term in Section 14 of the 2022 Contract in an effort to coerce him to reconsider his decision to leave his job. A-278-79 (ECF Doc. 23-7 at 3). This centrality of the loser pays term to ACS's scheme is reason alone, as a matter of New York law, to conclude that it cannot be severed from the contract.[17] *See Slatt v. Slatt*, 64 N.Y.2d 966, 967 (1985) ("In adjudicating the rights of parties to a contract, courts may not fashion a new contract under the guise of contract construction[.]") (citation omitted).

---

[17] Notably, the severance language in the Arbitration Provision suggests that severance only occur if it can be done in a way that "maintains the parties' original intent to the maximum extent possible." A-535. Given the centrality of the loser pays term to ACS's original intent in drafting the contract, there is simply no way to sever it consistent with that intent. *See Inetianbor v. CashCall, Inc.*, 768 F.3d 1346, 1353 (11th Cir. 2014) ("[T]he forum selection provisions are not severable from the general agreement to arbitrate, so the severability clause does not aid in our interpretation of how integral the limiting forum selection provision is.").

To the extent that some prior caselaw suggests that in the arbitration context courts should go out of their way to strike unconscionable and unenforceable terms and enforce arbitration requirements in their absence, more recent Supreme Court precedent confirms that, pursuant to the FAA, "a court must hold a party to its arbitration contract just as the court would to any other kind. But a court may not devise novel rules to favor arbitration over litigation." *Morgan*, 596 U.S. at 418.

As the District Court noted, this Court's cases such as *Ragone* severing unconscionable terms from arbitration agreements did so based on their view of the "federal policy favoring arbitration . . . under which courts are charged with encouraging and supporting arbitration." SPA-46-47 n.15 (quoting *Ragone*, 595 F.3d at 124) (internal quotation marks omitted). But, post-*Morgan*, that consideration is improper when applying general state law questions regarding the enforceability of arbitration provisions, as the FAA makes arbitration provisions just as enforceable as other contracts, but not more so.[18]

Whether an unenforceable term should be severed from an arbitration provision turns on general principles of contract law that apply to any contract. And here, those principles counsel against severance. ACS cannot demonstrate that it

---

[18] For this reason, ACS's reliance (Br. 37) on *Valle*, in which a district court severed an unconscionable loser pays provision in order to avoid overriding the intent of the parties to arbitrate, is misplaced. *See* 2015 WL 413449, at *7. The *Valle* court also performed no analysis as to the propriety of severance under state law. *Id.*

45

included the loser pays term "in good faith and in accordance with reasonable standards of fair dealing." Restatement (Second) of Contracts § 184(2); *see also BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 394 (1999). And particularly in light of ACS's conduct and threats, *see supra* Factual/Procedural Bkg. § III, severing the loser pays provision would create incentives for contract drafters like ACS to overreach and pack their contracts with unfair and unenforceable terms. *See, e.g.*, *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 1006 (9th Cir. 2021); *Hayes v. Delbert Services Corp.*, 811 F.3d 666, 675-76 (4th Cir. 2016); *Lowden v. T-Mobile, USA, Inc.*, No. 05 Civ. 1482, 2006 WL 1009279, at *9 (W.D. Wash. Apr. 13, 2006). If such terms were routinely severed in cases like this one, drafting parties would have every incentive to pack their arbitration requirements with fee-shifting provisions and loser pays terms, then use those terms to threaten workers while attempting to coerce their labor, knowing that—at worst—the court will sever or blue pencil the aspects of the requirement that it finds most concerning.

## V. The District Court Correctly Determined that Mr. Vidal Would Face Irreparable Harm If the Arbitration Was Not Paused.

The Court should affirm the District Court's preliminary injunction if it agrees that that Mr. Vidal had demonstrated "irreparable harm" and either likelihood of success on the merits or "sufficiently serious questions going to the merits of [his] claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party" as well as "that a preliminary injunction is

in the public interest." *Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011) (cleaned up).

The District Court correctly concluded that Mr. Vidal faced the irreparable harm of being forced to endure lengthy arbitration proceedings concerning the enforceability of the delegation clause and the Arbitration Provision as a whole before the District Court had the opportunity to assess his challenges on a full factual record.

