# No. 23-303

United States Court of Appeals for the Second Circuit

---

BENZOR SHEM VIDAL,
*Plaintiff-Appellee*

*v.*

ADVANCED CARE STAFFING, LLC,
*Defendant-Appellant*

---

On Appeal from the United States District Court
for the Eastern District of New York, No. 1:22-cv-05535 (NRM)(MMH)

---

## PLAINTIFF-APPELLEE'S SUPPLEMENTAL APPENDIX

Hugh Baran
Kakalec Law PLLC
195 Montague Street, 14th Fl.
Brooklyn, NY 11201
212-705-8730
hugh@kakaleclaw.com

David H. Seligman
Juno Turner
Valerie Collins
Towards Justice
P.O. Box 371689, PMB 44465
Denver, CO 80237-5680
(720) 441-2236
david@towardsjustice.org
juno@towardsjustice.org
valerie@towardsjustice.org

*Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

**Documents from the Record**

Transcript of Oral Argument before Hon. Nina R. Morrison
on Plaintiff's Motion for Preliminary Injunction (ECF No. 48) ...................PLA-1

1

```
                            UNITED STATES DISTRICT COURT
                            EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - -   X

BENZOR SHEM VIDAL,                :
                                        22-CV-5535(NRM)
            Plaintiff,           :

            -against-           :      United States Courthouse
                                        Brooklyn, New York
ADVANCED CARE STAFFING, LLC., :
                                        February 21, 2023
            Defendant.          :      11:00 o'clock a.m.

- - - - - - - - - - - - - -   X
```

```
                        TRANSCRIPT OF ORAL ARGUMENT
                BEFORE THE HONORABLE NINA R. MORRISON
                    UNITED STATES DISTRICT JUDGE.
```

APPEARANCES:

```
For the Plaintiff:          TOWARDS JUSTICE
                            PO Box 371680
                            Pmb 44465
                            Denver, CO 80237-5680

                            BY: DAVID SELIGMAN, ESQ.

                            KAKALEC LAW PLLC
                            195 Montague Street, 14th Floor
                            Brooklyn, NY 11201

                            BY:  HUGH BARAN, ESQ.

For the Defendant:          FORDHARRISON LLP
                            CityPlace II
                            185 Asylum Street, Suite 610
                            Hartford, CT 06103

                            BY: CRAIG T. DICKINSON, ESQ.
                                SAMI ASAAD, ESQ.

Court Reporter:             Charleane M. Heading
                            225 Cadman Plaza East
                            Brooklyn, New York
```

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

2

1          THE CLERK:  Civil cause for oral argument, case

2    number 22-CV-5535, Vidal versus Advanced Care Staffing.

3          Counsel, please state your appearances for the

4    record starting with plaintiff.

5          MR. SELIGMAN:  Good morning, Your Honor.  David

6    Seligman for Benzor Vidal and my client Mr. Vidal is here.

7    I'll let Mr. Baran introduce himself.

8          MR. BARAN:  Good morning, Your Honor.  Hugh Baran

9    from Kakalec Law here for plaintiff.

10          THE COURT:  Wonderful.  Good morning.

11          And good morning, Mr. Vidal.

12          MR. DICKINSON:  Good morning, Your Honor.  My name

13    is Craig Dickinson from FordHarrison and I appear on behalf of

14    defendant at the proceeding.  I am joined at counsel table by

15    my partner Sami Asaad who also has his appearance on file.

16          THE COURT:  Good morning to all of you.  Have a

17    seat, please.

18          You are welcome to remain seated or stand when we

19    talk about the case today, whatever is more comfortable for

20    you.  Just remember to speak into the microphone so the court

21    reporter can get your words down.  If you stand, that just

22    means you need to project a little louder, but I'll leave it

23    to each of you.

24          Thank you all very much for being here today.  I

25    know it involved travel for just about all of you.  I

3

1    appreciate it.  I asked you to come in person because this

2    case obviously raises a lot of fairly significant

3    inter-related issues and I thought, especially given the time

4    constraints, it would be better for me to hear from you all in

5    person.

6           So what I would like to do today is cover at various

7    levels of detail pretty much all of the major grounds on which

8    the plaintiff has asked me to pause the arbitration in this

9    case including the delegation clause, the existence and sort

10   of validity of the overall contract and the various provisions

11   of the contract that the plaintiff contends are unlawful.

12          First, I just want to ask a question about the

13   division of the argument.

14          So I understand on plaintiff's side, Mr. Seligman

15   and Mr. Baran are going to be dividing it up.  I did see your

16   letter, thank you, about the issues that you wanted to divide.

17          A couple of issues I do want to talk about.  One is

18   the question of whether the loser pays and/or the lost profit

19   provision can be severed from the rest of the contract.  So

20   which you of when I get to that will be addressing those

21   issues?

22          MR. SELIGMAN:  I'm happy to address that issue.

23          THE COURT:  Sounds good.

24          And, similarly, the question of whether there was a

25   sufficient showing of economic duress in the signing of the

4

1   2022 contract as grounds for invalidating the entire contract

2   which would include, but not be limited, to the delegation

3   clause.  Would that be you as well, Mr. Seligman?

4               MR. SELIGMAN:  I'll address that as well.

5               THE COURT:  Terrific.  Thank you.

6               All right.  So let me just sort of put out there

7   kind of a general framing issue and see if we're on the same

8   page about what I do or don't need to decide depending on

9   where I end up on various issues.

10              So as I indicated, you know, in my question about

11  who would argue this issue a moment ago, I know that one

12  argument the plaintiff has raised is that the contract isn't

13  valid as a whole because Mr. Vidal purportedly signed it under

14  economic duress, specifically, that he alleges, and it's

15  undisputed, that he signed a first contract with ACS in 2019

16  with a liquidated damages clause and a promissory note to

17  enforce that clause in the amount of $20,000 which a number of

18  courts in this district and elsewhere have held in somewhat

19  analogous circumstances to be unlawful.

20              So there's a question about whether he, his view

21  that he was bound by this first contract, whether or not he

22  signed the second one, somehow coerced or put him under

23  economic duress into signing the second contract, and if it

24  did, then that would render the whole contract invalid because

25  Mr. Vidal reasonably believed, whether correctly or not, that

5

1   he had at least a $20,000 penalty hanging over his head if he

2   did not sign the second contract.

3          Again, I'm not passing on the reasonableness of that

4   belief, whether it's correct at this point, but I do

5   understand that that's his argument.

6          So my question for the parties and I think it's

7   primarily a question for the defendant is do you agree that if

8   I find -- and, again, we're far from there at this point

9   because I have a lot of questions for both sides -- but if I

10  find that he is likely to succeed on the merits of this duress

11  claim and that the appropriate hardship showing is met, then I

12  wouldn't need to reach the issues of whether there's a valid

13  delegation clause or the other arguments under the TVPA or the

14  federal wage and hour laws as to specific provisions within

15  that contract.  Does that make sense?

16         MR. DICKINSON:  I understand -- I believe I

17  understand your question.

18         THE COURT:  Yes.

19         MR. DICKINSON:  And I categorically disagree with

20  that.

21         THE COURT:  Tell me why.

22         MR. DICKINSON:  I think that, unfortunately,

23  Your Honor, while the papers set forth a number of very

24  dramatic arguments and some compelling circumstances that may

25  be impacting Mr. Vidal's decision to emigrate from the

6

Philippines to London to New York, the Second Circuit, the
Supreme Court and your brother and sister courts throughout
the Eastern District and Southern District and Western
District and Northern District have readily and always
recognized that your role in this is relatively mundane.
You're a gatekeeper.

That standard test that was articulated set forth In
Re: American Express is that you have to decide, first, if
there's a valid agreement to arbitrate, and that's decided
under New York law and in this case, counsel has submitted the
signed agreement that includes arbitration.

THE COURT:  I hear -- let me stop you there because
I do have some questions for you about the merits of that
argument and I have read your brief so I understand your
opposition on the merits on that ground although I do want to
explore some of it with you.

I think my question may have been a little unclear
which is given that the first question I need to answer, as
you just said, is whether there was a valid agreement to
arbitrate, if I were to find that Mr. Vidal signed the 2022
contract under economic duress, as that's defined under
New York law, would that mean that the agreement to arbitrate
wasn't valid because a contract signed under economic duress
is not valid, and only if I get there and find for him on that
ground would I not need to reach these other issues.

1          I'm not saying I'm going to certainly not find that

2     as a reason not to reach the other issues, but I just want to

3     be clear as what I need to actually decide given the various

4     claims in play.

5          MR. DICKINSON:  Well, Your Honor, I'm going to --

6     bear with me but I'm going to circle back to this is a

7     prescribed process under Second Circuit law.

8          First thing is determine if there's an agreement.

9     Second thing is to determine whether the dispute falls under

10    the agreement.  And we didn't really talk about whether

11    there's an agreement.  There's a lot of argument --

12          THE COURT:  It's not just an agreement.  It's a

13    valid agreement because not all agreements are valid.

14          MR. DICKINSON:  Your Honor, yes, however, that is

15    not how the courts treat it.  The court treats it, first and

16    foremost, is there a meeting of the minds and an indication of

17    assent, and there cannot be any dispute about that in this

18    case because we have a signed agreement, we have, that

19    incorporates the arbitration clause, Mr. Vidal returned it and

20    he showed up for work and worked for three months consistent

21    with that agreement.  There cannot be, there cannot be any

22    dispute about whether an agreement was formed.

23          As to the issue of validity, that comes next.

24    That's when you first address the issue of delegation.  The

25    delegation clause specifically -- you keep using the term

8

1    "validity," the delegation clause literally says --

2         THE COURT:  I know what it says, sir, so I'm going

3    to get to that.  I know you came loaded and ready to argue

4    that point so trust me, we will get there.

5         I think that the question that I'm wrestling with,

6    and it's a question I'm really asking in an open way, let's

7    just assume a different set of facts where there was a

8    plaintiff who was challenging the circumstances under which he

9    signed the contract in a different way, say, a worker who was

10   contracting with ACS and, you know, there was sort of the

11   equivalent of the proverbial gun to the head.  Somebody

12   working for the company said to him, you know, he said, I

13   don't like the way this new contract reads, and the worker

14   said, Well, I know your brother is working for us in the U.S.,

15   if you don't sign this, we're going to find a way to have him

16   deported as well.  So clearly, in duress, clearly

17   impermissible.

18        If I were to decide that that contract, even though

19   he made the agreement and signed it, was not validly formed, I

20   wouldn't have to reach the question of what the meaning of the

21   delegation clause is or whether it's clear and unenforceable.

22        Do you agree with me on that?

23        MR. DICKINSON:  Absolutely not.

24        THE COURT:  So now please tell me why.

25        MR. DICKINSON:  Well, again, it is a prescribed

9

process that we go through.  The first thing you determine is
if there is an agreement.  The second thing you determine is
whether there's a delegation clause and how broad that
delegation clause is.  That is the law of the land,
Your Honor.  You can't -- and as the Second Circuit, and I can
pull out the cite if you want me to, recently said what you
are doing is putting the cart before the horse.  You want to
get to the meaty stuff but we've got to do the mundane stuff
first and the mundane stuff is is there an agreement, does the
agreement have a delegation clause in it, how broad is the
delegation clause.

The delegation clause here, as Your Honor has
already acknowledged, explicitly addresses validity.  You
can't -- you can't undo that.  It's expressly in the agreement
that the parties assented to and initiated performance under.

So once that's there, you only have two other things
to consider.  And this, I think, to some degree goes to some
of the substantive arguments raised by opposing counsel.

One is -- and it's, there's some touch upon the
issue of public concern.  The third criteria that the courts
acknowledge or look at, the only exceptions is unless there is
Congressional, clear Congressional intent to render the claim
non-arbitrable.  There is a very ready example of that that
has already been passed and that's sexual harassment and
sexual assault cannot be the subject of an arbitration.  That

1  is because, and the State of New York passed a law that said

2  we weren't going to have arbitration of discrimination claims.

3       THE COURT:  I understand that.  I guess to circle

4  back, before we get too far afield, and I promise we'll get to

5  whether the exclusions apply are don't apply, I heard you say

6  initially that it has to be a valid agreement.  Then I heard

7  you say, actually, it just has to be an agreement, Judge, and

8  you don't have any role in deciding whether it's valid or not.

9       There's a Second Circuit case, Doctors Association

10 versus I forget the other parties' name from a few years ago

11 in which the court said we're actually not going to get to the

12 delegation clause because we don't think there was

13 consideration in this contract.  So that would seem to suggest

14 that there is a role for courts to decide if the agreement was

15 valid.

16      I realize plaintiff still has a very heavy burden of

17 proving that an agreement he signed, entered into and traveled

18 to the U.S. in reliance upon was valid, but I'm a little

19 surprised and I guess I'm glad I asked the question to hear

20 you disputing that there's no role for me in deciding whether

21 the overall agreement was valid, whether it was a gun to the

22 head, no consideration, economic duress, whatever the ground.

23      So are we disagreeing on that or am I not hearing

24 you properly?

25      MR. DICKINSON:  Apparently, we are, Your Honor.

Case 1:22-cv-05535-NRM-MMH Document 42-5 Filed 03/27/23 Page 13 of 139 PageID #: 857

1          THE COURT:  Okay.

2          MR. DICKINSON:  And I'm looking at Doctors

3   Associates and it's Alemayehu, if I'm pronouncing it.

4          THE COURT:  That's why I couldn't remember the other

5   party's name.  It was a bit difficult to pronounce and

6   remember.

7          MR. DICKINSON:  And more recently, the Zachman case

8   that applied Doctors Associates and that's 49 F 495, reapplied

9   that standard.

10         Again, I recognize there's a degree of frustration,

11  but the first thing is, and it's really a mundane question, is

12  there an agreement, is there an agreement.  There's no dispute

13  that there is an agreement.

14         THE COURT:  I understand.

15         MR. DICKINSON:  There is no factual dispute on that.

16  So if there's an agreement, what does the agreement say?

17         THE COURT:  Okay.  All right.  I think I do

18  understand your position.  I think we've -- you're welcome, if

19  you think that there is some authority this I've missed other

20  than what we've talked about and you want to point me to it by

21  letter brief afterwards on this question of whether the court

22  is empowered, if there is an agreement, meaning signed by both

23  parties, that specifically prohibits me from inquiring into

24  the validity of the agreement before I look at this issue of

25  any specific provisions and what they say, I'm certainly happy

1   to review that.  I read the <u>Doctors Association</u> case a little

2   differently than you do, but I will certainly take another

3   look.

4          All right.  Let me just hear from plaintiff on that

5   issue briefly and then we'll get into some of the more

6   detailed factual issues in this case.

7          MR. SELIGMAN:  Absolutely.  Your Honor, I think that

8   the question is about the nature of the duress argument.

9          You're absolutely right that if the nature of the

10  duress argument, if duress goes to whether there was ever

11  formed an agreement to arbitrate, then that is an issue that

12  cannot be delegated, and that is typically how we understand

13  duress.

14         I'll say even if duress were a question of validity,

15  as opposed to a question of formation, because it is a

16  question of validity, that would also go to the delegation

17  clause, right, because if you entered into the arbitration

18  provision as a whole under duress, then you entered into the

19  delegation provision in particular under duress.  It still

20  would be a question for the Court because the validity of the

21  arbitration -- of the delegation provision is always a

22  question for the Court.

23         THE COURT:  Okay.  Thank you.  I think I understand

24  where the parties differ on this one.

25         Let me dig into some of the details here before we

1  get into the delegation clause issue.  I think I'm going to

2  focus on some of the other issues with the contract because I

3  thought the parties' positions in your briefs were pretty

4  clear with respect to the delegation clause.  I have a few

5  questions but I think I understand where the split is.

6          So let me start with defense counsel on questions

7  about the formation of the second contract.  So this is the

8  2022 contract.

9          So is it your position that at the time ACS offered

10 Mr. Vidal, on January 4, 2022, the opportunity to sign this

11 amended agreement that he ultimately signed, that the 2019

12 contract was already null and void or was he, and was ACS

13 still bound by the 2019 contract at that point?

14         MR. DICKINSON:  Well, Your Honor, that does present

15 kind of a complex issue that the court has grappled with on a

16 number of occasions.  There have been several cases where

17 there is an arbitration clause and then the parties enter into

18 a substantive agreement where there is no arbitration clause

19 and the court has said, no, you still have a binding

20 arbitration.

21         THE COURT:  I mean before he signed the 2022

22 contract.

23         So go back to January 4, 2022.  He gets an e-mail

24 saying either your interview with USCIS has been scheduled,

25 we've attached a whole bunch of other paperwork, included is

1    this amended and updated agreement that we'd like you to sign,

2    if you have questions, give us a call, here are the changes we

3    made from the last one.

4         Before he signed it, but at the moment they sent him

5    that contract, was the 2019 contract that both parties had

6    already signed valid and binding on either party?

7         MR. DICKINSON:  Your Honor, I would contend that it

8    is.  I think that you have a valid agreement.  Certainly, it's

9    not something that has been resolved.  I mean it could be

10   subject to the litigation process, that they can challenge it

11   on that basis, but the fact is applying the same two part test

12   that I've articulated earlier, did they enter into an

13   agreement?  Yes.  And we could discuss the validity of the

14   agreement or whether it should be delegated to the arbitrator.

15   I would say that in that particular case, the arbitration

16   clause still controls and it should be delegated.  That being

17   said, I think that you have a valid reformation of the

18   agreement.

19        THE COURT:  No, I'm not getting into that yet.  So

20   let's stick with -- bear with me on my questions about 2019.

21        MR. DICKINSON:  Okay.

22        THE COURT:  As of 2022, January 2022, when ACS sent

23   Mr. Vidal the second contract that they were proposing he

24   review and sign, if the 2019 contract was still binding,

25   Mr. Vidal could have then said, you know, I really don't want

15

1   to sign a second contract, I signed the first one, my brother

2   reviewed it with me back in the Philippines, we were

3   comfortable with it, I'd rather stick with this one, thanks.

4          So it's your position, I take it, since it's valid,

5   that he could have then gone to the United States and worked

6   under the terms of the 2019 contract, no issue at all, and ACS

7   would have been bound by those terms?

8          MR. DICKINSON:  Yes, Your Honor, and we would have

9   to live with some of the case law that has interpreted and

10  applied some of those things which we don't concede is

11  controlling on this issue because we don't have all of the

12  criteria that we're, all the boxes that were checked in the

13  Paguirigan case.

14         THE COURT:  So you're talking specifically.  I think

15  we both know where we're headed with this one which is the

16  2019 contract contained this $20,000 liquidated damages clause

17  as well as this promissory note that he signed, and if

18  Mr. Vidal had said, you know, I'm going to stick with the

19  first contract, there would have at least been a question

20  about whether that clause could have been enforced had he left

21  his employment early.  Right?

22         MR. DICKINSON:  Indeed, Your Honor, and, frankly,

23  one of our disputes with opposing counsel is you can't eat

24  your cake and have it too.  If you are going to argue that the

25  $20,000 liquidated damages clause and the note are punitive

16

1   and not enforceable, you can't turn around and say, okay,

2   we're taking those off the table, all we want is to be able to

3   prove our actual damages and then say that is --

4           THE COURT:  Okay.  Just bear with me on this one

5   because I want to drill down a little on what this might have

6   meant for his state of mind and my questions about the

7   validity of, and I note your position that it's not my job to

8   inquire, but I think I at least have to ask these questions.

9           MR. DICKINSON:  As long as we understand.

10          THE COURT:  You are answering my questions without,

11  in any way, as in any court, conceding that the judge's

12  questions are in any way relevant to anything.

13          MR. DICKINSON:  I'm at your disposal, Your Honor.

14          THE COURT:  Okay.  Thank you.  So bear with me on

15  this one.

16          So obviously, as you know and as you just alluded

17  to, the Paguirigan case, a case by Judge Matsumoto in this

18  District had, in the intervening time, ruled that liquidated

19  damages clauses, combined with some other factors, but

20  certainly this $25,000 damages clause in Paguirigan as well as

21  some other factors that you argue are specific to this case,

22  but had held that that was unlawful under the TVPA as well as

23  New York law, right?

24          MR. DICKINSON:  Yes, and that was not an arbitration

25  clause either, Your Honor.

1       THE COURT:  I understand.  I understand.  But just

2  the liquidated damages clause.

