# No. 23-303

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————————————

Benzor Shem Vidal,
*Plaintiff-Appellee*,

v.

Advanced Care Staffing, LLC,
*Defendant-Appellant*.

———————————————

On Appeal from the United States District Court
for the Eastern District of New York, No. 1:22-cv-05535 (NRM)(MMH)
Hon. Nina R. Morrison

———————————

**BRIEF OF *AMICUS CURIAE* PUBLIC JUSTICE
IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE**

———————————————

Hannah M. Kieschnick
PUBLIC JUSTICE
475 14th St., Suite 610
Oakland, CA 94612
Tel.: (510) 622-8150
Fax: (202) 232-7203
hkieschnick@publicjustice.net

Leah M. Nicholls
PUBLIC JUSTICE
1620 L St. NW, Suite 630
Washington, DC 20036
Tel.: (202) 797-8600
Fax: (202) 232-7203
lnicholls@publicjustice.net

*Counsel for* Amicus Curiae *Public Justice*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), *Amicus Curiae* Public Justice is a non-profit organization, does not issue stock, and has no parent corporation.

# **TABLE OF CONTENTS**

Corporate Disclosure Statement ................................................................. i

Table of Authorities ................................................................................ iii

Statement of Interest ............................................................................... 1

Introduction and Summary of Argument................................................... 2

Argument ................................................................................................ 5

I.    The Federal Arbitration Act Prohibits Courts from Applying
Arbitration-Specific Contract Rules ............................................. 6

II.   Under New York Law, the Traditional Remedy for an Unenforceable
Term Is to Invalidate the Contract Unless the Term Is Incidental to the
Contract and the Party Seeking Enforcement Acted in Good Faith.............. 7

III.  ACS Proposes a Categorical Rule of Severance Specific to Arbitration
that Does Not Survive *Morgan*.................................................... 12

IV.  The Loser-Pays Provision Is Not Severable Because It Goes to
the Core of ACS's Scheme to Coerce Workers into Staying in
Grueling Jobs and Immunize Itself from Liability for its
Abusive Working Conditions ...................................................... 15

Conclusion .......................................................................................... 18

Certificate of Compliance ......................................................................

Certificate of Service ...........................................................................

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Family Life Assurance Co. of N.Y. v. Baker*,
848 F. App'x 11 (2d Cir. 2021) ...........................................................................13

*Artache v. Goldin*,
133 A.D.2d 596 (N.Y. App. Div. 1987) ...........................................................6, 8

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011).........................................................................................6–7

*BDO Seidman v. Hirshberg*,
690 N.Y.S.2d 854 (N.Y. 1999) ............................................................................9

*Beletsis v. Credit Suisse First Boston, Corp.*,
No. 01 CIV. 6266(RCC), 2002 WL 2031610 (S.D.N.Y. 2010).........................14

*Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*,
448 F.3d 573 (2d Cir. 2006) ..............................................................................12

*B.F. v. Amazon.com Inc.*,
858 F. App'x 218 (9th Cir. 2021) ........................................................................2

*Brady v. Williams Cap. Grp., L.P.*,
878 N.Y.S.2d 693 (N.Y. App. Div. 2009)....................................................12–13

*Graham Oil Co. v. ARCO Prods. Co., a Div. of Atl. Richfield Co.*,
43 F.3d 1244 (9th Cir. 1994) .............................................................................10

*Granite Rock Co. v. Teamsters*,
561 U.S. 287 (2010)............................................................................................6

*Hayes v. Delbert Servs. Corp.*,
811 F.3d 666 (4th Cir. 2016) .............................................................................10

*Herrera v. Katz Comms., Inc.*,
532 F. Supp. 2d 644 (S.D.N.Y. 2008) ..........................................................13–14

*Lanza v. Carbone*,
130 A.D.3d 689, 692 (N.Y. App. Div. 2015) .....................................................11

*MacDonald v. CashCall, Inc.*,
883 F.3d 220 (3d Cir. 2018) ...............................................................................11

