# 23-303

In the United States Court of Appeals for the Second Circuit

Benzor Shem Vidal,
*Plaintiff-Appellee,*

v.

Advanced Care Staffing, LLC,
*Defendant-Appellant.*

**On Appeal from the United States District Court for the Eastern District of New York, No. 1:22-cv-05535-NRM-MMH**

**REPLY BRIEF OF DEFENDANT-APPELLANT ADVANCED CARE STAFFING, LLC**

Christopher J. Merken
Julia M. Curley
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Tel: (215) 994-4000
christopher.merken@dechert.com
julia.curley@dechert.com

David N. Kelley
Nicolle L. Jacoby
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Tel: (212) 698-3500
david.kelley@dechert.com
nicolle.jacoby@dechert.com

(*continued on inside cover*)

Proloy K. Das
Sami Asaad
FORDHARRISON LLP
CityPlace II
185 Asylum Street, Ste. 820
Hartford, CT 06103
Tel: (860) 740-1355
pdas@fordharrison.com
sasaad@fordharrison.com

***Counsel for Defendant–Appellant Advanced Care Staffing, LLC***

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................ 1

ARGUMENT ..................................................................................... 7

I.    THE PARTIES CLEARLY AND UNAMBIGUOUSLY DELEGATED QUESTIONS OF ARBITRABILITY TO AN ARBITRATOR. ........................ 7

II.   THE DELEGATION CLAUSE IS NEITHER UNCONSCIONABLE NOR UNENFORCEABLE. ............................................................... 14

     A.    The TVPA Does Not Render The Delegation Clause Unconscionable. ................................................................ 14

     B.    New York Law Does Not Render The Delegation Clause Unconscionable. ................................................................ 25

          i.    There Was No Procedural Unconscionability. ....................... 25

          ii.   There Was No Substantive Unconscionability. ...................... 29

III.  VIDAL DOES NOT FACE IRREPARABLE HARM. ...................................... 34

CONCLUSION .................................................................................. 37

## <u>TABLE OF AUTHORITIES</u>

CASES                                                                 Page(s)

*Am. Fam. Life Assurance Co. of N.Y. v. Baker,*
    778 F. App'x 24 (2d Cir. 2019) ............................................................ 32

*Arrigo v. Blue Fish Commodities, Inc.,*
    408 F. App'x 480 (2d Cir. 2011)............................................................ 11

*Brower v. Gateway 2000, Inc.,*
    246 A.D.2d 246 (1st Dep't 1998) .......................................................... 30

*Brown v. Peregrine Enters., Inc.,*
    2023 WL 8800728 (2d Cir. Dec. 20, 2023) ........................................... 31

*Ciago v. Ameriquest Mortg. Co.,*
    295 F. Supp. 2d 324 (S.D.N.Y. 2003) .................................................. 26

*Coinbase, Inc. v. Bielski,*
    599 U.S. 736 (2023) ............................................................................... 6

*Collins & Aikman Prod. Co. v. Bldg. Sys., Inc.,*
    58 F.3d 16 (2d Cir. 1995).......................................................................... 2

*Contec Corp. v. Remote Sol. Co.,*
    398 F.3d 205 (2d Cir. 2005)............................................................... 7, 8

*In re Currency Conversion Fee Antitrust Litig.,*
    265 F. Supp. 2d 385 (S.D.N.Y. 2003) .................................................. 31

*Daileader v. Certain Underwriters at Lloyd's London – Syndicate 1861,*
    2023 WL 3026597 (S.D.N.Y. Apr. 20, 2023) ...................................... 35

*Dale Carmen v. Health Carousel, LLC,*
    2021 WL 2476882 (S.D. Ohio June 17, 2021)................................. 19, 21

*Daly v. Citigroup Inc.,*
    939 F.3d 415 (2d Cir. 2019)................................................................. 23

*DDK Hotels, LLC v. Williams-Sonoma, Inc.,*
    6 F.4th 308 (2d Cir. 2021) ...........................................................*passim*

*Doctor's Assocs., Inc. v. Jabush,*
    89 F.3d 109 (2d Cir. 1996).............................................................. 30, 31

*Doctor's Assocs., LLC v. Tripathi,*
    794 F. App'x 91 (2d Cir. 2019) ........................................ 8

*Epic Sys. Corp. v. Lewis,*
    138 S. Ct. 1612 (2018) ...................................................... 23

*F.T.C. v. Standard Oil Co.,*
    449 U.S. 232 (1980) .................................................... 6, 35

*First Options of Chi., Inc. v. Kaplan,*
    514 U.S. 938 (1995) .......................................................... 7

*Gilmer v. Interstate/Johnson Lane Corp.,*
    500 U.S. 20 (1991) ........................................................... 23

*Granite Rock Co. v. Int'l Bhd. of Teamsters,*
    561 U.S. 287 (2010) .......................................................... 22

*Haaland v. Brackeen,*
    599 U.S. 255 (2023) ........................................................... 3

*Hensley v. Eckerhart,*
    461 U.S. 424 (1983) .......................................................... 33

*Holick v. Cellular Sales of N.Y., LCC,*
    48 F.4th 101 (2d Cir. 2022) ........................................... 33

*Howsam v. Dean Witter Reynolds, Inc.,*
    537 U.S. 79 (2002) ............................................................. 7

*JHT Tax, LLC v. Agnant,*
    62 F.4th 658 (2d Cir. 2023) ........................................... 34

*Molina v. Kaleo, Inc.,*
    363 F. Supp. 3d 344 (S.D.N.Y. 2019) ......................... 29

*Morgan v. Sundance, Inc.,*
    596 U.S. 411 (2022) .................................................. 22, 23

*NASDAQ OMX Grp., Inc. v. UBS Sec., LLC,*
    770 F.3d 1010 (2d Cir. 2014) .......................................... 7

*New Prime Inc. v. Oliveira,*
    139 S. Ct. 532 (2019) ....................................................... 22

*PacifiCare Health Sys., Inc. v. Book,*
    538 U.S. 119 (2003) .......................................................... 17

*Paguirigan v. Prompt Nursing Emp. Agency LLC,*
  2019 WL 4647648 (E.D.N.Y. Sept. 24, 2019)............................................. 18, 19, 21

*Pryce v. Progressive Cas. Ins. Co.,*
  2022 WL 2467013 (E.D.N.Y. June 10, 2022)........................................................ 35