First, the District Court concluded (SPA-53), consistent with the holdings of many courts in this Circuit, that Mr. Vidal will suffer *per se* irreparable harm if the arbitration is allowed to proceed. *See Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003) (finding that an investment fund would suffer irreparable injury if forced to arbitrate a dispute against a broker-dealer that is "outside the arbitration agreement"); *Mt. Ararat Cemetery v. Cemetery Workers & Greens Attendants U.*, 975 F. Supp. 445, 447 (E.D.N.Y. 1997) (citing *Spear, Leeds & Kellogg v. Centr. Life Assurance Co.*, 879 F. Supp. 403, 404 (S.D.N.Y.1995), *rev'd on other grounds*, 85 F.3d 21 (2d Cir. 1996), for proposition that compelling arbitration of matter not properly subject to arbitration constitutes "per se irreparable harm"); *Tellium, Inc. v. Corning Inc.*, No. 03 Civ. 8487(NRB), 2004 WL 307238, at *3 (S.D.N.Y. Feb. 13, 2004) (same); *Int'l Bhd. of Elec. Workers v. Charter Commc'ns*, 277 F. Supp. 3d 356, 364 (E.D.N.Y. 2017) (same).

The District Court emphasized that the arbitrator in this case "determined that she had jurisdiction over issues of arbitrability" but refused to "even consider Vidal's arguments that the arbitration agreement was unenforceable or unconscionable until she reached the merits of ACS's breach of contract claim." SPA-50. This conclusion recognizes the particular harm of unauthorized arbitration of arbitrability issues, and this Court's admonishment that "[t]he right of access to courts is of such importance that courts will retain authority over the question of arbitrability in the particular dispute unless the parties clearly and unmistakably provided that the question should go to arbitrators." *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 190 (2d Cir. 2019) (cleaned up). Absent an injunction, "Vidal would be unable to vindicate his rights to access the courts and present his claims that the arbitration agreement is unenforceable to a judge," SPA-50 and would thus suffer *per se* irreparable harm.

ACS's argument that "[w]here there is a *valid* arbitration agreement to arbitrate, no irreparable harm results from compelling the resisting party to arbitrate" (Br. 40) (emphasis added), may generally be legally correct, but is premature here given that the validity of the Arbitration Provision has not been determined and the District Court concluded, at this stage, that there was no valid authority for the arbitrator to rule on threshold questions of arbitrability.

But the District Court also found that even if being compelled into arbitration was not *per se* irreparable harm, Mr. Vidal had demonstrated that being forced to

48

expend time and resources in an unauthorized arbitration would cause him specific irreparable harm. SPA-50-51. After conducting a robust oral argument, the District Court found, as a factual matter, that Mr. Vidal has limited financial means and is living nearly paycheck to paycheck to provide his family in the Philippines with subsistence income. SPA-50. For him, taking shifts off work to attend arbitration proceedings or responding to discovery requests may have outsized consequences. *Id.* Vidal would lose money that would be essential to his and his family's wellbeing. SPA-50-51.

While ACS argues (Br. 40) that any potential loss of wages is not irreparable because it can be remedied—arguing that money, by definition, can be paid back, it fails to acknowledge that "[a]lthough an injury that is adequately compensated by a monetary award is not considered 'irreparable,' . . . the time and resources [a party] would expend in arbitration is not compensable by any monetary award of attorneys' fees or damages[.]" *Tellium*, 2004 WL 307238, at *3; *see also Port Drivers Fed'n 18, Inc. v. All Saints Express*, 757 F. Supp. 2d 443, 460-61 (D.N.J. 2010) (recognizing that the burden of future litigation can constitute irreparable harm). It is particularly unclear how Mr. Vidal would even be compensated after the fact for missed shifts or other collateral consequences of having to sit through an unauthorized arbitration. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) ("[I]rreparable

harm may be found where damages are difficult to establish and measure.") (citation

omitted). As the District Court found:

> for workers with as slim a financial margin as Vidal has,
> in a given month, missing out on income because of
> missed shifts could have an irreparable impact. For
> example, even a small amount of lost income in one month
> could mean the difference between Vidal's ability to pay
> for an unexpected medical expense, or not—and suffering
> more serious symptoms, pain, or a prolonged illness as a
> result . . . . it is simply not the case that for a worker in
> Vidal's financial position, the harm from lost income can
> always be remedied in full through retroactive
> compensation.

SPA-51. ACS has not identified anything in these factual findings on irreparable

harm that is clearly erroneous.