3       MR. DICKINSON:  Yes.

4       THE COURT:  So nobody from ACS told Mr. Vidal in

5  2022, by the way, if you stick with the first contract which

6  is your right to do, we may not be able to enforce any penalty

7  against you because the courts have found this to be unlawful

8  in other contexts and you may have an argument that you could

9  just walk away from your job with nothing but paying the visa

10  fees back and you'll be free and clear.

11       I mean wasn't that something that was important for

12  him to know at the time?

13       MR. DICKINSON:  Your Honor, I don't -- I am at a

14  loss for any authority that put them under an obligation to do

15  so.  They sent him a new contract.  The contract says talk to

16  a lawyer.  It lays out the basic provisions in the beginning.

17  It's set forth in relatively plain language.  Notwithstanding

18  the fact that it's characterized as impenetrable legalese,

19  it's a pretty straightforward agreement and Mr. Vidal signed

20  it and promptly and sent it back.

21       I mean, clearly -- and New York State contract

22  formation law is pretty clear on that.  It's not their

23  obligation to counsel you and to make sure that you understand

24  it.  If you are given the document, given the opportunity to

25  review and determine whether you understand it, and then

1    you -- and whether or not do you that and whether or not you

2    do actually understand it, but then you sign it, send it back

3    and then continue to act in accord with that agreement, you

4    abide by that agreement.

5          THE COURT:  Okay.  So let's not talk about what they

6    didn't say but what they did say.

7          So in the letter that they sent to him by e-mail

8    that accompanied the second contract, the letter says, and I'm

9    now quoting from the letter:  "The older version," meaning the

10   older version of the contract, "specified a sum of money to be

11   paid in the event of a breach and included a promissory note.

12   We received feedback that this was viewed as a 'buyout' which

13   was never our intention."  Then it goes on to talk about how

14   it eliminates, in light of that feedback, this specified sum

15   of damages and the new provisions for damages.

16         I mean it wasn't really true that ACS got feedback.

17   They actually had extensive litigation and they had rulings

18   from federal courts saying that analogous provisions were

19   unlawful.  So don't you think that saying it was feedback was

20   a little bit misleading and kind of would lead a reasonable

21   person to think that there's no legal problem with the first

22   contract or some detriment he might be under if he signed a

23   second one to cure the problems you identified?

24         MR. DICKINSON:  No, Your Honor, I don't.

25         THE COURT:  Tell me why.

1      MR. DICKINSON:  We are not under an obligation to

2  tell him the reason why we are changing this agreement is

3  because Paguirigan came out, there are a number of other cases

4  across the country, there's a decision or a settlement that

5  was reached in Albany between the State of New York and the

6  nursing staffing entity that found that some of these

7  provisions are a little bit questionable so we're removing

8  them from the agreement.

9      And, you know, that's assuming, also, facts not in

10  evidence that Mr. Vidal would not have signed the agreement if

11  he had known that.

12      THE COURT:  Right.  I mean that's something

13  presumably that could be developed during discovery, but can

14  you think of any circumstance under which any employee, if

15  they knew I've got option number one which contains a

16  liquidated damages clause of $20,000 but the courts and the

17  State that want me to go to work have already said that's

18  unconscionable and can't be enforced, or option two where

19  there's going to be these attorneys' fees for an arbitrator if

20  I go to arbitration and lose and it could be even higher, I'm

21  going to go with the one where I may not get the penalty.

22      I mean who would take option two over option one

23  knowing that, if they were informed of even of the most basic

24  question as you conceded that there was a serious question?

25      MR. DICKINSON:  Your Honor, first and foremost, and

1   I don't think you can jump over this, the fact that there's a

2   liquidated damages clause in a contract does not render it

3   unconscionable.

4          THE COURT:  I understand that.

5          MR. DICKINSON:  That's critical.  So the fact that

6   that's taken off the table and the fact that the promissory

7   note is waived are things that should have been arguably

8   attractive to Mr. Vidal as opposed to, geez, I should stay

9   with the old agreement because it may or may not be

10   enforceable.

11          I think that assuming those facts are inaccurate,

12   and the fact that you're suggesting that there was some duty

13   to, above and beyond, what's in the letter and what's in the

14   plain language of the agreement, to expressly warn or there's

15   some kind of duty to warn is not accurate and that's not

16   consistent with all the case law in this Circuit and the

17   brother and sister courts around here about people entering

18   into arbitration clauses on their phones where they can't even

19   see all the language and they just say "yes" and those are

20   held to be enforceable.

21          So, again --

22          THE COURT:  Let me ask you a different version of

23   that question then.

24          If he hadn't wanted to sign the 2022 proposed

25   amended contract, could he have walked away from the first

1    one?  Would he have been bound to come to the U.S., continued

2    to work for ACS once his visa was approved, and bound by all

3    the terms of the 2019 contract, even with that liquidated

4    damages clause in there?

5             MR. DICKINSON:  Well, Your Honor, I think it's

6    important to recognize that Mr. Vidal wasn't being forced to

7    come to this country.  That's a critical assumption.

8             THE COURT:  I understand.

9             MR. DICKINSON:  He wants to come here and we are

10   facilitating that process by sponsoring his visa application

11   to the United States Government saying --

12            THE COURT:  You're correct on this one.  I phrased

13   the question badly.

14            There was a provision in there that he couldn't work

15   for anyone else in those three years, right, once his visa was

16   approved --

17            MR. DICKINSON:  Right.

18            THE COURT:  -- because of the work that ACS had done

19   to secure that visa?

20            MR. DICKINSON:  Yes.

21            THE COURT:  So let's assume that he decided not to

22   sign the second contract and stayed with the 2019 contract.

23            I assume your position is that he would have, had he

24   chosen to follow through on his plans and come to the U.S., he

25   wouldn't have been able to work for any other employer besides

22

1    ACS.

2            MR. DICKINSON:  He would be subject to the terms of

3    that agreement, yes, Your Honor.

4            THE COURT:  Okay.  And did that apply to employers

5    outside the U.S. or just employers within the U.S.?

6            MR. DICKINSON:  Solely within the United States.

7            THE COURT:  That's what I thought.

8            MR. DICKINSON:  And the formation of the contract,

9    he explicitly says that he doesn't have any agreement with

10   anybody else in the United States.  That's part of the

11   wherefore clause, that he does not have any obligations to

12   anybody else.

13           THE COURT:  Okay.

14           All right.  Let me ask you a little bit about --

15   actually, just a quick question for the plaintiff just as I go

16   through the history.

17           How was it that Mr. Vidal learned that he had his

18   visa interview scheduled?  Did he hear that from the agency or

19   from ACS?

20           MR. SELIGMAN:  I believe, Your Honor, that he

21   learned that from ACS.

22           THE COURT:  Okay.  And this is something that you

23   can always supplement if you don't have this handy, but did,

24   since the narrative I have indicates that he quit his job in

25   the UK after he learned the interview was scheduled but prior

1  to signing the 2022 contract in January.

2  So the interview was scheduled in late 2021, then

3  he's notified by ACS that the interview's been scheduled,

4  things are finally moving after three years, and then in

5  reliance on that fact, he quits his job, correct?

6  MR. SELIGMAN:  That's right, Your Honor.

7  THE COURT:  And have you no reason to dispute what

8  defense counsel has said, because defense counsel's view is

9  they have no obligation to tell your client this information,

10  but that nobody told Mr. Vidal that there was any question

11  about the validity of any portion of his 2019 contract in late

12  2021 when he was deciding what to do with his UK job?

13  MR. SELIGMAN:  That's right, Your Honor.

14  THE COURT:  Okay.

15  All right.  So let me ask defendants then about your

16  argument that the promissory note was canceled which I know

17  you argue kind of vastly deflates the plaintiff's argument

18  that he signed the 2022 contract under any kind of duress

19  because he was well informed, whether or not you told him

20  anything about the status of litigation, that the promissory

21  note wouldn't bind him.  Right?  And I agree with you that

22  that short second letter that ACS sent is very clear:  Your

23  promissory note is canceled forever, gone, null and void.

24  The concern I have is that that letter does not say

25  that ACS won't seek to enforce the liquidated damages clause

24

1    in the 2019 contract some other way.  And in fact, in that

2    first contract, it actually says that the liquidated damages

3    clause can be enforced in a variety of ways.  One of them is

4    by enforcing the terms and conditions of the promissory note.

5    The other is deducting amounts from his paychecks.  Then the

6    other is that the employer "is obligated to enforce the

7    liquidated damages provision by legal action of any type."

8            So wouldn't reading the cover letter and then that

9    first contract in tandem lead him to believe that the

10   liquidated damages provision wasn't canceled, that is, it

11   still bound him as of 2019 and still could be enforced against

12   him?

13           MR. DICKINSON:  Your Honor, there's no dispute that

14   the liquidated -- if we stayed under the initial agreement,

15   the only thing that's been fully taken off the table is the

16   note.  That's gone.  Other than that, if we're, if we're still

17   under the first agreement, the liquidated damages are still

18   there, but their case law does not say that, dispositively,

19   that element alone renders that agreement invalid.

20           THE COURT:  Okay.  So even with the Paguirigan

21   decision and the other decisions, it's your view, like, sure,

22   that's still in effect, he'd take his a chances, maybe it

23   would be enforced, maybe it wouldn't, and there's nothing

24   coercive about it because he signed it and it would be up to

25   him to challenge its validity separately if it ever came to

1    that?

2         MR. DICKINSON:  Yes, Your Honor, and frankly,

3    Your Honor, to explain that to him would have to require a

4    fairly thorough recitation of what Paguirigan does say and

5    doesn't say in multiple decisions, and the fact is many of the

6    more coercive components of Paguirigan, for example, pursuing

7    criminal charges against people are not present here.

8         THE COURT:  So what did ACS mean by this "we

9    received feedback" language?  What could that possibly have

10   referred to if not the litigation?  I mean they weren't doing

11   employee surveys about the buyout or whatnot, right?

12        MR. DICKINSON:  Your Honor, we got feedback from

13   Mr. Vidal that he didn't want to go to the assignment that he

14   got.  There are aspects of that letter that talk about more

15   clarity in terms of assignments too.

16        THE COURT:  Right.  I think what I'm asking you

17   though, because this is a very serious issue with the contract

18   formation, is is ACS seriously contending that when it

19   represented to Mr. Vidal and potentially others that the

20   reason it was revising this contract to cancel unilaterally

21   this promissory note and take out that liquidated damages

22   clause even before he signed the second contract, right,

23   promissory notes completely canceled, that that was not

24   because of litigation and that was because of employee

25   feedback?

26

```
 1              MR. DICKINSON:  Your Honor, I'm not going to say
 2     that that's the only reason.  I'm saying that there is no
 3     record that there is no other feedback.  And, Your Honor,
 4     you're free to infer, and that you wouldn't be wrong, that
 5     this is good representation of a client that there are some
 6     issues that are arising that might call this agreement into
 7     question.  We are not checking all of the boxes that have
 8     caused other contracts to be called invalid, but these are
 9     points of concern.  We should remove them and reform the
10     contract without them.
11              THE COURT:  Right.  And it was more --
12              MR. DICKINSON:  There's nothing unlawful about that.
13              THE COURT:  No.  No.  It's more than just removing
14     it.  It's you unilaterally canceling the promissory note which
15     is a pretty big step to do.
16              MR. DICKINSON:  It is.
17              THE COURT:  I mean I think -- I don't mean to
18     quibble about something that ultimately may not matter but I
19     think that there seems to be not, not just a reasonable
20     inference, probably the only inference that a court on this
21     record could draw on that is reasonable is that the promissory
22     note was canceled because of the litigation, that they
23     wouldn't have unilaterally have done that as just a matter of
24     employee feedback.
25              MR. DICKINSON:  Well, Your Honor, that's not an
```

1  unreasonable inference.

2       THE COURT:  Okay.  Thank you.

3       MR. DICKINSON:  And it goes to whether it makes the

4  second agreement more enforceable.

5       THE COURT:  Okay.

6       All right.  Mr. Seligman, let me ask you a little

7  bit about this economic duress argument.

8       So the standard is a pretty demanding one for me to

9  find that you got a likelihood of success on the merits of

10  your economic duress argument and that this was not a valid

11  agreement or otherwise invalidate the contract or at least

12  find that the arbitration should pause because of that.  You

13  need to, as I understand it, fulfill two requirements:  One,

14  that ACS made some sort of wrongful threat that, two, made it

15  impossible for Mr. Vidal to exercise his free will in deciding

16  whether to sign the contract.

17       So particularly given what we've just been talking

18  about but, really, with any facts that you think are important

19  that I haven't touched on, what exactly is the wrongful threat

20  that you're alleging here that would give me a basis to so

21  find?

22       MR. SELIGMAN:  Your Honor, the wrongful threat here

23  is the presence of the liquidated damages provision and the

24  threat that if Mr. Vidal walked away, then he would face

25  crippling financial consequences that would prevent him from

28

 1  supporting himself and continuing to support his family in the

 2  Philippines.  I think that the context of the communications

 3  with the employer also are relevant in assessing the

 4  seriousness of the threat or whether he perceived it to be a

 5  threat.

 6          So the fact that at this point, he was on the verge

 7  of coming to the United States, had already expended all of

 8  his life savings to travel to the UK, and to pay the upfront

 9  costs of expedited visa processing and, at that point, you

10  know, couldn't continue working in the United Kingdom, all of

11  those things contribute to his perception of his

12  communications with Advanced Care Staffing as being a kind of

13  threat that would overcome his free will in entering into the

14  2022 agreement.

15          THE COURT:  I mean what's your answer to the

16  argument by ACS that your client didn't take them up on their

17  offer to call and ask questions about the 2022 agreement, the

18  proposed agreement?

19          If he was so concerned that if he didn't sign the

20  2022 agreement, he would be hit with this $20,000 penalty,

21  essentially to be held to be in breach of the 2019 agreement,

22  what, if anything, should I make of the fact that he didn't

23  call and ask for clarification?

24          I mean how can I say the defendant wrongfully

25  threatened him when they offered to clarify things and

1  apparently, according to defense counsel, though this

2  obviously wasn't known to him in 2022, they would have told

3  him you can walk away from the 2019 agreement and not come to

4  the United States, we won't come after you for that money if

5  you start working, we're only going to come to you for the

6  money if you come to the U.S. and begin working and then leave

7  your job.

8          MR. SELIGMAN:  So, as an initial matter, that was

9  not clear at the time to him.

10          THE COURT:  Right.  It certainly wasn't communicated

11  to him.

12          MR. SELIGMAN:  Yes.

13          THE COURT:  Right.

14          MR. SELIGMAN:  But as to the communications with ACS

15  around the time of the formation of the 2022 agreement, there

16  is also a factual dispute there.

17          You'll see in the declaration that we filed in our

18  reply brief, Mr. Vidal has stated that he received a call or

19  had a call with an agent of ACS who explained to him that he

20  had received a contract, a new contract, in his e-mail and

21  that he should sign it quickly.  He felt at the time that

22  there wasn't an opportunity to ask questions, that at this

23  stage, especially because of the, you know, tremendous

24  asymmetry, bargaining power in the relationship, he felt that

25  questions wouldn't get him anywhere.

30

1   THE COURT: Right. So I take it your argument is

2 that someone to whom he believed he might owe $20,000 if he

3 walked away calls him and tells him you better act quickly,

4 combined with the other circumstances he was in, combined with

5 the other factors I've mentioned about the letter, all of that

6 would lead a reasonable person in his position to believe that

7 if he didn't sign the contract, he would be on the hook for

8 that 20,000?

9   MR. SELIGMAN: That's right, Your Honor.

10   I acknowledge that this analogy is not perfectly on

11 point in some ways but if someone, you know, mimics a gun in

12 their pocket with their finger, it's not -- the fact that they

13 don't inquire about whether that is, in fact, a gun doesn't,

14 you know, undermine their duress arguments.

15   THE COURT: Right. While we're on the gun analogy,

16 do you agree, and if not, tell me why not, with defense

17 counsel's argument that a real gun, a fake gun, anything held

18 to his head economic or otherwise is outside my authority to

19 consider as long as there's a delegation clause in the

20 agreement that he signed?

21   MR. SELIGMAN: I disagree, Your Honor, again, for

22 two reasons.

23   One is that duress in that form is an argument that

24 goes to formation which is a question that cannot be delegated

25 but even if it is a question that, again, goes to validity, he

1  can't have entered into the delegation clause voluntarily or I

2  should say the delegation clause itself would be invalid for

3  the same reasons that we're arguing that the arbitration

4  agreement as a whole is invalid.

5         And I'll say, while we're on this point, even if --

6  you're right, that the duress threshold is high.  Even if we

7  can't satisfy the requirements of duress as a matter of

8  New York law, the circumstances here at the very least suggest

9  a very high degree of procedural unconscionability which,

10  coupled with subsequent unconscionability here, is, in our

11  view, more than sufficient to undermine the validity of the

12  delegation clause even if it exists, even if it is clear and

13  unmistakable.

14         Under the _Novallo_ case, for example, which is an

15  unconscionability case having to do with a "loser pays"

16  provision, in that case, the court found the "loser pays"

17  provision invalid even on a unconscionability theory even

18  though the court also held that there was no procedural

19  unconscionability.  In this case, there's quite a high degree

20  of procedural unconscionability.

21        THE COURT:  Right.  I want to get to that later.  I

22  mean, I'm aware that there are other grounds of

23  unconscionability to invalidate particular clauses.  I have

24  some questions for you but I would like to get to them later

25  about where that ultimately leaves your client, especially at

1   the preliminary injunction stage, where neither party is

2   asking, because we're not there yet, summary judgment for a

3   declaratory judgment about whether a particular clause or

4   provision is invalid and whether, even if I were to agree with

5   you, I would have the authority to enjoin the arbitration on

6   that basis as opposed to letting it proceed and then waiting

7   until we get to summary judgment to decide ultimately who pays

8   the fees regardless of who wins or loses, that enjoining the

9   arbitration may not be the remedy if we're talking about the

10   validity of a particular clause as opposed to the overall

11   contract which goes to the, which, by its nature, includes the

12   agreement to arbitrate as well as the delegation clause as

13   well as the "loser pays" provision, as well as everything else

14   in the contract.

15          So the other thing I want to ask you about, because

16   I am having trouble understanding why, you know, I could

17   consider any of the plaintiff's personal financial

18   circumstances as in any way bearing on the conduct of ACS at

19   the time when considering the validity of formation of the

20   contract and the answer may be that's not the proper place for

21   me to consider those or, indeed, that it is, but, you know,

22   many people in his position who are signing contracts with ACS

23   may be under varying degrees of considerable financial

24   pressure to take the bargain, go to the U.S., make a wage that

25   is multiple times higher than what they would get in their

1   home country, and they sign contracts that contain some pretty

2   unfavorable terms if they breach them but are taking that risk

3   and that unconscionability, for one, but really issues of

4   contract formation or validity require that the employer do

5   something, whether it's deceptive tactics, wrongful threat,

6   you know, or the like, to invalidate it.

7          So what gives me any authority to consider his

8   personal financial circumstances including his family's

9   circumstances, the choice he made to quit his UK job, that

10  sort of thing?

11         MR. SELIGMAN:  Thank you, Your Honor.

12         In determining whether a threat is wrongful, you

13  know, a statement to one person may not be threatening but to

14  another, would be, based on the circumstances of that person.

15  These are circumstances known to ACS or reasonably known to

16  ACS.  Right?

17         We had frequent communications with Mr. Vidal over

18  the course of his relationship with the company and, you know,

19  ACS was aware that he was, as far as we understand, that he

20  was working in London, right, that he had already expended

21  substantial sums of money to get to that point, that he was,

22  had, they should have been reasonably aware in light of their

23  recruitment practices that he was of very modest means and at

24  that moment, right, when they communicated the contract to

25  him, the statements, even if not explicitly sort of

1    threatening to someone else, were threatening to him.

2         THE COURT:  Okay.  I understand.

3         Let me ask you about the point you raised earlier

4    about what you said was a factual dispute about his call with

5    the ACS agent, which I did see in the supplemental declaration

6    attached to your reply, in which he alleges that an agent told

7    him, you know, you got this new contract and you need to sign

8    this quickly, in sum and substance.