*Mason v. Curtis*,
119 N.E. 559 (N.Y. 1918) .....................................................................................9

*McCall v. Frampton*,
81 A.D.2d 607 (N.Y. App. Div. 1981) ..................................................................8

*Mercado v. Schwartz*,
174 N.Y.S. 3d 82 (N.Y. App. Div. 2022) ............................................................12

*Morgan v. Sundance, Inc.*,
596 U.S. 411 (2022)....................................................................................*passim*

*Oneida Indian Nation of N.Y. v. Cnty. of Oneida*,
617 F.3d 114 (2d Cir. 2010) .......................................................................*passim*

*Parilla v. IAP Worldwide Servs., VI, Inc.*,
368 F.3d 269 (3d Cir. 2004) ...............................................................................10

*Parthey v. Beyer*,
238 N.Y.S. 412 (N.Y. App. Div. 1930) .............................................................7–8

*Pereira v. Cogan*,
200 F. Supp. 2d 367 (S.D.N.Y. 2002) ..................................................................9

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
388 U.S. 395 (1967)..........................................................................1–2, 6, 12

*Ragone v. Atl. Video at Manhattan Ctr.*,
595 F.3d 115 (2d Cir. 2010) ...............................................................................13

*Valle v. ATM Nat., LLC*,
No. 14-cv-7993, 2015 WL 413449 (S.D.N.Y. Jan. 30, 2015)...............12–13, 14

*Weintraub v. Vigilant Protective Sys., Inc.*,
36 A.D.2d 529 (N.Y. App. Div. 1971) ..................................................................8

iv

**Rules**

Fed. R. App. P. 29 ...................................................................1

**Other Authorities**

3 Dan B. Dobbs, *Law of Remedies: Damages-Equity-Restitution* § 12.8
    (2d ed. 1993) ...........................................................7

8 Richard A. Lord, *Williston on Contracts* § 18.1
    (4th ed. 1998 & Supp. 2009)...............................................7

E. Allan Farnsworth, *Farnsworth on Contracts* § 5.8 (1990) ...........................9, 10

Harlan M. Blake, *Employee Agreements Not to Compete*,
    73 Harv. L. Rev. 625 (1960).............................................8–9

Restatement (Second) of Contracts § 183................................................9

Restatement (Second) of Contracts § 184.........................................*passim*

Restatement (Second) of Contracts § 208...........................................5, 8

## STATEMENT OF INTEREST[1]

Public Justice is a national public interest advocacy organization that specializes in precedent-setting, socially significant civil litigation, with a focus on fighting to preserve access to justice for victims of corporate and governmental misconduct. Public Justice has long maintained an Access to Justice Project, which seeks to ensure that civil courts are effective tools for people with less societal power to win just and equitable outcomes and hold accountable those with more power.

Towards that end, the Access to Justice Project has an interest in the law surrounding arbitration and fighting against the unlawful use of pre-dispute mandatory arbitration clauses that deny workers and consumers their day in court. Public Justice has represented plaintiffs and *amici curiae* in cases involving pre-dispute mandatory arbitration clauses and the interpretation of the Federal Arbitration Act ("FAA") in the Supreme Court and courts around the nation.

Particularly relevant to this case, Public Justice's Access to Justice Project has taken a special interest in identifying legal doctrines that single out arbitration agreements for preferred treatment, in contravention of the Supreme Court's equal-footing principle that Congress intended arbitration agreements to be "as enforceable

---

[1] No party's counsel authored this brief in whole or in part, nor did a party, its counsel, or any other person contribute money to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(a)(4)(E). The parties consent to the filing of this brief.

1

as other contracts, but not more so." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967). Public Justice recently won a unanimous victory in *Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022), in which the Supreme Court reaffirmed the equal-footing principle and confirmed that the FAA requires courts to apply generally applicable state contract law to arbitration agreements, not arbitration-specific rules. *See also B.F. v. Amazon.com Inc.*, 858 F. App'x 218 (9th Cir. 2021) (Public Justice as *amicus curiae* in case where defendant-appellant invoked arbitration-specific rule of equitable estoppel).