*Ragone v. Atl. Video at Manhattan Ctr.,*
  595 F.3d 115 (2d Cir. 2010).................................................................. 28, 29, 30

*Rent-A-Ctr., W., Inc. v. Jackson,*
  561 U.S. 63 (2010) ..........................................................................................*passim*

*Sablosky v. Edward S. Gordon Co.,*
  535 N.E.2d 643 (N.Y. 1989)............................................................................... 32

*Top Choice Distribs., Inc. v. U.S. Postal Serv.,*
  1996 WL 756907 (W.D.N.Y. Dec. 26, 1996).......................................................... 35

*UBS Sec., LLC v. Voegeli,*
  405 F. App'x 550 (2d Cir. 2011)........................................................................ 34

*United States v. Fruehauf,*
  365 U.S. 146 (1961) .......................................................................................... 3

*Viking River Cruises, Inc. v. Moriana,*
  142 S. Ct. 1906 (2022) ................................................................................. 22, 36

**STATUTES**

9 U.S.C. § 402.................................................................................................... 24

**OTHER AUTHORITIES**

David Horton, *The Limits of the Ending Forced Arbitration of Sexual
  Assault and Sexual Harassment Act,* 132 YALE L.J. FORUM 1 (2023) ................. 24

**INTRODUCTION**

Plaintiff Benzor Shem Vidal and his opportunistic *amici* ignore Supreme Court and Second Circuit caselaw, reject Congress' directives, and misrepresent facts, all to advance their policy preference of outlawing employer-employee arbitration agreements. Vidal and his *amici* would have this Court issue a sweeping opinion ending employment-based arbitration agreements. But the proper vehicle for achieving policy preferences is lobbying Congress, not this appeal.

The question before this Court is whether the District Court properly issued a preliminary injunction against Advanced Care Staffing, LLC's ("ACS") breach of contract arbitration against Vidal.[1] Vidal sought

_____

[1] As noted in ACS' Opening Brief, there is some confusion concerning both the scope of the District Court's Order and the proper standard of review on appeal. This confusion derives primarily from the District Court's statement that it was denying ACS' request for a pre-motion conference with respect to its motion to compel "as moot." SPA-2. Because a preliminary injunction's purpose is merely to preserve the *status quo* until the court resolves a case's merits, the District Court's preliminary injunction did not "moot" the issues ACS proposed to address in its motion to compel. Accordingly, it is unclear whether the District Court's Order was intended simply to remove ACS' request from the docket as an administrative matter or if it was in fact intended to be a determination on the merits that the Court would determine the issue of arbitrability. In his brief, Vidal, asserts that the only decision at issue in this appeal is the decision preliminarily enjoining ACS' arbitration against him. Opposition Br. ("Opp. Br.") at 16–17. According to Vidal the District

1

the injunction for a narrow purpose: "so the Court can decide the threshold issue of whether the arbitration provision contains a clear and unmistakable delegation clause, and if it does, whether that clause is valid and enforceable." A-119. The District Court did not address the sweeping policy questions raised by Vidal and his *amici*, and this Court should likewise decline to decide issues irrelevant to the Order on appeal.

Putting aside the handwringing in inapposite *amici* briefs, including those filed by the U.S. Department of Labor ("DOL"),[2] Public

---

Court was merely "act[ing] within its discretion to manage its docket," and that therefore nothing in the District Court's Order precludes ACS from filing a motion to compel on the issue of arbitrability if the Order is affirmed. *Id.* at 17. Therefore, Vidal asserts, the appropriate standard of review here is abuse of discretion. If this reading of the Order is correct, it is accurate that the Order should be reviewed for abuse of discretion. But if the District Court meant to deny ACS' motion on the merits, the standard of review is *de novo. Collins & Aikman Prod. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 19 (2d Cir. 1995). Since, regardless of the standard applied, the Order was erroneous and should be vacated, ACS assumes the abuse of discretion standard applies.

[2] DOL concedes its argument is not properly before this Court. DOL Br. at 9 (conceding that "the district court did not reach Vidal's FLSA claim" but nevertheless urging the Court to "take this opportunity to clarify" an area of law that had no bearing on the District Court's Order); *see also* SPA-18 at n.1 (explaining that although Vidal argued "the delegation clause and arbitration agreement violate federal . . . labor laws . . . the Court need not address these other claims and reserves decision on these claims for the merits stage"). DOL admits that it seeks an advisory opinion. DOL Br. at 9–10 ("The issue of 'loser pays' agreements have not

Justice,[3] and a collection of advocacy groups, it is clear that the District Court erred in concluding that Vidal was likely to succeed in demonstrating that (1) his arbitration agreement's delegation clause—in which the parties delegated questions of arbitrability to an arbitrator—was not clear and unambiguous, and (2) the delegation clause was unconscionable and, thus, unenforceable.[4]

---

arisen frequently in the case law . . . [b]ut both employees and employers would benefit greatly from appellate case law indicating whether 'loser pays' provisions are permissible under the FLSA, hence the Acting Secretary's request that the Court address the issue here."). Such advisory opinions are unconstitutional. *See, e.g.*, *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023) (explaining "Article III's strict prohibition on issuing advisory opinions.") (cleaned up); *United States v. Fruehauf*, 365 U.S. 146, 157 (1961). Accordingly, DOL's brief should not be considered.

[3] Public Justice's brief is also irrelevant. ***First***, Public Justice concedes the District Court "expressly declined" to reach the question of severability of the arbitration agreement's fee-shifting provision as premature, "but nonetheless responds to ACS's specific arguments should remedies be relevant now." Pub. Justice Br. at 4 n.3. ***Second***, although Public Justice broadly contends ACS "urges this Court to apply an arbitration-specific rule of severance," ACS agrees the District Court properly declined to reach the severability question at the preliminary injunction stage; indeed, the District Court could *only* consider the delegation clause. Accordingly, Public Justice's brief should be disregarded.

[4] The Court's inquiry is constrained to the delegation clause, and should not consider the whole arbitration agreement or the employment agreement. *See, e.g.*, *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010) (explaining that "a party's challenge to another provision of the

***First***, the parties' delegation clause clearly and unambiguously delegated questions of arbitrability to the arbitrator:

> [***A***]***ny*** dispute, controversy or claim arising between [Vidal] and [ACS] (including a dispute, controversy or claim arising out of, in connection with, or relating to, this Agreement, or the interpretation, performance or breach, termination ***or validity hereof***) shall be resolved by arbitration pursuant to this dispute resolution provision (the "Provision").