ACS's reliance on inapposite case law does nothing to save its flawed

arguments. For example, ACS argues the Supreme Court recently held that litigation-

related burdens do not constitute irreparable harm. Br. 41 (citing *Coinbase*, 599 U.S.

at 746). But *Coinbase* held no such thing. *Coinbase* did not discuss irreparable harms

in context of preliminary injunction. It merely observed that the Plaintiff in that case

was incorrect that parties would be adequately protected by the four-factor standard

for a discretionary stay pending appeal, because other courts "often do not consider

litigation-related burdens . . . to constitute irreparable harm" for purposes of

determining whether to stay litigation pending appeal. 599 U.S. at 746; *see also*

*Woodlawn Cemetery v. Local 365*, No. 90 CIV. 6071(JMC), 1990 WL 150472, at *2-

3 (S.D.N.Y. Oct. 2, 1990) (staying arbitration pending final determination in National Labor Relations Board proceeding).

The remaining cases upon which ACS relies all stand for the unremarkable proposition that there is no irreparable harm in compelling arbitration when the parties agreed to arbitrate the dispute at issue. For example, in *Emery Air Freight v. Local Union 295*, the court noted that arbitration is "the preferred method *for resolving labor disputes*" pursuant to bargained-for collective bargaining agreements. 786 F.2d 93, 100 (2d Cir. 1986); *see also Med. Shoppe Int'l, Inc. v. Mitsopoulos*, No. CV 2004-5207(ERK)(MDG), 2006 WL 8438209, at \*3 (E.D.N.Y. May 5, 2006) (holding that where there is a *valid* agreement to arbitrate, no irreparable harm results from compelling the resisting party to arbitrate) (emphasis added). As noted, outside of the organized labor context, the Second Circuit has held that forcing a party to arbitrate when it has not agreed to do so may constitute irreparable injury. *See, e.g., Merrill Lynch Inv. Managers,* 337 F.3d at 129.

**VI. The District Court's Findings as to the Remaining Preliminary Injunction Factors Should be Affirmed in Light of Its Conclusion that Mr. Vidal Had at Least Demonstrated "Sufficiently Serious Questions" as to the Merits and Irreparable Harm.**

The preliminary injunction analysis is fundamentally rooted in equitable considerations subject to review on an abuse of discretion. Even if the Court disagrees that Mr. Vidal is likely to prevail on the merits of his arguments respecting the delegation clause, it is enough for it to agree that Mr. Vidal has at least raised

51

serious questions about those issues, demonstrated irreparable harm, and that the District Court properly determined that the equities tipped decidedly in his favor. As this Court has noted, "[o]ur [serious questions] standard accommodates the needs of the district courts in confronting motions for preliminary injunctions in factual situations that vary widely in difficulty and complexity." *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 38 (2d Cir. 2010). Because Mr. Vidal had demonstrated a likelihood of success or at least raised serious questions as to the merits, and demonstrated irreparable harm, it should defer to the District Court's remaining equitable determinations as to the final preliminary injunction factors. *See, e.g., North Atl. Instruments v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999) (affirming injunction was within Court's allowable discretion based on finding of likelihood of success on merits and irreparable harm, without addressing remaining factors); *Register.com, Inc.*, 356 F.3d at 404 (rulings on likelihood of success and irreparable harm "justify the affirmance of the preliminary injunction, without need to discuss the other contentions raised").

### A. The District Court Correctly Found that the Balance of Harms Tipped Decidedly in Mr. Vidal's Favor.

Here, the District Court correctly concluded that the balance of harms weighs heavily in Mr. Vidal's favor. Specifically, absent an injunction, Mr. Vidal could succeed in showing that the arbitrator lacks authority to decide arbitrability, while still having to suffer irreparable harm during the pendency of the arbitration. By

contrast, the only arguable harm a temporary delay in the arbitration would cause ACS would be a delay in ACS's recovery of damages. SPA-51-52.

Rather than meaningfully address the District Court's weighing of the equities, ACS accuses Mr. Vidal of "making "a cost-benefit analysis that he could earn more money elsewhere and that difference would cover any consequences of his breach . . . [and] now regrets the cost benefit analysis he performed." Br. 47. But ACS cites nothing to support this claim, which is irrelevant to the District Court's finding that ACS had not identified any "specific harm that it will suffer if the arbitration is temporarily paused while the Court adjudicates the merits of Vidal's claims." SPA-48.