9         Is that actually a factual dispute or is that just

10   an additional fact in support of your position?  Because I

11   wasn't -- and maybe there wasn't enough time permitting

12   defendants to respond to that, but I don't know if that was

13   actually disputed that there was that conversation where he

14   was urged to sign it quickly or not.  I think defendants would

15   probably, I don't want to put words in your mouth, probably

16   argue that even if it were said, it doesn't amount to much

17   because he still made a choice to sign the contract, but just

18   for the record, let me ask whether at this stage there's a

19   dispute over whether that call occurred or not.

20        MR. DICKINSON:  Your Honor, we haven't explored that

21   in terms of discovery or anything at this juncture, however, I

22   would like to respond to some details about those, that series

23   of communications between ACS and Mr. Vidal at that time and

24   his purported financial duress.

25        There's a lot --

1    THE COURT:  Sure.  Go ahead.

2    MR. DICKINSON:  There's a lot of discussion about

3  where he comes from and everybody -- Your Honor called it.

4  There's a lot of people that come here because they come from

5  very adverse circumstances and that they know that there's a

6  much better opportunity to earn here.

7    That's why Mr. Vidal contacted ACS and pursued the

8  opportunity, but that's not disputed that he reached out to

9  them.  He moved from the Philippines to the UK to

10  substantially increase his pay and when they reached out to

11  him while he was there and they were coordinating his visa

12  exchanges, an appointment was scheduled.  I think a critical

13  issue here is because there's a lot of discussion about he had

14  already quit his job and he was up against the wall against

15  UK.  What is totally absent in connection with that is

16  anything ACS had to do with that.

17    There's nothing that suggests that ACS told

18  Mr. Vidal to quit his job.  There's nothing in there that told

19  him, you know, anything to do with his immigration status in

20  London.  We had nothing to do with that.  We had nothing do

21  with creating those circumstances.  To the extent that he

22  expended some of his savings to, at his option, expend the

23  money to go for an expedited processing with the visa, that

24  was his choice.  Nothing here.  We're being asked to imply

25  that there was a threat and I think that there's a lot of

1    facts that are missing that don't add up to a threat.

2           If we're going to say the context matters and we're

3    going to say that the company is supposed to tell him what all

4    the problems are, there's no indication that he told them what

5    his circumstances were.

6           THE COURT:  Okay.

7           MR. DICKINSON:  He wanted to get here as quick as he

8    could so he signed the agreement and got here as quick as he

9    could.

10          THE COURT:  I understand.  I have not lost sight of

11   those facts and I understand your position and also why you

12   wanted to make sure that I understood them but I can assure

13   you I do.

14          MR. DICKINSON:  Thank you, Your Honor.

15          THE COURT:  Let me ask plaintiff's counsel a

16   different question.

17          What is your response, if any, to defense counsel's

18   argument that ACS was under no obligation to tell Mr. Vidal

19   that any aspect of the 2019 contract, specifically, the

20   liquidated damages clause, may be or was held illegal in an

21   analogous set of circumstances in Paguirigan as well as

22   related cases?

23          MR. SELIGMAN:  Your Honor, I agree that there isn't

24   some abstract duty by a drafting party to inform a

25   non-drafting party of every fact or premise to a contract of

1  adhesion.  I agree that that's not a sort of condition

2  precedent to the formation of a valid agreement.  That's not

3  really the question at issue here.

4        I mean these facts go to whether, based on

5  Mr. Vidal's circumstances, based on what he reasonably was

6  aware of, whether the communications with him amounted to a

7  wrongful threat as a matter of New York law under the duress

8  analysis and then also for procedural unconscionability

9  purposes, and I understand we're going to get to that

10  separately, whether they substantially undermined his ability

11  to exercise his free will.

12        So, yes, as an abstract matter, there's no duty to

13  warn, but in the circumstances of this case, absent more

14  explicit communication, the communications he did receive

15  substantially undermined his ability to exercise free will.

16        I'll say I do want to emphasize that I take issue

17  with some of the circumstances or some of the ways that

18  opposing counsel has framed the facts in this case.  I think

19  that that highlights why a preliminary injunction is important

20  here.

21        This question, whether there was a validly, a valid,

22  validly assented or whether Mr. Vidal assented to an agreement

23  to arbitrate is necessarily for the Court to decide and if

24  there are questions that go to formation, that go to the

25  voluntariness of Mr. Vidal's assent, then they necessarily,

38

1  whether or not there's a validation delegation provision, must

2  be resolved by this court before the arbitrator has any

3  authority to proceed.

4          MR. BARAN:  If I may, Your Honor.

5          THE COURT:  Yes, of course.

6          MR. BARAN:  On the question of whether there's a

7  duty to mislead, I would agree with my co-counsel that there

8  isn't an abstract duty, but there's an analogous circumstance

9  that New York courts have recognized in the language context.

10         So it's recognized that just because it gives a

11  Spanish-speaking worker, for example, an agreement in Spanish

12  does not, or an agreement in English and they don't understand

13  it, that doesn't obviate that worker's ability to get counsel

14  or translator and find a way to read that agreement, but there

15  is case law that recognizing if you mislead that worker about

16  what the contents of that agreement are or what the

17  complications are, that that is a formation issue.

18         I think it's very similar here where the agreement

19  was presented as though there was no issue with liquidated

20  damages provision in the prior agreement.  That is a kind of

21  misleading that goes to formation and interferes with his

22  ability, with our client's ability to understand what the real

23  choice is in front of him.  And it goes to -- so it's both the

24  formation issue and, as we've discussed, a procedural

25  unconscionability issue because it's really that superior

1 party exercising its power in this situation and manipulating

2 the circumstances in its favor by not presenting a free and

3 clear choice.

4          THE COURT:  Okay.

5          MR. DICKINSON:  Your Honor, may I be heard on that

6 issue?

7          THE COURT:  Sure.  I was just about to ask if either

8 party had anything else to say on contract formation before we

9 get to the details of this particular contract.  So knowing

10 how eager you are to move onto those other issues, I will

11 still allow you to address this one.

12          MR. DICKINSON:  Your Honor, I think Attorney Baran's

13 argument with respect to suggesting that in some way, having a

14 person that doesn't speak the language that's set forth in the

15 agreement.  On top of that -- we're not obligated to translate

16 the agreement for them to begin with but, second, then if you

17 mislead them on top of that, it might be an issue that would

18 suggest that they were misled.  None of that is present here.

19          THE COURT:  I think he was just offering it as an

20 analogous body of law and I think agreeing with you.  The way

21 I understood his argument was not that this is equivalent to

22 giving someone a contract in another language but, instead,

23 that he was agreeing with you that there's no affirmative

24 obligation to make sure they understand it by giving it to

25 them in a language that they do understand, that it's on the

1  worker to go out or the party to the contract to go out and

2  get it translated before they sign it, but that even when

3  there's no affirmative obligation, it is the obligation of the

4  drafter not to deceive or mislead affirmatively the person who

5  didn't draft the contract as to its contents.

6       I don't think either party, as I understand it,

7  disputes, correct me if I'm wrong, that that is the law, that

8  there's an affirmative obligation on the part of the drafter

9  not to, through other communications, not to mislead the

10 non-drafting party.

11      I know that you would vigorously dispute, as you've

12 said, that you did, in fact, mislead Mr. Vidal in any way, but

13 let me just ask you this.  Do you agree with your opposing

14 counsel that New York law is very clear that the drafter

15 cannot affirmatively mislead the non-drafter as to any

16 material terms in the contract?

17      MR. DICKINSON:  Your Honor, yes, and I would -- I

18 don't think that the term "feedback" as it's used in that

19 letter and not in the agreement and in that letter can be

20 construed as misleading.

21      It may not be complete and total disclosure of all

22 of the factors that led to the suggestion that there should be

23 a reformation of the contract to address some potentially

24 problematic conditions, but that does not rise, and that's why

25 I'm addressing the issue, I'm questioning the analogy, is it

41

1    does not rise to an active misleading about what the actual

2    content of the agreement is.

3           THE COURT:  How about the part of the cover letter

4    that says there's no liquidated damages provision -- well, no,

5    I think I understand your point.  I'll withdraw that.  All

6    right.  I understand.  Thank you.

7           Okay.  Let me -- anything else from plaintiff's

8    counsel on the contract formation issue before we move on?

9           MR. SELIGMAN:  No, Your Honor.

10          THE COURT:  Okay.  Thanks.

11          All right.  So, Mr. Baran, let me ask you about the

12   delegation clause.

13          I didn't think that your opening brief or your reply

14   brief really grappled with the Second Circuit's decision in

15   the DDK case and, specifically, the part of the test that

16   looks at the language of the contract itself to see if there's

17   a clear and unmistakable delegation because the contract, the

18   2022 contract, obviously, we're talking about says that any

19   dispute in the contract including, and this, I think, is the

20   most problematic clause for your client, the validity thereof

21   shall be resolved by arbitration.

22          So why isn't that as clear and unmistakable as it

23   gets?  How can a contract be any more clear than saying we're

24   delegating to the arbitrator the question of the contract's

25   validity?

42

1        MR. BARAN:  Thank you, Your Honor, for that

2  question.

3            So the first, the first thing I would point out is

4  that in that paragraph, it's actually unclear what the term

5  "agreement" means and it actually more logically appears to

6  refer to not the dispute resolution provision, but to the

7  first part of the agreement.  Right?

8            This dispute resolution is contained in a schedule

9  to the agreement but the way that this paragraph is drafted,

10  it sort of treats -- it's a reasonable reading, I think, to

11  say that "the validity hereof" refers to the agreement.

12        THE COURT:  What do you think it refers to?

13        MR. BARAN:  To the agreement, not to the dispute

14  resolution provision.  So, in other words, as to whether or

15  not the agreement, the first part of the agreement that is

16  setting out all of the obligations of the parties are valid

17  and enforceable.

18        THE COURT:  So I'm a little bit confused.  Didn't

19  your co-counsel just say a few moments ago that that's

20  actually my job is to decide the validity of the agreement and

21  the parties can't delegate that or by the agreement, do you

22  mean something else?

23        MR. BARAN:  I'm saying that in the -- if you look at

24  the way that the agreement is drafted, there's the agreement

25  and the schedule.

1           The dispute resolution provision says, you know, and

2    I'm just reading from it here:  "I agree that any dispute,

3    controversy or claim between me and employer including a

4    dispute arising out of or in connection with this agreement,"

5    which appears -- and then it says, "or the interpretation,

6    performance or breach" --

7           THE COURT:  Let me actually read along with you.

8    Tell me which page.  I want to pull up the 2022 contract.

9           MR. BARAN:  I'm sorry.

10          THE COURT:  Don't be sorry because you're reading

11   from it and I should have it handy when you're reading from it

12   so let me pull it up.

13          MR. BARAN:  This is document 236 on page 12.

14          THE COURT:  Okay.  Page 12.  This is in Schedule B?

15          MR. BARAN:  Yes.

16          THE COURT:  Okay.  Great.

17          MR. BARAN:  So this paragraph uses different terms

18   for "agreement" and "provision."  "Provision" refers to the

19   dispute resolution provision.  "Agreement" appears to refer to

20   the amended and restated employment agreement, not to the

21   schedule.

22          THE COURT:  Am I looking at, this is under --

23          MR. BARAN:  This is the very first paragraph.

24          THE COURT:  First paragraph of Schedule B, "As a

25   condition of my employment," that one?

44

1          MR. BARAN:  Yes.

2          THE COURT:  So let me look at this for just one

3     moment.

4          (Pause.)

5          THE COURT:  Okay.  So this is where he says, "I

6     agree that any dispute, controversy or claim arising between

7     me and employer," and then within that, I see what you're

8     arguing, there's kind of a sub paren which says, "A dispute,

9     controversy or claim arising out of, in connection with or

10    relating to this agreement or termination or validity hereof."

11          So what's the agreement that you think the

12    delegation of this validity question relates to?  What would

13    be an example of something that would be delegated under this

14    clause and what would not be?

15          MR. BARAN:  Well, I would, I guess, dispute that

16    this is a delegation clause at all.  It doesn't look on its

17    face like what we would expect a delegation clause to look

18    like but, you know, the other thing about the DDK case is that

19    we have to look at whether other aspects of the contract

20    create ambiguity as to the parties' intent.

21          THE COURT:  I know you're pointing to the other

22    language a court shall decide X, Y or Z which I want to get

23    to, but just sticking with this, I am having a little trouble

24    understanding why this is not a delegation clause because it

25    says all these disputes and the end of that parenthetical is

45

"shall be resolved by arbitration pursuant to this dispute
resolution provision," and this includes all these other
things.

I'm noting as I'm reading it, it even says statutory
claims for discrimination or harassment which defense counsel
has just told me earlier today cannot be subject to
arbitration.

So a little advisory note from the Court, you may
want to have your clients revise that provision as well but
I'm not going to issue an advisory opinion for plaintiff not
before this court for that. The record will reflect everyone
is chuckling in relief that this is not the case we're here on
right now.

In all seriousness, let's go back to my question
about what do you think that this Schedule B delegation
actually relates to?

MR. BARAN: Right. So I think that "agreement"
refers to everything before the schedules, and that that's a
reasonable interpretation of that provision, that basically if
there's any dispute about the wages that he's supposed to be
paid or the hours that he's working or sort of the questions
about what costs might be owing, that those are kinds of
questions that are the subject matter of the agreement.
Whereas --

THE COURT: And that if this was meant to delegate

46

everything under the sun or the entire arbitrability of any

dispute, that that would be in the agreement itself, not on

the schedule attached to the agreement?

MR. BARAN:  Well, the arbitrability or even these

questions about the arbitration provision would be spelled out

plainly and simply.

THE COURT:  Okay.  So it's not the place where

they're located, it's the context which leads you to believe

that it would be more specific.

So how -- I'm sorry to keep beating this horse but I

really want to understand.  What would a more -- what would be

a valid delegation clause?

If you were suddenly counsel for ACS and you were

drafting a valid delegation clause because you think this

language doesn't cover it, that would delegate, so we're all

on the same page though I know you all know this area probably

better than I do, that would delegate to the arbitrator the

question of the arbitrability of all aspects of the contract,

what would a valid delegation clause that is broad enough to

encompass arbitrability actually include?

MR. BARAN:  So here it's the agreement that defined

this schedule as the provision so there would have to be

language that says disputes about this provision are subject,

are, that the validity or enforceability of this provision are

the subject of, are for the arbitrator, not the court.

47

1          THE COURT:  Disputes about this provision meaning

2    the provision about arbitration?

3          MR. BARAN:  Yes.

4          THE COURT:  Okay.  I see.  And you don't think that

5    "validity hereof" is saying the agreement is encompassing

6    everything in Schedule B because schedule B is not part of the

7    whole agreement?

8          MR. BARAN:  I don't think so because of the way that

9    the paragraph is written in parsing out these terms,

10   "agreement" and "provision."

11         THE COURT:  Okay.  And I take it your next point is

12   the fact that I'm asking 15 questions about this indicates

13   it's not clear and unmistakable and not problems with my

14   logical reasoning but about the drafting itself?

15         MR. BARAN:  I would say, yes.

16         THE COURT:  Okay.  Has the advantage of flowering

17   the court as well as advancing your client's position.  All

18   right.  I think I understand your position.

19         You were going to make another point about context.

20         MR. BARAN:  Right.  So when we look at the rest of

21   the agreement, there are two, there are two other provisions

22   but, in particular, the second to last paragraph of the

23   provision, of Schedule B:  "I agree that in the event that any

24   court of competent jurisdiction shall determine that any

25   proportion of this provision exceeds the scope permitted

1  by" --

2      THE COURT:  Yes, I'm seeing that one.  This one I'm

3  familiar with, I'm familiar with the other one but this

4  language is a little less muddy.

5      So tell me what's your argument as to what this

6  clause is serving by way of a lack of clear delegation clause?

7      MR. BARAN:  Well, I think it is -- at the very

8  least, it makes it unclear whether there's been delegation of

9  those questions because it is contemplating explicitly the

10  possibility of judicial intervention, judicial review and blue

11  penciling specifically so it's contemplating a role for the

12  Court.

13      And I would note that, and, again, this language

14  uses the capital P, "Provision," that we saw in the first

15  paragraph.  So this paragraph is specifically contemplating

16  that courts are going to have roles in reviewing the

17  arbitration provision and its validity and enforceability.

18      I would point out with the DDK Hotels case that it

19  doesn't appear from the record there that there was any such

20  language like this paragraph in that arbitration provision and

21  that there's no, there was no dispute in that case that the

22  commercial rules were applicable.  What ACS has argued here is

23  that it's -- not that paragraph one alone creates a

24  delegation, but that it's the incorporation of the commercial

25  rules that creates the delegation.

49

1          The problem is that the commercial rules on their

2    face don't apply to this arbitration as, you know, the

3    arbitrator even herself found.  So, you know, it's a bit odd

4    to say at the very least and certainly not clear to say that

5    you can incorporate by reference a document that doesn't apply

6    to the dispute in question.  And that that somehow constitutes

7    a clear and unmistakable --

8          THE COURT:  Is your argument that the AAA employment

9    rules are the ones that are actually incorporated by reference

10   or that neither of them are?

11         MR. BARAN:  I would say neither of them are.

12         THE COURT:  Tell me why.

13         MR. BARAN:  Well, you don't get to sort of say we

14   can use the commercial rules but in the event they don't

15   apply, we just sub in the employment rules.  That's a rewrite

16   of the text of the agreement.  They don't -- this agreement

17   doesn't refer to the employment rules at all and, in fact, it

18   wasn't ACS's intent that the commercial rules would apply,

19   that our client would be forced to bear half the costs of the

20   arbitration and also bear, if he lost, his attorney's fees and

21   costs of arbitration.

22         THE COURT:  Okay.  Anything else you want to say

23   about the question of whether the contract is clear and

24   unambiguous in the delegation?  You have it covered?

25         MR. BARAN:  One thing I would just want to add is

50

1    that the arbitrator herself couldn't find a basis for those

2    issues that have been delegated.  She just said, she basically

3    said she had authority to rule on her own jurisdiction

4    pursuant to the AAA's rules.  She didn't cite specific

5    language in the arbitration provision that gave her that

6    authority, and I would argue because there is none, and she

7    has continued not take any of these threshold concerns

8    seriously and she's just -- or whether she even has

9    jurisdiction to rule on those issues.  And I think this goes

10   to the reason why --

11        THE COURT:  A part of the reason she hasn't done

12   that is because you have been contesting her authority in the

13   beginning and asking for stays and pauses.  She's saying, on

14   the one hand, you don't want to rack up fees and have your

15   client submit to arbitration, I think I have the authority to

16   do this but you're asking me to stand down so I'm going to

17   stand down for a month or two while you try to get that judge

18   in New York to pause the whole thing.

19        MR. BARAN:  She actually just said that the

20   arbitration keeps going and we'll deal with any of those

21   issues later and the problem for our client is that that means

22   he keeps incurring costs and fees including his own attorney's

23   fees because he would have to hire an attorney to defend him

24   in that arbitration.

25        I think that in our system of justice, right, we

1  take it as a given that the Court can't take action against

2  you without establishing that you're subject to its

3  jurisdiction.  The same has to be true for arbitration because

4  the Supreme Court has said arbitration is a matter of consent,

5  not coercion.  So the party who is seeking to subject another

6  one to arbitration has to show that it's doing so pursuant to

7  a valid and enforceable arbitration clause that establishes

8  that arbitrator's jurisdiction but there, there just continues

9  not to be any reckoning on the arbitrator's behalf or ACS's

10 behalf whether there actually is jurisdiction here and we

11 don't just skip over those questions.

12        That's why there's irreparable harm in letting this

13 arbitration proceed right now because, ultimately, it's

14 letting an entity, in this case, the AAA, that doesn't have

15 authority, assume that jurisdiction over you and that's kind

16 of Kafkaesque for the arbitrator to just keep saying I have

17 authority because the rules say I have authority to decide my

18 jurisdiction.

19        THE COURT:  Without looking at the specific terms of

20 the contract.

21        MR. BARAN:  Correct.

22        THE COURT:  That is, by simply saying by virtue of

23 the rules, I have authority without even looking as to whether

24 they're clearly incorporated or not or there's a valid

25 delegation clause or not and what the scope is.  I think I

52

1    understand your position on that.

2           All right. Let me -- I'm going to hear from defense

3    counsel on those issues but, first, while I have you, let me

4    ask you about another issue which is let's assume, and I'm not

5    sure which of you is arguing this so if it's Mr. Seligman, let

6    me know, but let's assume that I find that there is a valid

7    delegation clause under DDK and other cases given that

8    validity language so that would, you know, assume that I find

9    that the parties did contract to have the arbitrator determine

10   these questions of arbitrability which would include the

11   enforceability of the contract and the scope.