Contrary to *Morgan*, Defendant-Appellant has invoked an arbitration-specific rule of severance in arguing that the district court erred by not severing any illegal and unenforceable terms from the arbitration provision. As demonstrated by its work, Public Justice has interest and expertise not only in ensuring that mandatory arbitration is not abused generally, but specifically in ensuring that courts follow *Morgan* and the equal-footing principle.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Defendant-Appellant Advanced Care Staffing, LLC (ACS) tries to avoid the consequences of the arbitration provision it wrote by claiming that any illegal terms—in particular, a "loser pays" provision that could force immigrant healthcare workers like Plaintiff-Appellee Benzor Shem Vidal to shoulder ACS's fees and the

2

cost of arbitration—can just be cut from the provision. But ACS gets the law wrong. Under New York contract law, the loser-pays provision is not severable because it is essential to ACS's overall illegal scheme of luring nurses into the United States, coercing them into continuing to work under threat of grave financial penalty, and insulating itself from liability for its grueling working conditions.

Mr. Vidal is one such nurse.[2] ACS agreed to sponsor Mr. Vidal's visa and staff him in a healthcare facility, and he agreed to work for ACS for three years. ACS's form contract contained an arbitration provision which included, among other terms, the loser-pays provision. The job was not what Mr. Vidal had hoped. Although he feared being forced to pay damages, fees, and costs for walking away, Mr. Vidal also feared he would lose his nursing license working in an understaffed and unsafe facility. He resigned. Sure enough, ACS went to arbitration, claiming that Mr. Vidal had breached his contract and owed *at least* $20,000 in damages. It also invoked the loser-pays provision to say that Mr. Vidal would be on the hook for ACS's fees and the cost of arbitration.

Unable to afford such a judgment, Mr. Vidal sought a preliminary injunction. The district court paused arbitration after concluding that Mr. Vidal was likely to

---

[2] *Amicus* relies on the factual findings made by the district court in support of its order granting a preliminary injunction. *See* Special Appendix ("SPA"), ECF 48, 5–55.

3

succeed on the merits of his arbitrability claims: either that the court was to decide Mr. Vidal's challenges to the arbitration provision because the provision does not clearly and unmistakably delegate such challenges to the arbitrator, or that the purported delegation provision is unenforceable because it is unconscionable and violates federal law against forced labor. Either way, temporarily enjoining the arbitration would allow the district court to consider Mr. Vidal's challenges to the enforceability of the arbitration provision. On appeal, ACS resists the district court's evaluation of the merits and also claims the court erred in concluding that the loser-pays provision is not severable from the purported delegation clause.[3]

On the latter, ACS urges this Court to apply an arbitration-specific rule of severance contrary to *Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022), in which the Supreme Court confirmed that the Federal Arbitration Act (FAA) requires courts to apply generally applicable state contract law, not "bespoke" rules, to arbitration agreements. *Id.* at 417–18. Under generally applicable New York law, the "traditional remedy" when a term is unenforceable is to invalidate the whole

---

[3] In fact, the district court *expressly declined* to reach ultimate questions of remedy, explaining that "a severability analysis would be premature at this stage, where the only relief sought by Vidal is a preliminary injunction pausing the arbitration." SPA-46–47. *Amicus* agrees with Mr. Vidal that this restraint was the proper course, Vidal Br. 43, but nonetheless responds to ACS's specific arguments should remedies be relevant now.

4

contract. *Oneida Indian Nation of N.Y. v. Cnty. of Oneida*, 617 F.3d 114, 138 (2d Cir. 2010) (citations omitted). A court may instead sever the unenforceable term and enforce what remains, *id.* (citing Restatement (Second) of Contracts § 208 (1981)), but only so long as the term is "not essential" and the party seeking partial enforcement has acted in "good faith," Restatement (Second) of Contracts § 184(1). ACS would flip this flexible rule on its head by requiring courts to sever any unenforceable terms from an arbitration agreement.