A-249 (emphases added). The parties also agreed that the American Arbitration Association (the "AAA") would administer arbitrations, and that the AAA's Commercial Arbitration Rules (the "Commercial Rules") would govern the arbitration. *Id.* The delegation clause included a link to the Commercial Rules. *Id.*

The delegation clause's plain language and incorporation of the Commercial Rules confirms the parties' clear and unambiguous delegation of questions of arbitrability to an arbitrator and should end the Court's inquiry. *See DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 318 (2d Cir. 2021) (explaining that "[i]n determining whether the arbitrability of a dispute is to be resolved by the court or the arbitrator, the arbitration agreement is determinative," and that

---

contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate.").

"[w]here the parties explicitly incorporate procedural rules that empower an arbitrator to decide issues of arbitrability, that incorporation may serve as clear and unmistakable evidence of the parties' intent to delegate arbitrability to an arbitrator.") (cleaned up).

**Second**, the District Court erred by concluding that Vidal was likely to succeed in demonstrating that the delegation clause was unconscionable and unenforceable. Neither the Trafficking Victim Protections Act (the "TVPA") nor New York law renders the delegation clause unconscionable. Vidal and his *amici* demand that this Court ignore both Supreme Court authority and Congressional intent and create a novel doctrine that employers and employees can never enter arbitration agreements because those agreements, and delegation clauses in them, violate the TVPA. This *per se* rule would render the Federal Arbitration Act (the "FAA") a dead letter. This Court should reject such an invitation.

**Finally**, the District Court erred by concluding that Vidal made a strong showing of irreparable harm. The District Court incorrectly found that "Vidal has demonstrated a likelihood of specific irreparable harm in the form of time, energy, and expense in defending himself before the

arbitrator." SPA-50. But decades of Supreme Court authority foreclose this finding. *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 746 (2023) ("[C]ourts . . . often do not consider litigation-related burdens . . . to constitute irreparable harm."); *F.T.C. v. Standard Oil Co.*, 449 U.S. 232, 244 (1980) ("[T]he expense and annoyance of litigation is part of the social burden of living under government" and "[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury.") (cleaned up).

\* \* \*

In preliminarily enjoining ACS' arbitration against Vidal, the District Court committed reversible error. Accordingly, ACS respectfully requests that this Court vacate the District Court's order and remand so ACS may properly arbitrate its claims against Vidal.

## ARGUMENT

## I. The Parties Clearly And Unambiguously Delegated Questions Of Arbitrability To An Arbitrator.

Because ACS satisfied its burden of establishing "a clear and unmistakable expression of the parties' intent to submit arbitrability disputes to arbitration," *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1032 (2d Cir. 2014) (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)), the District Court erred by overriding ACS and Vidal's decision to let an arbitrator decide questions of arbitrability.

This Court recently explained that "[i]n determining whether the arbitrability of a dispute is to be resolved by the court or the arbitrator, the arbitration agreement is determinative." *DDK Hotels*, 6 F.4th at 318 (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)). And "[w]here the parties explicitly incorporate procedural rules that empower an arbitrator to decide issues of arbitrability, that incorporation may serve 'as clear and unmistakable evidence of the parties' intent to delegate arbitrability to an arbitrator.'" *Id.* (quoting *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005)). In *DDK Hotels*, this Court evaluated the Commercial Rules to determine whether those rules empowered an arbitrator to determine questions of arbitrability. *Id.*

There, this Court concluded that "[b]ecause the AAA Commercial Arbitration Rules . . . explicitly empower an arbitrator to resolve questions of arbitrability, we have found incorporation of these rules into an arbitration agreement to be relevant in evaluating whether there is clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the arbitrator.'" *Id.* (citing *Contec Corp.*, 398 F.3d at 208 and *Doctor's Assocs., LLC v. Tripathi*, 794 F. App'x 91, 94 (2d Cir. 2019)).

To be sure, incorporation of the Commercial Rules "does not, *per se*, demonstrate clear and unmistakable evidence of the parties' intent to delegate threshold questions of arbitrability to the arbitrator where other aspects of the contract create ambiguity as to the parties' intent." *Id.* But those ambiguities arise where parties demonstrate an intent to exclude certain claims from arbitration, as in *DDK Hotels*, not where a delegation clause is facially unambiguous and ambiguity is manufactured by relying on unrelated provisions elsewhere in a contract. *See id.*

No ambiguity exists in the delegation clause here, and the clause is not narrow or vague and does not contain "exclusionary language suggesting that the parties consented to arbitrate only a limited subset of disputes[.]" *Id.* at 319. Instead, the District Court used a standard savings clause permitting a court to modify the entire arbitration agreement, if necessary, to inject ambiguity into the delegation clause. *See* SPA-21–23. This effort to undermine a facially unambiguous delegation clause based on language in a provision unrelated to delegation and found elsewhere in the agreement was in error. The savings clause explained:

> [I]n the event that any court of competent jurisdiction shall determine that any portion of this [arbitration agreement] exceeds the scope permitted by applicable law, the court shall have the authority to modify or 'blue pencil' such portion so as to render it enforceable while maintaining the parties' original intent to the maximum extent possible.

A-250. The District Court reasoned that this savings clause "must be read in context" with the delegation provision, SPA-21, and concluded that the delegation clause was unclear. But this "contextualizing" runs afoul of the Supreme Court's direction that, under the FAA, when a party asks a court to enforce a delegation clause, that clause should be considered separately from the entire arbitration agreement. *See Rent-*

9

*a-Ctr.*, 561 U.S. at 71–72. "A written provision to settle by arbitration a controversy is valid, irrevocable, and enforceable *without mention* of the validity of the contract in which it is contained. Thus, a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate." *Id.* at 70 (cleaned up).