Eight months after the injunction was entered, ACS *still* has not identified any specific harm it is allegedly suffering from the paused arbitration. This further demonstrates that the injunction has not, as ACS seems to suggest, "award[ed] the movant the ultimate relief sought in the suit," but has only "preserve[d] the status quo by preventing during the pendency of the suit the occurrence of that irreparable sort of harm which the movant fears will occur." *Kane v. De Blasio*, 19 F.4th 152, 163 (2d Cir. 2021).

Moreover, given how decisively the equities weigh in Mr. Vidal's favor, if the Court finds Mr. Vidal demonstrated sufficiently serious questions as to the merits, it must affirm the District Court's Order. *See Citigroup*, 598 F. 3d at 35.

**B. The District Court Correctly Held that a Preliminary Injunction Is in the Public Interest.**

Finally, the District Court correctly recognized that the ongoing arbitration proceeding raised profoundly important issues regarding the exploitation of immigrant workers, and that an injunction pausing a "potentially unauthorized arbitration . . . while a court evaluates whether the arbitration is unconscionable or runs contrary to Congressional prohibition on forced labor" was squarely in the public interest. SPA-53.

The underlying facts of this case substantially overlap with trafficking cases involving other foreign nurses in New York. Indeed, at least one court in New York and the New York Attorney General have concluded that luring nurses into the United States and then coercing them to continue working under threat of financial penalties less substantial than those at issue in this case violates anti-trafficking laws. *See Paguirigan*, 286 F. Supp 3d at 535 ($25,000 contract termination fee unenforceable penalty designed to compel performance); *see also* Assurance of Discontinuance, *In re: Albany Med Health Sys.*, *supra* n.14 .

ACS opines that "the only interest arguably served would be Plaintiff's personal interest in avoiding the pecuniary consequences of his breach, not the public interest." (Br. 47.) But the public interest in a preliminary injunction— intended to prevent a staffing agency from engaging in systemic labor trafficking violations while the District Court determines the Provision's enforceability in light

of anti-trafficking laws—is clear. Indeed, the interest to the public is so significant, the NY Attorney General's Office has urged AAA to pause the arbitration, and USDOL has sued ACS challenging the same contractual provision. This is particularly true because the AAA has previously refused to voluntarily pause proceedings in order for a court to determine the Provision's enforceability and has filed arbitrations against other nurses in similar circumstances.

## CONCLUSION

For the foregoing reasons, Mr. Vidal urges the Court to affirm the District Court's preliminary injunction.

Dated:        October 25, 2023

<div style="margin-left:40%">

/s/ Hugh Baran
Hugh Baran
Kakalec Law PLLC
195 Montague Street, 14th Fl.
Brooklyn, NY 11201
(212) 705-8730
hugh@kakaleclaw.com

David H. Seligman
Juno Turner
Valerie Collins
Towards Justice
P.O. Box 371689, PMB 44465
Denver, CO 80237-5680
(720) 441-2236
david@towardsjustice.org
juno@towardsjustice.org
valerie@towardsjustice.org

*Counsel for Plaintiff-Appellee*

</div>

## CERTIFICATE OF COMPLIANCE

This brief complies with Federal Rule of Appellate Procedure 32(a) and the word limit of Second Circuit Local Rule 32.1(a)(4)(A) because it contains 13,587 words, excluding the exempted items.

This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5), and 32(a)(6) because it was prepared in a proportionally spaced typeface in 14-point Times New Roman.

Dated:    October 25, 2023        /s/ Hugh Baran
            Brooklyn, New York       Hugh Baran
                                       Kakalec Law PLLC
                                       195 Montague Street, 14th Fl.
                                       Brooklyn, NY 11201
                                       (212) 705-8730
                                       hugh@kakaleclaw.com

                                       *Counsel for Plaintiff-Appellee*

## CERTIFICATE OF SERVICE

I, Hugh Baran, certify that on October 25, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:    October 25, 2023    /s/ Hugh Baran
             Brooklyn, New York    Hugh Baran
                                        Kakalec Law PLLC
                                        195 Montague Street, 14th Fl.
                                        Brooklyn, NY 11201
                                        (212) 705-8730
                                        hugh@kakaleclaw.com

*Counsel for Plaintiff-Appellee*