12          So what authority would I be able to reach your

13   Trafficking Victims Protection Act case claims or federal wage

14   and hour claims and unconscionability because isn't that

15   really -- if the arbitrator has the jurisdiction to decide the

16   validity of the entire contract, how can I take from her the

17   authority to rule on whether a particular provision violates

18   federal law?

19          If I have jurisdiction over the whole contract, if

20   there was no valid delegation clause, I could look at

21   everything, but if she's got the football, doesn't she get to

22   keep it and decide about whether federal wage and hour laws

23   apply and the like?

24          MR. SELIGMAN:  Your Honor, I think that before we

25   decide whether she has the football, there's two questions.

53

1  Right?  The first question is whether there's a clear and

2  unmistakable delegation provision.

3         THE COURT:  Yes.

4         MR. SELIGMAN:  Which is what you've --

5         THE COURT:  Let's assume I think there is, right?

6  That there is a delegation provision which, of course,

7  references arbitrability as a whole.  So let's assume that I

8  agree with defendants on that.  What else could your client

9  hope to get from me at this stage with respect to particular

10  provisions, "loser pays," other, you know, even potentially

11  the lost profits claim under either substantive

12  unconscionability, procedural unconscionability?  What's left

13  if the delegation clause is valid?

14         MR. SELIGMAN:  Well, deciding that it's clear and

15  unmistakable is not deciding that it's valid.  There's a

16  second question about whether the delegation provision itself

17  violates the Trafficking Victims Protection Act, violates the

18  Fair Labor Standards Act and is unconscionable as a matter of

19  New York law.  And not just the Federal Labor Standards, but

20  as to the New York wage and hour law.

21         THE COURT:  So let me see.  I think I understand

22  your argument on this point but I want to make sure that I do.

23         Is your argument that the delegation clause, even if

24  they're unmistakable, might be invalid because delegating to

25  the arbitrator these questions of whether the penalties in the

1  contract violate the laws against trafficking, wage and hour

2  laws and the like, the mere fact of your client having to hire

3  an attorney and appear to defend himself, whether there's fee

4  shifting or not, with the risk that there might be fee

5  shifting at the end, right, that that in itself, the risk that

6  he could end up losing his argument and having to pay

7  attorneys' fees, lost profits, that the risk that he could end

8  up stuck with that bill at the end of arbitration is such a

9  serious harm, threat, that it would essentially force him to

10  continue working in his job, just litigating the question of

11  arbitrability or am I confusing that?

12          MR. SELIGMAN:  The forcing him to stay in his job

13  goes to the TVPA question.

14          THE COURT:  Right.

15          MR. SELIGMAN:  There's a separate question about

16  whether the delegation provision, and the fact that the "loser

17  pays" term applies to it as well, is, renders the delegation

18  provision unconscionable and the fact that the "loser pays"

19  term, and insofar as it applies to the delegation provision

20  which it does, renders the delegation provision unenforceable

21  under the wage and hour laws, but you're, the point is right,

22  right?

23          So one way of thinking about a delegation provision,

24  and sometimes courts frame the issue in these terms that I

25  think is helpful, is a delegation provision is sort of a mini

1   arbitration clause.  Right?  It's an arbitration clause inside

2   a bigger arbitration clause.  Now one difference between an

3   arbitration clause generally and a delegation provision is

4   that the presumption of arbitrability doesn't apply but the

5   presumptions are reversed.  Right?

6           So there's a clear and unmistakable standard

7   pursuant to Rent-A-Center, but aside from that difference, we

8   can, I think it's useful to think of it as a mini arbitration

9   clause and challenges regarding the enforceability of this

10  mini arbitration clause are for the court.  Right?  The

11  arbitrator does not have authority absent a delegation

12  provision that is both clear and unmistakable and that is

13  valid.

14          THE COURT:  So talk to me about the validity piece.

15          MR. SELIGMAN:  Yes.

16          THE COURT:  Because let's say that I find that it's

17  clear, what ground would I have to find that it's not valid,

18  that this mini arbitration provision, you know, which, in

19  effect, would require both parties to appear before the

20  arbitrator, and I keep wanting to say litigate, but argue and

21  present their case to the arbitrator over this question of,

22  what, whether the delegation is valid?

23          What would be, what would be contested in the mini

24  arbitration and why would it not be valid for your client in

25  this case?

1          MR. SELIGMAN:  It's not valid for many of the same

2   reasons that we don't argue that the arbitration provision as

3   a whole is invalid.  It violates the TVPA, it violates wage

4   and hour laws and it violates -- and it's unconscionable.

5          So just as one example, and this is, this is a sort

6   of skip ahead to a merits issue that received, that we

7   briefed.  It wasn't really addressed in the opposition so it's

8   briefed relatively minimally, although is set out at greater

9   length in our complaint in this case.

10          There are lots of courts that have held that a

11  "loser pays" term is fundamentally incompatible with one-way

12  fee shifting provisions in federal statutes, like the TVPA and

13  the Fair Labor Standards Act.  The idea is Congress made a

14  determination that these go one way and not both ways.

15          So in this delegation, per the delegation provision,

16  assuming it exists, would be a mini arbitration agreement that

17  says if the arbitrator decides questions of validity, and

18  pursuant to the "loser pays" term which also applies to the

19  delegation provision, if at the end of the case, Mr. Vidal

20  loses, right, the fees go back the other way.  So what that

21  means for Mr. Vidal in this case is one of the, some of the

22  best arguments he has that the arbitration provision as a

23  whole is unenforceable are that the arbitration agreement as a

24  whole involves, would affect trafficking and that it affects

25  the violation of the wage and hour laws, and in making that

57

1   argument, pursuant to federal law, he should have the benefit

2   of one-way fee shifting, not bilateral fee shifting pursuant

3   on a "loser pays" term.

4          THE COURT:  And any delegation clause that

5   incorporates fee shifting, by definition, is invalid because

6   it's so clearly in conflict with FLSA, for one, which only has

7   one-way fee shifting.

8          MR. SELIGMAN:  So I think that it would be invalid

9   in cases where the, where the parties, where it chills the

10  party, realistically chills the party from asserting claims

11  under those laws.

12          So ACS has argued, well, you shouldn't look at the

13  one-way fee shifting in the FLSA, you shouldn't look at the

14  one-way fee shifting in the TVPA, because this is a breach of

15  contract case.  Now, of course, Mr. Vidal, in defending

16  himself against the breach of contract action and in disputing

17  the validity of the arbitration provision, would want to mount

18  arguments under the TVPA and the FLSA which codify Congress'

19  view that one-way fee shifting is critical for incentivizing

20  victims of those violations to assert those claims, and in

21  this case, you know, the delegation provision strips him of

22  that Congressionally mandated right to one way, one-way fee

23  shifting.

24          So, so I would hesitate and I would hazard to say

25  that there's a rule that any delegation agreement that

58

1   includes "loser pays" is unenforceable, but in cases where one

2   of the parties to the agreement realistically may allege

3   claims under laws that included one-way fee shifting, I think

4   it is.

5          THE COURT:  Okay.  Right.  And by "realistically may

6   allege claims," the fact that at least liquidated damages have

7   been successfully challenged under those statutes.  Maybe it's

8   not a perfect analogy but tell me why, what's your ground for

9   finding that it would be realistic as opposed to he could

10  bring a claim under some, you know, law that obviously doesn't

11  have anything to do with this, an environmental law or

12  something else?

13         MR. SELIGMAN:  You know, I think a delegation

14  provision with one, with bilateral fee shifting between two

15  commercial entities that aren't going to assert claims under

16  the FLSA or the TVPA, I don't think that that would be

17  invalid.

18         THE COURT:  I mean there's no dispute that because

19  he's an immigrant worker her on an LPR and because he's an

20  hourly wage worker, that he is part of the class that is

21  subject to both the FLSA and the TVPA?

22         MR. SELIGMAN:  That's right.

23         THE COURT:  Okay.  All right.  Understood.

24         Okay.  So just to sum it up because I asked you a

25  number of sub questions in there, tell me in your own words so

59

1   I make sure your argument if not all fee shifting cases per se

2   invalidate a delegation clause because they contain "loser

3   pays," that is not all -- let me rephrase that.

4          If not all delegation clauses which contain "loser

5   pays" provisions are per se invalid even if they're clear and

6   unmistakable, tell me what authority I have to find this one

7   invalid?

8          Is it because of the chilling effect under the TVPA,

9   because of the threat of this mini arbitration potentially

10  costing him thousands, tens of thousands of dollars and that

11  that would chill him from leaving this employment?  What's the

12  practical effect of having that clause as opposed to waiting

13  for the results of the mini arbitration, as you put it?

14          MR. SELIGMAN:  And really the question about

15  severance?

16          THE COURT:  Yes.

17          MR. SELIGMAN:  Which I want to make sure we circle

18  back to that.

19          THE COURT:  Yes.

20          MR. SELIGMAN:  But I think your question is, and

21  correct me if I'm misstating it, is on what basis is the

22  delegation provision, assuming it is clear and unmistakable,

23  on what basis is it unenforceable, right?

24          THE COURT:  Yes.

25          MR. SELIGMAN:  So I highlighted one basis which is

1  that it conflicts with the bilateral, the "loser pays" term

2  conflicts with the one-way fee shifting protections in the

3  FLSA and the TVPA.

4      Another basis is that the delegation provision

5  violates the TVPA, the substantive protections of the TVPA,

6  because the delegation provision itself threatens Mr. Vidal

7  with thousands of dollars in costs he cannot afford because he

8  left his job, right?  And in fact, you know, and we've briefed

9  this at length, ACS uses the threat of attorneys' fees and

10 arbitration costs in an effort to coerce him to stay at his

11 job.

12      Then in addition we say it violates the substantive

13 protections of the Fair Labor Standards Act and State wage and

14 hour law and that is because through our underlying

15 arbitration, based on the face of the contract, we argue that

16 ACS is seeking an illegal kickback and, therefore, any costs

17 or fees associated with their effort to collect that kickback

18 are a violation of federal and state wage and hour laws.

19      I'd be happy to get deeper dive into that analysis

20 as well.

21      THE COURT:  Okay.  I do have some questions about

22 that but let me circle back to it.  I understand your argument

23 on the first two, "loser pays" and TVPA.  I'm not sure that I

24 understand your argument about lost profits being equivalent

25 to the things that courts have found to be an illegal

1   kickback.  So remind me if I don't come back to that.

2          MR. BARAN:  Absolutely, Your Honor.

3          THE COURT:  And we'll come back to severance as

4   well.  Are there any other grounds besides the three you

5   listed so I make sure I get them all?

6          MR. SELIGMAN:  And unconscionability.

7          THE COURT:  Unconscionability as a substantive and a

8   procedural matter.  And where does that play or how is it

9   different from these other arguments that you've made other

10  than it's New York law?

11         MR. SELIGMAN:  The unconscionability question,

12  again, New York law on this point is perhaps clearest in the

13  Valle case.  The question set out in Valle and the cases it

14  cites is basically whether the costs of, the potential costs

15  of the arbitration pursuant to "loser pays" provision are,

16  would, you know, substantially impede the party seeking to

17  invalidate the clause from asserting his rights under the

18  provision based on his circumstances and, for example, his

19  resources and whether he can afford to pay those costs and in

20  light of likely costs of the arbitration.

21             You know, from our briefing, we want to engage in a

22  sliding scale analysis and in our case, we think that the

23  substantial procedural unconscionability reduces the need, the

24  threshold for establishing substantive unconscionability but

25  even with a minimal showing of procedural unconscionability.

1          THE COURT:  Right.  And I know it's can be difficult

2   to fix a precise dollar amount, but the letter that ACS sent

3   to Mr. Vidal urging him to quickly return to his job after he

4   initially resigned in which they said he would get, risk at

5   least $20,000 in penalties plus fees, et cetera, I view that

6   as an estimate of the entire liability he might bear, not the

7   liability from the delegation clause or this mini arbitration

8   over arbitrability.

9          If I'm going to assess it on a sliding scale as you

10  urge me to do, how would I fix what those costs might be?

11  Should I say, you know, the hourly rate -- the cost piece, so

12  just the attorneys' fees, if I were to take the hourly fee for

13  the defendant's attorney plus your client's attorney, how do I

14  decide kind of what a reasonable estimate is of what that

15  would ultimately cost to assess whether it's the kind of thing

16  that would impede him from exercising his rights under various

17  other statutes?

18          MR. SELIGMAN:  Well, first of all, Your Honor, we

19  can't ignore the cost piece because unconscionability, like

20  the TVPA and like the FLSA, assesses enforceability at the

21  time that the contract is entered into based on the language

22  in the contract, and we cite numerous cases on this point, but

23  courts, especially recently, courts are identifying the ways

24  in which allowing drafting parties to undo some of the unfair

25  aspects of an arbitration provision after the fact, how that

1  incentivizes drafter overreach.

2        So the costs and the cost-shifting mechanisms of

3  this agreement are apparent on the face of the agreement and

4  we should be assessing --

5        THE COURT:  So the fact that defendants later said

6  we'll waive the cost is immaterial because it was in the

7  contract at the time it was signed and ratified by the parties

8  and at the time really that Mr. Vidal was making a decision

9  whether to leave or stay in his employment?

10       MR. SELIGMAN:  That's right.  I mean in this case,

11  they didn't say they just waived them.  It was only after the

12  arbitrator ruled against, ruled that the employment rules

13  applied, that they have appeared to suggest that the cost

14  wouldn't be shifted, but it's besides the point.  Right?  The

15  fact is look at the contract as written to determine whether

16  it's unconscionable.

17       THE COURT:  Okay.  What about the fees piece?

18       MR. SELIGMAN:  So on costs, we have $2,000 plus

19  $400 an hour, $450 per hour for the arbitrator.

20       In terms of the attorneys' fees, based on the Laffey

21  Matrix, right, I think we would be looking at, for an

22  attorney, just one attorney with 15 years of experience, we

23  would be looking at hourly fees of about $850 per hour.  So,

24  you know, it only takes about 25 hours to get you to $20,000.

25       We know and Mr. Vidal has attested in his

1    declarations that he can't even afford the $2,000 that, you

2    know, the initial sort of filing fees which would be shifted

3    to him under the --

4         THE COURT:  -- the price of admission as opposed to

5    what it would take to actually continue to litigate or contest

6    the arbitrability.

7         MR. SELIGMAN:  Any of these issues.

8         I should say it's also relevant that, you know, the

9    arbitrator has appeared to assume that Mr. Vidal's trafficking

10   and FLSA arguments, right, which go to the validity of the

11   contract can only be assessed after complete discovery and

12   presumably prolonged litigation.  So the delegation question

13   here, meaning the enforceability question here, is likely to

14   be a substantial inquiry that will require substantial

15   litigation and we would imagine the costs continuing to arise

16   well beyond what Mr. Vidal --

17        THE COURT:  I mean, I haven't seen any cases that

18   say that a court has to be able to precisely affix a cost to

19   assess where on the sliding scale this falls, but I think some

20   assessment of what is involved, even at the low end or the

21   rough end is necessary.  So I -- it seems as though those

22   assertions, in terms of what it would cost, are disputed.  I

23   know that defense counsel has a lot of responses to the

24   substantive points about why these particular provisions are

25   or are not unconscionable.

1        So let me then turn back to defense counsel for a

2  moment.

3        Let's go back to the language of the delegation

4  clause and I want to hear your response to Mr. Baran's point

5  about that language in Schedule B and why you think it clearly

6  and unmistakably references arbitrability as opposed to the

7  things in that particular passage.

8        MR. DICKINSON:  Well, to begin with, Your Honor, I

9  think opposing counsel is taking contradictory positions on

10  the agreement.

11        On the one hand, they argue that the entire

12  agreement is not valid, it's not enforceable and it has to be

13  considered in its entirety, but then when it comes to talking

14  about the delegation clause, Mr. Baran has said, Oh, no, you

15  only look at the Schedule B, it's a separate item, and he

16  tries to parse the language.  So I take exception --

17        THE COURT:  I think that was because I asked him to

18  presume that I didn't hold the entire contract valid and

19  enforceable.  So I think they're permitted to argue in the

20  alternative just as you are.

21        MR. DICKINSON:  Understood.

22        THE COURT:  So in the world where I am focused like

23  a laser beam on what I think you actually both started with

24  and I'm looking at the language of the delegation clause, why

25  don't you tell me what's your best argument in response to

1   their claim that this is insufficiently clear and

2   unmistakable?

3          MR. DICKINSON:  Well, Your Honor, I think just to

4   continue slightly with respect to the issue about there being

5   some kind of a distinction between "provision" and

6   "agreement," the first sentence of the, of this, of the

7   dispute resolution provision says, refers to an exception, the

8   only exception under the agreement that is not subject to

9   arbitrability, and that is enforcement of the restrictive

10  covenants as provided in 6C of the agreement.

11         So it talks about --

12         THE COURT:  Tell me where you are?  I'm looking at

13  the first paragraph of Schedule B.  Are you somewhere else?

14         MR. DICKINSON:  No, the first paragraph.  "As a

15  condition of my employment."

16         THE COURT:  Got it.

17         MR. DICKINSON:  And then it says, "The only

18  exception is the employer's enforcement of restrictive

19  covenants."

20         So if there was an issue about trying to pursue a

21  preliminary injunction to prevent him from violating

22  restrictive covenants that are set forth in the agreement,

23  that would go to court.

24         THE COURT:  What do you think "restrictive

25  covenants" contemplates in the context of this employment

1   contract?

2          MR. DICKINSON:  It's specified in paragraph 6C of

3   the agreement.  It talks about restrictive covenants, the

4   non-solicitation and things of that nature, not at issue in

5   this case at all.  But just, I'm using that as an example of

6   the first sentence says that this provision applies to the

7   agreement and the sentence goes on to, the paragraph goes on

8   to say:  "Any claim arising out of, in connection with or

9   relating to the agreement."

10         "The agreement" is clearly referring to the entirety

11  of the agreement between the parties including this provision

12  and, as Your Honor has picked up earlier, on the "related to."

13  This is a textbook broad arbitration clause.  There is nothing

14  vague.  There is nothing confusing about this.  And to the

15  contrary, the fact that we referenced the DDK, to reinforce

16  that conclusion, DDK and other cases have said if there's

17  reference to arbitration rules, that also reinforces that.

18         THE COURT:  I understand that that's a relevant

19  factor.

20         MR. DICKINSON:  And with respect to the issue about

21  commercial or employment laws, whether they apply, it doesn't

22  matter.  They both have the same provision.

23         Paragraph 6 in one, and paragraph 7 in the other

24  both say that the arbitrator can rule on arbitrability.

25  That's -- it doesn't matter.  If we had not specified

68

1   commercial under there, we would have gone to the arbitrator

2   and said which rules apply, commercial or employment, with

3   respect to arbitrability, in a delegation of arbitrability, it

4   doesn't matter.  They both say that the arbitrator can decide

5   arbitrability.

6           So this is as broad a clause as you are going to

7   find.

8           THE COURT:  So is it your view, let me just see if I

9   get this right, that the paragraph we're looking at, Schedule

10  B, carves out what is included in Section 6C of the agreement?

11          MR. DICKINSON:  That's it.

12          THE COURT:  So now I'm looking at 6C that you'll be

13  entitled to -- so this is injunctive relief.  So you're saying

14  that any damages for the breach are -- you wouldn't be able to

15  go to arbitration to get an injunction because that's outside

16  the scope of what the arbitrator would do.

17          MR. DICKINSON:  No, Your Honor.  What this says is

18  in Section 6 of the agreement, the confidentiality and

19  non-solicitation provision --

20          THE COURT:  Right.

21          MR. DICKINSON:  -- and if Mr. Vidal --

22          THE COURT:  I see, if he breaches the

23  confidentiality agreement, understood.

24          MR. DICKINSON:  If he had done that, that would have

25  been the only exception under the agreement where we can go to

69

1    court.

2          THE COURT:  I didn't think I was having a big Perry

3    Mason moment here and you all had missed it.  I just wanted to

4    check.  It's always nice when it happens.

5          MR. DICKINSON:  Sorry, Your Honor.

6          THE COURT:  All right.  So we can move on from that.

7          So I understand your position, that this sole

8    carveout is for Section 6C related to the confidentiality.