The difference between these two rules is not academic and, under the correct standard, the loser-pays provision is not severable. ACS has drafted an exploitative scheme that traps workers in grueling jobs because they cannot risk paying ACS's fees and costs should they be hauled into arbitration for quitting. The provision also insulates ACS from liability because few workers will risk the penalty of losing should they affirmatively challenge their employer's labor practices. Applying New York's generally applicable rule is not only consistent with *Morgan* and the FAA, it also ensures that entities like ACS cannot simply draft unlawful terms with impunity.

## ARGUMENT

The FAA requires courts to apply the same rules to arbitration agreements that apply to other types of contracts. *Morgan*, 596 U.S. at 417–18. And under New York law, an unenforceable term invalidates the entire contract *unless* it is incidental and

5

not essential to the main purpose of the contract and the party seeking enforcement has acted in good faith. *Oneida Indian Nation*, 617 F.3d at 138 (citations omitted); *Artache v. Goldin*, 133 A.D.2d 596, 599 (N.Y. App. Div. 1987); Restatement (Second) of Contracts § 184. ACS urges this Court to sever the loser-pays provision using an arbitration-specific rule that does not survive *Morgan*, but, under the correct standard, ACS cannot get the benefit of severance.

## I. The Federal Arbitration Act Prohibits Courts from Applying Arbitration-Specific Contract Rules.

In *Morgan*, the Supreme Court held that applying "bespoke" or "arbitration-specific" rules to arbitration clauses violates the FAA. 596 U.S. at 417–18. *Morgan* explained that many lower courts have developed "novel rules to favor arbitration over litigation" based on the FAA's purported "policy favoring arbitration." *Id.* at 418 (internal quotation marks, citation omitted). This weight on the scale was wrong, said the Supreme Court. Rather, drawing from case law describing a principle of equal treatment between arbitration and other contracts, the Supreme Court explained that the policy is to place all contracts "upon the *same* footing." *Id.* (quoting *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 302 (2010)) (emphasis added). Thus, the FAA "make[s] 'arbitration agreements as enforceable as other contracts, but not more so.'" *Id.* (quoting *Prima Paint Corp.*, 388 U.S. at 404 n.12); *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (interpreting

6

section 2 of the FAA to mean that "courts must place arbitration agreements on an equal footing with other contracts").

*Morgan* is not limited to the particular rule at issue in that case: an additional prejudice requirement for waiver applied only in the arbitration context. Rather, the Supreme Court relied on the equal-footing principle applied across contexts to confirm a broader legal principle. *See Morgan*, 596 U.S. at 417–18. Under the FAA, courts must apply the same generally applicable rules to arbitration agreements as they do to other contracts: "If an ordinary procedural rule—whether of waiver or forfeiture or what-have-you—would counsel against enforcement of an arbitral contract, then so be it. The federal policy is about treating arbitration contracts like all others." *Id.* at 418.

## II.    Under New York Law, the Traditional Remedy for an Unenforceable Term Is to Invalidate the Contract Unless the Term Is Incidental to the Contract and the Party Seeking Enforcement Acted in Good Faith.

Under generally applicable New York law, the "traditional remedy" when a term is unenforceable is to invalidate the whole contract, not partially enforce it. *Oneida Indian Nation*, 617 F.3d at 138 (citing 8 Richard A. Lord, *Williston on Contracts* § 18.1, at 2–9 (4th ed. 1998 & Supp. 2009); 3 Dan B. Dobbs, *Law of Remedies: Damages-Equity-Restitution* § 12.8(4), at 215–19 (2d ed. 1993)). For example, in *Parthey v. Beyer*, 238 N.Y.S. 412 (N.Y. App. Div. 1930), the court concluded that "no part" of a land agreement could be enforced where that agreement

contained both an unenforceable lease duration that exceeded legal limits and an otherwise enforceable option to purchase the property. *Id.* at 416–17.