Here, the District Court ignored the Supreme Court and improperly used a separate contractual provision to create ambiguity in an unambiguous delegation clause. Properly read, the delegation clause (with its incorporation of the Commercial Rules) clearly and unambiguously delegated questions of arbitrability to an arbitrator.[5]

---

[5] Vidal contends that the Commercial Rules were not effectively incorporated by reference because "those rules expressly disclaim their applicability to employment disputes, and instead say any such disputes are to be resolved under the Employment Rules." Opp. Br. at 27. This argument is wrong. ***First***, the Commercial Rules footnote on which Vidal relies does not say that parties in an employment relationship cannot agree to arbitrate using the Commercial Rules. Rather, it states that the Employment Rules apply to arbitrations pursuant to an "employment plan." Vidal's case involves a specific agreement to arbitrate between an employer and employee, not a "plan." In such a case, all the Commercial Rules footnote states is that the Employment Rules fee schedule applies, which is undisputed and entirely consistent with the statement in the parties' agreement that "[t]he costs for initiating arbitration will be governed by the AAA's policy on costs for employment-related disputes."

Even if ACS' decision to include a savings clause permitting judicial blue-pencilling was properly considered, it did not cloud the unambiguous agreement to delegate questions of arbitrability—instead, (at most) it allowed a court to conform the entire arbitration agreement to developments in the law. *See Arrigo v. Blue Fish Commodities, Inc.*, 408 F. App'x 480, 482 (2d Cir. 2011) ("While [one] provision is somewhat garbled, its opacity does not render ambiguous the clear, unequivocal, broad and emphatic arbitration provision. Therefore, we must treat the arbitration provision as valid and leave the unscrambling of the [other] provision to the arbitrator.").

The District Court also attempted to justify rejecting the delegation clause's clear language based on unsupported speculation that "it is highly unlikely that a foreign nurse unfamiliar with United States law, let alone caselaw surrounding the interpretation of arbitration agreements, would see a reference to the AAA Commercial Rules in the contract and reach the same conclusion, *i.e.*, understand that such

---

A-249. **Second**, regardless of which rules ACS ultimately agrees would govern its arbitration with Vidal, the parties' agreement specifically incorporated the Commercial Rules, which unequivocally delegate arbitrability determinations to the arbitrator.

incorporation would in any way reflect an actual 'intent to delegate the question of arbitrability to the arbitrator.'" SPA-24 (cleaned up). The District Court went even further, hypothesizing that "even if Vidal had followed the link in the 2022 Contract and reviewed the AAA Commercial rules, he still may not be aware of or understand that those rules might impact who would someday decide any challenges to arbitrability." *Id.*[6]

Such conjecture, without evidentiary citation or support, was in error. There was no evidence that Vidal, a well-educated professional and fluent English speaker, did not understand that the AAA, and not a court, would decide threshold questions of arbitrability. Nor is there any evidence that Vidal was unaware of, or did not understand, the Commercial Rules. In fact, Vidal, when presented with the arbitration agreement was offered an opportunity to consider it and to ask any questions he might have concerning the agreement. Vidal, however, who

---

[6] The Commercial Rules plainly state that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim, without any need to refer such matters first to a court." A-62. Further, this Court in *DDK Hotels* concluded that the Commercial Rules "explicitly empower an arbitrator to resolve questions of arbitrability." *DDK Hotels*, 6 F.4th at 318.

was living and working as a nurse in England, executed the agreement hours after having received it. Ignoring these facts, the District Court instead hypothesized that Vidal, or any foreign nurse, might not understand that he was agreeing to permit an arbitrator to decide questions of arbitrability. But those hypotheticals ignore the facts.

\*     \*     \*

Because ACS demonstrated the parties' clear and unambiguous delegation of questions of arbitrability to an arbitrator, the District Court committed reversible error when it ignored that clear and unambiguous delegation, disregarded the parties' intent, and stitched together disparate sections of the broader arbitration agreement to inject ambiguity into the delegation provision.

## II. The Delegation Clause Is Neither Unconscionable Nor Unenforceable.

The District Court erred by concluding that the TVPA or New York law likely rendered the delegation clause unconscionable.

### A. The TVPA Does Not Render The Delegation Clause Unconscionable.

Vidal and his *amici*'s[7] TVPA arguments are broad challenges to the alleged fee- and cost-shifting provisions of the parties' agreement that are unrelated to the delegation clause at issue in this appeal. Because neither the TVPA nor caselaw suggest that Vidal's TVPA "defense"

---

[7] Like the DOL and Public Justice briefs, the *amicus* brief submitted by various human rights and labor rights organizations (the "Human Rights Brief") is irrelevant. The brief, which is nothing more than a broadside against arbitration generally, incorrectly states that "[t]his is a human trafficking case." Human Rights Br. at 1. But this is a case about whether a delegation clause is clear and unambiguous, not human trafficking; indeed, Vidal does not assert TVPA claims and has never alleged he was trafficked. Although the brief irresponsibly lobs invective about ACS and staffing agencies generally, it fails to address any issues before this Court. Instead, the Human Rights Brief seems to be arguing that the use of arbitration, which it derides as "complex and secretive," is always prohibited by the TVPA. *Id.* at 19. The TVPA, however, is silent about the use of arbitration and the organizations' position is plainly inconsistent with the FAA, the Supreme Court, and this Court, all of which make clear that agreements to arbitrate should be honored in accordance with their terms. In its last few pages, the Human Rights Brief finally addresses *this* case, but simply regurgitates one distinguishable district court opinion unrelated to arbitration. *Id.* at 22–25. Accordingly, the Human Rights Brief should be accorded no weight.

cannot fairly be resolved in arbitration, these arguments are irrelevant. Although Vidal and his *amici* may dislike employment arbitration agreements, their hostility does not magically transform them from legitimate contracts between employers and employees into TVPA violations.

As the District Court correctly noted, the question is whether the TVPA likely renders the *delegation clause*—not the whole arbitration agreement, and not the employment agreement—unconscionable. SPA-29. Therefore, the question was this: is an arbitrator, instead of a court, determining threshold issues of arbitrability a "serious harm" under the TVPA?

Puzzlingly, despite no reference to arbitration in the TVPA, the District Court answered this question in the affirmative. Although the District Court provided no explanation for its conclusion, it clearly evokes the very sort of judicial hostility to arbitration that the Supreme Court has explained is not a proper basis for rejecting parties' agreements to arbitrate.