9    Anything else you want to say about plaintiff's interpretation

10   of this clause and what "agreement" means and what the

11   significance of capital P "Provision" is?

12         MR. DICKINSON:  Only, Your Honor, that I think that

13   that is a, an invalid argument, that it's clearly that this

14   provision applies to the entire agreement, and if there is any

15   confusion -- well, one thing.

16         The exception rule, this agreement is broader than

17   most.  Many agreements have other exceptions.  Some of the

18   cases cite to workers' compensation, unemployment claims,

19   things of that nature, that there are a laundry list of things

20   that might be excepted from the agreement.  The only thing

21   excepted from this agreement is the right to pursue injunctive

22   relief in court in the event of a violation of 6C.

23         So this is -- contrary to what counsel says, this is

24   actually a broader agreement than you will encounter in many,

25   in many broader delegation clauses and you are going to

1  encounter in many agreements that you might see or you'll see

2  in any of the authority that was cited and we may bring to

3  your attention in subsequent briefing.

4       THE COURT:  Okay.  Let's flip the page, unless you

5  have something else to say about that paragraph.  I think I

6  understand about what that was intended to include.

7       All right.

8       MR. DICKINSON:  If I may move on to the "loser pays"

9  issue.

10       THE COURT:  No.  Let's actually go, before we get

11  off the delegation clause --

12       MR. DICKINSON:  Okay.

13       THE COURT:  -- let's go to the next page which is

14  the paragraph above the bolded paragraph midway that starts

15  with, "I agree that in the event any court of competent

16  jurisdiction."  Do you see that one?

17       MR. DICKINSON:  Yes.

18       THE COURT:  So this is the language obviously

19  expressly contemplating that a court, as opposed to an

20  arbitrator will potentially invalidate certain portions of the

21  agreement which may include the delegation clause which may,

22  in turn, include anything else in the agreement, that there's

23  a severability provision.  It certainly suggests that there

24  would be some court involvement.

25       So how can that be reconciled with your argument

1  that the preceding page clearly and unmistakably delegated all

2  questions, including arbitrability, to the arbitrator and not

3  to a court?

4          MR. DICKINSON:  And I'm sorry, Your Honor, I think I

5  missed it.  Which provision are you looking at?

6          THE COURT:  So if you look on the second page of

7  schedule B?

8          MR. DICKINSON:  Yes.

9          THE COURT:  There's a bolded paragraph at the bottom

10  that says, "I understand that in a lawsuit in court."

11          MR. DICKINSON:  Yes, Your Honor.

12          THE COURT:  So above that, it says, "I agree that in

13  the event that any court of competent jurisdiction shall

14  determine any portion of this provision exceeds the scope

15  permitted by applicable law, the court shall have the

16  authority to modify or blue pencil such portion so as to

17  render it enforceable while maintaining the parties' original

18  intent to the maximum extent possible.  If a court determines

19  that a legal dispute shall not be resolved by arbitration for

20  any reason, the dispute or claim shall be decided by a judge

21  without a jury."

22          So what is this provision doing in here if I agree

23  with your view that the paragraph on page 1 said everything is

24  going to arbitration including arbitrability except for this

25  limited carveout for confidentiality breaches?

72

1        MR. DICKINSON:  Your Honor, I think I may be able to

2   give you your Perry Mason moment.

3        THE COURT:  All right.  Go ahead.  Let's see.

4        MR. DICKINSON:  You pointed out that in the first

5   paragraph, it includes discrimination or harassment.

6        THE COURT:  Yes.

7        MR. DICKINSON:  The harassment provision is no

8   longer arbitrable at this juncture.  This is a savings clause

9   that says if a provision, and as I started to describe at the

10  beginning of my argument that step three of the analysis that

11  the Court should be applying is Congress intended the claim to

12  be non-arbitrable, the Court would decide that in that initial

13  analysis.  If this were a harassment case and we were seeking

14  to compel arbitration, you would then say no, Congress has

15  expressed an intent that the claim is non-arbitrable.  Then

16  this says that the Court can apply it without a jury involved.

17       THE COURT:  Well, but under your view, wouldn't

18  Mr. Vidal -- let's say Mr. Vidal claimed he was sexually

19  harassed in his employment and that's the reason he quit.

20       Wouldn't you be sitting here saying he has to go to

21  arbitration to have an arbitrator determine that, whether

22  there's a carveout or not, that everything related to

23  arbitrability is sent to an arbitrator?  What would I be doing

24  here?

25       MR. DICKINSON:  Your Honor, again, going back to In

1  Re: American Express and its progeny, Doctors Associates as

2  well, the third step of the analysis is if there's a dispute

3  within the arbitration agreement unless there's Congressional

4  intent to the contrary.

5          So if we came here and those were the facts that

6  were before the Court, then in this standard analysis, the

7  Court can say there is a Congressionally expressed intent to

8  not let those cases be arbitrated.

9          THE COURT:  I mean I would essentially be

10 invalidating the delegation clause as to those claims.  I

11 would be invalidating the portion of page one as to those

12 claims.

13         MR. DICKINSON:  With respect to the harassment --

14         THE COURT:  Yes.

15         MR. DICKINSON:  -- because Congress has told you you

16 must.  Congress has made that decision.

17         THE COURT:  All right.  And you think it's a

18 distinction with the difference that Congress has said there's

19 no "loser pays" provision in FLSA claims, for example?

20         MR. DICKINSON:  Well, Your Honor, that's a little

21 bit more subtle discussion that I will transition to, but what

22 I will say it's not me that says that Congress has to express

23 its intent as to what won't be arbitrated.  It's the Supreme

24 Court of the United States that said that.  Unless the

25 Congress expresses that a particular claim is not subject to

74

1  arbitration, the court can't step in and render it not subject
2  to arbitration.
3       THE COURT:  I guess I'm still wondering what is this
4  reservation, the statutory claim for discrimination or
5  harassment, doing in an agreement drafted in 2022 when the
6  Congressional intent to exclude those from arbitration has
7  been clear for many years.
8       MR. DICKINSON:  That's not, that's not entirely
9  accurate, Your Honor, and I can tell you, I have a case
10 pending right now where an employee claimed sex discrimination
11 and age discrimination but the case doesn't set forth any
12 claims for harassment, only the harassment component would
13 not -- and then we would have a different set of
14 circumstances.
15      THE COURT:  Let me refine my question.  Why is
16 harassment in here given that you've agreed that's a carveout?
17      MR. DICKINSON:  As you pointed out, Your Honor, it's
18 an advisory opinion that it should be removed from the next
19 generation of this agreement.
20      THE COURT:  Okay.
21      MR. DICKINSON:  But the extent of your power,
22 Your Honor, is twofold.  One is if you can identify something
23 that Congressional power, clear Congressional expression that
24 something should not be subject to arbitration, you can carve
25 that out, and then the fourth step of the analysis is you have

1   to decide whether the rest of the case goes through with

2   arbitration and that claim stays separate.

3          So that's not this case but in a case, like my case

4   that's pending right now, if I had a situation where she

5   claimed both discrimination, disparate treatment,

6   discrimination and sexual harassment, that judge would have to

7   decide whether to stay the entire matter or just carve out the

8   harassment claim and that will be considered at a later day

9   and let everything else go forward in arbitration, but that's

10  not this case.

11         THE COURT:  Okay.  I think the concern I have about

12  your argument here as well --

13         MR. DICKINSON:  Your Honor, one last thing?

14         THE COURT:  Yes.

15         MR. DICKINSON:  The Congressional expression of

16  intent that sexual harassment is not a subject of arbitration

17  became effective on March 3, 2002, months after this agreement

18  was issued and signed by Mr. Vidal.

19         THE COURT:  Well, I think -- I'm glad you disclosed

20  that because then doesn't that significantly undermine the

21  point you made that they were expressly reserving this in

22  contemplation of harassment only being a ground?

23         I mean aren't they saying a court could at any time

24  or Congress could decide at any time that there are carveouts

25  or there are things that are not valid or a court can examine

 1   it for unconscionability?  If there was no specific statutory

 2   ground, what would be the purpose of this except to say that

 3   courts can decide questions of arbitrability as they deem

 4   appropriate under the particular claim?

 5          MR. DICKINSON:  That's not what I said, Your Honor.

 6          THE COURT:  Okay.

 7          MR. DICKINSON:  What I said was in the event, so --

 8          THE COURT:  Tell me again, now that we understand

 9   the history that the Congressional intent on harassment was

10   not, postdated this contract, what do you think the purpose of

11   this court's competent jurisdiction provision is?  What was it

12   intended to cover and why is it in here?

13          MR. DICKINSON:  If this was a harassment claim as

14   I've tried to explain, the standard analysis that's

15   articulated in In Re: American Express, following Doctors

16   Associates, is there an agreement, is there a dispute within

17   the arbitration agreement -- three, number three, is there a

18   clear Congressional intent that a claim, a claim, is

19   non-arbitrable.  If so, then do we stay, and then what does

20   the court do in terms of staying some portions of the claim

21   and not other portions of the claim.

22          This provision comes into play as of March of 2022.

23   This is a savings clause that if, if a claim -- and look, I

24   don't know, maybe through the efforts, the advocacy efforts of

25   Towards Justice, they're able to prevail on the United States

77

1    Congress to say that TVPA claims have to be carved out of

2    arbitration clauses.  Then, Your Honor, this provision would

3    come into effect.  Just like if this was a harassment claim,

4    you would carve out the sexual harassment claim from the

5    arbitration.  Otherwise, you have a comprehensive broad

6    arbitration clause that has delegated the arbitrability

7    question to an arbitrator and only if there is a clear

8    Congressional exception to that, which sexual harassment is

9    and TVPA is not yet, and the court has repeatedly rejected

10   arguments that the FLSA is subject to such an exception, the

11   case goes forward in arbitration.

12        THE COURT:  Okay.  And is it -- I think I understand

13   your argument on that point.

14        The last sentence of that paragraph which says, "If

15   a court determines that a legal dispute shall not be resolved

16   by arbitration for any reason," it's your view that it

17   similarly is contemplating only an act of Congress as the

18   reason, not, as it says here, any reason.

19        MR. DICKINSON:  Correct, it's a carveout.  Anything

20   that doesn't get, because of a carveout, that doesn't get

21   addressed in the arbitration, then it goes to court for a

22   non-jury trial.

23        THE COURT:  And it doesn't need to say if Congress

24   at some point or there's a provision that is held by virtue of

25   the applicable law not to be arbitrable by law, you think that

78

1    scope permitted by applicable law covers it.

2              MR. DICKINSON:  It anticipates that event.

3              THE COURT:  I want to get back to you on the other

4    points but let me hear from plaintiff about that specific

5    point on this carveout.

6              MR. BARAN:  I think this colloquy just demonstrates

7    once again that there is no clear and unmistakable delegation

8    here.  If there were, it would be plain on the face of the

9    agreement.

10             Going back to DDK Hotels, the test is really quite

11   strict.  It's not just whether the scope covered is broad.

12   And I want to really emphasize this, that when the court in

13   DDK is talking about where the arbitration agreement is broad,

14   it's talking about specific, and where the certain presumption

15   of arbitrability does or doesn't apply, it's talking about the

16   content and the subject matter of disputes.  It's not talking

17   about validity and enforceability questions because validity

18   and enforceability questions are presumptively for the courts,

19   not the arbitrator, and it's only with a specific clear

20   command in the arbitration provision that that can be

21   displaced, that presumption of the court decides those issues

22   of validity and enforceability.

23             In fact, I have a case here from Judge Cogan which

24   was cited in our reply brief which makes this clear as well

25   that when determining whether --

79

1          THE COURT:  Which case are you referring to?

2          MR. BARAN:  I'm sorry.  This the Government

3     Employees Insurance Company versus Grand Medical Supply, 2012

4     Westlaw --

5          THE COURT:  I have the cite.  Thanks.  I just wanted

6     to know which one.  Thanks.

7          MR. BARAN:  That, you know, a court has to answer

8     two questions when determining whether to compel arbitration:

9     One, whether there exists a valid agreement to arbitrate at

10    all under the contract, and if so, whether this particular

11    dispute sought to the arbitrator falls within the scope of the

12    arbitration agreement.  The first question whether there is a

13    valid arbitration agreement is determined solely by state

14    contract law without influence from the general presumption or

15    favor of arbitration underlying the FAA.

16          So we don't put our thumb on the scale when reading

17    that scope provision, the first paragraph alone to say, oh,

18    that must mean it refers to your ability of enforceability.

19    And particularly then when they're, you know, and DDK says

20    this as well, where there is, the arbitration agreement

21    contains, is vague or contains exclusionary language

22    suggesting the parties consented to arbitrate only a limited

23    subset of disputes, then incorporation of the rules like

24    commercial rules alone doesn't suffice to establish clear and

25    unmistakable delegation.

80

1      THE COURT:  Okay.  Thank you.

2      I do want to keep going.  I see that it's 10 to 1

3  and I've kept you here for quite a while.  We don't have a

4  substitute court reporter since this isn't a trial and had no

5  way of knowing that an oral argument on a PI motion would go

6  for over two hours so let me give our reporter and all of us a

7  ten-minute break.  Stretch your legs, use the restroom,

8  whatever you need, and let's come back a little after 1:00 and

9  wrap things up.  All right.

10      (Recess taken.)  (Court resumes.)

11      THE COURT:  All right.  So Mr. Dickinson, let me go

12  back to give you a moment to address the points you wanted to

13  make about plaintiff's challenges to the enforceability of the

14  delegation clause, that is plaintiff's argument that even if I

15  were to find the delegation clause is clear, that it's not

16  enforceable because, as they say, lowers pays, TVPA, the

17  substantive provisions of the FLSA and unconscionability under

18  New York law, that each of those are grounds that I could

19  decide, even if it's clear, it can't be enforced.

20      So what's your response?  Do I have the authority to

21  do that and if I do, why shouldn't I?

22      MR. DICKINSON:  Well, I'm going to approach that in

23  two ways, Your Honor, and please bear with me for repetition

24  but counsel keeps inviting me to what I would describe as a

25  circular argument.

1          The circular argument is if you are going to

2     consider whether the agreement is enforceable, then you have

3     to get to all these substantive provisions and as I point out,

4     that's not the test that's been prescribed by the Second

5     Circuit.  It's linear, and if there's an agreement and the

6     agreement has the broad delegation clause, you don't consider

7     the rest of that.  It goes to the arbitrator.

8          Just with respect to procedural unconscionability,

9     we can point you to Arrigo versus Blue Fish Commodities which

10    is 408 F.App'x 480.  It's a Second Circuit 2011 case.  It says

11    procedural -- that also addresses the, you know, sign the

12    agreement or no job situation.  That's the type of case that

13    was involved and the court said, look, the arbitrator decides

14    these conscionability questions.

15         More specifically with respect to the fee shift, I

16    also find that that kind of misstates or --

17         THE COURT:  So just let me, before you go on to the

18    fee shifting, so I think your answer is not repetitive at all

19    but it's responsive to my first question which is it's

20    actually not my job to look at the substantive challenges to

21    any of the particular provisions, that that is for the

22    arbitrator.

23         MR. DICKINSON:  Once you determine -- yes.  Once you

24    determine that it's a broad clause -- thank you, Your Honor.

25    Yes, once you determine that it's a broad clause and that this

82

1   dispute falls within the arbitrability provision, the rest of

2   it goes to the arbitrator.

3            THE COURT:  I understand your different positions on

4   that issue.  I'll take it under advisement.

5            Next point.  So assuming I disagree with you and I

6   think that I do have some power to examine the specific

7   provisions, I've read your briefs on this issue but what do

8   you want to make sure that I don't overlook in considering the

9   specific challenges that plaintiff is bringing based on the

10  FSLA, the TVPA or the New York law on unconscionability?

11           MR. DICKINSON:  Okay.  First and foremost, I've

12  already pointed out the fact that the TVPA has not been

13  accepted, there's no Congressional exception that's been

14  articulated.  So notwithstanding the fact that the New York

15  Attorney General's Office may have sent a letter or the

16  New York Department or the U.S. Department of Labor may be

17  investigating and looking into this, the fact of the matter is

18  the only body that can accept a particular claim from

19  arbitrability is Congress.  They're the only ones that can do

20  it and they haven't done it yet so there's no basis on TVPA to

21  strike that out.

22           Frankly, with respect to the FLSA, many, many cases

23  have been brought to challenge FLSA claims under this,

24  particularly in a context of class litigation and the court

25  said, no.

1           THE COURT:  Let me rephrase that then because I'm

2     aware of that body of law.

3           MR. DICKINSON:  Okay.

4           THE COURT:  Fee shifting specifically, why can't I

5     consider the plaintiff's claim -- well, assuming I can

6     consider it, why do you think the plaintiff is wrong that the

7     fee shifting provision specifically does not directly

8     contradict the FLSA or the TVPA?

9           MR. DICKINSON:  Well, Your Honor, the cases that

10    counsel refers to are not this case.  This is -- in the cases

11    that he's referring to, and I don't dispute what the meaning

12    of them is, is that if Mr. Vidal had brought a Title VII and

13    ADEA and ADA, FLSA, TVPA claim himself --

14          THE COURT:  He did bring an FLSA claim.

15          MR. DICKINSON:  Well, that's a critical distinction,

16    Your Honor.

17          THE COURT:  I understand.  Actually, I cut you off.

18    Let me let you finish that point.

19          MR. DICKINSON:  He hasn't done that.  It's not in

20    the complaint that's before Your Honor right now and it's not

21    in the arbitration yet and I'll get to, if it becomes part of

22    the arbitration, I'll address that.

23          The fact is in those instances, the cases that

24    counsel refers to, there's a provision in an arbitration

25    agreement that says prevailing party wins, the courts have

84

1    said if it's a Title VII claim, the Title VII fee shift only

2    applies to a prevailing plaintiff.  So we can't use

3    arbitration to turn that on its head.  Can't do that.  Can't

4    do that with FLSA.  FLSA, prevailing plaintiff wins, they get

5    the fee shift, but if the prevailing employer wins, they don't

6    get the fee shift.

7              THE COURT:  I understand.

8              MR. DICKINSON:  And that's consistent with what

9    happens with those cases with a fee shift, in those cases.

10             In this case, all you have pending before the

11   arbitrator at this time is our breach of contract claim and

12   there is no prohibition against the fee shift in a contract.

13   They're common.  It happens all the time.  It doesn't render

14   the contract unconscionable because the breach of contract

15   claim has a fee shift that's part of the agreement.  It

16   doesn't.

17             THE COURT:  But if his entire defense to the breach

18   of contract is that fulfilling the contract would allow the

19   employer to violate any of these federal statutes, the fact

20   that you're just bringing a breach of contract claim doesn't

21   mean that there's not fee shifting and vindicating his

22   subsequent rights under those statutes.

23             MR. DICKINSON:  That is an issue for the arbitrator

24   to resolve if and when she decides to award fees.

25             To the extent that time is expended, and I'm

1  presuming that Mr. Vidal brings counterclaims because that's

2  what they have to be or arguably his, his -- Your Honor, I

3  would, I would state that if all he does is say that the

4  agreement is unenforceable because of the TVPA or the FLSA, I

5  don't think that that does implicate their fee shifts.  That's

6  just going to the enforceability of the agreement, the

7  validity of the agreement.

8          Only if he affirmatively brings those claims as

9  counterclaims, in which case, then he would have a specific

10  claim to fees, the time spent addressing those claims would be

11  time that would be spent addressing the claims that have the

12  specific one-way carve out for the FLSA.  But in either

13  case --

14          THE COURT:  Right.  And if he loses, let's say he

15  brings the counterclaims under the FLSA, and the arbitrator

16  says I don't think what you were doing is in violation of the

17  FLSA, in a normal FLSA case before me, the employer's lawyers

18  get paid by the employer because there's only one-way fee

19  shifting and he only gets fees if he prevails.

20          In Mr. Vidal's case before the arbitrator, he brings

21  the exact same claims before an arbitrator and he loses, he

22  has to pay not just his own lawyers' fees, he has to pay

23  yours, and that seems to be the crux of his argument that just

24  the risk that the arbitrator might order him to pay all those

25  fees will chill him from bringing that counterclaim in

1    arbitration because the more claims he adds, the more time

2    he's going to spend, the more time you are going to spend, and

3    the bill is mounting and mounting and mounting before the

4    arbitrator rules.  And because of that, he may say, I'm going

5    to stay in my job no matter how much it is in violation of

6    federal law because I can't take the risk that if I try to

7    vindicate my rights, I'm going to get stuck with $100,000 in

8    attorneys' fees.