A court, though, retains "substantial flexibility" in deciding the appropriate remedy when contract terms are unenforceable. *Oneida Indian Nation*, 617 F.3d at 138 (citing Restatement (Second) of Contracts § 208). In particular, a court may exercise its discretion to sever the unenforceable term or terms and "enforce the remainder of the contract"—subject to two important limitations. *Id.* (quoting same).

**First**, the unenforceable terms must be "incidental to the legal aspects" and "not the main objective" of an agreement. *Artache*, 133 A.D.2d at 599. Or, in the words of the Restatement, the term must not be "an essential part of the agreed upon exchange," which largely depends on "its relative importance in the light of the entire agreement[.]" Restatement (Second) of Contracts § 184(1) & 184 cmt. a. This inquiry can also depend on the degree to which illegality "permeates" the agreement. *Weintraub v. Vigilant Protective Sys., Inc.*, 36 A.D.2d 529, 529 (N.Y. App. Div. 1971); *McCall v. Frampton*, 81 A.D.2d 607, 608–09 (N.Y. App. Div. 1981) (severability depends on "the degree to which the illegality infects and destroys the agreement"). In other words, courts have flexibility to consider everything from the role a specific term plays to the severity of illegality to the number of illegal terms.

8

Thus, for example, in an early decision, the New York Court of Appeals considered whether "the illegal part" of an agreement between two corporate stockholders could be severed and the remainder of the agreement enforced. *Mason v. Curtis*, 119 N.E. 559, 562 (N.Y. 1918). Although one stockholder claimed the parties agreed to "nothing more than" lawfully coordinating their votes to elect certain board members, the court considered the interaction of various provisions to identify the "main purpose" instead as illegally wresting corporate management from the board. *Id.* Because the main purpose of the agreement was to engage in this illegal scheme, particular provisions could "[]not be expunged." *Id.*

**Second**, the party seeking severance and the partial enforcement of an agreement must have negotiated in "good faith" and not "overreach[ed]," abused its "dominant bargaining power," or engaged in "other anti-competitive misconduct." *BDO Seidman v. Hirshberg*, 93 N.E.2d 1220, 1226 (N.Y. 1999) (citing, *inter alia*, Restatement (Second) of Contracts § 184); *Pereira v. Cogan*, 200 F. Supp. 2d 367, 377 (S.D.N.Y. 2002) ("Severability can only be invoked by 'a party who did not engage in serious misconduct.'" (quoting Restatement (Second) of Contracts § 183; citing E. Allan Farnsworth, *Farnsworth on Contracts* § 5.8, at 70 (1990))). This is because "a court will not aid a party who has taken advantage of his dominant bargaining power." Restatement (Second) of Contracts § 184 cmt. b. Any other rule

9

would invite a race to the bottom whereby those with more power would "fashion truly ominous covenants with confidence that they will be pared down and enforced[.]" Harlan M. Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625, 683 (1960).

The extent to which illegality permeates or infects an agreement is also relevant to this second consideration. For example, the Third Circuit applying Virgin Islands contract law—persuasive here because both the Virgin Islands and New York look to the Restatement—emphasized that a "multitude" of defects "will preclude severance" when they reflect an employer's "deliberate attempt" to abuse a dominant bargaining position and produce "biased" results. *Parilla v. IAP Worldwide Servs., VI, Inc.*, 368 F.3d 269, 289 (3d Cir. 2004) (citing, *inter alia*, Restatement (Second) of Contracts § 184 cmt. a). Similarly, both the Fourth Circuit and the Ninth Circuit have relied on a leading treatise also followed in New York to explain that "severance is inappropriate when the entire clause represents an 'integrated scheme to contravene public policy.'" *Graham Oil Co. v. ARCO Prods. Co., a Div. of Atl. Richfield Co.*, 43 F.3d 1244, 1249 (9th Cir. 1994) (quoting E. Allan Farnsworth, *Farnsworth on Contracts* § 5.8, at 70); *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 676 (4th Cir. 2016) (quoting *Graham Oil Co.*, 43 F.3d at 1249).