The District Court effectively concluded that employers and employees can *never* delegate questions of arbitrability, or indeed enter arbitration agreements. That conclusion is without any reasonable basis and is premised entirely on arguments challenging enforceability of the employment contract generally, not the delegation clause. For instance, Vidal asserts that "ACS explicitly threatened Vidal with legal fees [ACS] would accrue in arbitration in a bid to keep him in his job." Opp. Br. at 30. But this is a basis for challenging ACS' attempt to *bring claims generally* against Vidal; it is not a specific challenge to the delegation clause.

Evaluating the delegation clause does not require, and should not include, evaluating ACS' promise to hold Vidal accountable for his misconduct. In including irrelevant facts, Vidal conflates a straightforward analysis of the *delegation clause* under the TVPA with ACS' conduct as ACS sought to hold Vidal responsible for breaching his contract. Put simply, Vidal faces no "threat of serious harm" if an arbitrator determines questions of arbitrability.[8]

---

[8] The Supreme Court has concluded that a question about whether certain types of damages render an arbitration agreement unenforceable

16

Thus, the District Court should not have considered the rest of Vidal's employment agreement when evaluating whether the TVPA rendered the delegation clause unconscionable. *See Rent-A-Ctr.*, 561 U.S. at 71–72. Assuming the District Court *could* consider the employment agreement's damages clause, it still erred by relying exclusively on authority applying the TVPA to ***liquidated damages provisions*** in employment agreements. *See* SPA-31–32. Vidal's employment agreement did *not* include a liquidated damages provision. *See* SPA-32; *see also* A-244 (explaining ACS may be "entitled to all damages and other relief to redress the harm caused by the failure of [Vidal] to fulfill [his] obligations under this Agreement"); A-193 (explaining Vidal's 2022 contract "eliminate[d] a specified sum of damages and allows for recovery of whatever damages are proven"); A-194 (ACS unconditionally releasing Vidal's $20,000 promissory note).[9]

---

is premature at the threshold question of arbitrability stage and can be decided by an arbitrator. *See PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 119 (2003). ACS contends this case must first proceed to arbitration, and Vidal can challenge certain types of damages (including attorney-fee awards) during, or after, that arbitration concludes.

[9] The District Court invented its own explanations for ACS' decision to move from a liquidated damages contract model to its current contract model. *See* SPA-40 ("ACS's affirmative statement that it revised this

The District Court described this clause as "an uncapped damages provision" and concluded that "the fact that these provisions were uncapped does not make the potential penalties any less coercive than the liquidated damages provisions at issue in the foregoing cases." SPA-32. But "uncapped damages," a phrase found nowhere in the statute or the caselaw, simply means damages determined after a finding of liability—that is, not liquidated damages. The absence of a liquidated damages provision undermines the District Court's conclusion that the TVPA likely rendered the delegation clause unconscionable. To be sure, a few district courts have concluded that in cases where an employer includes a liquidated damages provision for, say, $20,000 or $25,000, an employee may feel compelled to continue working to avoid that automatic $20,000 or $25,000 harm. *See* SPA-31 (citing *Paguirigan v. Prompt*

_____

clause due to 'feedback' was highly misleading, and, in conjunction with the other circumstances, adds to the likelihood that Vidal will succeed on the procedural prong of the unconscionability analysis."); SPA-39 (noting that ACS explained its reasoning for removing the liquidated damages provision but contending that "ACS was no doubt well aware, as of January 2022, a number of courts in this circuit and elsewhere had held that liquidated damages clauses in contracts between staffing agencies and immigrant healthcare workers specifically were unenforceable, because they threatened workers with serious harm in violation of the TVPA."). The District Court made these statements without (and in contravention of) record evidence. This was in error.

*Nursing Emp. Agency LLC*, 2019 WL 4647648, at *18 (E.D.N.Y. Sept. 24, 2019) ($25,000 liquidated damages provision violated the TVPA) and *Dale Carmen v. Health Carousel, LLC*, 2021 WL 2476882, at *7 (S.D. Ohio June 17, 2021) ($20,000 liquidated damages provision violated the TVPA)). However, that reasoning relies on the fact that those liquidated damages clauses were unenforceable penalties that threatened employees with unlawful ***specific financial penalties***. Indeed, the court in *Paguirigan*, the primary case upon which Vidal relies, expressly acknowledged that it is not the inclusion of *any* liquidated damages clause in an agreement that renders it unenforceable under the TVPA; rather, a liquidated damages clause can only constitute a threat of serious harm under the TVPA where it constitutes an unenforceable penalty. *See Paguirigan*, 2019 WL 4647648, at *17 ("[O]f course, there is no prohibition against defendants placing a valid liquidated damages provision in their contracts. The provision at issue here, however, is a penalty under New York law[.]").

It is illogical to extend that reasoning to a contract with no liquidated damages provision. A non-liquidated damages provision—one that states Party A is liable for any damages Party B can prove in

accordance with applicable law—cannot be a "threatened financial penalt[y] serious enough to compel him or her into remaining on the job[,]" SPA-32, for two reasons. ***First***, an employee faced with a damages clause like Vidal's does not know whether the "harm" they would face (*i.e.*, damages awarded for breach of contract) would be "sufficiently serious" because an arbitrator could determine ACS is entitled to zero damages. Indeed, if Vidal wished to assert counterclaims in arbitration (say, for TVPA, FLSA, or New York Labor Law violations), theoretically, he could prevail and end up with a judgment in *his* favor. Thus, it cannot be the law that a contractual provision permitting a party to recover all damages it incurred and can prove to a factfinder is a "threatened financial penalty serious enough to compel him . . . into remaining on the job."[10]

**Second**, taken to its logical conclusion (and to the degree Vidal and his *amici* demand), an employer could never try to recover damages from an employee for breach of contract. The District Court committed error by reasoning that "[w]hether the amount is fixed or projected, employers'

---

[10] Neither Vidal nor his *amici* identify any authority standing for the proposition that an employer merely seeking to recover damages from an employee is an unlawful threat (because no such authority exists).

threats to collect tens of thousands of dollars in contractual damages from hourly workers certainly can violate the TVPA's prohibition on forced labor." SPA-35. That reasoning gives away the game: when an employer seeks to hold an employee liable for breach of contract, the employer violates the TVPA.