9         MR. DICKINSON:  Your Honor, there are employees in

10   all walks of life that are subject to employment agreements,

11   noncompete provisions, non-solicitation provisions, that

12   contain fee shift provisions.  And they all have to make the

13   determination that if they're going to leave their job and

14   face liability under that provision, that they might get

15   caught with paying fees.  It's part of the contract.

16        The fact that his defense may implicate other

17   potential claims, that is something that the arbitrator can

18   parse out --

19        THE COURT:  Isn't that what the cases you started

20   with hold cannot be done when it's, for example, a Title VII

21   claim?

22        MR. DICKINSON:  Only if the claim brought is a

23   Title VII claim, and the employer is trying to use the

24   arbitration provision, the fee shift in the arbitration

25   provision or in the agreement to say that there's the backflow

1    of the fees.  It doesn't -- this is not those cases.

2           This case is ACS's case against Mr. Vidal.  It's a

3    breach of contract claim and the breach of contract claim can

4    and does have a fee shift provision.

5           If he wants to push back and raise those issues as a

6    point, to the extent that the parties can parse it out, and

7    the arbitrator has to parse it out, that some of those fees

8    are not recoverable because they're attributable to the time

9    spent on the TVPA counterclaims or defense, that's something

10   the arbitrator has to deal with when a fee application is

11   before her.  It doesn't invalidate the entire provision

12   outright.

13          THE COURT:  I understand your point.  Let me just

14   hear from plaintiff on this point about the fee shifting on

15   particular claims.

16          I assume you have an argument that this is a

17   distinction without a difference.  I'd like to hear why that

18   is.

19          MR. SELIGMAN:  Absolutely.  And I just want to

20   situate this within all of our arguments because this is only

21   one of our arguments for unenforceability based on the

22   attorney fee shifting mechanism of the TVPA, FLSA and state

23   law, not the substantive provisions which we say the "loser

24   pays" term also violates.

25          THE COURT:  What is the difference between "loser

88

1 pays" and attorneys' fees?  Is it about cost or about

2 something else?  What is the "loser pays" that's not the

3 attorneys' fees?

4          MR. SELIGMAN:  Sorry.  That the -- what we're

5 engaging about now is one of our arguments that the "loser

6 pays" term and, therefore, the delegation provision is

7 unenforceable.

8          THE COURT:  Okay.

9          MR. SELIGMAN:  And that is that the fee shifting,

10 that "loser pays" violates the fee shifting mechanism of the

11 TVPA, the FLSA and state law.

12          The other arguments about the "loser pays" provision

13 go to whether the "loser pays" provision violate the

14 substantive protections of the TVPA, the FLSA and state wage

15 and hour law, for example, because the "loser pays" term

16 amounts to a threat of serious harm or abuse of legal process.

17          So dealing just with the question of whether the fee

18 shifting, the "loser pays" term violates the fee shifting, the

19 one-way fee shifting mechanism in those statutes, there is --

20 I think counsel is correct that in the vast majority of cases

21 that I'm aware of, the plaintiff is the employee and the

22 plaintiff has brought claims under those provisions.

23          This case is quite unique insofar as the plaintiff

24 here or the worker here is the defendant and the way that we,

25 the way that the reasoning of those courts, and as just one

89

example, I would refer the court to <u>Mantooth</u>, that's a District of Colorado case, only a Westlaw cite, 2018 Westlaw 2241130.  That's <u>Mantooth versus Bavaria Inn</u> in the District of Colorado.

In that case, the court says, look, the problem, the problem with the "loser pays" term is that it undermines the Congressional purposes encouraging these claims and defenses. That reasoning applies, I think, with greater force here, right, where the plaintiff is, the worker has not brought those claims which are the best claims and defenses to the question of whether the contract is enforceable and whether the arbitration provision is enforceable and is chilled from doing so because of the "loser pays" term.

Under the reasoning of those cases, the "loser pays" term is no different in this context from a provision saying something like you may not sue us or you may not counterclaim or raise defenses under the TVPA or the FLSA because, according to the reasoning of those courts, the one-way fee shifting mechanism is central to the core purposes of the enforcement scheme highlighted or the enforcement scheme set out for those statutes.

Additionally, courts in this context, when it comes to the vindication of federal statutory rights and when it comes to unconscionability, have again and again reminded that we look at enforceability questions at the time of formation.

1  Right?  So we look at the contract as it was entered into.
2  The contract is --
3          THE COURT:  When nobody sues anybody.  So nobody is
4  the plaintiff and nobody is the defendant.
5          MR. SELIGMAN:  That's right, Your Honor.
6          THE COURT:  Okay.  Let me move on from this issue
7  because I've got a little more to cover and we're getting late
8  in the day.
9          Let me just say, defense counsel, if you know of it
10 off the top of your head, great, if not, you're welcome to
11 submit it with a supplemental letter brief.
12         On this question of the provision we were talking
13 about in Schedule B that you argued was a reservation of
14 rights clause related to future Congressional action, I
15 haven't seen any cases in which courts have found that there
16 is a clear and unmistakable delegation clause where the
17 contract also has such a provision contemplating future court
18 rulings about the scope of arbitrability.  If there are any,
19 I'd certainly be interested to see them.  If not, you know,
20 that doesn't mean I so find because I understand your argument
21 but I would be interested in seeing that there are.
22         I'm not doubting that these are inserted in
23 contracts routinely.  My question though is when a court is
24 faced with a dispute over whether it's clear and unmistakable,
25 has any court interpreted that clause in the way that you urge

1   me to do so here.

2          MR. DICKINSON:  Your Honor, I will look into that.

3   Off the top of my head, I'm not aware of any case that would,

4   however, I also will add that the only Congressional excise of

5   a claim that I'm aware of was the harassment claims that were

6   carved out in March of 2022.  So it may not have -- that was

7   in the works at the time, that was pending.

8          THE COURT:  Right.

9          MR. DICKINSON:  The statue was under consideration

10  or had -- it was about to become effective when this contract

11  was written but I don't know that we will find it.

12         THE COURT:  Okay.  Mr. Baran, do you have anything

13  to say just about the timing of the Congressional carveout on

14  harassment as it relates to defense's argument on this point?

15         MR. BARAN:  I think as the Court pointed out

16  earlier, the timing is important here.  March 2022 is when the

17  statute passes.  Before that, there wasn't a carveout of a

18  specific claim but I think the defense counsel has the issues

19  a little bit backwards with respect to illegality.

20         The TVPA does not authorize, and Congress has not

21  authorized employers to use contract provisions that

22  perpetuate contracting or forced labor just because they are

23  cloaked with arbitration or because those issues have been

24  delegated.

25         What the Supreme Court has affirmed over and over

92

1  and most recently in <u>Morgan v. Sundance</u> is that the FAA's

2  policy is to treat arbitration provisions like any other

3  contract including, and that includes delegation provisions as

4  well, right, because they are mini arbitration provisions, and

5  to subject them to the same scrutiny that the court would give

6  any other contract, including as to whether it's valid and

7  enforceable.

8          So that is the authority that the Court can draw on

9  to decide that even if there was a valid delegation here which

10  we continue to contend there is not, they, that the Court can

11  look through that delegation and say that's not valid and

12  enforceable because it violates federal law, federal

13  trafficking law, wage and hour law, et cetera.

14          THE COURT:  Okay.  Thank you.

15          Let me jump to a couple other topics that may be a

16  little shorter than our prior discussion but if not, so be it.

17          Mr. Dickinson, let me ask you why is the "loser

18  pays" arbitration provision here not the functional equivalent

19  of the liquidated damages clause that was struck down in

20  <u>Paguirigan</u> and cases like it?

21          I realize that there were some threats of criminal

22  prosecution and other things, but don't you think the fact

23  that they threatened fees and specifically sent a letter that

24  coincidentally landed on $20,000 as the amount he would likely

25  have to pay as the minimum when that was the exact same as the

1   liquidated damages clause makes this functionally

2   indistinguishable from Paguirigan and other cases?

3          MR. DICKINSON:  No, Your Honor, I wouldn't agree

4   with that for a couple of reasons.

5          First and foremost, the cover letter that we were

6   talking about earlier at the time that the revised agreement

7   was promulgated and presented to Mr. Vidal made it clear that

8   the damages could be more or less than the liquidated damages.

9   So if we keep focusing on the time of the formation of the

10  agreement, at the time that the agreement was formed, there

11  was, it was made clear to him that the damages could be more

12  or less.  So I think that that is one strike against that

13  argument.

14         THE COURT:  So let's go with could be more.  Why is

15  that not enough to --

16         MR. DICKINSON:  It's a contract.  We have to prove

17  our damages.  There's no -- what counsel is essentially saying

18  is that we can't enforce anything against Mr. Vidal because of

19  his immigrant status and that's effectively what happened.  So

20  any other employee that signs an agreement --

21         THE COURT:  I don't think that's a fair

22  characterization of their argument.

23         MR. DICKINSON:  I would say that they put us in a

24  position where liquidated damages are no good but no other

25  damages can be pursued either.  Other people can face a fee

1    provision challenge but in this particular case, the fees

2    provision becomes coercive and is in violation of TVPA.

3           So anybody else that's faced with those types of a

4    fee shift, any other kind of consequences, potential damages,

5    suffers the consequences of their breach, but because of

6    these, the operation of these things and his subjective

7    perception of what may or may not have been happening,

8    essentially invalidates the contract.

9           I don't think that's what the law is and I don't

10   think that that's what the arbitration should be avoided for.

11   It's just that's -- I think that it takes the arguments too

12   far.  I don't dispute that in certain circumstances that there

13   are violations, we're -- I can't say it but you know what I'm

14   talking about -- is an instance where it crossed the line.

15          I do not think that what happened here, particularly

16   the reformation to take away some of these things, is that

17   case.  We backed away from those problems and I think that

18   chasing us as we pull away from those problems goes too far.

19          THE COURT:  Okay.  So let's, let me take you up on

20   your invitation to talk about what actually happened here.

21   Just as in Paguirigan, there were actions and conduct by the

22   employer after the nurses came to the U.S. and began

23   employment and indicated they may wish to leave their jobs.

24          So in this case, we know that when Mr. Vidal first

25   quit or indicated his intent to leave, ACS sent him a letter

95

1   saying, seriously, we urge you to reconsider, here's why, and

2   the letter was full of numbers of the damages he would likely

3   have to pay and that is where the figure that it would be at

4   least $20,000 came up.  Then the letter also said that there

5   was also $9,000 a year that he could pay.  I wasn't clear

6   whether this was part of the 20,000 they were contemplating or

7   whether that was an addition.  Then the letter also says, it's

8   clear, that the attorneys' fees and costs are over and above

9   the $20,000 if he doesn't prevail or at least could be.

10          So he's being told by ACS first, $20,000 plus

11  attorneys' fees and costs, so we're really putting that at

12  least, you know, 21,000 or likely when we look at attorneys'

13  fees and what people charge by the hour, it may be double or

14  triple the 20,000.

15          Do you not think that in light of Paguirigan and

16  other cases and the reasoning behind those cases, that 20,000

17  standing alone doesn't rise to that level and if not, what

18  about the rest of the money in that letter?  Like what would

19  be enough?  If they said we think we have $500,000 in

20  liquidated damages, of course, we'll have to prove them, of

21  course, we'll have to not liquidate, but the actual damages

22  we'll have to prove it, but you could be out a half a million

23  dollars in attorneys' fees if you don't go back to work next

24  week.  What would constitute a weaponization of the contract?

25          MR. DICKINSON:  Working from Paguirigan, there was a

1   $250,000 claim in that case.  That was one of the elements

2   that was held to be coercive.  $250,000, the threat to

3   criminal sanctions, the liquidated damages, the claim was

4   $250,000.

5          On top of that, another thing that seems to be

6   overlooked here is <u>Paguirigan</u> anticipates actual damages are

7   recoverable.  If we can prove damages flowing from the breach,

8   they're recoverable.  And if there's nothing coercive -- well,

9   I guess reasonable minds might take opposing opinions on this,

10  but cease-and-desist letters and demand letters in the wake of

11  or in the face of a breach, an articulated breach, are not

12  uncommon.  That is the appropriate legal process, trying to

13  avoid the controversy in the first place.  Mr. Vidal, we're

14  reminding you that you have a contract, your contract is for

15  three years, under the contract, you face these potential

16  damages.

17         THE COURT:  Right.  And I don't think, I'll ask

18  them, I don't think plaintiff's counsel is disputing that if

19  there were a liquidated damages clause that more closely

20  reflected the costs incurred as of that date and even some

21  compensation for the staff time on ACS's part to get Mr. Vidal

22  into the country and have him work for three months.  So maybe

23  a $4,000 clause, maybe a 5 or even slightly higher clause,

24  that more reasonably encapsulated what they contend are

25  permissible damages that don't violate federal law such as the

97

1  actual fees incurred and perhaps some of the expense in

2  finding a replacement or some time the agency would be without

3  an employee for that job, that I think it's a red-herring to

4  say that you couldn't threaten to collect any damages.

5        My question for you is is there a point at which a

6  cease-and-desist letter or a go-back-to-work letter would

7  amount to a serious threat of harm to violate federal law, the

8  TVPA, in particular, or is there not?

9        MR. DICKINSON:  I can't say categorically that it

10  couldn't happen.  I can't say that.  I can't say that you

11  could outline some Draconian measures, but I do think that if

12  using Paguirigan as our starting point, a claim for $250,000,

13  the $20,000 note, the threat to criminal prosecution and the

14  attempts at criminal prosecution are all considered an

15  aggregate.  I don't think the threat of a particular amount of

16  damages or the nature of the damages that flow from the

17  contract that you entered into are an appropriate, are an

18  inappropriate thing to reference in a return-to-work or a

19  demand letter.

20        The other thing, I think -- two critical points to

21  reference here, Your Honor.  One is the issues about this is

22  it supposed to be, was it coercive?  Clearly not because

23  Mr. Vidal didn't come back to work.  So he didn't find it

24  coercive.  That would make a TVPA claim a lot stronger if he

25  stayed in a job that he hated and he thought he was being

98

1    abused in and taken advantage of.

2           THE COURT:  Well, that's, I mean --

3           MR. DICKINSON:  I think that's a fact that the Court

4    can't ignore.

5           THE COURT:  What if the plaintiff doesn't quit their

6    job because they're being subject to quid pro quo sexual

7    harassment?  I mean there's lots of circumstances that could

8    be coercive and if someone doesn't give in to the coercion,

9    that doesn't mean they're not coercive circumstances.  I mean

10   that's not a required element.

11          MR. DICKINSON:  It makes their claim stronger.  It's

12   a fact, Your Honor.  It has to be considered.  It can't just

13   be disregarded.  I mean we keep talking about context matters

14   and what his state of mind was.  Well, apparently, his state

15   of mind at the time that he left his job, and this is set

16   forth in his affidavit, I made $200 a month when I worked in

17   the Philippines, I made $3,500 a month after taxes when I

18   worked in the UK and then I made 35 or whatever he said it

19   was, we know that it was $68,000.

20          He acknowledges that his after-tax pay after he left

21   his job is 40 percent higher in his new job.  He made a

22   cost/benefit analysis as to whether it made more sense for him

23   to face the damages from his, from breaching his contract to

24   take the new job.  He's an adult.  He entered a contract.

25          THE COURT:  I understand.  I understand.

99

1        MR. DICKINSON:  And he shouldn't just be excused

2   from that.

3        THE COURT:  I understand that but you're -- all

4   right.

5        So in answer to my question about what would be the

6   level, a monetary amount or some other financial penalty in a

7   cease-and-desist letter that foreign employees, not all are,

8   but foreign employees like Mr. Vidal who's here on an

9   immigrant visa and is subject to federal wage and hour

10  protections, so those two laws in particular, what if any,

11  besides just reciting back to me <u>Paguirigan,</u> which I

12  appreciate, what would rise to the level that would constitute

13  an impermissible threat of serious harm so as to make that an

14  employer tactic that would be unconscionable and how would it

15  read either in the enforcement or in the contract?

16       MR. DICKINSON:  Well, Your Honor, you actually bring

17  up an important distinction in this case from most of the

18  other cases that have been cited, almost all of them that I

19  can think of.  I'm not aware of a single case that's been

20  cited from either side that involves a person that there's a,

21  is not a permanent legal, green card.

22       All the other cases are H-1Bs or instances where the

23  employer threatens to report the loss of the job in connection

24  with the immigration status.  That is also a very integral

25  part to all of the cases where there's this coercion element.

1   Paguirigan had it.  Other cases -- the issue out of Albany

2   with the settlement that they cite, that was a very specific

3   part of that claim.  Most of the cases that involve an

4   immigrant involves the threat of taking away your immigrant

5   status.

6           That's not even an issue here.  It can't be.  That's

7   part of the reason why we're frustrated as he's got benefit --

8   there's no recourse.

9           THE COURT:  I understand that that's a factor I can

10  look to, but you're certainly not disputing that

11  Mr. Paguirigan, because he was here legally, is not entitled

12  to the benefit of the FLSA, the TVPA, those two, for example;

13  he's part of -- excuse me -- Mr. Vidal is part of the

14  protected class for those statutes, right?  There's nothing

15  that excludes him from coverage?

16          MR. DICKINSON:  Oh, no, absolutely not.

17          THE COURT:  Okay.

18          MR. DICKINSON:  If he worked overtime and he didn't

19  get paid overtime, he could bring an FLSA claim for sure.  And

20  if he wants to raise those issues as counterclaims or defenses

21  to this arbitration, he can do so.

22          THE COURT:  I understand.  And, similarly, the

23  protections of New York law as to unconscionable contracts and

24  the length, that applies equally to him once he's here in

25  New York?

1         MR. DICKINSON:  Of course.

2         THE COURT:  Okay.  Do you have any response on the

3 points we just addressed briefly before we move on to sort of

4 how I should read Paguirigan as to what the employer's actions

5 are and also whether it's even relevant, the letter that they

6 sent him saying here's what you possibly face as to damages,

7 if what I'm supposed to look at is what he faced at the time

8 of the contract formation?

9         MR. SELIGMAN:  Yes, Your Honor.

10         So first of all, the presence of a liquidated

11 damages provision in these cases, and as far as I'm aware

12 actually, the vast majority, I think all of these cases

13 involve legal permanent resident visas and not guesswork

14 visas.  Certainly, Towards Justice is litigating these cases

15 and that's important because in the guest worker context, you,

16 frankly, don't need the threat of serious harm to keep someone

17 trapped.  Their visa keeps them trapped.  Right?  So that's

18 why we think that this sector has innovated this device.

19         The difference between liquidated damages and

20 uncapped damages is, if anything, cuts in favor of the TVPA

21 concerns here.  The presence of a valid liquidated damages

22 provision is a defense that some have attempted to raise to

23 TVPA claims and so courts will walk through whether the

24 liquidated damages provision is valid but here, the uncapped

25 nature of the damages actually exerts greater coercive force

1    and the letter highlights this.

2           This is -- I think the letter, you know, again, I do

3    think you look at the contract as it was drafted, but the

4    letter helps to highlight the real world consequences of the,

5    of uncapped damages.

6           In the letter, ACS highlights that it would be at

7    least $20,000.  It's the uncapped nature of the damages, in

8    fact, that they seize upon as a tool to exert more pressure.

9    I'll say too I do want to respond to your point about how we

10   would not dispute that some costs could be shifted onto

11   Mr. Vidal.

12          I think as a general matter, of course, if Mr. Vidal

13   stole something from ACS, there's all kinds of ways in which

14   potentially he could be subject to a claim by ACS, but aside

15   from perhaps very narrow circumstances where it's very clear

16   and specific that the amounts at issue were paid for the

17   benefit of the employee, aside from those circumstances, I

18   think our position would be that shifting these debts under

19   the worker is not, is not permissible.

20          These are -- this circumstance is very different

21   from circumstances in which we have a trade secret or a

22   noncompete.  In these cases, and, again, this is relatively,

23   these are relatively new kinds of contracts especially for low

24   wage workers, the damages arise solely because you've left

25   your job, just for that reason alone, and this is an evolving

1   area that has come under greater scrutiny because it appears

2   to be a relatively new technique.