10

Moreover, while a severability clause may reflect the parties' intent about the main objective of an agreement, *see, e.g.*, *Lanza v. Carbone*, 130 A.D.3d 689, 692 (N.Y. App. Div. 2015), it can also reflect a party's coercive use of their bargaining power to insulate an unfair agreement from being fully invalidated. Thus, courts may take into account the presence of a severability clause but, consistent with New York's flexible approach to severance, do not treat such a clause as dispositive. For example, in *MacDonald v. CashCall, Inc.*, 883 F.3d 220, 230–31 (3d Cir. 2018), the Third Circuit applied New Jersey severance principles—again, persuasive here because New Jersey also looks to the Restatement—to hold that an illegal forum selection provision was an "integral, not ancillary" part of the agreement and thus not severable "despite the inclusion of a severability clause in the contract."

Applying these limitations to severance under New York law, severance is more likely to be appropriate when two entities of relatively equal bargaining power agree to an unlawful term as part of their overall business dealings, than when there is a significant disparity in power between the parties and evidence that one party has taken advantage of that disparity. As an example, a contract governing the relationship between a hospital and an insurance company may be partially enforceable even if a provision about reimbursement rates violates state law and is not enforceable. But a contract between a medical group and its patient may be

11

invalidated in full where the patient was presented with the contract in the waiting

room before surgery and the contract contains a term about expert witnesses in

medical malpractice cases that violates state law. *Compare Beth Israel Med. Ctr. v.*

*Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 580–81 (2d Cir. 2006),

*with Mercado v. Schwartz*, 174 N.Y.S. 3d 82, 90 (N.Y. App. Div. 2022).

## III.    ACS Proposes a Categorical Rule of Severance Specific to Arbitration that Does Not Survive *Morgan*.

ACS asks this Court to apply a rule of severance that sharply diverges from

the generally applicable rule described above: When the agreement is one for

arbitration, a court should simply sever the unenforceable term or terms. *See* ACS

Br. 37.[4] Both New York courts and courts in this Circuit have applied the arbitration-

specific rule ACS proposes, often concluding without analysis that "the 'appropriate

remedy is to sever the improper provision of the arbitration agreement' and not to

invalidate the entire Arbitration Provision." *See, e.g.*, *Valle v. ATM Nat'l, LLC*, No.

---

[4] Here, the question is whether unenforceable terms *within* an arbitration agreement invalidate the entire agreement or instead can be severed. This question is one of state law distinct from the "severability doctrine" that has developed under federal law, which says that an arbitration clause is "severable" and independently enforceable from the rest of the contract in which it is contained. *See Prima Paint Corp.*, 388 U.S. at 400, 403–04. The upshot of this federal doctrine is that a party seeking to oppose arbitration must challenge the enforceability of the arbitration agreement (or delegation clause) specifically, as opposed to the contract as a whole—which Mr. Vidal has done. *See* Vidal Br. 22.

12

14-cv-7993, 2015 WL 413449, at *7 (S.D.N.Y. Jan. 30, 2015) (quoting *Brady v. Williams Cap. Grp., L.P.*, 878 N.Y.S.2d 693, 701 (N.Y. App. Div. 2009), *aff'd as modified by* 928 N.E.2d 383 (N.Y. 2010)) (cited at ACS Br. 37). *Morgan* precludes this rule.