No case has gone as far as the District Court in expanding the TVPA's scope. For instance, the court in *Paguirigan*, while rejecting an unenforceable liquidated damages provision, specifically determined that the defendants in that case could proceed with a claim for damages akin to that asserted by ACS in its arbitration with Vidal. *See Paguirigan*, 2019 WL 4647648, at *12 ("Prompt Nursing's counterclaim for breach of contract against the named plaintiff is therefore limited to 'actual damages proven.'"). Similarly, in *Dale Carmen*, the other case on which Vidal relies most heavily, the court noted that "there are all sorts of financial pressures that can arise in the employment setting, and not all of them serve to establish a TVPA violation . . . . Rather, to constitute 'financial harm' under the TVPA, the threatened harm must be in some way improper or illicit." 2021 WL 2476882, at *5–7.

The TVPA does not prohibit employers from (a) suing employees for breach of contract or (b) entering into arbitration agreements with employees. *Amici* laud the District Court's erroneous conclusion that "the very existence of the arbitration clause could likely create a threat of financial harm significant enough to violate the [TVPA]." Human Rights Br. at 12. But that position ignores that Congress enacted the FAA "in response to judicial hostility to arbitration." *Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906, 1917 (2022); *see also New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 543 (2019) ("Congress adopted the [FAA] in an effort to counteract judicial hostility to arbitration and establish 'a liberal federal policy favoring arbitration agreements.'") (cleaned up). The federal policy favoring arbitration is "an acknowledgment of the FAA's commitment to 'overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and to place such agreements upon the same footing as other contracts.'" *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 302 (2010) (cleaned up). The Supreme Court recently reaffirmed that "a court must hold a party to its arbitration contract just as the court would to any other kind." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022).

And courts routinely uphold arbitration of employment-related claims. *See, e.g.*, *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1626–28, 1632 (2018) (confirming arbitrability of FLSA claims and noting that "every circuit to consider the question has held that the FLSA allows agreements for individualized arbitration") (cleaned up); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26, 33 (1991) (confirming ADEA claims are arbitrable because nothing in the statute's text or legislative history "explicitly precludes arbitration."); *Daly v. Citigroup Inc.*, 939 F.3d 415, 422 (2d Cir. 2019) (concluding Title VII and Equal Pay Act claims are arbitrable).

Contrary to this well-established authority, Vidal, his *amici*, and the District Court adopt a different tact:  any time an employee is bound by an arbitration agreement, that agreement could violate the TVPA. Facially, this argument runs afoul of the Supreme Court's guidance to "hold a party to its arbitration contract just as the court would to any other kind." *Morgan*, 596 U.S. at 418.  Simply put, the District Court improperly disfavored an arbitration agreement over another type of dispute-resolution agreement in contravention of the FAA.

Finally, Vidal and his *amici* ignore that Congress can exclude claims from arbitration; it simply has not decided to do so with respect to breach of contract claims by employers against employees. For example, Congress amended the FAA to bar arbitration "with respect to a case which is filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dispute." 9 U.S.C. § 402(a). By contrast, Congress has *not* amended the FAA to bar arbitration of employer-employee breach of contract claims or amended the TVPA to expressly prohibit arbitration of employer-employee disputes.[11] Congress, not this Court, should have the opportunity to determine whether employees and employers can enter arbitration agreements.

---

[11] Congress not only barred the use of arbitration related to sexual assault and harassment but has also abrogated the right to arbitration in other areas. *See* David Horton, *The Limits of the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act*, 132 YALE L.J. FORUM 1, 7 (2023).

**B.    New York Law Does Not Render The Delegation Clause Unconscionable.**

The District Court erred by concluding that Vidal was likely to succeed in demonstrating that the delegation clause was both procedurally and substantively unconscionable.

### i.    There Was No Procedural Unconscionability.

In concluding that Vidal was likely to succeed in demonstrating procedural unconscionability, the District Court emphasized that Vidal signed the 2022 contract while "in a particularly vulnerable position," having moved to London—of his own accord—and quit the job that brought him overseas. SPA-38. But the District Court ignored that when Vidal received the 2022 contract he had already agreed to arbitrate "[a]ll disputes" arising out of his employment with ACS years earlier in the 2019 contract.[12]  A-185.  The District Court therefore erred by finding that Vidal "lacked a meaningful choice" in signing the arbitration agreement due to his personal circumstances in January 2022, where he had already made the choice to arbitrate "[a]ll disputes" between the parties before he left the Philippines, before he moved to London, and

---

[12] Although the 2019 and 2022 arbitration agreements have different wording, they both confirm an unambiguous intent to arbitrate all disputes.  *Compare* A-185, *with* A-237–38.

25

before he quit his job. *Id.*; s*ee, e.g., Ciago v. Ameriquest Mortg. Co.*, 295 F. Supp. 2d 324, 329 (S.D.N.Y. 2003) (finding no procedural unconscionability where plaintiff was notified that "she would eventually have to sign an Arbitration Agreement" but was not provided with the agreement "until she had accepted employment with Ameriquest, quit her previous job and reported for her first day of work"). "At the moment he signed the 2022 Contract," Vidal was merely recommitting to the arbitration process. SPA-38. Thus, the District Court's emphasis on Vidal's personal circumstances in 2022 was in error.

It was another error for the District Court to consider ACS' commentary on the liquidated damages clause to find procedural unconscionability. *See supra* n.9. Initially, the District Court made clear its analysis was limited to "whether the agreement to delegate arbitrability—the delegation clause—[was] *itself* unconscionable." SPA-27. But the District Court focused its procedural unconscionability analysis on statements surrounding a contractual provision unrelated to either the delegation clause or the arbitration agreement.[13] The District

---

[13] As noted above, the District Court theorized without evidentiary support that ACS sought to mislead Vidal by stating that it had struck

Court did not find that ACS deceived or misled Vidal with respect to the arbitration process or, most crucially, the delegation clause. The District Court therefore erred by expanding its analysis beyond the delegation clause and beyond the limits set by the Supreme Court. *See Rent-A-Ctr.,* 561 U.S. at 70 ("A party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate.").