3          THE COURT:  So let me ask you the flip side of the

4   question I asked defense counsel.

5          You know, I pushed him for what would be an

6   impermissible amount of either liquidated damages or a

7   specific nature of threatening to enforce an uncapped damages

8   provision that in his view would rise to the level of

9   something the court or an arbitrator could declare unlawful.

10         Let me ask you the other side of that which is given

11  that ACS did unquestionably make an investment in Mr. Vidal

12  and others like him to bring them here, if he were to work off

13  the job without cause, and I have no idea whether his

14  allegations are true or not, they're just allegations in the

15  complaint, but you don't dispute that there needs to be or an

16  employer or a third-party staffing agency, I should say, has,

17  certainly could put something into the contract reflecting a

18  possible penalty for breach and so given the contract at issue

19  here for three years, what would be the permissible ranges of

20  penalties that would not chill the worker's ability or

21  incentives to, you know, leave the job for a protected reason

22  or a valid reason?

23         MR. SELIGMAN:  Well, wage and hour law gives us,

24  sort of sets out the parameters for how you can shift costs.

25  Right?  That's both under the Fair Labor Standards Act and the

1  New York wage and hour law where there's a cost that's clearly

2  expended for the benefit of the employee.

3          So, for example, and this would be a classic kind of

4  cost that, you know, the equivalent of, like, a cash advance

5  that a employer might incur --

6          THE COURT:  For the rent subsidy they might give.

7          MR. SELIGMAN:  Rent subsidy or groceries, things

8  that are very clear for the employee's benefit, and pursuant

9  to New York law, there's a clear agreement, there would have

10 to be a clear agreement specifically authorizing the repayment

11 of those provisions.

12         I suppose there's nothing to prohibit the employer

13 from conditioning repayment of those amounts based on the

14 worker staying in the job for a certain period of time, but

15 even, but if those amounts became so substantial, right, and I

16 don't think they would in this case, but if they became so

17 substantial that the threat of being forced to pay for them

18 amounted to a threat of serious harm, it may still violate,

19 for example, the TVPA even if they don't violate other laws.

20         THE COURT:  And what if, for the sake of convenience

21 of not having to litigate what those costs would be, an

22 employer or third-party staffing agency wanted a liquidated

23 damages clause that reflected, you know, perhaps on a sliding

24 basis given how long the worker has stayed.

25         So if you quit within your first -- you breach the

1   contract within your first three months of employment, your

2   first six months, your first year, and very clearly set out

3   this would be to recoup the costs and, as well as the

4   opportunity, costs potentially to bring you here as opposed to

5   someone else who would fulfill their contract, could they say

6   we're going to have a liquidated damages of $2,000 or $5,000

7   or something in that realm?

8          MR. SELIGMAN:  The only reason I would hesitate

9   there is that still potentially could violate New York wage

10  and hour law.  I don't think it would violate the FLSA

11  necessarily especially if it was tied to the cost of, for the

12  benefit of the employee, and I don't think it would violate

13  the TVPA certainly, especially in light of the sort of level

14  of the cost that you highlighted there.

15         It could, depending on the specificity of the

16  contract, still violate New York wage and hour law which

17  requires that deductions made for the benefit of the employee

18  have to be clearly authorized.  So you would have to just look

19  at the language of the agreement but, you know, in theory, I

20  think it could comply.

21         THE COURT:  All right.  And why is the promise --

22  let me ask another question before I get to that.

23         Why couldn't Mr. Vidal have brought this claim as I

24  think defense counsel is indicating as a standalone TVPA suit

25  for damages under the Section 1595 that allows for some civil

106

1  enforcement, why couldn't he have just brought a separate

2  claim for damages?  Like, let the arbitration do what it does

3  but bring your own suit in this court for damages under the

4  TVPA or is it your view that that's sort of embraced in the

5  controversy we are here about which is that that also has to

6  be arbitrated?

7          MR. SELIGMAN:  I suspect that the defense would say

8  that has to be arbitrated.  They would move to compel.

9          Opposing counsel says using Paguirigan as a starting

10  point, I do want to remind the Court of the standard here of a

11  preliminary injunction.  We don't need to finally decide these

12  issues.  We think that even a serious question, especially in

13  light of the way that we think it should be weighed here, in

14  interest of two public enforcement agencies, even if there's a

15  serious question as to the enforceability of the arbitration

16  provision, we think that that would warrant a preliminary

17  injunction and there can be further litigation regarding the

18  similarities or differences.

19          THE COURT:  Okay.  And how about, just briefly, the

20  argument that you have made not about the "loser pays," but

21  about the provision in the contract that seems to allow ACS to

22  recover actual damages in the amount of lost profits that they

23  would have made for the two and three-quarters years left on

24  Mr. Vidal's term?

25          I mean aren't they entitled not just to recoup the

1  actual costs but to some opportunity costs because that's how

2  the business runs, right?  They're taking a chance on

3  Mr. Vidal coming here and they're doing all this work on the

4  front end and we should encourage, as a matter of public

5  policy, these agencies who bring skilled workers here and

6  streamline the paperwork for them so that they can then work

7  here, make the money they're going to make, provide a service

8  to the employers and the clients, and if all we do is make

9  them whole after three months, we're removing the profit

10  motive which really disincentivizes the whole business?

11        Never mind, as a policy matter, what you think of

12  that but as a court, why should I consider lost profits so far

13  out of bounds given that the profit motive is clearly what

14  helps facilitate these types of arrangements?

15        MR. SELIGMAN:  First of all, I should clarify this

16  is also a challenge to the "loser pays" term, it's all a

17  challenge to the "loser pays" term.  The "loser pays" term

18  violates wage and hour laws because it's seeking, it permits

19  the employer to recoup the costs of effecting an illegal

20  kickback and this is an illegal kickback.

21        THE COURT:  Yes.  Tell me why lost profits are an

22  illegal kickback.

23        MR. SELIGMAN:  Lost profits are inherently for the

24  benefit of the, for the benefit for the employer and not for

25  the benefit of the employee.  I mean on their face, they're

1   for the benefit of the employer.

2           In every case, when an employee leaves a job, that

3   creates headaches for the employer.  Finding -- there's the

4   opportunity costs of trying to find a replacement, there's the

5   costs of training someone, there's costs of recruiting

6   someone.  And, you know, if we permitted employers, and I'm

7   not aware of any case permitting it, if we permit employers to

8   shift those costs onto their employees, that would eviscerate

9   the minimum wage protections.

10          I should also -- I would also refer the Court to --

11  there's good guidance on this point under New York law, in

12  particular.  If you look at New York law regarding deductions

13  and that is New York Labor Law, Section 193 and subsequent

14  sections, describes how, you know, many costs can, in theory,

15  can be framed as a cost, as providing a benefit to the

16  employee.  Right?

17          So, you know, a classic example would be the

18  employer shifts onto the employee the costs of writing the

19  paycheck.  That's for the employee's benefit.  The fact that

20  the employee has a job is for the employee's benefit, but at

21  its core, they're unlike a cash advance, they're unlike

22  paying, for example, for training where the training is for

23  the employer's benefit, not the employee's benefit.  Just like

24  the lost profits, those are for the benefit, are fundamentally

25  for the benefit of the employer.

109

```
 1              THE COURT:  Okay.  I didn't see it in your brief but
 2    I wanted to make sure I didn't miss something.
 3              Are you aware of any case in which any court has
 4    held that an employer's effort to recoup not something they
 5    already expended money on, but lost profits specifically is
 6    not something embraced in primarily for the benefit of the
 7    employee?
 8              That is -- most of the cases are ones where there is
 9    a direct cost like buying the bicycle, the cost of the
10    payroll, et cetera.  I understand those.  I realize this is
11    different.  It seems like your argument may be there's at
12    least a serious question on that point and maybe these are
13    worse because it's not even something that goes to the
14    employee's ability to do their job.  It's actually purely for
15    the employer's benefit.  But are you aware of any case that
16    addressing this question of profits as a kickback in any way?
17              MR. SELIGMAN:  I'm not but I'll say these contract
18    provisions that shift lost profits onto the employee, these
19    appear to be relatively new, at least in this context, so I'm
20    not sure.  Frankly, Your Honor --
21              THE COURT:  So they couldn't get the bicycles paid
22    for so they decided to come after profits essentially?
23              MR. SELIGMAN:  Or, and the Federal Trade Commission
24    highlights this in its recent finding on noncompetes, it's not
25    just about shifting the costs, it's also about undermining
```

110

1   worker mobility and the proliferation that we're currently

2   seeing in the use of employer-driven debt to shift costs but

3   also to undermine worker mobility may be an effort only to

4   undermine worker bargaining power.

5           THE COURT:  Is the rule-making opinion in your

6   brief?

7           MR. SELIGMAN:  It's not in our brief.  It does not

8   address the trafficking claims.

9           THE COURT:  It may be a little far afield, but if

10  you wanted to provide that after today, I would be happy to

11  take a look.

12          MR. BARAN:  But these provisions, the lost profits

13  provision and the "loser pays" provision, they operate in

14  tandem in a real important way.  Even if the arbitrator were

15  to rule that the employer was entitled to a dollar in lost

16  profits, they could still recover the full value of their

17  attorneys' fees and the costs of arbitration from Mr. Vidal.

18          So it's not -- that's part of what makes it so

19  problematic is that the lost profits isn't a real, that the

20  amount that they can recover through these provisions together

21  isn't a real reflection of their actual damages.  It's

22  whatever the attorneys' fees that get run up in the

23  arbitration would be.

24          THE COURT:  Okay.  Understood.  Thank you.

25          Let's go off the record for just a moment.

1          (Discussion off the record.)

2          THE COURT:  We're back on the record.

3          Okay.  Let's talk about severability.

4          MR. DICKINSON:  Your Honor, may I address the

5     concept we just talked about?

6          THE COURT:  I'll give you a minute or two but then I

7     really do need to move on.

8          MR. DICKINSON:  Okay.  With respect to these, it's

9     not a kickback because the kickback is usually when you're

10    paying to be in the job while you're on the job, not something

11    that flows from the fact that you breached an agreement.

12         Also, I think counsel makes two important -- you

13    know, costs like uniforms, paychecks, maybe those are not

14    things that should be deducted, but he did point to the case

15    of training and training is primarily for the benefit of the

16    employee.

17         Well, I would argue if that's the case, then getting

18    the person the visa so that they can come to work here is

19    primarily the benefit of the employee as well.

20         THE COURT:  Right, but I don't think he's disputing

21    that you could recoup the cost of getting the visa to come

22    here as you would training.  I think what he's saying is the

23    kickbacks are when you start talking about the lost profits.

24         MR. DICKINSON:  Well, kickbacks are during the

25    employment.  The fact that you've breached an agreement,

1  that's a damage that the arbitrator can decide based on the

2  breach.  And if it's recoverable, then it's something that he

3  faces but it's not something off the table.

4          THE COURT:  All right.  Understood.  Thanks.

5          All right, Mr.  Seligman, let me ask you about

6  separability.

7          So isn't it true that in <u>Paguirigan</u> and the other

8  cases addressing the invalidity of liquidated damages clauses

9  and other conduct by employers under the TVPA, that the courts

10  just declared those provisions unlawful and not the entire

11  contract, and so why should I invalidate the entire

12  arbitration agreement as opposed to simply severing the "loser

13  pays" provisions and fee shifting provisions to the extent

14  they're not duplicative of one another and saying that the

15  arbitrator can decide the breach claims but is not empowered

16  to order fee shifting in any way?

17          MR. SELIGMAN:  Thank you, Your Honor.

18          So, first of all, I do think it's important to

19  remind at this stage, we're not asking you at this stage to

20  declare those invalid.

21          THE COURT:  Right.  Let's say you're likely to

22  prevail on the merits of your claim that they are invalid or

23  unlawful.  So if I find that, it is a tricky question because

24  I don't know that I can sever in an injunction posture, but if

25  the remedy is typically severability, why would you be

1  entitled to an injunction of the entire process as opposed to

2  me enjoining the arbitrator from requiring Mr. Vidal to pay

3  anything if he loses other than his actual damages or the

4  employer's actual damages?

5          MR. SELIGMAN:  So I want to highlight three

6  principal reasons.

7          So, first, severance or reforming a contract, right,

8  is generally permissible when it's, you know, easy to cross

9  the term out and not undermine the core purposes of the

10 agreement.

11         In this case, it's not easy to cross the terms out.

12 In fact, this "loser pays" term appears in multiple places in

13 the agreement.  It appears in the arbitration clause itself.

14 It also appears in Section 14 of the agreement which says all

15 the costs of us seeking to enforce this agreement against you

16 are shifted onto you.  This is not a case where there's a

17 simple way to excise a single term.  There are multiple terms.

18         Additionally, you know, courts are clear and,

19 generally, in the arbitration context, the severance issues

20 come up where a worker brings a claim and the defendant and,

21 you know, the employer seeks to compel an arbitration and

22 there's a term in the contract that the worker says is

23 unenforceable but the employer asks the court to strike it

24 out.  In those cases, the employer -- there's no evidence that

25 the employer holds that term to be core to the purposes of the

114

1   agreement itself.  That's very different from this case.

2           In this case, the defendant has explicitly

3   identified that the arbitration, the fee shifting mechanism

4   and the "loser pays" term are core to its purposes, right,

5   core to its purposes, core to the purposes of the arbitration

6   provision.

7           THE COURT:  Why is that any different than the first

8   point you made?  What's the distinction?

9           MR. SELIGMAN:  So, for example, in a case where

10  there is a limitation on punitive damages or something like

11  that, I mean the context would be unconscionable.  A plaintiff

12  will sue a defendant, will move to compel those claims into

13  arbitration and a defendant will say, and then the plaintiff

14  will say the punitive damages waiver is unconscionable and the

15  defendant, in response, says sure, even if it's

16  unconscionable, the court should be able to sever it, it's not

17  to the core purposes of our agreement.  You know, we've never

18  sought to enforce it.  Right?  There's been no suggestion that

19  it's really like what we were getting at in drafting this

20  arbitration provision.  What we were, what we were seeking to

21  accomplish with the arbitration provision was speedy and

22  efficient dispute resolution.

23          That's different from this case, right, where the

24  employer has used the offending term as a cudgel and has

25  explicitly identified the importance of the offending term

1    throughout its interactions with the, with the plaintiff.

2           THE COURT:  And is that -- even though the issue is

3    really how it reads at the time of contract formation, is your

4    argument that the letter that they sent when he first tried to

5    leave his job that focuses almost entirely on the damages that

6    he would face under the "loser pays" provision and the costs

7    as written, I mean they do talk about other damages in there

8    so they're not exclusively relying on "loser pays," but the

9    fact that at least some of that is invoked and weaponized in

10   your view, is that why I should see that as integral to the

11   contract enforcement?

12          MR. SELIGMAN:  I think that that helps to reveal its

13   evidence of the integral nature of the "loser pays" term.

14          THE COURT:  Okay.

15          MR. SELIGMAN:  And then I, you know, finally, I

16   would also urge this court to consider case law concluding

17   that severing offending terms in certain contexts creates

18   incentives for drafter overreach and that being a reason not

19   to sever those terms.

20          So we cite these cases in our briefing but, you

21   know, in particular, there's the Lim case.  That's L-I-M.

22   Hale versus Brinker is a recent case from Judge Chhabria in

23   the Northern Division of California.

24          Those courts highlight how the, that we -- highlight

25   that we should be reticent to sever terms when, you know,

1   doing so would create incentives for drafter overreach.  I

2   think that this is, this is the clearest example of the

3   dangers of those incentives that I've seen because of the ways

4   in which the drafting party weaponized the terms that we say

5   offend the federal and state law.

6        THE COURT:  So how do you think I can distinguish

7   this case from or why is it not -- if I were to agree with you

8   that severance is not appropriate here for the reasons you

9   said, the Second Circuit's decision in the Ragone case from

10  2010, you know, which says that the remedy is, particularly,

11  in arbitration cases, right, where courts are charged with

12  upholding the purpose of the FAA supporting arbitration, that

13  where there's an unconscionable provision, that should be

14  separate.

15       Is that really your argument akin to that's more

16  along the lines of where there's a distinct clause like a

17  limit on punitive damages in an arbitration contract overall

18  or is there some distinction in Ragone?

19       MR. SELIGMAN:  Two responses to that.

20       First is that to the extent that Ragone applies,

21  smuggles the presumption of arbitrability in favor of

22  arbitrability into the severance analysis, Ragone does not

23  survive.  Recent Supreme Court case law, the Morgan case, for

24  example, says that arbitration agreements are just like any

25  other contract.  If they're valid and enforceable as matter of

1   state and federal law, then there's a presumption in favor of

2   arbitrability, but to get to that point, the presumption does

3   not apply.  Circuit courts --

4          THE COURT:  And you think that applies when we're

5   dealing with the unconscionability of a particular provision

6   in the delegation clause, not just the contract as a whole,

7   that is the logic of Morgan?

8          MR. SELIGMAN:  The logic of Morgan says when

9   deciding to sever the term or strike the entire arbitration

10  provision or delegation provision, we treat the delegation

11  provision just like any other contract and that the thumb on

12  the scale in favor of arbitration which some courts before

13  Morgan said would allow courts to substantially reform

14  arbitration agreements to save them, that is, that that is,

15  that is not the law certainly post Morgan.

16          I'll also say that I think that Ragone is, again,

17  when you're dealing with, you know, certain contractual

18  provisions that are ancillary to the core purposes of the

19  parties, then the severance analysis is different.  It often

20  is.  That's not what we're confronting here.

21          Again, Your Honor, I think the overall point is we

22  would argue you don't need to decide today whether the clause

23  should be severed or not.  The fact that there are serious

24  questions about whether the arbitration provision or the

25  delegation provision as a whole, the delegation provision is

118

1   enforceable, that that coupled with the equities here supports

2   the issuance.

3          THE COURT:  So let me go back to what I need to

4   decide today or, more precisely, in the coming couple of

5   weeks.

6          What if I were to agree with you that you're likely

7   to succeed on the merits of your challenge to "loser pays,"

8   period, on one of many grounds or all of them, I can't sever

9   them per se because I'm not issuing a final judgment, summary

10  judgment or otherwise on the contract, but I can certainly

11  write an opinion on all the reasons why you're likely to

12  succeed on the merits of those, where would that leave your

13  client at the arbitration?  That is, what at that point would

14  he be required to arbitrate?

15         Wouldn't the arbitrator in some ways be bound to

16  respect or consider that view and not impose fees or do you

17  think she would be free to disregard it and it essentially

18  gives him nothing even if I believe that those terms were

19  unconscionable because she can continue to proceed in her own

20  forum and he still faces the risk that he's going to have to

21  pay fees or lost profits at the end of it?

22         MR. SELIGMAN:  I don't think --

23         THE COURT:  I mean it's hard to know, I hear your

24  point that it's hard to know where severability fits at the

25  preliminary injunction stage.

1    MR. SELIGMAN:  That's right.  I mean I just want to

2  reiterate -- at the risk of doing that thing that litigators

3  do, I want to reiterate.

4    THE COURT:  The thing where they say I'm not going

5  to repeat myself, that's okay.  We've all done it.

6    MR. SELIGMAN:  That severance -- the reference is

7  here or at least we think we've raised a serious question

8  about whether severance would be proper, and that should be

9  enough to counsel against issuing that kind of opinion, but

10  assuming that you disagreed with us and you did, in fact,

11  decide to issue that kind of opinion, we, I don't know what

12  that would mean for the arbitration, frankly.  I'm not, I'm

13  not sure.

14    I think that we would -- what AAA has said and what

15  the arbitrator has said, and AAA has said this in response to

16  the AG letters, that it's going to look at what this court

17  orders as to whether the arbitration should proceed or not.  I

18  don't think that it's clear that AAA would do or the

19  arbitrator would do any particular thing with respect to that

20  kind of work.

21    THE COURT:  Okay.  Let me ask you briefly just to

22  respond or answer the question of if I were to find that the

23  delegation clause or one or more of the -- let me rephrase

24  that.

25    If I were to agree with the plaintiff that he's

120

1  likely to succeed on the merits of his claim that one or more

2  of the substantive provisions, "loser pays," broadly, is

3  unlawful either under federal or state law but I were to agree

4  with you that the remedy under Ragone is severance, what does

5  that mean?  How does the order read and where does that leave

6  the status of the arbitration?