Like the waiver rule rejected in *Morgan*, this rule of severance is expressly rooted in the "policy favoring arbitration." *Am. Family Life Assurance Co. of N.Y. v. Baker*, 848 F. App'x 11, 13 (2d Cir. 2021) (quoting *Brady*, 878 N.Y.S.2d at 701); *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 124–25 (2d Cir. 2010) (emphasizing "fact that we are charged with encouraging and supporting arbitration" when describing rule of severance for arbitration agreements from *Brady* (internal quotation marks, citation omitted)). This stated preference has led courts to construct a rule of severance that deviates from New York's generally applicable rule in two related ways. First, instead of starting with the "traditional remedy" of invalidation, courts start with the opposite presumption: partial enforcement aided by severance. Second, courts often apply this presumption in a categorical way that short-circuits consideration of the specific circumstances of the agreement.

Some courts considering whether to sever unenforceable terms from an arbitration agreement go halfway, purporting to consider the agreement's main objective—but they stop simply at "arbitration." For example, in *Herrera v. Katz*

13

*Comms., Inc.*, 532 F. Supp. 2d 644 (S.D.N.Y. 2008), the court stated that, to the extent a provision precluded a plaintiff from recovering fees, it would sever that term and compel arbitration because "[a]ny other approach would serve to thwart the very essence of the arbitral agreement the parties have reached." *Id.* at 647. Similarly, in *Valle*, the court merely cited the arbitration-specific severance rule and then stated: "By nullifying the objectionable 'loser pays' provision, this Court will not be overriding the intent of the parties to arbitrate." 2015 WL 413449, at *7.

This truncated analysis falls short of what is required when courts consider whether to partially enforce non-arbitration agreements. It generally does not, for example, account for the nature, purpose, and extent of the unenforceable terms—no matter how pervasive, or the conduct of the party seeking severance and partial enforcement—no matter how pernicious.[5] In short, the arbitration-specific rule ACS

---

[5] Some courts considering whether to partially enforce an arbitration agreement have engaged in an analysis closer to what is required under the generally applicable rule. For example, in *Beletsis v. Credit Suisse First Boston, Corp.*, No. 01 CIV. 6266(RCC), 2002 WL 2031610 (S.D.N.Y. Sept. 4, 2002), the court severed an attorneys' fees clause from an arbitration agreement based in part on the "liberal federal policy favoring arbitration agreements" and in part on New York's general rule that severance is available when the "illegal provisions are incidental to the legal aspects and are not the main objective of the agreement." *Id.* at *6 (internal citations, quotation marks omitted). Just because some courts do better does not mean that others do not totally miss the mark. So, rather than disprove the existence of an arbitration-specific rule, these cases demonstrate that courts are perfectly capable of applying general contract principles to arbitration agreements.

advocates for here incentivizes entities with more bargaining power to include unlawful terms in their form arbitration agreements without consequence—an outcome New York's generally applicable rule is designed to prevent.

### IV. The Loser-Pays Provision Is Not Severable Because It Goes to the Core of ACS's Scheme to Coerce Workers into Staying in Grueling Jobs and Immunize Itself from Liability for Its Abusive Working Conditions.

Applying the correct standard matters. Under ACS's proposed rule, the analysis is cut and dry: The Court must sever the loser-pays provision from the delegation clause, enforce the arbitration provision, and send Mr. Vidal back to arbitration—where he could face paying his former employer's fees and the cost of arbitration. Not so under the generally applicable rule that actually applies.

Putting the loser-pays provision in context makes apparent that ACS's purpose is not to provide a simple "mechanism to resolve employment disputes," ACS Br. 37, but to perpetuate a scheme of coercing workers and avoiding liability. That scheme operates as follows. The staffing agency recruits foreign nurses seeking the "American dream," brings them to the United States, and staffs them in healthcare facilities around the country. SPA-6. As part of ACS's form contract, nurses agree to work for ACS for three years. SPA-7. They also agree to an arbitration provision and, before 2022, a liquidated damages clause stating that ACS would be entitled to $20,000 in damages should an employee leave early. *Id.* As the district court explained, however, by 2022, numerous courts had held that similar

liquidated damages clauses in contracts between staffing agencies and immigrant healthcare workers violate anti-trafficking laws as coercive and unenforceable. SPA-31–32 (listing cases). So, when ACS presented Mr. Vidal with the operative employment contract in 2022, it stated vaguely that the contract been had revised to remove the clause based on "feedback" and to instead specify the types of damages ACS would suffer if Mr. Vidal resigned early. SPA-8–9. ACS also added to the arbitration provision a new loser-pays provision, described above, whereby the prevailing party would be reimbursed its reasonable attorneys' fees as well as the costs and fees associated with arbitration. SPA-11.