Moreover, the District Court erred in ignoring record evidence which directly undermined Vidal's contention that he was asked to sign the agreement "quickly" and had no opportunity to ask questions until "*after* he had signed the contract." SPA-41. On January 4, 2022, at 12:48 PM, ACS emailed Vidal the 2022 contract, stating "[l]et us know . . . should you have any questions or clarification." A-191–92. The cover letter accompanying the 2022 contract further stated, "[i]f you have any questions before signing, please contact me as soon as possible . . . . If you have no questions, please return a signed copy of the new Employment Agreement to me via email." A-193. And the text directly above the

---

the liquidated damages clause from its prior contract based on "feedback." SPA-40.

signature line in the arbitration agreement stated in bold, "**I understand that I have a right to consult with a person of my choosing, including an attorney, before signing this Provision**." A-238. Despite this evidence, the District Court found that Vidal was not invited to ask questions until "*after* he had signed the contract." SPA-41.

The record also shows that Vidal knew how to ask ACS questions when he had them. For example, on January 13, 2022, Vidal asked ACS to change his facility assignment—ACS granted his request. A-154; A-256. There is no evidence that Vidal approached ACS with concerns regarding the arbitration agreement or the delegation clause before signing the agreement. Rather, Vidal signed the agreement and sent it back to ACS at 4:33 PM—not even four hours after ACS sent it—without asking questions or expressing concern. A-251.

The record makes clear that Vidal signed the arbitration agreement quickly—perhaps without even reading it—and suggests that Vidal acted fast in signing the contract because he was eager to start work with ACS. But this evidence "is of no moment" where the record fails to show that ACS engaged in "high-pressure tactics or deception in procuring [his] signature on the agreement." *Ragone v. Atl. Video at Manhattan Ctr.*,

28

595 F.3d 115, 122 (2d Cir. 2010) (noting that the failure to "read the arbitration agreement before signing it" is "of no moment"); *see also Molina v. Kaleo, Inc.*, 363 F. Supp. 3d 344, 350 (S.D.N.Y. 2019) (finding no procedural unconscionability where employee "was advised that although she could 'technically' take the Agreements home to review, doing so would 'postpone' [her] training and [her] start date'"). Vidal chose to move to London, he chose to quit his job in London before securing a start date with ACS, and he chose to sign arbitration agreements with ACS in both 2019 and 2022. The District Court erred by concluding these circumstances likely demonstrate procedural unconscionability.

### ii. There Was No Substantive Unconscionability.

The District Court also committed error by concluding that Vidal likely demonstrated substantive unconscionability based on the arbitration agreement's cost- and fee-shifting provision where Vidal has not, and will not, incur any arbitration costs or fees. Over a year ago—on December 9, 2022—the Arbitrator determined that the "AAA Employment Arbitration Rules" apply to this dispute. A-460. Those rules require ACS, not Vidal, to pay the costs and fees associated with

arbitration. A-157. Vidal will not incur any costs or fees to arbitrate the threshold issue of arbitrability.

The District Court acknowledged that "once the arbitration began, ACS stipulated that it would agree to bear these [arbitration costs and fees] notwithstanding the contract's language to the contrary, and the arbitrator ratified that agreement." SPA-42. But the District Court then disregarded these facts and concluded that it must "determine the validity of the delegation clause in conjunction with other contractual provisions," including the cost- and fee-shifting provision with respect to arbitration costs and fees. *Id.* That decision was yet another error. *See Ragone*, 595 F.3d at 124 ("New York courts have accepted offers by parties to waive the enforcement of certain provisions of arbitration agreements, and have evaluated those agreements as modified by the parties' after-the-fact waivers.") (citing *Brower v. Gateway 2000, Inc.,* 246 A.D.2d 246, 254–56 (1st Dep't 1998); *see also id.* ("Because unconscionability is an equitable defense to the enforcement of harsh or unreasonable contract terms, a party cannot complain when the defendant through its waivers declines to enforce any potentially unconscionable term.") (citing *Doctor's Assocs., Inc. v. Jabush*, 89 F.3d

109, 113 (2d Cir. 1996)); *In re Currency Conversion Fee Antitrust Litig.,* 265 F. Supp. 2d 385, 411–12 (S.D.N.Y. 2003). This authority is particularly compelling here because the threat of arbitration costs or fees did not discourage Vidal from vindicating any substantive claim for relief—indeed, Vidal has not advanced affirmative claims against ACS. Despite the hypotheticals in DOL's irrelevant *amicus* brief, this is not the case where an employee forfeits a FLSA claim because she fears prohibitively high arbitration costs or where Congress has prohibited fee-shifting to protect employees' substantive rights. Vidal is the defendant in a breach of contract arbitration, and he sought a declaratory judgment in federal court invalidating his arbitration agreement with ACS. Any "chilling effect on [Vidal] enforcing his rights" is facially illusory. SPA-45. The District Court therefore erred by finding that Vidal was likely to succeed in showing that the delegation clause was unconscionable based on a hypothetical scenario in which he would be required to pay the costs and fees of arbitration.[14]

---

[14] To be sure, even if Vidal was required to share the costs and fees of arbitration, this Court has approved the enforceability of such a provision. *See Brown v. Peregrine Enters., Inc., et al.*, No. 22-2959, 2023 WL 8800728, at *2 (2d Cir. Dec. 20, 2023) (enforcing an arbitration agreement requiring the parties to "equally share the costs and expenses

The District Court committed further error by finding that the cost-
and fee-shifting provision with respect to attorneys' fees likely renders
the delegation clause substantively unconscionable.  The District Court
stated, "the agreement shifts . . . attorneys' fees to Vidal if ACS prevails
at arbitration."  SPA-42.  This statement fails to consider its necessary
opposite: if Vidal prevails at arbitration, attorneys' fees shift to ACS.
"Courts assessing the substantive unconscionability of an agreement
consider 'whether one or more key terms are unreasonably favorable to
one party.'"  *Am. Fam. Life Assurance Co. of N.Y. v. Baker*, 778 F. App'x
24, 27 (2d Cir. 2019) (citing *Sablosky v. Edward S. Gordon Co.*, 535
N.E.2d 643, 647 (N.Y. 1989)).  Here, the attorney fee-shifting provision
cannot support a finding of substantive unconscionability because it
favored neither ACS nor Vidal.

The District Court assumed, without citation, that attorneys' fees
necessarily shift on every issue throughout the arbitration such that
Vidal could owe attorneys' fees associated with the question of
arbitrability.  SPA-42.  This Court, however, appreciates that "[m]uch of

---

charged by the AAA . . . during the pendency of the arbitration prior to a
determination of . . . the prevailing party.").

counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis." *Holick v. Cellular Sales of N.Y., LLC*, 48 F.4th 101, 106 (2d Cir. 2022) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983)) (alteration in original). Thus, even if Vidal disputes arbitrability in arbitration and loses, he may ultimately prevail in the arbitration, owe no fees, and win his own attorneys' fees when the arbitration concludes.