7           MR. DICKINSON:  Well, Your Honor, I need to point to

8  two facts.

9           One is that in Section 12 of the agreement, it

10 contemplates any tribunal having jurisdiction over the matter

11 can strike the provisions that are too broad or that are

12 overreached.  It's in the initial agreement and there's a blue

13 pencil --

14          THE COURT:  Right, I can do that at summary

15 judgment, right, if it stays with me and we are here, right?

16 Even if I deny the preliminary injunction, you all could do

17 discovery over the next, whatever, come back to me at summary

18 judgment on cross motions and I could decide for either party

19 but if I go for plaintiff, then at that point, I actually have

20 the power to sever that provision, I think, but at this stage

21 where the plaintiff is only asking for an injunction against

22 the arbitration but I were to find that one or more of the

23 provisions, "loser pays" is unlawful, where does that leave me

24 in terms of what I could do or, more precisely, what would be

25 the impact of that ruling if I were to say the typical remedy

1   is that it should be severed and I think that's probably the

2   right course here, what does the arbitrator do with that

3   ruling?

4           MR. DICKINSON:  Well, Your Honor cautioned yourself

5   against advisory rulings.  My perception of the appropriate

6   course in this case is that you follow the prescribed

7   progression of --

8           THE COURT:  I heard you on that point.

9           MR. DICKINSON:  And I even cautioned -- I didn't say

10  I don't want to repeat myself.  I said I'm going to.

11          THE COURT:  But I really do want an answer to this

12  question.

13          So if I were to agree that the plaintiff is likely

14  to succeed on the merits, that one or more of the provisions

15  in his contract that is subject to arbitration is unlawful,

16  cannot be arbitrated because it violates federal or state law

17  and his rights under those laws as a member of the subject

18  class, those should not be arbitrated, can I enjoin the entire

19  arbitration?  Can I sever that clause and if so, what would

20  severance look like at the preliminary injunction stage?

21          MR. DICKINSON:  Well, Your Honor, I think, first, I

22  would say that that would be inappropriate.  You should let

23  the arbitration run its course, come back, look at it and at

24  the summary judgment stage where it's decided, find out

25  whether or not we even violated that, whether the arbitrator

122

1  has exceeded her scope or done something she wasn't supposed

2  to do and you should strike it then.

3         That being said, I think that the appropriate way to

4  progress is to let the whole thing go to arbitration and let

5  her do her job and if she agrees with you, you don't even have

6  to do anything.

7         On the other hand, if Your Honor feels compelled to

8  enter that agreement, then you could say the arbitrator may

9  not award these issues, these issues go too far, these render

10 the agreement unenforceable for this reason, the agreement

11 contemplates a tribunal with jurisdiction, striking provisions

12 and leaving the remainder of it in effect, you could do that.

13        THE COURT:  Are you aware of any cases where any

14 court has severed one clause from arbitration and allowed the

15 remainder to proceed?  Is that something fairly common at the

16 preliminary injunction stage specifically?

17        MR. DICKINSON:  Actually, Your Honor, when the Court

18 talks about the test that I repeatedly cited, stage four of

19 the test is if some but not all arbitrable, stay or dismiss

20 the underlying action.

21        So when courts go through this progressive analysis

22 to determine whether they should compel arbitration and there

23 are claims that cannot be compelled as we discussed earlier,

24 for example, a sexual harassment or a sexual assault claim, in

25 the broader context of a more comprehensive discrimination,

1    you know, laundry list of different types of discrimination

2    claims, the court can set that claim aside and can hold onto

3    it if it chooses to carve out --

4            THE COURT:  At the preliminary injunction stage, can

5    enjoin preliminarily one set of claims from proceeding and not

6    the others knowing that, you know, the opposing parties still

7    bear the risk that can get taken away and they may have to

8    arbitrate the whole thing at the end of the day?

9            MR. DICKINSON:  Your Honor, that brings to a head a

10   procedural issue with respect to this case.

11           We filed a motion to compel -- we filed a letter

12   requesting permission to pursue a motion to compel arbitration

13   back in October.  There was never any action on it and it came

14   here.  We said in our brief that our take on this position is

15   that the Court should deny the preliminary injunction and

16   compel arbitration.

17           There are two sides of the same coin and from our

18   perspective, if you grant the injunction, you're denying our

19   position that arbitration should be compelled.  It's a little

20   peculiar because the arbitration is actually ongoing and this

21   is running in parallel.  It's not in response to a claim

22   brought by Mr. Vidal.

23           So the procedural posture of this case is peculiar,

24   but I think that the analysis still applies and that the court

25   can set those issues aside for a later date.  You could do it

1    if it was the ordinary process of bringing the cases under the

2    motion to compel because Mr. Vidal had brought, for example,

3    his FLSA or his TVPA claims, he had brought those and we had

4    responded with a motion to compel, you could certainly carve

5    out things that were not appropriately subject to arbitration.

6    I don't see a reason why the inverse does not apply.

7              MR. BARAN:  Your Honor, if I may?

8              THE COURT:  Yes.

9              MR. BARAN:  I think that part of what is being

10   highlighted here including the complex procedural posture

11   we're in, is exactly why a preliminary injunction makes sense.

12             The goal as the Second Circuit has said repeatedly

13   of a preliminary injunction is not to award the plaintiff the

14   final relief that they're seeking but, instead, to freeze the

15   status quo to prevent irreparable harm.

16             We've outlined the irreparable harm very clearly to

17   our client of an unauthorized arbitration where the arbitrator

18   has no valid, we believe no valid jurisdiction to proceed

19   causes to our client, dignitary harm as well as a direct harm

20   in terms of time, money, et cetera.  And, you know, by

21   contrast, defendant has never pointed to any harm that it

22   would incur.

23             THE COURT:  You've anticipated my next question.

24   Let me not let's you take the answer away from him.  Let me

25   ask defense counsel.

1          What is your argument, if I were to get to this

2   serious question of law, balance of hardships analysis, I know

3   the burden is on plaintiff, the likelihood success of the

4   merits piece of it, to show irreparable harm to him, but if I

5   were to agree with plaintiff that in one or more of these

6   areas, there's a serious question of law that would warrant

7   keeping the status quo in place.  I have to decide, of course,

8   that the balance of hardships tips decidedly toward the

9   plaintiff.  He's outlined and I don't think I need to hear it

10  again because he reiterated in his briefs and yours as well

11  what the harms are to him from participating in an arbitration

12  that may not be lawful or authorized.

13          What, if any, harm do the defendants have from

14  pausing the arbitration for a period of months or a year, long

15  enough for this federal court action to proceed to discovery

16  and cross-motions for summary judgment, if you even needed

17  discovery?  Maybe you all are ready to proceed to summary

18  judgment on an expedited basis now.

19          MR. DICKINSON:  Well, Your Honor, I would address a

20  couple of things.

21          One, and for the reasons stated in the brief and I

22  won't prolong it, we dispute the irreparable harm for the

23  precise reason that if the Court, upon consideration of the

24  case after the matter is arbitrated, finds that there's

25  anything that was imposed that was inappropriate, the Court

1   can strike it.  It's not irreparable because it can get fixed.

2   It's not the irreparable harm of cutting a tree down or

3   tearing a building down or some other some way we can't undo

4   what was done.  So I don't think the irreparable harm is

5   definitively decided in plaintiff's case in any event.

6          Beyond that, Your Honor actually recognized this

7   issue to some degree earlier and it's reflected in

8   correspondence that has been submitted to the Court.

9          This, if this is allowed to take place, and there's

10   no impediment placed on Mr. Vidal's departure and we are

11   precluded from pursuing public policy that's been articulated

12   by the Supreme Court over and over and over again to a prompt,

13   expedient, cost-effective resolution of the claim through

14   arbitration, this part -- there are already two other cases

15   that have been paused waiting for the decision on this case

16   and Your Honor recognized that lost profits is potentially a

17   legitimate source of damages here.

18          If one person is allowed not to, and then by virtue

19   of that person not being allowed to do it, two other pending

20   arbitrations are not allowed to progress, and anybody and

21   everybody else that's been hired pursuant to a program that is

22   essentially sanctioned by the Federal Government because we

23   need you to sponsor people, say that you can't fill the job,

24   say that you are going to put them in a job that's paid a

25   prevailing wage, we're going to allow to you do that, the

1  contract is that you stay long enough to recover what you've

2  expended and what you expected to get, if you put this on ice

3  for a year and, pardon me, I have to answer your question with

4  a question, what is the likelihood that the Court's actually

5  going to get to this within a year or two years or

6  three years, given the backlog of cases and the priority that

7  has to be afforded to criminal cases?

8         This could stretch on for a year, two years,

9  three years.  This could be devastating to the business.  That

10  is actually irreparable.

11         THE COURT:  That if there's a pause in the

12  arbitration proceedings without a final ruling, without any

13  decision from the Second Circuit, me simply issuing an order

14  saying at a minimum, there's a serious question of law as to

15  whether he clearly and unmistakably had a delegation clause in

16  here in this particular contract, that my issuing an

17  injunction, a temporary injunction preliminarily pending final

18  resolution of this case would so chill the guest worker

19  program and then the third-party staffer's role in it?

20         I know federal courts are important but that seems

21  an awfully broad chilling effect from one pause in one

22  arbitration proceeding.

23         MR. DICKINSON:  Well, there is -- what I'm trying to

24  express, and please allow me to try to do this more clearly.

25         THE COURT:  Yes.

1    MR. DICKINSON:  It's essentially a snowball effect.

2  If you pause this arbitration, instead of, you know, balance

3  of equities, who's really going to suffer the irreparable

4  harms, all these things at once, you get a decision from the

5  arbitrator that at least takes a first pass that all the

6  issues that are before here consistent with the delegation

7  clause, comes back here to be reviewed, if there's something

8  wrong with the arbitration clause, Mr. Vidal, anything that's

9  stricken from that can be taken care of.

10    He hasn't laid out any money.  He hasn't had to pay

11  the damages to ACS.  It's on hold waiting for a determination

12  here but at least the arbitration goes forward and people

13  understand that that process isn't timely.

14    THE COURT:  I'm going to have to stop you only

15  because I understand your point, but also I promised important

16  people in this courtroom that we would be concluded by 2:20

17  for other matters and it's now 2:18.

18    So let me -- given that plaintiff has the burden of

19  proof, let me give you the last word on this one issue.

20    Given that Mr. Vidal could, if he goes to the

21  arbitration and does not prevail but I were to then or the

22  arbitrator were to hold that he actually was entitled to leave

23  his job and he prevails ultimately, gets all his money back,

24  that he was wrongly ordered to pay by one court or another,

25  having to go through the arbitration, why is that irreparable

129

1   harm?  That is the question but you understand what I'm

2   asking.

3           MR. SELIGMAN:  First of all, the case law in this

4   Circuit is clear that, per se, irreparable harm is subjecting

5   someone to an arbitration that is unauthorized which is core

6   to the arguments in the case.

7           And let me say with respect to the snowball effect,

8   first of all, there's nothing to prohibit ACS from pursuing

9   breach of contract claims in another forum, in this court, for

10  example, if there's an urgency to have those claims resolved.

11          Additionally, if anything, the consequences outside

12  of this case strongly support the granting a preliminary

13  injunction.  The New York Attorney General has said that

14  there's serious concerns about at least two other workers and

15  AAA has said it's watching this court to see what it should

16  do.

17          THE COURT:  Right.  The snowball can go both ways

18  depending on who is watching or whose conduct is influenced

19  and in many ways, it's not for me to determine what other

20  people will think of the decision.  It's really the harm to

21  the parties specifically.

22          Do you think I should consider the potential effect

23  on other workers in Mr. Vidal's position just as ACS is asking

24  me to consider the effect on the industry from allow it to

25  proceed?

1          MR. SELIGMAN:  I think under the public interest

2   prong, you can and you should.  Right?  There are two other

3   workers out there and AAA has said basically it's going to see

4   what this court does to decide what happens with those two

5   other workers.

6          Preliminary injunction gives us the opportunity to

7   pause, to investigate what's happening with those other cases

8   and to raise those issues for the court.  So this court may

9   exercise its jurisdiction to decide the enforceability.

10         THE COURT:  Got it.

11         Did defendants consent to the pause in the other two

12  cases?  Are these both ACS cases or are they involving other

13  agencies?

14         MR. DICKINSON:  They agreed to the 30 days.

15         THE COURT:  That's what I thought.  Okay.

16         MR. DICKINSON:  One point?

17         THE COURT:  Yes.

18         MR. DICKINSON:  To argue that the cost and fees

19  associated with arbitration are unconscionable but then to

20  suggest that the appropriate thing is to bring all the claims

21  here where the expenses will be undoubtedly higher and the

22  process will be undoubtedly longer I believe is disingenuous.

23         THE COURT:  I don't think anyone has facts and

24  records about what the costs would be in this court.  We're

25  not charging a fee for the forum.  If you've read any of

131

1    Judge Cogan's decision, you'll note that he will certainly

2    dispute the characterization that he is in any way less

3    efficient than any arbitrator and I'll take the Fifth on

4    whether I can claim the same.

5            That said, I do want to represent to each of you

6    that to the extent, whatever, however I decide the preliminary

7    injunction, if the parties would like an expedited briefing

8    schedule on summary judgment, if you think you're ready to

9    proceed to that point, and you can certainly speak with the

10   Magistrate about expedited discovery in the interest of

11   getting this resolved, it's something, given the importance of

12   the issues to both sides and other parties with similar

13   interests on both sides, it's certainly something that I would

14   entertain and certainly something we can do in tandem with our

15   criminal dockets and other matters.

16           All right.  Let me just ask one more question about

17   the harm to the plaintiff.

18           Are there any specific costs, opportunity costs,

19   lost hours at his job -- I'm aware of the case law about per

20   se harm, but anything specific to him of having to participate

21   in arbitration if it weren't to be stayed that would in any

22   way fall on the side of the harm spectrum for him?

23           MR. SELIGMAN:  I think throughout our communications

24   with AAA and through Mr. Vidal's communications with AAA, you

25   can see how stressful, how burdensome, how confusing the

132

1  process has been and I can tell you that the fact that we have

2  a status conference coming up in March in this case and

3  deadlines for interrogatories continues to cause Mr. Vidal

4  tremendous stress.  If the Court would like an additional

5  submission on it, we're happy to provide it.

6  　　　　　THE COURT:  Thank you.  I don't think so but thank

7  you.

8  　　　　　So am I right that the arbitration in this case is

9  currently stayed until March 10th?

10  　　　　　MR. SELIGMAN:  That's not accurate.

11  　　　　　THE COURT:  Okay.  When is it stayed until, pending

12  this ruling?

13  　　　　　MR. SELIGMAN:  There is no stay.

14  　　　　　THE COURT:  There is no stay?

15  　　　　　MR. BARAN:  I think deadlines were briefly extended

16  in light of the briefing here, but there weren't, it was not

17  actually a stay of the arbitration.  Defendants have never

18  agreed to one, AAA has never agreed to one nor has the

19  arbitrator.

20  　　　　　THE COURT:  Okay.  Is that correct?

21  　　　　　MR. DICKINSON:  Yes, Your Honor.

22  　　　　　THE COURT:  All right.  The other question is in the

23  interest of having this resolution, I will confess I didn't

24  look at this in advance because I thought there was a cushion

25  built in but that was my mistake, not counsel's, there is a

1   possibility that I could issue a short ruling, either having

2   you on a conference line doing it verbally or do a short text

3   to be followed by a longer opinion for purposes of appeal if

4   either side wishes to do that.

5           So you don't need to tell me today but you also are

6   free to let me know if either of you have any concerns about

7   me proceeding in that fashion, recognizing that whoever does

8   not prevail, should you choose to appeal the either grant or

9   denial of the preliminary injunction, your clock would begin

10  to run from when I issued an order which would actually, the

11  first order, whether verbal or otherwise, would be the order

12  granting or denying the injunction, to be followed as soon as

13  practicable by a longer opinion.  Given the Second Circuit's

14  briefing calendars, you know, you'll need to file a notice

15  relatively promptly, but your briefing schedule allows for

16  sufficient time to consider the merits.

17          You can let me know if you have any objection to

18  proceeding in that fashion without, of course, who might

19  benefit more, not from whichever side it comes out on.

20          MR. DICKINSON:  Interesting question, Your Honor, as

21  a practical matter, because it does start the clock to get the

22  appeal which I think either party would find appealing to at

23  least get the appellate process underway if one or the other

24  is going to pursue that and we would actually have the benefit

25  of your fuller opinion after that.  I think we should discuss

1   that.

2           THE COURT:  Why don't you confer.  I mean I think

3   what I would probably do is not leave you completely in the

4   dark as to my reasoning.

5           You know, we do this occasionally in criminal cases

6   with a suppression hearing where it can have an impact on

7   plea.  So the court might announce, you know, I've decided to

8   grant the motion to suppress or deny it so that the parties

9   know if that was the primary defense or a primary way of

10  having an adverse adjudication for the defendant and then an

11  opinion follows.

12          This would obviously be a bit more involved than

13  some other cases, but with an eye towards doing it more

14  promptly, what I could do is provide you with an outline of my

15  reasons with respect to the primary claims on the record, let

16  the party adversely affected file their notice of appeal and

17  then follow with an opinion in 30 or 60 days or something like

18  that.

19          MR. SELIGMAN:  I can tell you now we would not have

20  concerns.

21          THE COURT:  Okay.

22          All right.  Why don't you confer with your client

23  and let me know by letter or otherwise how you feel about that

24  route.  And if there would be any contingencies attached

25  around it, I can't promise that I'd honor them but I would

1   certainly consider them and I will also double check the rules

2   and make sure I didn't run afoul or in any way compromise

3   anyone's appellate remedies or otherwise.

4          Okay.  All right.  I have nothing further.

5          Give me one second.  Let me confer with my colleague

6   here.

7          (Pause.)

8          THE COURT:  With the understanding that the

9   arbitration isn't presently stayed, you indicated there were

10  some upcoming deadlines in the case.  Is that responding to

11  interrogatories, a status conference?  What is the next event

12  in the case?

13         MR. SELIGMAN:  I believe, Your Honor, Mr. Vidal has

14  a deadline to respond to interrogatories this week and has a,

15  this status conference in March.

16         We, Mr. Vidal has informed the arbitrator that he

17  will not be responding to interrogatories until this court

18  rules on the arbitrator's authority to preside over the case.

19  So, but nonetheless, the deadline is in place and, of course,

20  he's at risk for defaulting.

21         MR. BARAN:  And I would just note also our client

22  does not have representation.

23         THE COURT:  In the arbitration?

24         MR. BARAN:  Right.  And Towards Justice only

25  appeared for the purpose of challenging its validity.

1    THE COURT:  And your firm is affiliated with Towards

2  Justice and that's the extent of your involvement as well?

3    MR. BARAN:  We're co-counsel here in this case for

4  the Court but we're not involved in the arbitration.

5    THE COURT:  Understood.  So without inquiring, you

6  have been retained by Mr. Vidal for the limited purpose of

7  appearing here to challenge the arbitrability as we've talked

8  about?

9    MR. BARAN:  Correct.

10    THE COURT:  Understood.  All right.  Thank you.

11    Any other statement from defense counsel about any

12  deadlines or upcoming things I should know about?

13    MR. DICKINSON:  No other dates that you need to know

14  about, Your Honor.

15    I think we'd add that there's a half a dozen

16  interrogatories and document requests.  It's not an onerous

17  discovery request to Mr. Vidal.

18    THE COURT:  Thank you.

19    All right.  Thank you very much, gentlemen.  I

20  appreciate your time and your thoughtfulness and look forward

21  to your briefs and I'll let you know when we have a decision.

22    With respect to the additional authorities I invited

23  you to submit, please use your professional judgment and keep

24  them as brief as possible and limited to the specific topics I

25  indicated.

137

1        I did hear and, as you saw, took copious notes on

2   all of your arguments and we have the benefit of briefing

3   already, but if there's anything additional, please feel free

4   to submit a letter brief within the next few days or so.

5        All right.  Thank you very much.  Take care.

6        MR. DICKINSON:  Thank you.

7        MR. SELIGMAN:  Thank you.

8        (Matter concluded.)

9

10

11

12                    *    *    *    *    *

13

14

15  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.

16

17      /s/ Charleane M. Heading           March 22, 2023

18   _____    _____
        CHARLEANE M. HEADING                  DATE

19

20

21

22

23

24

25