The effect of the loser-pays provision is two-fold. First, it intimidates immigrant healthcare workers into remaining their full three-year terms—whatever the working conditions—rather than risk ACS going after them for damages related to their breach of contract plus its fees and costs. In other words, the provision serves the same coercive purpose as the liquated damages clause that ACS rescinded (at the same time it added the loser-pays provision) based on the widespread judicial recognition that such a clause unlawfully threatens workers. Second, the provision dissuades immigrant healthcare workers from themselves turning to arbitration to vindicate their rights under federal and state anti-trafficking and labor laws, even if they might have viable claims, because they cannot risk the financial penalty should

they lose. Thus, ACS uses the loser-pays provision both to illegally extract more labor from workers and to avoid liability for the way it treats those workers.

Mr. Vidal's experience makes clear that ACS views the loser-pays provision as central to its overall operations. The agreement repeatedly clarifies that Mr. Vidal will be responsible for the fees and costs associated with pursuing a breach of contract claim against him. *See* Appendix Vol. I ("A"), ECF 49, 244; A-249. And in fact, ACS relied on that provision in its demand letter, threatening that if Mr. Vidal were to resign, it would initiate arbitration proceedings, where he could face "*at least* $20,000 in damages, in addition to attorneys' fees" and the fees and costs associated with arbitration too, SPA-13 (emphasis modified)—a transparent attempt to intimidate Mr. Vidal into continuing to work. Although terrified of these financial consequences, Mr. Vidal ultimately feared losing his nursing license more. *Id.* He resigned rather than continue being forced to handle double the patients he had been promised, undermining his ability to provide adequate care, take legally required breaks, and protect himself from illness. SPA-12–13. That ACS's efforts ultimately did not work in Mr. Vidal's case does not mean the company did not take advantage of its dominant bargaining power in the first place.

Severing the loser-pays provision would reward ACS's overreach and send a dangerous signal to other corporations that there are few consequences for drafting

17

arbitration agreements replete with unfair and unenforceable terms. When the time comes, either this Court or the district court should apply New York's generally applicable rule of severance and find that the illegal loser-pays provision renders the entire purported delegation clause, and arbitration provision, invalid.

## CONCLUSION

For these reasons and the reasons stated in Mr. Vidal's brief, the Court should affirm the district court's order granting a preliminary injunction and, to the extent relevant now, should not order partial enforcement of the arbitration agreement.

Respectfully submitted,

October 31, 2023

/s/ Hannah M. Kieschnick
Hannah M. Kieschnick
PUBLIC JUSTICE
475 14th St., Suite 610
Oakland, CA
Tel.: (510) 622-8150
Fax: (202) 232-7203
hkieschnick@publicjustice.net

18

**CERTIFICATE OF COMPLIANCE**

This motion complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) and Local Rules 29.1(c) and 32.1(a)(4)(A) because this brief contains 4,233 words, excluding the parts of the motion exempted by Federal Rule of Appellate Procedure 32(f), as calculated by Microsoft Office 365.

This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Office 365 in 14-point Times New Roman font.

October 31, 2023

/s/ Hannah M. Kieschnick

Hannah M. Kieschnick

*Counsel for* Amicus Curiae *Public Justice*

## CERTIFICATE OF SERVICE

I certify that on October 31, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit via the CM/ECF system and served all parties or counsel via CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Hannah M. Kieschnick
Hannah M. Kieschnick