Finally, the District Court's substantive unconscionability conclusion defies logic. The District Court's ruling is essentially that (a) Vidal is likely to succeed in invalidating the delegation clause as unconscionable; and (b) Vidal is likely to lose on that same issue and therefore suffer "financial ruin" if arbitration fees shifted to the loser. SPA-43–44. Vidal cannot have it both ways. The District Court cannot reasonably conclude that Vidal is likely to win on his argument that the delegation clause is unenforceable and also lose on that same ground and suffer financial harm.

*     *     *

The District Court committed error by concluding that Vidal was likely to succeed in demonstrating that the delegation clause was both procedurally and substantively unconscionable.

## III. Vidal Does Not Face Irreparable Harm.

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *JHT Tax, LLC v. Agnant*, 62 F.4th 658, 672 (2d Cir. 2023) (cleaned up). For several reasons, the District Court mistakenly concluded that Vidal would suffer irreparable harm.

***First***, no court has concluded a litigant establishes *per se* irreparable harm by arbitrating claims instead of litigating them in court. *Cf.* SPA-49–50. Although this Court has concluded that "[b]eing forced to arbitrate a claim one did not agree to arbitrate constitutes an irreparable harm[.]" *UBS Sec., LLC v. Voegeli*, 405 F. App'x 550, 552 (2d Cir. 2011), the predicate finding for such *per se* irreparable harm is that Vidal did not agree with ACS to arbitrate disputes. Because Vidal *did* agree to arbitrate disputes with ACS, not once, but twice, *see supra* § I; A-249–50, the District Court erred by concluding that Vidal established *per se* irreparable harm.

34

**Second**, the District Court further erred by concluding that "Vidal has demonstrated a likelihood of specific irreparable harm in the form of time, energy, and expense in defending himself before the arbitrator." SPA-50. The District Court cited no authority for this proposition, perhaps because it is well-settled that "[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." *Standard Oil*, 449 U.S. at 244 (cleaned up). For decades, courts in this Circuit have agreed. *See, e.g.*, *Pryce v. Progressive Cas. Ins. Co.*, 2022 WL 2467013, at *2 (E.D.N.Y. June 10, 2022) ("Courts within the Circuit . . . have consistently held that a movant is not irreparably harmed by the prospect of litigation costs, even if substantial."); *Daileader v. Certain Underwriters at Lloyd's London – Syndicate 1861*, 2023 WL 3026597, at *15 (S.D.N.Y. Apr. 20, 2023) (explaining that "[b]ecause financial harm alone is generally insufficient to establish irreparable harm, litigation costs do not constitute irreparable harm for purposes of a preliminary injunction" and collecting cases); *Top Choice Distribs., Inc. v. U.S. Postal Serv.*, 1996 WL 756907, at *2 (W.D.N.Y. Dec. 26, 1996) ("[I]f litigation costs could be considered irreparable harm, then

any time a suit is brought, someone would have grounds for an injunction merely because of the cost of the litigation.") (cleaned up).

Moreover, the District Court's irreparable harm analysis amplifies its hostility toward arbitration. The District Court reasoned that "for Vidal, the financial costs of participating *in arbitration* could constitute irreparable harm," and that "taking shifts off work to attend arbitration proceedings or responding to discovery requests may have outsized consequences." SPA-50 (emphasis added); SPA-51 (noting that "Vidal's specific expenditures of time and resources in defending himself against *this arbitration*" constitute irreparable harm) (emphasis added). But these alleged costs are not unique to arbitration, and therefore provide no basis for finding irreparable harm specifically tied to Vidal having to participate *in arbitration*. Vidal is litigating his declaratory judgment action in federal court, which will result in him attending proceedings, responding to discovery requests, and otherwise engaging in the litigation. This strain of judicial hostility toward arbitration is precisely what Congress intended to ameliorate with the FAA. *See Viking River Cruises*, 142 S. Ct. at 1917.

Accordingly, the District Court committed reversible error in concluding that Vidal demonstrated irreparable harm.

## CONCLUSION

The preliminary injunction should be vacated and this action should be remanded to the District Court.

Dated:    December 26, 2023
              New York, New York

*/s/ David N. Kelley*

Christopher J. Merken
Julia M. Curley
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Tel: (215) 994-4000
christopher.merken@dechert.com
julia.curley@dechert.com

David N. Kelley
Nicolle L. Jacoby
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Tel: (212) 698-3500
david.kelley@dechert.com
nicolle.jacoby@dechert.com

Proloy K. Das
Sami Asaad
FORDHARRISON LLP
CityPlace II
185 Asylum Street, Ste. 820
Hartford, CT 06103
Tel: (860) 740-1355
pdas@fordharrison.com
sasaad@fordharrison.com

**Counsel for Defendant–Appellant Advanced Care Staffing, LLC**

## CERTIFICATE OF COMPLIANCE

This Petition complies with the type-volume limitation of Second Circuit Local Rule 32.1(a)(4)(B) and this Court's December 20, 2023 Order, *see* Dkt. No. 142, because it contains 7,416 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This Petition complies with the typeface and type style requirements of Second Circuit Local Rule 32.1(a) and Federal Rule of Appellate Procedure 32(a) because it was prepared using Microsoft Word in 14-point Century Schoolbook font.

Dated:      December 26, 2023
            New York, New York

/s/ *David N. Kelley*
David N. Kelley
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Tel: (212) 698-3500
david.kelley@dechert.com

**Counsel for Defendant-Appellant Advanced Care Staffing, LLC**

# CERTIFICATE OF SERVICE

I hereby certify that on December 26, 2023, I caused the foregoing document to be electronically filed with the Clerk of Court for the United States Court of Appeals for the Second Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated:     December 26, 2023
           New York, New York


                          */s/ David N. Kelley*
                          David N. Kelley
                          DECHERT LLP
                          Three Bryant Park
                          1095 Avenue of the Americas
                          New York, NY 10036
                          Tel: (212) 698-3500
                          david.kelley@dechert.com

                          ***Counsel for Defendant-Appellant
                          Advanced Care Staffing, LLC***